UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| IN RE VIVENDI UNIVERSAL, S.A. SECURITIES LITIGATION | 02 Civ. 5571 (RJH) (HBP) **REVISED MEMORANDUM OPINION AND ORDER**[*] |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiffs bring this securities fraud class action against defendants Vivendi Universal, S.A. ("Vivendi") and its two most senior former officers, Jean-Marie Messier (former CEO) and Guillaume Hannezo (former CFO), individually and on behalf of similarly situated Vivendi security purchasers.  Plaintiffs allege that defendants' materially false and misleading statements caused Vivendi securities to trade at artificially inflated prices, and further, that defendants induced them to purchase or otherwise acquire Vivendi securities pursuant to a registration statement and prospectus dated October 30, 2000, issued in connection with the December 8, 2000 three-way merger of Vivendi, Seagram Company Limited ("Seagram") and Canal Plus, S.A. ("Canal Plus"), in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, and Sections 11, 12(a) , and 15 of the Securities Act of 1933 ("Securities Act"), as amended, 15 U.S.C. § 77k, respectively.[1]

---

[*] The Court's Memorandum Opinion and Order entered on March 26, 2007 is hereby revised to correct typographical errors on page two and sixty-eight that incorrectly stated that plaintiff's proposed class period begins on October 20, 2000; plaintiff's proposed class period begins on October 30, 2000.

[1] The Section 12(a)(2) claim as alleged against defendant Hannezo in his individual capacity was dismissed in *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 187 (S.D.N.Y. 2003), and was not repleaded in the first amended consolidated class action complaint.  (*See* Stipulation and Order [107] , Dec. 17, 2003.)  The Section 12(a)(2) claim as alleged against defendant Messier remains.

Plaintiffs now move to certify a class pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure consisting of all persons, foreign and domestic, who purchased or otherwise acquired ordinary shares or American Depository Shares ("ADSs") of Vivendi Universal, S.A. between October 30, 2000 and August 14, 2002. For the reasons discussed below, the Court grants plaintiffs' motion [234] in part and denies it in part.

## BACKGROUND

**Prior History**

This litigation was commenced on July 18, 2002 with the filing of the original complaint.  On August 19, 2002, plaintiffs filed an amended consolidated complaint.  By Order dated October 1, 2002, the Hon. Harold Baer, Jr., to whom this action was originally assigned, consolidated fourteen related actions against Vivendi.  On January 7, 2003, plaintiffs filed a consolidated class action complaint.  Additional shareholder cases were consolidated herewith by Orders dated July 25, 2003 and September 3, 2003.  By notice dated January February 24, 2003, defendants moved to dismiss the consolidated class action complaint arguing, *inter alia*, that the Court lacked subject matter jurisdiction over the claims brought by foreign class members who acquired Vivendi's ordinary shares on foreign exchanges.  Applying the "conduct test" to determine whether extraterritorial application of the federal securities laws was warranted, Judge Baer, by opinion dated November 4, 2003, denied defendants' motion to dismiss for lack of subject matter jurisdiction.  *See In re Vivendi Universal, S.A.*, 381 F. Supp. 2d at 169. Judge Baer concluded that plaintiffs' complaint adequately alleged that "'defendants' conduct in the United States was more than merely preparatory to the fraud, and

particular acts or culpable failures to act within the United States directly caused losses to foreign investors abroad.'" *Id.* (quoting *Alfadda v. Fenn*, 935 F.2d 475, 478 (2d Cir. 1991)); *see also id.* at 170 (inferring "that the alleged fraud on the American exchange was a 'substantial' or 'significant contributing cause' of [foreign investor's] decision[s] to purchase [Vivendi's] stock abroad") (bracketed language in original, citation omitted).

Plaintiffs filed a first amended consolidated class action complaint ("FACC") on November 24, 2003.  Shortly thereafter, on December 4, 2003 this case was reassigned to this Court.  Defendants then moved for reconsideration of Judge Baer's order, which this Court denied by order dated September 21, 2004.  The Court issued a separate Memorandum Opinion and Order addressing one of the many issues raised in defendants' motions for reconsideration; namely, whether this Court has subject matter jurisdiction over foreign plaintiffs' claims pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  *See In re Vivendi Universal, S.A.*, No. 02 Civ. 5571 (RJH), 2004 WL 2375830 (S.D.N.Y. Oct. 22, 2004).  In concluding that the claims of foreign class members who acquired Vivendi's ordinary shares on foreign exchanges were properly before the Court and subject to U.S. federal securities laws, the Court reasoned that the United States–based conduct alleged by plaintiffs "significantly contributed to the alleged fraud and that such conduct directly caused foreign investors' alleged losses."  *Id.* at *7 (citing *Europe & Overseas Commodities Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 128–29 (2d Cir. 1998)).

By notice dated July 15, 2005, plaintiffs filed a substituted motion to certify a class pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.[2]  As

---

[2]  In the First Amended Consolidated Complaint, plaintiffs defined the proposed class as follows:

noted, the proposed class consists of all persons who purchased or otherwise acquired

Vivendi ordinary shares or ADSs between October 30, 2000 and August 14, 2002.  The

motion seeks appointment of plaintiffs Olivier M. Gerard, the Retirement System for

General Employees of the City of Miami Beach ("RSMB"), Bruce Doniger, Gerard

Morel, Capital Invest Die Kapitalanlagegesellschaft der Bank Austria Creditanstalt

Gruppe GmbH (in its capacity as manager of and attorney-in-fact for APK EU-Big Caps

Fund) ("Capital Invest"), and William Cavanagh (collectively, "proposed class

representatives"), as class representatives, and Milberg, Weiss, Bershad & Shulman LLP

and Abbey Gardy, LLP as class counsel.  (*Id.*)

**Factual Background**

Vivendi is a corporation organized under the laws of France.  It is a global

conglomerate engaged in business in two primary areas:  "Media and Communications"

and "Environmental Services."  (FACC ¶ 30.)  Throughout the class period, Vivendi's

total number of outstanding shares (ordinary shares and ADSs inclusive) was

approximately 1.08 billion.  (Declaration of François Bisiaux in Support of Vivendi

Universal, S.A's Opposition to Plaintiffs' Motion for Class Certification, Sept. 30, 2005

---

(a) on behalf of themselves and all persons who purchased or otherwise acquired
the common stock and American Depository Shares ("ADSs") of Vivendi (the
"Purchaser Class") between October 30, 2000 and August 14, 2002 inclusive
(the "Class Period"), alleging violations of the Securities Exchange Act of 1934
(the "Exchange Act"); (b) on behalf of themselves and all persons who acquired
Vivendi's common stock or ADSs (the "Merger Subclass") pursuant to a
registration statement and prospectus dated October 30, 2000 issued in
connection with the three-way merger (the "Merger") of Vivendi, S.A., The
Seagram Company Limited ("Seagram") and Canal Plus, S.A. ("Canal Plus")
that created Vivendi Universal, S.A., alleging violations of the Securities Act of
1933 (the "Securities Act"); and (c) on behalf of themselves and all persons who
were shareholders of Vivendi or Seagram as of November 25, 2000 and entitled
to vote on the Merger (the "Proxy Subclass") pursuant to the Joint Proxy
Statement-Prospectus issued in connection with the Merger, alleging violations
of the Exchange Act.

(FACC ¶ 1.)  Plaintiffs' class certification motion and supporting memoranda do not propose any
subclasses for certification.

("Bisiaux Decl."), Exs. 1–5.)  Approximately twenty-five percent of these were held by United States shareholders.  (*Id.*)  Around thirty-seven percent of Vivendi's total shares were held by French shareholders.  (*Id.*)  The remainder of Vivendi's shares were held predominantly by non-French but European persons or entities, and a small percentage (around five percent) was consistently held by shareholders in other unidentified countries.  (*Id.*)  During this time, virtually all of Vivendi's ADSs—which traded on the NYSE—were held by persons or entities in North America, while virtually all of Vivendi's ordinary shares—traded predominantly on the Paris Bourse—were held by persons or entities outside the United States, predominantly in France and the rest of Europe.  (Bisiaux Decl. ¶ 7.)

Beginning in June of 1996, at which time defendant Messier became CEO and defendant Hannezo was CFO, Vivendi (then Générale des Eaux, and later, as of April 1999, Vivendi, S.A.) embarked upon a massive acquisitions venture, which included a number of multi-billion dollar purchases.  (FACC ¶¶ 48–51.)  Vivendi purchased substantial equity positions in several U.S. companies and non-U.S. companies by using Vivendi stock as payment and by borrowing cash against future earnings.  Financing this growth strategy caused Vivendi to accumulate sizeable debt.  (*Id.* ¶ 50.)  Plaintiffs allege that in order to sustain Vivendi's growth strategy, the company was compelled to continue reporting favorable financial results (*see id.* ¶ 53), resulting in a series of false and misleading public statements reporting "better than expected" and "strong" financial results, while consistently denying rumored problems (*see generally id.* ¶¶ 56–113), and the filing of financial statements with the United States Securities and Exchange Commission ("SEC") that were materially false and misleading because, *inter alia*, they

failed to timely record goodwill impairments[3] and improperly applied generally accepted accounting principles ("GAAP") (*see generally id.* ¶¶ 54–55, 119–80).

As discussed in Judge Baer's prior opinion denying defendants' motion to dismiss, 381 F. Supp. 2d 158, and this Court's prior supplemental opinion denying defendants' motion for reconsideration, 2004 WL 2375830, the fraud alleged in the FACC was perpetrated, in important part, in the United States.  Vivendi's rapid-expansion scheme involved the acquisition of numerous well-known U.S. entertainment and publishing companies, such as Universal Studios, Houghton Mifflin and USA Networks (FACC ¶ 23), and in order to successfully accomplish this plan, it took on a $21 billion debt while, allegedly, fraudulently assuring all investors through false and misleading reports filed with the SEC and news releases that it had sufficient cash-flow to manage its debts (*id.* ¶¶ 24, 54–192).  Significantly, both of the alleged principal actors in this scheme, Messier and Hannezo, moved to the United States during 2001.  Messier, in particular, moved his primary residence to New York in September 2001, and spent half of his time in the United States from that time through the end of the class period (August 31, 2002), for the stated purpose of increasing United States investments in Vivendi. (*Id.* ¶¶ 69, 77, 90–92, 105.)  Many of the statements alleged to be false and misleading were made by defendant Messier after he had moved to New York.  *See* 2004 WL 2375830, at *4; (*see also* FACC ¶¶ 73–76, 81–97.)

Following the December 8, 2000 merger of Vivendi, Seagram, and Canal Plus, Vivendi repeatedly predicted "strong growth prospects" and touted financial results as

---

[3] Goodwill is the excess of the purchase price over the fair market value of an asset.  It reflects the value of intangible assets like reputation, brand name, good customer relations, good employee relations, any patents and proprietary technology, and other intangibles that improve a company's business.  Goodwill is a value in a company's balance sheet, and is amortized over a period of time.

exceeding even their "too ambitious" expectations.  (*Id.* ¶ 57–68.)  In September 2001—

the same time that Messier and Hannezo moved to the United States—rumors began to

circulate that Vivendi's earnings would be disappointing.  Messier responded by

consistently denying any problems—indeed, until the day before his ultimate resignation

he disavowed there was any serious problem—which quelled some of the negative

speculation.  (*See id.* ¶¶ 73–77.)  In late 2001, Vivendi announced its acquisition of USA

Networks for $10.3 billion, and reported that the transaction would increase Vivendi's net

free cash flow by a projected $350 million.  (*Id.* ¶¶ 80–81.)  Throughout the spring of

2002, Vivendi (and Messier) continued to make positive statements in the press to "dispel

concerns about the Compan[y's] debt levels and accounting practices."  (*Id.* ¶83; *see also

id.* ¶¶ 84–87, 89, 94–97.)  However, on May 3, 2002, Moody's lowered Vivendi's long-

term debt rating to one notch above "junk" status assigned to speculative investments,

due to concerns that Vivendi "might not be able to reduce debts as quickly and

comprehensively as planned."  (*Id.* ¶ 99.)  In response, Vivendi downplayed the rating

and announced it had "no impact on Vivendi Universal's cash situation," which it

described as "comfortable" and capable of financing Vivendi's continued debt reduction.

(*Id.* ¶¶ 100, 102–03.)

In response to continued concerns about Vivendi's debt levels, a June 25, 2002

press release was issued, noting steps taken to reduce debt and that its cash situation was

not precarious, and Messier held a June 26, 2002 conference call to assure investors there

was "no hidden liability" and expressing confidence with respect to Vivendi's debt and

cash outlook.  (*Id.* ¶¶ 104–05.)  On July 2, 2002, Messier e-mailed his employees stating

that despite reports that Vivendi was in danger of default, there were no hidden risks in

the company's accounting.  (*Id.* ¶ 109.)  The very next day, however, Messier resigned and Vivendi's securities prices collapsed.  (*Id.*)  Vivendi issued a press release through new management acknowledging its "short-term liquidity issue," though Messier continued to claim that Vivendi's financial statements were transparent.  (*Id.* ¶ 110.) Contrary to Vivendi's numerous press releases, financial statements, and SEC filings throughout the class period, plaintiffs allege that the company was in fact on the brink of financial disaster.  At the time of the USA Networks acquisition, announced on December 17, 2001 (*id.* ¶ 8), "Vivendi was already in dire financial straits," despite representations made to the contrary by Messier to investors and the board of directors (*id.* ¶ 184).  Vivendi was allegedly on the verge of insolvency by the end of 2001, and had barely enough "cash needed to pay the bills" as of May 2002.  (*Id.* ¶ 185.) Nevertheless, Vivendi had continued to reassure investors that it could meet its obligations for the next twelve months, despite being privately advised of its dire financial outlook.  (*Id.* ¶ 186.)

On August 14, 2002, new management announced that Vivendi had suffered a €12 billion net loss for the first half of 2002 and would take a €11 billion goodwill write-down of depreciated assets, the same day that Standard & Poor's rated Vivendi's long-term corporate credit at junk status.  (*Id.* ¶ 114.)  New management later admitted that Vivendi "would have been forced to declare bankruptcy within 10 days if Jean-Marie Messier had not resigned."  (*Id.* ¶ 187.)

