UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                                    02 Civ. 5571 (RJH) (HBP)

IN RE VIVENDI UNIVERSAL, S.A.
SECURITIES LITIGATION                        **MEMORANDUM
                                           OPINION AND ORDER**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        This is a securities fraud class action brought on behalf of shareholders of

Vivendi, S.A. ("Vivendi" or the "Company") against the Company and its former Chief

Executive Officer and Chief Financial Officer, Jean-Marie Messier and Guillaume

Hannezo.  Vivendi is a limited liability company incorporated in France.  Plaintiffs

accuse defendants of concealing a liquidity crisis that, once it became known, caused a

material drop in the price of Vivendi shares traded on the New York and various foreign

stock exchanges, including the Bourse in Paris.

        By opinion dated November 4, 2003, the Court (Baer, J.) denied defendants'

motion to dismiss for lack of subject matter jurisdiction.  *In re Vivendi Universal, S.A.

Sec. Litig.*, 381 F. Supp. 2d 158, 169 (S.D.N.Y. 2002) ("*Vivendi I*").  By opinion dated

September 21, 2004, the Court (Holwell, J.) denied defendants' motion for

reconsideration, finding that subject matter jurisdiction was properly based on

defendants' alleged conduct, including operation of the Company by the CEO and CFO

from their New York headquarters, which contributed to the alleged fraud and directly

caused injury to both domestic and foreign investors.  *In re Vivendi Universal, S.A. Sec.

Litig.*, No. 02 Civ. 5571 (RJH), 2004 WL 2375830, at *7 (S.D.N.Y. Oct. 22, 2004)

("*Vivendi II*").  On May 21, 2007, the Court (Holwell, J.) granted plaintiffs' motion for

class certification and included in the class shareholders from the United States, France, England and the Netherlands. *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76 (S.D.N.Y. 2007) ("*Vivendi III*").

Defendants now move for partial reconsideration of the Court's class certification decision, citing "recent" information that allegedly shows that the superiority requirement of Federal Rule of Civil Procedure 23(b)(3) cannot be established as to French shareholders who, defendants maintain, should now be excluded from the class. In short, defendants contend that French courts will never give *res judicata* effect to a judgment in a Rule 23(b)(3) opt-out class action and, therefore, that this action cannot be a superior means of litigating the French shareholders' claims.

Having reviewed the parties' typically comprehensive submissions, the Court concludes that virtually all the "recent" developments cited by defendants reflect the ongoing debate in France and the European Union as to whether class action procedures ought to be adopted, with either an opt-in or opt-out feature. However, the underlying issue—what form or forms of collective actions would be consonant with the French constitution as interpreted by France's high constitutional court, the Conseil Constitutionnel—remains unchanged. This issue, and the more immediate issue of whether a French court would refuse to enforce a U.S. class action judgment as contrary to international public policy, were thoroughly briefed by the parties and considered by the Court in the context of plaintiffs' original motion for class certification. For the reasons set forth in *Vivendi III* and below, the Court denies defendants' motion for reconsideration.

**BACKGROUND**

As detailed in *Vivendi III*, the Court found that the prerequisites to class certification set forth in Rule 23(a) had been readily satisfied.  The joinder of individual shareholders was "impracticable" in light of the approximately one billion ordinary shares that were outstanding during the relevant class period.  The existence of "questions of law or fact common to the class" was undisputed.  And the typicality of the named plaintiffs' claims was amply established as to all but one of the proposed class representatives.  *Vivendi III*, 242 F.R.D. at 83-90.  Nor did defendants seriously question whether, under Rule 23(b)(3), common questions of law or fact predominated over any questions affecting individual members.  *Id.* at 90-91.  However, defendants did contest whether, with respect to foreign shareholders, plaintiffs had established that a class action was "superior to other available methods for the fair and efficient adjudication of the controversy," as also required by Rule 23(b)(3).  In addressing this issue, the Court separately considered the non-exhaustive list of pertinent factors set forth in the Rule:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

*Id.* at 91.[1]

Regarding the first two factors, the Court concluded that this prototypical securities fraud case was particularly appropriate for class treatment.  Thousands of individual shareholders allegedly had been damaged by defendants' fraud, and most of

---

[1] In *Vivendi III*, the Court relied on the 2003 version of Rule 23.  Rule 23 has since amended, as part of the general "restyling" of the Federal Rules of Civil Procedure. Citations in this opinion are to the current version of Rule 23.

them would have claims too small to justify the initiation of an individual action. Moreover, only two individual shareholder lawsuits were pending in France, indicating that individual interest in conducting separate actions was minimal. *Id.* at 92.

Absent a better pigeonhole, the Court considered under the third articulated factor—the desirability of concentrating claims in this forum—the probable *res judicata* effects of a judgment entered by this Court. In particular, the Court analyzed to what extent defendants would be exposed to "second bite" actions in a foreign country that were not barred by the judgment in this case.

Judge Friendly analyzed this issue in *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974 (2d Cir. 1975), and stated, in *dicta*, that "while an American court need not abstain from entering judgment simply because of the possibility that a foreign court may not recognize or enforce it, the case stands differently when this is a *near certainty*." *Id.* at 996 (emphasis added). Given uncontradicted affidavits that this was so in the case before it, the Second Circuit directed the District Court to exclude foreign purchasers from the class in *Bersch*. *See Vivendi III*, 242 F.R.D. at 92-93 (summarizing *Bersch*).

Finding the "near certainty" test incomplete as a general guide to decision, the Court evaluated the risk of non-recognition along a continuum. Where a plaintiff cannot show as part of the general showing required by Rule 23, *see In re Initial Public Offering Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006), that foreign court recognition is more likely than not, this factor weighs against finding superiority; taken in consideration with other pertinent factors, it may lead to the exclusion of foreign claimants on superiority grounds. Generalizing from *Bersch*, the Court held that "[t]he closer the likelihood of non-

recognition is to being a 'near certainty,' the more appropriate it is for the Court to deny certification of foreign claimants."  *Vivendi III*, 242 F.R.D. at 95.

