UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE VIVENDI UNIVERSAL, S.A.            02 Civ. 5571 (RJH) (HBP)
SECURITIES LITIGATION

                                        **MEMORANDUM OPINION**
This Document Relates To:                        **AND ORDER**

ALL ACTIONS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       Defendants Vivendi, S.A. ("Vivendi"), Jean-Marie Messier, Guillaume Hannezo, and

Universal Studios, Inc. move for summary judgment against all plaintiffs based on a failure to

prove loss causation. Loss causation is a necessary element of plaintiffs' claims under Sections

11 and 12(a)(2) of the Securities Act of 1933, 15 U.S.C. §§ 77k(a), 77l(a)(2) (2006), Sections

10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Rule

10b-5 promulgated thereunder, as well as certain plaintiffs' common law claims for fraud and

negligent misrepresentation. Defendants make a variety of arguments as to why plaintiffs have

failed to carry their burden on this element but focus largely on plaintiffs' theory that revelations

concerning Vivendi's liquidity problems caused plaintiffs' losses. In addition to claiming that

plaintiffs' theory of "liquidity" is impermissibly broad, defendants argue that plaintiffs have

failed to establish a sufficient connection between Vivendi's allegedly false or misleading

statements and these revelations, or between the revelations and declines in Vivendi's stock

price. Defendants also move the Court to rule on whether certain allegations and statements are

actionable against them, as well as on the form of, and method for calculating, damages. For the

reasons that follow, defendants' motions are denied

## BACKGROUND

The Court here summarizes the plaintiffs'[1] case as set forth in the class plaintiffs' Counterstatement of Material Facts[2] and the expert report of Dr. Blaine Nye.[3]  In these motions, defendants challenge only the sufficiency of plaintiffs' evidence of loss causation, focusing primarily on Dr. Nye's report and testimony.  For the sake of context, however, the Court first describes plaintiffs' allegations concerning the substance of defendants' alleged fraud.  Because defendants were not required to dispute the facts set forth in class plaintiffs' Counterstatement, nothing in this opinion should be construed as deeming admitted or undisputed the facts asserted in that Counterstatement.  In brief, plaintiffs claim that defendants Messier and Hannezo saddled Vivendi with massive amounts of debt and concealed the risk to Vivendi's liquidity through various false and misleading public statements.  When that risk began to materialize in the first half of 2002, Vivendi's stock price declined as a result, causing plaintiffs' losses.

*Defendants' Alleged Fraud*

Vivendi is a publicly-traded French corporation that was known as *Compagnie Générale des Eaux* prior to 1998.  (Class Pl. Counterstatement ¶ 1; Def. 56.1 Statement ¶ 1.)  For the

---

[1] Defendants have traditionally distinguished four categories of plaintiffs:  (1) the class plaintiffs; (2) Liberty Media Corp., LMC Capital LLC, Liberty Programming Co. LLC, LMC USA VI, Inc., LMC USA VII, Inc., LMC USA VIII, Inc., LMC USA X, Inc., Liberty HSN LLc Holdings, Inc., and Liberty Media International, Inc. (collectively "Liberty Media"); (3) GAMCO Investors, Inc. ("GAMCO"); and (4) those plaintiffs who brought separate actions after being excluded from the class (the "Individual Plaintiffs").  Defendants filed two motions for summary judgment based on a failure to prove loss causation, with one motion directed at the class plaintiffs, Liberty Media, and GAMCO, and another motion directed at the Individual Plaintiffs.  The reason for defendants' separate motions appears to be the fact that the class plaintiffs, Liberty Media, and GAMCO submitted the expert reports and deposition testimony of Dr. Blaine Nye as evidence of loss causation, while the Individual Plaintiffs submitted the reports and testimony of Mr. Frank Torchio.  The issues raised by defendants, however, are identical for all plaintiffs except Liberty Media, and even in the case of Liberty Media, the issues are nearly identical.  Accordingly, the Court distinguishes among plaintiffs only as necessary.

[2] The Court cites to Class Plaintiffs Counterstatement of material facts as "Class Pl. Counterstatement ¶__".

[3] Without opining on the sufficiency of Mr. Torchio's report and testimony, the Court concludes that Dr. Nye's report and testimony are sufficient to deny defendants' motions for summary judgment against all plaintiffs and limits discussion accordingly.

newly-minted CEO, defendant Messier, the name change was part of a grand strategy to transform the company from a simple water utility into an international media and telecommunications conglomerate.  (Class Pl. Counterstatement ¶¶ 3-5.)  Central to that strategy was a series of acquisitions that peaked with a three-way merger with The Seagram Company, Ltd.—a U.S. company that owned both Universal Pictures and Universal Music Group—and Canal Plus S.A.—one of Europe's largest cable television operators.  (*Id*. ¶¶ 5-7.)  The acquisitions increased Vivendi's media and telecommunications debt from approximately €3 billion in early 2000 to over €21 billion in 2002.  (*Id*. ¶ 32.)

Plaintiffs allege that defendants first began to mislead the public when they were promoting the merger to Vivendi's extant shareholders.  At a shareholder meeting in anticipation of the merger vote, for example, Messier told shareholders that "[t]hanks to our free net cash flow and the opportunities to dispose of some holdings . . . we will have an additional war chest of 10 billion euros for 2001-2002 before the first euro of debt."  (*Id*. ¶ 13.)  Plaintiffs allege that Messier knew this statement was false, citing a memo from Hannezo stating that "I believe it is wrong to reason in terms of . . . free cash flow (there won't be any this year) . . . ."  (*Id*. ¶ 14.)  Nevertheless, Messier continued to tout the "Strength of [Vivendi's] Cash Flow" to shareholders throughout 2001.  (*Id*. ¶ 49 (Letter to Shareholders dated June 26, 2001).)

Plaintiffs allege that a large part of defendants' fraud appeared in Vivendi's financial statements, with detailed numbers backing up Messier's rosy descriptions of the company's liquidity position.  In particular, plaintiffs allege that defendants used purchase accounting to ensure that Messier's promises that Vivendi's EBITDA[4] would grow at 35% annually.  (*Id*. ¶¶ 15-16.)  Purchase accounting is typically used at the time of a merger and "allows the

---

[4] EBITDA is defined as Earnings Before Interest, Taxes, Depreciation, and Amortization.  (*Id*. ¶ 16.)  It is a widely-used measure of a company's earnings and its ability to service debt.  (Vasilescu Decl. Ex. 294 (Mintzer Report ¶¶ 150-52).)

acquiring company to provide for cash business expenses by reducing allowances and reserves on the balance sheet." (*Id.* ¶ 18.)  Because expenses accounted for in this way reduced allowances and reserves rather than net earnings, Vivendi's net earnings were correspondingly higher.  (*Id.*)  Plaintiffs allege that Vivendi knew its use of purchase accounting beyond the merger was misleading, citing an e-mail from Hannezo declaring that defendants "will benefit from a maximal flexibility in making the opening balance sheet adjustments, and the analysts will not have it easy to track the purchase accounting benefits." (*Id.* ¶ 23.)  Internally, Vivendi employees referred to purchase accounting or PA as their "profit adder".  (*Id.* ¶ 20.)  Indeed, plaintiffs claim that 50% of Vivendi's reported EBITDA growth in the media and communications group was achieved through purchase accounting.  (*Id.* ¶ 30.)

