## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ——————————————————— x | |
| **IN RE VIVENDI UNIVERSAL, S.A.** : | |
| **SECURITIES LITIGATION** : | |
| ——————————————————— : | No. 02 Civ. 5571 (RJH/HBP) |
| This Document Relates To: : | |
| : | **JURY TRIAL DEMANDED** |
| No. 07-8156, No. 07-9229, No. 07-11092, No. 08-1973 : | |
| No. 08-1974, No. 08-1975 : | |
| : | |
| Allianz Global Investors Kapitalanlagegesellschaft : | |
| MBH; Allianz Global Investors, Luxembourg S.A.; : | |
| Alecta Pensionsförsäkring, Ömsesidigt; Sjunde AP- : | |
| Fonden; Varma Mutual Pension Insurance Company; : | |
| Danske Invest Administration A/S; AFA : | |
| Livförsäkringsaktiebolag; AFA : | |
| Trygghetsförsäkringsaktiebolag; AFA : | |
| Sjukförsäkringsaktiebolag; and AFA : | |
| Sjukförsäkringsaktiebolag on behalf of : | |
| Kollektivavtalsstiftelsen Trygghetsfonden TSL; AMF : | |
| Pension Fondförvaltning AB; : | |
| Arbetsmarknadsförsäkringar, : | **BARROWAY TOPAZ KESSLER** |
| Pensionsforsakringsaktiebolag; Pensionskassernes : | **MELTZER & CHECK, LLP** |
| Adminstration A/S; Arbejdsmarkedets : | John A. Kehoe (JK-4589) |
| Tillaegspension; Industriens Pensionsforsikring A/S; : | Stuart L. Berman |
| ARCA SGR S.p.A.; Ilmarinen Mutual Pension : | Benjamin J. Hinerfeld |
| Insurance Company; Prima Societa' di Gestione del : | John J. Gross |
| Risparmio S.p.A.; Nordea Invest Fund Management : | 280 King of Prussia Road |
| A/S; Nordea Fonder AB; Nordea Investment Funds : | Radnor, Pennsylvania 19087 |
| Company I.S.A..; Nordea Fondene Norge AS; Nordea : | Telephone: 610-667-7706 |
| Fondbolag Finland Ab; Swedbank Robur Fonder AB; : | Facsimile: 610-667-7056 |
| Fjarde AP-Fonden : | |
| : | |
| Plaintiffs : | |
| v. : | |
| Vivendi Universal, S.A., Jean-Marie Messier And : | |
| Guillaume Hannezo : | |
| : | |
| Defendants : | |
| ——————————————————— x | |

## AMENDED COMPLAINT

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ........................................................................................1

II.     JURISDICTION AND VENUE ................................................................................7

III.    THE PARTIES..........................................................................................................13

IV.     FACTUAL BACKGROUND AND THE FRAUDULENT SCHEME.................24

        A.      Vivendi's Extraordinary Growth Prior to and Through the Merger ...............24

        B.      Vivendi's Continuing Acquisitions Following the Merger .............................26

        C.      Vivendi's Improper Accounting Methods and Practices..................................27

                1.      Accounting Rules Applicable to Vivendi as a Foreign Issuer..............27

                2.      Vivendi's Improper Consolidation of Maroc Telecom in its Financial
                        Statements .............................................................................................31

                3.      Defendants' Improper Manipulations of Vivendi's Reported EBITDA..............35

                        a.      Second Quarter of 2001 (Cegetel) ...........................................36

                        b.      Third Quarter of 2001 (UMG) .................................................37

                        c.      Second Quarter of 2001 (VUP) ...............................................38

                4.      Defendants' Failure to Properly Report Pro Forma Accounting Metrics ...........39

                5.      Defendants' Failure to Disclose Vivendi's 2% Interest in Elektrim
                        Telekomunikacja....................................................................................40

                6.      Defendants' Failure to Disclose that Vivendi's 2001 (and Forward)
                        EBITDA Results Benefited from Purchase Accounting Adjustments.................41

        D.      Defendants' Concealment of Vivendi's Growing Liquidity Crisis..................42

                1.      Defendants' Failure to Disclose the Insufficiency of Vivendi's Working
                        Capital ....................................................................................................43

                2.      Defendants' Failure to Disclose Material Commitments Concerning
                        Cegetel and Maroc Telecom....................................................................44

                        a.      The Cegetel Current Account ...................................................44

                        b.      The Maroc Telecom Side Agreement .......................................46

                3.      The Magnitude of the Undisclosed Liquidity Crunch ............................47

V.      THE TRUTH EMERGES, CAUSING HARM TO PLAINTIFFS AND OTHER
        VIVENDI INVESTORS..................................................................................49

VI.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ...........58

VII.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER.................................94

VIII.   PRESUMPTION OF RELIANCE.............................................................. 100

IX.     INAPPLICABILITY OF STATUTORY SAFE HARBOR................................... 101

X.      LOSS CAUSATION .................................................................................... 102

XI.     TOLLING OF THE STATUTE OF LIMITATIONS........................................... 105

XII.    CLAIMS FOR RELIEF................................................................................. 107

        COUNT  I Violations of Section 11 of the Securities Act of 1933 (Asserted Against
        All Defendants)......................................................................................... 107

        COUNT  II Violations of Section 12(a)(2) of the Securities Act of 1933 (Asserted
        Against All Defendants) ........................................................................... 109

        COUNT  III Violations of Section 15 of the Securities Act of 1933 (Asserted
        Against Defendants Messier and Hannezo) ............................................... 110

        COUNT  IV Violations of Section 10(b) of the Securities Exchange Act of 1934 and
        Rule 10b-5 Promulgated Thereunder (Asserted Against All Defendants)............................ 112

        COUNT  V Violations of Section 20(a) of the Securities Exchange Act of 1934
        (Asserted Against Defendants Messier and Hannezo)................................. 113

XIII.   PRAYER FOR RELIEF................................................................................ 114

XIV.    JURY DEMAND......................................................................................... 115

Plaintiffs, by their undersigned attorneys, allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon their investigation made by and through their attorneys, which included, among other things, the review and analysis of (i) public filings by Vivendi Universal, S.A., now known as Vivendi, S.A. ("Vivendi" or the "Company") with the Securities and Exchange Commission (the "SEC") and the Commission des Opérations de Bourse (the "COB") (now part of the Autorité des marchés financiers (the "AMF")), the principal French securities regulation and enforcement agency; (ii) press releases issued by Vivendi; (iii) analyst reports concerning Vivendi and its securities; (iv) other public statements made by or on behalf of Vivendi and the other named Defendants; (v) pleadings in litigation in which Vivendi is a named defendant, including *In re Vivendi Universal, S.A. Securities Litigation,* No. 02 Civ. 5571 (RJH) (S.D.N.Y.) (the "Securities Class Action") and *SEC v. Vivendi Universal, S.A.,* No. 03 Civ. 10195 (PKC) (S.D.N.Y.) (the "SEC Action"); and (vi) other public information, including press and media reports, concerning Vivendi, its securities, and the other named Defendants.

## I.    <u>NATURE OF THE ACTION</u>

1.    Plaintiffs bring this federal securities action against Vivendi, Jean-Marie Messier ("Messier"), the Company's former Chief Executive Officer and Chairman, and Guillaume Hannezo ("Hannezo"), the Company's former Chief Financial Officer (collectively, "Defendants"). During the Core Period of October 30, 2000 through August 14, 2002, Vivendi, Messier (until he was forced to resign on July 3, 2002), and Hannezo (until he resigned on July 9, 2002) issued numerous materially false and misleading statements concerning Vivendi's financial condition. These statements were filed with the SEC or otherwise publicly disseminated, in violation of the federal securities laws.

2.    The company now known as Vivendi was originally founded in France in the 1800s as a water utility. Before and during the Core Period, Messier caused Vivendi to embark on a massive,

$77 billion acquisition program that quickly transformed Vivendi from a small water company into an enormous global media and telecommunications conglomerate. In pursuing this acquisition spree and growing the Company at an extraordinary rate, Defendants falsely reported strong revenue and earnings, and portrayed Vivendi as a corporation that was generating sufficient cash flow and earnings to satisfy its debt obligations on the $21 billion in debt that the Company had amassed in financing its vast acquisition program. As a result of Defendants' repeated upbeat (and false) earnings announcements and assurances concerning the Company's growth and its ability to meet its massive debt obligations, the prices of Vivendi's ordinary shares traded on the EuroNext Paris, S.A. (the "Paris Bourse"), and Vivendi's American Depository Shares ("ADSs") traded on the New York Stock Exchange (the "NYSE"), were artificially inflated during the Core Period.

3.       As Defendants knew but did not disclose, Vivendi's financial condition and the state of the Company's operations were dramatically worse than what their public statements portrayed. For example, immediately prior to and during the Core Period, Vivendi (using its increasingly inflated common stock as currency to finance many of its acquisitions) bid aggressively for several large companies, and substantially overpaid for them. Subsequent events (unbeknownst to investors) confirmed to Vivendi, Messier and Hannezo that these acquired entities could not generate sufficient cash flow to justify their high acquisition costs. Vivendi's failure to generate earnings in line with its publicly touted estimates threatened the Company's liquidity and its ability to generate the massive cash flow necessary to satisfy its obligations on more than $21 billion-worth of debt.

4.       To conceal the deteriorating state of Vivendi's newly built international conglomerate, Defendants engaged in a variety of fraudulent and otherwise improper asset and revenue-inflating practices during the Core Period that enabled the Company to artificially inflate its reported assets, revenue, income and earnings per share ("EPS"), thereby rendering Vivendi's publicly filed financial

2

statements and other communications regarding its financial performance materially false and misleading.

5.      In addition, Vivendi engaged in a variety of improper revenue recognition and expense-deflating practices, and other related misconduct, to overstate its reported financial performance during the Core Period.   These practices included, *inter alia*, (i) reporting and consolidating into its own reported financial statements billions of dollars of revenue from entities such as Maroc Telecom (defined below) in which Vivendi held only a minority stake and which Vivendi did not control, in violation of U.S. GAAP (as alleged in Section IV.C.2 below); (ii) improperly manipulating Vivendi's reported EBITDA (as alleged in Section IV.C.3 below); (iii) failing to properly report pro forma accounting metrics (as alleged in Section IV.C.4 below); and (iv) failing to disclose a 2% interest in Elektrim Telekomunikacja (as alleged in Section IV.C.5 below).

6.      These improper accounting practices not only allowed Vivendi to keep its stock price artificially high, but also facilitated Defendants' fraudulent efforts to conceal the Company's worsening liquidity problems.   For example, on December 6, 2001, Messier assured the investing public that "Vivendi Universal is in a very strong position, with solid performance in virtually every business."   Just weeks later—after having announced that the Company would raise $2.5 billion by selling a $1.5 billion interest in British Sky Broadcasting Plc ("BSkyB") and a $1.06 billion interest in Vivendi Environnement—Vivendi stated that these asset sales would give Vivendi "room to manoeuvre" for additional acquisitions and enable it "to cover any eventual needs from different opportunities for strategic partnerships."   Then, on December 17, 2001, Vivendi announced that it would acquire USA Networks, Inc. for approximately $10 billion.

7.      Unbeknownst to investors, however, Vivendi's business at that time was anything but "very strong" and had precious little "room to manoeuvre."   To the contrary, as *The Wall Street Journal* later reported, the Company was then facing a potentially catastrophic liquidity crisis:

On Dec. 13 last year [2001], Guillaume Hannezo sent Jean-Marie Messier, chairman of Vivendi Universal SA, a desperate handwritten plea.

***"I've got the unpleasant feeling of being in a car whose driver is accelerating in the turns and that I'm in the death seat,"*** wrote Mr. Hannezo, the company's chief financial officer. ***"All I ask is that all of this not end in shame."***

That very day, unknown to investors and the Vivendi board, the company had narrowly averted a downgrade by credit-rating agencies, which would have made it difficult to borrow money and plunged the company into a cash crisis. Mr. Hannezo (pronounced AN-ZO) implored his boss and longtime friend to take serious steps to reduce Vivendi's ballooning debt.

When the company's board met the next day to consider whether to approve a roughly $10 billion acquisition of USA Networks Inc.'s TV and film businesses, Mr. Messier made no mention of the close call with the rating agencies. Instead, when a director asked about Vivendi's financial profile, Mr. Messier said the company had no problem, according to two directors who were there.

The board endorsed the USA Networks deal, buying Mr. Messier's pitch that it would help complete Vivendi's transformation from a onetime water utility into an entertainment giant. . . .

But Vivendi was already in dire financial straits. . . .

As new management struggles to salvage the French conglomerate, it has become clear that Vivendi came close to financial disaster far earlier than previously thought. That picture is starkly at odds with the one repeatedly presented by Mr. Messier to investors and his board.

John Carreyrou and Martin Peers, *How Messier Kept Cash Crisis At Vivendi Hidden for Months: Media Giant Was At Risk Well Before Investors Knew,* Wall St. J., Oct. 31, 2002, at A1 (emphases added).

8.    Without publicly disclosing the adverse material facts facing the Company—and while affirmatively and materially misrepresenting the truth concerning the Company's actual prospects, financial performance, improper accounting practices and liquidity situation—Defendants took advantage of the market's ignorance of the truth by causing Vivendi to purchase numerous companies during the Core Period using artificially inflated Vivendi stock as currency. By maintaining

4

an artificially inflated price for Vivendi's common stock, Defendants were able, in essence, to purchase tens of billions of dollars worth of stock of The Seagram Company Ltd. ("Seagram"), Canal Plus, and other entities at a deep discount, because Vivendi was paying for its interests in those companies with a currency (Vivendi's own stock) that actually was worth only a fraction of its publicly traded price.

9.      The multinational giant Messier and Hannezo built was a house of cards and eventually collapsed of its own weight.  In June 2002, Vivendi suffered a severe and immediate cash shortage that threatened the Company's ability to stay in business.  Plaintiffs did not begin to learn the truth about Defendants' deception until July 2, 2002, when a credit rating agency downgraded Vivendi's debt.  According to published reports, this "sparked near-panic selling in Paris that caused Vivendi shares to plunge 25% for the day, to a new 15-year trading low of €17.8."  The credit agency report also disclosed that Vivendi's financial obligations in 2002 could be as much as $3 billion more than—or *twice* as large as—what most analysts had expected.  The situation was so dire that, although not known by the public at the time, Goldman Sachs had privately presented several scenarios for Vivendi's future to a group of Vivendi Board members on June 24, 2002.  One of those scenarios showed Vivendi going bankrupt in as little as just three or four months, *i.e.*, in September or October 2002.

10.      On July 3, 2002, Vivendi's Board of Directors fired Messier.  The Board obtained Hannezo's resignation a few days later.  Messier stubbornly refused to admit any wrongdoing, stating on the day that he was ousted from the Company that there were "no underestimated liabilities" and "no overvalued assets" on Vivendi's financial statements, and that its previously reported financial results were all "true, genuine and complete."  The Company's new management, however, was soon forced to disclose that the Company would have to secure bridge and long-term financing immediately to avoid default on its largest credit obligations.  During a hearing before the French

parliament in September 2002, Vivendi's new Chairman, Jean-René Fourtou ("Fourtou"), admitted that had Messier remained CEO beyond July 3, 2002, Vivendi undoubtedly would have gone bankrupt "within 10 days."

11.     On August 14, 2002, Vivendi reported that it had suffered a huge loss of approximately $12 billion for the first half of 2002, and that it would have to sell approximately $10 billion in assets in an effort to reduce its debt. Fourtou, the new Chairman, candidly admitted that "[w]e are facing a liquidity problem." The same day, Standard & Poor's further cut its ratings on Vivendi's long-term corporate debt to "junk" status.

12.     Although Messier and Hannezo succeeded in their dream of transforming Vivendi from a small water company to a diversified global conglomerate, the Company and its shareholders have paid an enormous price for Defendants' unchecked ambition, hubris, and falsehoods. As alleged in greater detail below, the revelation of Defendants' frauds resulted in devastating drops in the prices of Vivendi's ordinary shares traded on the Paris Bourse and ADSs traded on the NYSE; the Company's de-listing from the NYSE; an onslaught of civil litigation; investigations by the U.S. Department of Justice and French regulatory authorities; and the imposition of a massive civil fine by the SEC.

13.     The disclosure of Defendants' fraud caused a precipitous decline in the trading prices of Vivendi securities. On August 14, 2002, Vivendi's ordinary shares plunged 25% (in addition to the 25% drop in early July) to as low as €11.89. Overall, the Company's ADSs lost 85% of their value from the high during the Core Period of $75.50, and its ordinary shares fell 83.9% from their Core Period high of €86.50. These price declines, which resulted from the fraud alleged herein, caused Plaintiffs to suffer substantial damages in connection with their purchases and acquisitions of Vivendi ordinary shares and ADSs during the Core Period.

## II.    JURISDICTION AND VENUE

14.    The claims asserted herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77*l*(a)(2) and 77*o;* Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a); and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.l0b-5.

15.    This Court has jurisdiction over the subject matter of this action and personal jurisdiction over the Defendants pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v; Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. §§ 1331, 1337(a), and 1367.

16.    In connection with the acts and course of conduct alleged in this Complaint, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of national securities markets.

17.    Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b), (c) and (d).   Many of the acts, practices, and conduct complained of herein occurred in substantial part and/or had an effect in this District, including the dissemination of materially false and misleading statements and the creation and implementation of manipulative and deceptive devices and contrivances.   Defendants conducted substantial business and had substantial contacts within this District during the Core Period.   Offers and sales of Vivendi securities at issue in this action occurred in this District.

18.    Pursuant to the judicially prescribed "effects test" for asserting extraterritorial jurisdiction, this Court can properly exercise subject matter jurisdiction over Plaintiffs' claims because Defendants' improper conduct had an impact upon the NYSE, the U.S. market on which Vivendi sold ADSs and which was fully integrated with the market on which Plaintiffs purchased ordinary shares.   Defendants' improper conduct, including that which was carried out in the United States,

7

artificially inflated the price of Vivendi securities and affected the integrity of prices paid for Vivendi securities in the United States and on the Paris Bourse. Vivendi ordinary shares listed on the Paris Bourse, and ADSs listed on the NYSE, traded in tandem. This single, worldwide market was defrauded by Defendants' conduct, causing substantial effects in the U.S. and abroad.

19.    This Court can also properly exercise subject matter jurisdiction over the claims of foreign purchasers of Vivendi ordinary shares traded on foreign exchanges, including the Paris Bourse, under the "conduct test" articulated by the United States Court of Appeals for the Second Circuit, which provides that a federal court has subject matter jurisdiction if (i) the defendant's activities in the United States were more than "merely preparatory" to a securities fraud conducted elsewhere, and (ii) these activities or culpable failures to act within the United States "directly caused" the Plaintiffs' losses. The facts alleged herein show that Defendants' conduct within the United States was not "merely preparatory," but rather was substantial and in furtherance of the alleged fraudulent and other misconduct, and directly caused Plaintiffs' losses.

20.    Vivendi actively marketed and sold securities in the United States whose prices were artificially inflated owing to material misstatements in financial reports, a Form F-4 Registration Statement filed with the SEC on October 30, 2000, and Company press releases. Numerous Vivendi press releases shared a New York dateline. Vivendi also regularly filed false and misleading annual and current reports with the SEC on Form 20-F and Form 6-K, as alleged in detail herein.

21.    Further, Vivendi organized and participated in meetings in New York with financial and securities industry participants, including Wall Street analysts, to review and report on Vivendi's financial results, and issued materially false and misleading statements during those meetings.

22.    Defendants engaged in substantial business activities in the United States to further their fraud and the fraudulent scheme alleged herein was centralized in large part in this District, where Messier and Hannezo orchestrated the fraud and where Defendants maintained the Company's

U.S. headquarters.  As described further below, a primary objective of Vivendi's expansion plan from the late 1990s through July 2002 was to expand into the United States by acquiring American companies.  Vivendi had to go to the financial markets to raise the money needed for such acquisitions, and used its securities (both ADSs and ordinary shares) and borrowed cash against future earnings to purchase significant equity positions in a number of U.S. companies.  Defendants carried out their fraudulent scheme and course of conduct by using Vivendi's falsified financial statements to raise billions of dollars of new capital in the United States and elsewhere, while making false statements about Vivendi's financial condition and prospects in order to inflate the value of the shares it would use as consideration to acquire numerous businesses.  By such fraudulent means, Vivendi was able to acquire and conduct significant operations and activities in the United States.

23.    Defendant Vivendi was formed as a result of a 2000 merger among Vivendi, S.A.; Seagram, which owned the U.S. company Universal Studios; and Canal Plus (the "Merger").  Before and during the Core Period, Vivendi acquired such American companies as USA Networks Inc. (for $10.3 billion); U.S. Filter Corp. (for $6.2 billion); Houghton Mifflin Co. (for $2.2 billion); EchoStar Communications Corp. (for $1.5 billion); MP3.com, Inc. (for $400 million); Uproar, Inc. (for $128 million); Waste Management, Inc. (for €103.5 million); and EMusic.com (for $24 million).

24.    According to a Vivendi press release dated February 16, 2001, the percentage of Vivendi's securities owned by United States shareholders had more than doubled over a 12-month period, demonstrating that the Company was truly "international."

25.    As alleged in the Securities Class Action, in a February 27, 2001 interview on "Market Call," Messier reiterated his ambitions for Vivendi to a deep and lasting presence in the U.S. capital markets and among the investing public in the United States:

> I'm enthusiastic about doing and continuing and persuading this
> education job [for American investors and Wall Street analysts].
> Since the merger, the level of U.S. investors in all capital has jumped

9

> from less than 10 percent to more than 25 percent. I have a very
> simple goal in mind. I want the level of U.S. investors, within
> Vivendi Universal, to reach as quickly as possible 50 percent of all
> capital . . . I will take any necessary step to convince and educate Wall
> Street and U.S. investors.

26.     Not only did Vivendi maintain substantial offices in New York during the Core

Period, but Messier and Hannezo themselves moved to New York in September 2001 in order to

better direct the Company's operations and to promote misleading perceptions about the Company

on Wall Street and to U.S. investors. As alleged in the Securities Class Action, Messier explained why

he moved to New York during a February 17, 2002 interview on CNN:

> Moving to New York, yes there [were] very simple reasons. The first
> one Vivendi Universal has 50,000 U.S. employees. They have a boss.
> Where is the boss? The boss is in the U.S. He's working there. I
> can meet with them. I can spend time with them. He is really the
> boss.
>
> The second goal was Vivendi International is a new group for many
> U.S. investors in the media field. We need and I needed to spend
> more time with the U.S. Universal community to explain the Vivendi
> Universal story, to go through all reasons of performances of
> prospects, and I think that it's just better to do it being an American,
> than being outside.

27.     According to the Company's Form 20-F Annual Report for the fiscal year ended

December 31, 2001, filed with the SEC on May 28, 2002 (the "2001 Form 20-F"), more than 54% of

Vivendi's long-lived assets, valued at €53.5 billion, were located in the United States. The 2001 Form

20-F also states that Vivendi had more than €7 billion in U.S. revenues for 2001. According to the

Securities Class Action, at a luncheon in Los Angeles on January 19, 2002, Messier stated that Vivendi

was "[f]orty percent within the United States, sixty percent out of the states," and in the CNN

interview referenced above, Messier stated that the Company "has 50,000 U.S. employees."

28.     Near the end of the Core Period, as news came to light of Vivendi's near-collapse into

bankruptcy, the SEC commenced an investigation of Vivendi in this District. On or about

September 24, 2003, the SEC obtained an Order from this Court requiring Vivendi to place $23

million into a judicial interest-bearing escrow account, representing the payment Vivendi might otherwise have been required to pay to Messier under a lucrative termination agreement he entered into with the Company just prior to his termination in early July 2002. The SEC also obtained an Order from this Court preventing Messier from executing a judgment that he had obtained from the New York State Supreme Court, New York County, confirming a $23 million arbitration award to Messier on his claim for compensation under his termination agreement with Vivendi.