**DISCUSSION**

I.     **Legal Standard**

A district court's analysis of a class certification request generally proceeds in two

steps, both of which are governed by Rule 23 of the Federal Rules of Civil Procedure.  As

a threshold matter, the court must be persuaded, "after a rigorous analysis, that the

prerequisites of Rule 23(a) have been satisfied."  *Gen. Tel. Co. of Southwest  v. Falcon*,

457 U.S. 147, 161 (1982).  Rule 23(a) provides:

> (a) Prerequisites to a Class Action. One or more members of a class may
> sue or be sued as representative parties on behalf of all only if (1) the class
> is so numerous that joinder of all members is impracticable, (2) there are
> questions of law or fact common to the class, (3) the claims or defenses of
> the representative parties are typical of the claims or defenses of the class,
> and (4) the representative parties will fairly and adequately protect the
> interests of the class.

Fed. R. Civ. P. 23(a).

If a court determines that the Rule 23(a) requirements have been met, it must then

decide whether the class is maintainable pursuant to one of the subsections of Rule 23(b),

which govern, *inter alia*, the form of available relief and the rights of absent class

members.  When seeking to certify a class pursuant to Rule 23(b)(3), plaintiffs must meet

the following two additional criteria:  (1) questions of law or fact common to class

members must predominate over any questions affecting individual members; and (2) the

class action device must be superior to any other method of adjudication.  Fed. R. Civ. P.

23(b)(3).  The requirement of "rigorous analysis" to ensure "actual, not presumed

conformance" with Rule 23(a) applies with "equal force to all Rule 23 requirements,

including those set forth in Rule 23(b)(3)."  *Miles v. Merrill Lynch & Co.* (*In re Initial

Public Offering Sec. Litig.*), 471 F.3d 24, 33 & n.3 (2d Cir. 2006) (citing *Falcon*, 457

U.S. at 160–61). Thus it is not sufficient for plaintiffs to make merely "some showing" that the requirements of Rule 23 have been met. *Id.* at 35–36 (citing and distinguishing *Caridad v. Metro-North Commuter Railroad,* 191 F.3d 283, 292 (2d Cir. 1999) and *In re Visa Check/Master Money Antitrust Litigation,* 280 F.3d 124, 134-35 (2d Cir. 2001)). To the contrary, the following standard now applies to class certification motions in this circuit:

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits.

*In re IPO Sec. Litig.*, 471 F.3d at 41. With these principles in mind, the Court turns to the Rule 23 analysis.

## II.    Rule 23(a)

### A.    Numerosity

Rule 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Impracticability means difficulty or inconvenience of joinder [not] . . . impossibility of joinder," *In re Blech Sec. Litig.*, 187 F.R.D. 97, 103 (S.D.N.Y. 1999) (citation omitted), and the Second Circuit has

observed that "numerosity is presumed at a level of 40 members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995), *cert. denied*, 515 U.S. 1122 (1995) (citing 1 *Newberg on Class Actions* § 3.05 (2d ed. 1985)); *see also Presbyterian Church v. Talisman Energy, Inc.*, 226 F.R.D. 456, 466 (S.D.N.Y. 2005) ("Numerosity is presumed when a class consists of forty or more members."). "Precise quantification of the class members is not necessary because a court may make common sense assumptions regarding numerosity." *In re Blech Sec. Litig.*, 187 F.R.D. at 103 (citations omitted); *see also de la Fuente v. DCI Telecomms., Inc.,* 206 F.R.D. 369, 390 (S.D.N.Y. 2002); *Weissman v. ABC Fin. Servs., Inc.*, 203 F.R.D. 81, 84 (E.D.N.Y. 2001).

"In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *Teachers' Ret. Sys. of La. v. ACLN Ltd.*, No. 01 Civ. 11814 (LAP), 2004 WL 2997957, at *3 (S.D.N.Y. Dec. 27, 2004) (citations and internal quotation marks omitted)); *see also In re Globalstar Sec. Litig.*, No. 01 Civ. 1748 (PKC), 2004 WL 2754674, at *3–*4 (S.D.N.Y. Dec. 1, 2004) ("[I]t is not unusual for district courts to certify plaintiff classes in securities actions based on the volume of outstanding shares." (citations omitted)); *In re Deutsche Telekom AG Sec. Litig.*, 229 F. Supp. 2d 277 (S.D.N.Y. 2002) ("Class certification is frequently appropriate in securities fraud cases involving a large number of shares traded publicly in an established market."); *In re Frontier Group Ins., Inc. Sec. Litig.*, 172 F.R.D. 31, 40 (E.D.N.Y. 1997). With more than 107 million ADSs and approximately 1 billion ordinary shares outstanding during the relevant class period, plaintiffs have established that joinder is impracticable and that the proposed class

satisfies the numerosity requirement.  (*See* FACC ¶ 41; Bisiaux Decl. Ex. 2 (indicating

1.086 billion outstanding Vivendi shares, ordinary shares and ADSs inclusive, as of June

30, 2001).)

> **B.     Commonality**

The class certification prerequisite of commonality requires that "there are

questions of law or fact common to the class . . . ."  Fed. R. Civ. P. 23(a)(2); *Marisol A. v.*

*Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (per curiam) ("[P]laintiffs' grievances [must]

share a common question of law or of fact.").  Not every "issue[] must be identical as to

each [class] member, but . . . plaintiff [must] identify some unifying thread among the

members' claims that warrants class treatment."  *Cutler v. Perales*, 128 F.R.D 39, 44

(S.D.N.Y. 1989) (internal quotation marks and citation omitted).  The commonality

requirement "has been applied permissively" in securities fraud litigation.  *In re Nortel*

*Networks Corp. Sec. Litig.*, No. 01 Civ. 1855 (RMB), 2003 WL 22077464, at *3

(S.D.N.Y. Sept. 8, 2003) (internal quotation marks omitted); *see also In re Frontier*, 172

F.R.D. at 40.  Here, plaintiffs allege the following questions of fact or law are common to

all members of the proposed class:  (1) whether defendants violated the securities laws by

the acts and conduct alleged in the FACC; (2) whether defendants issued false and

misleading statements during the class period; (3) whether defendants acted with scienter

in issuing materially false and misleading statements; (4) whether the market prices of

Vivendi ordinary shares and ADSs during the class period were artificially inflated

because of defendants' misconduct, and (5) whether the members of the class sustained

damages, and, if so, what is the appropriate measure of damages.  (FACC ¶ 45.)  *Cf. In re*

*Interpublic Sec. Litig.*, No. 02 Civ. 6527 (DLC), 2003 WL 22509414, at *3 (S.D.N.Y.

Nov. 6, 2003) (finding commonality requirement satisfied where plaintiffs raised common issues as to whether defendants' public filings and statements contained material misstatements, whether the defendants acted with scienter in misrepresenting material facts in the company's public filings and press releases, and whether the damages to the investors were caused by the defendants' misstatements); *In re Ashanti Goldfields Sec. Litig.*, No. CV 00-0717 (DGT), 2004 WL 626810, at *12 (E.D.N.Y. Mar. 30, 2004) (finding commonality on similar allegations). Defendants do not dispute commonality. Plaintiffs have adequately demonstrated that these claims are common to the members of the proposed class, and the Court finds the commonality requirement is satisfied.

### C.      Typicality and Adequacy

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "While the commonality inquiry establishes the existence of a certifiable class, the typicality inquiry focuses on whether the claims of the putative class representatives are typical of the class sharing common questions." *In re Frontier*, 172 F.R.D. at 40. Typicality requires that "the claims of the named plaintiffs arise from the same practice or course of conduct that gives rise to the claims of the proposed class members." *Marisol A. v. Giuliani*, 929 F. Supp. 662, 691 (S.D.N.Y. 1996), *aff'd* 126 F.3d 372 (2d Cir. 1997); *see also Robidoux v. Celani*, 987 F.2d 931, 936–36 (2d Cir. 1993) ("When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims."). Rule 23(a)(4) requires plaintiffs to

establish that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  This showing requires that plaintiffs demonstrate that the proposed class representatives have no "interests [that] are antagonistic to the interest of the other members of the class."  *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).  As many courts have observed, the issues of typicality and adequacy tend to merge because they "serve as guideposts for determining whether . . . the named plaintiff's claim and the class claims are so inter-related that the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 157 n.13.

In this case, proposed class representatives argue that the typicality requirement is met because their claims "arise out of the same uniform pattern of conduct—i.e., defendants' failure to disclose that Vivendi's operations and financial condition were dramatically weaker than what their public statements portrayed."  (Pls.' Supp. Mem. 11.)  In the First Amended Consolidated Complaint, named plaintiffs, like the other purported class members, have asserted that they purchased or otherwise acquired Vivendi securities during the class period, and were injured by defendants' false and misleading representations made throughout the class period in violation of the securities laws.  Central to all the proposed class representatives claims is defendants' alleged course of conduct throughout the class period.  In prosecuting their case, plaintiffs will necessarily seek to develop facts relating to the alleged accounting irregularities and the dissemination of allegedly false or misleading statements underlying their claims.  Such allegations are generally considered sufficient to satisfy the typicality requirement.  *See, e.g.*, *In re Interpublic Sec. Litig.*, No. 02 Civ. 6527 (DLC), 2003 WL 22509414, at *3

(S.D.N.Y. Nov. 6, 2003); *In re WorldCom Inc. Sec. Litig.*, 219 F.R.D. 267, 280–81

(S.D.N.Y. 2003).  Furthermore, defendants' individualized arguments regarding the

adequacy and typicality of the proposed class representatives are unavailing.  The Court

will address seriatim the arguments made with respect to the six named plaintiffs.

### 1.   Olivier Gerard

Proposed class representative Gerard is a resident of France who, on December

11, 2000, exchanged Vivendi, S.A. shares for Vivendi Universal shares pursuant to the

three-way merger with Seagram and Canal Plus.  (*See* Deposition of Olivier Marie-

Guillaume Gerard, June 24, 2005 ("Gerard Dep.") at 81:05–82:13; Gerard Second

Corrected Certification, June 24, 2005 at Schedule A, Zach Decl. Ex. 7.)

Defendants submit that Gerard is not an adequate class representative for two

reasons.  First, defendants argue that persons such as Gerard who obtained Vivendi

Universal shares and/or ADSs only in the one-to-one exchange of Vivendi, S.A.

securities may not be properly included in the putative class, because such persons[4] did

not suffer economic damage and cannot prove materiality.  (*See* Defs.' Opp'n Mem.

("Opp'n") 21–23, 27.)

Defendants argue that this group of class members, as preexisting Vivendi

shareholders, "cannot show that the alleged misstatement inflating the value of shares or

ADSs that they already owned was material to them or caused them any economic

damage."  (Opp'n 21.)

---

[4] Defendants' contention that all foreign persons should be excluded from the proposed class is discussed *infra* in connection with an evaluation of whether a class action including foreign shareholders would be superior to alternative methods of adjudication.

Plaintiffs propose as a solution to defendants' concerns that the words "and were damaged thereby" be inserted into the class definition.  Plaintiffs also argue that it would be premature to exclude class members who have exchanged Vivendi S.A. shares for Vivendi Universal shares because the question of whether defendants' misstatements were material to these plaintiffs cannot be determined at the class certification stage.

Given the teaching of *In re IPO Sec. Litig.*, 471 F.3d at 41–42, it is not inappropriate to consider either damages or materiality in assessing the typicality of the individual plaintiffs' claims, even though some assessment of the merits of their claims is required.  However, the Court is not persuaded that either issue precludes a finding that the typicality requirement is satisfied here.  Materiality for all class members will turn on the nature and accuracy of all defendants public statements including, obviously, those made in connection with the three-way merger of Vivendi, Seagram and Canal Plus in December, 2000.  That Vivendi S.A. shareholders received Vivendi Universal shares as a result of the merger does not alter the materiality of defendants alleged misstatements to plaintiff-shareholders' decision to approve the merger and accept shares in a new entity. And to the extent that, as alleged, defendants were constructing an ever-expanding house of cards, old Vivendi S.A. shareholders who accepted shares in Vivendi Universal were likely damaged thereby.[5]  Therefore, the Court declines to exclude members of the class

---

[5] In addition to opposing the inclusion of those who acquired Vivendi shares through the one-for-one exchange, defendants oppose the inclusion of so-called in-and-out purchasers in any class certified—i.e., those who purchased shares and sold them during the class period.  Defendants do not oppose the appointment of any of the proposed class representatives on this basis.  However, even if they did raise such an argument, courts have consistently found that this does not render a representative's claim atypical. *See, e.g.*, *In re Gaming Lottery Sec. Litig.*, 58 F. Supp. 2d 62, 69–71 (S.D.N.Y. 1999) (rejecting defendants' argument that in-and-out purchaser proposed as class representative was inadequate because, *inter alia*, he was not injured because he sold as well as purchased at inflated prices); *Werner v. Satterlee, Stephens, Burke & Burke*, 797 F. Supp. 1196, 1215 (S.D.N.Y. 1992) (rejecting attempt to disqualify proposed class representatives because of the timing of their purchases, and stating that although timing issues could eventually surface differing interests among class members, "the greater weight of recent authority

who acquired their shares in the one-to-one exchange, including Gerard as class representative, on the basis of defendants' arguments regarding damages or materiality.

Defendants also allege that Gerard is incapable of performing the fiduciary responsibilities as a class representative because Gerard admitted to destroying documents. (Opp'n 27–28 n.23.) The documents to which defendants allude, however, appear to be French and other European newspaper articles relating to the Vivendi scandal, and perhaps some personal notes taken by Gerard during meetings with his French attorney. (Gerard Dep. 28:24–29:16, 30:23–31:02.) Gerard testified that he discarded the news articles because he believed the attorneys in this matter had collected all the relevant documentation and articles published in the press, and there was no reason for him to keep it. (*Id.* at 29:11–30:05.) Defendants cite no authority to support the proposition that such conduct renders Gerard inadequate to represent the interests of the class, and the Court finds Gerard to be an adequate class representative. *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 88 (S.D.N.Y. 2004) (rejecting defendants' credibility argument to defeat appointment of named plaintiff as class representative where "[t]here [was] no evidence that any of the conduct here was the result of bad faith or an attempt to deceive defendants or the court").

---

militates denying class certification on that ground" (internal citation omitted)); *In re Sumitomo Copper Litig.*, 182 F.R.D. 85 (S.D.N.Y. 1998) (rejecting defendants' arguments regarding conflicts created by inclusion of in-and-out purchasers in proposed subclasses and noting that "it is well settled in this Circuit that factual differences in the amount of damages, date, size or manner of purchase, the type of purchaser, the presence of both purchasers and sellers, and other such concerns will not defeat class action certification when plaintiffs allege that the same unlawful course of conduct affected all members of the proposed class" (citing *Green v. Wolf*, 406 F.2d 291, 299–301 (2d Cir. 1968), *cert. denied sub nom. Troster, Singer & Co. v. Green*, 395 U.S. 977 (1969))).