After analyzing a veritable mountain of expert affidavits on foreign law, *see id.* at 96 n.12, the Court concluded that German and Austrian courts were not likely to give *res judicata* effect to a judgment entered in this case, while French, English and Dutch courts were likely to do so.  With respect to France, the Court applied the test set forth in *Munzer v. Jacoby*, Cass. civ. lre, Jan. 7, 1964, [1964] Juris-Classeur Périodique [J.C.P.] II 13590, which asks, *inter alia*, whether a foreign judgment would violate French concepts of "international public policy."[2]  Concluding that it would not, and considering other factors relevant to the issue of superiority, the Court included French shareholders in the class.

The Second Circuit declined to hear an interlocutory appeal, and the Supreme Court declined to issue a writ of certiorari.  *In re Vivendi Universal, S.A. Sec. Litig.*, No. 07-1419 (2d Cir. May 8, 2007); *Vivendi S.A. v. Gerard*, 128 S. Ct. 391 (2007).

## DISCUSSION

According to defendants a series of "recent events" in France have "now made it clear beyond any doubt" that opt-out class actions are unconstitutional in France, and that a French court would never recognize a judgment in this case, since to do so would violate "French concepts of international public policy" under *Munzer*.  (Vivendi Mem.

---

[2] The four conditions that must be met under *Munzer* in order to grant *exequatur* may be summarized as follows:  (1) the foreign court must properly have jurisdiction under French law (the "jurisdictional prong"); (2) the foreign court must have applied the appropriate law under French conflict-of-law principles (the "applicable-law prong"); (3) the decision must not contravene French concepts of international public policy (the "public policy prong"); and (4) the decision must not be a result of *fraude á la loi* (evasion of the law) or forum shopping (the "forum shopping prong").  *See Vivendi III*, 242 F.R.D. at 96.

1, 5).  Accordingly, defendants contend that as far as its French shareholders are concerned, a class action is not a superior means to achieve the fair and efficient adjudication of this controversy.  (*Id.* at 2-3.)

Pursuant to Rule 23(c)(1)(C), a court may alter or amend a previous order certifying a class.  In exercising its discretion, a court should consider whether a "changed factual situation" renders its original decision unsound.  *In re FleetBoston Fin. Corp. Sec. Litig.*, No. 02 Civ. 4561, 2007 WL 4225832, at *5 (D.N.J. Nov. 28, 2007).  Nevertheless, decertifying or redefining the scope of a class should only be done where defendants have met their "heavy burden" of proving the necessity of taking such a "drastic" step.  *Gordon v. Hunt*, 117 F.R.D. 58, 61 (S.D.N.Y. 1987).

In urging reconsideration, defendants argue that the "legal underpinning" of the Court's opinion—a comment that while opt-out actions are not presently permitted in France, "the ground is shifting quickly"—is no longer correct.  (Vivendi Reply Mem. 2 n.3 (quoting *Vivendi III*, 242 F.R.D. at 101).)  Defendants misread the Court as predicting that France will itself adopt legislation creating a class action procedure with an opt-out mechanism.  This is not so.  As is clear from the remainder of the *Vivendi III* opinion, the Court drew no conclusion as to whether France would ever adopt class action legislation and, if so, whether it would include an opt-out mechanism.  *See Vivendi III*, 242 F.R.D. at 101 ("Of course, whether or when France adopts class action legislation and whether it includes an opt-out mechanism cannot be foretold.").  After reviewing the vigorous debate ongoing in French society, the Court concluded only that the class action model, whether opt-in or opt-out, was not so contrary to French public policy that the inclusion of French shareholders in a U.S. litigation, alleging violations of U.S. securities laws,

would be deemed contrary to "international public policy."  *Id.*  The Court will reconsider, then, whether the "recent events" in France alter that conclusion.

I.     **"Recent Events"**

A.     **The Guillame/Clément /Fombeur Letters**

Understandably displeased with the Court's decision to certify a class of Vivendi shareholders that included residents of France, it appears that Vivendi's General Counsel, Jean-Francois Debos, solicited the views of a member of the Ministry of Justice regarding that aspect of the decision.  (*See* Letter from Marc Guillaume, Director of Civil Affairs, to Jean-Francois Dubos, Secretary General, at 1 (April 3, 2007), Cameron Decl. Ex. B.)  Mr. Guillame provided a brief memorandum stating an opinion in conclusory form that an opt-out class action would not comply with a 1989 decision by the Conseil Constitutionnel, CC Decision No. 89-257.[3]  (*Id.*)  The form or content of Mr. Dubos' request is unknown, although it appears the letter may have been solicited in connection with Vivendi's interlocutory appeal of *Vivendi III* to the Second Circuit and its subsequent petition for a writ of certiorari.  It is not known whether Mr. Guillame was provided with a copy of *Vivendi III* decision or of the submissions of the parties upon which that decision was based.  After plaintiffs lodged complaints that Mr. Guillame's letter was in some manner not authorized, Vivendi submitted a letter from Pascal Clément, the former Minister of Justice, to the effect that it was "worthwhile" to consider Mr. Guillame's "legal arguments" and that he, too, was of the opinion that a U.S. class action mechanism was incompatible with CC Decision No. 89-257.  (Letter from Pascal

---

[3] This decision is attached as Exhibit B to the Declaration of Jessica R. Buturla (June 2, 2008).