In 2001, plaintiffs allege, Messier continued to push forward with multiple acquisitions, including a minority stake in Maroc Telecom and a secret deal for an additional stake in 2002. (*Id.* ¶ 31; Nye Report ¶ 61.)  These acquisitions translated to debt levels that began to severely test the company's liquidity.  Moreover, Vivendi's need for cash prompted it to take out large loans on unfavorable terms, including the €608 million loan from Cegetel, the French telecom in which Vivendi owned a large stake, which was repayable on demand.  (Nye Report ¶ 91.)  Other sources of debt included draw-downs on its commercial paper backstops—actions that in themselves potentially put Vivendi in default according to the prudential rules set by the rating agencies.  (Nye Report ¶ 8(f).)  Internally, Vivendi's treasury department stressed that this debt meant that the company did not have the capacity for further acquisitions.  (Class Pl. Counterstatement ¶ 35.)  By June 2001, there was talk of bankruptcy if Vivendi continued on its course.  (*Id.* ¶¶ 50-52.)  At the time, Hannezo warned that "the risk of [a credit rating]

downgrade is significant."  (*Id.* ¶ 53.)  After narrowly avoiding just such a downgrade in December 2001, Hannezo wrote the following to Messier:

> I told you that I would talk to you about the personal consequences that I'm drawing from my painful and humiliating meetings with the ratings agencies . . . . For the first time, I felt the wind pass by from the cannonball of something that, from a personal point of view, I do not want to put up with:  a downgrade, which would have led to a liquidity crisis; the jeers of all those who have waited for us at the pivotal occasion, desperate for such a long time to see us stumble . . . . and the unpleasant feeling of being in a car whose driver is accelerating in a sharp turn while I'm the one in the death seat.  . . . The only thing that I am asking is that it doesn't all end in shame.

(*Id.* ¶¶ 81-82.)  Nevertheless, throughout the fall of 2001, Messier continued to boast of "strong third quarter results" with "Year-to-date . . . EBITA increased 46%."  (*Id.* ¶ 62.)  Just days after Hannezo sent his "death seat" memo, defendants reported on a conference call that "We have a strong balance sheet and such a strong basis of earnings, which we intend to grow, that we're confident that we will be able to keep our credit rating and to grow the business."  (*Id.* ¶ 86.)

While plaintiffs allege that Vivendi continued to make false and misleading statements to the public in 2002, those statements were made as other events allegedly began to reveal Vivendi's true liquidity position.  Plaintiffs' analysis of these events is the heart of their case for loss causation.

*Plaintiffs' Evidence of Loss Causation*

The report of Dr. Blaine F. Nye purports to "provide expert opinion on the issues of causation, materiality, market efficiency, and [damages]."  (Nye Report ¶ 3.)  Dr. Nye has an M.B.A. and Ph. D. in finance from Stanford University and has frequently served as an expert in securities actions.  (Nye Report ¶ 1; Nye Report Exs. 1, 2.)  Defendants do not here challenge Dr. Nye's reliability as an expert, but rather the sufficiency of his findings to establish loss causation.

Before reaching his causal analysis, Dr. Nye makes several assumptions in his report.  He first assumes that "Vivendi Universal had progressively worsening and undisclosed liquidity risks throughout the relevant time period, which ultimately led to a liquidity crisis in the summer of 2002."  (Nye Report at 9.)  He defines liquidity as "the ability or ease with which Vivendi/Vivendi Universal could timely meet its financial obligations and fund its operations with cash on hand, assets readily convertible to cash on hand, cash from operations, or readily accessible sources of debt."  (*Id.*)  He also assumed that defendants concealed the risk of a liquidity crisis by misrepresenting or omitting the truth about the following facts, among others: (1) Vivendi's free cash flow and EBITDA; (2) the terms of Vivendi's debt to its subsidiary Cegetel; (3) Vivendi's draw on its commercial paper backups; and (4) Vivendi's obligation to purchase an additional 16% interest in Maroc Telecom by February 28, 2002.  (*See id.* ¶ 8; *see also id.* ¶ 93.)

In his section entitled "Causation:  Class Action," Dr. Nye proceeds to explain the causal connection between Vivendi's concealment of liquidity risk and stock declines on eleven days in 2002.  Dr. Nye begins a summary of the events surrounding the fraud and identifies some of defendants' allegedly false or misleading statements, including those just summarized above.  (*Id.* ¶ 33.)  The core of Dr. Nye's report, however, is his regression analysis and event study.  The purpose of a regression analysis is to disaggregate market and industry declines from residual, company-specific share price declines.  (*Id.* ¶ 254-60.)  Regression analysis is a common mathematical tool for determining whether and to what extent a correlation exists between two variables.  (*Id.* ¶ 254.)  In this case, Dr. Nye compared the day-to-day percentage increases and decreases of Vivendi's share price to the same increases and decreases for a market-wide index and an industry-wide index.  (*Id.*)  The market-wide index is derived from a

collection of different stocks that reflect the "average" behavior of the entire market—as, for example, the Dow Jones Industrial Average does.  (*Id*.)  The industry-wide index is derived from a similar collection of, in this case, media and telecommunications stocks during the class period.  (*Id*.)  In this way, Dr. Nye could predict rises and declines in Vivendi's stock price based on the rises and declines of these indexes.  Where Vivendi's stock declined in excess of the market and industry by a statistically significant margin, Dr. Nye could identify days where Vivendi's share price fell for reasons independent of market or industry forces—Vivendi-specific residual declines.  (*Id*.)  From his regression analysis, Dr. Nye identified eleven days on which there were Vivendi-specific residual declines:  January 7, May 3, June 21, June 24, July 2-3, July 10, July 15, and August 14-16, 2002.  (*Id*. ¶¶ 127, 171, 192, 195, 213, 216, 222, 225, 239, 242, 244.)

On these days, Dr. Nye conducted his event study.  Dr. Nye describes "event study methodology" as used "to disentangle the effects of company-specific information from market and industry information" by associating "day-to-day information releases from sources including Vivendi/Vivendi Universal's press releases, conference calls, news reports, securities analysts' reports, and SEC filings with the daily residual returns on Vivendi/Vivendi Universal stock during the Damage Period."  (*Id*. ¶ 261.)  While regression analysis identifies days in which a company's value decreases net of market and industry, it does not explain why.  Those declines could be due to Vivendi-specific news that is unrelated to the fraud.  Dr. Nye's event study undertook to determine the extent to which the events reported to the public on these eleven days revealed Vivendi's true liquidity condition.  A summary of his study follows:

- January 7, 2002:  Vivendi sells certain of its treasury shares into the market, reversing its earlier-stated intention to cancel them.  (*Id*. ¶ 126.)  Dr. Nye opines that Vivendi's share price declined, even though Vivendi got a good deal for the shares, because the public

7

had started to doubt Vivendi's prospects.  (*Id.* ¶¶ 127-28.)  Dr. Nye does not, however, point to any evidence suggesting that this negative view of Vivendi was in any way related to liquidity and the risk that Vivendi might not be able to pay down its debt.  He does distinguish the concurrent AOL-Time Warner write-down announcement as not a significant cause of the decline because the news was long expected.  (*Id.* ¶¶ 131-32.)

- May 3, 2002:  Moody's downgrades Vivendi, noting that its "continuing concerns that Vivendi Universal might not be able to reduce debt as quickly and comprehensively as planned by the company . . . ."  (*Id.* ¶ 166.)  Moody's also noted that Vivendi's weak share price had triggered its put obligations requiring major cash outlays, and that meaningful cash flow was a problem.  (*Id.*)  Dr. Nye opines that the downgrade revealed that Vivendi's liquidity position that was much worse than the public had thought.  (*Id.* ¶¶ 167-70.)

- June 21, 2002:  The market learns of a quick private sale of Vivendi Environment ("VE") shares to Deutsche Bank.  (*Id.* ¶ 189.)  The sale was in advance of an announced sale of VE stock.  (*Id.* ¶ 186.)  Dr. Nye opines that quick sales of assets suggest the need for immediate cash inflows, and hence weakened liquidity, because companies often get lower prices when they need to sell quickly.  (*Id.* ¶ 20.)  This was such a sale and the market reacted by punishing Vivendi's share price.  (*Id.* ¶ 189.)