29. The SEC also brought an enforcement action in this District against Vivendi, Messier and Hannezo for violations of the federal securities laws, alleging fraudulent conduct in the United States, including the dissemination of materially false and misleading statements to investors in the United States. The SEC asserted that certain of the alleged securities law violations occurred within this District. The SEC also alleged that the Court could exercise subject matter jurisdiction because Vivendi conducted business and maintained offices within this District, and that Messier and Hannezo both lived in this District during the Core Period. As part of the resolution of the SEC action, Defendants executed a consent decree entered in this Court.

30. The United States Attorney's Office for the Southern District of New York has also conducted a criminal investigation of Defendants' fraudulent conduct in this District.

31. This Court, in the Securities Class Action, has already exercised subject matter jurisdiction over federal securities claims substantially similar to those Plaintiffs assert here. *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158 (S.D.N.Y. 2003) (Baer, J.). The Court denied Defendants' motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, concluding that the Court, under the "conduct test," had subject matter jurisdiction over claims brought by foreign class members who acquired Vivendi ordinary shares traded on foreign markets. *Id.* at 169-70. The Court found that Defendants' conduct within the United States was not merely preparatory, but rather "was a substantial or significant contributing cause of foreign investors'

11

decisions to purchase Vivendi's stock abroad." *Id.* at 170 (internal quotations omitted). The Court noted that Defendants did not dispute that (i) Messier and Hannezo had relocated to the United States in September 2001, (ii) Vivendi filed Forms 20-F and 6-K with the SEC during the Core Period, (iii) Defendants disseminated other materials to investors in the United States, and (iv) Vivendi made numerous acquisitions in the United States. *Id.* at 169-70.

32.    As alleged in the Securities Class Action, Defendants' conduct within the United States that formed sufficient grounds for the exercise of subject matter jurisdiction over the claims of foreign investors included Vivendi's acquisition of well-known U.S. entertainment and publishing companies such as Universal Studios, Houghton Mifflin, and USA Networks, and that Vivendi, in order to successfully accomplish this program, took on $21 billion in debt while assuring investors "through false and misleading reports filed with the SEC and news releases that it had sufficient cash flow to manage its debts." *Id.* at 169.

33.    In addition to these U.S. acquisitions, and significant to the Court, was the fact that Messier and Hannezo, Vivendi's two senior most officers and the alleged principal actors in the fraudulent scheme, spent roughly half of their time in the United States from September 2001 through the end of the class period (which is the same as the Core Period herein), specifically for the purpose of increasing investments by U.S. investors in Vivendi and, allegedly, to "better direct corporate operations and more effectively promote misleading perceptions on Wall Street." *Id.* at 170. The Court also found that it was reasonable to infer from the decision by Messier and Hannezo to move to the United States during the class period that the alleged fraud on the NYSE was a "substantial" or "significant contributing cause" of foreign investors' decisions to purchase Vivendi stock abroad. *Id.*

34.    The Court, after a reassignment of judges, subsequently declined to reconsider its opinion denying Defendants' motion to dismiss in the Securities Class Action. *In re Vivendi Universal,*

*S.A. Sec. Litig.,* No. 02 Civ. 5571 (RJH), 2004 WL 2375830 (S.D.N.Y. Oct. 22, 2004) (Holwell, J.). In this decision, the Court confirmed that it had subject matter jurisdiction over foreign investors' claims against Defendants because, among other things, (i) allegedly false and misleading statements were disseminated from and within the U.S.; (ii) Messier and Hannezo, Vivendi's two top executives, moved to and ran Vivendi from the U.S., allegedly to better carry out their fraudulent scheme; and (iii) Messier and Hannezo acted significantly within the U.S. in furtherance of the alleged fraud and as controlling persons of Vivendi. The decision on reconsideration specifically stated that "this Court concurs with Judge Baer's opinion finding jurisdiction over this dispute pursuant to the conduct test." *Id.* at *7. The Court also found Messier's and Hannezo's alleged presence and conduct within the U.S., together with Vivendi's alleged false statements to Wall Street analysts, of "crucial importance" to the issue of jurisdiction. *Id.* More recently, the Court denied Defendants' motion to dismiss filed in this action, and confirmed that it has subject matter jurisdiction over the claims asserted herein, by Order dated March 13, 2009.

## III.    THE PARTIES

35.    Plaintiffs are as follows:

a)    Allianz Global Investors Kapitalanlagegesellschaft MBH and Allianz Global Investors, Luxembourg S.A. (together referred to herein as "AGI") was founded in 1956 as DIT (Deustscher Investment Trust) and became AGI in 2007. AGI is part of the Allianz Global Investors network and the asset management division of Allianz AG.

b)    Alecta Pensionsförsäkring, Ömsesidigt ("Alecta") manages the Alecta Pension Fund for private clients and institutions. Based in Stockholm, Sweden and founded in 1917, Alecta is one of the largest providers of

occupational pension services in Sweden catering to salaried private-sector employees.

c)    Sjunde AP-Fonden ("AP7"), or the Seventh Swedish National Pension Fund, is based in Stockholm, Sweden and was founded in 1998.  AP7 is part of the Swedish National Pension Fund (AP Fund) system and manages a portion of the pension assets of the citizens of Sweden.

d)    Varma Mutual Pension Insurance Company ("Varma") manages the pension assets for the Finnish private sector.  The firm was founded in 1998, following the merger between Sampo Pension and Pension Varma.

e)    Danske Invest Administration A/S ("Danske") is a Copenhagen, Denmark based mutual fund manager.  Danske is the fund manager and administrator of the Danske family of mutual fund and with assets under management of approximately US $26 billion, it is one of the largest mutual fund managers in Denmark.  By assignment and transfer executed on April 16, 2009, Danske is the assignee and transferee of all rights, title, and interest in the claims, demands, and/or causes of action, against Vivendi and its co-defendants, of the following Danish investment funds (also referred to as associations):

   i)    Investeringsforeningen Danske Invest

   ii)    Investeringsforeningen Danske Invest Select

   iii)    Famandsforeningen Danske Invest Institutional Funds(formerly Specialforeningen Danske Invest Institutional)

14

Before Danske initiated legal action, and at all relevant times, the members of the Board of Directors of each of the funds on whose behalf Danske is pursuing claims authorized Danske to commence and pursue this lawsuit, and to take all actions necessary to recover losses incurred in connection with the investments in Vivendi made by or on behalf of the funds.

f)    AFA Livförsäkringsaktiebolag; AFA Trygghetsförsäkringsaktiebolag; AFA Sjukförsäkringsaktiebolag; and AFA Sjukförsäkringsaktiebolag on behalf of Kollektivavtalsstiftelsen Trygghetsfonden TSL (collectively referred to herein as "AFA Insurance") is based in Stockholm, Sweden and administers the various insurance policies and services negotiated by the three private-sector federations in the labor market, Svenskt Näringsliv, LO and PTK, as part of their collective agreements.  AFA Insurance is also responsible for managing the equity assets related to these policies.

g)    AMF Pension Fondförvaltning AB and Arbetsmarknadsförsäkringar, Pensionsforsakringsaktiebolag (collectively "AMF Pension") manages the AMF family of mutual funds, as well as separate pension, private client, and fixed income portfolios.  AMF was established in 1973 as the asset management branch of the Stockholm-based AMF insurance group.

h)    Pensionskassernes Adminstration A/S ("PKA") is Denmark's largest administration company for occupational pension funds which represents those individuals in the public social and health sectors.  By assignment and transfer executed on July 7, 2009, PKA is the assignee and transferee of all rights, title, and interest in the claims, demands, and/or causes of action,

15

against Vivendi and its co-defendants, of the following Danish investment

funds:

    i)     Pensionskassen for Sygeplejersker / The State Nurses
         Pension Fund;

    ii)    Pensionskassen for Kost- og Ernæringsfaglige tidligere
         Pensionskassen for Økonomaer / The Danish Diet and
         Nutrition Officers Pension Fund, formerly The Cathering
         Officers Pension Fund;

    iii)   Pensionskassen for Ergoterapeuter og Fysioterapeuter / The
         Occupational Therapists and Physioterapists Pension Fund;

    iv)   Pensionskassen for Bioanalytikere / The Medical
         Laboratory Technologists Pension Fund;

    v)     Pensionskassen for Jordemødre / The Midwives Pension
         Fund;

    vi)   Pensionskassen for Kontorpersonale tidligere
         Pensionskassen for Kontorfunktionærer / The Office Staff
         Pension Fund, formerly The County Office Workers
         Pension Fund;

    vii)  Pensionskassen for Lægesekretærer / The Medical
         Secretaries Pension Fund;

    viii) Pensionskassen for Socialrådgivere og Socialpædagoger /
         The Social Workers and Social Pedagogues Pension Fund;

Before PKA initiated legal action, and at all relevant times, the members of

the Board of Directors of each of the funds on whose behalf PKA is

pursuing claims authorized PKA to commence and pursue this lawsuit, and

to take all actions necessary to recover losses incurred in connection with

the investments in Vivendi made by or on behalf of the funds.

i)    Arbejdsmarkedets Tillaegspension ("ATP") is a self-governing institution

that has no shareholders and "owns itself under its constitution" under

Danish law, which was established in 1964 (the "ATP Act") with a view to

ensuring a larger basic pension for large portions of the Danish population – a supplement to the state retirement pension. ATP is a fully funded insurance scheme and is funded by mandatory contributions from employees and their employers. The amount of the contributions is determined by the Danish government and adjusted from time to time. The fund size is approximately $60 billion. Currently, approximately 4.4 million employees are contributing to the plan and approximately 630,000 pensions and death benefits are being paid. By assignment and transfer dated June 8, 2009, ATP is the assignee and transferee of all rights, title, and interest in the claims, demands, and/or causes of action, against Vivendi and its co-defendants, of Arbejdsmarkedets Erhverssygdomssikring ("AES").

j)    Industriens Pensionsforsikring A/S ("Industriens") is a Danish pension fund for blue-collar workers across Denmark. The fund serves nearly 450,000 members.

k)    ARCA SGR S.p.A. ("Arca") was established in 1983 and is a Milan, Italy based mutual fund manager.

l)    Ilmarinen Mutual Pension Insurance Company, founded in 1961, is based in Helsinki, Finland and is a mutual pension insurance company with approximately €24 billion in assets under management.

m)    Prima Societa' di Gestione del Risparmio SpA ("Prima" f/k/a Monte Paschi Asset Management S.G.R. S.p.A) is a Milan, Italy based mutual fund manager with approximately $40 billion under management. By assignment and transfer dated June 26, 2009, Prima is the assignee and transferee of all

17

rights, title, and interest in the claims, demands, and/or causes of action, against Vivendi and its co-defendants, of Monte SICAV.

n)  Nordea Invest Fund Management A/S ("Nordea Invest") is an investment management company for Danish registered investment funds. Founded in 1990 and based in Copenhagen, Denmark, Nordea Invest has approximately $600 million in assets under management. By assignment and transfer executed on April 24, 2009, Nordea Invest is the assignee and transferee of all rights, title, and interest in the claims, demands, and/or causes of action, against Vivendi and its co-defendants, of the following Danish investment funds:

    i)    Investeringsforeningen Nordea Invest,

    ii)   Fåmandsforeningen Nordea Invest,

    iii)  Investeringsforeningen Nordea Invest Special,

    iv)   Fåmandsforeningen Nordea Link,

    v)    Investeringsforeningen Nordea Invest Engros, and

    vi)   Fåmandsforeningen PenSam Invest

Before Nordea Invest initiated legal action, and at all relevant times, the members of the Board of Directors of each of the funds on whose behalf Nordea Invest is pursuing claims authorized Nordea Invest to commence and pursue this lawsuit, and to take all actions necessary to recover losses incurred in connection with the investments in Vivendi made by or on behalf of the funds.

o)  Nordea Fonder AB ("Nordea Fonder"), founded in 1976, is part of the Nordea Group - the largest financial services group in the Nordic and Baltic

region.  Nordea Fonder manages the Swedish registered mutual funds of the Nordea Group which comprises assets of over €11 billion.

p)      Nordea Investment Funds Company I.S.A.. ("Nordea Investment Fund"), founded in 1989, is part of the Nordea Group - the largest financial services group in the Nordic and Baltic region.  Nordea Investment Fund, manages the Luxembourg registered funds of the Nordea Group.  The funds are organized and exist under the law of the Grand Duchy of Luxembourg as open ended mutual investment funds (Fonds commun de placement) and have assets of approximately €7.3 billion under management.

q)      Nordea Fondene Norge AS ("Nordea Fondene"), founded in 1981, is part of the Nordea Group - the largest financial services group in the Nordic and Baltic region.   Nordea Fondene manages the Norwegian registered mutual funds of the Nordea Group and has total assets of approximately €3.4 billion under management.

r)      Nordea Fondbolag Finland Ab ("Nordea Fondbolag"), founded in 1987, is part of the Nordea Group - the largest financial services group in the Nordic and Baltic region.  Nordea Fondbolag manages the Finnish registered mutual funds of the Nordea Group and has total assets of approximately €20.1 billion under management.

s)      Swedbank Robur Fonder AB ("Robur") was founded in 1967 as the asset management branch of Swedbank and manages the Robur family of mutual funds.  Based in Stockholm, Sweden, Swedbank is the leading bank in Sweden, Estonia, Latvia and Lithuania with 17,000 employees serving 9 million private and 475,000 corporate customers.  By assignment and

19

transfer dated June 1, 2009, Robur is the assignee and transferee of all rights, title, and interest in the claims, demands, and/or causes of action, against Vivendi and its co-defendants, of Swedbank Robur International, SICAV.

t)    Fjarde AP-Fonden ("AP4"), or the Fourth Swedish National Pension Fund, is based in Stockholm, Sweden and manages a portion of the pension assts of the citizens of Sweden.  AP4 is part of the Swedish National Pension Fund (AP Fund) system and was founded in 1998

36.    Defendant Vivendi is a société anonyme organized under the laws of France with its principal place of business at 42, avenue de Friedland, 75008 Paris, France.  Vivendi has offices in this District located at 800 Third Avenue, New York, New York 10022.  Between October 30, 2000 and April 20, 2006, Vivendi was known as Vivendi Universal, S.A.

37.    During the Core Period, Defendant Vivendi described itself as a global conglomerate engaged in business focused primarily on two core areas: "Media & Communications" and "Environmental Services."   Vivendi's Media & Communications business was divided into five segments: (i) Music (conducted through Universal Music Group, which produces, markets, and distributes recorded music throughout the world in all major genres); (ii) Publishing (purportedly Europe's premier publisher of information, which provides content across multiple platforms, including print, multimedia, on the wired Internet and to PDAs (Personal Digital Assistants) via WAP (Wireless Application Protocol) technology); (iii) TV and Film (which produces, distributes and licenses motion picture, television and home video/DVD products worldwide, owns and operates a number of cable and pay TV channels, and operates theme parks and retail stores around the world); (iv) Telecoms (which provides a range of telecommunications services, including mobile and fixed telephone, Internet access, and data services and transmission, principally in Europe); and (v) Internet (which manages strategic Internet initiatives and new online ventures).  Vivendi Environnement, a

subsidiary of Vivendi, operated the Company's worldwide environmental services business, including its water utility operations.

38.     Defendant Vivendi is the entity created by the Merger, and is named as a Defendant herein in its own right and as the successor entity and successor-in-interest to pre-Merger Vivendi, S.A., Seagram, and Canal Plus.  At all times relevant to this Complaint, Vivendi sold ADSs on the NYSE and ordinary shares on the Paris Bourse.

39.     Defendant Jean-Marie Messier ("Messier") was Chief Executive Officer and Chairman of the Board of Directors of Vivendi throughout the Core Period until he was forced to resign on July 3, 2002.  Messier received compensation of $4.8 million in 2001 despite the Company's record losses, as well as various other perquisites, including the use of a $17.5 million penthouse apartment the Company acquired for him on Park Avenue in New York.  Messier was a "control person" of Vivendi within the meaning of Section 15 of the Securities Act and Section 20(a) of the Exchange Act.

40.     Defendant Guillaume Hannezo ("Hannezo") was Vivendi's Chief Financial Officer throughout the Core Period until his resignation on July 9, 2002.  According to the Associated Press, Hannezo was a "close collaborator" of Messier.  Hannezo was a "control person" of Vivendi within the meaning of Section 15 of the Securities Act and Section 20(a) of the Exchange Act.

41.     It is appropriate to treat Defendants Messier and Hannezo as a group for pleading purposes and to presume that the materially false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of these Defendants.  Both Messier and Hannezo, who held top positions of control and authority as officers and/or directors of the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company

21

and its business operations, products, growth, financial statements, and financial condition, as alleged herein. Both Messier and Hannezo were involved in the drafting, preparation and/or dissemination of the various public, shareholder and investor reports and other communications alleged herein, were aware of, or recklessly disregarded, that materially false and misleading statements were being issued regarding the Company, and approved and ratified these statements, in violation of the federal securities laws.

42.    Because of their Board memberships and/or executive positions with Vivendi, both Messier and Hannezo had access to the material adverse non-public information about the business, operations, finances, markets, financial statements, and present and future business prospects of Vivendi particularized herein via access to internal corporate documents, conversations and communications with other corporate officers and employees, attendance at management and/or Board of Directors and Board committee meetings, and via reports and other information provided to them.

43.    The statements made by Messier and Hannezo, as particularized below, were materially false and misleading when made. The true financial and operating condition of the Company, which was known or recklessly disregarded by Messier and Hannezo, remained concealed from the investing public throughout the Core Period. Both Messier and Hannezo, who were under a duty to disclose material facts, instead misrepresented and concealed them during the Core Period. As officers or directors, and controlling persons, of a publicly held company whose ADSs were, at all times during the Core Period, registered with the SEC pursuant to the Exchange Act, traded on the NYSE, and governed by the provisions of the federal securities laws, Messier and Hannezo both had a duty to promptly disseminate accurate and truthful information with respect to such matters as Vivendi's financial condition and performance, financial statements, business and earnings, and to correct any previously issued statements that had become materially misleading or untrue. Messier's

and Hannezo's misrepresentations and omissions during the Core Period violated these specific requirements and obligations.

44.    Both Messier and Hannezo, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company and issued during the Core Period.  Messier and Hannezo were both provided with copies of the documents alleged herein to be materially misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance and to cause them to be corrected.  Because of their positions and access to material non-public information, both Messier and Hannezo knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, Plaintiffs and the public and that the representations concerning the Company complained of herein were materially false and misleading.  Accordingly, both Messier and Hannezo are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the material misrepresentations and omissions contained therein.

45.    Both Messier and Hannezo are liable as direct participants in a fraudulent scheme and course of business that operated as a fraud and deceit on Plaintiffs by disseminating materially false and misleading statements and concealing material adverse facts.  The scheme: (i) deceived the investing public regarding (among other things) Vivendi's business, operations, and management and the intrinsic value of Vivendi ordinary shares and ADSs; (ii) enabled the Company to complete numerous acquisitions in its multi-billion dollar buying spree; (iii) permitted Vivendi to maintain relatively favorable credit ratings so that Vivendi could accumulate more and more debt to make acquisitions on favorable terms; and (iv) caused Plaintiffs to purchase and acquire Vivendi ordinary shares and ADSs at artificially inflated prices.

IV.    **FACTUAL BACKGROUND AND**
       **THE FRAUDULENT SCHEME**

    A.    **Vivendi's Extraordinary Growth**
             **Prior to and Through the Merger**

    46.    Vivendi originated in 1853 as a French water company called Compagnie Générale des Eaux ("CGE"). Messier became CGE's Chairman in June 1996. At that time, CGE was still principally a water company, and its stock was trading in the €27 to €29 range. Messier changed CGE's name to Vivendi in April 1999.

    47.    After becoming Chairman, Messier embarked on an ambitious plan to expand and remake Vivendi into a diversified conglomerate and one of the world's largest media companies. Between 1998 and the start of the Core Period, Vivendi acquired the following companies (with the Company's preexisting ownership interest, if any, shown in parentheses):

| Company Acquired | Closing Date | % Acquired |
| --- | --- | --- |
| Quotidien Sante | 04/09/98 | 100% |
| Linjebuss AB | 04/15/98 | 66.7% (33% owned) |
| Havas SA/Old | 06/02/98 | 70% (30% owned) |
| Cia de Saneamento do Parana | 06/08/98 | 41.38% |
| Ediciones Doyma SA | 06/25/98 | 50% |
| l'Etudient | 11/10/98 | 100% |
| ScVK | 11/18/98 | 43.17% |
| OVP-Vidal | 11/23/98 | 100% |
| Vivendi Universal | 12/15/98 | 10.5% |
| ALPINA GmbH | 01/05/99 | 100% |
| Cendant Software | 01/12/99 | 100% |
| Pathe | 01/26/99 | 19.6% (5% owned) |
| FCC | 03/05/99 | 28% |
| Aique | 04/20/99 | 100% |
| U.S. Filter Corp. | 04/30/99 | 100% |
| SL Tunnelbanan AB | 05/04/99 | 60% |
| MediMedia | 05/12/99 | 100% |
| 18 Litre Water Division | 05/20/99 | 100% |
| Sani Gestion Inc. | 06/11/99 | 100% |

| Company Acquired | Closing Date | % Acquired |
|---|---|---|
| MUSIDISC | 06/30/99 | 99.02% |
| Canal Plus | 07/22/99 | 15% (34% owned) |
| British Sky Broadcasting Plc | 07/22/99 | 4% (20.5% owned) |
| Aqua Alliance Inc | 08/24/99 | 17% (83% owned) |
| Pathe | 09/30/99 | 80.2% (19.8% owned) |
| Superior Services Inc. | 11/11/99 | 100% |
| 23 GPU In. Power plants | 11/24/99 | 100% |
| Elektrim Telekomunikacja | 12/09/99 | 49% |
| Daesan Power Plant | 12/17/99 | 100% |
| The StayWell Company | 02/29/00 | 100% |
| Three V Health Inc. | 02/29/00 | 100% |
| Haniel Rohr; Kanal Service & Haneil Industrie Reinigung | 03/28/00 | 100% |
| Prize Central Network | 03/29/00 | 100% |
| KD Offshore | 05/30/00 | 100% |
| Quod Bonum BV | 08/17/00 | 80% |
| Prelude et Fugue | 09/20/00 | 100% |
| Poland.Com SA | 09/21/00 | 55.01% |

48.     Messier's rapid growth strategy required the Company to finance its acquisitions, which caused the Company to accumulate large amounts of debt. For example, in early 1999, Vivendi financed its $6.2 billion acquisition of U.S. Filter by raising approximately €5.7 billion through a convertible bond offering. Similarly, in late 1999, Vivendi increased its equity investment in Elektrim Telekomunikacja ("Elektrim"), a Polish conglomerate, to $1.2 billion (or 49% of Elektrim's equity), by investing an additional $250 million in cash and converting an earlier $615 million loan into Elektrim shares.

49.     By June 2000, Vivendi had significantly expanded and diversified its holdings, and announced the massive, €29.5 billion three-way Merger among Vivendi, Seagram, and Canal Plus to create Vivendi Universal, S.A. (the "Merger"). Vivendi paid $36 billion in stock for Seagram and $12 billion in stock for Canal Plus. The Merger closed on December 8, 2000. As the Company announced in its 2000 Annual Report:

> As a result of the Merger Transactions, we are one of the world's leading media and communications companies, with assets that include the world's largest recorded music company, one of the largest motion picture studios and film libraries in the world and leading businesses in the global telecommunications, television, theme park, publishing and Internet industries. We believe that we will become a fully integrated global media and communications company capable of providing a diverse array of entertainment and information over wired and wireless access devices using cable, Internet, satellite and broadcast networks.

50.    According to *The New York Times,* the Merger "transformed the Company into the second-largest global media empire after AOL Time Warner." *Vivendi Provides Critics Some Revenue Numbers to Chew On,* N.Y. Times, Feb. 12, 2002.