2.      **Gerard Morel**

Gerard Morel is also a French resident who exchanged his shares in Vivendi, S.A. and Canal Plus for Vivendi Universal shares after the December 2000 merger. (Declaration of Gerard Morel, Feb. 19, 2005 ("Morel Decl.") at Schedule A, Zach Decl. Ex. 8.) He also bought and sold Vivendi ordinary shares on the Paris Bourse during the proposed class period. (*Id.*) His last transaction in Vivendi securities occurred on January 11, 2002. (*Id.*)

Defendants argue that Morel only has standing to represent a class including Europeans who purchased Vivendi securities on a European exchange up to the latest date on which he engaged in a transaction involving Vivendi stock. (Opp'n 28.) Without an adequate proposed class representative who purchased Vivendi ordinary shares on the Paris Bourse after January 11, 2002, defendants argue, the period of any class including French shareholders cannot extend beyond this date.[6] Defendants further argue that inconsistencies in Morel's testimony, submissions, and document production on the issue of his transactions in Vivendi securities will become a focal point of cross-examination and unique defenses at trial to the detriment of the class. (*Id.* at 28 n.25.)

With respect to class representative standing, it is well established that where, as here, plaintiffs allege that their losses were the result of a sustained course of conduct that propped up defendant's stock price throughout the class period, the class may be represented by an individual who purchased his shares prior to the close of the class period. *See Robbins v. Moore Med. Corp.*, 788 F. Supp. 179, 187 (S.D.N.Y. 1992) (finding class representatives entitled to assert Section 10(b) claims "arising from

---

[6] Defendants, as noted, object to the inclusion of any foreign shareholders in the proposed class. See *supra*, fn. 5, and the discussion of the issue of superiority, *infra*.

statements made both before and after the purchase date if the statements allegedly were made in furtherance of a common scheme to defraud" (citing *Nicholas v. Poughkeepsie Savings Bank/FSB*, No. 90 Civ. 1607 (RWS), 1990 WL 125154, at *5 (S.D.N.Y. Sept. 27, 1990))); *Zucker v. Sasaki*, 963 F. Supp. 301, 306–07 (S.D.N.Y. 1997) (discussing *Robbins* and noting that where defendants with an identity of interest make a series of "inter-related misstatements" as part of a "common course of conduct," post-purchase statements are relevant to the course of wrongful conduct alleged); *cf. Denny v. Barber*, 576 F.2d 465, 468–69 (2d Cir. 1978) (finding that proposed class representative could not properly represent persons who bought securities in reliance on fraudulent statements where he had purchased before *any* alleged false statements were made).  As such, the Court finds that Morel may adequately represent later purchasers.  *See Nicholas*, 1990 WL 145154, at *6 (rejecting implication that only someone who bought on the last day of the class period would be able to bring an action on her own behalf or on behalf of the entire class, and stating "there is considerable authority allowing class plaintiffs to represent later purchasers" (internal citations omitted)).

### 3.    Capital Invest

Capital Invest, the fund management company of the Bank Austria Greditanstalt Gruppe GmbH ("Bank Austria"), seeks to represent the claims of APK EU–Big Caps fund ("Big Caps Fund"), in its capacity as manager and attorney-in-fact.  (Declaration of Irene Reisenberger, August 30, 2005 ("Reisenberger Decl.") ¶ 2, Zach Decl. Ex. 12.) The sole owner of the shares (i.e., units) in the Big Caps Fund is a large Austrian pension entity known as APK Pensionskasse Aktiengesellschaft ("APK").  The Big Caps Fund obtained Vivendi Universal shares in exchange for previously held Vivendi, S.A. shares,

and also purchased and sold Vivendi Universal shares on foreign exchanges, the last purchase of which occurred on January 21, 2002.  (Zach Decl. Exs. 15, 16.)  For reasons discussed in greater detail below, Austrian claimants shall be excluded from the class in this action. Therefore, the Court finds it unnecessary to address typicality/adequacy of representation issues as they relate to this plaintiff as it cannot properly serve as a class representative.

### 4.  William Cavanagh

William Cavanagh is a United States resident.  He purchased 100 Vivendi Universal ADSs on the NYSE on June 13, 2002.  (Zach Decl. Ex. 31, at 21; Deposition of William Cavanaugh, July 29, 2005, Parr Decl. Ex. 24 ("Cavanaugh Dep.") at 170:23– 171:07.)  Defendants dispute Cavanagh's adequacy as a class representative because of his "striking" lack of knowledge regarding his claim.  (Opp'n 34.)  Defendants cite the following examples in support of this argument:  (1) Cavanagh's inability to recall the year the complaint was filed, the relevant dates for the proposed class period, or how he decided to seek to become a proposed class representative, or to articulate key elements of the claims; (2) Cavanagh's similar inability to testify regarding his transactions in Vivendi securities beyond testifying that he sold his 100 Vivendi Universal shares at some point, though he did not know when or at what price (Cavanaugh Dep. 259:23– 260:11, 181:14–182:03); (3) Cavanagh's failure to monitor class counsel, as evidenced by his inability to recollect ever meeting or speaking with any attorney associated with the Milberg Weiss law firm, and only works with attorneys from the law firms of Murray Frank and Abbey Gardy (*id.* at 15:25–16:19, 278:25–280:02).

"The Supreme Court . . . expressly disapproved attacks on the adequacy of a class representative based on the representative's ignorance." *Baffa*, 222 F.3d at 61 (citing *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 370–74 (1966)).  Courts in this district have held that "[p]laintiffs are entitled to rely on the 'expertise of counsel,'" and "a class representative will be found inadequate due to ignorance only when they 'have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." *In re Worldcom Inc. Sec. Litig.*, 219 F.R.D. 267, 286 (S.D.N.Y. 2003) (quoting *Baffa*, 222 F.3d at 61); *accord Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077–78 (2d Cir. 1995).  "[I]t is well established that 'in complex litigations such as securities actions, a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance upon the expertise of counsel is to be expected.'" *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 181 (S.D.N.Y. 2005) (quoting *In re AM Int'l, Inc. Sec. Litig.*, 108 F.R.D. 190, 196–97 (S.D.N.Y. 1985)).

Despite defendants' concerns regarding Cavanaugh's imperfect recollections outlined above, there is nothing in the record to suggest that Cavanaugh is unwilling or unable to pursue the litigation on behalf of the class.  Cavanaugh's deposition testimony reflects that he is aware that he is a proposed class representative (Cavanaugh Dep. 97:22–97:24), he understands the role carries an obligation "to represent the class members to the best of [his] ability, in discussions with [his] attorney" and an obligation to supervise class counsel (*id.* at 278:04–278:09, 278:25–279:04), he knows the action is against Vivendi and its former CEO and CFO and is aware of the claims (*id.* at 117:20–

117:25, 254:10–255:22; 306:02–306:08), and expressed a desire to "vigorously" pursue the case, in consultation with counsel (*id.* at 306:02–306:08).  *Cf. Baffa*, 222 F.3d at 62.  Defendants' criticism that Cavanaugh is only in communication with one of the two firms appointed as class counsel is insignificant.  In light of the foregoing, the Court finds Cavanaugh to be an adequate class representative.

###  5.  RSMB

RSMB administers the pension fund of the retirement system for the general employees of Miami Beach, Florida.  In the December 2000 merger, RSMB exchanged Vivendi, S.A. and Canal Plus ADSs for Vivendi Universal ADSs in the three-way merger.  (Zach Decl. Ex. 33 at 3.)  RSMB did not acquire any other Vivendi Universal securities during the proposed class period.  As such, defendants argue that RSMB could only represent North American residents who acquired Vivendi Universal ADSs as part of the merger and does not have standing to bring claims based on alleged misstatements issued after the exchange of shares pursuant to the merger.  As discussed *supra* in section 2.C.ii. (discussing adequacy of proposed class representative Gerard Morel), these arguments are unpersuasive in a case such as this, where a common scheme to defraud renders later-made statements relevant to the course of wrongful conduct underlying an earlier purchaser's (or acquirer's) claims.[7]

Defendants further argue that RSMB is an inadequate class representative because RSMB's "most knowledgeable" representative, Rick Rivera, RSMB's pension administrator, lacks sufficient knowledge to demonstrate RSMB is an adequate class

---

[7] The Court notes that RSMB stands in a slightly different position from Morel in that it held both Vivendi S.A. and Canal Plus shares at the time of the merger.  This distinction does not alter the Court's analysis of materiality, damages, or a shareholder's ability to adequately represent shareholders who purchased later in the class period.

representative.  Defendants contend that Rivera's testimony demonstrates that RSMB does not understand important aspects of this action or the responsibilities attendant to being a class representative.[8]  However, plaintiffs have established that Rivera understands that the pension fund seeks to be appointed a class representative, in which capacity it would seek damages on behalf of the entire class, and that his responsibilities would include following the case, reviewing documents and filings, and consulting with counsel.  (Deposition of Rick Rivera, May 20, 2005 ("Rivera Dep.") 152:21–153:14, 150:02–150:11.)  He also understood that as class representative RSMB would have to represent the best interests of the class, which includes all members who sustained damages as a result of Vivendi's alleged fraud.  (*Id.* at 153:24–154:03, 107:03–108:07.)  He also understood that the complaint alleges that "defendants provided false statements that inflated the stock price."  (*Id.* at 59:15–59:23.)  The Court has been presented with no evidence suggesting that RSMB will be unable or unwilling to adequately represent the class, or that RSMB has interests antagonistic to those of the class as a whole, which are the relevant inquiries at issue here.  The lack of knowledge of which defendants complain does not rise to the sort of ignorance that warrants denial of class representative status.  *See, e.g.*, *In re Worldcom*, 219 F.R.D. at 286.

---

[8] For example, Rivera could not (1) describe the scope of the proposed class (Rivera Dep. 107:15–108:07); (2) identify any document relevant to the action that RSMB has reviewed, or state with any certainty that RSMB reviewed the complaint (or understand the term "complaint") (*id.* at 27:07–27:20, 58:02–58:04); (3) state with any certainty that RSMB read its responses to defendants' interrogatories, though he personally verified the responses (*id.* at 73:08–73:25); (4) identify how many times RSMB has spoken with plaintiffs' counsel, or whether RSMB had ever done so within the last year (*id.* at 57:03–57:25); (5) identify the number of shares RSMB acquired during the proposed class period, or when such shares were acquired or sold (*id.* at 85:14–86:09); (6) state with certainty whether RSMB had disposed of all its Vivendi securities during the proposed class period (*id.* at 185:16–186:02); (7) describe the interests of the class members or how RSMB would determine those interests (*id.* at 124:16–124:10).

### 6.   Bruce Doniger

Bruce Doniger is a resident of the United States.  Doniger acquired Vivendi Universal ADSs in exchange for his previously held Seagram shares following the December 2000 three-way merger.  Defendants argue that Doniger lacks standing to bring claims for alleged misstatements made after he exchanged his shares, and note that there are no other representatives with standing to represent post–December 2000 claims.  This argument has already been addressed and rejected by the Court.

Defendants also point out that Doniger is a second cousin to Edgar Bronfman, Sr. and Charles Bronfman (father and uncle, respectively, to Edgar Bronfman, Jr.) and sponsor of former Vivendi Board member Samuel Minzberg.  Prior to the December 2000 merger, the principal owners of Seagram were Edgar Bronfman, Jr. and the Bronfman family, which became the largest shareholders of Vivendi following the merger.  (FACC ¶ 51.)  Edgar Bronfman, Jr. held the position of Executive Vice Chairman of the Vivendi Board until December 2001, at which time he resigned.  (FACC ¶ 79.)  Defendants further state that Doniger received his Seagram shares because of his familial relationships.  (Doniger Dep. 20:03–23:10, 38:23–39:08, 101:11–102:11.)  Based on these relationships, defendants appear to argue that Doniger would be subject to unique defenses likely to become the focus at trial, rendering him atypical and prejudicing absent class members.  However, defendants do not point to any evidence that Doniger is subject to unique defenses concerning, for example, lack of reliance because of the receipt of nonpublic information obtained by virtue of these relationships. *Cf. Landry v. Price Waterhouse Chartered Accountants*, 123 F.R.D. 474, 475–76 (S.D.N.Y. 1989) (finding proposed class representatives atypical where their deposition

testimony reflected that they had received nonpublic information and recommendations from friends and associates).  Furthermore, the Court does not find that Doniger's familial relationships, without more, are sufficient to conclude that Doniger has interests antagonistic to those of the class, or that he would be unwilling or unable to fairly and adequately represent the class.

## III.    Rule 23(b)(3)

Having addressed the requirements of Rule 23(a), the Court now turns to whether Rule 23(b)(3) has been satisfied.  Rule 23(b)(3) requires a court to find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b).  A class certified pursuant to Rule 23(b)(3) is sometimes referred to as an "opt-out" class because Rule 23(c)(2) mandates that members of a class certified under Rule 23(b)(3) be afforded an opportunity to "request exclusion" from that class.[9]  Particularly relevant to a purported class including foreign purchasers, anyone who does not affirmatively inform the Court that they wish to be excluded from the class is bound by the final disposition of the case.

### A.    Predominance of Common Issues

Rule 23(b)(3) allows for certification of a class where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).  This inquiry "trains on the legal or factual questions that qualify each class member's case as a genuine controversy . . .

---

[9] Rule 23(c)(2)(B) provides, in relevant part, that notice to members of "any class certified under Rule 23(b)(3) . . . must concisely and clearly state in plain, easily understood language . . . that the court will exclude from the class any member who requests exclusion."

[and] tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. v. Windsor*, 521 U.S. 591, 623 (1997).  The Rule 23(b)(3) predominance inquiry "is a more demanding criterion than the commonality inquiry under Rule 23(a).  Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."  *Moore v. Paine Webber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002) (internal citations and quotation marks omitted).  However, the Supreme Court has noted that "[p]redominance is a test readily met in certain cases alleging . . . securities fraud."  *Amchem Prods.*, 521 U.S. at 625 (citing Fed. R. Civ. P. 23 Advisory Committee Notes, 1966 Amendment, 28 U.S.C.A. Rule 23, at 385).