Clément to Hervé Pisani, at 1 (Jan. 15, 2008), Cameron Decl. Ex. N).[4]  Shortly thereafter

a confirmatory memorandum was written by Mr. Pascal Fombeur, the successor to

Mr. Guillame at the Ministry of Justice, which reiterates Mr. Guillame's previously

expressed opinion.  (*See* Mem. of Pascal Fombeur, Director of Office of Civil Matters

(Jan. 22, 2008), Cameron Decl. Ex. P.)

        The Court respects the opinions of Ministry of Justice officials that were provided

subsequent to its issuance of the class certification decision in *Vivendi III*.  While the

Court has not been provided with the benefit of the analysis underlying their opinions, it

can fairly be said that identical, more detailed opinions were submitted by Vivendi's

retained experts in connection with Vivendi's opposition to the motion for class

certification.  Moreover, Mr. Guillame's views concerning the constitutionality of class

actions were previously considered by the Court in connection of its review of a report of

the Working Group appointed by President Jacques Chirac in 2005, which recommended

the adoption of opt-in class actions and questioned the constitutionality of an opt-out

class action.  Mr. Guillame was co-chairman of that Group.[5]

        While the Court has given careful consideration to Mr. Guillame's opinion, it has

also considered the opinion of plaintiffs' experts (as well as one of defendants' own

---

[4] Mr. Clément is currently a lawyer at Orrick, Herrington & Sutcliffe LLP, which is representing Vivendi in a RICO action filed against Deutsche Telekom.  *Vivendi S.A. v. T-Mobile, Inc.*, 06 Civ. 1524 (W.D. Wash. 2006).

[5] Mr. Guillame was appointed the Secretary General of the Administrative Services of the Conseil Constitutionnel sometime in 2007.  He recently authored another letter in response to another inquiry by Vivendi's General Counsel in which he opined that "French law does not recognize the 'class action' based on 'opt-out' mechanism such as they exist in American law."  Mr.Guillame again cites CC Decision No. 89-257 as the basis for this opinion.  (*See* Letter from Marc Guillame to Jean-Francois Dubos (Mar. 9, 2009), *available at* Ex. B to Letter from Paul Saunders to Hon. Richard J. Holwell (Mar. 11, 2009).)

experts) who have expressed the opinion that the opt-out class mechanism, found in the United States as well as several Western European countries, and proposed to the French National Assembly in 2006, is not inconsistent with French principles of individual freedom and, indeed, is consistent with Decision No. 89-257 of the Conseil Constitutionnel.  It is sufficient to note, at this point, that the substantive opinions of Messrs. Guillame, Clement and Fombeur are therefore known to the Court and do not constitute new matters that would otherwise warrant reconsideration of the Court's class certification decision.  *See* Fed. R. Civ. P. 23(c)(1)(C); S.D.N.Y. Local R. 6.3; *FleetBoston*, 2007 WL 4225832, at *5.  The Court further accepts the conditions under which Mr. Guillaume provided his opinion to Vivendi, namely, that "it is not up to . . . the minister of justice, to evaluate a decision handed down by a court, let alone when this court is in a sovereign foreign State, nor to intervene in a dispute between private parties."  (Letter from Marc Guillame to Jean-François Dubos, at 1 (Apr. 3, 2007) (original capitalization), Cameron Decl. Ex. B.)

### B.      The Attali Commission and the Coulon Report

Appointed on August 30, 2007 by President Sarkozy, the Attali Commission prepared a 242-page report proposing "300 decisions for changing France."  (Cameron Decl. Ex. Q.)  One of the proposals was to "introduce group actions into French law." (*Id.*)  The specific proposal was to establish an opt-in class action for consumer frauds. (*Id.*)  The Report does not mention any opt-out proposals or comment on the constitutionality of such procedures.

The "Coulon Report," issued by another government-appointed working group in January 2008, strongly endorses the introduction of consumer class actions in France.

(Cameron Decl. Ex. S ("Coulon Report").)  Interestingly, the Report comments favorably on Quebec's class action model, which it correctly notes is an opt-out system.  (*Id.* at 76.)[6]  The Report ultimately proposes an opt-in model, noting that an opt-out model is "constitutionally uncertain."  (*Id.* at 80.)  The Court agrees on this point and notes that this uncertainty will not be resolved until the Conseil Constitutionnel addresses the constitutional implications of any class action statute adopted by the legislature.[7]  That issue that was only indirectly addressed in Decision No. 89-257, albeit in a manner favorable to the proponents of an opt-out model.  *See* discussion, *infra*, § II.  Of course, the fact that the constitutionality of a newly-adopted procedure may be uncertain does not indicate that it is certainly unconstitutional; similar uncertainty surrounded the adoption of revisions to Rule 23 in 1966.  Marvin E. Frankel, *Some Preliminary Observations Concerning Civil Rule 23*, 43 F.R.D. 39, 44-47 (Sept. 18, 1967); *see generally* Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure* § 1753 (Supp. 2008) ("Wright & Miller").

### C.   **MEDEF and the LaTribune Article**

At the request of Vivendi, a French business association, MEDEF ("Morivement des Enterprises de France") issued a "certificate" confirming "its firm hostility" to any class actions under French law, including any opt-out procedure.  (Cameron Decl. Ex. U.)  In a similar vein, Pierre Simon, the President of the Paris Chamber of Commerce wrote

---

[6] The Report continues to criticize the American class action system, not because of  its opt-out feature but due to the availability of punitive damages, potential abuse of the discovery process and the availability of contingent attorney's fees.  (Coulon Report 78.)