- June 24, 2002:  Vivendi announces the pending sale of a 15.6% stake in VE.  (*Id.* ¶ 193.)  Dr. Nye opines that the market again interpreted the sudden announcement as a sign of needing a quick infusion of cash and therefore of weakened liquidity, pointing to commentators reaching the same conclusion.  (*Id.*)  Dr. Nye also distinguishes two competing causes for the same stock declines:  (1) rumors that News Corp. would back

out of a deal with Vivendi were based on the same concerns as the sale of the VE stake, and therefore cannot be seen as an independent cause; and (2) British Telecom's announcement that it had not yet decided to sell its Cegetel stake was not new information.  (*Id*. ¶ 194.)

- July 2-3, 2002:  On July 1, Moody's downgrades Vivendi to junk status (Ba1) after markets close.  (*Id*. ¶ 207.)  The next day, S&P downgrades Vivendi to one notch above junk (BBB-).  (*Id*. ¶ 209.)  Moody's notes concerns over refinancing and the slow pace of asset sales coupled with lower-than-expected sales prices.  (*Id*. ¶¶ 207, 211.)  S&P notes a lack of transparency, the strain imposed by Vivendi's outstanding put options, and certain debt obligations, including the Cegetel loan.  (*Id*. ¶¶ 209-10.)  Dr. Nye opines that the downgrades again revealed a weaker Vivendi liquidity position than previously thought and caused price declines on both July 2 and 3.  (*Id*. ¶¶ 213, 216.)

- July 10, 2002:  Vivendi announces a new $1 billion unsecured credit line, but this positive development is overshadowed by news that French regulators had raided Vivendi's Paris headquarters as part of their investigation into possible securities fraud.  (*Id*. ¶ 219.)  Moody's and S&P also greeted the new credit line with caution, continuing to warn that unless Vivendi did more to pay down its debt, further downgrades were possible.  (*Id*. ¶¶ 220-21.)  Dr. Nye opines that the rating agencies' reaction revealed continuing liquidity concerns.  (*Id*. ¶ 220.)  He does not, however, attempt to distinguish any independent price decline caused by news of the investigation, opining that the information "effectively informed investors of suspicions regarding the Company's accounting practices."  (*Id*. ¶ 222.)

- July 15, 2002:  The French press reports that Vivendi created a shell company and share

agreement to control Elektrim, a Polish telecom.  (*Id*. ¶ 224.)  One interviewer questioned

the legality of Vivendi's actions, but Vivendi denied any wrongdoing.  (*Id*.)  Nye opines

without further explanation that "[t]hese information releases constituted a partial

disclosure of Vivendi Universal's true liquidity condition . . . ."  (*Id*. ¶ 225.)

- August 14-16, 2002:  Vivendi announced preliminary second quarter results on August
  14, 2002.  The announcement included a variety of negative facts, including:  (1) the need
  to sell an additional €10 billion worth of assets; (2) that debt was €10 billion over what it
  should be for Vivendi's desired credit rating; (3) that French GAAP debt stood at €35
  billion; and (4) that the company was experiencing a short-term liquidity problem.  (*Id*.
  ¶ 235.)  Moody's and S&P also downgraded Vivendi again, with S&P noting Vivendi's
  "liquidity crisis."  (*Id*. ¶ 237.)  Dr. Nye opines that the announcements revealed the need
  for a "fire sale" of assets and the extent of Vivendi's liquidity problems.  (*Id*. ¶¶ 235,
  240.)  The next day Bloomberg announced that Houghton Mifflin, previously acquired by
  Vivendi, would sell for less than one-fifth of what Vivendi paid for it, and analysts
  continued to discuss the repercussions of the August 14 announcements.  (*Id*. ¶¶ 241,
  243.)  Dr. Nye opines that stock declines on August 14, 15, and 16 were all caused by the
  August 14 disclosures and continued reports on their consequences.  (*Id*. ¶¶ 240, 242,
  244.)

Dr. Nye concludes his report (at least with respect to the class plaintiffs) with a

description of the two methods he used to quantitatively assess damages.  He begins by stating

generally that "[p]rice inflation in the ADS[5] and ordinary shares is measured by the declines in

---

[5] ADS stands for American Depository Shares and were essentially those Vivendi shares that were traded on the
New York Stock Exchange.  *See In re Vivendi Sec. Litig.*, 242 F.R.D. 76, 81 (S.D.N.Y. 2007).

those securities' prices upon disclosures related to the alleged fraud, through which investors learned Vivendi Universal's true liquidity condition." (*Id.* ¶ 250.) Equivalently, Dr. Nye maintains that while the damages due plaintiffs is the per-share inflation resulting from defendants' false or misleading statements, the appropriate method for calculating those damages is to examine the price declines that occur in reaction to disclosures of Vivendi's liquidity position. (*Id.* ¶ 251.) Of course, if particular plaintiffs sell before all of Dr. Nye's identified disclosures, they may be entitled to recover only that portion of the inflated price that they actually lost.[6] (*Id.*)

## DISCUSSION

### I.  Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "The plain language of

---

[6] Dr. Nye describes broadly the two alternate methods—constant-dollar (constant-euro) inflation and constant-percentage inflation—that he uses to make this calculation:

> If the magnitude of the inflation on the date the misrepresentation is made or the fraud is revealed is not expected to be influenced by market, industry, or non-fraud-related company-specific events, or indeed based on any available information, then from the standpoint of financial economics, the best estimate of the inflation on the date of purchase is simply the dollar value of the inflation on the date of the initial inflation or the date the fraud was revealed, i.e., the inflation remains constant over the relevant period (constant-dollar inflation). On the other hand, if inflation is expected to be influenced by market, industry and non-fraud-related company-specific events, as would any misrepresentations or omissions about the condition and business operations of the company and thus its earnings and earnings growth, from the standpoint of financial economics the best estimate of inflation at the time of purchase is the percentage change in share price at the point of initial inflation or at the time of revelation of the fraud, as adjusted by market, industry and non-fraud-related company-specific returns during the period between the date of purchase and the date the fraud is revealed (constant percentage inflation).

(*Id.* ¶ 185.)

Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 321 (1986); *see also Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 61 (2d Cir. 1998); *Conway v. Microsoft Corp.,* 414 F. Supp. 2d 450, 458 (S.D.N.Y. 2006).  A party moving for summary judgment may discharge its burden "by 'showing'—that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325.

A fact is considered "material" for purposes of Rule 56 if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Whether a material issue is "genuine" depends on whether the evidence is of a type that would permit a reasonable jury to return a verdict in favor of that party.  *Mitchell v. Shane,* 350 F.3d 39, 47 (2d Cir. 2003).  In making its showing that a genuine issue of material fact exists, the nonmoving party may not rely on "the mere existence of a scintilla of evidence" to support its position, but must instead proffer "evidence on which the jury could reasonably find for the [plaintiff]." *Dawson v. County of Westchester,* 373 F.3d 265, 272 (2d Cir. 2004) (citing *Anderson,* 477 U.S. at 252).

## II.      The Law of Loss Causation

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).  It stands in contrast to transaction causation, i.e., reliance, or whether plaintiffs would not have purchased or sold their stock but for the alleged misconduct.  *Id*.  Proving loss causation is

prescribed by statute for actions under Section 10(b) and Rule 10b-5.  15 U.S.C. § 78u-4(b)(4) ("In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.").  The same standard applies for actions under Sections 11 and 12(a)(2) except that defendants bear the burden of negating causation.  *See In re Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2005 WL 375314, at *6 (S.D.N.Y. Feb 17, 2005) ("the negative causation defense in Section 11 and the loss causation element in Section 10(b) are mirror images").  A similar requirement applies to actions for common law fraud and negligent misrepresentation.  *See Emergent Captial Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) ("Similar to loss causation, the proximate cause element of common law fraud requires that plaintiff adequately allege a causal connection between defendants' non-disclosures and the subsequent decline in the value of [the stock].").