**B.    Vivendi's Continuing Acquisitions Following the Merger**

51.    Within just sixteen months after the enormous Merger, Vivendi continued its acquisition strategy by acquiring significant equity positions (or added to its existing equity positions) in the following companies, several of which Vivendi acquired outright:

| Company Acquired | Closing Date | Industry | % Acquired |
|---|---|---|---|
| Maroc Telecom | 12/21/00 | Telecom services | 35% |
| MUSIDISC | 01/31/01 | Multimedia | 0.98% (99.02% owned) |
| Medicine Publishing | 02/01/01 | Publishing | 100% |
| HCCOM | 02/19/01 | Publishing | 100% |
| Uproar, Inc. | 03/23/01 | Internet connectivity | 100% |
| GetMusic LLC | 04/25/01 | Internet content | 50% (50% owned) |
| Editions Juris Service | 04/25/01 | Multimedia | 100% |
| EMusic.com, Inc. | 06/14/01 | E-commerce | 100% |
| RMM Records & Video | 06/25/01 | Music | 100% |
| Scoot Europe NV | 07/27/01 | Broadcast server | 50% (50% owned) |
| Houghton Mifflin Co. | 08/03/01 | Publishing | 100% |
| MP3.com | 08/28/01 | Internet content | 100% |
| Elektrim Telekomunikacja | 09/04/01 | Telecom services | 2% (49% owned) |
| Mediabright | 09/12/01 | Software applications | 100% |

| Studio Canal | 10/12/01 | Motion picture services | 14.8% (85.20% owned) |
|---|---|---|---|
| Multithematiques | 12/17/01 | Cable TV | 27% |
| EchoStar Communications | 01/22/02 | Satellite telecom | 10% |
| Koch Group Recorded Music | 02/15/02 | Music | 100% |
| USA Networks Inc. | 05/07/02 | Cable TV | 93% |
| USA Networks Inc. | 05/07/02 | Cable TV | 93% |

52.    The vast majority of these post-Merger acquisitions were paid for either by using Vivendi stock as currency or by borrowing against future earnings.  Thus, in order to sustain its growth by acquisition strategy, it was crucial for Defendants to continue to report favorable financial results in order to keep Vivendi's stock price high and to maintain its favorable credit ratings and access to additional debt financing.

### C.    Vivendi's Improper Accounting Methods and Practices

53.    During the Core Period, Vivendi, Messier and Hannezo utilized a variety of improper accounting methods and practices whose purpose and effect was to materially misstate Vivendi's reported financial results, as more fully alleged below.

### 1.    Accounting Rules Applicable to Vivendi as a Foreign Issuer

54.    During the Core Period, Vivendi filed financial statements with the SEC that were represented to have been prepared in conformity with GAAP in France ("French GAAP").  The SEC allows foreign issuers, such as Vivendi, to prepare their primary financial statements in accordance with a comprehensive body of GAAP other than U.S. GAAP, provided that an understanding of such financial statements is facilitated via a reconciliation to U.S. GAAP.  In particular, Item 17 of the Instructions to Form 20-F requires that foreign issuers' financial statements "shall disclose an information content substantially similar to financial statements that comply with U.S. generally accepted accounting principles and [SEC] Regulation S-X."

27

55.    The SEC requires that each annual financial statement filed by a foreign issuer on Form 20-F, and each annual and interim financial statement included in an SEC registration statement, be reconciled to U.S. GAAP.  Vivendi represented that its consolidated annual financial statements for 1999, 2000 and 2001, filed with the SEC on Form 20-F, were prepared in conformity with French GAAP and purportedly reconciled to U.S. GAAP.  Vivendi's 2001 Form 20-F also represented that beginning in 2002 the Company's financial information would be reported on a U.S. GAAP basis and reconciled to French GAAP.

56.    GAAP are those fundamental rules and principles that are recognized by the accounting profession as essential and that define accepted accounting practice at a particular time. As set forth in Financial Accounting Standards Board ("FASB") Statement of Financial Accounting Concepts ("Concepts Statement") No. 1, *Objectives of Financial Reporting by Business Enterprises,* one of the fundamental objectives of financial reporting is that financial statements provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, ¶ 42 states:

> Financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

57.    SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), also states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.  The representations by Defendants that Vivendi's financial statements were reconciled to U.S. GAAP  were materially false and misleading because the financial statements materially inflated and distorted the Company's true financial performance, as described herein.

58.    Vivendi's financial statements for fiscal years 1999, 2000 and 2001 (ending December 31) did not fairly and accurately represent the Company's financial position and operations, and were materially false and misleading because, as alleged in greater detail below, Vivendi, Messier and Hannezo falsified, manipulated and distorted those financial results through accounting methods and practices that violated at least the following basic GAAP principles:

(a)    The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (Concepts Statement No. 1, ¶ 34);

(b)    The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1, ¶ 40);

(c)    The concept that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, ¶ 42);

(d)    The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily

accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, ¶ 50);

(e)    The concept that financial reporting should be reliable in that it represents what it purports to represent.  That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶ 58, 59);

(f)    The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶ 79);

(g)    The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶¶ 95, 97);

(h)    The concept that revenues and gains generally should not be recognized until realized or realizable, and that revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues (Concepts Statement No. 5, ¶ 83); and

(i)    The concept that the costs of services be matched with, *i.e.,* recognized contemporaneously with, the recognition of revenues that resulted from the same transactions (Concepts Statement No. 6, ¶ 145).

2. **Vivendi's Improper Consolidation of Maroc Telecom in its Financial Statements**

59.    Vivendi also overstated its 1999, 2000 and 2001 revenues and operating income in violation of U.S. GAAP by improperly consolidating certain investments in which the Company possessed less than a 50% ownership interest.

60.    Although Vivendi held only a minority interest in Moroccan telecommunications company Maroc Telecom S.A. ("Maroc Telecom"), Vivendi included Maroc Telecom's complete financial results in its 2001 consolidated financial statements.  In particular, in the footnotes to its 1999, 2000 and 2001 financial statements filed with the SEC on Form 20-F, Vivendi disclosed the full consolidation of the following companies:

| | Ownership Interest | | |
|---|---|---|---|
| Name | 1999 | 2000 | 2001 |
| Maroc Telecom | - | - | 35% |

61.    U.S. GAAP permits consolidation of related entities onto a company's balance sheet when specific requirements are met.  Accounting Research Bulletin ("ARB") No. 51 provides:

> The purpose of consolidated statements is to present, primarily for the benefit of the shareholders and creditors of the parent company, the results of operations and the financial position of a parent company and its subsidiaries essentially as if the group were a single company with one or more branches or divisions.  There is a presumption that consolidated statements are more meaningful than separate statements and that they are usually necessary for a fair presentation when one of the companies in the group directly or indirectly has a ***controlling*** financial interest in the other companies. [Emphasis added.]

62.    U.S. GAAP also limits the circumstances under which consolidation is appropriate.  Majority control is generally a prerequisite for consolidation.  ARB No. 51, as amended by FASB's SFAS No. 94, also provides:

> The usual condition for a controlling financial interest is ownership of a ***majority voting interest,*** and, therefore, as a general rule ownership by one company, directly or indirectly, of over fifty

31

percent of the outstanding voting shares of another company is a condition pointing toward consolidation.  [Emphasis added.]

63.     Although majority control is generally required for consolidation, FASB's Emerging Issues Task Force ("EITF") has issued Abstract No. 96-16, which provides guidance for when minority shareholders possessing certain rights can, under limited circumstances, overcome the presumption that consolidation requires a majority voting interest.  EITF No. 96-16 provides in pertinent part:

> The Task Force believes that minority rights (whether granted by contract or by law) that would allow the minority shareholder to effectively participate in the following corporate actions should be considered substantive participating rights and would overcome the presumption that the investor with a majority voting interest should consolidate its investee:
>
> 1.     Selecting, terminating, *and* setting the compensation of management responsible for implementing the investee's policies and procedures; and
>
> 2.     Establishing operating *and* capital decisions of the investee, including budgets, in the ordinary course of business.
>
> The Task Force considered the above to be illustrative of substantive participating rights, not necessarily all-inclusive.  The Task Force believes that the rights noted above are participating rights because, in the aggregate, the rights allow the minority shareholder to effectively participate in decisions that occur as part of the ordinary course of the investee's business and are significant factors in directing and carrying out the activities of the business.  Individual rights, such as the right to veto the termination of management responsible for implementing the investee's policies and procedures, should be assessed based on the facts and circumstances to determine if they are substantive participating rights in and of themselves.  However, minority rights that appear to be participating rights but that by themselves are not substantive . . . would not overcome the presumption of consolidation by the investor with a majority voting interest in its investee.  The likelihood that the veto right will be exercised by the minority shareholder should *not* be considered when assessing whether a minority right is a substantive participating right.

32

64.     Moreover, APB 18, *The Equity Method of Accounting for Investments in Common Stock,* provides special rules for accounting for an entity where the company owns between 20% and 50% of the entity and has the ability to exercise significant influence over that entity.  APB 18 provides:

> In order to achieve a reasonable degree of uniformity in application, the Board concludes that an investment (direct or indirect) of 20% or more of the voting stock of an investee should lead to a presumption that in the absence of evidence to the contrary an investor has the ability to exercise significant influence over an investee.  **Under the equity method, an investor recognizes its share of the earnings or losses of an investee in the periods for which they are reported by the investee in its financial statements.**  An investor's share of earnings or losses from its investment is ordinarily shown in its income statement as a single amount.  The Board recognizes that determining the ability of an investor to exercise such influence is not always clear and applying judgment is necessary to assess the status of each investment.  [Emphasis added.]

65.     Given that Vivendi held only a 35% interest in Maroc Telecom, Vivendi violated U.S. GAAP by consolidating the results of Maroc Telecom into its financial statements for 2001.  Vivendi should have accounted for Maroc Telecom under the equity method.

66.     Vivendi also violated SFAS No. 95, *Statement of Cash Flows,* by improperly consolidating entities whose cash it could not access.  Paragraph 5 of SFAS No. 95 provides:

> The information provided in a statement of cash flows . . . should help investors, creditors, and others to (a) assess the enterprise's ability to generate positive future net cash flows; (b) assess the enterprise's ability to meet its obligations, its ability to pay dividends, and its needs for external financing . . . .

67.     Vivendi's disclosures concerning its cash flows did not help investors to assess its ability to generate positive future cash flows and its ability to meet its obligations.  Rather, Vivendi presented a materially false and misleading disclosure of its financial position by including cash on its balance sheet that it had no right to access.

68.     Additionally, under French GAAP, exclusive control and the power to direct the financial and operational policies of an enterprise is required in order to consolidate results.  French

33

GAAP states that enterprises are **excluded** from consolidation where severe and long-lasting restrictions substantially call into question the control or influence exercised over the enterprise. *See* Regulation 99-02, Section 1002, 101.

69.    Vivendi did not possess controlling financial interests in, at least, its Maroc Telecom subsidiaries, and therefore should not have consolidated Maroc Telecom's financial statements into its own.

70.    With respect to Maroc Telecom, Vivendi stated its Form 20-F for 2001 that:

> In the course of the partial privatization of Maroc Telecom, Vivendi Universal was chosen to be a strategic partner in the purchase of an interest in Morocco's national telecommunications operator for approximately €2.4 billion. The transaction was finalized in April 2001, at which time Maroc Telecom began to be consolidated in the accounts of Vivendi Universal, as we obtained control through majority board representation and share voting rights. As a leader in Moroccan telecommunications, Maroc Telecom operates 1.2 million fixed lines, has 3.7 million GSM clients and generated revenues of approximately €1.4 billion in 2001.

71.    Vivendi also stated in the 2001 Form 20-F that no other shareholder or groups of shareholders exercise substantive participatory rights, which would allow them to vote or block decisions taken by the Company.

72.    This disclosure and the consolidation of Maroc Telecom's 2001 results were false and misleading because Vivendi only owned 35% of Maroc Telecom, and because the remaining 65% was held by a single entity: the Moroccan government. The Moroccan government did not conduct its operations based on the views of Vivendi.

73.    This improper consolidation caused Vivendi to materially misstate its financial results. As a result of the improper consolidation of Maroc Telecom's financial statements, Vivendi's reported revenues were overstated by €1.4 billion for 2001.

74.     Vivendi's consolidation of Maroc Telecom in its financial statements caused the Company to overstate its reported revenue, operating income, EBITDA, operating cash flow, and reported growth rates for 2001.

75.     When asked about the liquidity of the Company, Vivendi's CEO, Jean-René Fourtou (who replaced Messier after he was fired), admitted in a June 26, 2002 conference call that "we do not have access to Cegetel and Maroc Telecom."  In an August 14, 2002 conference call with investors, Fourtou conceded further that "Vivendi cannot acce[ss] the cash flow generated by the companies it owns less than 50 percent of."

### 3.     Defendants' Improper Manipulations of Vivendi's Reported EBITDA

76.     In addition to the accounting improprieties alleged above, Vivendi, in violation of GAAP, improperly adjusted certain of its subsidiaries' reserve accounts and made accounting entries without supporting documentation in order to meet aggressive earning targets.  As alleged in the SEC Action, during the Core Period, Vivendi, Messier and Hannezo referred to these improper efforts to meet or exceed earnings targets as "stretching."

77.     At the time of the Merger, Vivendi and Messier predicted that the Company would generate annual EBITDA growth of 35% during 2001 and 2002.  According to the complaint in the SEC Action, Defendants ensured that Vivendi would meet that target by, during 2001, improperly adjusting various reserve accounts and prematurely recognizing revenue in a manner that violated U.S. GAAP, and in particular SFAS No. 5, *Accounting for Contingencies*.

78.     As the SEC Action alleged, in late June 2001, Messier, Hannezo and other Vivendi executives became concerned that Vivendi's EBITDA growth for the quarter ended June 30, 2001 might not meet or exceed market expectations.  As a result, Vivendi, at the direction of its senior executives, made various improper adjustments that artificially inflated Vivendi's EBITDA by almost

€59 million, or 5% of the total EBITDA of €1.12 billion that Vivendi reported (excluding the results of the recently acquired Maroc Telecom) for that quarter.

a. <u>Second Quarter of 2001 (Cegetel)</u>

79.    As alleged by the SEC, Defendants increased Vivendi's EBITDA primarily by causing Cegetel, in the weeks leading up to Vivendi's earnings release for the second quarter of 2001, to depart from its historical methodology for determining the level of its reserve for bad debts (accounts receivable) during the second quarter of 2001.    That departure resulted in Cegetel's taking a lower provision for bad debts during that quarter than its historical methodology required.    This departure caused Cegetel's bad debts reserve for the second quarter of 2001 to be €45 million less than it should have been; Vivendi's overall EBITDA for that quarter was overstated by the same amount.

80.    Under U.S. GAAP, SFAS No. 5 precludes the use of reserves, including excess reserves, for general or unknown business risks, and the systemic or time release of reserves into income.    Paragraph 23 of SFAS No. 5 further states than an estimate of losses on accounts receivable "normally depend[s] on, among other things, the experience of the enterprise . . . and appraisal of the receivables in light of the current economic environment."

81.    As alleged by the SEC, Cegetel reduced its provision for bad debts during the second quarter of 2001 without the level of documentation and analysis that was required.    Further, the decision to take a lower provision for bad debts in the second quarter of 2001 occurred at a time when Cegetel was actually having more difficulty collecting on its bad debts.

82.    In addition to taking a lesser bad debt position in the second quarter of 2001, according to the SEC Action, Cegetel also, at the direction of Vivendi's senior executives, improperly deferred to the third quarter of 2001 approximately €14 million in provisions for potential future payments and potential liabilities that Cegetel properly should have booked in the second quarter of

36

2001.  Together, the adjustments at Cegetel totaled €59 million and enabled Vivendi to report overall EBITDA growth of 35% for the second quarter of 2001.

83.     These accounting adjustments at Cegetel were made without proper supporting documentation and, as a result, Vivendi's reconciled U.S. GAAP financial statements, which incorporated Cegetel's results, were not in conformity with the requirements of SFAS No. 5.

### b.     Third Quarter of 2001 (UMG)

84.     As alleged in the SEC Action, various improper adjustments to Vivendi's EBITDA also occurred in the third quarter of 2001, and principally affected the results of its music division, UMG.   These improper adjustments increased UMG's reported results for the quarter ended September 30, 2001 by at least €10.125 million, or approximately 4% of UMG's total EBITDA for that quarter of €250 million.

85.     The SEC Action alleged that Vivendi improperly increased UMG's results in order to reach a pre-determined EBITDA figure at UMG for the quarter ended September 30, 2001 of €250 million.  At that level, UMG would have been able to show EBITDA growth of approximately 6% versus of third quarter of 2000, and to outperform its competitors in the industry.

86.     Defendants, according to the SEC Action, made at least two improper adjustments to UMG's reported results in order to reach their €250 million EBITDA target.  First, Defendants caused UMG to prematurely recognize approximately €3 million in revenue in connection with a contract between UMG and other parties that UMG itself had deferred recognizing.  UMG deferred recognizing the revenue because, under the terms of this contract, the €3 million payment would need to be refunded if the parties to the contract failed to meet certain conditions by mid-December 2001. Because those conditions were not met during the third quarter of 2001, the €3 million payment remained refundable by UMG, and Vivendi's recognition of this amount as income in that quarter was in violation of U.S. GAAP.

37

87.     Second, in late October 2001, Vivendi temporarily reduced the amount of corporate overhead charges it allocated to UMG by €7 million. According to the SEC Action, this reduction in corporate overhead charges equaled the exact amount of additional earnings that Vivendi's senior executives determined that UMG would need in order to reach €250 million in EBITDA for the third quarter of 2001.

88.     This allocation of overhead charges violated U.S. GAAP, specifically Concept Statement No. 6, *Elements of Financial Statements,* which provides that allocations should be assigned and distributed "according to a plan or formula." Moreover, SFAS No. 131, *Disclosures about Segments of an Enterprise and Related Information,* provides that amounts allocated to reported segment profit or loss "shall be allocated on a reasonable basis." According to the SEC Action, during the third quarter of 2001, Defendants based the overhead allocation charged to UMG not on a plan or formula, but rather on a desire to reach a predetermined, specific EBITDA target. This was inconsistent with Concept Statement No. 6 and SFAS No. 131.

89.     The SEC Action also alleged that both the corporate overhead adjustment and the premature recognition of the contract revenue occurred after UMG had submitted its accounts to Vivendi for that quarter. Additionally, these accounting adjustments to UMG's EBITDA were made without proper documentation and violated U.S. GAAP. Vivendi incorporated these inflated financial results into its own financial statements, causing Vivendi's third quarter 2001 financial reports, press releases, and other market communications to be materially false and misleading as alleged in Section VI below.

### c.     Second Quarter of 2001 (VUP)

90.     Vivendi improperly managed its earnings for Vivendi Universal Publishing by recording revenues for improperly shipping all of its July 2001 orders for its interactive products in June 2001, even though these products had not been ordered at the time. This resulted in an increase

in its second quarter EBITDA of about €10 million. In addition, VUP pushed into its third quarter approximately €10 million of costs, also resulting in an increase in its second quarter EBITDA. Since the additional revenues recorded in the second quarter had apparently not been ordered for delivery in the quarter, VUP had not met the SEC's requirement that there was persuasive evidence that an arrangement existed when it shipped product in June 2001.

### 4. Defendants' Failure to Properly Report Pro Forma Accounting Metrics

91.    In addition to the manipulations of EBITDA described above, Vivendi violated GAAP by failing to report pro forma metrics properly. Vivendi's unique definition of EBITDA, which served as the basis for calculating both its operating income and operating free cash flow, enabled the Company to include all amounts from consolidated subsidiaries, including Maroc Telecom, which were not 100% owned. Contrary to this approach, EBITDA does not normally include earnings from consolidated subsidiaries attributable to minority shareholdings.

92.    GAAP not only governs the accurate accounting of transactions, but also encompasses the meaningful disclosure of all matters accompanying the financial statements. Concepts Statement No. 1 provides that one of the primary focuses of financial reporting is information about an enterprise's performance as measured by earnings and its components. Under GAAP, pro forma amounts, such as EBITDA, are considered to be supplemental disclosures designed to assist readers to understand certain transactions that relate generally to the effect of accounting changes (APB No. 20) and business acquisitions (APB No. 16 and SFAS No. 141). Article 11 of SEC Regulation S-X, titled *Pro Forma Business Information,* requires pro forma disclosures in connection with business combinations and for other transactions or events for which disclosure of pro forma financial information would be helpful to investors. The SEC further requires that pro

forma amounts be reconciled with the most directly comparable GAAP amount. EBITDA, in particular, is reconciled to Net Income.

93.     Vivendi misstated its EBITDA by consolidating the results of Maroc Telecom, and accordingly, in violation of GAAP, failed to report pro forma metrics properly.

### 5.     Defendants' Failure to Disclose Vivendi's 2% Interest in Elektrim Telekomunikacja

94.     In 1999, Vivendi made a €1.198 billion investment in a joint venture with Elektrim Telekomunikacja ("Elektrim") that gave the Company a 47% interest in a company that controlled Polish mobile telephone operator PTC and Polish cable operator Bresnan. On June 28, 2001, Vivendi announced a memorandum of understanding pursuant to which it would increase this stake from 49% to 51% via an additional €100 million investment.

95.     According to the SEC Action, after this announcement, Vivendi learned that Poland's antitrust authorities would have to approve the June 2001 deal, a process that could have taken several months. Vivendi also learned that the market in general, and the credit rating agencies in particular, might react negatively to Vivendi's acquisition of additional Elektrim shares. The SEC alleged that Vivendi, as a result, rather than directly purchase the additional 2% interest in Elektrim as Vivendi had planned, instead deposited €100 million into an investment fund administered by Société Générale Bank & Trust Luxembourg. That investment fund then purchased a 2% stake in Elektrim in September 2001.

96.     Vivendi did not disclose all of the material details about this transaction until 2003. Vivendi's 2001 Form 20-F limited its disclosure about its interest in Elektrim to the following:

> Participation in Elektrim—In September 2001, Elektrim Telekomunikacja, in which Vivendi Universal has a 49% interest, acquired all of Elektrim SA's landline telecommunications and Internet assets.

97.     Vivendi failed to consolidate 51% of Elektrim's results into its own financial results in violation of ARB No. 51, *Consolidated Financial Statements,* SFAS No. 94, *Consolidation of All Majority-Owned Subsidiaries,* and APB No. 18, *The Equity Method of Accounting for Investments in Common Stock.* Notably, APB No. 18 required Vivendi to apply the equity method of accounting to its Elektrim investment.  Under APB No. 18, Vivendi was required to recognize its share of Elektrim's earnings or losses in its financial statements.

98.     Elektrim, which Vivendi was required to consolidate under GAAP, was losing money during this period; according to Vivendi's own Form 20-F reports, Elektrim's net income for 2000 and 2001 were net losses of €31 million and €28 million, respectively.  To avoid having to record Elektrim's losses on its own financial statements, Vivendi simply decided not to consolidate Elektrim. By not consolidating Elektrim in violation of GAAP, Vivendi overstated its own income.

**6.      Defendants' Failure to Disclose that Vivendi's 2001 (and Forward) EBITDA Results Benefited from Purchase Accounting Adjustments**

99.     The use of purchase accounting in connection with the acquisition of assets requires that assets and liabilities acquired be recorded at their fair value and any excess of the purchase price over the fair value of net assets be recorded as goodwill.  When Vivendi merged with Seagram's and Canal + it took certain purchase accounting adjustments in the form of reserves to cover future costs (detailed below).  By taking these reserves, rather than recording the liabilities at fair value, Vivendi misleadingly increased its EBITDA (going forward) by lowering its liabilities and, as explained below, allowed it to meet its EBITDA targets.

100.    Specifically, the undisclosed use of purchase accounting techniques allowed Defendants to increase M&C's 2000-2002 compound annual growth rate ("CAGR") for EBITDA to 35%, whereas without purchase accounting, M&C's CAGR would have been only 26%.