In this case, there are common questions of law and fact involving violations of the securities laws based on a common course of conduct directed at the entire class, and that predominate over any individualized questions that may exist.  The common issues in this action include whether defendants issued materially false and misleading statements as to Vivendi's earnings (both in connection with a registration statement and prospectus dated October 30, 2000, and thereafter), scienter, reliance, and causation.  All plaintiffs will rely on the same or substantially similar documents, statements, and legal theories to prove the defendants' liability.  Defendants do not present any argument that the claims at issue here may not be largely resolved by class-wide proof.  Indeed, they do not appear to contest that the predominance requirement in met in this case.  Because common factual and legal questions predominate over individual issues, the Court

determines that this requirement has been satisfied.  *See, e.g.*, *In re AOL Time Warner, Inc. Sec. and ERISA Litig.*, No. 02 Civ. 5575 (SWK), 2006 WL 903236, at *5 (S.D.N.Y. Apr. 6, 2006) (finding predominance requirement readily met because "allegations of defendants' misrepresentations and the improper inflation of AOL's accounting revenues underlie the factual and legal claims of every Class Member"); *In re Globalstar Sec. Litig.*, No. 01 Civ. 1748 (PKC), 2004 WL 2754674, at *5 (S.D.N.Y. Dec. 1, 2004) (finding predominance prong met where there were common issues with respect to whether defendants issued materially false and misleading statements as to Globalstar's subscription rate and revenues, scienter, reliance, and causation).

### B.    Superiority of Class Action Treatment

The superiority requirement asks courts to balance, in terms of fairness and efficiency, the advantages of a class action against those of alternative available methods of adjudication.  *See* Fed. R. Civ. P. 23 Advisory Committee Notes, 1966 Amendment, 28 U.S.C.A. Rule 23, at 385 ("Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.").  Rule 23(b)(3) identifies several factors to consider in determining whether a class action is in fact "superior to other available methods for the fair and efficient adjudication of the controversy":

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3).  This list of pertinent factors is nonexhaustive, *see* Fed. R.

Civ. P. 23 Advisory Committee Notes, 1966 Amendment, 28 U.S.C.A. Rule 23, at 386

(1992), "and the purposes of Rule 23 should weigh heavily in this determination," 2 Alba

Conte & Herbert Newberg, *Newberg on Class Actions* § 4:28 (4th ed. 2002).

### 1.  Interests in Prosecuting Individual Suits; the Extent and Nature of Other Pending Litigation

As the advisory committee's notes to Rule 23 indicate, "[t]he court is to consider

the interests of the individual members of the class in controlling their own litigations and

carrying them on as they see fit."  Fed. R. Civ. P. 23 Advisory Committee Notes, 1966

Amendment, 28 U.S.C.A. Rule 23, at 386.  In considering this interest, "the court should

inform itself of any litigation actually pending by . . . the individuals," because the

existence of pending actions may reveal that "[t]he interests of individuals in conducting

separate lawsuits [are] so strong as to call for denial of a class action."  *Id.*; *see also In re

"Agent Orange" Prod. Liability Litig.*, 818 F.2d 145, 165 (2d Cir. 1987) ("All plaintiffs

may not desire class certification . . . because those with strong cases may be better off

going it alone.").

As courts have frequently noted, class action treatment is particularly appropriate

when plaintiffs seek redress for violations under the securities laws.  *See Mills v. Elec.

Auto-Lite Co.*, 396 U.S. 375, 382 (1970); *Green v. Wolf Corp.*, 406 F.2d 291, 296 (2d Cir.

1968) ("[A] class action in a federal securities action may well be the appropriate means

for expeditious litigation of issues, because a large number of individuals may have been

injured, although no one person may have been damaged to a degree which would have

induced him to institute litigation solely on his own behalf."); *Eisenberg v. Gagnon*, 766

F.2d 770, 785 (3d Cir. 1985) ("[C]lass actions are a particularly appropriate and desirable

means to resolve claims based on the securities laws, since the effectiveness of the securities laws may depend in large measure on the application of the class action device." (internal quotation marks and citations omitted)); *In re Blech*, 187 F.R.D. at 101; *Baron v. Commercial & Indus. Bank of Memphis*, No. 75 Civ. 1274 (LBS), 1978 WL 168588, at *2 (S.D.N.Y. Aug. 21, 1978) ("Because most securities fraud cases involve purchasers' claims which might otherwise be too paltry to justify individual litigation, courts have concluded in securities actions, the class action procedure is not only superior, but probably indispensable for the vindication of plaintiffs' rights . . . and to assure that the securities laws will be vigorously enforced." (internal quotation marks and citation omitted)); 5 James Wm. Moore et al., *Moore's Federal Practice* § 23.03 (3d ed. 2004).  In a case such as this, where each individual plaintiff can only have a fraction of the interest in the outcome of the litigation as the defendants, any interest the members of the class might have in individually controlling the prosecution of separate actions is heavily outweighed by the obvious benefits of pressing their claims as a class.  *See Amchem*, 521 U.S. at 617 ("'The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.  A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.'" (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (1997))).

The actions by putative class members currently pending before French courts against Vivendi do not, in the Court's view, change this calculus.  According to submissions made by both parties, at present Vivendi is defending two individual

shareholder suits filed in the Paris Tribunal de Grande Instance (trial court) in France, *Société Richard Hugo v. Vivendi Universal, S.A.* and *Courage v. Vivendi Universal, S.A.* (Bisiaux Decl. ¶¶ 12–13 & Exs. 8–9).[10]  The pendency of these actions does not persuade the Court that any individual shareholder has an interest in conducting separate lawsuits sufficient to outweigh the advantages to all shareholders of proceeding on a class basis. *See*, Fed. R. Civ. P. 23 Advisory Committee Notes, 1966 Amendment, 28 U.S.C.A. Rule 23, at 386 (noting that even where additional litigation is pending, the interests in conducting separate lawsuits may be "theoretical rather than practical" because, *inter alia*, "the amounts at stake for individuals may be so small that separate suits would be impracticable").

### 2.    Desirability or Undesirability of Concentrating the Litigation of the Claims in this Particular Forum

Plaintiffs' proposed class definition encompasses a significant number of foreign class members; indeed, thirty-seven percent of Vivendi's ordinary shares were held by citizens of France who purchased them on the Bourse, while U.S. investors held twenty-five percent of Vivendi shares in the form of ADSs purchased on the NYSE.  (Bisiaux Decl. ¶ 7.)  Relying primarily on Judge Friendly's opinion in *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 996 (2d Cir. 1975), defendants argue that all foreign plaintiffs must be excluded from the class because it is a "near certainty" that if this action is dismissed, taken to judgment, or settled, defendants would not be able to assert claim prelusion to bar subsequent actions in the countries in which foreign plaintiffs reside.  Although defendants do not consistently characterize their argument as such, the Court will

---

[10] A third action, *Pasturaud v. Vivendi Universal, S.A.*, a suit by ninety-seven individual shareholders, was dismissed without prejudice due to plaintiffs' failure to register the complaint.  (Defs.' Sur-Reply Mem. 1 n.1.)

consider this aspect of their opposition to be an attack on the superiority of class action treatment of the claims of foreign purchasers.

### (a)        The "Near Certainty" Test

*Bersch* involved an action on behalf of all purchasers of stock in a Swiss-based, Canadian corporation asserting claims for violations of the federal securities laws relating to stock offerings made outside the United States.  The proposed class included approximately 50,000 purchasers of whom 386 were American and the balance of whom were foreigners.  *Id.* at 977–78 n.2.  The Court first determined that federal securities laws did *not* reach losses from sales of securities to foreigners outside the United States because no acts occurred within the United States directly causing such losses, *see id.* at 986–90.  Having dismissed these federal securities law claims for lack of subject matter jurisdiction, the Court then addressed whether the class might still be certified to include foreign purchasers with respect to their state law claims.  The *Bersch* plaintiffs argued that there was pendent jurisdiction over their alleged common law fraud claims and that this would justify the inclusion of foreign purchasers in the proposed class.  *Id.* at 993. The Second Circuit rejected this argument, calling it "ludicrous" to consider the state law claims of foreign purchasers pendent, and finding it would be an abuse of discretion for the district court to exercise pendent jurisdiction over the foreign purchasers' common law fraud claims.  *Id.* at 996 (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726–27 (1960)).  The Court also articulated practical concerns, such as the introduction of complex choice-of-law issues, and the resultant necessity to look at the laws of at least fourteen other countries where sales were made, and the minimal domestic impact of a

substantially foreign transaction, which together also weighed heavily against the exercise of pendent jurisdiction.

While not necessary to its finding of lack of jurisdiction, the Court noted that the management of a class including thousands of foreign purchasers could impose burdens on overtaxed district courts. In addition, and of critical importance to defendants' argument here, Judge Friendly also considered the likelihood of foreign recognition of any U.S. judgment that might be ultimately entered in the action: "Also, while an American court need not abstain from entering judgment simply because of a possibility that a foreign court may not recognize or enforce it, the case stands differently when this is a *near certainty*," because, as Judge Frankel had observed in his district court decision certifying a class, "if defendants prevail against a class they are entitled to a victory no less broad than a defeat would have been." *Id.* (emphasis added).[11]  In light of "uncontradicted affidavits that England, the Federal Republic of Germany, Switzerland, Italy, and France would not recognize a United States judgment in favor of the defendants as a bar to an action by its their own citizens" and an affidavit stating that several hundred individually brought claims were pending in Switzerland and that at least ninety had been settled, the Second Circuit directed the district court to exclude from the class action all foreign purchasers over whose claims—importantly—there was neither federal nor pendent jurisdiction. *Id.* at 996–97.

(b)     **The Progeny of Bersch**

Since *Bersch*, and without the benefit of any further guidance from the Second Circuit, courts in this district and elsewhere have considered, in a somewhat haphazard

---

[11] Judge Frankel's decision of June 28, 1972 was not reported, but it appears that despite his concern about claim preclusion he certified a class of all purchasers, foreign and domestic. *Id.* at 982.

way, the risk of nonrecognition by a foreign court as a factor relevant to whether, for purposes of satisfying Rule 23(b)(3), class treatment of foreign purchasers' claims is a superior method of adjudication.

Defendants point to three post-*Bersch* cases to support the exclusion of foreign purchasers from the proposed class here.  In *CL-Alexanders Laing & Cruickshank v. Goldfeld*, 127 F.R.D. 454, 459 (S.D.N.Y. 1989), Judge Mukasey denied class certification in a securities fraud action because the combination of (1) an uncontested affidavit stating that a British court "will not" recognize a foreign judgment in a U.S. opt-out class action, (2) a class size of only twenty-five members, and (3) atypical claims by the named plaintiff together failed to satisfy the requirements of Rule 23.  "[T]he combination of these problems," Judge Mukasey noted, "no one of which standing alone would necessarily require denial of class certification, virtually mandates the rejection of the class action form here."  *Id.* at 460.  While it is not clear what standard Judge Mukasey applied with respect to the claim preclusion issue, it would appear that he considered an uncontested affidavit stating to a certainty that a British court would not recognize a U.S. judgment insufficient on its own to deny class certification.  Similarly in *Ansari v. New York University*, 179 F.R.D. 112 (S.D.N.Y. 1998), Judge Mukasey found that doubts regarding claim preclusion in foreign jurisdictions tipped the scales against an already weak motion for class certification.  In *Ansari*, a dentist sued New York University, its college of dentistry, and various university officials, alleging breach of contract and violation of state statutes relating to an alleged failure to provide education services.  The proposed plaintiff class included only thirty-five members, some of whom were foreigners, and failed to satisfy Rule 23(a)(1)'s numerosity requirement.  *Id.* at 116.

Second, though "not as significant as the failure to satisfy the numerosity requirement," class certification was denied because "limited case law . . . suggests" that at least six of the relevant foreign countries would not accord claim preclusion to an opt-out class action. *Id.* at 117. Judge Mukasey considered this fact "further evidence that class certification is inappropriate," though of course the decision could have rested entirely on plaintiffs' failure to establish numerosity. *Id.*

In *In re Daimler Chrysler AG Securities Litigation*, 216 F.R.D. 291 (D. Del. 2003), on which defendants also rely, plaintiffs asserted securities fraud claims against a German automobile manufacture based on false statements allegedly made in connection with the acquisition of an American automobile manufacturer. The court did not cite *Bersch* but did cite *Ansari* and *CL-Alexanders* for the proposition that class certification may be inappropriate where "obstacles" exist due to the inclusion of foreign class members. *Id.* at 301. Finding "practical difficulties" in maintaining a class with foreign investors, and further that plaintiffs had not adequately addressed manageability and damage issues, the court limited the class to U.S. investors.

Reaching a different result in *Cromer Finance Limited v. Berger*, 205 F.R.D. 113 (S.D.N.Y. 2001), Judge Cote considered the res judicata effect of a class action judgment as "a factor that must be considered in evaluating the superiority of the class action device," but distinguished those cases "in which there is a 'possibility' that a foreign court may not recognize a judgment, and those in which there is 'near certainty' that it will not be recognized." *Id.* at 134–35 (citing *Bersch*, 519 F.2d at 996). Judge Cote concluded, upon review of the competing expert affidavits, that it was "at most a 'possibility'" that foreign courts would not recognize a U.S. judgment, and certified a

34

class including foreign claimants alleging federal securities fraud against an operator of an offshore investment fund and Bermuda accounting firms.  *Id.* at 135.  Taking a different tack, Judge Sweet, in *In re Lloyd's American Trust Fund Litigation*, No. 96 Civ. 1262 (RWS), 1998 WL 50211, at *15 (S.D.N.Y. Feb. 6, 1998), read *Bersch* as applying only to whether a class action should proceed under principles of pendent jurisdiction, and emphasized that *Bersch* did not directly address the issue of superiority under 23(b)(3).  Without applying the "near certainty" test, Judge Sweet concluded that "a foreign court may look to the results achieved here for guidance, thereby contributing to the superiority of the class action procedure," and certified the class.  *Id.*; *see also In re U.S. Fin. Sec. Litig.*, 69 F.R.D. 24, 50 (S.D. Cal. 1975) (stating that defendant's "reliance upon *Bersch* is misplaced because *Bersch* does not preclude foreign nationals from membership in any class alleging violations of the federal securities acts simply because of res judicata problems" and noting that "[a]lthough the res judicata problem is one factor to consider . . . it should not be used to deny [class certification] . . . especially when this Court otherwise has subject matter jurisdiction").