[7] Of course, if a class action statute is not adopted in France, the constitutional issues may not be presented to the Conseil Constitutionnel.  As for enforcement of a class action judgment in this case, the constitutional and international public policy issues may be raised in a trial court such as the Paris Tribunal de Grand Instance.  *See Vivendi III*, 242 F.R.D. at 92.

an opinion piece for the newspaper, LaTribune, entitled "Class Actions, Watch Out!" (Cameron Decl. Ex. T.)  Mr. Simon believes that only an opt-in action should be adopted "from a constitutional viewpoint."  (*Id.*)  The Court finds the views of such business groups as unsurprising as the views of consumer advocates who strongly support the introduction of opt-out legislation in France.  (*Cf.* Mourre Supp. Decl. ¶ 19 (Apr. 11, 2008).)  There are sound social and political reasons both to oppose and support the adoption of class action procedures in France, whether of an opt-in or opt-out nature. Weighing them, however, is not the province of this Court.

### D.     Commentary in the *Cahiers du Conseil*

Of more interest to the Court is a recent commentary by an unidentified author in the *Cahiers du Conseil* (or *Constitutional Court Journal*) published in 2007.[8] (Commentary No. 23, Cameron Decl. Ex. L ("Commentary 23"). )  The Journal reports and comments upon recent decisions of the Conseil Constitutionnel.  The commentaries are not authored by judges of the Conseil but by its administrative branch.  Thus the commentaries do not bind the Conseil and are presented for information purposes only. Nonetheless, they may be viewed as persuasive.  (*See* Cameron Decl. Ex. V, at 3 (English translation); Mourre Decl ¶ 24 (Apr. 4, 2008).)

The decision that was subject to commentary, CC Decision. No. 2007-556, involved review of a statutory provision that, petitioners claimed, limited the right of

---

[8] An affidavit filed in a case before Judge Marrero attributes this commentary to Mr. Guillame, who as noted left the Ministry of Justice to become General Secretary of the Administrative Services of the Conseil Constitutionnel sometime in 2007.  (Supp. Decl. of Jean-Paul Béraudo ¶¶ 41-42, *Louisiana State Employees' Retirement System v. Alstom U.S.A., Inc.*, No. 03 Civ. 6595 (VM) (Apr. 12, 2008) ("It is indeed the opt-out that he [Guillaume] targets!").)

workers in the ground transportation industry to strike.[9]  The Conseil found, *inter alia*, that the lengthening of a cooling-off period between union notification of a decision to strike and the beginning of a strike did not impose unwarranted restrictions on an employee's personal freedom to strike.  Moreover, the union representatives' ability to act on a collective, representative basis in deciding when to issue a strike notice did not infringe constitutional rights as such notice "leaves every employee free to decide whether or not to take part in the strike."  (*Id.* ¶¶ 11-13.)

The Conseil did not refer to or discuss its opinion in CC Decision No. 89-257. Nevertheless, in discussing CC Decision No. 2007-556, the commentator drew a distinction between a union's right to call a strike, the right to which is specifically preserved in the Constitution, and other rights such as the right to file a collective action on behalf of employees.   Quoting from Decision No. 89-257, the commentator noted that for such an action to be constitutional, the employee had "to give his/her consent with full knowledge of the case" and had to "maintain the freedom to terminate this action." (Commentary 23 ¶ III.1.6.)  The commentator then added:  "By failing to comply with this individualized assent, which does not, for example, exist in Anglo-Saxon opt-out systems in collective actions, the individual would be unreasonably deprived of a right in violation of the Constitution."  (*Id.*)

Defendants' experts contend that this sentence confirms their prior legal opinions that a judgment in a U.S. opt-out class action will not be enforced in France because it would violate not only the right to "personal freedom" guaranteed by the French

---

[9] This decision is attached as Exhibit K to the Supplemental Declaration of Timothy G. Cameron (Mar. 17, 2008).

constitution, but also French concepts of international public policy. Specifically, defendants' experts opine that a class action would not be constitutional in France unless class members received individualized notice, and further, that an opt-in model was employed to establish an individual's actual consent to participate in the action. Defendants then argue that the class certified in this case does not meet this constitutional standard; that standards of international public policy will thereby be violated; that a French court therefore will not give preclusive effect to a U.S. judgment; and finally, that without complete *res judicata* protection, a class action including French shareholders of Vivendi does not meet the superiority requirements of Rule 23(b)(3). Plaintiffs and their experts, on the other hand, contend that the commentator does not speak for the Conseil Constitutionnel, and has misread CC. Decision No. 89-257, which should be read to permit class actions with an opt-out feature. Since neither the French Constitution nor French concepts of international public policy are threatened, plaintiffs contend that a French court is likely to give preclusive effect to a judgment in this case. Taken with the other factors warranting certification, plaintiffs argue that the superiority requirement of Rule 23(b)(3) is therefore satisfied.

## II.    Constitutional Requirements Regarding Notice and Consent

In evaluating the parties' arguments it should be recalled that France has never adopted a class action statute and, perforce, no French court has passed on the constitutionality of any such statute. Nevertheless, it appears that France is moving in the direction of adopting some form of group action. (Mourre Add'l Decl. ¶ 9 (June 19, 2008).) As defendants' Professor Cohen notes: "French law does not cease to evolve in a direction favorable to class actions." *Vivendi III*, 242 F.R.D. at 101. The policy

concerns that underlie this movement are the same that led to the adoption of the modern class action device in the United States in 1966 and, subsequently, in other countries. Thus most participants in the debate recognize the need for collective actions to permit consumers and others to recover for injuries where the amount of any individual's damages are too small to justify the cost of seeking relief.  (Coulon Report 74-75.)  The modalities proposed in France have included both opt-in and opt-out procedures similar though not identical to Rule 23.  These proposals reflect the trend in other countries to adopt collective actions employing both opt-in and opt-out mechanisms.  For example, legislation implementing class action procedures, including some form of opt-out mechanism, has been adopted in the Netherlands (Section 3:305 of the Dutch Civil Code), Portugal (law dated August 31, 1995), Ontario (Section 9 of the Ontario Class Proceeding Act of 1992), Quebec (law dated January 23, 1982), Australia (Section 33 E of the Federal Court of Australia Act of 1976), Finland (Group Action Act 444/2007) and Norway (Section 35-7(1) of the Dispute Act).  (*See* Mourre Supp. Decl. ¶ 13 (Apr. 11, 2008) (collecting sources).)