Owing to the great similarity of an action under Rule 10b-5 to an action for common law fraud, courts have consistently characterized loss causation as similar to the tort concept of proximate causation.  *See Lentell*, 356 F.3d at 172 ("We have described loss causation in terms of the tort-law concept of proximate cause . . . ."); *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007) (same); *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 187 (2d Cir. 2001) (same).  As when assessing proximate cause, courts assessing plaintiffs' case for loss causation look to whether the alleged damages were reasonably foreseeable given the alleged false or misleading statements.  *See Castellano*, 257 F.3d at 187 (looking to whether "the damages suffered by plaintiff [were] a foreseeable consequence of any misrepresentation or material omission").  As with proximate cause, these determinations "may often rest in part on legal policy considerations" that "fix a . . . limit on a person's responsibility, even for wrongful

13

acts." *Id*.  However, the Court of Appeals has noted that "the tort analogy is imperfect."  *Lentell*,

356 F.3d at 173.  In particular, unlike for proximate cause in tort, "it cannot ordinarily be said

that a drop in the value of a security is 'caused' by the misstatements or omissions made about it,

as opposed to the underlying circumstance that is concealed or misstated."  *Id*.  For this reason,

among others, application of the loss causation concept "to particular facts has often been

challenging."  *Castellano*, 257 F.3d at 187.

The Supreme Court recently attempted to bring clarity to this area in *Dura*

*Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).  In *Dura*, the defendant had developed a

spray for treating asthma and had represented that it expected the FDA to approve the device.  It

also represented that its drug sales would be profitable.  Plaintiffs alleged that these

representations were false, that they constituted a fraud on the market, and that they had paid

inflated prices for defendant's shares as a result.  The Ninth Circuit held that these allegations

were sufficient to survive a motion to dismiss.  The Supreme Court disagreed and reversed.

The Supreme Court specifically rejected the Ninth Circuit's holding that "plaintiffs were

harmed when they paid more for the stock than it was worth."  *Broudo v. Dura Pharms., Inc.*,

339 F.3d 933, 938 (9th Cir. 2003) (quoting *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 832

(8th Cir. 2003)).  The Ninth Circuit had reasoned that if the injury occurs at the time plaintiff

purchases or sells the stock, the chain of causation ends there too, and it would therefore be

unnecessary for plaintiffs to prove that a "disclosure and subsequent drop in the market price of

the stock . . . actually occurred . . . ."  *Id*.  In contrast, the Supreme Court reasoned that "as a

matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss;

the inflated purchase payment is offset by ownership of a share that *at that instant* possesses

equivalent value."  *Dura*, 544 U.S. at 342 (emphasis in original).  Consequently, plaintiffs suffer

a loss only when the shares they possess decline in value below the purchase price.  Alleging a connection between the overstated price and the false statements was therefore not enough to establish causation.  Plaintiffs needed to draw a causal connection between the false statements and the subsequent decline in share value.

The disagreement between the Supreme Court and the Ninth Circuit in *Dura* was partly rooted in differing views of the likelihood of real financial loss following plaintiffs' purchase. The Ninth Circuit had held elsewhere that loss was not inevitable, admitting that plaintiffs who later sell at a profit or for the same price as the purchase price could not recover.  *See Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1437 (9th Cir. 1987).  Nevertheless, the Ninth Circuit considered this the exception rather than the rule and found that plaintiffs could recover after any share decline below the purchase price—including declines that occurred before the truth leaked into the market.[7]  *Id*.  Because some loss was inevitable in the vast majority of cases, there was no need to require plaintiffs to establish a causal chain past the inflated price.  In contrast, the Supreme Court found that shareholder loss was far from inevitable.  *Dura*, 544 U.S. at 342 ("If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss.  But that is far from inevitably so.").  While plaintiffs may later sell at a price below the purchase price, "that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price."  *Id*. at 343.  Any one of such factors may

---

[7] If, for example, a person paid $110 for a share that would have been worth $100 had the truth been known, and later sold it for $105 before the truth came out, she could still recover five of the ten dollars she overpaid regardless of why the share price declined.  The Ninth Circuit described such losses as occurring "as a result of market forces operating on the misrepresentations."  *Wool*, 818 F.2d at 1437; *see also* Madge S. Thorsen, Richard A. Kaplan, & Scott Hakala, *Rediscovering the Economics of Loss Causation*, 6 J. BUS. & SEC. L. 93, 105-06 (April 2006) (discussing how market forces operate on a fraud).

precede a decline in the stock price, and a reasonable fact-finder could infer that it was that factor and not the fraud that caused the decline.  For a fact-finder to conclude that the fraud caused a decline in the share price, there must at least be evidence that the truth had begun to leak out into the market and that the shares traded at lower prices as a consequence of this leak.  Accordingly, the plaintiffs who sold prior to the truth leaking out could never recover.  *See id.* at 342 ("if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss").

Unsurprisingly, the Court's principal authority for this argument was the common law of tort.  The Restatement (Second) of Torts, quoted by the Court, concludes that "one who misrepresents the financial condition of a corporation in order to sell its stock will become liable to a purchaser who relies upon the misinformation for the loss that he sustains when the facts as to the finances of the corporation become generally known and as a result the value of the shares is depreciated on the market . . . ."  RESTATEMENT (SECOND) OF TORTS § 548A, cmt. b; *see also Dura*, 544 U.S. at 344.  However, "there is no liability when the value of the stock goes down after the sale, not in any way because of the misrepresented financial condition, but as a result of some subsequent event that has no connection with or relation to its financial condition."  RESTATEMENT (SECOND) OF TORTS § 548A, cmt. b.  Similarly, the treatise known colloquially as "Prosser and Keeton," also quoted by the Court, concluded that "losses due to a subsequent decline in the market, or insolvency of the corporation brought about by business conditions or other factors in no way relate[d] to the [false] representations will not afford a basis for recovery."  W. KEETON, D. DOBBS, R. KEETON, & D. OWEN, PROSSER AND KEETON ON LAW OF TORTS § 110, at 767.[8]

---

[8] In addition to tort law, the Supreme Court also held that a closer causal relationship between the alleged false or misleading statements and plaintiffs economic losses was more consistent with Congress's intent when it enacted the

Because it had long adopted similar principles of loss causation, this Circuit felt little impact from *Dura*. Indeed, the lead case on loss causation by the Court of Appeals, *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005), was decided several months before *Dura* and remains the law today. In *Lentell*, plaintiffs sued Merrill Lynch for permitting its analysts to publish "BUY" recommendations on stocks they knew were bad bets. Plaintiffs had, of course, bought the recommended stocks and then lost money when their value declined. The Court of Appeals affirmed dismissal of the suit on the grounds that plaintiffs had failed to adequately plead loss causation.

*Lentell* answers several questions not fully addressed in *Dura*. *Dura* holds that plaintiffs must establish a causal connection between the fraud and stock declines that occur after the truth begins to "leak out", but it is silent as to how plaintiffs might prove this. The Supreme Court confirms the analogy to proximate cause, but admits differences as well. *See Dura*, 544 U.S. at 343 ("private securities fraud actions resemble in many (but not all) respects common-law deceit and misrepresentation actions"). *Lentell* notes that the key difference is that stock prices decline in reaction to information released into the market rather than in reaction to the fraudulent statements themselves. When that information was previously concealed from the market by the fraud, we can properly conclude that whatever decline in the stock price was caused by the release of that information was also caused by the fraud. *Lentell*, 396 F.3d at 173 ("To establish loss causation, a plaintiff must allege that . . . the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."). The Court of Appeals called the event or events that released this previously concealed information the "materialization of the risk." *Id.* The *Lentell* court also clarified loss causation's relation to

---

securities laws. *Dura*, 544 U.S. at 345 (holding that Congress's statutory scheme intended to "protect [investors] against those economic losses that misrepresentations actually cause" rather than "provide [them] with broad insurance against market losses").

foreseeability.  The law required plaintiffs to establish "both that the loss [was] foreseeable *and* that the loss [was] caused by the materialization of the concealed risk."  *Id*.  To prove that the loss-inducing event was foreseeable, plaintiffs must establish that the risk of the event occurring "was within the zone of risk *concealed* by the misrepresentations and omissions alleged by the disappointed investor."  *Id*.