101.     The impact of the use of purchase accounting was even more significant if only the 2001 period is examined. Purchase accounting adjustments accounted for 50% of M&C's 2001 EBITDA growth— in other words, without the use of purchase accounting, M&C's 2001 actual EBITDA growth would have been 17%, rather than the 34% reported. If the benefit of purchase accounting adjustments is excluded, M&C's 2000-2001 EBITDA growth rate was significantly less than what was required in 2001 for M&C to be on track to achieve its 35% EBITDA compound annual growth rate for 2000-2002, which was an important part of the rational behind the Vivendi, Canal + and Seagram's merger.  In raw numbers, Vivendi added approximately €2 billion in purchase accounting adjustments to its EBITDA during the class period by taking the purchase accounting adjustments.

102.     Vivendi's failure to disclose its use of purchase accounting results in the inability to meaningfully compare 2001 actual EBITDA to that of 2000 and, because the use of purchase accounting was not disclosed,  Vivendi Universal's public disclosures did not provide clear indication of the benefit of purchase accounting adjustments on M&C's projected and actual EBITDA results.

103.     Vivendi's undisclosed use of purchase accounting allowed it to maintain two sets of books, one set reported to the public, and the second set hidden from the public because it showed that lower EBITDA results would have been reported if the purchase accounting adjustments were charged against EBITDA.  By not disclosing the impact that the use of purchase accounting had on Vivendi's results, specifically within the M&C division, shareholders and the public could not view Vivendi's projections and 2001 operations through the eyes of management, and were precluded from making meaningful comparisons with Vivendi Universal's 2000 results.

D.     **Defendants' Concealment of**
        **Vivendi's Growing Liquidity Crisis**

104.     In implementing its growth-by-acquisition strategy, Vivendi spent enormous sums to acquire companies, often overpaying, and leaving the Company strapped for cash until it faced a

potentially devastating liquidity crisis.  In addition to the improper accounting practices alleged above, Defendants affirmatively took steps to conceal the Company's growing liquidity crisis in order to ensure continued access to financing and prop up the stock price.

105.    Throughout 2001, contrary to what Defendants were telling the investing public, Defendants internally understood that a crisis would erupt if the truth about Vivendi's liquidity situation was disclosed.  For example, at Hannezo's Finance Committee meetings from at June 2001 to at least October 2001, Vivendi's treasurer regularly expressed his concerns about Vivendi's cash shortfalls and the fact that Vivendi was spending too much on acquisitions.  In response Hannezo shared with his other senior managers his concern that if the situation continued, Vivendi would be near bankruptcy.

106.    Hannezo also expressed his concerns to Messier – but not to the investing public.  In fact, as early as May 2001, Hannezo told Messier that Vivendi was facing a significant risk of a credit rating downgrade.  Again, in November 2001, Hannezo wrote to Messier that Vivendi had effectively cannibalized itself by making costly purchases of its own treasury shares, and that its already worsened credit rating position would be stretched to its limits unless they put a limit put on Vivendi's financing needs.  Goldman Sachs echoed those concerns a November 23, 2001 memo to Dominique Gibert, Vivendi's Deputy Chief Financial Officer.

### 1.    Defendants' Failure to Disclose the Insufficiency of Vivendi's Working Capital

107.    Throughout the Core Period, Defendants failed to disclose the insufficiency of Vivendi's working capital.  Item 5B of the Instructions to Form 20-F required Vivendi to include "a statement by the company that, in its opinion, the working capital is sufficient for the company's present requirements, or, if not, how it proposes to provide the additional working capital needed." In addition, Paragraph 49 of Concept Statement No. 1, *Objectives of Financial Reporting by Business Enterprises,* provides:

43

> Financial reporting should provide information about how an
> enterprise obtains and spends cash, about its borrowing and
> repayment of borrowing, about its capital transactions, including cash
> dividends and other distributions of enterprise resources to owners,
> and about other factors that may affect an enterprise's liquidity or
> solvency.

Concept Statement No. 1, ¶ 49.

108.    Defendants failed to comply with the Instructions for completing Form 20-F, and

violated Concept Statement No. 1, by failing to disclose that (i) as alleged above, Vivendi could not

readily access Maroc Telecom's cash, despite the fact that its financial results were consolidated in the

Company's financial results, and (ii) the Cegetel current account, as described below, severely

impacted the Company's liquidity.

### 2.    Defendants' Failure to Disclose Material Commitments Concerning Cegetel and Maroc Telecom

109.    As alleged in the SEC Action, in key meetings with analysts from Moody's Investor

Services ("Moody's") and Standard & Poor's in December 2001, and in its Forms 20-F for 2000 and

2001, Defendants failed to disclose future commitments regarding Cegetel and Maroc Telecom that

would have revealed serious doubts about Vivendi's ability to meet its cash needs.

### a.    The Cegetel Current Account

110.    During the summer of 2001, Defendants caused Vivendi to enter into an undisclosed

"current account" with Cegetel, its most profitable and cash flow-positive subsidiary.  Under this

current account, which operated much like a loan, Cegetel delivered excess cash to Vivendi on a

short-term basis beginning in August 2001.  Vivendi paid Cegetel a market rate of interest and agreed

to return the funds upon the expiration of the current account agreement on December 31, 2001.

111.    As alleged by the SEC, Vivendi maintained cash pooling arrangements with most of

its subsidiaries, but it treated the funds received from Cegetel differently than it treated the other

pooling arrangements.  In addition to the specific December 31, 2001 expiration date, the Cegetel

current accounts contained an "on demand" clause that entitled Cegetel to demand immediate reimbursement of the funds it deposited with Vivendi at any time.

112.    According to the SEC Action, Cegetel gave Vivendi approximately €520 million pursuant to the current account in August 2001. This account balance ballooned between September 2001 and June 2002, and at times exceeded €1 billion. Vivendi used this money to pay for ordinary operating expenses.

113.    Cegetel's right to demand immediate reimbursement of the funds it provided to Vivendi under the current account had a direct impact on the Company's liquidity. Vivendi, however, declined to disclose the existence of this account in its 2001 Form 20-F. Item 5B(1)(b) of the Instructions for filing Form 20-F, *Liquidity and Capital Resources,* required Vivendi to include in its financial statements the nature and extent of any legal or economic restrictions on the ability of subsidiaries to transfer funds to the Company and to disclose the impact such restrictions have had or are expected to have on its ability to meet its cash obligations. Vivendi failed to make the required disclosure in violation of Item 5B(1)(b).

114.    Vivendi's failure to disclose the current account also violated Item 303 of SEC Regulation S-K. Item 303 requires issuers to identify any known "demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in a material way." By failing to disclose the Cegetel current account, Vivendi violated Item 303.

115.    Vivendi's failure to disclose the Cegetel current account not only violated SEC regulations, but also U.S. GAAP. Paragraphs 2 and 3 of SFAS No. 57, *Related Party Disclosures,* provide:

> 2.    Financial statements shall include disclosures of material related party transactions, other than compensation arrangements,

expense allowances, and other similar items in the ordinary course of business . . . .  The disclosures shall include:

a.      The nature of the relationship(s) involved

b.      A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements

c.      The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period

d.      Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

3.      Transactions involving related parties cannot be presumed to be carried out on an arm's-length basis, as the requisite conditions of competitive, free-market dealings may not exist.  Representations about transactions with related parties, if made, shall not imply that the related party transactions were consummated on terms equivalent to those that prevail in arm's-length transactions unless such representations can be substantiated.

116.    Vivendi violated SFAS No. 57 by failing to disclose the Cegetel current account.

**b.      The Maroc Telecom Side Agreement**

117.    In February 2001, Vivendi entered into a side agreement with Maroc Telecom to purchase an additional €1.1 billion stake in that entity.  Defendants failed to disclose this side agreement.

118.    As discussed in Section IV.C.2 above, Vivendi acquired a 35% stake in Maroc Telecom in December 2000.  As alleged in the SEC Action, in February 2001, Vivendi entered into a side agreement with the Moroccan government that required the Company to purchase an additional 16% of Maroc Telecom's shares in February 2002 for approximately €1.1 billion.  In return, the

Moroccan government granted Vivendi certain management rights over Maroc Telecom's operations that Vivendi used to justify its consolidation in the Company's financial statements.

119.    This side agreement was not disclosed in Vivendi's public filings in 2001 and early 2002. By failing to disclose this €1.1 billion liability, Defendants were able to conceal Vivendi's burgeoning cash crunch and were able to keep the Company's stock prices and credit ratings at artificially high levels during the Core Period.

### 3.    The Magnitude of the Undisclosed Liquidity Crunch

120.    As subsequently reported by *The Wall Street Journal* in a Pulitzer Prize-winning October 31, 2002 article, Vivendi's acquisition spree, together with the other factors referenced in the preceding paragraphs, had put Vivendi on the brink of utter collapse:

> On Dec. 13, [2001], Guillaume Hannezo sent Jean-Marie Messier, chairman of Vivendi Universal SA, a desperate handwritten plea.
>
> "I've got the unpleasant feeling of being in a car whose driver is accelerating in the turns and that I'm in the death seat," wrote Mr. Hannezo, the company's chief financial officer. "All I ask is that all of this not end in shame."
>
> That very day, unknown to investors and the Vivendi board, the company had narrowly averted a downgrade by credit-rating agencies, which would have made it difficult to borrow money and plunged the company into a cash crisis. Mr. Hannezo (pronounced AN-ZO) implored his boss and longtime friend to take serious steps to reduce Vivendi's ballooning debt.
>
> When the company's board met the next day to consider whether to approve a roughly $10 billion acquisition of USA Networks Inc.'s TV and film businesses, Mr. Messier made no mention of the close call with the rating agencies. Instead, when a director asked about Vivendi's financial profile, Mr. Messier said the company had no problem, according to two directors who were there.
>
> The board endorsed the USA Networks deal, buying Mr. Messier's pitch that it would help complete Vivendi's transformation from a onetime water utility into an entertainment giant. He boasted that the company would be able to distribute the movies and music made

by its Universal Studios and Universal Music units by means of cellular devices, as well as by satellite, cable and pay television.

But Vivendi was already in dire financial straits.  The USA Networks deal, along with a $1.5 billion investment in satellite-TV operator EchoStar Communications Corp., in fact signaled the beginning of the end for Mr. Messier.  The boy wonder of the French business establishment was ousted seven months later, in July, after directors discovered the company was skirting close to a bankruptcy filing.

As new management struggles to salvage the French conglomerate, it has become clear that Vivendi came close to financial disaster far earlier than previously thought.  That picture is starkly at odds with the one repeatedly presented by Mr. Messier to investors and his board.

121.    Similarly, citing an article first appearing in *Le Monde*, Bloomberg News reported on

May 14, 2002 that Vivendi was close to insolvency at the end of 2001:

Vivendi Universal SA, the world's second-largest media company, was close to insolvency at the end of 2001 after delays in planned asset sales, French daily Le Monde said, without citing anyone.

Delays in the sale of the Seagram liquor unit and a French magazine business caused a "serious cash crisis" at the Paris-based company, which faced payments of about 10 billion euros ($9 billion) at the end of last year, the paper said.  Today, Vivendi's businesses "barely produce the cash needed to pay the bills," according to the report . . . .

Vivendi's cash woes help explain why the company sold 55 million of its own shares in January, 9 percent of Vivendi Environnement SA, as well as its stake in AOL Europe and British Sky Broadcasting Plc, Le Monde said.  Since the beginning of the year, Vivendi shares have lost half their value.

122.    Although Defendants denied any pending liquidity crisis in response to the *Le Monde*

report and reassured investors during the spring and early summer of 2002 that Vivendi could meet

its obligations for the next 12 months, in reality the Company continued to teeter on the edge of

bankruptcy.

123.    Similarly, on September 27, 2002, *AFX News* reported:

> Vivendi Universal chairman Jean-Rene Fourtou said the company
> would have been forced to declare bankruptcy within 10 days if Jean-
> Marie Messier had not resigned, according to a report in Le Figaro.

124.    On December 13, 2002, the Associated Press reported, based on an article first

appearing in *Le Monde*, that Defendant Hannezo admitted that 2001 was marked by a series of errors,

including underestimating the debt problem:

> Electronic mail seized in an investigation of alleged financial
> irregularities at Vivendi Universal and other documents show
> escalating tension amid a growing debt crisis that led to the fall of
> flamboyant Chairman Jean-Marie Messier.
>
> Board member Edgar Bronfman Jr. of Canada's Seagrams empire,
> which was purchased by Vivendi in 2000, warned Messier in an e-
> mail that he could be courting danger with his "very costly personal
> shows," according to Friday's edition of the newspaper Le Monde.
>
> And former Financial Director Guillaume Hannezo, in a note to
> France's stock exchange watchdog, said Messier had turned Vivendi
> into a "permanent deal machine," while an "urban guerrilla
> atmosphere" gripped a divided board, the newspaper said.
>
> *        *        *
>
> Hannezo, the former finance director, said in his 20-page report to
> the COB that 2001 was marked by the "accumulation of a series of
> errors," including underestimating the debt problem, according to Le
> Monde.
>
> *        *        *
>
> Hannezo, a key figure in the COB investigation, speculated that
> Vivendi could have been spared its debt mountain in 2001 "had it
> resolved to sell before buying . . . .  Unfortunately, it oriented itself
> toward the inverse choice, satisfying itself with potential riches," he
> wrote.  Vivendi's shares have tumbled around 75 percent this year.

## V.    THE TRUTH EMERGES, CAUSING HARM TO PLAINTIFFS AND OTHER VIVENDI INVESTORS

125.    On May 3, 2002, Moody's downgraded Vivendi's long-term debt rating to Baa3, just

one level above the "junk" status assigned to speculative investments.  Moody's attributed the ratings

drop to concerns that Vivendi might not be able to reduce its debt load as quickly and comprehensively as the Company had planned.

126.    In response to the ratings downgrade, Vivendi issued a press release which contended that Moody's purportedly failed to consider the poor market conditions or the full extent of Vivendi's debt reduction program.  In a Form 6-K that Vivendi issued that same day, Defendants tried to assure the market that Moody's downgrade would have no adverse affect on Vivendi, stating:

> This decision has no impact on Vivendi Universal's cash situation.  It does not trigger any renegotiation clauses or advance repayments of bank credit lines.  In addition, Vivendi Universal's use of commercial paper in the current amount of 1.6 billion euros is well covered by back-up lines of more than 3 billion euros, the availability of which will not be affected by the rating change.
>
> Vivendi Universal affirms that it has every confidence in its ability to meet its operating targets for 2002, as proved by its first-quarter results. The company is totally determined to carry through its debt reduction program in order to make a rapid return to a comfortable position with a Baa2 rating.

127.    Despite the Company's effort to reassure the market, Vivendi's ADSs dropped $1.60, from $30.67 to $29.07, in response to Moody's rating downgrade.  The Company's ordinary shares dropped €2.25, from €33.77 to €31.52.

128.    As Vivendi's stock fell rapidly, Messier's personal stock had fallen considerably with the Board and investors.  On or about May 29, 2002, Vivendi's Board established a corporate governance committee to monitor Messier's strategic and financial decisions.  As reported in the British newspaper *Independent* on May 31, 2002, "[t]he move is an embarrassing comedown for Mr. Messier, who once boasted he did not have to answer to anyone.  He will now answer to the very person he has attempted to sideline since Vivendi's mega-merger two years ago."

129.    By May 29, 2002, with Vivendi's ADSs trading in the $29 to $30 range and its ordinary shares trading in the €31 to €33 range in response to concerns about its debt levels, Defendants sought to reassure the financial markets by issuing a press release (also filed on a Form 6-K) reflecting

50

a May 29, 2002 meeting of the Company's Board of Directors. The press release stated that the Board had "carried out a detailed examination of Vivendi Universal's operating and financial targets for 2002." According to the press release, the Board stated that their strategy was "based on the active continuation of the debt reduction program and the internal growth of the company's businesses." Messier was quoted as follows:

> Our Board of Directors and management are proceeding together, deliberately and decisively, to execute a plan that, in meeting our financial targets and operating objectives, will deliver increased value and solid growth to our Company. I look forward to the recommendations of our newly created governance committee, which, I believe, will have an added contribution by continuing to improve the structures and procedures that insure an absolute and impartial focus on the Board's fiduciary duty to stakeholders.

130.    While the Company sought to assure investors that it was not facing a liquidity crisis, rumors that Vivendi was in danger of default on its credit facilities persisted. On July 2, 2002, Vivendi's debt was downgraded for a second time. This announcement caused Vivendi's ADSs to plummet nearly 21%, falling from $22.45 to $17.76, while its ordinary shares fell more than 25%, from €23.90 to €17.80. The Company's shares dropped so rapidly that the Paris Bourse repeatedly suspended trading of the ordinary shares.

131.    Vivendi swiftly ousted Messier the following day, and admitted that the Company was facing a "short-term liquidity issue." Vivendi disclosed that it would be required to repay creditors €1.8 billion by the end of July 2002 and that €3.8 billion in credit lines were up for renegotiation. Further, credit analysts estimated that Vivendi could face a cash shortfall of €2.7 billion by the end of 2002—an amount they feared could expand to €5.5 billion by the middle of 2003 if the Company failed quickly to secure new multibillion-euro lines of credit. These announcements caused the Company's ADSs and ordinary shares to fall even further, dropping nearly another 12% on July 3, 2002 from $17.76 to $15.66 and nearly another 22% from €17.80 to €13.90, respectively. All told, the

Company's ADSs and ordinary shares fell a stunning 30% and 41.8%, respectively, in the two days following the second credit rating downgrade.

132.    On July 5, 2002, *The Globe and Mail*, a Canadian newspaper, reported that Vivendi "finally admitted what its ousted chairman and chief executive officer, Jean-Marie Messier, had strenuously denied in recent weeks: The media-and-utility conglomerate is in danger of a cash crunch." *The Globe and Mail* further stated:

> Based on a detailed liquidity statement Vivendi put out late Wednesday, credit analysts estimate that Vivendi could face a cash shortfall of 2.7 billion euros ($2.64-billion U.S.) by the end of the year, expanding to as much as 5.5 billion euros by the middle of 2003, unless it can quickly secure a new multibillion-euro credit line from its lenders.

> \*          \*          \*

> In its statement, Vivendi said it must repay 1.8 billion euros this month and said the payment would be financed from 2.4 billion euros in existing cash and credit lines.  It also has a 3.8-billion-euro credit line that will roll over this month unless the banks determine there has been a "material adverse change" with the company.

> This grim outlook contrasts with Mr. Messier's recent assurance that the "treasury situation" at Vivendi—owner of Universal Studios, Universal Music Group, USA Networks and minority stakes in a host of other assets—was "comfortable even in the most pessimistic market hypotheses."

133.    On July 10, 2002, *The Wall Street Journal* reported that the COB had raided Vivendi's Paris headquarters as part of a formal investigation into the Company's financial disclosures going back to 2001.  The French investigation had been opened to look into alleged "publication of false balance sheets for the tax years closing December 31, 2001 and December 31, 2002" and the publication of false and misleading information concerning the Company's financial outlook for those years.

134.   On July 16, 2002, Vivendi announced that Hannezo was relieved of his duties as CFO and would stay with Vivendi for six months as an advisor to the new chairman.  A July 17, 2002 research report by BNP Paribas Equities stated:

> This is no surprise.  Guillaume Hannezo was very close to Jean-Marie Messier.  The group's financing packages and strategy were as much his as Messier's.

135.   Unfortunately for Vivendi's investors, the stunning collapses of early July 2002 only foreshadowed drops still to come.

136.   On August 14, 2002, the Company's new management held a conference call and issued three press releases (filed with the SEC on Forms 6-K) informing the public of just how dire Vivendi's financial situation had become.

137.   The first press release memorialized the August 14 conference call.  In it, Fourtou stated that:

> In the short term, due to the structure of our debt, we are facing a liquidity problem . . . in spite of the value of our assets.  That's why the first thing I did upon my arrival was to negotiate . . . a new bank facility of 1 billion euros.  This new money has not yet been used.  As announced in July, we are presently negotiating a new facility of 3 billion euros which will include the first 1 billion euros.  We have reached a framework for agreement with the same seven banks and we expect this new facility to be signed by the end of August.  This will allow Vivendi to buy the time necessary to implement the best conditions for the necessary sale of the businesses.

138.   The second August 14 press release reported on a August 13, 2002 Board meeting and announced that the Board had, among other things, approved a plan to dispose of at least €10 billion worth of assets, including €5 billion in the next nine months; voted to sell Houghton Mifflin; and authorized the cancellation of 20,865,167 treasury shares linked to certain stock option plans.

139.   The final August 14 press release and Form 6-K announced Vivendi's results for the first half of 2002, and reported that "[n]et income was a loss of 12.3 billion euros, representing negative 11.32 euros per basic share, for the first half of 2002."  Further, the press release highlighted

the €11 billion goodwill impairment charge and the "financial provisions of 3.4 billion euros" that were recorded at June 30, 2002. Net income was negative €66 million, "or negative 0.06 euros per basic share in the first half of 2002 compared with positive 0.27 euros earnings per basic share in the 2001 period." Debt under French GAAP was approximately €35 billion. The Board also laid out its commitment to "raising at least 10 billion euros through asset sales during the next two years, 5 billion euros of which will be completed during the next 9 months."

140.    In response to this news, debt-rating agency Standard & Poor's slashed Vivendi's long-term corporate credit that same day and warned of a further downgrade if Vivendi could not secure new funding within a month. Fourtou was quoted by the Associated Press on August 14, 2002 as stating: "We are facing a liquidity problem, [and I will] try to avoid any fire sale, but we have negotiations that could be concluded very soon if the price was lowered." The news report also stated:

> Vivendi Universal, the teetering French media conglomerate, reported a massive loss of $12 billion for the first half of the year and said it will pare debt by selling $10 billion in assets, including the U.S. publisher Houghton Mifflin.
>
> Adding insult to injury, a ratings agency downgraded the company's debt to junk.
>
> Investors punished Vivendi's shares yesterday on the Paris Exchange and on the New York Stock Exchange, where shares plummeted 23.9 percent to close at $11.66.
>
> The sale of Houghton Mifflin, which the company only bought last year for $1.7 billion, appeared to mark a first step toward breaking up the entertainment and media empire built up by Vivendi's former chairman, Jean-Marie Messier, in a whirlwind of costly acquisitions.
>
> In all, Vivendi said it hopes to dispose of at least $9.8 billion worth of assets—half of them within nine months, the rest within two years.

141.    In response to these developments, on August 14, 2002, Vivendi ordinary shares closed at €11.89, down more than €4.00 (or approximately 25%) from its close the previous day. Vivendi's ADSs suffered a similar decline, closing down $3.67 at $11.66.

142.    In the wake of the public admission that the Company was facing a cash crunch, Vivendi's new management set about the process of raising revenue by jettisoning some of the conglomerate's major assets.  Media reports indicated that the Company had enough cash to last only until October 2002, putting Vivendi in a dire position.  In response, Vivendi announced an ambitious plan to unload €16 billion in assets between July 2002 and the end of 2004.  The fire sale included the following dispositions:

| Date | Asset | Price |
|------|-------|-------|
| July 2002 | B2B/Health | €150 million |
| July 2002 | Lagardére | €44 million |
| July 2002 | Vinci | €291 million |
| December 2002 | Vizzavi | €143 million |
| December 2002 | Houghton Mifflin | €1.567 billion |
| December 2002 | VUP publishing activities in Europe | €1.138 billion |
| December 2002 | Veolia Environment | €1.865 billion |
| December 2002 | EchoStar | €1.037 billion |
| December 2002 | Sithe Energies, Inc. | €319 million |
| February 2003 | Consumer Press division | €200 million |
| February 2003 | Canal+ Technologies | €191 million |
| April 2003 | Telepiur | €831 million |
| May 2003 | Fixed-line telecommunication in Hungary | €315 million |
| May 2003 | Comareg | €135 million |
| May 2003 | Interest in Vodafone Egypt | €43 million |
| June 2003 | InterActive Corp. warrants | €600 million |
| June 2003 | Interest in Sithe International | €40 million |
| June 2003 | VUE real estate | €276 million |
| October 2003 | Canal+ Nordic | €48 million |
| February 2004 | Atica & Scipione | €31 million |
| March 2004 | Sportfive | €274 million |
| May 2004 | Vivendi Universal Entertainment | €2.312 billion |
| May 2004 | Kencell | €190 million |
| June 2004 | Monaco Telecom | €169 million |
| June 2004 | Egée and Cédre Towers | €84 million |
| August 2004 | Interests in VIVA Media | €47 million |

| September 2004 | Canal+ Group headquarters | €108 million |
| October 2004 | UCI Cinemas | €170 million |
| December 2004 | 15% of Veolia Entertainment | €1.497 billion |

In total, Vivendi dumped more than €15 billion in assets between July 2002 and December 2004.