In *Frietsch v. Refco, Inc.*, 92 C. 6844, 1994 WL 10014 (N.D. Ill. Jan. 13, 1994), the district court for the Northern District of Illinois considered a motion to certify a class of investors in commodity pools, including a number of German putative class members. The plaintiffs alleged, *inter alia*, violations of Sections 10(b) and 12(2) of the Exchange Act.  *Id.* at *1.  There, as here, the defendants argued that the class action device failed under Rule 23(b)(3) because German law would not recognize a judgment in a U.S. class action.  *Id.* at *11.  In support of this argument, the defendants' German law expert stated that a judgment in defendants' favor would "'most likely' not be given res judicata

effect."  *Id.*  By contrast, the plaintiffs' German law expert stated that the "issue of res judicata cannot be predicted with certainty because there are no precedents, and any decision by a German court would be fact specific."  *Id.*  Faced with dueling affidavits, the court concluded that the preclusion issue "remain[ed] an uncertainty that [would] not paralyze the court from making a ruling that will provide all parties with the most efficient tools available to litigate the claims in this case."  *Id.*  The *Freitsch* court distinguished *CL-Alexanders* and *Bersch*, because in those cases the record contained uncontradicted affidavits that persuaded the respective courts that foreign courts would certainly not afford res judicata effect to a U.S. judgment on behalf of a class.  *Id.*

The foregoing cases, regardless of their ultimate outcome, reveal that res judicata concerns have been appropriately grafted onto the superiority inquiry.  It does not appear, however, that res judicata concerns should be dispositive without either an evaluation of the likelihood of nonrecognition or a consideration of other factors which impact a determination of the superiority requirement.  *Ansari*, 179 F.R.D. at 116 (res judicata is "one of the factors that must be considered.");  *Cromer*, 205 F.R.D. at 134; *In re U.S. Fin. Sec. Litig.*, 69 F.R.D. at  49 ("[T]he issue of *res judicata* was *one* of several factors to be considered." (citing *Bersch*, 519 F.2d 974)).  With regard to an evaluation of the risk of nonrecognition, the Court does not find the "near certainty" standard to be a particularly useful analytical tool.  In *Bersch*, Judge Friendly found, based on unopposed affidavits that nonrecognition was almost certain; however, there is no indication that only this degree of certitude calls into question the superiority of a class action.  Nor is it likely that only where nonrecognition is a "mere possibility" ought a court find superiority to be established.  It seems more appropriate, instead, to evaluate the risk of

nonrecognition along a continuum.  Where plaintiffs are able to establish a probability

that a foreign court will recognize the res judicata effect of a U.S. class action judgment,

plaintiffs will have established this aspect of the superiority requirement.  *See In re IPO

Sec. Litig.*, 471 F.3d at 33 (placing burden on plaintiff not just to produce "some

evidence" of compliance with Rule 23, but to show that its requirements are met).  Where

plaintiffs are unable to show that foreign court recognition is more likely than not, this

factor weighs against a finding of superiority and, taken in consideration with other

factors, may lead to the exclusion of foreign claimants from the class.  The closer the

likelihood of non-recognition is to being a "near certainty," the more appropriate it is for

the Court to deny certification of foreign claimants.  With these principles in mind, the

Court now turns to the parties' arguments with respect to the degree of risk of foreign

nonrecognition in this case.

### (c)      Recognition in France

Both sides have submitted voluminous competing expert declarations on the

question of whether foreign courts would grant preclusive effect to a United States

judgment or settlement in this action.[12]  Because a vast majority of the foreign

---

[12] The following citation conventions will be followed with respect to the parties' competing expert
declarations.  Declaration of Bernart Audit in Support of Vivendi Universal, S.A's Opposition to Plaintiffs'
Motion for Class Certification, Sept. 27, 2005 ("Audit Decl."); Declaration of Guy Carcassonne in Support
of Vivendi Universal, S.A's Opposition to Plaintiffs' Motion for Class Certification, Sept. 23, 2005
("Carcassone Decl."); Declaration of Daniel Cohen in Support of Vivendi Universal, S.A's Opposition to
Plaintiffs' Motion for Class Certification, Oct. 3, 2005 ("Cohen Decl."); Declaration of Gérard de Geouffre
de la Pradelle in Support of Vivendi Universal, S.A's Opposition to Plaintiffs' Motion for Class
Certification, Sept. 29, 2005 ("de la Pradelle Decl."); Declaration of Olivier Renard-Payen in Support of
Vivendi Universal, S.A's Opposition to Plaintiffs' Motion for Class Certification, Sept. 27, 2005 ("Renard-
Payen Decl."); Declaration of François Terré in Support of Vivendi Universal, S.A's Opposition to
Plaintiffs' Motion for Class Certification, Sept. 30, 2005 ("Terré Decl."); Joint Declaration of Daniel
Cohen and Géraud de Geouffre de la Pradelle in Support of Vivendi Universal, S.A's Sur-Reply in
Opposition to Plaintiffs' Substituted Motion for Class Certification, Feb. 3, 2006 ("Cohen/de la Pradelle
Decl."); Declaration of Alexis Mourre in Support of Plaintiffs' Motion for Class Certification, Dec. 6, 2005
("Mourre Decl."); Declaration of Hélène Gaudemet-Tallon in Support of Plaintiffs' Motion for Class
Certification, Dec. 1, 2005 ("Gaudemet-Tallon Decl."); Declaration of Hans Smit in Support of Plaintiffs'

shareholders are French nationals, the Court will address first, and in greater detail, the likelihood of recognition by a French court.

As both parties agree, there is no bilateral (or multilateral) agreement between France and the United States governing the recognition and enforcement of judgments and jurisdictional decisions rendered by their respective courts.  (*See* Mourre Decl. ¶ 19; Renard-Payen Decl. ¶ 12; Audit Decl. ¶ 13; de la Pradelle Decl. ¶ 15.)  French law also does not follow the condition of reciprocity, whereby a foreign judgment may have effect in France only if the foreign jurisdiction gives effect to French decisions. (*See* Terré Decl. ¶ 14.)  Thus the United States's rules for recognition of foreign judgments are not relevant, and French recognition of a United States judgment is determined with reference solely to French law.  The issue of whether a United States class action judgment would be recognized and enforced in France has never been directly addressed by French courts.  (*See* Mourre Decl. ¶ 17; de la Pradelle Decl. ¶ 35; Gaudemet-Tallon Decl. ¶ 26; Smit Decl. ¶ 91.)  However, French decisional law does address in general terms the circumstances in which foreign judgments may be recognized.  (*See* de la Pradelle Decl. ¶ 15.)

Under French case law, before a foreign decision may be enforced or recognized (i.e., given preclusive effect) in France, it must first be subjected to the "exequatur" procedure.  (Terré Decl. ¶ 15; de la Pradelle Decl. ¶ 30; Mourre ¶ 154.)   Exequatur proceedings are concerned with the enforceability of a foreign decision under French law,

---

Motion for Class Certification, Dec. 20, 2005 ("Smit Decl."); Supplemental Declaration of Alexis Mourre in Support of Plaintiffs' Motion for Class Certification, June 22, 2006 ("Mourre Suppl. Decl."); Joint Declaration of Bernard Audit, Guy Carcassonne, Daniel Cohen, Gérard de Geouffre de la Pradelle, and Olivier Renard-Payen Setting Forth Observations with Respect to the Supplemental Declaration of Alexis Mourre and the Decision of the *Cour de Cassation* in *Prieur v. De Montenach*, July 7, 2006 ("Defs.' Suppl. Decl.").

and not with the substance of the underlying dispute.  (Terré Decl ¶ 16; Smit Decl. ¶ 56.)

If exequatur is granted, the underlying judgment is not changed, but rather its content is

incorporated into the exequatur judgment, which then receives enforceability and res

judicata effect in France.  (Terré Decl. ¶ 16; Mourre Decl. ¶¶ 154–56.)  The competing

expert declarations agree that the recognition and enforcement of foreign judgments

(grant of exequatur) in France is primarily governed by the *Munzer* case, decided by

France's highest court, the *Cour de cassation*, in 1964.  (*See, e.g.*, Audit Decl. ¶¶ 14, 16;

Mourre Decl. ¶ 20; de la Pradelle Decl. ¶ 17; Terré Decl. ¶ 19; Renard-Payen Decl. ¶ 13.)

The conditions that must be met under *Munzer* in order to grant exequatur may be

summarized as follows:  (1) the foreign court must properly have jurisdiction under

French law (the "jurisdictional prong"); (2) the foreign court must have applied the

appropriate law under French conflict-of-law principles (the "applicable-law prong"); (3)

the decision must not contravene French concepts of international public policy (the

"public policy prong"); and (4) the decision must not be a result of *fraude á la loi*

(evasion of the law) or forum shopping (the "forum shopping prong").  (*See* Cohen/de la

Pradelle Decl. ¶ 5.)

### (i)  Jurisdictional Prong

Whether this Court would be viewed as having properly asserted jurisdiction over

the French defendants is governed by the *Cour de cassation* case of *Simitch v. Fairhurst*

(Cass. 1e civ. Feb. 6, 1985) (*see* Defs.' Suppl. Decl. ¶ 3; Mourre Decl. ¶ 22; Smit Decl. ¶

58).  The *Simitch* test requires that, in order for a foreign court to have properly exercised

its jurisdiction, the following requirements must be met: (1) the case must not fall within

the exclusive jurisdiction of the French courts, (2) the circumstances of the case or

judgment at issue must be linked in a "characterized manner" to the foreign court, and (3) the choice of the foreign court must not be fraudulent.  (*See* Mourre Decl. ¶ 24; *see also* Defs.' Suppl. Decl. ¶ 3.)  Defendants' initial submissions relied heavily on the proposition that French courts had exclusive jurisdiction over French defendants under Article 15 of the French Civil Code and that, absent waiver, French courts would never recognize a U.S. judgment entered against a French entity.  That position is no longer tenable in light of the recent decision of the *Cour de cassation* in *Prieur v. Montenach* (Cass. 1e civ. May 23, 2006) holding that "Article 15 only provides for an optional jurisdiction of French courts."

The question then becomes whether there is a sufficient or "characterized link" to warrant the exercise of jurisdiction by a U.S. court.  Plaintiffs' experts contend that in order to satisfy this requirement, a French court does not need to determine that the foreign court has jurisdiction according to French conflict-of-jurisdictions rules, but rather must find that there were sufficient connections between the case and the foreign court such that its exercise of jurisdiction was not inappropriate.  (Mourre Decl. ¶ 76.) Although there are no precise criteria to define what might constitute a "characterized link" (*id.* at ¶ 75), one of plaintiffs' experts, Professor Hans Smit, likens it to the American concept of subject matter jurisdiction.  (Smit Decl. ¶ 58).  This Court, of course, has determined that subject matter jurisdiction exists based on plaintiffs' allegations that a substantial number of Vivendi's securities were traded in the United States, that individual defendants allegedly moved to the United States to expand Vivendi's presence there, and that a number of the alleged fraudulent acts took place in the United States.  (*See* Mourre Decl. ¶ 77.)  Based on the foregoing, plaintiffs' experts

conclude that the "characterized link" requirement is "easily met in this case" (*id.* at ¶ 78), and indeed, that "there can be no doubt" of that fact (Smit Decl. ¶ 58).

Defendants' experts, however, express no such sanguine view of the likelihood of the "characterized link" test being met.  They are instead "firmly of the view that a French court would reject a U.S. Court's assertion of jurisdiction over those foreign/absent class members as improper."  (Defs.' Suppl. Decl. ¶ 5.)  Defendants' experts base this conclusion in large part on the circumstances underlying the *Cour de cassation*'s recognition of foreign jurisdiction in the above-mentioned *Prieur* case. There, the French court found that the exercise of jurisdiction by the Swiss courts was appropriate in an annulment proceeding where the husband and wife were both born in Switzerland, married in Switzerland under Swiss law, and established their marital residence in Switzerland.  Although the husband was a French citizen, these "ties" to Switzerland, the French court concluded, justified referring the case to Swiss courts to rule on the annulment of the marriage.  (*See* Mourre Suppl. Decl. Ex. A, at 3.) Defendants' experts contend that the *Prieur* case shows a French court will require a similar showing of substantial contacts between the parties and the foreign jurisdiction before recognizing a "characterized link."  (Defs.' Suppl. Decl. ¶¶ 8–9.)  Unlike the parties in the *Prieur* case, the foreign shareholders in the putative class had no direct contacts with the United States, and did not purchase their Vivendi shares in the United States.  (*Id.* at ¶ 10.)  In addition, the foreign shareholders have not expressly indicated any desire to sue Vivendi—a French corporation with its headquarters in Paris—in the United States or to be included in the putative class here.  (*Id.*)

The acknowledged difference in degree of the contacts between the parties and the foreign forum in *Prieur* and in the instant case, however, is not sufficient to persuade this Court that a French court would not find a sufficient characterized link between the alleged fraud in this action and the United States sufficient to support the Court's exercise of jurisdiction. Defendants' experts merely show that where the ties of a case to the foreign jurisdiction are so significant as to be considered near absolute, a characterized link is readily established. It does not follow that the connection between defendants' alleged fraudulent course of conduct, occurring in sufficient part in the United States to warrant a finding of subject matter jurisdiction under our laws, would be insufficient under the "characterized link" standard. The links between the parties and the foreign forum in *Prieur* tend more to establish the paradigmatic case than to illuminate what a French court would decide when faced with the potentially closer question presented here. Upon the record presented, where Vivendi's CEO and CFO moved their operations to the United States and, allegedly, continued their fraudulent scheme there, the Court concludes that a French court would likely find a "characterized link" sufficient to satisfy the second element of the *Simititch* test.

The final element of the *Simititch* test is that plaintiffs' choice of a United States court must not have been fraudulent. This requirement has two different elements. First, the foreign judgment must not have been "obtained through deceitful maneuvers." (Mourre Decl. ¶ 79.) Defendants do not contest this element. Second, the case must not have been brought "in a foreign court in order to obtain a ruling from that foreign court, under foreign law that differs from the law to which a litigant would otherwise be subjected domestically." (Terré Decl. ¶ 45.) That is, plaintiff must not have

manufactured jurisdiction in order to choose a more favorable forum when French law should have applied.  Defendants argue that plaintiffs' U.S. action is "engineered" to evade a judgment under French law.  In 2002, the "ADAM" association (protecting minority shareholders) along with certain Vivendi shareholders (designated by name) petitioned the Paris Commercial Court to investigate Vivendi during the basic class period.  The court found the claim "ill-founded" and dismissed it.  The ADAM chairwoman allegedly stated that the dismissal prompted her to introduce a class action in the United States on behalf of French shareholders.  Thus, defendants argue, the U.S. action is an attempt to avoid the proper application of French law, and will preclude a grant of exequatur. (Terré Decl. ¶ 46; *see also* Cohen/de la Pradelle Decl. ¶ 21.)