The defendants' contention that an opt-out class action "obviously" violates the right of personal freedom and international public policy is surely overstated, if only for the reason that no French court has yet considered the issue.  Defendants are correct, however, that an opt-out procedure raises French constitutional concerns that center around the adequacy of notice to absent class members and the individual rights of a class members not to participate in the action.  Unsurprisingly, these are the same constitutional due process concerns that are implicated by the application of Rule 23 in the American context.  *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12

(1985); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313-15 (1950).

Central to both American and French legal systems is the concept that resort to the courts

should be had to protect individual rights, and that no individual may be bound by a

judgment in an action to which he is not a party. *Hansberry v. Lee,* 311 U.S. 32, 40

(1940). A Rule 23(b)(3) class action is a "fundamental departure from the traditional

pattern in Anglo-American litigation," Joseph M. McLaughlin, *McLaughlin on Class

Actions* § 1:2 (5th ed. Supp. 2008) ("McLaughlin"), as it would be in France should such

a mechanism be adopted.

To protect individual due process rights in an American class action, Rule 23 as

well as the Due Process Clause require that a representative plaintiff have claims

common to the class, and be able to adequately represent the interests of the class. *See

Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997). This appears to be fully

consistent with French constitutional precepts, or at least defendants do not argue to the

contrary. As a matter of individual due process, Rule 23(b)(3) further requires that class

members have an absolute right to opt out of a class action and, thereby, not be bound by

any judgment. *See Shutts*, 472 U.S. at 812 ("[D]ue process requires at a minimum that an

absent plaintiff be provided with an opportunity to remove himself from the class by

executing and returning an 'opt out' or 'request for exclusion' from the court."); *see also*

McLaughlin § 5:75 ("The right to opt out is an individual one that must knowingly be

exercised on a class-member-by-class-member basis."). In order to exercise the

individual right not to participate, Rule 23(c)(2) requires that notice be sent in a manner

reasonably calculated to appraise interested parties of the pendency of the action and their

right not to participate. *See generally Mullane*, 339 U.S. at 314. It can be seen that

notice and the right to opt out are separate but intimately-related concepts. Individual notice, generally by first-class mail, is mandated for all class members who can be identified with reasonable efforts. *Eisen v. Carlisle & Jacqueline*, 417 U.S. 156, 166-67, 177 (1974). However, where the identification of class members is not possible, courts may approve other methods, including publication, as "the best notice practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B).

While these notice provisions may satisfy the Due Process Clause, defendants' experts contend they infringe on the French concept of personal freedom, which would require as a constitutional matter that each class member receive individualized notice of the pendency of a class action. While conceding that no French court has passed upon this issue, defendants point to CC Decision No. 89-257, wherein the Conseil Constitutionnel assessed the constitutionality of a statute that authorized collective actions brought by unions on behalf of their members. The statute provided that members would be notified by registered mail (return receipt) of the Union's intention to bring a collective action. The member would then have fifteen days to decide whether or not to participate in the proceeding. The Conseil found this procedure consonant with the concept of personal freedom provided that the notice "contain all useful information" about the nature of the proceeding and the individual's right not to participate. (*Id.* ¶ 26). If the employee does not respond within fifteen days "he is deemed to have given his approval." (*Id.* ¶ 25.)

Focusing first on the issue of notice, defendants are correct to note that the Conseil Constitutionnel was upholding a statute that provided for individual notice. Ergo, defendants contend, this is the *only* constitutionally permissible method of

16

providing notice to collective action members in France.  (Vivendi Reply Mem. 4.)  But the Court sees little justification for this leap of logic in either an American or French context.  Interestingly, if faced with the same class (i.e., one in which all members are identifiable), the U.S. Supreme Court also would insist on individual notice.  *Eisen*, 417 U.S. at 173-75; *Mullane*, 339 U.S. at 319-20.  Thus, contrary to the analysis offered by defendants' Professor Lagarde, Rule 23 is not significantly "less stringent" with respect to notice in such a case.  (*See* Lagarde Decl. ¶ 9 (May 23, 2008), Buturla Decl. Ex. C.) Moreover, the requirement of individual notice in such a case does not speak to the constitutional adequacy in France (or the United States) of other reasonable forms of notice where individual notice is not possible.  While defendants insist that publication notice would be an affront to the French concept of personal freedom, a number of class action proposals have been made in France that contemplate notice by publication. Indeed, the Coulon Report, heavily relied on by defendants, proposes adoption of an opt-in class mechanism that explicitly relies on notice by publication.  (Coulan Report 80.) Under the proposed scheme, a collective action is brought by a representative consumer association.  In the first stage, the court rules on liability; if liability is established, the judge "would order the publication of the declaratory judgment according to the terms and methods he/she deems appropriate."  (*Id.*)  Of course, there are important distinctions between opt-in and opt-out systems that will be discussed below, but proposals such as those made in the Coulon Report are some indication that individualized notice, where such notice is not possible, is not the *sine qua non* of French constitutional law.  As much can be discerned from defendants' own experts.  For example, Professor Lagarde reads Decision No. 89-257 as requiring personal *knowledge* by a union member to satisfy

constitutional requirements for an opt-out situation, as opposed to requiring an exclusive method of establishing knowledge.  (Paul Lagarde Decl. ¶ 9.)  Likewise Michel Verpeaux, upon whose declaration defendants also rely, has elsewhere written that Decision No. 89-257 "far from condemning all reforms . . . simply emphasizes . . . that the issue of *publicity* is fundamental in order to preserve the consumers' liberty to act as an element of personal freedom."  (*See* Michel Verpeaux, *Can the "Class Action" Be Assimilated into the Constitution?*, Recueil Dalloz, at 258 (2007) ("Verpeaux Commentary"), Vasilescu Decl. Ex. 7.).  Indeed, Mr. Verpeux, Professor at the Panthéon-Sorbonne (Paris-1), Director of the Center for Constitutional Law Research, concludes:

> From a constitutional viewpoint, there is . . . no major obstacle on the path of the introduction in France of a class action with an exclusion option, with the only condition that each of the victims included in the action must retain the possibility of opting out in order to respect their personal freedoms to act.  Thus, the Constitution can hardly be invoked as a direct obstacle to the introduction of the class action.