The classic example of a loss-inducing event is a corrective disclosure by the company itself.[9]  A corrective disclosure is traditionally an admission by the company that one or more of its previous statements were false or misleading followed by a corrected, truthful and complete version of those statements.  *See In re AOL Time-Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007) (a corrective disclosure "reveal[s] an alleged misstatement's falsity or disclose[s] that allegedly material information had been omitted"); *Lentell* 396 F.3d at 175 n.4 (requiring that a corrective disclosure "reveal to the market the falsity of the prior recommendations"); *but see In re IPO Sec. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008) ("There is no requirement that corrective disclosures emanate from the company itself, so long as the truth is disclosed in some fashion.").  The event need not take this form, however.  The event could be a credit ratings downgrade, *see In re Dynex Capital, Inc. Sec. Litig.*, No. 05 Civ. 1897 (HB), 2006 WL 314524, at *11 (S.D.N.Y. Feb. 10, 2006) (holding that a concealed risk materialized when the ratings agencies downgraded certain bonds, and defendants had previously misrepresented the quality of the bonds' collateral), *vacated on other grounds*, *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190 (2d Cir. 2008), or the

---

[9] The Court notes that many courts in the district consider corrective disclosures to be a separate conceptual category from "materialization of the risk", *see, e.g.*, *In re IPO Sec. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008) ("There are several possible methods of pleading loss causation, including 'direct causation,' 'materialization of risk,' and 'corrective disclosure.'"), and that other courts have stretched the notion of corrective disclosure to include all possible loss-inducing events, *see, e.g.*, *In re Bristol-Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 164-65 (S.D.N.Y. 2008) (discussing corrective disclosures and partial corrective disclosures).

collapse of the company, *see In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 307 (S.D.N.Y. 2005) ("The concealed risk materialized when Parmalat suffered a liquidity crisis on December 8, 2003 and was unable to pay bonds as they came due.").  For an event to qualify as a materialization of the risk, it need only disclose part of the truth that was previously concealed by the fraud.  A ratings downgrade reveals the risk of deteriorating liquidity, and the failure to obtain agency approval may reveal the risk of a non-viable product.  Unlike corrective disclosures, these events do not identify specific company statements as false or misleading.  But if the company had previously concealed its liquidity condition or the failure of its product by making false or misleading statements, these events may be sufficiently related to the fraud to qualify as materializations of the risk.

Once an event qualifies as a materialization of the risk, plaintiffs must still prove that their losses were caused by that event.  Admittedly, this is a potentially complicated endeavor.  A stock's price as listed on an exchange is merely a continuous posting of thousands of individual trades.  Moreover, as the Supreme Court in *Dura* noted, a decline in stock price can occur in reaction to "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events . . . ."  *Dura*, 544 U.S. at 343.  Sorting out which declines were caused by such extraneous factors and which were caused by a materialization of the concealed risk is generally the province of an expert.  *See Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997) (determining causation and damages in a securities fraud action "is often done, as it was here, with the help of an expert witness").  It is an expert that produces the almost obligatory "event study" that begins by isolating stock declines associated with market-wide and industry-wide downturns from those specific to the company itself.  *See In re Imperial Credit Indus., Inc. Sec. Litig.,* 252 F. Supp. 2d 1005, 1014-15

(C.D. Cal. 2003) (requiring an event study or similar analysis).  Once plaintiffs' expert has isolated days where the stock declines were statistically significant relative to these downturns, he must consider firm-specific events that might have caused those declines.[10]

While the plaintiffs at all times bear the burden on loss causation, it is important not to confuse causation with damages when comparing competing causes for a stock decline.  In theory, plaintiffs need only prove that they suffered *some* damage from the fraud.  Liability obviously does not hinge on how much damage.  However, when there are two competing causes for a stock decline, it is easy to argue that one caused the entirety of the decline while the other did not cause any of it.  The Fourth and Eleventh Circuits have specifically addressed this problem and held that to satisfy loss causation plaintiffs need only produce sufficient evidence for a jury to conclude that the fraud-related event was a "substantial cause" of the decline.  *See Miller v. Asensio & Co., Inc.*, 364 F.3d 223, 229 (4th Cir. 2004) ("when courts require a showing of damages *proximately caused* by the defendant's conduct for liability, they require only that the plaintiff show that the defendant's conduct was a *substantial* cause of its injury"); *Robbins*, 116 F.3d at 1447 ("Because market responses, such as stock downturns, are often the result of many different, complex, and often unknowable factors, the plaintiff need not show that the

---

[10] The Court in *In re Enron Corp. Sec. Derivative & ERISA Litig.*, 529 F. Supp. 2d 644 (S.D. Tex. 2006), gave the following description of an event study:

> An event study is a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price. This approach assumes that the price and value of the security move together except during days when disclosures of company-specific information influence the price of the stock. The analyst then looks at the days when the stock moves differently than anticipated solely based upon market and industry factors-so-called days of "abnormal returns."  The analyst then determines whether those abnormal returns are due to fraud or non-fraud related factors.... [E]vent study methodology has been used by financial economists as a tool to measure the effect on market prices from all types of new information relevant to a company's equity valuation.

*Id*. at 720.

defendant's act was the sole and exclusive cause of the injury he has suffered; he need only show that it was 'substantial', i.e., a significant contributing cause."). The Fourth Circuit even went so far as to uphold a verdict where the jury had found that the fraud had been a substantial cause of the loss, but awarded no damages because that loss could not be determined with sufficient certainty. *Miller*, 364 F.3d at 225. The Second Circuit has adopted a similar approach, requiring plaintiffs to produce sufficient evidence for the fact finder to "ascribe some rough proportion of the whole loss" to defendants' fraud. *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007).

Similarly, the *Lentell* court noted that it was not suggesting that "plaintiffs were required to allege the precise loss attributable" to defendants' fraud. *Lentell*, 396 F.3d at 177. The Court of Appeals also noted that as a general matter, "the chain of causation . . . is a matter of proof at trial . . . ." *Id*. at 174. Because causation is fundamentally a factual matter, the relevant factors may include the time between the event and the decline, *Castellano*, 257 F.3d at 186, the prominence of the fraud-related news relative to other news, *Lattanzio*, 476 F.3d at 158, or how new the information is, *In re Omnicom Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008). Ultimately, courts must still rely on basic summary judgment principles to determine whether a genuine issue of fact has been raised.

Summarizing the case law here discussed, plaintiffs seeking to prove loss causation must establish two causal connections: a connection between the alleged false or misleading statements and one or more events disclosing the truth concealed by that fraud, and a connection between these events and actual share price declines. *Lentell*, 396 F.3d at 173. To demonstrate the connection between the statements and the events—termed "materializations of the concealed risk"—plaintiffs must show: (1) that these events were foreseeable consequences of

the alleged fraud, *id*.; and (2) that these events revealed new information previously concealed by defendants' alleged fraud, *id*.; *see also Dura*, 544 U.S. at 342.  To demonstrate the connection between the events and the share price declines, plaintiffs must:  (1) show a correlation between news of the event and the declines; and (2) disaggregate the declines or some rough percentage of the declines from losses resulting from other, non-fraud-related events.  *Dura*, 544 U.S. at 342-43; *Lattanzio*, 476 F.3d at 158.