143.    On October 30, 2002, Vivendi announced that the Paris Public Prosecutor's office had opened an investigation into the veracity of the Company's financial disclosures. A few days later, the Company announced that a separate investigation had been opened by the U.S. Attorney's Office for the Southern District of New York. The U.S. Attorney announced that it planned to coordinate its efforts with the SEC, which had already begun to conduct an informal inquiry into Vivendi.

144.    On November 20, 2002, the SEC announced that it had upgraded its inquiry into Vivendi from an informal inquiry to a formal investigation. The SEC made clear that it intended to review Vivendi's accounting and the veracity of its public disclosures. In connection with these enforcement efforts, the SEC obtained a court order on September 24, 2003 forcing Vivendi to place in escrow $23 million (€21 million) it had earmarked to pay a severance package Messier negotiated just before his ouster. Messier was similarly barred from executing a judgment he had obtained via an arbitration in New York State court concerning this severance package.

145.    On December 12, 2002, *Bloomberg* reported that a police team from the Finance Brigade of the Paris Public Prosecutor's office raided Vivendi's headquarters in Paris and Messier's home. The Finance Brigade also raided Canal Plus's headquarters the next day, as well as the homes or offices of various Vivendi directors. Messier was held in custody for two days, during which he was interrogated regarding claims of securities fraud and a $2 billion share buyback by Vivendi in 2001. Hannezo had also been placed under formal investigation.

146.    On September 15, 2003, the COB—following a fourteen month investigation—announced its conclusion that Vivendi had made false financial disclosures. Among the Company's

56

failures, the COB found that Vivendi had not disclosed to investors the growing cash problems it faced during the end of Messier's tenure.  The COB had charged that Messier had "deceived the public" and had "'deliberately issued in the company name inexact and falsely optimistic information on the consolidation of Telco [Elektrim] and Vivendi's debts, cash flow and outlook between October 2000 and April 2002.'"[1]

147.    The United States-based investigations into the crisis caused by Messier's $77 billion acquisition spree concluded on December 24, 2003.  That day, the SEC filed and simultaneously settled securities fraud charges against Vivendi, Messier and Hannezo, imposing fines totaling $51 million.  The SEC charged Vivendi, Messier and Hannezo with multiple violations of the federal securities laws committed between December 2000 and July 2002.  Specifically, the SEC contended that these parties had engaged in a course of fraudulent conduct that disguised the Company's cash flow and liquidity problems, improperly adjusted accounting reserves to meet predetermined EBITDA targets, and failed to disclose material commitments at Cegetel and Maroc Telecom.

148.    In addition to the massive fines imposed against them, Messier and Hannezo both entered into consent decrees permanently enjoining them from further violations of the federal securities laws and barring them from service as officers or directors of any public companies for ten and five year periods, respectively.  Messier further agreed to relinquish his claim to the €21 million severance package he had negotiated before he was forced to resign.

149.    On December 8, 2004, French regulators imposed fines of €1 million on each of Vivendi and Messier.  This was only the second time the AMF had imposed fines so close to its maximum fine of €1.5 million.

---

[1] *Corporate Ethics and Governance*, Dec. 7, 2004 <http://www.icego.org/details/vivendi and its former boss fined.html>.

## VI.    DEFENDANTS' MATERIALLY FALSE
##        AND MISLEADING STATEMENTS

150.    Vivendi Universal's Business Plan dated October 11, 2000  included Vivendi

Universal's compound annual growth rate calculations for EBITDA. The Business Plan shows that

for M&C, Vivendi Universal estimated a 2000-2002 compound annual growth rate of 36.4%.   This

statement contained untrue statements of material fact and omitted to state material facts required

therein or necessary to make the statements therein not misleading because Defendants failed to

disclose that C&M's EBITDA results and projections were inflated by the use of purchase

accounting.

151.    October 30, 2000, Vivendi Universal filed its Form F-4, which was a prospectus and

registration statement regarding the promised merger.  The form F-4  projected that following the

merger, Vivendi's compound annual growth rate for pro forma adjusted EBITDA, would

approximate 35% from 2000 to 2002.  This statement contained untrue statements of material fact

and omitted to state material facts required therein or necessary to make the statements therein not

misleading because Defendants failed to disclose that this projection was inflated by the use of

purchase accounting, for the reasons set forth in Section IV.C.6 above.

152.    On  December  22,  2000,  Vivendi  issued  a  press  release  announcing  that  it  had

purchased a 35% stake in Maroc Telecom for approximately €2.3 billion.  The press release stated

that the purchase would "have a positive effect on net income before goodwill from 2001, taken that

the  company  is  consolidated."   This  statement  contained  untrue  statements  of  material  fact  and

omitted  to  state  material  facts  required  therein  or  necessary  to  make  the  statements  therein  not

misleading  because  Defendants  failed  to  disclose  that  the  consolidation  of  Maroc  Telecom  was

improper, for the reasons set forth in Section IV.C.2 above.

153.    On  January  12,  2001,  Defendants  caused  the  text  of  a  December  5,  2000  speech  to

shareholders to be memorialized in a January 12, 2001 Form 6-K filed with the SEC (the "January 12,

58

2001 6-K").  In the speech, Messier touted Vivendi's quadrupled share price, sevenfold increase in

market capitalization and tenfold increase in operating income.  He also reported Vivendi's pro forma

revenues of "almost 25 billion euros at the end of 2000, and pro forma EBITDA of 3.2 billion euros

in the consolidated businesses alone."  Calling the figures "reliable and concrete," Messier projected

an additional €220 million of EBITDA in 2002 and more than €400 million in 2003.  He went on to

state that "[w]e are therefore very comfortable with our business and financial performance forecasts,

irrespective of the economic climate in the next two years."  Messier's December 5, 2000 speech, and

the January 12, 2001 6-K on which it was filed with the SEC, contained untrue statements of material

fact and omitted to state material facts required therein or necessary to make the statements therein

not misleading because Defendants' improper consolidation of Maroc Telecom into Vivendi's own

results caused these financial projections to be materially misstated, for the reasons set forth in

Section IV.C.2 above.

      154.    In a March 9, 2001 press release, filed on form 6-K, Vivendi Universal reiterated its

confidence in achieving its 35% EBITDA growth target for M&C. Mr. Messier specifically stated:

> The strong results that Vivendi Universal has generated for calendar
> 2000 provide a very solid foundation for the Company's growth
> prospects in 2001. The robust performance of Vivendi Universal's
> business segments clearly reflects the fast pace and clear momentum
> that we have established as Vivendi Universal enters 2001. The
> Company's unique combination of content and distribution assets
> paves the way for enormous growth opportunities. We have our
> management teams in place as we move to execute the growth
> strategies. The management team, in particular, has been focused on
> day-to-day operational performance and increased productivity of
> each of the Company's business units. I am very confident that, for
> Media and Communications, we will reach our revenue growth target
> of 10 percent and our aggressive EBITDA growth target of 35
> percent for the period 2000-2002 and achieve superior returns for
> Vivendi Universal shareholders.

This statement contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because Defendants

failed to disclose that C&M's EBITDA results and projections were inflated by the use of purchase accounting, for the reasons set forth in Section IV.C.6 above.

155.    On March 9, 2001 Vivendi executives held an earnings call.  In this earnings call, Vivendi Universal executives presented the highlights of Vivendi Universal's year 2000 results. They confirmed their 2001 outlook and reiterated that Vivendi Universal's target for 2001/2002 was 35% EBITDA growth, a target with which they were "quite comfortable on the basis of what we have achieved in 2000, to be able to achieve all targets for the two coming years."  This statement contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that C&M's EBITDA results and projections were inflated by the use of purchase accounting, for the reasons set forth in Section IV.C.6 above.

156.    In a March 30, 2001 Chairman's Statement and Shareholder Newsletter, filed with the SEC on a Form 6-K on the same date (the "March 30, 2001 6-K"), Messier stated that 2000 pro forma results showed an increase of almost 20% in revenues and an EBITDA increase of 48%, and that "[t]he EBITDA rise for the media and communications businesses alone is stronger still, reaching 76%."  Messier also pointed out that Vivendi was "ahead of our targets for 2000" and that he could "confirm the ambitious growth targets that we set for media and communications in October 2000: increases of 10% for revenues and 35% for EBITDA."  He further stated:

> Since the merger [with Seagram and Canal Plus], the integration of our teams has progressed well, enabling us to identify and develop synergies. Consumers will soon be seeing the first concrete results. In addition, we are in exceptionally fine financial health—our communications activities are nearly debt free.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Messier failed to disclose that Vivendi was neither "in exceptionally fine financial health" nor "nearly debt free."

Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Messier failed to disclose Vivendi's use of purchase accounting to enhance EBITDA, that Vivendi was in a precarious financial condition due to the fraudulent accounting scheme and Defendants' active effort to conceal Vivendi's liquidity crisis, set forth in Sections IV.C and IV.D above.

157.    On April 24, 2001, Vivendi issued a press release and filed a Form 6-K (collectively, the "April 24, 2001 6-K") announcing "very strong" first quarter 2001 results. The April 24, 2001 6-K announced that Media and Communications revenues were up 10% to €5.9 billion and that Telecom revenues were up 30% to €1.5 billion. The April 24, 2001 6-K further reported that Media and Communications EBITDA increased 112% to €900 million and that Telecom's EBITDA more than tripled to €433 million. The April 24, 2001 6-K quoted Messier as follows:

> I am very pleased with Vivendi Universal's outstanding performance in our first quarter as a new company. All our results meet or exceed our key operating targets. We created significant momentum by delivering solid first quarter 2001 results in EBITDA, which more than doubled, and by generating double digit revenue growth.

> These results show the focus and dedication of all our management teams, in executing the unique promise of Vivendi Universal around its global strategy. This is a great beginning. With our momentum, our targets and the drive of our executive team, I am extremely confident that, for Media and Communications, we will reach our annual EBITDA and revenue growth targets of 35% and 10%, respectively in 2001 and 2002 and achieve superior returns for Vivendi Universal shareholders.

> Finally . . . We are also ahead of targets for the synergies which indicate that the path of integration between our teams is great. My only focus is and remains execution of this compelling media merger.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the results reported were not attributable to the stated causes but, rather, to

the fraudulent accounting scheme and the use of purchase accounting as particularized in Section IV.C above.

158.    On April 24, 2001, Messier addressed Vivendi's shareholders at the Company's shareholders' meeting, the transcript of which was subsequently filed on the June 26, 2001 Form 6-K (collectively, the "June 26, 2001 6-K"):

> The foundations of our communications-related businesses are particularly healthy and strong. I would just like to emphasize a few points:
>
> -        A HEALTHY BALANCE SHEET with total equity reaching 66 billion euros;
>
> -        A PRO FORMA NET DEBT THAT IS PRACTICALLY NON-EXISTENT—around three billion euros;
>
> -        Vivendi Universal posted RECORD-HIGH NET INCOME, and has cash available for investing (participation in BskyB, etc.);
>
> -        Vivendi has RAPIDLY GROWING revenue, which reach the double digits annually, spread out through all the European and American markets (60% and 40%); extraordinarily large customer bases, several dozen million subscribers; business models often based on subscription—meaning loyalty, recurrence, predictable revenues, and very little dependence on the advertising market.
>
> Financially, Vivendi Universal, concerning the communications sectors, is rock solid—very stable with high growth.
>
> *        *        *
>
> In my role as the Chairman and as an employee of the company, I owe you the company's results. Here they are. They are good.
>
> *        *        *
>
> Vivendi Universal, our company, your company, is solid. Today, we are a leader, strong, dynamic, and profitable.

159.    On May 18, 2001, Vivendi filed a Form 6-K with the SEC and issued a press release providing total revenue information for first quarter 2001 (collectively, the "May 18, 2001 6-K"). The May 18, 2001 6-K stated in part:

> Vivendi Universal revenue for first quarter of 2001 totaled 12.6 billion euros, a global 34.5% increase over the first quarter of the prior year. Vivendi Universal's media and communications businesses accounted for 5.9 billion euros and environmental services businesses accounted for 6.7 billion euros.

160.    The March 30, 2001 6-K; the April 24, 2001 6-K; the June 26, 2001 6-K; and the May 18, 2001 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia,* the Company was engaged in improper accounting practices, including the use of purchase accounting, and improper earnings management, as particularized in Section IV.C above.   In addition, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a liquidity crisis (as particularized in Section IV.D above) and that Vivendi would need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

161.    On July 2, 2001, Vivendi filed its Form 20-F with the SEC, signed by Defendant Hannezo, for the fiscal year ended December 31, 2000 (the "2000 Form 20-F").   The 2000 Form 20-F contained Vivendi's consolidated financial statements for the years ended December 31, 2000, 1999, and 1998 and as of December 31, 2000 and 1999.  The 2000 Form 20-F stated as follows:

> For the years ended December 31, 2000, 1999 and 1998, we had a net income under U.S. GAAP of €1,907.8 million, €246.1 million and €565.2 million, respectively, compared to €2,229.0 million, €1,431.4 million and €1,120.8 million under French GAAP.   Under U.S. GAAP, shareholders' equity was €64,729.4 million and €16,954.5 million for 2000 and 1999, respectively, compared to €56,671.1 million and €10,892.2 million under French GAAP.

162.    The 2000 Form 20-F further reported on marketing rights, stating:

> As of January 1, 2000, the following new accounting principles were adopted:

*      *      *

63

Sports broadcasting rights acquired by Canal Plus are now capitalized as intangible assets and are amortized over the period of the agreement. The cumulative effect of this change had no impact on net income in 2000 and 1999. Total assets increased by €2.0 billion (most of which related to intangible assets) and total liabilities and shareholders' equity increased by the same amount.

163. When discussing Accounting Policies, the 2000 Form 20-F stated that revenues and costs for the music segment were recognized upon shipment to third parties and that revenue relating to public service contracts was recognized when the services were rendered.

164. On July 23, 2001, Vivendi issued a press release and filed a Form 6-K (collectively, the "July 23, 2001 6-K") announcing its "very strong" second quarter and first half 2001 Media and Communications results. Vivendi reported that Media and Communications revenues were up 16% (excluding Universal Studios Group) to €6.6 billion, and EBITDA grew 57% to €1.3 billion. Concerning Vivendi's first half 2001 results for the Media and Communications businesses, the press release stated in part:

In the course of the first half of 2001, Vivendi Universal achieved three quarters of its full-year target of incremental EBITDA (nearly 800 million euros excluding Maroc Telecom, relative to the company's target of slightly more than 1 billion euros).

In the first half of 2001, revenues increased to 12.4 billion euros (up 15% [excluding USG]), and EBITDA grew to 2.2 billion euros (up 77% over 2000 comparable period).

During a strong second quarter, revenues increased 16% [excluding USG] to 6.6 billion euros, and EBITDA grew 57% to 1.3 billion euros.

Excluding Maroc Telecom, revenue growth was 8%, and EBITDA growth was 35% for the second quarter. For the first half of 2001, revenues were up 11% and EBITDA was up 62%. [Footnotes omitted.]

165. The July 23, 2001 6-K also reported on the Telecom segment, reporting Telecom EBITDA of €703 million for the quarter ended June 30, 2001 and €1.136 billion for the first half ended June 30, 2001, and stating:

64

> Telecoms has registered an excellent second quarter and half year. In the second quarter of 2001, revenues increased by 51%, and EBITDA grew by 70% versus the second quarter 2000.

166.    Messier commented on the results, stating in part as follows:

> The results produced by Vivendi Universal in the second quarter are well ahead of market consensus. . . . They confirm the robustness of our businesses . . . and the fast progress of the reorganization and implementation of our recent merger.

> With three quarters of the 'aggressive' incremental EBITDA target for the full year 2001 [(1.12 billion euros of incremental EBITDA, or 35%, over the pro forma 2000 guidance provided last October and slightly above 1 billion euros of incremental EBITDA over the final 2000 results)] already achieved in the first half of the year, I can only re-emphasize our confidence. We will at least meet our stated targets.

> Obviously, our current stock price does not fully reflect this situation in terms of EBITDA multiples or Enterprise Value to EBITDA to growth. With the highest growth rates of the industry and the lowest multiples, our stock is definitely an attractive investment today.

> The first half has been a period of total operational focus in each of our businesses, while completing significant achievements in the implementation of the merger, reorganization and execution of our strategy.

167.    Following the July 23, 2001 press release, Vivendi hosted a conference call to discuss the second quarter 2001 results and the Company's business and prospects. A July 26, 2001 analyst report by Commerzebank reported that "Messier is confident the company will reach its own targets." As the plaintiffs in the Securities Class Action allege, during the conference call, Messier and others in Vivendi management stated:

> Vivendi was able to achieve strong results even in a down market and was in fact gaining market share.

> The Company was still on track to achieve strong growth in revenues and earnings in 2001, including EBITDA growth of 35%.

The statements made by Vivendi management during the conference call contained untrue statements of material fact and omitted to state material facts required therein or necessary to make

the statements therein not misleading because they failed to disclose that Vivendi was able to achieve the purportedly "strong results" reported only as a result of the accounting fraud and through the undisclosed use of purchase accounting and the improper management of earnings, as set forth in Section IV.C above, and Defendants' active concealment of the Company's burgeoning liquidity crisis, as discussed in Section IV.D above.

168.    On August 10, 2001, Vivendi issued a press release and filed a Form 6-K (collectively, the "August 10, 2001 6-K") announcing its total revenue for the first half of 2001, including the second quarter.  Second quarter 2001 revenue totaled €13.9 billion, "comprised of 6.6 billion euros for media and communications businesses and 7.3 billion euros for environmental services businesses."  The first half of 2001 total revenue for Vivendi was €26.4 billion, "comprised of 12.4 billion euros for media and communications businesses and 13.9 billion euros for environmental services businesses."

169.    In early September 2001, Vivendi's ADSs declined from the mid-$50s to the mid-$40s per share, and its ordinary shares declined from the mid-€50s to the mid-€40s.  In response, Defendants categorically denied any problems.  Vivendi, after the market closed on September 5, 2001, reiterated its targets for 2001 and 2002.  Messier stated in an interview with Reuters that evening that "no profit warning of any kind needs to be feared coming from Vivendi Universal."  Messier's statement contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi's security in its targets and in the fact that it would not have to issue any profit warning was attributable to the accounting fraud as set forth at Section IV.C above, its improper use of purchase accounting, its improper earnings management and to its active concealment of the Company's liquidity crisis, as discussed in Section IV.D above.

170.    On September 25, 2001, Vivendi issued a press release and filed a Form 6-K (collectively, the "September 25, 2001 6-K") announcing "Strong First Half 2001" results and a "Solid Outlook for 2002." The press release reported that revenues increased 11% to €26.4 billion, that EBITDA grew 42% to nearly €4 billion, that operating income grew 65% to €1.9 billion, and that net income, before goodwill amortization, reached €1.1 billion or €0.97 per share. With respect to Media and Communications, the release reported that first half 2001 revenues reached €12.4 billion, up 15%, EBITDA reached €2.2 billion, up 77%, and that operating income nearly tripled to €946 million, up 184%. Concerning Vivendi's environment business, the release reported that revenues were up 11% to €13.9 billion, that EBITDA was up 12% to €1.76 billion, and that operating income was up 13% to €0.97 billion. In the filing, Messier commented:

> Despite the current environment, we will reach all our previously stated revenue/EBITDA objectives for the 2001 year. I continue to express my confidence in achieving our more than 10% revenue growth targets for 2001 and our more than 35% EBITDA growth (versus the company's October 2000 guidance) at a constant asset base. This, combined with some extensions in the company's asset base (i.e., Maroc Telecom and Houghton Mifflin), should result in full-year Media and Communications EBITDA slightly north of 5 billion euros. In the current environment, giving a 2002 target would not be meaningful, and we have yet to complete our 2002 budget and plan process. Before the recent tragedy [of September 11, 2001], market consensus for 2002 EBITDA was not far from 6 billion euros. Despite the events, looking at the trends of our businesses and our defensive qualities, we are currently very comfortable with this expectation. [Footnote omitted.]

171.    On October 17, 2001, Vivendi filed a Form 6-K (the "October 17, 2001 6-K") announcing its consolidated half-year financial statements as filed with regulatory authorities in France. The October 17, 2001 6-K reported:

> In the first half of 2001, Vivendi Universal's revenues increased to €26.4 billion from €19.4 billion in the comparable period of 2000. On a pro forma basis the revenue increase was 11.5%.
>
> The parent company recorded revenues of €64.1 million and net income of €149.7 million in first half 2001.

67

Media and Communications reported a revenue increase to "€12.4 billion, up 12.4% over the pro forma first half of 2000. Excluding Maroc Telecom and Universal Studios Group (USG) Filmed Entertainment, revenue growth was 11%." Environmental Services reported revenues of "€13.9 billion compared to €12.5 billion in the first half 2000, an 11.3% increase."

172.    The July 23, 2001 6-K; the August 10, 2001 6-K; the September 25, 2001 6-K; and the October 17, 2001 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia,* the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized in Section IV.C above), including: (a) improperly consolidating into its financials revenue from its Maroc subsidiary in which the Company had less than 50% ownership; (b) improper EBITDA manipulation; (c) the undisclosed use of purchase accounting; and (d) the improper earnings management. In addition, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a liquidity crisis (as particularized in Section IV.D above) and that Vivendi would necessarily need to restructure its debt obligations in order to remain solvent and avoid bankruptcy. Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was not adhering to the "Significant Accounting Policies" listed in its 2000 Form 20-F but, rather, was preparing its financial statements using accounting policies that violated GAAP.

173.    On October 30, 2001, Vivendi issued a press release and filed a Form 6-K (collectively, the "October 30, 2001 6-K") announcing its third quarter 2001 Media and Communications results. The October 30, 2001 6-K announced that Media and Communications

68

revenues were up 24% to €7.3 billion, and that EBITDA was up 90% to €1.5 billion.  This 6-K

further reported that Telecom revenues increased by 17%, and EBITDA grew by 31% versus pro

forma results for the third quarter of 2000.  Music EBITDA was €250 million for the quarter ended

September 30, 2001 and €702 million for the nine months ended September 30, 2001.   UMG

reported a 6% increase in EBITDA to €250 million.  The 6-K also stated in pertinent part:

> On a pro forma basis, third quarter revenue growth was 8%, and
> EBITDA growth was 30%.  Year-to-date revenues increased 9%, and
> EBITDA increased 46%.
>
> Company reaffirms confidence in achieving its growth targets: 10%
> revenue growth and 35% organic EBITDA growth in 2001.
> [Footnotes omitted.]

174.    Messier was quoted in the October 30, 2001 6-K as follows:

> Our third quarter results for the media and communications
> businesses, with 24% revenue and 90% EBITDA growth, including
> organic growth of 8% and 36% respectively, are obviously strong
> despite the tough environment. . . .  They reflect both our higher
> potential for growth and greater resiliency to recessionary
> environments compared to many of our peers.
>
> *      *      *
>
> Additionally, Vivendi Universal's media and communications
> businesses are presently less vulnerable to recessionary environments
> than many of our peers because of our strong defensive qualities[.]
>
> *      *      *
>
> Having the highest resiliency and lowest sensitivity to a recessionary
> environment explains our ability to outperform most of our peers.
>
> *      *      *
>
> An early look at the fourth quarter indicates that we are on track to
> meet our targets.  I continue to express my confidence in achieving
> 10% revenue growth and 35% EBITDA growth in 2001 at a constant
> asset base.  This, combined with some expansions in the company's
> asset base (i.e., Maroc Telecom and Houghton Mifflin), should result
> in full-year Media and Communications EBITDA slightly above 5
> billion euros.  [Footnotes omitted.]