As an initial matter, there is no evidence that the action pending before the Court was in fact brought at the instigation of the ADAM chairwoman.  Furthermore, while plaintiffs in this case have clearly come before this Court in order to avail themselves of causes of action and procedural devices unavailable in France, it is by no means a certainty that this alleged forum shopping would form a bar to recognition.  Indeed, it is difficult to see how plaintiffs in this case are operating a fraud on the court by bringing U.S. securities law claims that are, in part, based on activities in the United States, and which have been found to be within the Court's subject matter jurisdiction.  The Court concludes, therefore, that a French court is unlikely to find that plaintiffs engaged in improper forum shopping in pursuing this action in the United States, and would conclude that the third element of the *Simititch* test (and thereby the jurisdictional prong of *Munzer*) is satisfied.

### (ii)      Applicable-Law Prong

The applicable-law prong asks whether under French choice-of-law principles the application of U.S. law in this action is appropriate.  Although French law recognizes that when a French company trades securities on foreign exchanges it is subject to the laws of those countries (*see* Mourre Decl. ¶ 139), the issue here is whether U.S. law was properly applied with respect to non-U.S. investors who did not purchase Vivendi securities on the NYSE.  Neither party provides guidance on what recognized French choice-of-law principles in fact are, nor what rules of analysis are applied in determining whether, in the French view, the proper law has been applied.

Defendants' expert opinions are not uniform with respect to their analysis of the applicable-law prong.  Two of defendants' experts believe that a French court would determine that the appropriate applicable law would be French law, because the defendants are French, much of the alleged wrongdoing occurred in France, and many of the relevant transactions were made by French investors in France.  (*See* Terré Decl. ¶ 28; Audit Decl. ¶ 25.)  However, Terré and Audit both acknowledge that the application of foreign law may be recognized as appropriate where the doctrine of "equivalence" applies.  (*See* Terré Decl. ¶ 29; Audit Decl. ¶ 26.)  Equivalence exists where the resolution of the matter under French law would have been the same as the one made under the foreign law at issue.  (*See* Terré Decl. ¶ 29.)  Both Terré and Audit argue that the application of U.S. law and French law in these circumstances would not be considered equivalent because of fundamental procedural differences, such as the opt-out

mechanism and the calculation of damages contemplated by Rule 23.[13]  (*See* Terré Decl.

¶¶ 30–31; Audit Decl. ¶ 26.)

Defendants' experts Cohen and de la Pradelle take a slightly different view,

though arriving at the same conclusion that a French court would not consider the

applicable-law prong satisfied.  Under French law, a company whose office is in French

territory is subject to French law.[14]  (*See* Cohen Decl. ¶ 18.)  Cohen and de la Pradelle

conclude that based on the foregoing provisions of French law, any judgment applying

U.S. law to a case involving a French company would not be recognized.  (*See* Cohen/de

la Pradelle Decl. ¶ 15; *see also* Cohen Decl. ¶ 18.)  These provisions standing alone,

however, do not provide any basis for concluding that a company whose registered office

is located on French territory may not, under certain circumstances, be subject to the laws

of any other jurisdiction.  In addition to these provisions of French law, Cohen and de la

Pradelle rely on a 1997 decision by the *Cour de cassation*, *Société Africatours* (Cass. 1e

civ. July 1, 1997).  (*See* Cohen Decl. ¶ 20, Ex. 6.)  A translation of the case was not

provided but the entire summary provided by Cohen reads as follows:

> In [*Société Africatours*], the *Cour de cassation* set aside the decision of the
> Court of Appeal which had declared Senegalese law applicable to a
> company with its registered office in Senegal but had interpreted it from
> the point of view of French law which it had believed was similar:  in
> doing so, it had falsely applied ordinarily applicable law and had
> misinterpreted it.

(Cohen Decl. ¶ 20.)  Although Cohen and de la Pradelle assert that this case "specifically

[rules] that if a company's registered office is located in France, then any legal action

---

[13] Notwithstanding the procedural differences, Terré concedes that substantively the claims in this action and in suits by two shareholders pending actions in France are undeniably similar.  (Terré Decl. ¶ 31; see also Cohen Decl. ¶ 24 regarding similarity of causes of action alleged under French law.)

[14] "According to Article 1837 of the French Civil Code and Article L. 210-3 of the French Commercial Code 'companies whose registered office is located on French territory shall be subject to French law.'" (Cohen/de la Pradelle Decl. ¶ 15; Cohen Decl. Ex. 5.)

against that company brought by shareholders must be conducted according to French law" (Cohen/de la Pradelle Decl. ¶ 16), without more the conclusion simply does not follow from the described reasoning of the *Cour de cassation*.

As with the jurisdictional prong, plaintiffs' experts believe the applicable-law prong is easily met in this case: "[T]he requirement that the foreign court must have applied the law that governs according to French choice of law rule[s] is flexible and . . . it is sufficient if the law applied is substantively equivalent under French choice of law principles. That requirement appears amply met." (Smit Decl. ¶ 87.) More specifically, plaintiffs' expert Mourre argues first that the dominant view among French scholars is that the applicable-law prong should not be applied, and states that in fact the requirement is frequently not applied by courts. (Mourre Decl. ¶ 142.) Under this "dominant view" the proper inquiry asks only whether the foreign judge "seized" jurisdiction with the intent of avoiding the application of French law, or if the application of foreign law would constitute a violation of public policy. (*Id.*) Alternatively, Moure contends that the applicable-law may be met under the doctrine of equivalence, which accepts the application of a law other than that designated by French choice-of-law rules where the application of that foreign law leads to a result equivalent to the result that would have been reached under French law. (*Id.* at ¶ 146.) Considering the elements of plaintiffs' Section 10(b) claim, together with the fact that no punitive or other special or exemplary damages may be awarded in this action, Mourre concludes that the result in this action would be equivalent to that reached under Article L. 465-2 of the *Code monétaire et financier*.[15] (*Id.* at ¶ 148.) This conclusion is supported indirectly by

---

[15] This provision "provides for the liability of any individual or entity who 'disseminates in the public, by any means, false or misleading information on the perspectives of evolution or on the situation of an issuer

defendants' expert, Professor Cohen, who details at great length the substantive similarities of U.S. and French laws prohibiting the dissemination of false and misleading information to shareholders.  (Cohen Decl. ¶¶ 27–43).  Defendants' expert Audit opines that procedural differences between French and U.S. shareholder litigation code preclude a finding of equivalence, but he provides no basis for his views.  (Audit Dec., ¶ 26).  On balance, the Court concludes (a) that procedural differences are more properly the subject of a public policy analysis and (b) that the substantive similarities between U.S. and French law regarding securities fraud are likely sufficient under the doctrine of equivalence to meet the applicable-law prong of the *Munzer* test.

### (iii)    Public Policy Prong

This prong of the *Munzer* test requires that the foreign judgment to be recognized must be in "conformity with international public policy."  (Audit Decl. Ex. 5.)  This requirement is perhaps the most problematic of all the *Munzer* conditions inasmuch as French law does not recognize opt-out class actions.  (Cohen Decl. ¶ 49–51; Mourre Decl. ¶¶ 102–05).  The fact that opt-out class actions are not presently permitted is, of course, some indication that such actions are contrary to French public policy.  However, the fact that a particular right is not recognized in France will only lead to nonrecognition of a foreign judgment where the judgment would "infringe principles of universal justice."  *Lautour v. Guiraud* (Cass. 1e civ. May 25, 1948) (Mourre Decl, Annex 27) ("[F]oreign rules . . . are not contrary to the French conception of international public policy merely because they differ from mandatory provisions of French law, but only

---

of securities whose securities are traded on a regulated stock exchange or on the perspectives of evolution of a financial instrument traded on a regulated market, in a manner that can influence the market value.'" (Mourre Decl. ¶ 148.)

insofar as they infringe principles of universal justice considered in French conception as having universal value.").)

Defendants contend that an opt-out class action offends such universal principles in three respects. First, it is an accepted principle of French law that no one may claim in court by proxy. This principle—in French, *nul ne plaide par procureur*—procedurally requires anyone acting as a plaintiff or defendant in a lawsuit to make his identity known individually in the legal proceedings. (*See* Terré Decl. ¶ 38.) As a result, defendants' argue, the fact that not all members of the putative class will be identified by name, but instead represented by court-appointed class representatives, will be fatal to recognition of a U.S. judgment in this case by a French court. (*See id.* at ¶ 39; Renard-Payen Decl. ¶ 15; de la Pradelle Decl. ¶¶ 40–43; Cohen/de la Pradelle ¶¶ 19–20.) Defendants further argue that the failure to identify each plaintiff individually contravenes French notions of due process. (Audit Decl. ¶ 30.) This is because of a "strong principle" of French law that no one should be a plaintiff without consenting affirmatively to do so. (Audit Decl. ¶ 31). Members of an opt-out class, of course, are not required to take any steps to be included in this class. Defendants also argue that the opt-out class is inconsistent with the fundamental principle of adversarial proceedings, *le principe du contradictoire*, which gives every litigant the "personal freedom" to appear and be heard during any proceeding affecting his rights. (Cohen/de la Pradelle Decl. ¶ 20; Audit Decl. ¶ 32) Particularly where individual notice is not required (as is permissible under Rule 23), a class member could be deprived of his fundamental right to appear without ever having received actual notice. (Cohen/de la Pradelle Decl. ¶ 20.) Finally, contingency fees are prohibited under French law because such fees reduce the amount of compensation available to plaintiffs,

and, therefore, a U.S. judgment which provided contingent fees "could likely be regarded" as a violation of French public policy. (Audit Decl. ¶ 34.)

Plaintiffs' experts reject the notion that U.S.-style class actions are incompatible with fundamental principles of justice as interpreted by the French courts. (Smit Decl. ¶¶ 85–90; Mourre Decl. ¶¶ 97–105.) Thus, Mourre points out that group actions may be instituted by trade unions on behalf of employees without individual consent, and that associations of copyright holders are permitted to act in court on behalf of the members of their group. (Mourre ¶¶ 99–101.) Furthermore, as one of defendants' own experts points out, shareholder associations have the right to sue companies and their directors, and to solicit a mandate from individual shareholders (using mail and public notice) to act on their behalf. (Cohen Decl. ¶¶ 45–48.) Though these procedures are surely distinguishable from a Rule 23(b)(3) opt-out class, they do not evince a fundamental hostility to the concept of collective actions.

Plaintiffs' experts further argue that defendants misinterpret and misapply the principle of *nul ne plaide par procureur.* In Mourre's view, the principle of *nul ne plaide par procureur* stands for the proposition that a party to a court proceeding cannot appear as acting in its own interest when in reality it exercises the rights of a third party whose identity is concealed. The purpose is to avoid procedural fraud so that a defendant knows about specific defenses. (Mourre Decl. ¶ 131; *see also* Smit Decl. ¶ 74 (opining that the rule is the French equivalent of the real party-in-interest requirement of Rule 17).) In this case, defendants know the plaintiffs represent the absent class members, who are the real parties bound together by Rule 23's requirement of commonality and typicality. (*See* Smit Decl. ¶ 74, Mourre Decl. ¶ 132.) Moreover, Mourre points to case law confirming

that *nul ne plaide par procureur* is not part of the French conception of international public policy and is not a basis to set aside a foreign judgment.  (Mourre Decl. ¶¶ 133–34 (citing *Chenue v. Brachat* (Paris 5e. B, Oct. 24, 1991); Colmar, *Kruger v. Fougerolle* (Apr. 30, 1996); *Mandel v. Coprim* (Paris 1e. C, Oct. 27, 1998)).

Plaintiffs' experts acknowledge that French citizens have the right as "personal freedom" to appear and be heard in any action but contend, simply, that Rule 23(b)(3) honors such rights by providing every class members the opportunity to opt-out of the class.  (Smit. Decl. ¶ 88; Mourre Decl. ¶¶ 109–10.  Mourre also notes that collective actions by trade unions have been permitted by French courts on the equivalent of an opt-out basis, provided that member-employees are given notice of the action.  (Mourre Decl. ¶ 99.)  Thus it may well be that the French courts would enforce a U.S. class action judgment against a class member who received actual notice and, therefore, had a meaningful opportunity to exercise his "personal freedom," but decline to enforce the judgment against a class member who can show that he did not receive actual notice.

Weighing both parties detailed affidavits, the Court concludes that an opt-out class judgment would not offend French concepts of international public policy.  While it is clear that such class actions are presently not permitted, it is equally clear that the ground is shifting quickly.  Defendants' own expert, Professor Cohen, noted this development:

> French law does not cease to evolve in a direction favorable to *class actions*.  Following the practice of the United States, the President of the French Republic seriously wished to develop collective actions and put in place a commission of study on April 13, 2005 responsible for the introduction of a sort of "class action" for relationships with consumers.
> Quite naturally the issue of the introduction into French law of "*securities class actions*" was raised in order to more effectively protect shareholders and investors. . . .  The least that one can say is that this

> tendency is strongly gaining ground and that the evolution of French law
> seems very rapid.  While not long ago one considered that they seemed far
> from French law, works are multiplying today to attempt to take the exact
> measure and to acclimate them in France. . . .  French law is thus oriented
> toward "class actions" in matters of protection of shareholders and
> investors.

(Cohen Decl. ¶¶ 49–50.)  Defendants are quick to point out that the study referred to by

Professor Cohen observed that most of the study group's members viewed on opt-out

class to be contrary to French law.  (Cohen/de la Pradelle Decl. Ex. D at 32).  On the

other hand, a number of the members of the study recommended legislation establishing

an opt-out class mechanism based on the U.S. and Quebecois models.  (*See, e.g.*, *id.* Ex.

D, Working Group Report, Comment by Jean-Guy Lévy, President of the Bar.)  Of

course, whether or when France adopts class action legislation and whether it includes an

opt-out mechanism cannot be foretold.  However, the expressed views of the French

President, as well as the ongoing debate in legal and business sectors is strong evidence

that the class action model is not so contrary to French public policy that its use would

likely be deemed an infringement of "principles of universal justice" or contrary to

"international public policy."  Accordingly, the public policy prong of the *Munzer* test is

likely satisfied.