(*Id.*)  Plaintiffs' expert agrees.  (Mourre Decl. ¶ 18 (Apr. 11, 2008).)

It must be kept in mind that the issue here is how a *future* Conseil Constitutionnel might view a *future* French class action statute, or, more precisely, the viability of a *res judicata* defense in a possible *future* action brought in a court of first instance by a French shareholder dissatisfied with a judgment in this case.  As this Court noted in *Vivendi III*, "it may well be that a French court would enforce a U.S. class action judgment against a class member who received actual notice and, therefore, had a meaningful opportunity to exercise his 'personal freedom,' but decline to enforce the judgment against a class member who can show that he did not receive actual notice."  *Vivendi III*, 242 F.R.D. at 101.

Turning from notice to consent, certain of defendants' experts insist that individual, actual consent is required by the French Constitution, again citing CC Decision No. 89-257.  But as plaintiffs' expert (as well as one of defendants' experts) correctly point out, the Conseil Constitutionnel actually indicated in that decision that an opt-out mechanism is not constitutionally infirm.  The Conseil noted that the constitutional concept of personal freedom required that an individual must grant his or her consent to participate in the action.  (CC Decision No. 89-257 ¶ 24.)  Importantly, however, the employee was "deemed" to have consented if he or she did not respond to the letter of notice, the employee's silence being deemed "tacit acceptance."  (*Id.* ¶¶ 25-26.)  There is no escaping the conclusion that the statute approved in CC Decision No. 89-257 provided for an opt-out procedure in which informed silence was deemed consent.  Thus it cannot be said, as defendants frequently do, that only an opt-in collective action would be constitutional in France.  It is against this background that one must consider the opinion of the commentator in the *Cahiers du Conseil Constitutionnel*, which states in reference to the same decision, "[i]n the absence of respect for individual consent, which does not exist in Anglo-American 'opt-out' mechanisms in collective agreements [sic—actions], the individual would be unjustly deprived of a right in violation of the Constitution."  Necessarily the "absence of respect for this individual consent" does not refer to the need for actual consent in the form of an opt-in procedure inasmuch as the decision that the commentator cites explicitly endorses implied consent in the form of an opt-out procedure.  Rather it appears likely that the concern with the American form of opt-out (and it is unknown whether this is shared by the Conseil itself) is that individual consent in the American context is implied upon proof of reasonable

notice to, as opposed to proof of actual knowledge by, a putative class member.  This
appears, in any event, to be the view of one of defendants' experts.  (*See* Lagarde Decl.
¶ 27 (noting that an "American judgment would have the consequence, among others, of
depriving [French shareholders], who were presumably unaware of the [present] action of
their right[s] . . . .").)  Such would not be the case, of course, for any French shareholder
who actually received adequate notice whether by letter or publication.

   As something like a fall-back position, defendants maintain that the American
opt-out mechanism would be unconstitutional in France because a class member must
have the right to opt out at any time*, including after judgment*.  (*See* Carcassone Decl. ¶ 5
(Mar. 13, 2008), Cameron Decl. Ex. V; Verpeaux Decl. ¶ 6 (June 24, 2008).)[10]  It is
generally true that the opt-out period in a Rule 23(b)(3) class action occurs early in the
litigation.  In the present case, however, the Court has deferred authorizing notice
pending resolution of defendants' motion for reconsideration.  As a result, shareholders
who receive notice will have an informed opportunity to withdraw from the class up to
the eve of trial, a month or two before entry of judgment.  The Court also notes that in
individual actions the parties generally do not have a right to withdraw after judgment
and bring a new action.  While Professor Verpeaux may disagree with this principle in
the context of the proposed collective action statute he examined (*see* Verpeaux
Commentary, at 1), it appears that certain of the legislative proposals for class actions
made to the National Assembly provide for opt-outs after judgment for the sensible
reason that, under the legislation proposed, the Court would enter a declaratory judgment

---

[10] Interestingly, in his declaration submitted on behalf of defendants, Professor Verpeaux
confirms that opt-out actions "could allow compliance with French constitutional
principles."

on liability in an initial phase of the litigation, while in the second phase notice to consumers would be provided and consumers would be awarded damages.  In such a system, of course, there is simply no procedure for opting out until after the initial judgment is entered and notice thereof provided.  (*See, e.g.*, Coulon Report 77.)