### III.   Dr. Nye's Report Raises a Genuine Issue of Material Fact Concerning Loss Causation

Defendants argue that plaintiffs have failed to establish both the connection between their allegedly false or misleading statements and any fraud-revealing events, and the connection between these alleged events and Vivendi stock declines.  First defendants argue that, as a matter of law, the events identified by plaintiffs cannot qualify as "materializations of a concealed risk" because they do not reveal new information concealed by defendants' alleged fraud.  Second, defendants argue that plaintiffs have failed to disaggregate competing causes of stock price declines.

#### A.      Plaintiffs' Materialization-of-the-Risk Theory Is Viable

In his report and deposition testimony, Dr. Nye identifies eleven days on which the alleged fraud caused loss by the plaintiffs.  (Nye Report ¶¶ 127, 171, 192, 195, 213, 216, 222, 225, 239, 242, 244.)  He identified these days by applying a regression analysis to Vivendi's share price over the class period and selecting those days on which there was a Vivendi-specific residual price decline.  (*Id*. ¶ 262.)  Dr. Nye then proceeded to identify and describe particular events on these days that he claims caused Vivendi's stock price to decline.  (*Id*.)  At least in this motion, defendants do not challenge the method by which Dr. Nye selected the eleven days.

Rather, defendants challenge whether the events on these days actually disclosed information that had previously been concealed by the fraud. *Lentell*, 396 F.3d at 173.

As a threshold matter, the Court notes that while plaintiffs argue that "[b]oth corrective disclosure and materialization of concealed risk analyses support loss causation in this case," Class Pl. Br. at 22, this is not a case of corrective disclosure. None of the eleven events include an announcement identifying specific Vivendi statements as false or misleading. *See In re AOL Time-Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007); *Lentell* 396 F.3d at 175 n.4. These events may reveal truthful information previously concealed by the fraud—as they must to satisfy the requirements of loss causation—but this alone does not qualify an event as a corrective disclosure.

Under a broader, materialization-of-the-risk theory, plaintiffs argue that defendants' false and misleading statements concealed the risk of a liquidity crisis, and that events on those eleven days gradually revealed Vivendi's deteriorating liquidity condition. Plaintiffs define liquidity as "the ability or ease with which Vivendi/Vivendi Universal could timely meet its financial obligations and fund its operations with cash on hand, assets readily convertible to cash on hand, cash from operations, or readily accessible sources of debt." (Nye Report at 9.) The subject of Vivendi's allegedly fraudulent statements therefore covers the extent of its debt, the size of its income stream, and, perhaps most importantly, how quickly Vivendi could convert assets into cash. *See Lentell*, 396 F.3d at 173 ("a plaintiff must allege … that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered").

Defendants argue that plaintiffs' conception of liquidity risk "is so amorphous and all-encompassing as to render it meaningless." (Def. Br. at 10.) Admittedly, liquidity is a broad concept, but it is not as amorphous as defendants make it out to be. Cash flow by itself, for

23

example, does not mean anything for liquidity, but it does mean something when combined with information concerning the debt it is intended to service.  Among other things, plaintiffs argue that defendants' statements concealed specific facts regarding:  (1) Vivendi's actual EBITDA and free cash flow; (2) Vivendi's debt to its subsidiary Cegetel and the terms of that debt; (3) Vivendi's drawing on its commercial paper backups; and (4) Vivendi's obligation to purchase an additional 16% interest in Maroc Telecom by February 28, 2002.  (Nye Report ¶ 93.)  Plaintiffs argue that Vivendi's published EBITDA and free cash flow numbers—the primary measures for cash flow available to service debt—were inflated and that the size and nature of its debt obligations were minimized.  (*Id.*)  Broad though it may be, the Court concludes that such a theory of liquidity risk is coherent.  *See, e.g.*, *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 97-98 (2d Cir.2001) (risk of liquidity crisis concealed by edited background report omitting important negative events in executive's financial and business history); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d at 307 (risk of liquidity crisis concealed by omission of massive debt load from company's disclosures).

Assuming the legitimacy of plaintiffs' theory, defendants still argue that the information revealed by events on the eleven days was merely "bad news" rather than new information that had been previously concealed.  (Def. Reply Br. at 12-15.)  Except for the events identified on July 10, 2002, July 15, 2002, and August 14-16, 2002, plaintiffs identify either quick, unexpected asset sales or credit rating downgrades as the loss-inducing events.  (Nye Report ¶¶ 126-128, 167-70, 189, 193, 207, 209.)  Considering that credit ratings purport to assess the probability that a company will default on its obligations, there is little question that a downgrade is a sign of deteriorating liquidity.  As for unexpected asset sales, Dr. Nye specifically discusses their relevance to liquidity in his report.  (Nye Report at ¶¶ 19-20.)  Specifically, Dr. Nye writes

24

that resolving a liquidity crisis "may require rapid sale of assets in which shareholders hold interests to pay the claims of debtholders, and at prices less than shareholders expected for those assets, or sale of assets important to realization of the company's strategy."  (*Id*. at ¶ 19.)  Put simply, maximizing shareholder value when a company sells one of its assets means negotiating the best price for it.  If the company must sell the asset quickly to meet liquidity demands, it may be forced to accept a lower price for the asset than it would have but for time constraints. Accordingly, both ratings downgrades and unexpectedly quick asset sales have a reasonable relationship to liquidity risks and may be seen as materializations of such risks.

Defendants' argument runs astray when at this point they respond that, at most, plaintiffs have demonstrated that the downgrades and the quick asset sales were foreseeable from the allegedly false or misleading statements.  (Def. Reply at 13.)  Implicitly conceding foreseeability, defendants purport to challenge only "actual causation," citing *Lentell*.  (*Id*.)  But proving actual causation, at least in the way *Lentell* uses the phrase, is part of plaintiffs' burden to show a causal connection between the materialization of the risk and the stock price declines, *not* the causal connection between the allegedly false and misleading statements and the materialization of the risk.  Establishing the latter connection does not, as defendants appear to believe, require plaintiffs to establish a one-to-one correspondence between concealed facts and the materialization of the risk.  In other words, if a company misrepresents fact A (we have plenty of free cash flow), which conceals risk X (liquidity), the risk can still materialize by revelation of fact B (a ratings downgrade), an indication of risk X (liquidity).  As discussed above, to prove the causal connection between misrepresenting fact A and the revelation of fact B, plaintiffs must establish only that the revelation of fact B was foreseeable, i.e., within the zone of risk X, and that fact B reveals information about risk X.  When fact B is revealed, the market

need not be aware of fact A or that fact A had been previously misrepresented.  The way defendants describe the law, only a corrective disclosure would prove loss causation.

None of defendants' attempts to distinguish the relevant case law on this point is successful.  In *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001), the plaintiffs alleged that defendants concealed the company CEO's incompetence and that the risk of the CEO being unable to manage the company's liquidity risk materialized when the company had a liquidity crisis.  The complaint nowhere alleged that the liquidity crisis revealed the CEO's incompetence when it occurred (presumably that was discovered later), but the Court of Appeals nevertheless allowed the claim to proceed.  *Id.* at 96-98.  In *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278 (S.D.N.Y. 2005), the court allowed a claim to proceed where bankruptcy revealed the risk of a liquidity crisis.  There, the market did not know that Parmalat had been hiding massive amounts of debt when the bankruptcy occurred, but that did not stop plaintiffs from seeking recovery.  *Id*. at 307.