69

Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that the results reported were not attributable to the stated causes but, rather, to the accounting fraud particularized in Section IV.C above, and to Defendants' concealment of the liquidity crisis discussed in Section IV.D above.

175.    Following the release of the October 30, 2001 6-K, Vivendi hosted a conference call to discuss the third quarter 2001 results and the Company's business and prospects.  As reported in the complaint in the Securities Class Action, during the call, Messier and others in Vivendi management stated:

> Vivendi was able to achieve strong results even in a down market and was in fact gaining market share;
>
> The Company was still on track to achieve strong growth in revenues and earnings in 2001.

176.    The statements made by Vivendi management during the conference call contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because they failed to disclose that the Company was only able to achieve the results reported through the accounting fraud discussed in Section IV.C above, including the undisclosed use of purchase accounting and improper earnings management and through their concealment of the liquidity crisis the Company was facing, as set forth in Section IV.D above.

177.    Based on Defendants' statements, including those made during the conference call, securities analysts that followed Vivendi securities reacted positively to the Company's reported financial results.  For example, on October 31, 2001, ING Barings issued a "Strong Buy" recommendation, stating:

> Vivendi Universal is one of the few media groups not to have issued a profit warning since the beginning of the year.  Management has

stressed its confidence once again and remains comfortable with the consensus forecasts (FY02F EBITDA of around €6bn).

178.    On November 14, 2001, Vivendi filed a Form 6-K (the "November 14, 2001 6-K") incorporating Messier's shareholder newsletter. Messier trumpeted Vivendi's first-half 2001 earnings as "good" and stated that "we are in a position to confirm our annual targets with confidence despite the economic climate." He further stated:

> For the company as a whole, revenues are up 11%, generating a 42% increase in EBITDA to almost 4 billion euros. The Media and Communications businesses posted a 77% increase in EBITDA and a 184% increase in EBIT, while Environmental Services businesses have continued to grow steadily in terms of both revenues (11%) and EBITDA (12%). Vivendi Universal's primary strength is its operational strength, which comes from the quality of its people and products.

179.    On December 6, 2001, Vivendi issued a press release and filed a Form 6-K announcing the decision of Edgar Bronfman, Jr. ("Bronfman") to resign from his position as Executive Vice Chairman of Vivendi. Bronfman remained as "Vice-Chairman of the Board and a close advisor to Mr. Messier." Commenting on Bronfman's resignation, Messier assured the investing public that Vivendi "is in a very strong position, with solid performance in virtually every business." Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi was not in a "very strong position" but, rather, was in a precarious financial position as a result of the accounting fraud discussed in Section IV.C above, including the undisclosed use of purchase accounting and the improper earnings management, and was suffering from a liquidity crisis, as more particularized in Section IV.D above. Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Messier failed to disclose that Vivendi's purportedly "solid performance" was attributable to the accounting fraud discussed in

71

Section IV.C above, including the undisclosed use of purchase accounting and the improper earnings management and to Defendants' active concealment of the liquidity crisis the Company was facing, as more particularized in Section IV.D above.

180.    The October 30, 2001 6-K and November 14, 2001 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia,* the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized in Section IV.C above), including: (a) improperly consolidating into its financials revenue from its Maroc Telecom subsidiary in which the Company had less than 50% ownership; (b) improper EBITDA manipulation (c) the undisclosed use of purchase accounting and (d) improper earnings management.  In addition, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a liquidity crisis (as particularized in Section IV.D above) and that Vivendi would necessarily need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.  Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was not adhering to the "Significant Accounting Policies" listed in its 2000 Form 20-F but, rather, was preparing its financial statements using accounting policies that violated GAAP.

181.    In a December 13, 2001 press release, the Company announced that it had "authorized Goldman Sachs and Deutsche Bank to carry out a [$1.5 billion] placement of BSkyB share certificates that must be converted in October 2002."  The press release went on to state:

> Following last week's sale of 9.3% of Vivendi Environnement and with this transaction, Vivendi Universal will then be in a position to cover any needs that may arise from various opportunities for

> strategic partnerships in the U.S. television and distribution segments.
> Such opportunities may or may not be taken up.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a liquidity crisis, as discussed in Section IV.D above.

182.    The next day, on December 14, 2001, the *Financial Times* (London) reported on the announced sale of Vivendi's $1.5 billion interest in BSkyB and the sale of a $1.06 billion interest in Vivendi Environnement.  The article quoted Vivendi as stating that these asset sales would give Vivendi "room to manoeuvre" for additional acquisitions, and enable it "to cover any eventual needs from different opportunities for strategic partnerships."   These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a liquidity crisis, as discussed in Section IV.D above.

183.    On December 17, 2001, Vivendi issued a press release in Paris and New York and filed a Form 6-K announcing the acquisition of USA Networks for $10.3 billion in combined stock and cash.  The acquisition was financed by an exchange of securities and "limited" cash outlay by Vivendi.  Commenting on the acquisition, Messier stated in pertinent part:

> Our strategy is clearly coming together.  Combining within the same operational entity, VUE, USG and the entertainment assets of USA creates a new U.S. major, which will benefit from the full integration of TV and movies activities with production and distribution.
>
> *            *            *
>
> In addition, this strategic move will significantly benefit Vivendi Universal shareholders, because of its significant value-accretion at every level—EBITDA, net income and free cash flow.  By using mainly non-core, consolidated assets to acquire this control, we are strongly positioned to enhance performance and value to Vivendi Universal shareholders.

73

\*     \*     \*

> At the end of just one year following our merger with Seagram and Canal+, we have put the pieces together in fulfilling our strategy. In one short year, we have focused on integration and addressing our relative distribution weakness in the U.S.—and here we are today. We expect that 2002 will be a year of growth, without further change in perimeter.

Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that the Company was not "strongly positioned to enhance performance and value to Vivendi Universal shareholders" but, rather, was in a precarious financial condition due to the Defendants' concealment of Vivendi's liquidity crisis from the investing public.

184. As alleged in the Securities Class Action, Messier held a press conference on December 17, 2001 with Barry Diller, Chairman and CEO of USA Networks, at the St. Regis Hotel in New York City to discuss the acquisition of USA Networks, the creation of Vivendi Universal Entertainment ("VUE"), and Vivendi's prospects for 2002:

> At the end of the day, this transaction is not putting pressure on Vivendi Universal. On the reverse, what it allows us to do is to increase our [EBITDA] target for 2002 by more than ten percent. It's to increase our net income in 2002 by roughly 200 million dollars. It's to increase the net free cash flow of the group in 2002 by, let's say three hundred and fifty million dollars. At every level of the [P&L] and of the cash flow that you may look at, this transaction is very positive to VUE shareholders year one.

\*     \*     \*

> As far as the global [debt] ratio of the group is concerned, our target is to have in '02 a debt to [EBITDA] ratio well below three times and especially we are focusing to reach that target ahead of the end of the first half of 2002, which means that Vivendi Universal will end up its program of selling its non core asset in the first half of '02; it will give us very comfortable triple B credit rating targets that we are very comfortable with. . . . So, no cleaning of balance sheet because the balance sheet is clean. . . . [W]e are committed to issue full U.S. [GAAP] earnings starting Q1 of '02. We already, in fact, worked on the basis of U.S. [GAAP] accounting methods in '01 in order to build

74

> our track record at the time of this year, at the time of the release of
> our first full quarterly U.S. [GAAP] in '02. So we are already applying
> all U.S. [GAAP] methodologies, including those relating to
> amortization.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Messier failed to disclose that Vivendi was not applying "U.S. [GAAP] methodologies" but, rather, was engaging in accounting fraud as discussed in Section IV.C above. Moreover, Messier's statements referred to above were false and misleading because, contrary to his assertions, the transaction was "putting pressure" on Vivendi because it exacerbated the large and growing liquidity problems that had already surfaced internally as described in more detail at Section IV.D.

185. As alleged in the Securities Class Action, on February 6, 2002, *AFX News Limited* reported that in an attempt to dispel concern about the Company's debt levels and accounting practices, a letter was distributed to the Company's employees stating that no profit warnings were forthcoming:

> Vivendi Universal CEO Jean-Marie Messier said the media company
> will not make any change in its guidance for 2001 earnings due for
> release on March 5, although the fourth quarter was a difficult period.
> Messier made the comment in a letter to Vivendi's staff, addressing
> the recent volatility and losses in the company's share price. "As a
> result of the 9/11 attacks, the fourth quarter of 2001 was indeed
> difficult. Some global markets, including the music market, declined
> during this period. But despite the difficulties, we are the only media
> company not to have issued a profit warning on its operating results
> and there's no change to that situation," said Messier.
>
> *            *            *
>
> "There are no hidden risks and no speculative instruments," he said.

Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, contrary to his

75

assertions, there were "hidden risks" associated with Vivendi—the accounting fraud and liquidity crisis discussed in Sections IV.C and IV.D above.

186.    On February 11, 2002, Vivendi issued a press release (the "February 11, 2002 Press Release") announcing its year-end 2001 Media and Communications results.  Vivendi announced Media and Communications "pro forma revenue growth of 9% for the year ended December 31, 2001, reaching 28.9 billion euros."   The press release further reported that Vivendi's Telecom segment achieved 24% revenue growth in 2001, and that "[r]evenue growth was 10% using the 2000 perimeter excluding Universal Film, exactly in line with management estimates given 12 months ago."

187.    Commenting on the results, Messier stated:

> I am pleased that we achieved our ambitious target of 10% organic revenue growth in 2001, for the businesses resulting from Vivendi's merger with Seagram and Canal+.  Organic growth is, more than ever in today's markets, the most important strength of Vivendi Universal. Achieving the highest level of growth in our industry is a big differentiation of Vivendi Universal, and the operating management deserves recognition for fulfilling their growth objectives and outperforming their peers in a difficult year.  Our 2001 results give us confidence that we can achieve our growth targets again in 2002.

188.    The February 11, 2002 Press Release contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia,* the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized in Section IV.C above). In addition, the February 11, 2002 Press Release contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the Company was suffering from a liquidity crisis (as particularized in Section IV.D above), and that Vivendi would need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

76

189.    On March 4, 2002, Messier was quoted in the *Financial Times* as stating that Vivendi had only two significant off-balance sheet structures, one relating to shares it is selling in BSkyB and another relating to four buildings: "There are no hidden risks and no speculative instruments." Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, contrary to his assertions, there were "hidden risks" associated with Vivendi—the accounting fraud and liquidity crisis set forth in Sections IV.C and IV.D above.

190.    On March 5, 2002, Vivendi issued a press release and filed a Form 6-K (collectively, the "March 5, 2002 6-K") proclaiming its year-end 2001 results.  Vivendi announced that revenues of €57.36 billion reflected a 10% increase and that operating income of €3.795 billion reflected a 47% increase, on a pro forma basis.

191.    The March 5, 2002 6-K included financial information by business segment.  The release further reported Media and Communications revenues of €28.1 billion, representing 10% pro forma revenue growth; EBITDA of €5 billion, representing 34% pro forma EBITDA growth; and operating income of €1.8 billion, representing 89% pro forma growth.  In addition, Telecom's pro forma revenue was up 24% to €8 billion and its EBITDA increased 49% to €2.5 billion.  Further, the March 5, 2002 Form 6-K listed Telecom EBITDA of €2.3 billion as 46% of Media and Communications EBITDA of €5 billion.  Telecom's operating income was €1.3 billion, which was 72% of Media and Communications' operating income of €1.8 billion.  The Telecom pro forma EBITDA was reported as growing by 49%, with Maroc Telecom reporting a pro forma EBITDA gain of 33%.  EBITDA was discussed as follows:

> EBITDA consists of operating income before depreciation, amortization (including film amortization at CANAL+ Group and book plate amortization at VUP), restructuring charges and other one-time items (principally reorganization costs at CANAL+ Group), and does not reflect adjustment for any minority interests in fully

consolidated subsidiaries. EBITDA is presented and discussed because Vivendi Universal management considers it an important indicator of the operational strength and performance of its Media and Communications businesses, including the ability to provide cash flows to service debt and fund capital expenditures.

\*          \*          \*

US GAAP requires consolidation by whatever company manages the assets, controls the board of directors and possesses majority voting control. VU is required under US (and French) GAAP to consolidate Cegetel and Maroc Telecom, since they meet these criteria.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because the consolidation of Maroc Telecom was not "required" under U.S. GAAP but, rather, violated GAAP as set forth in Section IV.C.2 above.

192.    In discussing off-balance sheet transactions, Vivendi stated that there were "no off-balance sheet loans that have not been disclosed or any such items that would create accounting benefits" and that Vivendi regards "cash as 'king'." Vivendi attached a document to its March 5, 2002 Form 6-K that would "provide full disclosure of our off balance sheet financing as well as other matters" for the Media and Communications division. Here, Vivendi stated that "[p]hilosophically, VU prefers to keep its obligations on the balance sheet." Only two off-balance sheet financing vehicles were reported: "two qualifying special purpose entities (QSPEs) associated with the sale of 400 million BSkyB shares." These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Vivendi failed to disclose the existence of two significant obligations, the Cegetel current account and the Maroc Telecom side agreement, set forth in Section IV.D.2 above.

193.    Vivendi also reported a charge for impairment to goodwill under French GAAP of €12.6 billion, including €6 billion for Canal Plus. Debt in French GAAP was listed as €14.6 billion

78

for the Media and Communications activities; under U.S. GAAP, debt was €19.1 billion. The press release also stated in part:

> After having been the only large media company not to modify any of its guidance for the year 2001, Vivendi Universal reiterates its confidence in the strength of its businesses and their performance and their ability to grow. For 2002, no other new guidance will be expressed, apart from the company's full confidence to reach for its Media and Communications businesses.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants, despite their alleged "confidence" in the strength of Vivendi's business, were concealing both the accounting fraud discussed in Section IV.C above, and the liquidity crisis discussed in Section IV.D above.

194. The March 5, 2002 6-K also touted the Company's "Operating Free Cash Flow" as being "ahead of guidance" and announced Media and Communications operating free cash flow of €2.026 billion, "up 2 billion euros over 2000." Commenting on the results, Messier stated in part as follows:

> I am very pleased with the excellent operating results that have been achieved. These results confirm the strength of Vivendi Universal's businesses across the board despite a very difficult global economic environment.
>
> Most of our businesses improved market share, EBITDA and free cash flow during this period of global economic slowing. Even more important, those operational performances are showing improvement at every level of our P&L. The good EBITDA to EBIT transformation ratio: 68% of incremental EBITDA translating in incremental EBIT, is a strong and positive sign. The improvement of operational free cash-flow (FCF) at a higher rate than EBITDA indicates the clear focus given in 2001 to cash management. We will continue this effort.
>
>         *       *       *
>
> We stay fully committed to conveying full transparency in our financial results. Vivendi Universal is not only transparent but is the

> only media and communications company not to change its numbers
> and targets; it underscores its commitment to accurate, conservative
> and consistent reporting in every area of its operations.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the results reported were not attributable to the reasons stated but, rather, to the accounting fraud discussed in Section IV.C above, including the undisclosed use of purchase accounting and the improper earnings management and their active concealment of the liquidity crisis discussed in Section IV.D above. Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants were not "fully committed to conveying full transparency" in Vivendi's financial results but, rather, were employing fraudulent accounting to burnish the Company's actual performance, including the undisclosed use of purchase accounting, as set forth in Section IV.C above.

195.    The March 5, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia,* the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings as particularized in Section IV.C above. In addition, the March 5, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the Company was suffering from a liquidity crisis (as particularized in Section IV.D above) and that Vivendi would need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

196.    On March 5, 2002, during an investor conference call, Messier discussed the Company's fiscal year 2001 results and fiscal year 2002 expectations as follows:

I just want to say a very quick points before going to your questions. And I—the first point here based on the fact that we experienced excellent operating results in the '01 and obviously that's very fortunate because this excellent operating results in '01 are also in the captive of the future and then we'll drive our future. I think that we build our operational reserve but what I want to point out is that if we continue or renewed on the EBITDA growth target results and add to our main in the quarter ' 01. We did all of this. Our operating pre cash flow target, we average Euro 2 million instead of the guidance of Euro 1.2-1.5 million. Obviously the fact that the more you go to cash the more we over this—the guidance that we gave to the market is a strong sign of the quality of the casual management in working above the requirements and CAPEX management in '01. That goes to the same direction is that we did overcome largely all targets in terms of cash service. We save Euro 200 million EBITDA, we reach 300 EBITDA 100 more, and close to Euro 600 million total cash savings. The operations and these business achievements, I think that we owed them to our competitive advantages that were evident in '01. That: (1) the excellent quality of management; (2) the fact the we gain market share in about every single of our business. Those gains of market shares coming from [scale and scope]; (3) the assets mix, maximize our ability to go to digitalization for delivery on the mobile devices; and (4) to our global footprint minimizes of earnings volatility. That's the business achievement.

197.    Bear Stearns issued a report on March 6, 2002, based on the March 5, 2002

conference call, stating in pertinent part as follows:

For '02, Management reiterated their guidance of 10% organic sales growth for all the Media Communications businesses and expects EBITDA of close to €6 billion (pre-USA Networks and pre-Stream).

*        *        *

A list of ten accounting "issues" relating to off-balance sheet financing was published in conjunction with the results and the group is today holding an accounting workshop to clarify the impact of moving to US GAAP when it reports Q1'02 results this year.

*        *        *

The company disclosed that the €19 billion of net debt has an average maturity of 4-years and an average cost of 4.1%. Management pointed out that the strength of the group's finances is underlined by a recently negotiated 5-year credit facility at 45 basis points over LIBOR.

81

The statements made by Vivendi management contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that they expected to reach the reported goals by employing fraudulent accounting, including the undisclosed use of purchase accounting, and the improper earnings management as discussed in Section IV.C above, and by continuing to conceal the Company's liquidity crisis, as discussed in Section IV.D above.

198.     On April 4, 2002, Messier filed another shareholder newsletter on Form 6-K (the "April 4, 2002 6-K"). In it, he confirmed that "Vivendi Universal has met its targets in 2001." He went on to state:

> Our media and communications businesses posted EBITDA . . . of 5 billion euros (a 34% pro forma growth), an operating income of 1.8 billion euros (an 89% pro forma growth) and operating free cash flow of 2 billion euros, which is above projections. These results were achieved with a 10% pro forma revenue growth to 28.9 billion euros. If we include our subsidiary Vivendi Environnement, total pro forma revenues amount to 58.2 billion euros.
>
> Our businesses in media and communications have improved their performance, with strong EBITDA growth for Cegetel, TV and Film . . . , and Vivendi Universal Publishing . . . .
>
> Achieving these results during the general economic downturn of recent months was no easy task. But it is in tough situations like this that we can demonstrate our capacity. The proof is there, thanks to the quality of our teams and our products.

Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi was able to meet its target and posts the results reported only by employing fraudulent accounting, including the undisclosed use of purchase accounting and the improper earnings management, as discussed in Section IV.C above, and by continuing to conceal to Company's liquidity crisis, as discussed in Section IV.D above.

199.    On April 15, 2002, Defendants caused Vivendi to file a Form 6-K (the "April 15, 2002 6-K") containing a translation of financial information provided to the French financial regulators.

200.    The financial statements contained in the April 15, 2002 6-K indicated that "[t]otal revenues were €57.4 billion." The revenues generated by Vivendi's "core businesses" were €57.2 billion, which was an increase of 43%. Twenty-seven percent of the revenues was due to the "inclusion of a full twelve-month results of the acquired Seagram's operations in 2001 . . . 4% resulted from the 2001 acquisitions of Maroc Telecom, Houghton Mifflin and MP3.com, and the remaining 12% was generated by a combination of organic growth and the impact of less significant acquisitions and disposals." The April 15, 2002 6-K further stated:

> Revenues generated by our Media and Communications businesses increased 107% to €28.1 billion, accounting for 49% of our total revenues compared to 33% in 2000 . . . . On a pro forma basis, which includes twelve months of comparable operations both for Seagram and the above 2001 acquisitions, revenues increased 9% to €28.9 billion (10% excluding Universal Studios Group filmed entertainment). Double-digit revenue growth of 24% and 36% respectively, were generated by our Telecom and Internet businesses. Our TV & Film and Publishing businesses generated revenue growth of 8% and 5%, respectively. In our Music business, revenues declined 1%, however, this was a strong performance in a down market.
>
> Revenues generated by our Environmenmental Services businesses, at €29.1 billion, increased 11%, 8% of which was generated by organic growth and 3% of which was due to the implementation of the Dalkia-EDF agreement and other acquisitions. . . .
>
> *       *       *
>
> . . . In the U.S., revenues increased 81% to €12.7 billion.

201.    In discussing Vivendi's operating income, the April 15, 2002 6-K noted that operating income had "more than" doubled to €3.8 billion, an increase of 145% in Vivendi's "core businesses." The Media and Communications businesses generated €2.2 billion in operating income "before holding and corporate expenses." The 2001 €2.2 billion operating income was an extraordinary

increase from €174 million in 2000.  Environmental Services operating income increased 24% to €2 billion.

202.    On April 24, 2002, Vivendi filed a Form 6-K (the "April 24, 2002 6-K") announcing its "strong" first quarter 2002 Media and Communications results.  Vivendi reported a "strong surge of operational free cash flow, up 159% to 1.4 billion euros, well ahead of expectations."  The release, issued in New York, further reported that "[n]et debt fell from approximately 19 billion euros to approximately 17 billion euros."  The release also reported Media and Communications "revenue organic growth of 13% to 6.8 billion euros; strong EBITDA growth, up 18% to 1.1 billion euros; and solid operating income growth, up 37% to 408 million euros."  Messier commented on these results as follows:

> The hard numbers in the first quarter show that Vivendi Universal has a winning strategy, and demonstrate our commitment to excellent management and delivering operating results quarter after quarter.  In the first quarter, each operating segment delivered its revenue targets, and most segments over-delivered EBITDA and operating free cash flow compared with their budgets.
>
> *        *        *
>
> In a difficult environment, Vivendi Universal's businesses gained market share.  Cash management improved dramatically.  Finally, the revenue and cost synergies achieved in the quarter were significant. Further gains will be driven by improving businesses that currently have negative operating free cash flow: Canal+ and Internet operations.

203.    On April 30, 2002, Vivendi filed a Form 6-K (the "April 30, 2002 6-K") announcing "strong" results for the first quarter of 2002, including a 12% increase in pro forma consolidated revenue to €13.2 billion.  The release, issued in New York, also reported that consolidated operating income grew 11% pro forma to €781 million, excluding goodwill amortization.  In the release, Messier commented on the results as follows:

> The consolidated financial results for the quarter demonstrate that Vivendi Universal is delivering on the strategy, goals and targets that

84

we have articulated to our shareholders. In the first quarter of 2002, both Media & Communications and Vivendi Environnement delivered their targets.

The Media & Communications financial results released last week, coupled with our consolidated results issued today, are testimony to our ability and conviction to deliver strong results in operations, cash flow, EBITDA and net income. As I said last week, because of our strong performance in the quarter, we are lowering our estimate of Media & Communications year-end Debt/EBITDA ratio to less than 3x by December 31, 2002.

In a very difficult economic environment, characterized by many market uncertainties, Vivendi Universal's global businesses gained market share. In addition, strong improvement was achieved in cash management, debt reduction, synergies, management development and revenue growth.