### (iv)   Absence of Fraud

The final prong of the *Munzer* test – that the action before the foreign court was

not fraudulent – has been addressed in the course of the Court's consideration of the

*Simitch* decision.  *See discussion supra*.  For the reasons stated above, it appears unlikely

that a French court would find fraud or improper forum shopping in plaintiffs' pursuit in

this Court of claims arising under the U.S. securities laws.

*      *      *

In sum, the Court concludes that plaintiffs' experts have shown a probability that French courts will find that (i) this Court has properly asserted jurisdiction over claims that have a "characterized link" to this jurisdiction; (2) U.S. securities laws satisfy the doctrine of equivalence and are appropriately applied; (3) a judgment herein will not infringe principles of universal justice; and (4) plaintiffs have not engaged in prohibited forum shopping. Accordingly, a judgment in this case would, more likely than not, be granted recognition at such time as an exequatur proceeding is instituted.

### (d)    Recognition in England

There is no clear authority addressing the res judicata effect of a U.S. class action judgment in England. As there is no statute or convention at play, the issue is addressed under common law rules. English common law provides for enforcement of a foreign judgment where the foreign court was "competent."[16] English authorities consistently discuss the competency of a foreign court in terms of whether there was jurisdiction over the *defendant*. Thus, a court is competent when (i) the defendant was present within its jurisdiction when proceedings were instituted, or (ii) the defendant submitted to its jurisdiction. (Declaration of Laurence Rabinowitz in Support of Vivendi Universal, S.A's Opposition to Plaintiffs' Motion for Class Certification, Sep. 29, 2005 ("Rabinowitz Decl."), ¶ 25.) By this standard, of course, this Court would be competent as Vivendi's extensive U.S. operations place it within the Court's jurisdiction.

Defendants contend, however, that if presented with the issue, English courts would also require that a U.S. court have personal jurisdiction over non-U.S. class

---

[16] The other elements generally required to establish *res judicata* are (i) that the judgement be final, (ii) that there is an identity of parties and (iii) that there is an identity of subject matter. (Rabinowitz Decl. ¶ 34 (citing *Good Challenger v. Navegante SA v. Metalexportimport SA* [2003] EWCA Civ. 1668).) The defendants do not argue that these elements would not be met.

members through their individual appearance in the action (Rabinowitz Decl. ¶ 26.)
Some support for this position can be found in dicta in *Campos v. Kentucky & Indiana
Terminal Railroad Company* [1962] 2 Lloyd's Rep. 459 (QB).  Therein the court ruled in
favor of defendant on the merits of the case but went on to note that defendant's
alternative defense of res judicata with regard to a favorable U.S. class action judgment
would likely fail because (i) the U.S. action was a "spurious" class action,[17] which did not
bind absent parties even under U.S. law and (ii) in any event, plaintiff was not a class
member at the initiation of the U.S. proceeding.  Lastly, the court found "great force" in
the argument that res judicata would not operate in an English court against a party who
has not been served with process in the foreign proceeding.  This begs the question of
whether a class member is a party.  Thus, it is far from clear how the court's
observation—accurate as far as it goes—would have been applied in the case of a "true"
Rule 23(b)(3) class wherein absent class members are not parties for a variety of
procedural purposes, including service of process.  Conte & Newberg, *supra*, § 1.4 n.2.
Defendants' expert simply ignores the issue and assumes, without analysis, that absent
members are subject to the same English common law jurisdictional rules that, as noted,
refer only to the need for service upon, or an appearance by, individual party defendants.
While English courts are not bound thereby, the Supreme Court has explicitly rejected
this reasoning, holding that non-resident class members need not appear individually, and
that adequate notice with an opportunity to opt-out is sufficient to establish a limited
consent to jurisdiction.  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 806-14 (1984).
In addition, the inference that an English court would not find a U.S. court competent

---

[17] "[S]purious class action was little more than a permissive joinder device, which would be binding only
on the original parties to the suit and those who might subsequently intervene."  1 Conte & Newberg,
*supra*, § 1:9.

where non-resident class members had not personally been served, appears inconsistent

with English law governing class or "representative" actions which, in fact, allows absent

parties to be bound.  Rule 19.6 of the 1998 Civil Procedure Rules provides as follows:

> (1)   Where more than one person has the same interest in a claim –
>        a.  the claim may be begun; or
>        b.  the court may order that the claim be continued, by or against one or
>            more of the persons who have the same interest as representatives of
>            any other persons who have that interest.
> (2)   The court may direct that a person may not act as a representative.
> (3)   Any party may apply to the court for an order under paragraph (2).
> (4)   Unless the court otherwise directs any judgment or order given in a claim
>       in which a party is acting as a representative under this rule –
>        a.  Is binding on all persons represented in this claim; but
>        b.  may only be enforced by or against a person who is not a party to the
>            claim with the permission of the court.

(Harris Decl. ¶ 44.)  Thus, English representative actions will bind those on whose behalf

a claim is brought (and, under section 4(b), persons who are not parties to the claim with

the court's permission).  *See generally* Neil Andrews, *Multi-Party Proceedings in*

*England:  Representative and Group Actions*, 11 Duke J. Comp. & Int'l L. 249 (2001).

There is no requirement, express or implied, that class members, foreign or domestic,

must appear or be served in order to be bound.  It is true that the scope of representative

actions relating to claims for damages is considerably narrower in England than in the

United States and that it is unlikely that the present action could proceed as a

representative action in England.  (Declaration of Jonathan Harris in Support of

Plaintiffs' Motion for Class Certification, Dec. 8, 2005, ¶ 45.)[18]  However, this appears to

be more of a procedural distinction than a jurisdictional one, the point being that English

law recognizes the competency of its own courts to bind absent parties in appropriate

situations.  While the issue is hardly free from doubt, based on the affidavits before it, the

---

[18] But defendants' expert notes that "an English court might even entertain a class (or representative) action against Vivendi.  Such a procedure is permitted by CPR Rule 19.6 . . ."  (Rabinowitz Decl. ¶ 23.)

Court concludes that English courts, when ultimately presented with the issue, are more likely than not to find that U.S. courts are competent to adjudicate with finality the claims of absent class members and, therefore, would recognize a judgment or settlement in this action.  (Harris Decl. ¶¶ 14–20 and 50–51 (citing John C. L. Dixon, *The* Res Judicata *Effect In England of a US Class Action Settlement*, 46 Int'l & Comp. L.Q. 134, 145–50 (1997)).)[19]

(e)        **Recognition in Germany**

Whether a foreign judgment would be recognized in Germany is a matter of German procedural law.  Plaintiffs' expert, Dr. Peter Mankowski, and defendants' expert, Dr. Gerhard Herman Otto Wegen, agree that there is no decision by a German court as to whether a judgment in a U.S. class action would be recognized under the German Code of Civil Procedure (Zivilprozessordnung) ("ZPO").  (Declaration of Peter Mankowski in Support of Plaintiffs' Motion for Class Cerification, Dec. 12, 2005 ("Mankowski Decl."), ¶ 8; Declaration of Gerhard Hermann Otto Wegan in Support of Vivendi Universal, S.A's Opposition to Plaintiffs' Motion for Class Certification, Sep. 27, 2005 ("Wegan Decl."), ¶¶ 7–8.)  Section 328 of the ZPO provides for the recognition of foreign judgments if five conditions are met:

> (1)  if the foreign court was competent for deciding on the claims based on the German provisions on jurisdiction, (2) if the defendant was properly served (in the legal relationships of the United States and Germany according to the Hague Service Convention) in a timely manner enabling defendant to defend itself properly, (3) if the judgment is not inconsistent with an earlier German or foreign judgment which would be itself recognised in Germany, (4) if the contents of the judgment do not infringe the German *ordre public*, i.e. the indispensable provisions of German law

---

[19] As in France, English courts will not recognize foreign judgments that are contrary to "principles of natural justice."  Dixon, *supra*, at 148.  Significantly, Defendants' expert does not contest this point.  (*See generally* Rabinowitz Decl.)

55

and (5) if reciprocity is guaranteed, i.e. if the foreign court would
recognise a corresponding German judgment.

(Wegen Decl. ¶ 7.)  Defendants' expert does not question the satisfaction of the first,

second, third and fifth conditions.

Dr. Wegen contends, however, that a U.S. class action judgment would violate the

"ordre public."  (Wegen Decl. ¶ 7.)  The constitutional premise for this position is found

in Article 103 of the German Constitution which establishes the right of a citizen to be

heard and to participate in legal proceedings.  (Wegen Decl. ¶ 9; Mankowski Decl. ¶ 36.)

This right, in the nature of a due process protection, is referred to as the right of "correct

representation," (Wegen Decl. ¶ 10), or the "disposition maxim," (Mankowski Decl.

¶ 39).  Interestingly, Dr. Wegen appears to conclude that the right of correct

representation could be satisfied, and a U.S. judgment would be enforced as to absent

class members, provided they were to receive actual notice of the class action and had the

opportunity to opt-out.  (Wegen Decl. ¶ 12.)  However, according to Dr. Wegen, service

of notice must be made "in a manner that strictly complies with the requirements of the

Hague Service Convention."[20]  (Wegen Decl. ¶ 17.)

It is true that service of process in conformity with the Hague Service Convention

would require individual service through the German Central Authority and local German

courts.  (Wegen Decl. ¶¶ 13–14.)  But service of process in this context refers to the

formal delivery of an initial pleading to an *opposing* party, i.e., the defendant.  It cannot

readily be thought of as a means of providing notice by plaintiff to a member of the

plaintiff class.  (Mankowski Decl. ¶¶ 49–54.)  By analogy, in the U.S. context, it makes

little sense to evaluate a class member's due process right to adequate notice in terms of

---

[20] Under German law, German nationals can only be served by foreign claimants in conformity with the
provisions of the Hague Service Convention.

whether the service requirements of Rule 4 of the Federal Rules of Civil Procedure have been satisfied.

Plaintiffs, then, appear to have the better of the argument that compliance with the due process requirements of the German constitution could be satisfied by measures reasonably calculated to give actual notice to class members of their right to opt-out of a U.S. class action and pursue, or decline to pursue, their individual claims.  But even under Dr. Mankowski's analysis, it would seem that a U.S. judgment would not be enforced against a class member who did not in fact receive actual notice despite plaintiffs' efforts to broadly disseminate notice.

There is a further concern regarding enforceability of a class action judgment that is not directly addressed by defendants' expert.  Leaving aside the question of whether the Hague Service Convention is the exclusive means for notifying absent class members, can it be said that the use of a collective action is so contrary to German public policy that a U.S. class action judgment will not be recognized under any circumstance?  In this regard the Court notes that, in contrast to France and England,  collective actions remain unknown in Germany.  Germany has recently passed the Investor Protection Model Procedure Act which addresses multiple suits by shareholders that allege violations of the capital market laws.  (Mankowski Decl. ¶¶ 32–33.)  This act provides for the use of test cases whose outcome would be binding in other individual shareholder actions.  (*Id.*)  However, it is not a collective action in the sense that non-party shareholders are bound by the results.  By comparison, both France and England, albeit in limited circumstances, recognize collective actions in which the interests of non-parties are pursued and non-parties are bound by the results.  *See discussion supra.*  Taking the parties' expert

affidavits as a whole, the Court is left with the distinct impression that the formalities of German law may well preclude the recognition of a judgment in the instant case.  Indeed, plaintiffs' expert concludes only that "one cannot rule out a U.S. class action settlement or judgment . . . will be recognized or enforced in German."  This candid opinion is insufficient on its face and leads the Court to conclude that plaintiffs have not shown a probability that German courts will give res judicata effect to a judgment in this case.

(f)       <b>Recognition in Austria</b>

With respect to Austrian law, the parties' experts agree that under the current applicable law, there must be "formal reciprocity" between the foreign state and the Republic of Austria as a condition to recognition of a foreign judgment.  (Declaration of Christian Herbst in Support of Vivendi Universal, S.A's Opposition to Plaintiffs' Motion for Class Certification, Oct. 1, 2005 ("Herbst Decl."), ¶ 34; Declaration of Leopold Specht in Support of Plaintiffs' Motion for Class Certification, May 12, 2005 ("Specht Decl."), ¶ 23.)  Formal reciprocity may be established by a treaty to which the foreign state and the Republic of Austria are a party, or a duly published Austrian decree that states the existence of reciprocity.  (Herbst Decl. ¶ 34; Specht Decl. ¶ 23.)  The United States and Austria are not party to a reciprocity treaty, nor has an Austrian decree been published that would provided for the enforcement of a U.S. judgment.  (Herbst Decl. ¶ 35.)  Plaintiffs' expert, in response, provides only the opinions of various Austrian legal scholars that the Austrian law establishing these requirements is unconstitutional. (Specht Decl. ¶¶ 23–24.)  These opinions fall far short of establishing a probability that an Austrian court would grant preclusive effect to any judgment or settlement issuing from this action.

58

### (g)   Recognition in The Netherlands

Plaintiffs have submitted the opinion of Professor Smit that Dutch courts would give binding effect to a judgment in, or settlement of a U.S. class action.  As is true in other European jurisdictions, a shareholder class action does not appear to be available in the Netherlands.  (Smit Decl. ¶ 46).  Nevertheless, the Dutch Legislature has recently enacted class action legislation in other contexts indicating that recognition of a judgment in this case would not be contrary to fundamental principles of fairness in Dutch law (*Id.* ¶¶ 36–39.)  Defendants have offered no evidence to dispute the Smit Declaration.  Based on the record before it, the Court finds plaintiffs have shown a probability that Dutch courts would recognize a judgment or settlement in this action.

### (h)   The Risk of Nonrecognition Does Not Compel Exclusion of All Foreign Class Members

Having considered the arguments presented by both sides on the risk of nonrecognition of a U.S. judgment or settlement abroad, the Court concludes that such concerns, without more, do not warrant exclusion of the citizens of France, England, and the Netherlands, who are otherwise putative members of the proposed class.  If and when the issue is presented to these countries, it is more likely than not that the courts in these countries would recognize the enforceability of a judgment or settlement in the present case.