### III.   <u>Considerations of International Public Policy</u>

In considering the twin requirements of adequate notice and the opportunity to opt out, it should be kept in mind that there is a fundamental difference between (a) whether a future French (or EU) statute will meet French constitutional requirements and (b) in what situations will it be contrary to "international public policy" for a French shareholder who is a member of a Rule 23(b)(3) class to be barred after judgment from filing a second lawsuit.  It may well be, as defendants assert, that the current political winds in France are blowing in favor of the adoption of an opt-in mechanism, as recommended by the Attali Commission, or indeed, no class action procedure at all.  It may also be that the Conseil Constitutionnel will ultimately conclude that any opt-out mechanism adopted by the legislature that permits class members to be bound even if they have not received notice would be unconstitutional.  It is undisputed, however, that French constitutional law and French concepts of international public policy are not synonymous.  (Seraglini Decl., at 2-8 (Apr. 7, 2008).)  Thus, not every foreign judgment that is inconsistent in some respect with French constitutional principles will be disregarded.  (Mourre Supp. Decl. ¶¶ 9-12).  Rather only foreign judgments that infringe "principles of universal justice," *Lautour v. Guirand*, Cass. le Civ., May 25, 1948, will be found contrary to international public policy.

It also bears noting that whether a foreign judgment is contrary to international public policy will be made on an individualized case-by-case basis, not upon an abstract comparison of U.S. and French law, or upon consideration of an as-yet unenacted French statute.  (Mourre Sup. Decl. ¶ 9; Seraglini Decl. ¶ 10).  Thus the *res judicata* effect of a judgment as to any particular Vivendi shareholder will await a determination of the facts surrounding the institution of a second action by that shareholder and, thereafter, the assertion by Vivendi of a *res judicata* defense.  Where that shareholder received full and fair disclosure of the nature of the present suit and his or her absolute right to opt-out from the litigation, this Court concludes that it is unlikely that a French court will decline to respect a U.S. judgment on the grounds that the form of notice (mail or publication) or the method of consent (opt-in or opt-out) offends constitutional principles, let alone French concepts of international public policy.[11]  Similarly, since a shareholder who receives actual notice can fairly be said to have given implied consent to the present action, it also appears unlikely that a French court would find the shareholder's inability under U.S. law to opt-out after judgment to violate either constitutional concepts of personal freedom or principles of international public policy.

The issue would appear to be closer with respect to a shareholder who never received notice of the present action and then sought to bring a post-judgment action in France.  On the one hand CC Decision No. 89-257 can be read to hold that implied

---

[11] As indicated by the 1989 Decision, a French court may place the burden of proof regarding notice upon Vivendi.  The Court, as a fiduciary for the class, is obligated to approve a plan of notice under which as many French classmembers as possible receive actual notice of this action.  Thus, while Vivendi may be forced to defend a notice plan it did not strictly speaking devise, the Court is confident that the plan will be as effective as reasonably possible.  In any event, Vivendi will be given the opportunity to offer evidence and argument as to the adequacy of notice.

consent to a collective action is consistent with concepts of personal freedom only if the absent plaintiff has actual knowledge of the nature of the action and his or her right not to participate.  On the other hand, a number of the schemes proposed in France and endorsed by French constitutional scholars clearly contemplate notice by publication. (*See* Coulon Report 80 (following test case on liability, court "would order the publication of the declaratory judgment according to the terms and methods he/she deems appropriate"); *see also* Verpeaux Commentary, at 2.)  This dissonance is reflected to some degree in U.S. law.  While numerous federal court decisions hold that absent class members who do not receive actual notice may be bound in the appropriate case, the Supreme Court has said that a class member "must receive notice" in order to be bound by a class judgment, *Shutts*, 472 U.S. at 813, which has led to some uncertainty. *See* Wright & Miller § 1789.1 ("*Shutts* also may be read to suggest that a class member may appear [after judgment] and claim never to have received notice and thus not to be bound . . . .").

In concluding that a French court is likely to respect a U.S. class judgment, the Court is cognizant of the fact that another Court in this District has come to the contrary conclusion.  *See In re Alstrom SA Sec. Litig.*, 253 F.R.D. 266 (S.D.N.Y. 2008) (Marrero, J.).  The plaintiffs in *Alstrom* asserted federal securities law violations against Alstrom SA, a French company with operations around the world, including the United States. Plaintiffs sought to certify a class of purchasers of shares in the U.S., Canada, France, England and the Netherlands.  *Id.* at 272.  Evaluating the superiority requirement of Rule 23(b)(3), the Court applied what it referred to as the "Probability Standard" adopted by this Court in *Vivendi III*.  The *Alstrom* court certified a class including U.S. shareholders

as well as Canadian, British and Dutch shareholders, finding that the courts of these countries would likely recognize a judgment entered against certain of the defendants. However, the Court declined to include French shareholders, concluding that plaintiffs had not sufficiently demonstrated that a French court would more likely than not recognize and give preclusive effect to a U.S. judgment involving French class members. *Id.* at 287.

The *Alstrom* court distinguished this Court's decision on the grounds that "recent legal developments" in France, such as the Ministry of Justice letter authored by Mr. Guillame, post-dated the class certification decision in this case. *Alstrom*, 253 F.R.D. at 286-87 n.11. Of fundamental importance to the *Alstrom* decision, however, was the conclusion that this Court does *not* draw, namely, that Decision No. 89-257 holds that a collective action must provide for each member's individual consent in order to pass muster under the French Constitution. *Id.* at 285. ("A French court would likely conclude that any judgment rendered by this Court involving absent French class members offends public policy because absent French investors did not consent to this Court's jurisdiction . . . ."). This conclusion, advanced by defendants in this case as well, is an unsupportable reading of the 1989 Decision which, as noted, actually approves an opt-out type procedure whereby union members were "deemed" to have given "tacit" consent where they received written notice and did not withdraw [i.e., opt-out] within 15 days.[12] (Decision No. 84-257 ¶¶ 25-26.) One can consider, as the Court has, what type of notice might be necessary to give rise in France or, indeed, the United States to an

---

[12] The *Alstrom* opinion misattributes to the Conseil the remarks made by the commentator that "Anglo-Saxon opt-out class actions" would deprive individuals of the right of "individualized consent." The Conseil made no such observation. (*Compare* CC Dec. No. 2007-556 *with* Commentary 23, at 7.)