Defendants practically ignore *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171 (2d Cir. 2001), one of the only Court of Appeals cases to address loss causation at summary judgment rather than a motion to dismiss.  In *Castellano*, defendants allegedly concealed their plans for a company restructuring even as they negotiated plaintiff's resignation from a high-level executive position.  As a private company, Young & Rubicam had the right to repurchase plaintiffs' shares if he resigned.  As one of the company's largest shareholders, plaintiff was therefore concerned that by resigning he might lose the projected value of his equity.  Plaintiff nevertheless chose to resign based in part on defendants' representations that "nothing was going to change in the near future."  The company exercised its right to repurchase plaintiff's shares only to later participate in a leveraged recapitalization that sent its shares soaring.  On appeal,

defendants argued that summary judgment on loss causation grounds should be affirmed because the specific plans concealed during the resignation negotiations were merger plans with a company called True North.  The ultimate transaction that caused the plaintiff's loss was a leveraged recapitalization with a company called Hellman & Friedman.  Hence, defendants argued that the risk they concealed, a merger with True North, never materialized to cause plaintiff's loss.  The Court of Appeals, however, rejected this argument and reversed the grant of summary judgment.  The court held that defendants' concealment of the merger negotiations and other facts misled plaintiff "as to the zone of risk that [the company] might soon enter into a major corporate transaction."  *Id*. at 188.  Thus, defendant "disguised the very risk to which [plaintiff] fell victim."  *Id*. at 189.  The level of specificity with which plaintiff was held to on loss causation corresponded only to the foreseeability requirement and information ultimately disclosed.  The risk was not that a particular transaction would cause a rise in value of plaintiff's shares, but that any major transaction would.

Defendants erroneously claim that "to the extent it suggests that a risk of the same type was foreseeable and thus the loss was caused by the risk . . . [*Castellano*] has been overruled by *Lentell*'s explicit requirement plaintiffs prove both foreseeability and proximate cause . . . and *Dura*'s holding that securities laws only protect 'against those economic losses that misrepresentations actually cause.'"  (Def. Reply Br. at 14 n.10.)  As a threshold matter, one panel of the Court of Appeals generally will not "overrule" an earlier panel, except in unusual circumstances not present here.  *Consub Delaware LLC v. Schahin Engenharia Limitada*, 543 F.3d 104, 109 (2d Cir. 2008) ("[O]ne panel of this Court cannot overrule a prior decision of another panel, unless there has been an intervening Supreme Court decision that casts doubt on this Court's controlling precedent, or unless an en banc panel of this Court overrules the prior

decision."). Second, there is nothing inconsistent between *Castellano* and *Lentell*. Besides citing approvingly to *Castellano*, *Lentell* does not address the connection between the fraud and the materialization of the risk when it talks about "actual cause." As noted above, the Court of Appeals was here referring to the causal connection between the materialization and the actual decline in stock price. *Lentell*, 396 F.3d at 172-73. The causal connection between the false or misleading statements and the materialization is established if the materialization was foreseeable and if it disclosed information that was previously concealed. *Dura*, 544 U.S. at 342; *Lentell*, 396 F.3d at 173. Finally, nothing in *Dura* suggests otherwise. The word "cause" takes on a variety of meanings at different levels of generality. Defendants' *Dura* quote uses causation at a very high level of generality and does not suggest that *Lentell*'s approach is erroneous.

As in *Castellano*, plaintiffs here allege that defendants concealed a broad risk to which the company later fell victim by misleading the public on particular facts and denying the risk. Specifically, plaintiffs argue that defendants concealed a severe liquidity risk by denying any liquidity problems, misrepresenting Vivendi's actual EBITDA and free cash flow, omitting the terms of its Cegetel debt, omitting Vivendi's draws on its commercial paper backups, and omitting Vivendi's purchase obligation in Maroc Telecom. (Class Pl. Br. at 7-21.) The events plaintiffs argue constitute a materialization of this concealed risk do not reveal Vivendi's free cash flow or the previous draws on its commercial paper backups anymore than the announcement of a leveraged capitalization by Young & Rubicam revealed its previous merger discussions with True North. They do, however, present a genuine material issue of fact with regard to whether previously concealed information—here, the tenuous liquidity position of Vivendi—was revealed to the market on those eleven days.

**B.** **Plaintiffs Have Adequately Disaggregated Competing Causal Events**

Defendants properly raise whether plaintiffs have established "actual causation" between the fraud-related disclosures and declines in share price.  (Def Br. at 12.)  Defendants argue that on each of the eleven days there were other potential causes competing with the fraud-related disclosures.  According to defendants, plaintiffs have failed to produce sufficient evidence for a fact finder to distinguish between the losses caused by these competing factors and the losses caused by the fraud-related events; therefore, plaintiffs have failed to demonstrate loss causation. The Court does not find it necessary to determine whether plaintiffs have produced sufficient evidence of a causal connection on each of the identified days.  To deny summary judgment, it is sufficient for the Court to observe that on several of the days—indeed, a majority—plaintiffs have produced sufficient evidence of such a connection.

Defendants begin with *Dura*'s observation that absent evidence to the contrary, a lower stock price may reflect, "not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Dura*, 544 U.S. at 343.  Plaintiffs therefore bear the burden of producing evidence establishing that the loss they suffered "was caused by the alleged misstatement as opposed to intervening events." *Lentell*, 356 F.3d at 174.  Equivalently, if we treat the difference between the purchase price and the sell price as plaintiffs' total loss, plaintiffs bear the burden of producing evidence sufficient for a fact finder to "ascribe some rough proportion of the whole loss" to defendants' fraud. *Lattanzio*, 476 F.3d at 158.

Plaintiffs' first respond by pointing to the fact that of "out of more than 440 trading days in the entire class period", Dr. Nye selected only eleven as days on which fraud-related losses occurred.  (Class Pl. Br. at 2.)  Moreover, Vivendi's stock price fell €70.36 over the course of the class period, while the aggregate decline on the eleven days identified by Dr. Nye amounts to only €27.58, i.e., 39% of the "total" loss.  (*See* Tr. of Mar. 2, 2009 Hr'g at 29-33; Nye Report Ex. 9D.)  To identify these days, Dr. Nye conducted a regression analysis to disaggregate market-wide and industry-wide effects on the share price and thus find the days on which there were Vivendi-specific residual declines.  Having identified the days on which there were potential fraud-related losses, Dr. Nye confirmed that these losses were fraud-related by analyzing disclosures made on each of the eleven days and opining both that materializations of the risk occurred and that any other company-specific information released on those days did not cause the residual declines.  Plaintiffs argue that these facts rebut defendants' argument.

Defendants respond by arguing that on these eleven days Dr. Nye has nevertheless failed disaggregate competing causal factors.  The fact that Dr. Nye has disaggregated days in which no fraud-related revelations occurred does not release him from disaggregating from competing events on each of the eleven days because *Dura* applies no matter how narrow the scope of application.  (Def. Br. at 16-17.)  Defendants point incredulously at Dr. Nye's assertion that 100% of the price decline on each of the eleven days was due to fraud-related revelations.  (*Id*. at 17.)  Surely, they argue, some part of that price decline was due to some other factor. Defendants are technically correct.  If five top Vivendi executives had resigned the same day as a ratings downgrade, it may be incumbent on plaintiffs to produce evidence establishing roughly how much of the price decline was due to the downgrade and how much to the resignations.  But the key term here is "roughly."  Indeed, given the admonishment by the Court of Appeals that

plaintiffs "were [not] required to allege the precise loss attributable" to the fraud, *Lentell*, 356 F.3d at 177, it seems logical that the shorter the time frame considered, the rougher the proportion need be.  Furthermore, in most cases, "the chain of causation . . . is a matter of proof at trial."  *Id*. at 174.  Given that plaintiffs have produced evidence that Vivendi's liquidity risk did gradually materialize on days when the stock price declined, defendants must at least adduce competing causal events that plaintiffs have failed to disaggregate.  *See Celotex,* 477 U.S. at 325.

For the most part, however, defendants do not point to an obvious competing cause on each of the eleven days.  Instead, defendants make the novel argument that plaintiffs have failed to disaggregate damages caused by the risk from damages caused by the materialization of the risk.  (Def. Br. at 14-15; Def. Reply Br. at 21-25.)  Defendants argue that plaintiffs' causal theory is premised on Vivendi concealing the risk that it would have a liquidity crisis.  For example, suppose Vivendi had concealed from the public in December 2001 a 50% risk that it would experience a liquidity crisis in May 2002.  Had plaintiffs been aware of that risk, they would have paid €X less for stock.  Logically, had the risk been 100%, they would have paid even less (although not necessarily €2X less).  If Vivendi does experience a liquidity crisis in May 2002, the risk has become 100%, and the price decline would reflect what would have happened had a 100% risk been announced in December 2001 rather than a 50% risk.  Accordingly, defendants argue, plaintiffs must disaggregate the additional damages caused by the materialization of risk from those attributable to risk itself.  Defendants cite no case law for this argument, and the Court has not found any.