204.    The April 30, 2002 6-K further touted the Company's allegedly strong cash flow position:

On a pro forma basis, excluding Vivendi Universal's publishing businesses to be disposed of (including the B-to-B and Health businesses whose sale is expected to be completed in the second quarter), Media and Communications reported:

-    A strong surge of operational free cash flow, up 159% to 1.4 billion euros, well ahead of expectations;

-    Strong operating results in the first quarter: revenue organic growth of 13% to 6.8 billion euros; EBITDA growth, up 18% to 1.1 billion euros; and solid operating income growth, up 37% to 408 million euros. All were significantly ahead of budget[.]

205.    The April 4, 2002 6-K; the April 15, 2002 6-K; the April 24, 2002 6-K; and the April 30, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia,* the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings, including the undisclosed use of purchase accounting and improper management of earnings, as particularized in Section IV.C above. In addition, these statements contained untrue

85

statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the Company was suffering from a liquidity crisis (as particularized in Section IV.D above) and that Vivendi would need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

206.    On May 3, 2002, Moody's lowered the Company's long-term debt rating to Baa3. According to Moody's, the ratings downgrade reflected Moody's concern that Vivendi "might not be able to reduce debt as quickly and comprehensively as planned."

207.    That same day, Vivendi issued a press release, filed on a Form 6-K, criticizing Moody's decision and attempting to downplay its significance:

> The company believes that this decision does not fully take into consideration the currently poor market conditions and the fact that the agency does not take into account immediately the whole of the debt reduction program planned by Vivendi Universal.
>
> This decision has no impact on Vivendi Universal's cash situation. It does not trigger any renegotiation clauses or advance repayments of bank credit lines. In addition, Vivendi Universal's use of commercial paper in the current amount of 1.6 billion euros is well covered by back-up lines of more than 3 billion euros, the availability of which will not be affected by the rating change.
>
> Vivendi Universal affirms that it has every confidence in its ability to meet its operating targets for 2002, as proved by its first-quarter results. The company is totally determined to carry through its debt reduction program in order to make a rapid return to a comfortable position with a Baa2 rating.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi's "confidence" in its ability to meet its targets for 2002 was based on the accounting fraud discussed in Section IV.C above, and on their continued concealment of the Company's burgeoning liquidity crisis discussed in Section IV.D above.

208.    On May 28, 2002, Vivendi filed its Form 20-F for the fiscal year ended December 31, 2001 (the "2001 Form 20-F"). The 2001 Form 20-F, signed by Defendant Hannezo, reported total revenues of €57.4 billion in 2001, which was an increase of 43% over 2000. Vivendi's Media and Communications revenues increased 107% to €28.1 billion over 2000, accounting for 49% of its total revenues. The Environmental Services businesses generated €29.1 billion, an increase of 11% over 2000. In discussing 2001 financial results versus the 2000 results, Vivendi reported that "EBITDA more than doubled to €2.3 billion and operating income almost tripled to €1.3 billion." Excluding Maroc Telecom's results, "revenue growth was 26%, EBITDA increased 56% and operating income increased 103%." In discussing 2000 financial results versus 1999 results, Defendants reported that "EBITDA grew 164% to €1.3 billion and operating income of €486 million was earned compared to an operating loss of €60 million."

209.    According to the 2001 Form 20-F, Vivendi's total operating income "more than doubled to €3.8 billion." The Media & Communications businesses "generated operating income before holding and corporate expenses of €2.2 billion in 2001." Environmental Services' operating income increased 24% to €2 billion.

210.    Vivendi listed its liquidity and capital resources at December 31, 2001 as follows:

> €41.8 billion of debt, €4.7 billion of cash and cash equivalents and €36.7 billion of shareholders equity compared to €38.8 billion of debt, €3.3 billion of cash and equivalents and €65.7 billion of shareholders' equity at December 31, 2000.

211.    The Consolidated Balance Sheet listed cash at €4.7 billion and €3.2 billion as of December 31, 2001 and December 31, 2000, respectively. Net cash provided by operating activities was presented in the Consolidated Statement of Cash Flows as being €4.5 billion and €2.5 billion as of December 31, 2001 and December 31, 2000, respectively.

212.    Defendants also reported cash flow in the 2001 Form 20-F as follows:

*Net Cash Flow from Operating Activities*—Net cash flow provided by operating activities totaled €4.5 billion in 2001, an increase of €2 billion from 2000. The increase was attributed to operating earnings generating incremental cash flow of €1.1 billion and improvements in working capital of €1.5 billion, partially offset by approximately €600 million of cash payments made for the settlement of restructuring and merger-related liabilities. Of the improvements in working capital, €0.8 billion was generated by Vivendi Environnement primarily due to the implementation of a receivables securitization program. In 2000, operating activities provided net cash of €2.5 billion compared to €0.8 billion in 1999. The significant improvement was primarily due to increased earnings generated by our Telecoms, Publishing and Environmental Services businesses.

*Net Cash Flow from Investing Activities*—Net cash flow provided by investing activities was €4.3 billion in 2001 compared to net cash flow used for investing activities of €1.5 billion in 2000. Contributing to cash from investing activities was €9.4 billion from the sale of our spirits and wine business and €4 billion from the disposal of our investment in BSkyB, partially offset by capital expenditures for tangible and intangible assets net of sales proceeds of €4.9 billion and the acquisitions of Houghton Mifflin for €2.0 billion and Maroc Telecom for €2.4 billion. In 2000, net cash used for investing activities was €1.5 billion compared to €12.9 billion in 1999. The significant decrease primarily reflects fewer strategic acquisitions paid for in cash in 2000 compared to 1999. . . . Proceeds from the disposal of investments and fixed assets were €6.9 billion in 2000 compared to €4.5 billion in 1999, mainly attributable to the divestiture of non-core real estate, construction assets and GPU power generation plants.

*Net Cash Flow from Financing Activities*—In 2001, net cash flow used for financing activities was €7.5 billion, the principal components of which included; a €5.9 billion repayment of long-term borrowings and other liabilities, a €1.7 billion decrease in short-term borrowings, the purchase of treasury stock for €4.3 billion and cash dividends paid of €1.4 billion, partially offset by €5.2 billion proceeds from the issuance of long-term borrowings and other liabilities and €0.6 billion net proceeds from the issuance of common stock. In 2000, net cash flow used for financing activities was €0.6 billion compared to net cash provided by financing activities of €13.7 billion in 1999. The year-on-year variance was primarily due to the Merger Transactions. In July 2000, the sale of 37% of Vivendi Environnement through an IPO contributed to an increase in financing transactions of €3.8 billion.

213.    In discussing the Maroc Telecom consolidation in Footnote 11 to the Consolidated Financial Statements, Defendants reported:

> [Maroc Telecom is] consolidated because, through a shareholders' agreement, Vivendi Universal has a majority of the shareholder voting rights and no other shareholder or groups of shareholders exercise substantive participating rights, which would allow them to veto or block decisions taken by Vivendi Universal.

214.    In reporting on its investment into Elektrim, Defendants disclosed only that Vivendi had entered into an Investment Agreement with Elektrim, acquiring 49% of Elektrim. It further stated:

> In March 2002, Vivendi Universal announced that it had signed a non-binding Memorandum of Understanding with a group [of] financial investors led by Citigroup Investments to sell its 49% interest in Elektrim Telekomunikacja. As part of the agreement, Vivendi Universal will retain a minority interest in the Citigroup-led consortium and will be granted a put option and the investors a call option on this interest. The exercise of the two options will ensure that Vivendi Universal is able to completely withdraw from its investment in Elektrim Telekomunikacja in due course.

215.    In discussing Vivendi's accounting policies, Defendants again stated that Vivendi recognized revenues from the sale of recorded music, "net of a provision for estimated returns and allowances, . . . upon shipment to third parties" and recognized revenues in Environnemental Services when services were provided, stating:

> Amounts billed and collected prior to services being performed are included in deferred revenues. Fees incurred to obtain a contract and paid upfront are capitalized and amortized on a straight-line basis over the duration of the contract. Revenues from long-term contracts involving a substantial construction component are recorded on the percentage-of-completion basis.

216.    For the reasons set forth in greater detail in Section IV.C above, Vivendi's historical financial statements and balance sheets contained in Vivendi's 2001 Form 20-F contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading. In addition, the 2001 Form 20-F contained untrue statements

of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a liquidity crisis, as set forth in Section IV.D above.

217.    Defendants further attempted to address concerns about debt levels by issuing a press release on May 30, 2002, subsequently filed on a Form 6-K (collectively, the "May 30, 2002 6-K"). The May 30, 2002 6-K disclosed that Vivendi had negotiated some debt relief by obtaining an "agreement from the banks to delete the clauses that linked the availability of credit lines to a rating level." This action decoupled Vivendi's bank credit lines from rating agencies' decisions. Investors were further reassured that "the Company has no reason to anticipate or fear any further deterioration in its credit rating." The May 30, 2002 6-K further stated:

> Vivendi Universal has also confirmed that, after payment of the dividend and the acquisition of USA Networks, its available credit lines that have not been used to date amount to almost 3.5 billion euros. Also, its use of commercial paper is limited to about 1 billion euros, and the reimbursement of expected debts during the coming months is limited.

> This cash situation, which, the Company believes, is comfortable— even assuming an extremely pessimistic market—will enable the Company to continue its debt reduction program with confidence and with a view to creating the best possible value for its shareholders.

218.    The May 30, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was facing a liquidity crisis, as discussed in Section IV.D above. Unbeknownst to investors, Vivendi's cash situation was dire and a further deterioration in its credit rating was all but certain. Defendants were offering false reassurances that had their intended effect—on May 31, 2002, Vivendi ADSs closed up $1.23, at $31.05.

219.    On June 13, 2002, Defendants caused Vivendi to file a Form 6-K (the "June 13, 2002 6-K") containing Vivendi's first quarter 2002 unaudited consolidated financial results reporting numbers in line with its April 30, 2002 6-K, as set forth above.

220.    The statements contained in the June 13, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading for the same reasons the statements in the April 30, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading, as set forth in Sections IV.C and IV.D above.

221.    Defendants continued their efforts to counteract the stream of bad news.  On June 25, 2002, Vivendi issued a press release (and filed a Form 6-K) (collectively, the "June 25, 2002 6-K") titled "Vivendi Universal to Lower Debt by €4 billion in 2002," reiterating the positive steps it had taken to reduce debt and announcing that the Company's cash position was not precarious.

222.    The statement in the June 25, 2002 6-K that the Company's cash position was not precarious contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the Company was facing a liquidity crisis, as set forth in Section IV.D above.

223.    On June 26, 2002, Vivendi issued yet another press release and Form 6-K (collectively, the "June 26, 2002 6-K") outlining additional details about Vivendi's "deleveraging and liquidity."  The June 26, 2002 6-K first outlined that "[a]ccording to the U.S. definition of net debt (gross debt less cash), Vivendi Universal's net debt (excluding Vivendi Environnement) fell from around €19 billion at December 31, 2001 to approximately €17 billion at March 31, 2002, (and from €14.6 billion to €12.8 billion under French GAAP)."  The June 26, 2002 6-K stated that "[t]he main factors that will impact debt under U.S. practices in the second quarter were or will be [cash inflows and cash outflows]."

224.    Further, the June 26, 2002 6-K stated that Vivendi's new debt target was €15 billion by December 31, 2002, stating that "[t]his target represents a ratio of debt-to-estimated 2002 EBITDA of below 2.5 times, including . . . Maroc Telecom, as is required by both U.S. and French accounting standards.  Using 'proportional' levels of estimated 2002 EBITDA and debt adjusted for the minority interests of Telecoms, the debt target ratio is around 3 times EBITDA."  According to the press release, the lowered debt target, "which is lower than that so far announced, has been made possible by the rapid progress made in the debt-reduction plan during the first half of the year."

225.    The June 26, 2002 6-K also lauded Vivendi's high levels of available credit, stating that "[a]t this point in time, Vivendi Universal has available around €3.3 billion in unused credit lines. This is available to back up its commercial paper outstanding of nearly €1 billion."  This Form 6-K extolled Vivendi's strong free cash flow, stating:

> Owing to its strong free cash flow, combined with the execution of
> the disposals program and potential bond issues, Vivendi Universal is
> confident of its capacity to meet its anticipated obligations over the
> next 12 months.

226.    According to the June 26, 2002 6-K, to aid its cash situation, Vivendi had also "renegotiated a number of bank clauses, in particular those that placed it in the situation of certain loans being called if its credit ratings fell below BBB-/Baa3."

227.    The June 26, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the Company was facing a liquidity crisis, as set forth in Section IV.D above.

228.    On June 26, 2002, Messier discussed the Company's debt and liquidity during an investor conference call as follows:

> I have read, I held in the markets all certainties, question, rumors in
> the current environment relating to views, view for yourselves, views
> for your accounting and I seen that in those circumstance.  The best

92

> that we can do is to show you that's there is no hidden liability that's
> you have all the information to come back.

Messier's statement that there was no "hidden liability" contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi was engaging in a fraudulent accounting scheme, as discussed in Section IV.C above, and that it was facing a liquidity crisis, as set forth in Section IV.D above.

229.     As alleged in the Securities Class Action, Dow Jones International News reported on June 26, 2002:

> Chairman Jean-Marie Messier said late Wednesday that he plans to stay in charge of the embattled media company despite criticism of his strategy and a crumbling share price.
>
> Messier sought to counter those doubts, opening the call with a comment that the company has no hidden, off-balance sheet liabilities and adding, "we feel very confident looking to our debt and cash analysis with all our commitments of the group for the coming 12 months."

Messier's statement that there was no "hidden liability" contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi was engaging in a fraudulent accounting scheme, as discussed in Section IV.C above, and that it was facing a liquidity crisis, as discussed in Section IV.D above.

230.     On July 2, 2002, Vivendi's debt was downgraded again amid reports that the Company was in danger of default.  Also on July 2, 2002, *Bloomberg* reported that Messier "told employees in an e-mail that while he may have gone 'too fast, too far,' there are 'no hidden risks' in the company's accounting."  Messier's statement that there were no hidden risks in the Company's accounting contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi

was engaging in a fraudulent accounting scheme, as discussed in Section IV.C above, and that it was facing a liquidity crisis, as discussed in Section IV.D above.

231.    The next day, July 3, 2002, *The Columbian* (Vancouver, Washington) reported that Messier continued to defend Vivendi's financial statements: "There are no underestimated liabilities. There are no overvalued assets," Messier said. "Our results are true, genuine and complete."

232.    Messier's contention that the Company's results were "true, genuine and complete" contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi was engaging in a fraudulent accounting scheme, as discussed in Section IV.C above, and that it was facing a liquidity crisis, as discussed in Section IV.D above.

## VII.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

233.    Throughout the Core Period, as alleged herein, Defendants intentionally, or at least recklessly, made materially false and misleading statements and concealed material information concerning Vivendi's financial condition. Many of these misrepresentations and omissions were the result of intentional deception and intentional violations of GAAP by Defendants done for the purpose of boosting Vivendi's ordinary share and ADS prices.

234.    As set forth above in detail, Messier and Hannezo, by virtue of their receipt of information reflecting the true facts regarding Vivendi, their control over, and/or receipt and/or modification of Vivendi's materially misleading statements, financial statements and/or their associations with the Company that made them privy to confidential proprietary information concerning Vivendi, were active and culpable participants in the fraudulent scheme. Messier and Hannezo knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to Plaintiffs and the investing public.

235.    Vivendi is charged with the knowledge possessed by its senior officers, including Messier (the former Chairman and CEO) and Hannezo (the former CFO).

236.    Messier's and Hannezo's intentional misconduct included, among other things, authorizing improper accounting practices and directing Vivendi employees to misapply GAAP in order to conceal the Company's actual, serious liquidity and cash flow problems.

237.    No later than mid-December 2001, Defendants knew that Vivendi had just narrowly avoided a downgrade in its investment status by the credit rating agencies that, had a downgrade occurred, would have nearly wiped out Vivendi's cash and would have harmed the Company's ability to borrow additional funds from its credit facilities to finance further acquisitions.  It was this near-downgrade that gave Hannezo, as alleged above, the "unpleasant feeling of being in a car whose driver is accelerating in the turns" with him in the "death seat," and led him to pray that "all of this not end in shame."  Nevertheless, Messier chose to not mention the narrowly averted credit rating downgrade when he urged Vivendi's Board of Directors to approve the $10 billion acquisition of USA Networks' television and film business just two days later, and both he and Hannezo continued to sign off on Vivendi's false disclosures about, *inter alia,* the Company's cash and liquidity situation.

238.    Although Vivendi claimed in its March 5, 2002 earnings release that, based on the company's "excellent" operating results, it would pay a dividend of €1 per share, Vivendi had to borrow against credit facilities to pay the dividend, which cost more than €1.3 billion after French corporate taxes on dividends.  Similarly, despite stating in Vivendi's June 26, 2002 press release that the Company had "around €3.3 billion in unused credit lines to back up its commercial paper outstanding of nearly €1 billion" and that the cash situation had greatly improved since the beginning of the year, just one day before Vivendi issued that press release, at least €900 million of the €3.3 billion in Vivendi's credit lines had expired, and Vivendi's cash situation had in fact worsened as a

result of a demand made weeks earlier by Cegetel's minority shareholders for the repayment of a current account pursuant to which Cegetel made its excess cash available to Vivendi.

239.    The magnitude of the impact of Defendants' fraud also strongly evidences Defendants' intentional or reckless conduct.  The revelation of Vivendi's precarious liquidity situation—including a €19 billion debt burden—caused it to teeter on the edge of bankruptcy, dried up its credit lines, caused its credit ratings to crater, triggered its credit facility covenants' ratings thresholds, and led its lenders to refuse to extend to Vivendi desperately needed fresh credit.  Vivendi itself admitted that it faced having to reduce its debt by billions of euros in order to achieve an acceptable capital structure.  This cash and liquidity crisis did not happen overnight.  Rather, it was the direct result of Defendants' deliberate, steady collision course driven by their insatiable appetite for more acquisitions and the associated prestige, power and money that come with being (or appearing to be) the world's leading media and entertainment company.  The extent of the crushing debt load, that Vivendi only first started to publicly acknowledge in July 2002, directly contradicted the financial picture that Defendants presented to the securities markets during the Core Period.

240.    Defendants' scienter is further evidenced by the fact that, commencing immediately on the heels of the disclosure that the Company's continued viability was at risk absent a "fire sale" of assets, new management rapidly downsized the Company, sold off major assets and restructured it.  Those actions demonstrate the extent of the bloat, waste and excess caused by Defendants' burning desire for a global empire that they built by misleading investors about Vivendi's financial condition.

241.    In the arbitration proceedings brought by Messier to enforce the terms of his termination agreement with Vivendi, Vivendi itself stated that Messier caused Vivendi's near collapse.  In addition, as reported by the Associated Press on December 12, 2002, Hannezo admitted that "2001 was marked by a series of errors, including underestimating the debt problem."  Further, Vivendi's new CEO also admitted at a French parliamentary hearing in September 2002 that had

Messier remained CEO of Vivendi beyond July 3, 2002, Vivendi invariably would have gone bankrupt "within 10 days."

242.    Messier and Hannezo had the motive and opportunity to commit fraud because they had the means and the likely prospect of obtaining concrete benefits from their fraudulent conduct. Messier wanted Vivendi to be a worldwide empire and Vivendi was on an unrelenting quest to maintain and expand its business enterprises.  Vivendi spent more than $75 billion overall in pursuit of Messier's ambition to create the world's No. 1 entertainment company through rapid acquisitions of companies in the United States and abroad, using Vivendi's securities as consideration. Defendants achieved that objective by artificially maintaining the value of Vivendi's ordinary shares and ADSs and by propping up their price through the dissemination of the materially false and misleading statements described in detail above.  In addition, Vivendi's ability to maintain positive credit ratings and thereby to obtain additional financing for further acquisitions depended on Defendants' fraudulent scheme.  Vivendi's global reach could not have been achieved without Defendants' fraudulent inflation of the Company's share prices.

243.    Defendants were further motivated to boost Vivendi's share price because Messier made a huge bet that Vivendi shares would rise by selling put options to banks in late 2000 and 2001. The options committed Vivendi to buy back tens of millions of its shares at fixed prices in the future. On October 31, 2002, *The Wall Street Journal* discussed Messier's stock buy-backs and sales of put options:

> Mr. Messier had a special incentive to boost Vivendi's share price with the buybacks: He had made a massive bet on the company's behalf that Vivendi shares would rise by selling "put options" to banks in late 2000.  The options committed Vivendi to buy back tens of millions of its shares at fixed prices in the future.  If Vivendi's share price were to fall, the company could lose as much as $1.4 billion on the options.  Even with the buy backs, the share price fell in the end.  So far, the put options have cost Vivendi $900 million.

97

244.    Messier had an even greater motive for falsifying the appearance of Vivendi's finances from which he derived concrete benefit: his bonus was pegged to Vivendi's achieving specific earnings targets.  Messier's compensation included a base salary, plus lucrative bonuses based on earnings results, stock options and other perks such as a personal assistant, security guards and the use of a $17 million Park Avenue penthouse at a below-market rate.  As reported in Vivendi's Form 20-F for 2001, Messier received 835,000 stock options and earned $4.8 million in compensation that year.  Of that amount, more than $3 million—two-and-a-half times his salary—comprised his bonus, which he received because Vivendi's EBITDA had increased that year by more than 30%.  Had Vivendi's earnings increased by more than 35%, Messier would have received three times his base salary as a bonus.  Hannezo likewise received lucrative compensation and remuneration that was dependent upon the Company's achievement of certain financial targets.  As *The Economist* reported on June 8, 2002, "[t]he company even bases its bonus scheme for top management on ebitda."  By manipulating the Company's accounting to create the illusion that those targets had been achieved, Messier and Hannezo created an entitlement to bonuses they would not have received if the Company's financial results had been accurately reported.

245.    As CEO, Messier was the public voice of Vivendi and was therefore in a position to communicate, as he did during conference calls and in press releases and other public documents, false and misleading statements concerning the Company's financial condition, its compliance with GAAP and the veracity of its financials.  Messier signed or authorized all of the Company's SEC filings, Annual Reports and press releases during the Core Period.  Indeed, Messier was an intensely hands-on manager, as he expressed at a Goldman Sachs conference in London on December 6, 2000: "We are an Old World conglomerate that has grown by five times.  You don't do that without concentrating on margins day by day.  At the same time we have reshaped the group and managed it on a day-to-day basis."

246. Hannezo signed certain of the Company's SEC filings and Annual Reports as alleged herein. Further, Hannezo oversaw the Company's accounting and financial reporting, was responsible for creating and approving accounting policies and procedures, and was directly involved in the preparation of the Company's financial statements. Thus, Messier and Hannezo had the ability to control the Company's accounting as well as the content of its financial statements and disclosures. Both had the motive and the opportunity to commit fraud, and took it.

247. Vivendi had an obvious opportunity to commit fraud, because it published and controlled the content of its own financial statements and other public statements, and because it controlled its own accounting and financial reporting functions, by which the fraud was perpetrated.

248. Messier's and Hannezo's scienter is further evidenced by their insider trading during the Core Period. According to an article in *The Wall Street Journal* dated January 24, 2003, Messier and Hannezo (and other senior executives of Vivendi that were part of Messier's "dream team") exercised options and sold stock days before an abrupt, huge share placement in the first weeks of 2002 by Vivendi that Messier had arranged to raise desperately needed cash. That transaction sent Vivendi's ordinary share and ADS price precipitously downward. Specifically, as reported by *The Wall Street Journal,* on or about December 28, 2001, just days after writing the "death seat" memorandum and before the stock sale transaction, Hannezo exercised stock options that earned him a profit of €1.3 million ($1.4 million). An April 11, 2003 article in *The Wall Street Journal* reported that Vivendi acknowledged that Messier also sold 152,000 shares on December 21, 2001 and 106,669 shares on December 27, 2001. In addition, Agnes Touraine, head of Vivendi Universal Publishing, and Catherine Gros, chief of Vivendi's communications department, also exercised stock options at or around the same time. Shortly thereafter, on or about January 7, 2002, Vivendi unexpectedly sold 55 million shares of treasury stock in a €3.3 billion deal. Given their top positions at the Company, Messier and Hannezo and these other executives knew or were in a position to know about that

transaction. The market reaction to the sale caused the Company's share price to tumble, but not before Messier, Hannezo had the chance to exercise stock options at a profit. It was not until April 2003 when Messier admitted for the first time that in late 2001 he had sold a huge number of Vivendi shares, worth at least €15 million.