However, it is more likely than not that German and Austrian courts, at present, will not give res judicata effect to judgments or settlements in a U.S. opt-out class action.  Because lawsuits could be brought by Austrian and German nationals against defendants alleging the same wrongdoing that underlies the allegations in this case, the Court concludes that the adjudication of German and Austrian shareholders' claims in this class

action is not necessarily superior.  The likelihood of nonrecognition in Germany and

Austria raise weightier issues of fairness and lessen, albeit in limited realistic situations,

the promise of economy, consistency, and finality made possible when class members are

bound to a final judgment or settlement.  *See* Fed. R. Civ. P. 23(b)(3)(C); *see also* 7AA

Charles Alan Wright et al., Federal Practice and Procedure § 1780 (3d ed. 2005) (noting

that Rule 23(b)(3)(C) requires, *inter alia*, a court to "evaluate whether allowing a Rule

23(b)(3) action to proceed will prevent the duplication of effort and the possibility of

inconsistent results"); Edward F. Sherman, *American Class Actions:  Significant Features

and Developing Alternatives in Foreign Legal Systems*, 215 F.R.D. 130, 130 (2003)

("[The American class action] serves the interests of economy by not having to try the

same issues again and again in separate cases. It also serves the interests of consistency

and finality by avoiding the possibility of inconsistent outcomes in separate trials of

similar cases and resolving all claims in a single case that is binding on all class

members.").

   A countervailing concern, however, is that in a global economy, companies do

business across international borders and sell their securities worldwide, and acts of

corporate misconduct—whether committed in the United States, abroad, or both—may

have substantial effects on the United States market.  Where, as here, the Court has

determined that significant alleged conduct occurred in the United States warranting

application of the federal securities laws to foreign actors, *see In re Vivendi*, 381 F. Supp.

2d at 169, the United States has a strong interest in the enforcement of those laws where

applicable.  *Cf. Dirienzo v. Philip Servs. Corp.*, 294 F.3d 21, 32 (2d Cir. 2002) (rejecting

defendant's *forum non conveniens* arguments in part because of United States' interest in

enforcing its securities laws, and also noting that "[f]or securities markets to function efficiently, securities fraud law must be clear and enforceable"); *Fidenas AG v. Compagnie Internationale Pour L'Informatique CII Honeywell Bull, S.A.*, 606 F.2d 5, 9 (2d Cir. 1979) ("Congress did not intend 'to allow the United States to be used as a base for manufacturing fraudulent security devices for export, even when they are peddled only to foreigners.'" (quoting *ITT v. Vencap, Ltd.*, 519 F.2d 1001, 1017 (2d Cir. 1975))); Ilana T. Buschkin, Note, *The Viability of Class Action Lawsuits in a Globalized Economy—Permitting Foreign Claimants to be Members of Class Action Lawsuits in the U.S. Federal Courts*, 90 Cornell L. Rev. 1563, 1569 (2005) (arguing in favor of "default presumption in favor of including foreign claimants in small claim securities, class actions law suits," because to do otherwise would lessen the deterrent effect of class adjudication).

Furthermore, in considering whether the threat of nonrecognition defeats the superiority of the proposed class, the Court should not ignore practical realities that reduce the risk that defendants would in fact be prejudiced by any potential nonrecognition in the form of duplication of effort or inconsistent results.  *See Cromer*, 205 F.R.D. at 135 n.32;[21] *In re U.S. Fin. Sec. Litig.*, 69 F.R.D. at 48 (noting "that

---

[21] The contingencies that would have to be met before genuine *res judicata* concerns might arise in the context of a judgment were described as follows:

> "[M]any events would have to occur before [defendant] would be prejudiced by an inability to assert the defense of res judicata successfully.  Specifically, (1) the class action would have to be tried to judgment, despite the greater likelihood that the case would instead be settled; (2) the class would have to lose on the merits; (3) an absent class member would have to bring a subsequent lawsuit in [a foreign] court, despite such practical deterrents as the unavailability of contingent-fee representation or a class action vehicle in those courts; (4) the absent class member would have to succeed in establishing jurisdiction over the defendants in that foreign court; (5) the foreign class member would have to convince the foreign court to ignore this Court's ruling and render judgment in its favor on the merits; and (6) the absent class member would have to then convince a Bermuda court to enforce the foreign judgment and ignore the judgment rendered by this Court."

practical difficulties in each country make lawsuits by these [foreign plaintiffs] virtually impossible"); *see also* Buschkin, *supra*, at 1597.  In this sense, defendants' res judicata concerns are "more hypothetical than real," since the likelihood of relitigation by absent class members in a European forum is low.  (Pls.' Reply Mem. 11.)  As plaintiffs' expert points out, absent class members who were dissatisfied with an adverse judgment, would be pressing claims (1) already adjudicated against them, (2) without the benefit of contingency fee arrangements, (3) with the added risks of having to pay defendants' counsel fees and costs of litigation.  Further, such plaintiffs would be facing the risk that defendants would be able to successfully invoke this Court's jurisdiction to prevent recovery.  (*See* Smit Decl. ¶ 105)  Similar disincentives would apply to absent class members dissatisfied with a favorable judgment they deemed inadequate.  (*Id.*)  And in the case of a settlement, the Court can fashion a proof-of-claim mechanism intended to bind all participants and discourage relitigation.  *See Cromer*, 205 F.R.D. at 135.  While it could be argued that practical considerations weigh strongly in favor of allowing all foreign purchasers to participate in plaintiffs' proposed class, the Court elects to proceed with caution and limit the class to foreign shareholders whose courts, in the unlikely event of successive litigations, are likely to give *res judicata* effect to any judgment herein.  This double layer of security should allay defendants' legitimate concerns, and argues in favor of including French, British and Dutch shareholders in the proposed class.

### 3.  Manageability

In determining whether a class action is a superior method of adjudication for a particular action, courts must also consider the management difficulties likely to be encountered if the action is continued as a class suit, such as the burden of complying

---

*Cromer*, 205 F.R.D. at 135 n.32.

with Rule 23's notice requirements.  *See* 7AA Charles Alan Wright et al., *Federal Practice and Procedure* § 1780, at 187–90.  The determination of whether a particular action is manageable is "peculiarly" within the discretion of the district court.  *In re Visa Check/Mastermoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001), *cert. denied*, 536 U.S. 917 (2001).

Rule 23(c)(2) requires that "notice must be ordered, and is not merely discretionary, to give the members in a subdivision (b)(3) class action an opportunity to secure exclusion from the class."  Fed. R. Civ. P. 23 Advisory Committee Notes, 1966 Amendment, 28 U.S.C.A. Rule 23, at 388.  Rule 23(c)(2) states that the required notice must be "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  Further,

> [t]he notice must concisely and clearly state in plain, easily understood language:  the nature of the action, the definition of the class certified, the class claims, issues or defenses, that a class member may enter an appearance through counsel if the member so desires, that the court will exclude from the class any member who requests exclusion, stating when and how members may elect to be excluded, and the binding effect of a class judgment on class members under Rule 23(c)(3).

*Id.*  Defendants argue that because Vivendi does not keep, does not have access to, and does not have the right to access information that would enable individual notice to shareholders carrying "bearer shares," individual notice would only be possible to a small number of European class members holding "registered shares."  (*See* Bisiaux Decl. ¶ 9; Heiser Decl. ¶¶ 13, 23.)  Publication notice in a number of foreign countries and in a variety of foreign languages, defendants' argue, would be unmanageable and insufficient to comport with due process.

While individual notice, where reasonably possible, is required, when class members' names and addresses may not be ascertained by reasonable effort, publication notice has been deemed adequate to satisfy due process. *See Eisen*, 417 U.S. at 173 (requiring individual notice to all class members whose names and addresses may be ascertained through reasonable effort); *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) (finding notice by publication constitutionally sufficient as to trust beneficiaries whose names and addresses are unknown). As long as the Court is persuaded that "class counsel acted reasonably in selecting means likely to inform persons affected," notice will be considered adequate. *Denney v. Jenkins & Gilchrist*, No. 02 Civ. 5460, 2005 WL 388562, at *20 (S.D.N.Y. Feb. 18, 2005); *see also In re Western Union Money Transfer Litig.*, No. 01 Civ. 0335 (CPS), 2004 WL 3079932, at *5 (E.D.N.Y. Oct. 19, 2004) (finding, in case involving class partially comprised of foreign class members, that individual notice must be sent to all class members identifiable in defendant's computer database, and requiring publication notice including, *inter alia*, "media outreach in the form of a press release, video news release, and radio news release, to be translated into various foreign languages and distributed internationally"); *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 175 (S.D.N.Y. 2000) (describing notice of settlement to foreign class members as including direct mail notice to ascertainable members, and publication notice including, *inter alia*, a widespread notice campaign in foreign newspapers, promotional announcements in key foreign cities.); *In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139, 144 (E.D.N.Y. 2000) (approving multi-faceted notice plan involving direct mail, worldwide publication, public relations, Internet and grass roots community outreach in light of inability to send

notice exclusively by direct mail).  Indeed, in a recent class action settlement including

global purchasers of Royal Ahold N.V. American Depository Receipts and/or ordinary

shares, the United States District Court for the District of Maryland found that notice

including direct mailings to all reasonably identifiable persons and entities, posting of

documents on websites, and publication of notice in numerous different countries and

different languages "fully satisfied the requirements of Rule 23 of the Federal Rules of

Civil Procedure and the requirements of due process."  *In re Royal Ahold N.V. Sec. &*

*ERISA Litig.*, 437 F. Supp. 2d 467, 472 (D. Md. 2006).

In response to defendants' manageability concerns, plaintiffs have filed a

comprehensive affidavit outlining the effectiveness of its proposed method of providing

notice in foreign countries.  (*See* Affidavit of Todd B. Hilsee on Ability to Provide Multi-

National Notice to Class Members, Dec. 19, 2005 ("Hilsee Aff.") ¶ 7.)  According to this

affidavit, the following methods of notification will be used to execute the dissemination

of notice required under Rule 23(c)(2):  (1) individual mailed notice to all reasonably

identifiable class members; (2) publication notice in appropriate multi-national media to

reach, in combination with direct mailings, a high percentage of the shareholders in each

country; (3) a neutral informational press release, to be approved by the Court in advance,

announcing the commencement of the notice program to increase awareness; (4) notice

through any shareholder communication channel that might exist, including Vivendi's

website; and (5) a neutral website, to be approved by the Court in advance, translated into

all relevant language, posting the notices, the plaintiffs' complaint, defendants' answers,

the class certification order; an exclusion request form, and other relevant documents.

(*Id.* ¶ 11.)  Although the issue of executing appropriate notice will necessarily be

revisited, for purposes of considering plaintiffs' motion to certify a class the Court is satisfied that plaintiffs intend to provide individual notice to those class members whose names and addresses are ascertainable, and that plaintiffs' proposed form of publication notice, while complex, will prove both manageable and the best means practicable of providing notice.[22]  At this stage, "the issue of foreign notice is not sufficiently grave to defeat class certification."  *In re Lloyd's*, 1998 WL 50211, at \*16; *cf. In re DaimlerChrysler*, 215 F.R.D. at 301 (noting difficulties involved in maintaining class including foreign investors, and observing that lead plaintiffs had not adequately responded to defendants' concerns relating to class management).

## IV.    Subclasses

Defendants argue that there is no single integrated worldwide market for Vivendi ordinary shares and Vivendi ADSs and, therefore, that a single class consisting of holders of both securities cannot be certified.  (Opp'n 4–6).  Implicit in their argument is the contention that if plaintiffs' motion for certification is granted, separate subclasses should be established for purchasers of ADSs and for purchasers of ordinary shares.  The Court has the authority under Rule 23(c)(4)(B) of the Federal Rules of Civil Procedure to divide a class into subclasses.  The existence of divergent interests is the primary reason to establish subclasses.  *See* 1 Conte & Newberg, *supra*, § 8:12.  Defendants argue that a single class cannot be certified because American and European stock markets are not fully integrated and, therefore, each group of purchasers will require separate proof on

---

[22] Defendants' contention that providing notice to foreign class members is unmanageable is further undercut by the recent approval by Judge P. Kevin Castel of a comprehensive program to provide notice to eligible claimants of money received from the settlement between the Securities Exchange Commission and Vivendi, Messier and Hannezo for the violation of securities laws.  *See SEC v. Vivendi Universal, S.A.*, No. 03 Civ. 10195 (PKC) (S.D.N.Y. Dec. 18, 2006).  The notice plan was in many respects similar to the one proposed by Hilsee in this proceeding.  While that decision is of court not binding on the Court, it suggests that it is realistic to provide notice to foreign class members involved in this very case.

the issues of reliance and damages.  (Defs.' Sur-Reply Mem. 8-9).  According to

defendants' expert, Professor Gompers, there are two district trading markets because (1)

U.S.-based investors faced a foreign exchange risk not faced by foreign investors; and (2)

investors in each security followed different trading strategies and had different trading

opportunities because of the time zone difference between the markets.  (Declaration of

Paul A. Gompers in Support of Vivendi Universal, S.A's Opposition to Plaintiffs' Motion

for Class Certification, Oct. 3, 2005, ¶ 6.)  The lack of full integration is evidenced by

market metrics that show segmentation and an alleged market lag with news being

incorporated into the price of ordinary shares on the Paris Bourse before impacting the

price of ADSs on the NYSE.  (*Id.* ¶¶ 40–44.)  Plaintiffs present their own expert, Jane D.

Nettesheim, who opines that the markets for Vivendi ordinary shares and ADSs are

"highly integrated," although concededly not "perfectly integrated."  (Declaration of Jane

D. Nettesheim in Support of Plaintiffs' Motion for Class Certification, Dec. 19, 2005, ¶

7.)  Analyzing the relative prices of each security during the period where both markets

are trading, Nettesheim finds that prices were "almost always effectively equivalent."

(*Id.* ¶ 8 & Exs. 4, 5.)  While the NYSE and the Bourse may not be perfectly integrated,

such that Vivendi ordinary shares and ADSs are perfect substitutes with identical prices

and returns, this distinction does not require creation of subclasses.  It is undisputed that

the two markets are highly integrated and nothing in defendants' submission supports the

proposition that such minor inefficiencies between the markets that may exist will have

any impact on class-wide proof of the element of reliance.  And small differences in

returns experienced by holders of ADSs and ordinary shares may affect the amount of

damage but are unlikely to alter the methodologies of calculation, at least to a degree

necessary to warrant, at this juncture, the creation of subclasses.

## CONCLUSION

Consistent with the foregoing, plaintiffs' motion to certify the class [234] is

GRANTED in part. A class is hereby certified consisting of all persons from the United

States, France, England, and the Netherlands who purchased or otherwise acquired

ordinary shares or American Depository Shares of Vivendi Universal, S.A. between

October 30, 2000 and August 14, 2002.


SO ORDERED.

Dated: New York, New York
    May 21, 2007

Richard J. Holwell
United States District Judge

68