inference of implied consent, but to simply conflate the issue of notice with that of consent, as defendants have, obscures the analysis.  The *Alstrom* court also accepts the defendants' clearly erroneous contention that the Conseil Constitutional Decision No. 2007-556 "expressly rejected opt-out mechanisms of class actions as contrary to French Constitutional principles."  *Alstrom*, 253 F.R.D. at 287 n.11.  This is not so. Decision No. 2007-556 contains not a single reference to class actions or the conditions under which a class action would offend French constitutional principles.  (*See* Decision No. 2007-556, Cameron Decl. Ex. K; *see also* Mourre Supp. Decl. ¶ 22 (Apr. 11, 2008).)[13] Having carefully reviewed translations of both the 1989 and 2007 Decisions, the Court concludes that plaintiffs' readings are persuasive and that neither Decision finds or implies that individualized consent through an opt-in mechanism is constitutionally mandated or, stated in the alternative, that an opt-out procedure based on implicit consent is constitutionally prohibited, much less offensive to "fundamental French constitutional values in accordance with principles of universal justice." (*Compare Vivendi III*, 242 F.R.D. at 100-03 *with Alstrom*, 253 F.R.D. at 287.)

*   *   *

In conclusion, the Court does not find that "recent events" in France support defendants' motion for partial reconsideration of the Court's prior class certification decision.  All of the substantive arguments being made by both parties were made in great detail at the time plaintiffs first moved for class certification.  The Court continues to find that as to French shareholders, a class judgment entered in this Court will likely

---

[13] The *Alstrom* opinion attributes the same conclusion to the 2008 Attali Commission Report.  *See Alstom*, 253 F.R.D. at 287 n.11.  As previously noted, *see supra* p. 9, the Report draws no such conclusion.

operate as a complete bar to the relitigation of claims asserted here, whether a second action is brought in the United States or France.  The Court acknowledges the possibility that some French class members—those who do not receive actual notice of this action—may not be absolutely precluded from relitigating their claims.  Yet this possibility is just that.  For it to materialize, French law must develop in a way that both refuses to give effect to publication notice as a reasonable and necessary backstop to actual notice, (*see Mullane*, 339 U.S. at 315; Coulon Report 80), and holds that such notice violates international public policy, *see* discussion *supra*, at 21-23.  In this regard (and despite the novel facts involved), the Court finds itself in substantially the same position as every court called upon to rule on class certification.  Ex ante, "the court conducting the action cannot predetermine the *res judicata* effect of the judgment."  Fed. R. Civ. P. 23, 1966 Advisory Committee Note, 28 U.S.C.A. Rule 23, at 20 (2008).  As a result, Rule 23 requires only that the Court make a reasoned prediction as to the likely preclusive effect of its judgment on absent class members and evaluate the risk of non-recognition together with all factors relevant to determining whether a class action is superior to other available methods for adjudicating the controversy.  *Vivendi III*, 242 F.R.D. at 95.

The fact that a substantial number of French shareholders are likely to be bound strongly argues for certification.  In addition, there would be substantial disincentives to initiating "second bite" litigation, not the least of which would be the adverse decision in this case following full discovery unavailable in France, the risk that the shareholder would lose again and, this time, be required to pay Vivendi's counsel fees, and the present inability to proceed in France on a class basis.  The Court does not treat Vivendi's concerns lightly, but the hypothetical possibility of less than complete *res judicata* effect

is not dispositive in assessing whether a class action is "superior to other available methods for the fair and efficient adjudication of the controversy." *See, e.g., Cromer Fin. Ltd. v. Berger,* 205 F.R.D. 113, 135 (S.D.N.Y. 2001) (Cote, J.) ("Even where all the available evidence indicates that foreign plaintiffs who lose in the United States will be able to sue the defendants a second time in their own country, a class action may remain the superior means for litigating the dispute . . . ."). Here, a class action provides an efficient means whereby the claims of French shareholders arising under U.S. law can be adjudicated in a manner likely to be binding on a broad class of those shareholders who, in the event of judgment adverse to the class, might consider an action in France. *See Vivendi III*, 242 F.R.D. at 106-07. Moreover, it is fair to assume that there are many French shareholders of Vivendi whose claims are too small to justify individual actions and it is surely in their interests to participate in the class. Further, it is in the interest of the United States to provide a forum for individuals, including foreign shareholders, who are alleged to have been injured by the managers of a company operating directly from the United States. *See Fidenas AG v. Compagnie Internationale Pour L'Informatique CII Honeywell Bull S. A.*, 606 F.2d 5, 9-10 (2d Cir. 1979). Finally, there are no manageability issues that preclude a finding of superiority. The challenges of providing direct and published notice have been met in numerous cases involving foreign class members. *See, e.g.*, *In re Royal Ahold N.V. Sec. & ERISA Litig.*, No 1:03-MD-01539, 2007 WL 3128594 (D. Md. Sept. 26, 2007); *In re Holocaust Victim Assets Litig.*, 314 F. Supp. 2d 155 (E.D.N.Y. 2004). Many French class members have already received some notice of their potential claims against Vivendi by virtue of the SEC's notice and distribution to shareholders of the substantial fines paid by the Company in connection

with settlement of the SEC's enforcement action.  *Vivendi III*, 242 F.R.D. at 108 n.22.

There is no indication in the record that French shareholder-claimants have had any

difficulties in understanding their rights to a share of that fund or the procedures for filing

a claim thereto.

## CONCLUSION

For the reasons stated above and in the Court's initial decision certifying a class

consisting of shareholders from the United States, France, England and the Netherlands,

Vivendi's motion for partial reconsideration **[457]** is denied.

SO ORDERED.

Dated: New York, New York
        March 31, 2009

Richard J. Holwell
United States District Judge