The first problem with defendants' argument is that Dr. Nye opines that "all the pieces were there" in December 2001 and "the probability [of a liquidity crisis] was basically a hundred percent."  (Class Pl. Br. at 40.)  While defendants argue that "Dr. Nye performed no analysis to

arrive at this conclusion", this is an argument better made in a challenge to Dr. Nye's credibility as an expert rather than a summary judgment motion.  Dr. Nye's opinion alone creates a genuine issue of material fact on this point.  Second, if the Court analyzes the problem through the lens of tort law and proximate cause, the Court reaches the same result.  The Restatement (Second) of Torts concludes that plaintiffs seeking damages for fraud are entitled to seek out-of-pocket damages *and* "pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation."  RESTATEMENT (SECOND) OF TORTS § 549.  Prosser and Keeton concurs, noting that plaintiffs can recover for "losses which might be expected to follow from the fraud and from events that are reasonably foreseeable."  W. KEETON, D. DOBBS, R. KEETON, & D. OWEN, PROSSER AND KEETON ON LAW OF TORTS § 110, at 767.  Prosser and Keeton notes that "if the plaintiff stores his goods in a warehouse represented [to] him to be fireproof and they are destroyed when it burns down, he can recover, and likewise, when he invests in an automobile agency, after false assurance of profits make by similar agencies, and the agency goes bankrupt." *Id.*  In the goods example, plaintiff is entitled to recover not only the inflated price he paid for a fireproof storage facility, but also the cost of the goods lost in the fire.  In the agency example, the plaintiff is entitled to recover not only the inflated price he paid for equity in the agency, but also whatever portion of the bankruptcy loss that was foreseeable.  Of course, the bankruptcy example is an example restricted neither to textbooks or common law fraud.  *See In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278 (S.D.N.Y. 2005).

Finally, it is hard to see how price declines allegedly caused by the materialization of the risk should not be incorporated into plaintiffs' damages.  Stocks are risky investments, and purchasers assume a variety of risks to the value of their stock.  Suppose Vivendi disclosed sufficient information in December 2001 for plaintiffs to conclude that there was a 50% risk that

Jean-Marie Messier would resign as CEO of Vivendi in July 2002.  In December 2001, the price would reflect that risk, and plaintiffs who bought stock then would assume the risk that the stock price would suffer if Messier did in fact resign in July 2002.  Plaintiffs allege, however, that they could not have assumed the risk of a liquidity crisis because it was concealed from them.  Defendants are essentially arguing that plaintiffs should bear a risk they did not assume and that was intentionally concealed from them.  Imposing liability for this loss would not be downside insurance for investors.  Not imposing liability, however, might be a windfall for fraudsters.

Defendants remaining arguments mostly concern problems with Dr. Nye's day-to-day analysis.  On certain days, however, defendants utterly fail to point to competing causes of the price declines.  On May 3, 2002, defendants point to no competing causes, arguing only that the downgrade revealed no new information.  For this argument, applied to several of the eleven days, defendants rely primarily on *In re Omnicom Sec. Litig.*, 541 F. Supp. 2d 546 (S.D.N.Y. 2008), citing its statement that "[a] recharacterization of previously disclosed facts cannot qualify as a corrective disclosure."  *Id.* at 552.  While the Court agrees that this statement comports with the law in this Circuit, the Court does not find that no reasonable juror could conclude that the ratings downgrades disclosed no new information.  In *In re Omnicom*, the company share price plummeted after a negative article in the *Wall Street Journal*, but the facts in the article had been disclosed months earlier, and the Court concluded that the negative tone of the article and subsequent commentary was responsible for the decline rather than any disclosure of concealed facts.  *Id.* at 554.  In contrast, the ratings agencies had previously affirmed their ratings and essentially changed their minds.  Defendants argue that the facts on which the agencies based their conclusions were not new to the market, but defendants do not support this proposition.  First, rating agencies have access to non-public information, and the

public could have assumed that the agencies were acting on such information.  Second, facts available to the public are not necessarily well disseminated into the market.  While the court in *In re Omnicom* could point to particular articles explicitly stating that the *Wall Street Journal* article disclosed no new information, Dr. Nye can point to articles noting the market's "surprise" at the downgrade.  (Nye Report ¶ 168.)  The analysis is identical for the July 2, 2002 declines due to downgrades.  *See In re Dynex Capital, Inc. Sec. Litig.*, 2006 WL 314524, at *11.

Defendants also fail to point to any unaddressed competing causes on June 21, 2002 and June 24, 2002.  While defendants argue that the Deutsche Bank transaction was announced prior to June 21, 2002, and therefore that the market had already absorbed the news, they can point to no reason why the stock declined.  Defendants are also incorrect that Dr. Nye fails to account for the News Corp. rumors and British Telecom.  (*See* Nye Report ¶ 194.)  For the reasons discussed above, the Court concludes that there is a genuine issue of material fact as to whether these quick sales disclosed a need for cash and therefore weakened liquidity.

Finally, the only competing cause defendants can adduce on August 14, 2002 (and by implication August 15 and 16) is rating agencies' concerns over Vivendi management's "failure to explain its future strategy."  However, a fact-finder could reasonably accept the inference proffered by Dr. Nye that this comment is directly related to the liquidity concerns and how management would address the problem.  The Court again concludes that Dr. Nye's report raises a genuine issue of material fact for the stock declines on this day and on the two days following.

## IV.    Particular Allegations, Misleading Statements, and Damages

Defendants also seek rulings from the Court that certain allegations and allegedly false or misleading statements could not possibly have contributed to plaintiffs' loss.  Defendants argue

34

that the following allegations are unconnected to the plaintiffs' loss "regardless of how broadly plaintiffs define their theory of 'liquidity risk'":  (1) the failure to disclose the obligation to Maroc Telecom; (2) the back-dating of the Cegetel current account; (3) the repurchase of the Seagram Bonds; and (4) the failure to meet synergy targets after the merger.  (Def. Reply Br. at 15-16.)  Similarly, defendants argue that plaintiffs cannot seek damages for:  (1) any alleged misleading statements during periods where inflation did not increase; (2) any misleading statements alleged by the Class but not alleged by Liberty Media; and (3) any statements made before March 9, 2001.  Whether or not the alleged misstatements or omissions were the proximate cause of plaintiffs' losses, evidence concerning these allegations may be admissible for the purpose of showing the existence of a liquidity crisis or to establish scienter and a scheme to defraud.  Accordingly, the Court will reserve decision on these issues until trial or until the parties raise them in motions *in limine*.

Finally, defendants argue that Liberty Media is not entitled to seek rescissionary damages and that Dr. Nye's "constant percentage" method for calculating damages is invalid.  The Court finds that damage issues are not properly before it on this motion.  Defendants have moved for summary judgment on loss causation, and damage issues, while related, are quite another matter.

## CONCLUSION

For the reasons given, defendants' motion for summary judgment against the class plaintiffs, Liberty Media, and GAMCO for failure to establish loss causation [644] and defendants' motion for summary judgment against the individual plaintiffs for failure to establish loss causation [646] are DENIED apart from the Court's finding that Dr. Nye's constant-percentage method is irreconcilable with precedent and that plaintiffs may not pursue damages from certain allegations.

SO ORDERED.

Dated: New York, New York
      March 31, 2009

                                      _____
                                           Richard J. Holwell
                                 United States District Judge