249.    Finally, criminal, civil and regulatory authorities in both the United States and France, including the SEC, the Department of Justice, public prosecutors in Paris, and the COB, that investigated or instituted proceedings against Defendants all focused on the same question: whether Vivendi and Messier, Hannezo and other Vivendi executives misled investors with false and inflated assessments of the Company's financial health and position. The SEC found as a result of its investigation that Vivendi, Messier and Hannezo violated Section 10(b) of the Exchange Act and other provisions of the federal securities laws. The COB found that Vivendi's financial disclosures had material irregularities and fined Vivendi and Messier €1 million each for issuing misleading financial disclosures between 2000 and 2002.

## VIII.    PRESUMPTION OF RELIANCE

250.    In connection with their claim asserted under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine because the securities purchased and acquired by Plaintiffs traded in an open and efficient market.

251.    The Company's ordinary shares are listed and trade on the Paris Bourse and its ADSs were listed and traded on the NYSE during the Core Period.

252.    Both the Paris Bourse and the NYSE are open and developed markets for Vivendi's securities.

253.    As a regulated issuer, Vivendi filed periodic reports publicly with the SEC and the COB (now AMF).

254.    In addition, Vivendi issued press releases that were carried by national and international newswire services and were publicly available and entered the public marketplace.

255.    There were a large number of traders and trading volume for Vivendi securities during the Core Period.

256.    The Company was followed by analysts employed by major securities firms who wrote reports that entered the public marketplace.

257.    The stock price responded rapidly to Company disclosures.

258.    As a result of the foregoing, the market for Vivendi securities promptly digested current information from all publicly available sources and reflected such information in the price of Vivendi securities.

259.    Under these circumstances, all purchasers of Vivendi's ordinary shares and/or ADSs during the Core Period, including Plaintiffs, suffered similar injury through their purchases of Vivendi's securities at artificially inflated prices, and a presumption of reliance applies.

260.    As alleged herein, Defendants made material misrepresentations or failed to disclose material facts. These misrepresentations and omissions would tend to induce a reasonable investor to misjudge the value of Vivendi securities. Plaintiffs purchased or acquired Vivendi securities between the time that Defendants misrepresented or omitted material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

## IX.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

261.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded herein. The allegedly false statements all relate to historical facts or existing conditions and were not identified as forward-looking statements. To the extent any of the false statements alleged herein were forward-looking statements, they were not accompanied by meaningful cautionary statements identifying important

101

factors that could cause actual results to differ materially from the forward-looking statement. To the extent that the statutory safe harbor would otherwise apply to any statement pleaded herein, Defendants are liable for those materially false forward-looking statements because at the time each of those statements was made, the speaker knew that the statement was false.

## X.    LOSS CAUSATION

262.    The material misrepresentations and omissions alleged herein directly or proximately caused the damages sustained by Plaintiffs. As alleged herein, Defendants made or caused to be made a series of materially false or misleading statements during the Core Period concerning Vivendi's business, prospects, operations and financial condition. These misrepresentations and omissions had the purpose and effect of creating in the market an unrealistically positive assessment of Vivendi and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated. Defendants' material misstatements during the Core Period resulted in Plaintiffs' purchasing or acquiring Vivendi securities at artificially inflated prices. But for Defendants' misstatements and misconduct, Plaintiffs would not have purchased Vivendi securities, or would not have purchased them at the artificially inflated prices at which they traded during the Core Period. As the truth about Vivendi's actual business, prospects, operations and financial condition was revealed, the artificial inflation caused by Defendants' material misstatements was removed from the price of Vivendi's securities, causing damages to Plaintiffs.

263.    Vivendi's stock price began to drop starting on May 3, 2002 when, citing concerns about the Company's debt load, Moody's lowered the Company's long-term debt rating to just one notch above "junk" status. Despite Defendants' attempt to reassure the market that Moody's was wrong, on May 3, 2002, in response to Moody's rating downgrade, Vivendi ADSs declined $1.60, from a close of $30.67 on May 2, 2002 to a close of $29.07 on May 3, 2002. Vivendi ordinary shares suffered similar declines, falling from €33.77 on May 2, 2002 to €31.52 on May 3, 2002.

264.    On June 21, 2002, the market learned of a quick private sale of Vivendi Environment ("VE") shares to Deutsche Bank, and understood that the shares would be repurchased.  The sale was in advance of a previously announced sale of VE stock.    The market understood this transaction to be a signal of a liquidity problem, in that the Company could not wait for a market sale, but had to raise cash quickly through an immediate repurchase deal with one buyer.  On that day, Vivendi's ADS price fell from the prior closing price of $25.32 to $23.21 at close, a decline of 8.3%, or 6.8% net of market and industry.  Vivendi's ordinary share price fell from the prior closing price of €26.70 to €24.45 at close, a decline of 8.4%, or 7.6% net of market and industry.    These information releases constituted a partial disclosure of Vivendi Universal's true liquidity condition, and were material to investors.

265.    On June 24, 2002, Vivendi announced the pending sale of a 15.6% stake in VE.   The market again interpreted the sudden announcement as a sign of needing a quick infusion of cash and therefore of weakened liquidity.  In addition, market rumors that same day that News Corp. would back out of a previously announced deal with Vivendi were based on the same concerns as the sale of the VE stake, that is that the Company's rush to sell assets to restore liquidity placed it in the vulnerable position of making "fire sales" to raise cash in the short term from less pressured parties.  That day, the price of Vivendi's ADS fell from the prior closing price of $23.21 to $19.80 at close, a decline of 14.7%, or 14.7% net of market and industry and the price of a Vivendi Universal ordinary share fell from the prior closing price of €24.45 to €18.75 at close, a decline of 23.3%, or 18.8% net of market and industry.  These information releases constituted the flow of partial disclosures of Vivendi Universal's true liquidity condition, and were material to investors.

266.    On July 2, 2002, Vivendi's debt was downgraded for a second time.  This announcement caused Vivendi's ADSs to fall nearly 21%, from a closing price on July 1, 2002 of $22.45 to a closing price on July 2, 2002 of $17.76.  The Company's ordinary shares fell more than

103

25%, from a closing price on July 1, 2002 of €23.90 to a closing price on July 2, 2002 of €17.80. The Company's ordinary shares plunged so fast that the Paris Bourse temporarily suspended trading in those shares.

267.    The following day, Vivendi finally disclosed to the public that the Company was facing a "short-term liquidity issue" and ousted Messier. Vivendi disclosed that it would be required to repay creditors €1.8 billion by the end of July 2002 and that €3.8 billion in credit lines were up for renegotiation. Further, credit analysts estimated that Vivendi could face a cash shortfall of €2.7 billion by the end of 2002—an amount they feared could expand to €5.5 billion by the middle of 2003 if the Company failed to secure new multi-billion euro lines of credit quickly. These announcements caused the Company's ADSs and ordinary shares to fall even further, dropping nearly another 12% from its July 2, 2002 close of $17.76 to a July 3, 2002 closing price of $15.66 and nearly another 22% from its July 2, 2002 close of €17.80 to a July 3, 2002 close of €13.90, respectively. In total, the Company's ADSs and ordinary shares fell 30% and 41.8%, respectively, in the two days following the second credit rating downgrade.

268.    On July 10, 2002, *The Wall Street Journal* reported that the COB had raided Vivendi's Paris headquarters as part of a formal investigation into the Company's financial disclosures going back to 2001. Notably, the French investigation had been opened to look into alleged "publication of false balance sheets for the tax years closing December 31, 2001 and December 31, 2002" and the publication of false and misleading information concerning the Company's financial outlook for those years.

269.    On July 15, 2002, Agence France-Presse reported that Vivendi had created a shell company and share agreement in order to control Elektrim in cooperation with Société Générale. One interviewer questioned the legality of Vivendi's actions, but Vivendi denied any wrongdoing.

That day, Vivendi's ordinary share price fell from the prior closing price of €17.15 to €15.00 at close, a decline of 12.5%, or 8.0% net of market and industry. The information releases that day constituted a partial disclosure of Vivendi Universal's true liquidity condition, and were material to investors in ordinary shares.

270.    On August 14, 2002, Vivendi announced that it had suffered a €12 billion net loss for the first half of 2002 and that it would take a further €11 billion goodwill write-down for depreciated assets. Following this announcement, Standard & Poor's dropped Vivendi's debt to junk status. Vivendi's ADSs and ordinary shares tanked, dropping 23.9% (from $15.33 to $11.66) and 25.2% (from €15.90 to €11.89) respectively, in a single day.

271.    Between July 2, 2002 and August 14, 2002, Vivendi lost an astonishing €6.4 billion in market capitalization.

272.    In sum, Messier's $75 billion-plus acquisition spree caused investors in Vivendi ADSs to suffer an 85% decline from their Core Period high of $75.50, and investors in its ordinary shares to suffer an 83.9% decline from their Core Period high of €86.50.

## XI.    <u>TOLLING OF THE STATUTE OF LIMITATIONS</u>

273.    Plaintiffs did not know, and could not reasonably have been on inquiry notice before, at the earliest, July 2, 2002 that Vivendi's financial statements and Defendants' other public statements regarding the Company's financial condition were materially false and misleading. On that date, Vivendi's debt was downgraded, spurring near-panic selling in Paris. This massive sell-off caused Vivendi's ordinary share prices to plummet 25% to a new 15-year low of €17.80. Following his July 3, 2002 ouster from the Company, Defendant Messier continued to deny all wrongdoing and maintained instead that the Company's financial results were all "true, genuine, and complete." Moreover, even after being on inquiry notice, Plaintiffs did not know and reasonably could not have known that Defendants had committed fraud until after Plaintiffs conducted a further investigation.

274. Despite Messier's attempts to reassure the market, on August 14, 2002, Vivendi finally was forced to reveal its precarious financial condition, announcing that it suffered a massive $12 billion loss in the first half of 2002 and that it would have to sell $10 billion in assets to reduce its debt. Jean-René Fourtou, who succeeded Messier, admitted that "[w]e are facing a liquidity problem."

275. Prior to, at the earliest, July 18, 2002, the statutes of limitations on Plaintiffs' claims were tolled by Defendants' active and continuing concealment of their fraud. The tolling of the statutes of limitations on Plaintiffs' claims continued on or after July 18, 2002, owing to the filing of a securities class action complaint on that date which is now pending as the Securities Class Action. Plaintiffs were members of the putative class in the Securities Class Action which asserts claims against Vivendi, Messier and Hannezo pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, and Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 thereunder. Those claims arise out of the same facts and circumstances as the claims asserted herein.

276. By Memorandum Opinion and Order entered March 26, 2007, subsequently corrected by a Revised Memorandum Opinion and Order entered May 24, 2007, this Court ruled on the plaintiffs' motion for class certification in the Securities Class Action. *In re Vivendi Universal, S.A. Sec. Litig.,* 242 F.R.D. 76 (S.D.N.Y. 2007) (Holwell, J.). The Court certified a class of all persons from the United States, France, England, and the Netherlands who purchased or otherwise acquired Vivendi ordinary shares or ADSs between October 30, 2000 and August 14, 2002. On April 6, 2007, Plaintiff Pioneer Investments Austria GmbH ("PIA") (then known as Capital Invest, die Kapitalanlagegesellschaft der Bank Austria Creditanstalt Gruppe GmbH), an Austrian investor, filed a petition with the United States Court of Appeals for the Second Circuit pursuant to Rule 23(f) of the Federal Rules of Civil Procedure, seeking leave to appeal from the Memorandum Opinion and Order. On April 9, 2007, Vivendi filed a Rule 23(f) petition with the Court of Appeals seeking leave to appeal

from the Memorandum Opinion and Order.  By Order filed on May 8, 2007, the Court of Appeals

denied both PIA's and Vivendi's petitions.  On August 8, 2007, Vivendi filed a petition for writ of

certiorari with the Supreme Court of the United States, seeking review of the Memorandum Opinion

and Order.  On October 9, 2007, the Supreme Court denied the petition for certiorari.  *Vivendi, S.A.*

*v. Gerard,* No. 07-154, 2007 WL 2273641 (U.S. Oct. 9, 2007).  Accordingly, the statutes of limitations

on Plaintiffs' claims were tolled between July 18, 2002 and at least October 9, 2007.

277.    All of Plaintiffs' claims have been brought within the applicable statutes of limitations,

after giving effect to tolling and the relation-back doctrine.

## XII.    CLAIMS FOR RELIEF

### COUNT  I
### Violations of Section 11 of the Securities Act of 1933
### (Asserted Against All Defendants)

278.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth

herein, except allegations that Defendants made the untrue statements of material facts and omissions

intentionally or recklessly.   For purposes of this claim, Plaintiffs assert only strict liability and

negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

279.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k,

against all Defendants.

280.    Vivendi issued ordinary shares pursuant to the Registration Statement contained

within the Form F-4 for the Merger, and is the registrant for those shares.  All purchases of Vivendi

ordinary shares are pursuant or traceable to the Registration Statement.

281.    The Registration Statement contained untrue statements of material fact including, but

not limited to, the financial statements of Vivendi and other statements regarding Vivendi's business

operation and financial results.  In addition, the Registration Statement omitted to state material facts

required to be stated therein or necessary to make the statements therein not misleading, including the

Company's true cash and liquidity position existing at the time the Registration Statement was issued and the violations of GAAP described herein. The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement.

282.    Vivendi issued stock pursuant to the Registration Statement, which Defendants Messier and Hannezo signed. Accordingly, Defendants are strictly liable for the untrue statements of material fact and omissions to state material facts therein.

283.    In connection with the Merger, and pursuant or traceable to the Registration Statement, Plaintiffs acquired Vivendi ordinary shares. Plaintiffs suffered damages in connection with these acquisitions of Vivendi securities.

284.    Defendants owed Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement, to ensure that the statements were true and that there was no omission to state a material fact required to be stated therein in order to make the statements contained therein not misleading.

285.    Defendants did not make a reasonable investigation of the statements contained in the Registration Statement, and did not possess reasonable grounds to believe that the Registration Statement did not contain any untrue statements of material fact or omit to state any material facts required to be stated therein or necessary to make the statements, in light of the circumstances under which they were made, not misleading.

286.    Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untrue statements of material fact or omissions of material fact in the Registration Statement when they purchased or acquired Vivendi's ordinary shares.

287.    As a result of the foregoing, Defendants are liable to Plaintiffs for violations of Section 11 of the Securities Act.

<u>COUNT II</u>
**Violations of Section 12(a)(2) of the Securities Act of 1933**
**(Asserted Against All Defendants)**

288.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein, except allegations that Defendants made the untrue statements of material facts and omissions intentionally or recklessly.    For purposes of this claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

289.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2),  against all Defendants.

290.    Defendants offered to sell, and did sell, in a public offering, Vivendi's ordinary shares by means of the Prospectus contained with the Form F-4 Registration Statement for the Merger.  The Prospectus contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements contained therein, in light of the circumstances under which they were made, not misleading.  The untrue statements of material fact in the Prospectus included, but were not limited to, the financial statements of Vivendi and other statements concerning Vivendi's business operation and financial results.  In addition, the Prospectus omitted to state material facts necessary in order to make the statements contained therein not misleading, including the Company's true cash and liquidity position existing at the time of the Merger.  The facts misstated and omitted would have been material to a reasonable person reviewing the Prospectus.

291.    Defendants owed the purchasers of Vivendi shares, including Plaintiffs, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus, to ensure that the statements were true and that there was no omission to state a material fact required to be stated therein in order to make the statements contained therein, in light of the circumstances under which they were made, not misleading.

109

292.    Defendants did not make a reasonable investigation of the statements contained in the Prospectus, and did not possess reasonable grounds to believe that the Prospectus did not contain any untrue statements of material fact or omit to state any material facts required to be stated therein or necessary to make the statements, in light of the circumstances under which they were made, not misleading.

293.    Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untrue statements of material fact or omissions of material fact in the Prospectus at the time they purchased or acquired Vivendi's ordinary shares.

294.    As a result of the foregoing, Defendants are liable to Plaintiffs for violations of Section 12(a)(2) of the Securities Act.

295.    Plaintiffs hereby tender their shares of Vivendi securities to Defendants and seek rescission of their purchases to the extent they continue to own such securities.

## COUNT III
### Violations of Section 15 of the Securities Act of 1933
### (Asserted Against Defendants Messier and Hannezo)

296.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein, except allegations that Defendants made the untrue statements of material facts and omissions intentionally or recklessly.    For purposes of this claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

297.    This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77*o*, against Defendants Messier and Hannezo.

298.    As alleged herein, Vivendi violated Section 11 of the Securities Act with respect to the Merger by issuing a Registration Statement that included untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the

statements therein not misleading.  The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement.

299.    As alleged herein, Vivendi violated Section 12(a)(2) of the Securities Act by soliciting Plaintiffs' purchases of Vivendi ordinary shares by means of the Prospectus, which included untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.  Vivendi failed to exercise reasonable care regarding the accuracy and completeness of the Prospectus.  The facts misstated and omitted would have been material to a reasonable person reviewing the Prospectus.

300.    Defendants Messier and Hannezo were control persons of Vivendi when the Registration Statement was filed and became effective and when the Prospectus was disseminated due to (among other reasons alleged herein) their respective positions as Chief Executive Officer and Chairman and Chief Financial Officer of Vivendi; their direct involvement in the Company's day-to-day operations, including its financial reporting and accounting functions; and their signatures on and participation in the preparation and/or dissemination of the Registration Statement and Prospectus. Because of their control and authority over Vivendi, Messier and Hannezo were able to, and did, control the contents of the Registration Statement and Prospectus.

301.    By virtue of the foregoing, Messier and Hannezo both had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Vivendi, including the content of its financial statements and of the Registration Statement and Prospectus.

302.    Messier and Hannezo acted negligently and without reasonable care regarding the accuracy of the information contained in the Registration Statement and Prospectus and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

**COUNT IV**
**Violations of Section 10(b) of the Securities Exchange**
**Act of 1934 and Rule 10b-5 Promulgated Thereunder**
**(Asserted Against All Defendants)**

303.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.  This Count is asserted against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

304.    During the Core Period, Defendants made and disseminated numerous false and misleading statements that were directly attributable to them.  Defendants were provided with or had unlimited access to copies of the Company's financial statements, internal reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to, but did not, prevent the issuance of the statements or cause the statements to be corrected.

305.    As described above, Defendants carried out a fraudulent scheme and course of conduct that was intended to and, throughout the Core Period, did: (i) deceive Plaintiffs as well as the investing public; (ii) artificially inflate and maintain the market prices of Vivendi securities; and (iii) cause Plaintiffs to purchase Vivendi securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein, which operated as a fraud and deceit upon Plaintiffs as purchasers of Vivendi securities.

306.    As alleged above, Defendants acted with scienter in that they knew, or were reckless in not knowing, that Vivendi's press releases, public statements reported in news articles, investor conferences and analyst reports, Annual Reports, Forms 20-F, Forms 6-K, Registration Statement and other documents filed with the SEC or COB during the Core Period, as well as Defendants' own public statements set forth herein, were materially false and misleading as alleged in detail above; knew that such statements or documents would be issued or disseminated to the investing public,

including Plaintiffs; and knowingly or recklessly participated in a fraudulent scheme and course of conduct or business as primary violators of the federal securities laws.

307.    As a direct and proximate result of the Defendants' dissemination of materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of Vivendi ordinary shares and ADSs purchased during the Core Period were artificially inflated.  In ignorance of this artificial inflation, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, Plaintiffs purchased or otherwise acquired Vivendi ordinary shares and ADSs during the Core Period at artificially high prices.

308.    Had Plaintiffs known the truth concerning the misrepresented and omitted facts described above, they either would not have purchased or otherwise acquired their Vivendi securities, or they would have done so only at substantially lower prices.

309.    Plaintiffs were substantially damaged as a result of their purchases and acquisitions of Vivendi securities at artificially inflated prices and the subsequent decline in the price of those securities when the fraud was disclosed.

310.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

### COUNT  V
### Violations of Section 20(a) of the Securities Exchange Act of 1934
### (Asserted Against Defendants Messier and Hannezo)

311.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.  This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against Defendants Messier and Hannezo.

312.    Messier and Hannezo, by reason of their executive positions, their direct involvement in the day-to-day operations of Vivendi, including its financial reporting and accounting functions;

113

their signatures on and participation in the preparation and dissemination of Vivendi's false financial statement; their false and misleading press releases and other public statements; and their direction of Vivendi's employees to engage in fraudulent accounting practices that caused the Company's financial statements to be false and misleading, were each controlling persons within the meaning of Section 20(a) of the Exchange Act. As such, Messier and Hannezo had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.

313.    As set forth above, Vivendi participated in a fraudulent scheme and course of conduct or business, and issued false and misleading statements as a primary violator of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. By virtue of their positions as controlling persons of Vivendi and their culpable participation in the Company's fraud, Defendants Messier and Hannezo are liable pursuant to Section 20(a) of the Exchange Act to the same extent as Vivendi for its primary violations of Sections 10(b) and Rule 10b-5.

314.    As a direct and proximate result of Vivendi's primary violations of the Exchange Act, for which Defendants Messier and Hannezo are liable pursuant to Section 20(a), Plaintiffs suffered substantial damages in connection with their purchases of Vivendi securities during the Core Period.

## XIII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Declaring and determining that Defendants violated the Securities Act and Exchange Act by reason of the acts and omissions alleged herein;

B.    Awarding Plaintiffs compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial, together with prejudgment interest thereon;

114

C.    Awarding Plaintiffs the right to rescind their Vivendi securities to the extent Plaintiffs continue to hold such securities;

D.    Awarding Plaintiffs the costs and expenses incurred in this action, including reasonable attorney's fees and fees for Plaintiffs' experts; and

E.    Granting Plaintiffs such other and further relief as the Court may deem just and proper.

## XIV.  JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

Dated:  July 8, 2009

BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP

By _____

John A. Kehoe (JK-4589)
Stuart L. Berman
Benjamin J. Hinerfeld
John J. Gross
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: 610-667-7706
Facsimile: 610-667-7056

115

## CERTIFICATE OF SERVICE

I, John A. Kehoe, hereby certify that on July 8, 2009, I caused the foregoing Amended

Complaint to be served via electronic mail upon the following counsel:

| | |
|---|---|
| Paul C. Saunders, Esq. **CRAVATH SWAINE & MOORE LLP** Worldwide Plaza 825 Eighth Avenue New York NY 10019 | Michael Malone, Esq. **KING & SPALDING LLP** 1185 Avenue of the Americas New York, NY 10036 |
| Martin L. Perschetz, Esq. **SCHULTE ROTH & ZABEL LLP** 919 Third Avenue New York, NY 10022 | Penny Reid, Esq. **WEIL, GOTSHAL & MANGES LLP** 767 Fifth Avenue New York, NY 10153 |
| Brian C. Kerr, Esq. **BROWN WOODS GEORGE LLP** 49 West 37th Street New York, NY 10018 | Arthur N. Abbey, Esq. **ABBEY SPANIER RODD & ABRAMS LLP** 212 East 39th Street New York, NY 10016 |
| Vincent R. Cappucci, Esq. **ENTWISTLE & CAPPUCCI LLP** 280 Park Avenue New York, NY 10017 | Michael Spencer, Esq. **MILBERG LLP** One Pennsylvania Plaza New York, NY 10119 |

I declare under penalty of perjury that the foregoing is true and correct.

John A. Kehoe
**BARROWAY TOPAZ KESSLER MELTZER & CHECK, LLP**
280 King of Prussia Rd
Radnor, PA 19087

116