# Exhibit 2

1473

9AUSVIV4          Hannezo - direct

1  A. I don't remember on which one I did make comments.  There
2  were several of them and I cannot remember on which I did make
3  comments and which I did not make.
4  Q. Okay.
5      Let me ask you to look at Exhibit 724.
6      MR. GLUCK:  I offer it.
7      MR. SWARTZ:  Hearsay as to Mr. Hannezo.
8      MR. MALONE:  Partial hearsay as to Mr. Messier.
9      THE COURT:  Admitted -- Mr. Quinn?
10     MR. QUINN:  No objection, your Honor.
11     THE COURT:  Admitted with limiting instruction.
12     (Plaintiff's Exhibit 724 received in evidence)
13 Q. If you look at the first -- this is I guess a televised
14 conference and if you look at the first page it appears that
15 you were there.
16 A. Yes.
17 Q. Did you regularly go to these kinds of conferences, press
18 conferences?
19 A. No, there were two different things.  There were the press
20 conferences where I was not there or I may have been, like
21 everybody else, in attendance, but I was not on the dais.  So
22 these were the press conferences, and there were the
23 conferences for financial analysts or investors where usually I
24 was somewhere there and did answer that question.
25     This is another thing, which is not a press conference

1474

9AUSVIV4          Hannezo - direct

1  but which is a conference call, and this conference call is
2  being recorded, and, like here, someone is writing what is
3  being said.  This conference call is probably one since I am
4  there, it's probably one which is designed for the analysts.
5  Q. And at these conference calls, you speak from time to time?
6  A. Yes.
7  Q. So, for example, on this one, if you turn to the page
8  marked 20, that shows you speaking.
9  A. The page marked 20?
10 Q. Yes.
11 A. Yes.
12 Q. And I see you speaking again -- 23, 24, 25 -- so at these
13 conferences you might do a fair amount of speaking depending on
14 what the subject is, right?
15 A. A fair amount of speaking -- I don't necessarily do a huge
16 amount of speaking since Jean-Marie knows quite well the
17 financials, but he would either ask me to answer a question
18 where he would not have the figure in mind or he would ask me
19 to do a part of the presentation.
20 Q. The major speaker was Mr. Messier.
21 A. Yes.
22 Q. Let me ask you to look at Exhibit 282, and I offer it.
23     MR. MALONE:  You say Exhibit 282?
24     MR. GLUCK:  Yes.
25     MR. MALONE:  Limiting instruction as to Mr. Messier.

1475

9AUSVIV4          Hannezo - direct

1      MR. SWARTZ:  Limiting instruction as to Mr. Hannezo as
2  well.
3      THE COURT:  Admitted with a limiting instruction.
4      MR. QUINN:  No objection.
5      (Plaintiff's Exhibit 282 received in evidence)
6  Q. Again, this looks like a draft press release --
7  A. Yes.
8  Q. -- for your review.  We can't tell what draft it is.
9      How would you go about giving your comments and input
10 on these?
11 A. Me and my team and the auditors would make their comments
12 in writing or if there were small comments, or the accounting
13 department would rewrite certain paragraphs if there were
14 entire paragraphs to modify.  This was basically a document
15 which was consolidated by the communication division with the
16 pieces which are coming from the accounting department, pieces
17 regarding the results, the global results, which pieces which
18 were coming from the divisions regarding the operational
19 reserves of the division and how the divisions were doing.
20 This was all consolidated by the communication division in one
21 single press release, and this press release was reviewed by
22 everybody and everybody eventually could make comments.
23 Jean-Marie Messier was handwriting a lot of it and the new
24 version, so you would see typically version 1, 2, 3, up to 10
25 or 15, would have been circulated between the operating

1476

9AUSVIV4          Hannezo - direct

1  divisions, the finance division, the communication division,
2  and the auditors.
3  Q. Now, let's go on to 112.
4      MR. GLUCK:  And I offer it.
5      MR. SWARTZ:  Limiting instruction as to Mr. Hannezo.
6      MR. QUINN:  No objection, your Honor, for Vivendi.
7      MR. MALONE:  Partial limiting instruction as to Mr.
8  Messier.
9      THE COURT:  Admitted with limiting instruction.
10     (Plaintiff's Exhibit 112 received in evidence)
11 Q. This one doesn't have a sort of covering e-mail on it, but
12 it has your initials with yellow -- it has your initials.
13     You got it, didn't you?
14 A. Yes.
15 Q. Probably from us.
16 A. I got it.  I don't know, but I am initialed on the
17 document.
18 Q. Okay.
19     And there is a lot of handwriting on it.
20 A. Yes.
21 Q. And is any of it yours?
22 A. Let me look.
23     No.
24 Q. No.
25     Do you recognize anybody's handwriting on this?

1477

9AUSVIV4          Hannezo - direct

1   A. It's essentially Jean-Marie Messier's handwriting and this
2   is typically something where he would make his comments but
3   particularly the CEO comments, how the CEO is viewing the
4   results, and there are changes there.  So Jean-Marie Messier is
5   making his modification and comments as to adopt the previous
6   version of the press release which was submitted to him and
7   this is already version draft number 10, so after Jean-Marie's
8   comments it's going to be draft 11, et cetera.
9   Q. It's not very likely, is it, that you would have gotten it
10  with handwriting on it?
11  A. That I would?
12  Q. That you would have gotten this particular one with the
13  handwriting on it, or would you?  In other words, Mr. Messier
14  has made a lot of handwritten comments.
15  A. Yes, he made a lot of handwritten comments and sometimes
16  several times.
17  Q. Yes.  And when you get the document is it with his
18  handwritten comments or either before or after they are
19  factored in?
20       MR. PERSCHETZ:  Objection to the form of the question.
21       THE COURT:  As a general practice.
22       You may answer.
23       MR. PERSCHETZ:  Thank you.
24  A. Here it is the arrow is urgent, send to Catherine Gros, and
25  she is the head of the communication division, so he is sending

1478

9AUSVIV4          Hannezo - direct

1   the new version with his comments to Catherine Gros.  I don't
2   know how far we are from the publication there, and then it
3   says plus back, GMM, GL, John Luczycki, and GTM, which is
4   himself.  So that says I want to copy back for these three
5   people.
6   Q. Okay.
7        Let me ask you to turn now to Exhibit 58.
8   A. 50?
9   Q. 58.
10  A. Yes.
11       MR. GLUCK:  I offer it first.
12       MR. SWARTZ:  Hearsay as to Mr. Hannezo.
13       MR. QUINN:  No objection.
14       MR. MALONE:  Hearsay as to Mr. Messier.
15       THE COURT:  Admitted with limiting instruction.
16       (Plaintiff's Exhibit 58 received in evidence)
17  Q. This looks like it's sending along -- well, it says
18  enclosed is a document from GH re I guess quarter 2, first half
19  revenue EBITDA figures, do you see that?
20  A. This is a document from GH regarding --
21  Q. That is you, right?
22  A. That is me, regarding Q2 H1 revenue EBITDA figures, yes.
23  Q. And it looks like, but let me ask you, this is something
24  that is being used to put together some sort of public release.
25  A. This is a document which is circulating to prepare slides

1479

9AUSVIV4          Hannezo - direct

1   and usually the slides are for the analyst presentation.  So
2   there would be a support, which, by the way, it's fine, which
3   is the document on which the management during the analyst
4   presentation or Jean-Marie during the press conference is going
5   to go through and this is this document which here seems to be
6   prepared.
7   Q. Okay.
8        Now, let's just go through it because there seems to
9   be a variety of things in there.
10       The first page, is this something coming from you or
11  that you were handed from someone that just went out?
12  A. It says that, yes, so we are on -- that must be the
13  American way of writing this.  So we must be on July 12 and I
14  sent to a bunch of people, Ariane de Lamaze, investor
15  relations, chief accounting officer, Mr. Luczycki, Mr. Messier,
16  Mr. Bronfman, Mr. Licoys, the COO of the company, Mr. Lescure,
17  the COO of Canal Plus, Donne Olivier, the COO of Canal Plus,
18  and Yves Touraine, the CEO of VUP, Mr. Morris, the CEO of
19  Universal Music, Mr. Henny, the CFO, Mr. Sutman, the CFO of
20  Universal Studio, Ms. Gros, the head of the communication
21  division.
22  Q. Okay.
23       But these are your comments?
24  A. They are handwritten comments from me.
25  Q. We are going to get to the handwritten in a minute.  First

1480

9AUSVIV4          Hannezo - direct

1   let's do the top.
2        These are coming from you, right?
3   A. Yes.
4   Q. Now we have handwritten comments and these are also coming
5   from you, right?
6   A. Yes.
7   Q. And one of the things you say in terms of I think we have
8   to focus the argument on --
9   A. H1 results --
10  Q. H1?
11  A. H1.
12  Q. I see a 2.  Is that just a mistake?
13  A. No, H1 results --
14  Q. That is a 1?
15  A. Yes, with 50 percent EBITDA growth compared with 30 percent
16  target.
17  Q. Now we have some typed comments and some handwritten
18  comments and now we have slides with handwriting on them.
19  A. Yes.
20  Q. And can you identify any of the handwriting?
21  A. It seems that this is my handwriting.
22  Q. There are a bunch of pages and I just want to see if it's
23  all your handwriting.
24  A. Yes.
25  Q. Keep on turning the pages with me because if there is

**THIS PAGE INTENTIONALLY LEFT BLANK**

3465

9BHSVIV3

1      THE COURT:  Please take your seats.

2      Mr. Spencer.

3      MR. SPENCER:  Plaintiffs call Dr. Blaine Nye to the

4  stand.

5  BLAINE NYE,

6      called as a witness by the Plaintiffs,

7      having been duly sworn, testified as follows:

8  DIRECT EXAMINATION

9  BY MR. SPENCER:

10  Q.  Good morning, Dr. Nye.

11      Could you tell us please why you are here today?

12  A.  You asked me.  I am here to offer testimony on causation

13  and damages in this litigation.

14  Q.  Causation and damages?

15  A.  Correct.

16  Q.  And what is your field of expertise?

17  A.  I am a financial economist.  That is sort of an economist

18  of investment over time as opposed to a contemporary economist.

19  Goods and services -- never mind.  About investment.

20  Q.  Before I ask you about your background, Dr. Nye, I would

21  just like to orient a little bit the scope of your testimony in

22  the case.

23      Can we put up the first slide, please.

24      So it sets forth here, Dr. Nye, three questions that

25  you expect to answer in your testimony, is that right?

3466

1  A.  Yes.

2  Q.  What is the first one?

3  A.  Did the alleged misconduct by defendants cause share

4  purchasers during the class period to suffer damages?

5  Q.  I would like to just ask you on a preliminary basis about a

6  few of those terms.  It says alleged misconduct.  What does

7  that mean?

8  A.  Well, I have been asked to assume that Vivendi engaged in a

9  number of activities as part of a scheme to conceal their

10  liquidity risk and I have also been asked to assume it

11  progressively worsened from the beginning of the class period

12  culminating in a liquidity crisis in 2002.  The only trouble

13  was the market wasn't aware of this increasing liquidity risk

14  and, as a result, the share price became inflated.  And by

15  "inflated" I mean the difference between what the share price

16  actually was and what it would have dropped to had the market

17  known at that point what the true liquidity risk was.  So that

18  is what inflation in the share price is.  It's the difference

19  between what Vivendi knew and what the investors in the market

20  knew.  That part of the price would go away if the market had

21  the full story is the inflation.

22  Q.  You said, Dr. Nye, that you have been asked to assume that

23  the defendants engaged in alleged misconduct, is that right?

24      MR. PERSCHETZ:  That mischaracterizes the testimony,

25  and I object.

3467

1      THE COURT:  Objection overruled.

2  Q.  You can answer.

3  A.  What was the question again?

4  Q.  The question was you said in your testimony that you have

5  been asked to assume alleged misconduct by the defendants,

6  correct?

7      MR. PERSCHETZ:  Your Honor, may we approach?

8      THE COURT:  No.  Let's get the testimony done, please.

9  Q.  Do you recall saying that, Dr. Nye?

10  A.  Yes.

11  Q.  When you say that you have been asked to assume it, are you

12  going to give testimony to this jury that from your analysis

13  the defendants in fact engaged in any misconduct?

14  A.  I don't believe so, no.

15  Q.  Am I correct that your testimony is going to start with an

16  assumption that the defendants engaged in misconduct of the

17  type that has been alleged in this trial and from that point

18  you are going to inform the jury as to your view whether any

19  damages were caused by that misconduct?

20  A.  That is correct.

21  Q.  What kind of evidence are you going to give the jury about

22  your opinion as to the kind of damage that was caused based on

23  that assumption?

24  A.  The kind of analysis I have done to do that is basically

25  perform an event study, and by an event study I mean a study of

3468

1  evaluating or reviewing information.  In other words, what

2  information was in the marketplace, what came out at different

3  times, and then observing and analyzing share price movements

4  in response to the release of that information, so that

5  basically if information comes out, negative information comes

6  out and the share price drops, it can be economically inferred

7  then that that information caused the share price drop and that

8  the value of that information, the value of the information

9  released on that day, is the value of the stock price drop,

10  right.

11  Q.  I see your second question up here is how did you measure

12  the amount of inflation per share?

13  A.  Yes.

14  Q.  What is the reference to inflation per share?  What does

15  that mean?

16  A.  Well, that is what I started talking about a minute ago.

17  It's the difference between what the share price should be

18  given all the information, including that in possession of the

19  company, of Vivendi, and what the share price is and what the

20  market knows about the true liquidity risk of the company and

21  the difference is -- in other words, the share price has a

22  certain value.  The company knows some information, that

23  negative information, that would cause share price to

24  decline if it came out.  The public just knows what it knows

25  publicly.

3469

1    So that the difference between what the share price
2    sits at now without the public knowing or without the market
3    fully knowing what the company does and what it drops to then,
4    that price, the difference between those two is the inflation.
5    That is the difference between the price of what the market did
6    not know about the liquidity risk.
7    Q.  Dr. Nye, I would like you now not it tell us the number
8    that you are going to give as a result of your opinions until
9    we go through your background, but I just want to clarify some
10   of the basic concepts here.
11       The third question that you said you were going to
12   answer is what is the amount of inflation per share for
13   purchases on each day of the class period?
14       Is that right?
15   A.  That is right.  That is measured on each day of the class
16   period, how much the share price as quoted differs from what it
17   should be had the market full information about the liquidity
18   risk of Vivendi.
19   Q.  I think when most people think about lawsuits like this
20   they expect that the verdict at the end, if there is a finding
21   for the plaintiffs, is one big number in this case for all of
22   the members of the class.  Are you going to give an opinion
23   that includes such an aggregate number that would cover damages
24   for the entire class?
25   A.  I am not going to give an aggregate number, no, just per

3470

1    share damages from which an individual plaintiff or damaged
2    plaintiff can calculate his damages, provide a basis for those
3    damages.
4    Q.  So it will be a number that would be inflation per share
5    and you are going to give the numbers for every day of the
6    class period, is that right?
7    A.  That is right.  Economically I am going to analyze how much
8    inflation there was in the share price on the day, on each day,
9    then based on when people bought it, they will buy it when they
10   buy it, when it's inflated they pay too much.  If the inflation
11   wasn't there they would pay a lower price.  When they buy they
12   pay too much and if they sell it for too much that is also a
13   consideration, so you need the buying and the selling days to
14   calculate the extent to which there were damages.  How much did
15   they pay and how much did they get back when they sold it, that
16   kind of thing.
17   Q.  When we get to this point in your testimony near the end,
18   have you prepared a written chart that sets forth your opinion
19   as to what the inflation per share was on each day of the class
20   period?
21   A.  Yes, I have.
22   Q.  And are you prepared to offer that to the jury as your
23   opinion that they can use in their deliberations?
24   A.  I am.
25   Q.  I am going to ask you, Dr. Nye, now something about your

3471

1    background.
2        You can take that down.
3        Would you just please tell us a little bit about where
4    you grew up and your education please.
5    A.  Well, I grew up all over.  My dad was a Marine and so we
6    moved all over the country, but I went -- the college I
7    attended was Stanford University and I got a BS in physics
8    there in 1968.  Then for the next 9 years I played professional
9    football.  It was a pretty easy job back in those days.  We had
10   6 months on, 6 months off, so there was plenty of spare time
11   and I went to school in the off season and in 1970 I received a
12   Masters degree in physics from the University of Washington in
13   Seattle.  At that point I decided I better switch over to
14   business because the job market in physics wasn't that good at
15   that point.
16   Q.  Let's stop there for a second.
17       Could you tell us very briefly about your football
18   career please?
19   A.  I am safe to say I am world class at knocking people down.
20   It's something you don't use a lot.
21   Q.  Who did you play for and just tell us a little bit about
22   that.
23   A.  I played for the Dallas Cowboys from '68 to '76.  I guess I
24   played in three Super Bowls, two Pro Bowls.  We won one of the
25   Super Bowls, lost the other two by a total of 7 points, which

3472

1    is sort of heart-rending, but I have gotten over it a little.
2    In fact, I played with one of the judge's teammates in
3    Amityville, I understand, John Niland.
4    Q.  You said that in 1970 you received your Masters in physics,
5    is that right?
6    A.  Yes, in physics.
7    Q.  So you were going to be a scientist but you decided to
8    change fields, is that right?
9    A.  I was going to be a physics faculty, a professor, and the
10   job market at that point after -- in the '60s there was a big
11   push and kind of got overpopulated so there wasn't a lot of
12   room in 1970 for graduating Ph.Ds in physics that I decided I
13   better make a living and switch back to business school, so
14   over the next four off seasons I went to Stanford Graduate
15   School of Business and got an MBA.  I worked for a couple of
16   years as a banker with Wells Fargo Bank in the off seasons and
17   then finally retired in early 1977 and enter entered the Ph.D.
18   program.
19   Q.  When you say you retired, you retired from professional
20   football?
21   A.  Right.
22   Q.  And then you entered the Ph.D. program.
23   A.  Stanford Business School.  They were style hiring in the
24   faculty business school so I figured I would do that.  They
25   quit after that, but whatever.

**THIS PAGE INTENTIONALLY LEFT BLANK**

3485

9BH8VIV4          Nye - direct

1   A. It's a percentage change in the share price.  So if
2   Vivendi's share price on -- one day it's $100 and the next day
3   it goes to $102, the percentage change in that is 2 percent.
4   Q. So the return is an economist's way of saying change in the
5   share price?
6   A. It's a percentage change.  The reason everything is done in
7   percentages is two identical companies, one half as big as the
8   other one, and otherwise operating in exactly the same way,
9   would have the same return, but not the same profit.  In other
10  words, one's profit would be the half of other one's, but it
11  would still be the same return percentage wise.  So things are
12  done in percentages so the different size firms that are
13  identical otherwise, the performance is comparable.
14  Q. In giving your opinion about how the defendants' alleged
15  misconduct caused damages to the class members, why did you
16  remove market and industry effects in your analysis?
17  A. Vivendi certainly can't be held responsible, or certainly
18  nothing Vivendi alone did can be -- we can't take a market
19  effect -- something that the market or the industry caused in
20  the share price move, Vivendi certainly is not responsible for
21  that.  If there is a market change that causes a Vivendi
22  return, that return due to the market clearly isn't Vivendi's
23  fault, the market caused that return.  Similarly with an
24  industry to the extent there are industry effects.
25  Q. Could you give us just a couple of examples of those kind

3486

9BH8VIV4          Nye - direct

1   of market or industry effects that you removed in your
2   analysis?
3   A. I suppose something like overall interest rate levels,
4   something like that, that would affect the whole market, if
5   just interest rates were different.
6   Q. How about 9/11, did that occur during the class period?
7   A. There are shocks like 9/11 that is a huge shock to the
8   whole economy.  So that would cause things to flutter and
9   increase volatility for a brief period.
10  Q. Did you remove that from your analysis in the way that you
11  have described?
12  A. We didn't really have anything -- a return -- on the day
13  9/11, we didn't have a return we were interested in terms of
14  revealing the liquidity risk.  In fact, actually, we left
15  it -- no, in the sense of what you're asking, no, we didn't.
16  We didn't have anything on that day.
17  Q. So what is the next step that you took?
18  A. It would be analyze days of company-specific declines,
19  identify dates and amounts of share price declines due to
20  alleged fraud by defendants.  This appears to be a step whereby
21  we would --
22  Q. Your day-by-day analysis?  Are you having trouble seeing
23  the screen?
24  A. No, I'm not.  I am wondering -- no offense, would it be
25  better doing slide 7 to talk about statistical analysis?

3487

9BH8VIV4          Nye - direct

1   Q. We were going to do that a little bit more fully.  We are
2   just doing the summary now.
3       With respect to this third step, did you look at the
4   information in the market on a day-by-day basis?
5   A. Looked at the information in the market on a day-by-day
6   basis to see what was happening.
7   Q. What was the purpose of doing that?
8   A. To ascertain if the information in any way implied the
9   market had found out about increased liquidity risk.
10  Q. And the result of that was the nine days that you talked
11  about?
12  A. The result of that was the nine days.  On those days things
13  came out that indicated to the market that Vivendi had more
14  liquidity risk than they had reported, or that the market was
15  aware of it at that point.  So those were nine key days.
16  Q. Step 4 says, "Identify date and amount of maximum per share
17  inflation," which you have concluded was on December 13, 2001?
18  A. That's correct.
19  Q. The date of maximum inflation.  And the amount on that date
20  was 22.52 euros per share, is that correct?
21  A. That's correct.
22  Q. Step 5, what was that?
23  A. It was to derive the per share inflation for days of the
24  class period before the maximum, that is, before December 13.
25  Q. Then the sixth step and last step, you have prepare a chart

3488

9BH8VIV4          Nye - direct

1   showing each day's per share inflation due to alleged fraud
2   committed by defendants.
3       Is that the daily chart we discussed previously?
4   A. That's correct.
5   Q. So we are going to proceed now to discuss things in
6   accordance with these steps, and if you can just keep slide 5
7   handy so we can come back occasionally and see where we are.
8       Let's go to the next slide.  I think you probably
9   described this already, Dr. Nye, but could you just summarize
10  step one, please?
11  A. Yes.  This is the kind of information we look at.  Vivendi
12  regulatory filings, Vivendi conference call transcripts, rating
13  agency reports and communications, securities analysts'
14  reports, market commentary, information leaks, news reports,
15  other statements of Vivendi management, and Vivendi press
16  releases, just are some of the broad headings.
17  Q. Are these categories of public information that was known
18  about Vivendi and surrounding events?
19  A. Yes.  If we can find it, I guess the public knew about it.
20  Q. I guess my point is, in doing this work, you did not use or
21  have access to the inside documents at the company that we have
22  looked at in the trial with respect to this part of your work,
23  is that right?
24  A. That's correct.
25  Q. You wrote, "Market efficiently incorporates all known news

**THIS PAGE INTENTIONALLY LEFT BLANK**

3537

9BH8VIV6          Nye - direct

1   A.  Vivendi's head of corporate communications testified the

2   repo was done to improve Vivendi's liquidity.

3   "A.  The repo was intended to provide Vivendi with liquidity,

4   the journalists understood that there was a liquidity issue,

5   and what I was saying was the lack of the transparency of the

6   operation gave the impression that there was a problem with

7   liquidity.

8   "Q.  But you knew that the point of the VE repo was to improve

9   Vivendi's liquidity, correct?

10  "A.  Well, it was obvious."

11  Q.  Do you recall what market commentary said about this

12  situation?

13  A.  Market commentary stated that the repo showed Vivendi had a

14  significant need for cash.  Vivendi shares fell heavily on the

15  Paris stock market Friday on news of the lease -- that's this

16  repo thing -- where they sold the shares to Deutsche Bank with

17  a repurchase agreement -- that's what they mean by the lease

18  here -- as investors and analysts were concerned that a company

19  that had a significant need for cash in the short-term,

20  contrary to its end May statement when it said it had an open

21  3.5 billion euro credit line, considered as comfortable.

22  Q.  Do you recall whether Vivendi reportedly made further

23  public commentary on this situation?

24  A.  We are still on June 21.  Vivendi continued to insist that

25  the repo had been done to reduce credit costs and was not

3538

9BH8VIV6          Nye - direct

1   connected to the sale of shares announced on the June 17th.

2   Vivendi Universal said Friday that the lease of a 12.7 percent

3   stake in 63 percent owned utilities unit Vivendi Environment

4   (VE) to Deutsche Bank is aimed at reducing the cost of credit

5   lines.  Vivendi said the short-term lease deal isn't connected

6   to a plan unveiled June 18 to sell a 15 percent chunk of

7   utility company.  So they continued to deny that those shares

8   were the same.

9   Q.  Now, do you recall that further events happened in the

10  market on the next day, next trading day June 24, concerning

11  the same subject?

12  A.  Right.  On June 24, Vivendi announced the immediate sale of

13  the VE shares, including the shares for the repo by Deutsche

14  Bank.

15  Q.  So this was another announcement by Vivendi on the same

16  general subject?

17  A.  Yes, exactly.

18  Q.  You have included this as your fourth day for calculating

19  per share inflation.  So, again, would you please describe what

20  happened to Vivendi's share price that day?

21  A.  Vivendi announced the immediate sale of VE shares.  This is

22  that sale they talked about on the 17th when they were going to

23  sell them when market conditions were right.

24  Q.  What happened to the price that day in the market?

25  A.  It dropped 23-plus percent, it looks like, in euros.  It

3539

9BH8VIV6          Nye - direct

1   was 5 euros 70.  Net of market and industry effects, the

2   decline due to the alleged fraud was 4 euros 62 cents.

3   Q.  On June 24, do you recall what Vivendi next said to the

4   public about this situation?

5   A.  Vivendi acknowledged that this offer was mostly made up of

6   shares from the June 12th repo.

7       So they weren't the same shares that they had already

8   sold before on the 17th.

9       Vivendi Environment and Vivendi Universal announced

10  today the second offering of up to 15.5 percent of Vivendi

11  Environment's share capital by Deutsche Bank, as selling

12  shareholder.  Through this offering Deutsche Bank will have

13  sold the shares held in the context of a financing granted to

14  Vivendi Universal on June 12, 2002, through a pension livree, a

15  French repurchase agreement.  Those are all the same thing as

16  lease, repo, basically the parking of the shares by Deutsche

17  Bank to get the money immediately on the 12th.

18  Q.  Were there further press commentaries about how the market

19  and investors were reacting to this information?

20  A.  Yes, indeed.

21       Investors grow concerned about possible cash crunch at

22  Vivendi.

23  Q.  What did the Wall Street Journal report?

24  A.  Vivendi made good on its pledge to sell a 15.6 percent

25  stake in its water utility, Vivendi Environment SA, but

3540

9BH8VIV6          Nye - direct

1   investors were spooked by the timing of the sale, which came

2   just 12 days after Vivendi leased a 12.7 percent stake in

3   Vivendi Environment to Deutsche Bank in a so-called repurchase

4   swap.

5       The successive transactions gave the impression that

6   Vivendi needed a quick cash injection and couldn't wait two

7   weeks for the Vivendi Environment share placement, said Michael

8   Nathanson, an analyst with Sanford C. Bernstein & Co.  It looks

9   like they were in a big rush to get that cash he said.

10  Q.  Do you recall whether the Financial Times had commentary

11  about the same thing?

12  A.  I do, indeed.

13       Vivendi's rush to sell VE shares frightened investors.

14       Investors took fright at its decision to rush through

15  the sale of a stake in its water unit, Vivendi Environment.

16  Q.  That was a long series of events so let's take a look at a

17  summary of that.

18       We are talking about two things here, the Deutsche

19  Bank repo and the VE share sale.

20       This summary says that on May 30, Vivendi had

21  announced that its cash situation was comfortable, even

22  assuming an extremely pessimistic market.

23  A.  Right.

24  Q.  June 12, Vivendi sold 12.7 percent of its VE shares to

25  Deutsche Bank in an undisclosed repo transaction that day.

3541

9BH8VIV6          Nye - direct

1      Five days later, Vivendi publicly announced that it
2  would sell 15-plus percent of VE shares when market conditions
3  are appropriate.
4      On June 20, news media and analysts reported the repo
5  deal after the close of the market in Paris.
6      Laura Martin got calls from investors who were
7  concerned thinking that the repo was done because the company
8  needed cash.
9      Whereas, Vivendi responded that it denied that the
10  repo indicated a cash problem and it denied any connection
11  between repo and the shares to be sold.
12      MR. SLIFKIN:  May I approach?
13      THE COURT:  Yes.
14      If you have an objection, I will sustain the
15  objection.
16      MR. SLIFKIN:  I have an objection.
17  Q. What happened on June 21, according to your summary, Dr.
18  Nye?
19  A. On June 20 -- the slide just left.
20      News media and analysts reported the repo deal after
21  the Paris market closed.  This is when Vivendi's Laura Martin
22  got calls from investors who were concerned that the repo was
23  done because we needed cash.
24      Vivendi reportedly denied the repo indicated a cash
25  problem and denied any connection between the repo and the

3542

9BH8VIV6          Nye - direct

1  shares to be sold when the market conditions are appropriate.
2  In other words, those shares that they said they were going to
3  sell on the 17th.
4      Then on June 21, Vivendi's share price fell.  Market
5  commentary concluded that Vivendi sold VE shares in the repo
6  due to a significant need for cash.  They sold them before they
7  even announced they were thinking about selling them.  They
8  sold them on the 12th before they announced they were thinking
9  about selling them on the 17th.
10      Then on June 21, Vivendi announced that Deutsche Bank
11  was selling 15.5 percent of VE shares.  In other words, that's
12  the batch announced on the 17th now.  Vivendi acknowledged that
13  these shares included the 12.7 percent of VE shares sold to
14  Deutsche Bank in the repo on June 12.
15      Press reports questioned why Vivendi could not wait
16  until market conditions are appropriate to sell VE shares, and
17  Vivendi's share price fell yet again to 4 euros 62 cents.
18  Q. So how much did you conclude that the Vivendi share price
19  decline on June 21st was due to materialization or disclosure
20  of the company's liquidity related risk?
21  A. 2 euros 1 cent.
22  Q. The same question with respect to June 24.  How much of the
23  share decline in Vivendi's price that day did you conclude was
24  attributable to materialization or disclosure of the liquidity
25  related risk?

3543

9BH8VIV6          Nye - direct

1  A. 4 euros 62 cents.
2  Q. Were there some other news events that occurred on June 24
3  that you also considered in doing your assessment on that day?
4  A. Yes, there were.
5  Q. Can we go to the next slide?
6  A. News reports stated that Vivendi was having trouble raising
7  cash by selling Telepiu, which is liquidity related.  One of
8  their goals was to sell assets and raise money to make sure
9  they had enough cash.
10      Financial Times article:  The fact that the Telepiu
11  sale is now less likely and that they have pushed through the
12  sale of Vivendi Environment without waiting for better
13  conditions as they said they would have raised questions of
14  whether the company's liquidity condition is worse than recent
15  filings suggest, said Mark Harrington, analyst at JP Morgan.
16      (Continued on next page)

3544

1  Q. Did you conclude that the news that day concerning Telepiu
2  was related to liquidity or liquidity risk in the company?
3      MR. SLIFKIN:  Objection, your Honor.
4  Can I approach on this?
5      THE COURT:  Excuse me?
6      MR. SLIFKIN:  May I approach on this?
7      THE COURT:  Yes.
8      (Continued on next page)

3545

1    (Side bar conference)

2    THE COURT:  Yes, Mr. Slifkin.

3    MR. SLIFKIN:  Both in that last question and in an

4  earlier question a few moments ago, Mr. Spencer deliberately

5  put the word risk, liquidity risk, in the question.  That is

6  precisely the word your Honor ordered stricken from the

7  headings, right?  It used to say liquidity before.  Your Honor

8  ordered the word risk to be removed from the heading like this.

9    THE COURT:  What is the pending question?

10    MR. SLIFKIN:  To what extent this liquidity or

11  liquidity risk related?

12    MR. SPENCER:  I will restate it without it.

13    THE COURT:  Thank you.

14    (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

3546

1    (In open court)

2    THE COURT:  Rephrase the question.

3    Q.  I will try the question again, Dr. Nye.

4    Did you conclude this news report concerning Telepiu

5  was related to liquidity at Vivendi?

6    A.  Yes, I did.

7    Q.  Did you also consider some news concerning British Telecom

8  and Cegetel on that day?

9    A.  Yes.

10    Q.  Next slide, please.

11    What did you see on the news on June 24 about that?

12    A.  That British Telecom continued to delay selling its part of

13  Cegetel to Vivendi.  We still want to sell the stake but we can

14  wait.  For the time being, the conditions for the sale are not

15  right, so we won't move, Pierre Danon, chief executive of BT

16  Retail and a group board member, told Reuters.  A newspaper

17  report, meanwhile, raised doubts over the recent sale of

18  Vivendi's Italian pay-TV arm Telepiu to Robert Murdoch, which

19  is designed to reduce Vivendi's debt by 1.2 billion Euros.

20  Dealers said that those signals shook confidence in survivors'

21  ability to manage cash flow despite reassurances from the

22  world's second largest media firm over its finances last week.

23  Basically these were two other ways Vivendi could raise cash.

24  One was to buy Cegetel and get control of the floor and the

25  other was to sell Telepiu and get cash from it.

3547

1    Both of those would have made the cash situations

2  better and both were put off to some extent here, which I

3  imagined fanned the flames of the market in thinking that

4  Vivendi needed cash and these two sources were out at least for

5  awhile.

6    Q.  Were those two news items related to liquidity in your

7  analysis?

8    A.  Yes.

9    Q.  The next day that you considered, if we go to slide 57, you

10  called it an offset day, June 26, 2002.

11    Could you describe what you meant by offset day?

12    A.  Well, this was a day where Vivendi's return went up based

13  on fraud-related information.

14    Q.  Let's look, first of all, at what happened to the market

15  price that day.

16    A.  Yes, both market and industry were down and Vivendi's total

17  increase was just under 8 percent or 1.56 Euro but the total

18  Vivendi specific return had offset both market and industry

19  returns so it actually winds up being bigger than the total

20  return, and that is 1.97 Euro.

21    Q.  So the Euro 97 was an amount that you offset against the

22  negative numbers that we have been looking at in deciding the

23  amount of inflation?

24    A.  Correct.

25    Q.  And what did you see and hear on that day?

3548

1    First of all, do you remember what happened the night

2  before?

3    A.  Yes, WorldCom --

4    Q.  What is the reference to WorldCom?

5    A.  The day after a major announcement of the WorldCom fraud

6  the market declined but Vivendi's price rose.  Cash situation

7  has -- and this is in the press release.  The cash situation

8  has greatly improved since the beginning of the year, owing to

9  its strong free cash flow combined with the execution of the

10  disposals program and potential bond issues, so they planned on

11  raising bonds the day after WorldCom.  Vivendi Universal is

12  confident in its capacity to meet its anticipated obligations

13  over the next 12 months.

14    Q.  Let's back up for a second.

15    The major announcement of the WorldCom fraud the night

16  before, could you just remind us what that was please?

17    A.  Could you repeat the question?

18    Q.  What was the WorldCom fraud and what announcement came out?

19    A.  I am not sure I know the details of the WorldCom fraud.

20    Q.  I am not asking for details.

21    What was WorldCom?

22    A.  Basically they collapsed based on fraud.

23    Q.  Was it a big U.S. company?

24    A.  Yes, a giant U.S. company.

25    Q.  So on this day the market was down but Vivendi went up and

**THIS PAGE INTENTIONALLY LEFT BLANK**

3565

1    of 5.6 billion Euros.  Vivendi finance director Jacques
2    Espinasse told a conference called that the 5.6 billion Euro
3    figure, given in a press release by a credit ratings agency,
4    was approximately correct.
5    Q.  Do you recall seeing some reports about what Mr. Fourtou
6    had said that day in the conference call sponsored by Vivendi?
7    A.  Yes, he stated that Vivendi's debt was 10 billion Euros
8    over the normal level for a triple B rating.  That is an
9    investment grade, S&P's middle investment grade.
10   Q.  What is it reported he said on the conference call?
11   A.  He said, we have also evaluated what the normal debt of
12   Vivendi should be in order to regain a triple B rating.
13   Assuming that we cannot benefit from the cash flow of Cegetel,
14   this excess debt is around 10 billion Euros to date.
15   Q.  Do you recall that there was further commentary by Mr.
16   Fourtou on the conference call?
17   A.  Yes.  Vivendi had to sell 10 billion Euros of assets.
18       We are, to that purpose, committed to sell assets for
19   a minimum amount of 10 billion Euros in the 2 years to come, 5
20   billion Euros of which will be completed during the next 9
21   months.
22       So really rapid sales of a lot of worth of assets.
23   Q.  Do you remember whether Mr. Espinasse made any comments on
24   the conference call that you considered to be significant?
25   A.  Vivendi admitted that EBITDA could be misleading and stated

3566

1    that it would no longer report EBITDA.
2    Q.  What is Mr. Espinasse reported as having said?
3    A.  Vivendi Universal will report operating income and not
4    EBITDA.  EBITDA is far too easy to grow when the company is
5    being acquisitive.  More importantly, we believe that EBITDA
6    can be misleading when a large part of the operating income is
7    representive of minority interest or companies in which we do
8    not have an ownership position over 50 percent.
9    Q.  Do you recall whether S&P took action that day?
10   A.  S&P further downgraded Vivendi to junk.  French media giant
11   Vivendi Universal's rating could fall into the triple C
12   category if a credit line isn't put in place in the next month,
13   analysts at S&P's corporation said Wednesday.  The agency cut
14   Vivendi Universal's long-term rating to double B from triple B
15   minus and its senior unsecured debit rating from B plus to
16   triple B minus.  While previously S&P had said that the
17   company's liquidity position would be good through October now
18   a refinancing gap could arise earlier than anticipated.
19   Moreover, asset disposals could pose a risk.
20   Q.  Do you recall whether anything was reported about the
21   corporate strategy at Vivendi to address the problems?
22   A.  Yes, Vivendi offered no specific strategy to end its
23   liquidity problems.  He failed to tell analysts how he will
24   refinance 4.2 billion Euros of debt by March or to disclose
25   lower cash flow projections that had been given to credit

3567

1    rating companies before they downgraded Vivendi's debt.  The
2    analyst meeting was something of a fiasco, said Richard
3    Wiseman.  Either they didn't want to divulge certain
4    information or they just don't have a grip.  Either way it's a
5    negative for the shareholders.  I didn't think Fourtou provided
6    any clarity on the important points, said Chrystele Lucas at
7    Credit Mutual Finance.
8    Q.  Is your understanding that the he that is referred to at
9    the beginning of the quotation that you read is Mr. Fourtou?
10   A.  That is my understanding, correct.
11   Q.  Going back to the conference call, did Mr. Espinasse
12   reportedly say something about upcoming refinancing needs?
13   A.  Mr. Espinasse had not focused on a possible refinancing
14   need for 1.8 billion Euros in March 2003.
15       It has a question:
16   "Q.  I am thinking of the 2 percent convertible.  There is a
17   1.8 billion one that has got a put in March next year so that
18   would mean people could put that back in the company, can you
19   refinance it?
20   "A.  Yes, we haven't focused on that point at the moment so I
21   cannot answer your question."
22       So they have a lot to do and they haven't even thought
23   about this 1.8 billion.
24   Q.  Do you recall seeing commentary by securities analysts on
25   that day?

3568

1    A.  Securities analysts recognized Vivendi's critical liquidity
2    position.  We feel it is impossible to present a buy
3    recommendation on a stock which is capable of being declared
4    insolvent within two months and for which we have no clarity on
5    the prospective group structure and strategy.  We therefore
6    downgrade the stock.  Further downside cannot be ruled out
7    until the liquidity issues are addressed.  Multiple rating
8    downgrades from S&P and Moody's serve to confirm that VU's
9    liquidity position is now critical.
10   Q.  What analyst organization made that statement?
11   A.  It appears to be Deutsche Bank in an article of Vivendi
12   Universal, "A Race Against Time."
13   Q.  So let's look at your summary of what happened on August
14   14, 2002.
15       Would you give us your summary please.
16   A.  Well, it comes out Vivendi announces our debt is 10 billion
17   over the normal level for a triple B rating, which is what they
18   aspired to and cultivated all through 2001 before everything
19   started to come out or the true nature of their liquidity risk
20   started to come out.  So to get rid of that 10 billion they had
21   to sell 10 billion in assets.
22       Vivendi admitted EBITDA could be misleading and said
23   it would no longer report EBITDA.
24       They used that to overstate their earnings or they
25   used purchase accounting to benefit their earnings.

3569

1    S&P further downgraded Vivendi to junk.

2    Vivendi offered no specific strategy to end its

3    liquidity problems.  They didn't -- they had a lot of problems

4    and they didn't seem to know their way out of them on this day,

5    on August 14.

6    Espinasse had not focused on a possible refinancing

7    need for 1.8 billion in early 2003.

8    So all their problems, they hadn't even thought about

9    the 1.8 billion.

10    Securities analysts recognized Vivendi's critical

11    liquidity condition.  Vivendi's share price fell, and that is

12    the end of the class period.

13    Q.  Based on your analysis, Dr. Nye, did you conclude that the

14    events and commentary on August 14, 2002 pertained to Vivendi's

15    liquidity risk?

16    A.  Yes, indeed.

17    Q.  Did you conclude that 3.52 Euro drop in Vivendi's share

18    price on that day occurred as a result of materialization or

19    disclosure pertaining to the fraud alleged by plaintiffs

20    against the defendants in this litigation?

21    A.  Yes.

22    Q.  Now, that is the 9th and last day of the days that you

23    identified in order to determine the total amount of inflation

24    per share that you are giving an opinion about in this case, is

25    that right?

3570

1    A.  That is correct.

2    Q.  So in summary let's go back to one of the questions that we

3    looked at the very beginning of your testimony that you said

4    you were going to answer.

5    How did you measure the amount of inflation per share

6    at Vivendi?

7    And in brief terms what is your answer to that?

8    A.  As I said, inflation in the share is the difference between

9    the price, the actual share price, less the price to which that

10    share would fall if all information about their liquidity risk

11    were revealed to the market.  In other words, the market

12    doesn't know about the full liquidity risk.  When the market

13    finds that out the price will drop, and the difference between

14    the posted price and the price to which it drops is the overall

15    inflation.

16    On each one of these 9 days we found that the market

17    discovered or part of the liquidity risk, true liquidity risk,

18    materialized in the market on each of these 9 days.  When that

19    came out the share price dropped and thereby lowered the

20    inflation in the share price.  If you add all these up there

21    are 9 drops plus the one offset, and you get the maximum amount

22    of inflation that was in place on January 7th or the total

23    inflation that was in place on January 7th.

24    (Continued on next page)

25

3571

9BH8VIV8          Nye - direct

1    Q.  So let's look back at the graph and the chart just to see

2    how that works.

3    First of all, the graph on slide 90 again, this is

4    exactly the same as the one we saw previously?

5    A.  Right.

6    Q.  Shown there, are those the dates and the figures about

7    which you have testified, days one through nine, this

8    afternoon?

9    A.  Those are the ones -- those are the ones we just went

10    through, right.

11    Q.  Dr. Nye, if your analysis of inflation per share caused by

12    the defendants' alleged fraud here is based only on the nine

13    days represented by those arrows and figures, what happened

14    with respect to all of the rest of the descending red line

15    graph that you're not pointing to, what does that represent?

16    A.  Well, from an earlier graph, we had market and industry up

17    there, it was very apparent that the market and industry came

18    down a lot during this period and Vivendi went down with it.

19    So all of that drop is certainly not Vivendi's fault.

20    We've been or I've been very conservative -- and the

21    market has continued to drop after January 7 too.  And I have

22    been very conservative in using only statistically significant

23    returns, only the large returns that may reveal the fraud.

24    So those are the main factors.  There is also a

25    Vivendi drop that isn't captured by that, and that would be

3572

9BH8VIV8          Nye - direct

1    other Vivendi specific problems.

2    Q.  Other Vivendi specific problems apart from liquidity risk

3    related problems?

4    A.  Yeah.  At least in terms of the information that came out,

5    couldn't discern that they were liquidity related.

6    Q.  So you haven't counted drops attributable to those, is that

7    right?

8    A.  That's correct.  Just attributable to fraud.

9    Q.  You have not counted drops attributable to market-wide or

10    industry-wide declines?

11    A.  That's correct.  There is a very large drop there and

12    something like 20-plus euros is the amount that I estimated

13    with my knowledge is attributable to fraud.

14    MR. SLIFKIN:  Your Honor, I assume Dr. Nye meant

15    alleged fraud in his last answer?

16    THE COURT:  Yes.  That's what we are talking about.

17    Q.  Dr. Nye, could you now look at the next slide?

18    Is this a summary of the observations and the

19    testimony based on your observations that you have given this

20    afternoon with respect to the nine decline dates where price

21    changes were, according to your testimony, related to the

22    alleged fraud and one offset date?

23    A.  Yes.  I think we had one of these on earlier.  Anyway, yes.

24    The red numbers are the downs and the black number is the one

25    up, and the sum of all those numbers is 22 euros and 52 cents.

3573

9BH8VIV8          Nye - direct

1   Q. So just explain to us, please, what exactly does that 22

2   euros and 52 cents signify?

3   A. That's the maximum inflation attributable to the alleged

4   fraud, according to my analysis, economic analysis that I

5   performed in this case.  Those were the price drops due to the

6   release of company specific information relating to the alleged

7   fraud, the related liquidity risk of Vivendi, and as

8   information came out revealing to the market that liquidity

9   risk, the inflation came out of the stock and gradually lowered

10  the share price.

11       MR. SPENCER:  Could we bring back up the summary slide

12  from the very beginning?  I think it was 5, is that right?

13  Q. So looking back on the road map that we laid out at the

14  beginning, Dr. Nye, is it correct that we have done step 1, the

15  analysis of public information; step 2, the statistical

16  analysis to remove market and industry effects; and step 3, the

17  analysis of days of company specific declines that you

18  identified?

19  A. Yes.

20  Q. So now we are going to move on to steps 4, 5 and 6?

21  A. Right.

22  Q. Please tell us what the fourth step that you undertook in

23  your work was?

24  A. Step 4 was to determine the amount of maximum inflation per

25  share by simply adding up all the price changes caused by the

3574

9BH8VIV8          Nye - direct

1   alleged fraud.

2   Q. That's the result of what we have just seen?

3   A. That's the sheet we just looked at that adds up all the

4   downs and the one up, and that would be 22 euros and 52 cents.

5       Step 4(b) is to determine the date by which this

6   maximum inflation per share was reached.

7   Q. Let's talk about that step 4(b), the date by which you

8   determined maximum inflation had been reached.

9       Now, there is a fair amount of material on this slide,

10  Dr. Nye.  Could you please describe for us the economic

11  analysis that you did of the public statements made concerning

12  Vivendi and the evidence that you were asked to assume or that

13  you heard at trial concerning Vivendi, and how you determined

14  that the maximum inflation was reached at the company by

15  December 13, 2001?

16  A. OK.  First, it might be a good idea to simply say, on the

17  sheet with the nine downs and the one up, that's how the

18  inflation came out of the share.  That's down the mountain,

19  coming down the slope as the alleged fraud is revealed.

20  Q. After January 7, 2002?

21  A. January 7.  By August 14, the end of the class period, the

22  fraud is purged, there is no longer any inflation in the stock,

23  no more for the market to find out about that the company

24  knows.  So the company doesn't know anything the market doesn't

25  know, and so the inflation is out as of August 14.

3575

9BH8VIV8          Nye - direct

1   Q. So before January 7, 2002, that's the analysis that you're

2   describing now?

3   A. Now we are looking to the left going up the hill.  This is

4   based on my assumption that the -- Vivendi had a progressively

5   worsening financial risk in the beginning of the class period

6   culminating to a liquidity crisis in 2002.

7       So as it gradually increased in 2001, or from the

8   beginning of the class period, what was the date at which it

9   had increased to the maximum that rained on January 7, 2002,

10  before it started to come out?

11  Q. How did you perform that analysis?

12  A. In terms of finding the maximum inflation, this economic

13  analysis up here under 4(b), the basic ribs of it, basically,

14  the public statements were Vivendi's press release on December

15  13.  That after Vivendi Environment shares and the BSkyB

16  transaction for 1.5 billion, Vivendi would be able to cover any

17  needs arising from opportunities in the U.S. television and

18  distribution.  Basically, they were BBB rated at this point,

19  and they had just done their last major acquisition of USA

20  Networks and Echostar, the combination.

21       The second one is Vivendi press release on December

22  11.  This is part of the schedule Vivendi Universal and USA

23  Networks confirmed.

24       The third point, statements by Jean-Marie Messier at

25  an analyst investor conference, as reported by Reuters on

3576

9BH8VIV8          Nye - direct

1   December 7.  Vivendi still predicts 2001 revenue growth of 10

2   percent and EBITDA growth of 35 percent and is comfortable with

3   the pre-9/11 expectations for EBITDA in 2002.  So he is

4   standing on his forecast, on his projections, at that point

5   with a BBB rating.

6       So on the public side, the market seems to think

7   what -- the information they have is Vivendi is doing fine,

8   they are celebrating and looking forward to prosperity.

9       Now, what did the market not know?

10      The trial evidence from inside Vivendi:

11      Anne Brassens testified that the liquidity situation

12  became dangerous at the end of 2001.  So she said it was -- and

13  one of my assumptions is that she said it was serious

14  throughout 2001 and dangerous at the end of 2001.

15      Mr. Hannezo wrote a private letter on December 13,

16  2001 to rating agencies, pledging to sell treasury shares and

17  dispose of nonstrategic assets as part of Vivendi's effort to

18  retain a BBB rating after USA Networks and Echostar

19  acquisitions.  So inside there was some work to be done to hold

20  that BBB rating.

21      Finally, Hannezo to Messier on meetings with rating

22  agencies.  Downgrade narrowly avoided.  Mr. Hannezo

23  specifically emphasized something that from a personal point of

24  view I do not want to put up with a downgrade which would have

25  led to a liquidity crisis.

3577

9BH8VIV8          Nye - direct

1      So these kinds -- and then given the fact that, like I
2   said, all the major pieces were in place, they had that large
3   acquisition, USA Networks and Echostar, right about December
4   13, that was the date that I thought that the discrepancy
5   between what the market knew and what Vivendi knew was at its
6   widest, and indeed, as wide as it proved to be on January 7,
7   because at that point all the information came out between that
8   and August 14 and showed that there were 22 euros and 52 cents
9   per share inflation.
10      So that's the date, in my opinion, that the inflation
11   was at its max.
12   Q.  Did that maximum amount or rate continue to January 7?
13   A.  Right.
14   Q.  So then let's go on to step 5 of your analysis, Dr. Nye,
15   which is, from the maximum of December 13, 2001, with that
16   22.52 euro amount, and looking backward in time, as far as your
17   analysis was concerned, did you do an analysis to determine how
18   the inflation per share developed during the class period from
19   the beginning of the class period October 30, 2000 up until the
20   maximum date that you just described of December 13, 2001?
21   A.  Yes, I did.
22   Q.  So let's take a look at some slides and see how you did
23   that analysis.
24      Starting from the beginning of the class period, that
25   is that October 30, 2000 date, what was your economic analysis

3578

9BH8VIV8          Nye - direct

1   of the conditions then that you used to decide how inflation
2   related to the defendants' or caused by the defendants' alleged
3   fraud developed?
4   A.  There are four items to consider.
5      Early in the class period, liquidity issues posed
6   problems due to debt from acquisitions.  That's Ms. Brassens'
7   testimony.
8      Internal documents showed planning for use of purchase
9   accounting benefits, analysts will not have it easy to track.
10      So the indication was that the plan was to use
11   purchase accounting to benefit their --
12   MR. PERSCHETZ:  Objection.
13   THE COURT:  Counsel approach.
14   (Continued on next page)

3579

9BH8VIV8          Nye - direct

1   (At the side bar)
2   THE COURT:  Yes, Mr. Perschetz.
3   MR. PERSCHETZ:  My objection is to the continuation of
4   the testimony after he read this, and he now begins to say,
5   essentially, so what they were planning on doing is using
6   purchase accounting benefits.  I don't know what the rest of
7   the answer was going to be, but obviously I wanted to nip it in
8   the bud before it came.
9      It's not up to this witness to testify what Mr.
10   Hannezo was planning, and as a matter of fact, Mr. Hannezo has
11   described what he means by purchase accounting benefits, and he
12   said essentially it was a shorthand, that there really was no
13   such thing, that there was no benefit to EBITDA as a result of
14   purchase accounting.
15      We have objected to this.  Your Honor has approved it,
16   but now the witness is getting into what Mr. Hannezo was
17   planning, and I object.
18   MR. SAUNDERS:  Also, your Honor, I would add, there is
19   no other evidence in the record that's what Vivendi was
20   planning to do in September of 2000.
21   MR. SPENCER:  We think this evidence was extremely
22   eloquent.  Dr. Nye began to say indications were.  He is not
23   talking about Mr. Hannezo.  And as he said, this is his
24   economic analysis, it's not a legal analysis.  Despite the fact
25   that we completely disagree with Mr. Perschetz's view of what

3580

9BH8VIV8          Nye - direct

1   the case law does or does not permit experts to say about
2   characterizing other testimony, I don't think we are even
3   getting close to that yet.
4   MR. PERSCHETZ:  Could we read back the beginning of
5   his answer?
6   THE COURT:  Yes.
7   (Record read)
8   MR. PERSCHETZ:  The indication was that the plan.  It
9   is not up to this witness to testify what Mr. Hannezo's plan
10   was, especially in the face of Mr. Hannezo's testimony.
11   MR. ABBEY:  There's a bunch of documents that say that
12   that's what they are doing.
13   MR. PERSCHETZ:  That's your interpretation and that's
14   his interpretation.
15   THE COURT:  Let's move on to the next point.
16   MR. PERSCHETZ:  Thank you, your Honor.
17   (Continued on next page)

3581

9BH8VIV8          Nye - direct

1      (In open court)
2  BY MR. SPENCER:
3      Q.  Could you describe the analysis that is reflected in the
4  third bullet that you have there, please?
5      A.  Vivendi applied purchase accounting benefits starting with
6  fourth quarter of 2000.  In other words, right in the beginning
7  of the class period.
8      Q.  Please continue.
9      A.  They announced their objectives of 35 percent EBITDA growth
10  rate per year for 2000-2002.
11     Q.  Now, in general, Dr. Nye, why did those four factors and
12  anything else you have analyzed in connection with that lead
13  you to conclude in your economic analysis that inflation caused
14  by the alleged fraud by defendants began at the beginning of
15  the class period?
16     A.  These points indicated that they intended to use purchase
17  accounting to benefit their EBITDA.
18         I don't know if anybody said what EBITDA is.  EBITDA
19  is earnings before interest and taxes, depreciation and
20  amortization.  It's basically all the stuff that goes to the
21  shareholders, earnings before interest goes to the bondholders,
22  taxes goes to the government, the third investor and everybody.
23  It's that number before, typically, non-cash charges,
24  depreciation and amortization.  So it's meant to be a good
25  example of your cash income.

3582

9BH8VIV8          Nye - direct

1         As Mr. Fourtou pointed out in the end of -- it was
2  Espinasse, I believe.  On August 14, he said EBITDA is too hard
3  to -- it's too easy to manipulate when you're being
4  inquisitive.  So when you get -- when you're acquiring
5  companies -- and the accountants went through all of this so
6  it's not my bailiwick.  The point is it's easy to benefit this
7  number EBITDA that's meant to be representative of earnings or
8  cash in kind of thing.
9         So if you can benefit that with purchase accounting --
10  and that's part of your growth, this 35 percent EBITDA growth
11  was meant to be a big value hit.  An illustration of how big
12  that was is if -- basically, when you buy a share of stock,
13  you're buying -- you get a piece of paper and you get the
14  earnings from the company next year, and you get the earnings
15  the year after that, and you get the earnings for the year
16  after that, and you get the earnings on forever, big piles of
17  money, they represent the earnings of the company.  The present
18  value of that is the value of the share.  So if those earnings
19  grow 35 percent in the first year, every pile of money gets 35
20  percent more money on it, that's 35 percent growth in share
21  price.  And the second time it happens, the second year, that's
22  another 35 percent on top of that 35 percent.  That's almost
23  doubling the share price, that growth and all these piles of
24  money in the future.
25         If that increase in EBITDA is from operations, in

3583

9BH8VIV8          Nye - direct

1  other words, you're making that money now, and I am going to
2  make it next year and next year and next year, and my earnings
3  are all going to be higher by that amount.  If you do purchase
4  accounting, it's not year by year from operations, it's a one
5  time accounting adjustment.  So your earnings go up because you
6  have got this purchase accounting benefit, or adjustment, but
7  that won't repeat itself on these piles of money in the future.
8  It's just one time, bang.  And so to the extent that that's not
9  there really, just appears to be there, it leaves the share
10  price greatly inflated.
11         One more thing.  There is a tendency to think value of
12  the company is the buildings and the cars and what the company
13  owns, and it looks like that's the value.  And that is the
14  baseline for the value, because if in operating that company
15  those piles of money are bigger than the cost of all the
16  assets, then you keep the company open, you run the company.
17  If it makes you more money to sell the assets off, then you
18  close the company.  So the market value of those piles of
19  earnings is always bigger than the buildings and the stuff.
20         So this purchase accounting was a huge deal in the
21  value of the company, and it started from the beginning of the
22  class period, and I think -- what does it say -- analysts will
23  not have it easy to track.  This is one of my assumptions
24  that I was asked to make was that from the documents filed that
25  an analyst could not discern what the effect of purchase

3584

9BH8VIV8          Nye - direct

1  accounting was on the EBITDA.
2      Q.  So was that your economic analysis --
3      A.  I am still thinking.
4      Q.  Do you have more to your answer?
5      A.  Now you ruined it.  Go ahead.
6      Q.  Was that a description of the kind of economic analysis
7  that you did, Dr. Nye, to reach the conclusion that it was
8  appropriate for you to find that inflation began at the start
9  of the class period?
10     A.  Right.  They were doing that right from the beginning.
11         And so then it was a matter of how fast their
12  knowledge of what they were doing grew between then and
13  December 13.
14     Q.  Let's look at the next slide.  The top says, "Inflation
15  grows during class period until December 13, 2001."
16         Does that express your conclusion?
17     A.  Purchase accounting benefits accounted for increasing
18  amounts of EBITDA growth.  That's, again, my assumption and
19  based on Mr. Mintzer's testimony.
20         Liquidity problems grew serious, then dangerous.
21         These two things indicate that the problem was serious
22  or substantial very early and not just at the end when it was
23  dangerous.  It was serious early.
24         S&P always on the razor's edge on August 16.
25         Vivendi narrowly escaped downgrade in connection with

3585

9BH8VIV8          Nye - direct

1  USA Networks -- that's at the end, December 13.
2       There is an indication that this inflation was in
3  place from the beginning of the class period and was probably
4  relatively significant pretty early, but to be very
5  conservative I just simply said, well, they were aware of the
6  purchase accounting and they were aware of the purchase
7  accounting benefits.  So I simply used Mr. Mintzer's, the
8  proportion of purchase accounting quarter by quarter that he
9  said was used through the fourth quarter of '01 and used just
10  simply the pro rata proportion.  You sort of start small.  I
11  can't remember the numbers exactly.  But it's 2 percent of 662
12  million euros in the first quarter, and then it goes to 12 in
13  the second quarter, 21 percent in the third -- second quarter.
14  So it kind of goes up fast at the end.  In other words, early
15  in the year '01 it was pretty low.  But, basically, that was a
16  conservative way of allocating the inflation from the beginning
17  of the class period when it existed, but still making sure that
18  it was less than actual inflation to be conservative.
19       Then when I finally got to the end of the announcement
20  date after the end of the second quarter, we were only about a
21  month and a half from December 13.  So then at that point I
22  just pro rata'd it up to where my opinion was on the 13th.
23  Q. Let's recap what you just said, Dr. Nye.
24       In this slide and the preceding one, you said that you
25  concluded that inflation started at the beginning of the class

3586

9BH8VIV8          Nye - direct

1  period and grew during the class period until December 13,
2  2001.  Did you just describe then how you quantified that
3  growth?
4  A. Yes, I did.  I was trying to.
5  Q. Let's look at the chart that describes the results of the
6  analysis that you just gave us.
7       Would you explain what this chart shows?
8  A. This is just from the beginning of the class period to the
9  reporting date on the first quarter.  That's the date they
10  reported the results of the first quarter which ended March 31.
11       I just used a very simple 2 percent of the maximum
12  inflation up to 4.23.  That's 2 percent of the maximum
13  inflation 22.52, less the inflation that went in on July 23rd,
14  that other up.  It's 2 percent of something like 19 dollars or
15  20 dollars.  It's 30 euro cents per share on every day from the
16  beginning of the class period through the reporting date of the
17  first quarter '01.
18       Then it goes up to, I believe it's 12 percent of max
19  inflation.  Again, that's net of the July 23rd up.  So it's 12
20  percent of like $20.  That's $2.41.
21  Q. 2 euros 41 cents?
22  A. Two euros and 41 cents through 7/20.
23       Then on July 23rd we get the double hit.  Inflation
24  comes in from that offset up from the announcement of higher
25  earnings using purchase accounting.  It goes up to 4.80 and

3587

9BH8VIV8          Nye - direct

1  stays there until the announcement date of the beginning of the
2  class -- the announcement date of the third quarter.
3       Then, finally, at that point, we have got to get to
4  22.52 before December 13.  So it's about 50 days there.  At
5  that point, I just pro rata'd it from that point up.  So I have
6  got this kind of bow to the left.  It's serious all throughout
7  2001 liquidity problems.  It's certainly more than 30 cents
8  euros a share.
9       You didn't understand it either.
10  Q. Let me just ask, generally, Dr. Nye, you concluded, as you
11  described earlier, that the maximum inflation per share was
12  22.52, and that's the number we see at the lower right-hand
13  corner of the chart, right?
14  A. Right.
15  Q. So the result of the other analysis that you did was, in
16  effect, to reduce the amounts of inflation per share from dates
17  from October 30, 2000, all the way up to December 13, 2001?
18       MR. SLIFKIN:  Objection.  Leading.
19  A. Yes.
20       THE COURT:  Overruled.
21  Q. Just describe again, what does that rate of increase look
22  like?  What kind of curve is it?
23  A. I would use the word exponential, but that wouldn't do any
24  good for the lawyers.
25       It's just very slight.  As you can see, it stays 30

3588

9BH8VIV8          Nye - direct

1  cents for five, six, seven months, just flat.
2       There is actually a chart that shows what it looks
3  like.
4  Q. Let's go to then and see if that helps.
5       Go to the next slide.  I am sure this is very
6  illuminating.
7       Can you describe that, Dr. Nye, please?
8  A. The blue line is the Vivendi actual price.  That's the
9  price that people paid for the stock.  The Vivendi true value
10  line is the red line.  That's the line less the inflation in
11  the blue price, day by day by day.  And you can see that the
12  inflation starts to get big on October 30, '01, something like
13  that.
14       The green line is the difference between the red and
15  the blue line.  So the max inflation, that flat spot on the
16  top, just above 20 euros, that's the 22 euros and 52 cents,
17  from December 13, '01 to January 7, '02.
18       The 30 cents is the very low flat line on the left.
19  Then it goes up to 2.41, I believe, which is the flat line next
20  to that.  Then it goes up to 4.80.  Then it jumps in the third
21  quarter, announcement of the third quarter.  Then on the 31st
22  it begins just a linear progression.  It's kind of bowed to the
23  right.  It probably would have been even acceptable just to pro
24  rata it from the very beginning, and then it would have been a
25  slanted line from the very beginning to the edge.  And this

3589

9BH8VIV8          Nye - direct

1  line is way to the right and under it.

2  Q.  When you say it's way to the right of and under it, is that

3  more a conservative result?

4  A.  That's right.  That's putting the inflation in but making

5  sure that it's not too much.

6  Q.  Now, is it the green line on this graph that presents your

7  ultimate conclusion about inflation per share?

8  A.  That's it.

9  Q.  Does the green line represent in graphic form the same

10  information that was on the preceding slide number 97 in chart

11  form?

12  A.  Yes.

13      MR. SPENCER:  Just go back to that.

14  Q.  So the amounts per share on the right side of the chart

15  there during the date periods set forth, that's what is shown

16  on the green line on the next page with the graph?

17  A.  Yes, indeed.

18  Q.  Now, if you look at the heading on this graph, it says,

19  "Summary of price inflation in the class period."  You have

20  told us it's the green line.

21      In fact, did class members, Dr. Nye, buy two different

22  types of securities of Vivendi?

23  A.  Yes, they did.

24  Q.  What were those?

25  A.  They bought ordinary shares that were sold on Euronext and

3590

9BH8VIV8          Nye - direct

1  they were priced in euros.  And they could also buy ADS,

2  American depository shares, that's sold on the New York Stock

3  Exchange in dollars.

4  Q.  Is it your understanding that purchasers of both of those

5  types of Vivendi Universal securities or shares are included in

6  the class in this case?

7  A.  That's my understanding, yes.

8  Q.  Did you do any analysis to determine the relationship in

9  the market as between those two kinds of shares?

10  A.  Yes, I did.

11  Q.  Let's look at the next slide, please?

12      What does this graph show?

13  A.  Basically, the blue line is the ordinary share closing

14  price and the red line is the ADS closing price in euros.  And

15  that little blue spot in the middle is 9/11.

16  Q.  I see.  What, in general, did you conclude about the

17  relationship of the closing prices for Vivendi ordinary shares

18  and Vivendi ADS's during the class period?

19  A.  They tracked very closely, as they would have to.

20  Q.  So when you prepared your final chart or table of inflation

21  values on each day of the class period for Vivendi securities,

22  did you in fact do that separately for the shares and the

23  ADS's?

24  A.  Yes, indeed.

25  Q.  So let's just go to the last slide here.

3591

9BH8VIV8          Nye - direct

1      It says, "Inflation amounts per ordinary share and per

2  ADS for each day of the class period."

3      Is that what you are offering to show your opinion

4  with respect to the damages issue in this case of inflation per

5  share?

6  A.  Yes.  My economic analysis leads to this estimate of

7  inflation amounts per share on each day of the class period.

8      MR. SPENCER:  May I approach the witness, your Honor?

9      THE COURT:  Yes.

10  Q.  Dr. Nye, I have shown you what has been marked as

11  Plaintiffs' Exhibit 1486.  I would like to ask you whether this

12  is the results of your expert work showing the inflation

13  amounts per ordinary share and per ADS for each day of the

14  class period?

15  A.  Yes.  It appears to be.

16      MR. SPENCER:  Your Honor, may we put this up on the

17  screen?

18      THE COURT:  Yes.

19  Q.  So, Dr. Nye, if you could just page through it, there are a

20  number of pages in this chart.

21      Dr. Nye, does this exhibit show the conclusion of your

22  expert analysis being the inflation amounts that you believe

23  apply here per ordinary share and per ADS for each day of the

24  class period?

25  A.  Yes, it does.

3592

9BH8VIV8          Nye - direct

1      MR. SPENCER:  I would like to either offer this into

2  evidence or make it available for eventual use by the jury in

3  deliberation.

4      THE COURT:  All right.  We will address that.

5  Q.  One other thing I would like you to testify about

6  quantitatively, Dr. Nye.

7      Did you in doing your work prepare charts of the

8  closing prices for Vivendi ordinary shares and Vivendi ADS's

9  for the class period, and in fact sometime before and after,

10  based on publicly available information showing that data?

11  A.  I did.

12      MR. SPENCER:  Could we put up PX 1245, please?

13  Q.  Maybe you can just look at it on the screen, Dr. Nye, or if

14  you would like, I can give you a hard copy.

15  A.  OK.

16  Q.  Just look through that, and can you tell us, is that the

17  closing price data that you derived from publicly available

18  information?

19  A.  It certainly appears to be.  I didn't memorize them all,

20  but it looks like an exhibit from one of my reports.

21  Q.  It also shows the volume on the dates?

22  A.  The volume as well.

23  Q.  Could we also look at PX 1241, and my question to you about

24  this, Dr. Nye, is is this the same data but with respect to

25  Vivendi ADS's during the dates that are covered by the chart,

**THIS PAGE INTENTIONALLY LEFT BLANK**

3679

9BI8VIV3                Nye - cross

1      (In open court)

2      THE COURT:  Just ask a question.

3  BY MR. SLIFKIN:

4  Q.  According to you, you were asked to assume that Vivendi had

5  an undisclosed obligation to pay 1.1 billion euros to Maroc

6  Telecom as of the end of 2001, correct?

7  A.  I thought it was in 2002, but generally, yeah.

8  Q.  We are talking about during the class period, October 2000

9  through August 14, 2002, right?

10  A.  Right.

11  Q.  And your opinion is that there was liquidity risk that

12  existed in December of 2001 that was undisclosed, right?

13  A.  My opinion is that all of the liquidity risk, in other

14  words, all the liquidity risk that came out from January 7 to

15  August 14, was undisclosed as of December 13.

16  Q.  And part of that liquidity risk was an obligation to pay

17  the government of Morocco 1.1 billion euros, right?

18  A.  One of the things they had an obligation to do at that

19  point was to pay 1.1 billion, right.

20  Q.  That obligation was renegotiated during 2002, correct?

21  A.  Sometime before it was due, right.

22  Q.  And the renegotiation was disclosed to the market, correct?

23  A.  I believe there was a disclosure to the market about the

24  Maroc deal sometime in early 2002 that basically was, as I

25  characterized it earlier, they had the right to buy or not buy

3680

9BI8VIV3                Nye - cross

1  16 percent, depending on whether anybody else did or did not

2  buy or whether Maroc Telecom wanted to sell it to them or not.

3  It was a very loose, hey, maybe we will purchase it, that kind

4  of thing.

5  Q.  When the renegotiation was disclosed, that was in the

6  period that you analyzed, right?

7  A.  I believe so, yeah.

8  Q.  And you know, don't you, sir, that there was no significant

9  stock price reaction to the disclosure of the new agreement,

10  right?

11  A.  Correct.

12  Q.  And the old obligation went away, didn't it?

13  A.  The new obligation isn't going to make the share price

14  change because there was nothing to the new announcement.  It

15  was simply we may or may not buy Maroc Telecom whenever we feel

16  like it.  So there is no information there that reveals any

17  liquidity risk.

18  Q.  The old obligation went away, right?

19  A.  The old obligation apparently went away at some point in

20  there, yes.  Presumably before that announcement.

21  Q.  And Vivendi never paid the 1.1 billion euros under the old

22  obligation, did it?

23  A.  I don't believe so.  I don't know.

24  Q.  And that makes no difference to your opinion, does it, sir?

25  A.  No.

3681

9BI8VIV3                Nye - cross

1  Q.  Isn't it true, sir, that in your opinion, there is

2  absolutely no difference from 1.1 billion that you do have to

3  pay and 1.1 billion that you don't have to pay?

4  A.  That makes a difference, but their liquidity risk in

5  December was -- I assume that's the maximum inflation and the

6  market didn't know about that.

7  Q.  So we are clear, in your deposition, you page 76, line 2

8  though 7, you recall that I asked you the question:

9  "Q.  So in this regard, your opinion is that there is no

10  difference between an obligation that has to be paid and an

11  obligation that doesn't have to be paid?

12  "A.  In December of '01 there was no difference."

13      Do you recall giving that testimony?

14  A.  Obligation that had to be paid -- no, I don't know.

15  Q.  Let's put it on the screen.  76, line 2 through 7.

16      MR. ABBEY:  Do you need a larger amount for context?

17      THE COURT:  Yes.

18  Q.  Right after this answer I moved to a different topic so

19  let's look at the prior page, 75.

20      We are talking about the first Maroc Telecom put.  You

21  see I asked you the line on line 13:

22  "Q.  But Vivendi never had to pay the 1.1 billion, did it?

23  "A.  They never did have to pay, no.

24  "Q.  Does that make any difference to your opinion the fact

25  that the money never had to be paid?

3682

9BI8VIV3                Nye - cross

1  "A.  Not at all."

2      And then it continues.

3  A.  My point is in December, when it hadn't been resolved, the

4  question was it was something that they were going to have to

5  fund.  So at that point it was part of the liquidity risk.

6  Whether it actually got paid or not, in other words, down the

7  road, that was something different.  That's down the road, OK,

8  we got out of it, we paid it off, we renegotiated it down.  In

9  other words, they are continuing throughout this period to pay

10  their obligations off in the best way they can, and one of the

11  ways to do that is to try to renegotiate the Maroc Telecom and

12  they did.  But as far as December, that amount was due.  And so

13  it would be an obligation, just like any of the other

14  obligations they had.

15  Q.  The fact that it never actually came due is irrelevant to

16  your analysis?

17  A.  In December how can you know whether it's going to become

18  due or not?  The whole point is I have got to shuffle my

19  obligations to make my credit risk.  Whether I am going to get

20  an inheritance from my family later on doesn't make me any more

21  or less of a credit risk before I find that out.

22  Q.  My question, sir, was, and the fact that it never actually

23  came due is irrelevant to your analysis of damages, correct?

24  A.  It's not -- again, that's in December of '01, there was no

25  difference.  I thought you asked me now after that.

**THIS PAGE INTENTIONALLY LEFT BLANK**

3695

1  A. I am not sure I did personally.  I think we had the report
2  and we did read it and obviously we had Ms. Hammer's report as
3  well.
4  Q. But you didn't read it yourself?
5  A. I personally didn't read either one of them, no.
6  Q. Okay.
7        Now, after you picked December 13 as the date of
8  maximum inflation, you then engaged in an analysis to figure
9  out how inflation was distributed from the beginning of the
10 class period to December 13, 2001, correct?
11 A. Correct.
12 Q. If we look at your slide 97, those are the dates and the
13 amounts that you have presented as both periods and the amounts
14 by which the share price is inflated, correct?
15 A. Correct.
16 Q. So we are clear, what you are saying here is, in your
17 opinion, somebody who bought between October 30, 2000 and April
18 23, 2001, they overpaid by 30 Euro cents per share, right?
19 A. That is correct.
20 Q. People who bought later overpaid by somewhat more, 2.41 or
21 4.80, correct?
22 A. Correct, as Vivendi internally became more and more aware
23 of their growing liquidity risk the inflation grew during these
24 periods prior to December 13.  And this is a model of how much
25 an attempt to conservatively model how much they knew of the

3696

1  full inflation that was reached by December 13.
2  Q. Okay.
3        And you displayed that graphically on your chart
4  number 98, right?
5  A. I believe I did, yes.
6  Q. That is the green line, right?
7  A. Yes.
8  Q. Okay.
9        Now, that green line, that is based upon information
10 you got from Mr. Mintzer, isn't it?
11 A. Certainly, yes, the first part.
12 Q. Right.
13       Now, Mr. Mintzer gave an opinion regarding purchase
14 accounting effects, correct?
15 A. Correct.
16 Q. And you relied on that opinion -- certainly up through
17 December 13, 2001, you relied on that opinion to determine how
18 inflation should be distributed in the period, correct?
19 A. It was an attempt, yes, to distribute inflation prior to
20 the max, prior to December 13.
21 A. Right.
22 Q. Right.
23       Now, if we were to look at page 199 of your report and
24 we focus in on that chart at the bottom, you see how this is
25 purchase accounting effect summarized from Mr. Mintzer's

3697

1  report, Exhibit C, do you see that?
2  A. I do.
3  Q. Okay.
4        So all of those numbers for those different dates,
5  October 30, 2000, March 9, 2001, April 24, 2001, and so forth,
6  you get all of those dates from Mr. Mintzer, right?
7  A. Well, the dates are simply dates of quarterly reporting but
8  the numbers down are cumulative purchase accounting effect and
9  purchase accounting affecting by quarter I got those from Mr.
10 Mintzer, right.
11 Q. So the dates you say is public and you got the numbers from
12 Mr. Mintzer, is that fair?
13 A. Right.
14 Q. So you used this as a substitute for analyzing liquidity
15 risk on those particular days, is that fair?
16 A. Not really.
17 Q. Why not?
18 A. I used it to model how much Vivendi internally knew about
19 the inflation risk as it progressed, as it progressively
20 worsened.  So the idea here is by the beginning of the class
21 period they had intended to use purchase accounting to help
22 their EBITDA and so this is just a percentage of total EBITDA
23 used through the end of 2001 and how much had been used by
24 3/9/2001.  It was 2 percent, 10 million Euros out of 662, about
25 2 percent, so Vivendi was aware of using 2 percent of that 662

3698

1  million by that point to benefit their EBITDA, to make
2  themselves look like they had more EBITDA and greater
3  liquidity.
4        So I am saying at this point they knew that and that
5  is why I used this to model it.  Like I said, it was
6  conservative, meant to be conservative, and just not overstate
7  how much they knew.  For example, according to Ms. Brassens'
8  testimony and one of my assumptions was that the liquidity risk
9  was serious from the beginning of 2001 and dangerous at the end
10 of 2001.  So serious at the beginning of 2001 is about 30 Euro
11 cents or 2 percent of the EBITDA would be certainly a
12 conservative estimate of what Vivendi knew about their
13 liquidity risk at that point.
14 Q. I am going to go into the details of what you did in a
15 moment but let me ask you first:  Have you ever previously
16 constructed an inflation band using purchase accounting as you
17 just described it?
18 A. Certainly I have done it a number of times with earnings,
19 with earnings that were in error, that were, you know, falsely
20 reported.  And this is basically a similar kind of thing.  I
21 don't recall ever doing it with purchase accounting.  I
22 certainly could have though.
23 Q. So the answer is you don't recall ever having done a
24 purchase accounting analysis for an inflation band like this
25 before, right?

3699

1  A. No, but I do explicitly recall doing earnings restatements
2  and using exactly this pattern on a number of occasions before.
3  Q. But I didn't ask you about earnings restatements.  I asked
4  you in fact there was no earnings restatements by Vivendi, was
5  there?
6  A. No, there was not, but the effect is the same in the
7  earnings misrepresented and then restating the earnings gives
8  you the true earnings redoing it based on an allocation and I
9  have done it on a number of cases, and so have a lot of other
10  people.
11  Q. I didn't ask you about earnings restatements here.  It
12  didn't occur here, and I didn't ask you about your allocation.
13  I asked you if you had done a purchase accounting analysis for
14  an inflation band like this in any other case.
15  A. And you asked me that before and I answered like this:  I
16  said I don't recall, but I said I have used earnings
17  restatements in exactly the same way on a number of cases.
18  Q. Sir, I asked you about what you had done in other cases.
19  You either did it or you didn't do it.
20  A. I answered you twice.
21      MR. ABBEY:  Objection.
22  Q. Yes or no or you don't remember.
23      THE COURT:  The witness may answer.
24  A. I answered you twice.
25  Q. Can you please give me a yes-or-no answer to that question?

3700

1  A. No, I can't.  I said I don't recall if I used purchase
2  accounting before.  I used it this time.  I don't recall if I
3  used purchase accounting as an irregularity in earnings but I
4  do recall restated earnings a number of times.
5  Q. Okay.
6      Now, you are aware that Vivendi publicly stated that
7  it was using purchase accounting, right?
8  A. Sure.  It was part of an acquisition.  Purchase accounting
9  is where you deal when you acquire companies, you are going to
10  use purchase accounting.
11  Q. Is it fair to say that the market -- you could have done a
12  market analysis, right?  You have done a market analysis,
13  right?
14  A. By general description it's okay if you want to summarize.
15  I have done what I did.
16  Q. You have done an analysis of the information that was
17  public and within the market and affected the stock price,
18  right?
19  A. Certainly I have done that.
20  Q. We have established that Vivendi had announced it was going
21  to use purchase accounting, right?
22  A. I think you said that and I agreed with you and I said,
23  yes, when you acquire assets purchase accounting is certainly
24  an option to account for them, the difference between what you
25  paid and the book value of those assets.  So it's a routine

3701

1  accounting treatment, correct.
2  Q. And the market knows what purchase accounting is, right?
3  A. The market is, indeed, aware of purchase accounting.
4  Q. And there are lots of people in the market who understand
5  how purchase accounting works, right?
6  A. I would hope all accountants do but, yes, I would assume
7  that most people are familiar with purchase accounting.
8  Accountants certainly know how it works.
9  Q. So it's fair to say that the market knows how purchase
10  accounting works, right?
11  A. I would say the market is probably roughly aware of how
12  purchase accounting works.
13  Q. Now, if you look at Mr. Mintzer's numbers that you rely
14  upon, the first actual financial statement that reflects an
15  actual purchase accounting impact is on March 9, 2001, right?
16  A. That is the day it was reported, right.
17  Q. So that is the first time Vivendi issued a number to the
18  public that reflected a purchase accounting effect, right?
19  A. It seems reasonable, yes, true.
20  Q. But your band starts before March 9, right?
21  A. My band starts on 10/30, right.  The reporting for that
22  fourth quarter 2000 is for the fourth quarter 2000.  So they
23  used an October, November, December 2000, and it was reported
24  on 3/9.  I had been even more conservative by deferring the
25  effect as far as the day it was reported.  But the whole idea

3702

1  is to know what Vivendi knew and Vivendi in the fourth quarter
2  of 2000 was currently doing this.  Yes, indeed, it stretches
3  back to the fourth quarter.
4  Q. On all of these columns you have a bunch of numbers and
5  then a percentage except for the first column where there are
6  no numbers, right?
7  A. Right.
8  Q. But you still have the same percentage, right?
9  A. It's sitting there, yes.
10  Q. If you can bear that date, March 9, 2001, in mind.  Let's
11  look again at your slide 97.  If you look at that first date
12  range, that is October 30 to April 23, right?
13  A. Correct.
14  Q. March 9 is within that band, right?
15  A. March 9 is within that band, correct.
16  Q. And in your analysis the day before Vivendi makes the
17  public statement and the day after Vivendi makes the public
18  statement causes no difference in the inflation in the price,
19  correct?
20  A. Well, of course that is correct.  This is internal
21  knowledge.  This is not something announced to the market.
22  This is Vivendi becoming aware that their liquidity is risk and
23  the market not knowing.  So the market did not know.  So of
24  course the price didn't change.  This is Vivendi becoming
25  aware.

3703

1  Q. Okay.

2      Let's go back to Mr. Mintzer's chart. That is page

3  199 of Dr. Nye's report, the Mr. Mintzer data.

4      Then on the next public statement -- so we are clear,

5  from 10/30/2000 to 4/23/2001, you are saying, well, Vivendi was

6  thinking about using it and so I am putting in a number based

7  on what they were thinking about, is that right?

8  A. No, actually in the fourth quarter they did use 10 million

9  Euros in purchase accounting. It was 2 percent of the total.

10  Q. Starting March 9?

11  A. It's not starting March 9. It's for the fourth quarter of

12  2000. They actually used purchase accounting in the fourth

13  quarter of 2000, which is October, November, December 2000.

14  That is reported March 9 but they actually used it in the first

15  quarter. That is why it starts at the beginning.

16  Q. It starts October 30.

17  A. Right.

18  Q. You said the fourth quarter is October, November, December.

19  November, December hadn't happened as of October 30, correct?

20  A. November, December hadn't happened as of October 30. I

21  see. No, November, December were still in the future, correct.

22  Q. Alright.

23      So isn't it fair to say, sir, that from October 30,

24  2000 to March 9, 2001, your view is based upon intended use,

25  not actual use?

3704

1  A. No, not at all. There was discussion that they were going

2  to use purchase accounting to enhance their EBITDA from the

3  beginning and that 2 percent is during the fourth quarter.

4  Q. Okay.

5      In your deposition on page 325 at line 15 I asked you

6  the question:

7  "Q. From October 30, 2000 to March 9, 2001 your view is based

8  upon intended use, right?

9  "A. Their knowledge is based on their intended use, right,

10  during that period."

11      Was that true when you gave that testimony, sir?

12  A. Sure. It's still true. They intended to use it from the

13  beginning of the class period. The amount they used during the

14  fourth quarter is 2 percent and it's listed up there.

15  Q. Okay.

16      Now, once we get -- let's go back to Mr. Mintzer's

17  chart.

18      Once 3/9/2000 starts your inflation band follows

19  exactly Vivendi's actual reported use of purchase accounting,

20  correct?

21  A. From 3/2 --

22  Q. From 3/9/2001 your inflation band is flat at 2

23  percent.

24  A. Correct.

25  Q. Then from 4/24/2001 to 7/20/2001 -- that is a Friday I

3705

1  believe -- your inflation band is flat at 12 percent, right?

2  A. Correct.

3  Q. Based upon reported numbers, correct?

4  A. Correct.

5  Q. The numbers that had been reported on 4/24, right?

6  A. Right. And had been the result of the first quarter, in

7  other words, January, February and March, and then

8  4/24. Like I said, they used purchase accounting in the first

9  quarter, January, February, March, and I used 4/24 as the date

10  of reporting conservatively to push it off as far as possible.

11  Q. So 4/24 there is a new announcement made for the prior 3

12  months, right?

13  A. Correct.

14  Q. But instead of using what Vivendi was intending to do, you

15  used what Vivendi actually announced, right?

16  A. Correct.

17  Q. And that is the same from --

18  A. They had done 12 percent by the end of the first quarter

19  and on 4/24 when they announced I said 2 it would be 12 percent

20  from then on. I see what you are saying now. In the end of

21  2000 they were in the process of doing it and then on 3/9 it

22  was reported, right. So that is stretched back to the

23  beginning based on the notion that they planned to do it. That

24  is what you are talking about. Okay.

25  Q. And from July 23 to October 29 you also have a band that is

3706

1  based upon actual reported numbers from July 23 at 21 percent,

2  right?

3  A. Correct.

4  Q. And then from October 30 to December 12, 2001, you just

5  drew a straight line up, didn't you?

6  A. After on the first day, the 30th going to 42 percent, from

7  then on until December 13th just hit pro rata line, a slanted

8  line to arrive at December 13, correct.

9  Q. If you look at Mr. Mintzer's numbers, they are at 42

10  percent on October 30, 2001 and they go to 100 percent March 5,

11  2002, right?

12  A. Certainly.

13  Q. But you didn't use those numbers, did you?

14  A. The proxy had out lived its usefulness at that point. I

15  was using it to try to model what they knew inside Vivendi as

16  they went along by their demonstrated and reported use of

17  purchase accounting. By the time we get to October 30 with the

18  maximum -- so I have been conservative to that point. Now, by

19  December 13 that is the maximum inflation and we have to stop

20  and draw a line to it, which is that slanted line on that slide

21  that had the charts on it.

22  Q. Let's focus on a graphic of what you did.

23  A. Remember, this is awareness of Vivendi's awareness of how

24  the maximum inflation developed over the 2001.

25  Q. DX 1828. All we have done is taken your green line and

3707

1 made it a little easier to see without other stuff on it.

2     So, again, from October 30, 2001 to December 13 you

3 just drew a straight line, right?

4 A. A pro rata straight line, right, slanted, right.

5 Q. You didn't follow Mr. Mintzer's numbers that you cite in

6 your chart -- in your report, right?

7 A. No, I ceased using Mr. Mintzer's numbers as a conservative

8 estimate of how much Vivendi knew along the earlier parts of

9 the period.  Remember Ms. Brassens, her testimony was that

10 liquidity risk inside Vivendi was serious from the beginning of

11 2001, which would be much higher than this earlier inflation,

12 but I have been conservative and used the purchase accounting

13 which they knew about and wanted to develop, but then I have a

14 demonstrated maximum inflation of December 13 from the drops

15 and so the two have to come together and so I had been

16 conservative clear to August 30 and continued to be

17 conservative but just had to get up to December 13 to the

18 maximum inflation which was demonstrated in the drops.  So it's

19 simply a way of trying to model conservatively how aware

20 Vivendi was of their true liquidity risk.  So I used Mr.

21 Mintzer through 10/30 and then I just pro rata went up to the

22 maximum.

23 Q. Isn't it true, sir, what you did is from the beginning of

24 the period you didn't rely on Mr. Mintzer's numbers but you

25 rely upon your opinion of what Vivendi was thinking, and then

3708

1 for the middle of the period you did rely upon Mr. Mintzer's

2 numbers, and then for the end of the period going up to

3 December 13, you went back to your opinion of what Vivendi was

4 thinking, right?

5 A. The last part got me.  You are dead right up to that point.

6 It was an attempt to model conservatively what Vivendi did and

7 I took advantage of those artifacts.

8 Q. You went from what Vivendi was thinking to what Vivendi was

9 saying according to Mr. Mintzer back to what Vivendi was

10 thinking according to you, isn't that true, sir?

11 A. Well, it was what Vivendi was thinking all along.  Mr.

12 Mintzer's numbers in terms of purchase accounting were simply

13 to be a conservative estimate of what they had to know because

14 purchase accounting was happening and they were aware it

15 happened.

16 Q. Now, you said that it was conservative several times, sir.

17     Now, we have put together a demonstrative that

18 compares -- let's put up that chart.  Let's put up the chart on

19 the bottom of 199.

20     Now, you see where these numbers are and how they

21 correspond to the dates, right?

22 A. We have been looking at that for awhile.

23 Q. It's possible to construct a chart using those percentages

24 or those numbers that correspond to percentages and those

25 dates, isn't it, sir?

3709

1 A. And I think you should do it.

2 Q. Why don't we look at DX 1381.  I am sorry, 1831.

3     Isn't it true, sir, that had you used Mr. Mintzer's

4 actual numbers it would have been even more conservative

5 because damages would have been lower at the beginning of the

6 period if it had been zero and it would have been lower from

7 October 30, 2001 to March 5, 2002?

8 A. You mean is it possible that I could have come up with an

9 even more conservative way of doing it than I did?  And this is

10 your suggestion?  Is that the idea?

11 Q. Could you answer my question?

12 A. I thought I was.

13 Q. If you had used Mr. Mintzer's numbers, actual numbers that

14 you put into your report, damages would go down, wouldn't they,

15 sir?

16 A. I have already explained to you why I used Mr. Mintzer's

17 numbers when I did and you seem to insist now that I have to

18 use them across the board and seem to refuse to recognize what

19 I am trying to model here from December 13 back is how much

20 Vivendi was aware, and I use Mr. Mintzer's purchase accounting

21 effects as an artifact, a conservative artifact of indicating

22 how much they knew at that point.  Why would I go on to March 5

23 when maximum inflation in January 7 to December 13 is already

24 higher than that?

25 Q. Well, let me try one more time.  Can you please answer my

3710

1 question?

2     MR. ABBEY:  Objection.

3 Q. If you use --

4     THE COURT:  Restate the question.

5 Q. If you had used Mr. Mintzer's actual numbers reflected in

6 the red line damages would be lower, isn't that true?

7 A. Well, it looks like if you have less inflation -- of course

8 that violates the whole other thing I did, you know, all the

9 drops.  It puts maximum inflation at March 5.  We clearly have

10 maximum inflation at January 7 demonstrably from the drops.  So

11 this is a contradiction in terms and really kind of silly but,

12 frankly, if you made the line flat there would be no damages,

13 it would be perfect.

14 Q. Was that a yes?

15 A. If you made the line flat there would be no damages.

16 Q. No.  If you use the red line damages would be lower,

17 wouldn't they, sir?

18 A. The red line and any other line you can scheme up would be

19 lower, but there is no basis for using Mr. Mintzer's purchase

20 accounting effects all the way to that date.  We have already

21 established the maximum at December 13.  I am simply trying to

22 model to the left up to December 13 how much Vivendi knew and

23 do it conservatively.  Vivendi clearly knew more than that on

24 10/30.  Brassens' answer was the situation was dangerous in the

25 last quarter.

THIS PAGE INTENTIONALLY LEFT BLANK

3715

```
1         MR. ABBEY:  I have one request, your Honor.
2         With the court's permission approximately at 2:30 I
3   have a matter on the 9th floor before the Second Circuit.  I
4   will be gone probably about 45 minutes.
5         Can I be excused at that time?
6         THE COURT:  Of course.
7         MR. ABBEY:  Thank you very much.
8         THE COURT:  2 o'clock.
9         (Luncheon recess)
10        (Continued on next page)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3717

```
    9BI8VIV5              Nye - cross
1   shares was shortly after December 13.
2         MR. SAUNDERS:  It was pursuant to a contract.
3         MR. SLIFKIN:  Signed shortly after December 13.  Which
4   will give a reason for why he picked that date and why that
5   date is significant.
6         MR. ABBEY:  I think going into Liberty this point with
7   this jury is really unfathomable, and we would object to that.
8         MR. SLIFKIN:  I thought you would say that, which is
9   why I am standing to the side.
10        THE COURT:  I am glad you raised it.  I understand the
11  nature of inquiry.  I think there is too much of a risk here of
12  leading the jury way far away from this case because then it's
13  going to require introducing evidence as to who Liberty Media
14  is, the plaintiffs are going to then be entitled to go into
15  what the nature of their clients are and whether or not this
16  day is important.  So I am going to exclude this line of
17  testimony under a 403 analysis.
18        MR. SAUNDERS:  Two things, your Honor.
19        First, is it allowable for us to ask whether any part
20  of his $4 million that he received was paid by somebody other
21  than the class?  I suspect, I don't know, that part of that was
22  paid by Liberty Media because he submitted a single report for
23  both cases.  There aren't two separate reports.
24        THE COURT:  We can talk about this later, but I don't
25  see any useful relevance.
```

3716

```
    9BI8VIV5              Nye - cross
1        A F T E R N O O N   S E S S I O N
2                2:00 p.m.
3        (Jury not present)
4        MR. SLIFKIN:  Before the jury comes in, there is a
5   point of substance that I want to raise with you and counsel
6   about my next line of questioning outside the presence of the
7   jury or the witness.
8        THE COURT:  All right.  Why don't you approach?
9        (At the side bar)
10       THE COURT:  The jury wants Wednesday off.  I think I
11  will accede to their request unless counsel objects.
12       MR. SAUNDERS:  No objection.
13       MR. ABBEY:  No objection.
14       MR. SLIFKIN:  As your Honor will have heard, I have
15  examined this witness with respect to his selection of December
16  13 as the date of maximum liquidity.  I have also examined him
17  with respect to the difference between his current inflation
18  line and what Mr. Mintzer's numbers are.  That was last thing I
19  did.
20       The next thing I was planning to do is to start to
21  elicit testimony from him that the class plaintiffs, the
22  members of the class, are not his only clients, and that
23  Liberty Media is also his client, and that he has done work for
24  Liberty Media, the same analysis, and these dates are
25  significant to Liberty Media because their acquisition of
```

3718

```
    9BI8VIV5              Nye - cross
1        MR. PERSCHETZ:  Can I give it a shot?
2        THE COURT:  Sure.
3        MR. PERSCHETZ:  First of all, the amount of additional
4   evidence that would be required is really very little because
5   the transaction that we are talking about is the USA Networks
6   transaction and the jury has heard about it in detail.  There
7   really is not a lot else to tell.  And all that Mr. Slifkin was
8   proposing is to elicit information relating to this witness's
9   bias, which to us seems pretty clear, in coming up with maximum
10  inflation exactly at the time that most benefits his client.
11       We don't think it's coincidence that his point of
12  maximum inflation is December 13, the board approved the USA
13  deal on December 14, the contract was signed on December 17.
14  And if the maximum inflation occurred after December 17, it
15  wouldn't do Liberty Media any good.  The level of inflation is
16  relatively flat.  Up goes the so-called straight line to get to
17  December 13.
18       So even on a 403 analysis, it seems to me the
19  probative value of this is fairly high, given the significance
20  of that line going up, versus the prejudice.  To the extent
21  that the prejudice consists of some extraneous information,
22  really, the only fact that's being added is that it's Liberty
23  Media that sold the interest in USA Networks and that Liberty
24  Media is his client and he has an interest and bias.
25       THE COURT:  I understand that argument.  Of course,
```

3719

9BI8VIV5          Nye - cross

1  it's not solely that because the plaintiffs would be entitled

2  to put in far more than that as to the why and wherefore of the

3  Liberty Media litigation and what Liberty Media's position is.

4  That's a different lawsuit.

5          MR. ABBEY:  They are not here.

6          MR. PERSCHETZ:  Actually, they are.

7          MR. ABBEY:  I am not going to defend Liberty.

8          THE COURT:  It's a judgment call.  I have made that

9  call.

10          MR. SAUNDERS:  Just to make our offer of proof.

11          MR. SLIFKIN:  In light of that, I believe we will make

12  an offer of proof, a written offer of proof, which we will file

13  with the Court.

14          THE COURT:  Surely you can file something in writing,

15  but I take it you have just made an offer of proof on the

16  record.

17          MR. SLIFKIN:  For the circuit as to what the questions

18  would have been and what the answers would have been.

19          MR. SAUNDERS:  The selection of December 13 as a date

20  of maximum inflation was a subjective decision by this witness.

21  It's not a mathematical computation.  He said, I looked at the

22  evidence and I decided that that was the date of maximum

23  inflation.  There is really no way to test that.  And the

24  reason why we would want to bring forward this other evidence

25  is to attack his credibility with respect to that testimony

3720

9BI8VIV5          Nye - cross

1  that that's why he selected the date of December 13.  That

2  would be in our offer of proof, but that's why we want to do

3  it.

4          MR. PERSCHETZ:  I think to some extent there is some

5  additional prejudice to my client by not being able to go into

6  this evidence because what he is going to say instead, and we

7  believe it to be false, is that he did not rely on the factors

8  that we are talking about, but instead relied on the memo, the

9  so-called death seat memo, which really has --

10          THE COURT:  The what memo?

11          MR. PERSCHETZ:  The death seat memo that his slides

12  had originally said was the reason he picked December 13 as

13  maximum inflation.

14          THE COURT:  Let's see what his testimony is.

15          (Continued on next page)

3721

9BI8VIV5          Nye - cross

1          (In open court)

2          (Jury present)

3  BLAINE NYE, resumed.

4          THE COURT:  I have received the note from the jury

5  with respect to next Wednesday.  I might say that all counsel

6  are in agreement with the jury's request.  And since I don't

7  want to sit here by myself, we will take that day off.

8          THE JURY:  Thank you, your Honor.

9          MR. SLIFKIN:  May I proceed?

10          THE COURT:  Yes, please.

11  BY MR. SLIFKIN:

12  Q.  Let me move to a different topic, Dr. Nye.

13          Let's put up on the screen your slide 17.

14          You testified about this yesterday and how under your

15  methodology you exclude, you have that column excluded and you

16  exclude market effects -- withdrawn.  You exclude share price

17  movements that are caused by market-wide effects, is that fair?

18  A.  Yes.

19  Q.  And you then exclude share price movements that are caused

20  by industrywide effects, is that fair?

21  A.  That's fair.

22  Q.  And then you exclude share price movements that are company

23  specific but nonfraud related, is that fair?

24  A.  That's fair.

25  Q.  And that's how you end up calculating the loss due to the

3722

9BI8VIV5          Nye - cross

1  alleged fraud, is that fair?

2  A.  That's fair.

3          MR. SLIFKIN:  Now, if we could put up, please,

4  defendants -- this is defendants' demonstrative exhibit 1832.

5  Q.  This is derived, Dr. Nye, from your Exhibit 1486.  If you

6  want to look at 1486, I will be happy to hand it to you.

7          My first question, does this accurately set forth the

8  damages amounts, the inflation amounts that you have identified

9  both for ordinary shares and American depository shares on your

10  days that you analyzed yesterday?

11  A.  It would be helpful if you gave me PX 1486 and just let me

12  make sure.

13          MR. SLIFKIN:  May I approach, your Honor?

14          THE COURT:  Yes.

15  A.  OK.  It appears to be, yes.

16  Q.  Now, there is a distinction between ordinary shares and

17  ADSs.  You see, for example, January 7, 2002, it's 1 euro 97,

18  but for the American depository shares traded here in New York

19  is 3 U.S. dollars.

20          Now, those differences, they are not just because of

21  currency differences, are there?

22  A.  No.

23  Q.  There are actually different time periods in both

24  jurisdictions, are there not?

25  A.  Right.  There are times when Paris is opened and New York

3723

9BI8VIV5          Nye - cross

1   is not and vice versa.  So they don't close contemporaneously.
2   Q.  I think we established earlier that you used
3   different -- you used different industry indexes for those
4   different types of shares?
5   A.  Depending on date of availability and that kind of thing,
6   yes, it turned out the industry was a little different.
7   Q.  Now, I am going to ask you some questions about each of
8   these days and if you need to make a distinction between the
9   two markets, the French market and the U.S. market, please do
10  so.
11       Now, we saw on that prior slide that you take out the
12  market effects, the industry effects, and the company specific
13  nonfraud related information.
14       For January 7, how much did you take out for company
15  specific nonfraud related movement?
16  A.  I don't have a chart for that.  We concentrated on ordinary
17  shares.  The ADS -- it could be similar charts produced.  In
18  terms of market and industry offsets, is that what you meant?
19  Q.  No.  Why don't you focus on ordinary shares?  You showed us
20  a slide for January 7 where you showed that you took out a
21  market effect and you took out an industry effect.  So now I am
22  asking you to help us with quantifications now.  What did you
23  take out in terms of euros for company specific nonfraud
24  related movement?
25  A.  And this is the ADSs or the euros?

3724

9BI8VIV5          Nye - cross

1   Q.  Either one, sir.
2   A.  Nothing.  For company specific nonfraud related, no, I
3   didn't take anything out.
4   Q.  Let me put back my slide 17 so we can understand that
5   clearly.
6       That's the red band.  You took out nothing for the red
7   band?
8   A.  Yes.
9   Q.  I am being corrected.  It is orange.
10  A.  It is orange in all fairness.
11  Q.  You took out nothing for the orange band.
12       MR. SLIFKIN:  Can we put back DX 1832?
13  Q.  We are talking about January 7 and you took out nothing
14  from the orange band for either ordinary shares or ADSs?
15  A.  That's true.
16  Q.  With respect to May 3, how much did you take out for
17  company specific nonfraud related information?
18  A.  On those days, nothing.  On.
19       That date, nothing.  I'm sorry.  Two different
20  markets, but one day.
21  Q.  You also took out nothing for June 21, 2002?
22  A.  That's true.
23  Q.  You took out nothing for June 24, 2002?
24  A.  That's true.
25  Q.  June 26, inflation goes back up.

3725

9BI8VIV5          Nye - cross

1       July 2?
2   A.  I took out nothing there either, by the way.
3   Q.  Fine.  July 2, you took out nothing for nonfraud related
4   company specific information, right?
5   A.  That's true.
6   Q.  Also on also on July 3, that's also true?
7   A.  That's true.
8   Q.  And July 10, yes?  You took out nothing for nonfraud
9   related company specific movement?
10  A.  That's true.
11  Q.  And July 15, you took out nothing for that item either?
12  A.  That's true.
13  Q.  And you took out nothing from August 14, 2002 for nonfraud
14  related company specific information?
15  A.  That's true.
16       On July 15, it actually wasn't significant under the
17  ADSs.
18  Q.  I will come back to that.  You actually have no damages at
19  all on July 15 for people whose securities were traded in New
20  York, is that fair?
21  A.  That's true.
22  Q.  It is true, is it not, sir, that for none of the days that
23  you have analyzed did you take out anything from your orange
24  band that we saw on your slide 17, not one of them?
25  A.  I think we just established that.

3726

9BI8VIV5          Nye - cross

1   Q.  Now let's look at -- nonetheless, you put that as something
2   excluded on your slide 17, right?
3   A.  That's something you would exclude.  If there were any
4   nonfraud related company specific information released on one
5   of these days, you would want to take that out, yes.
6   Q.  Now, the first date -- let's go back to demonstrative 1832.
7       The first date you analyzed is the sale of treasury
8   shares, correct?
9   A.  Correct.
10      MR. SLIFKIN:  Can we put up PX 376?
11  Q.  Now, this is a Vivendi press release from that day
12  concerning that sale of treasury shares, right?
13  A.  It's January 7, and it talks about the treasury shares,
14  yes.
15  Q.  And this is part of the public information that you
16  previously discussed that would be reflected in the price of
17  the security, correct?
18  A.  Yes.
19      MR. SLIFKIN:  Can we focus in on the first three
20  paragraphs and blow those up?
21  Q.  Isn't fair to say, sir, that the market was told that the
22  proceeds to Vivendi would be at least 3.3 billion euros in
23  cash?
24  A.  That's correct.
25  Q.  And the market was also told that that would be used to

3727

9BI8VIV5          Nye - cross

1   reduce debt, right?

2   A. That's true.

3   Q. And the market was also told, if you look at the second

4   paragraph, that Vivendi had actually bought these shares itself

5   for 57, do you see that, "bought on the open market in 2001 at

6   an average price of 57"?

7   A. Yes.

8   Q. But this was not a new issuance of shares by Vivendi, this

9   was shares that it had bought out in the marketplace from other

10  investors, correct?

11  A. It had bought them back, yes.

12  Q. And it paid 57, right?

13  A. It says an average unit price of 57, yes.

14  Q. It was then selling those shares to Deutsche Bank and

15  Goldman Sachs between 60 and 61, is that correct?

16  A. That's correct.

17  Q. So Vivendi was actually, having bought at 57, selling at

18  60, they were making over 100 million euros in profit on that

19  transaction, were they not?

20  A. Certainly that's one way of looking at it.

21  Q. And they were increasing their actual liquidity in terms of

22  cash by 3.3 billion euros, right?

23  A. That's correct.

24  Q. And they were going to be reducing debt, right?

25  A. That's what it indicates.

3728

9BI8VIV5          Nye - cross

1   Q. And that is something that the rating agencies had been

2   wanting Vivendi to do for quite some time, right?

3   A. Especially since the middle of December, right.

4   Q. In fact, in December 2001, the rating agencies issued

5   reports saying that Vivendi's debt was expected to be reduced

6   by at least 2 billion euros in the first quarter of 2002

7   through asset sales and other debt reduction measures, right?

8   A. I'm not reading that here.  Are you reading it somewhere?

9   Q. Let's put up DX 1150.

10      Can we look at the bullet at the bottom?

11      It says, "Vivendi Universal's debt level is expected

12  to be reduced by at least 2 billion euros during the first

13  quarter of 2002, through asset sales and other debt reduction

14  measures."  Do you see that?

15  A. I do, indeed.

16  Q. That was made public December 17, 2001 by Standard &

17  Poor's, if you look at the top?

18  A. I think information to that effect had been available for

19  over a year from Vivendi that they were going to reduce their

20  debt, but this is another affirmation of that.

21  Q. So do you think -- well, Vivendi made a significant profit

22  on this sale of shares, right?  So that was not a bad thing,

23  was it?

24  A. It didn't seem bad, no.

25  Q. And Vivendi enhanced its cash liquidity with this

3729

9BI8VIV5          Nye - cross

1   transaction, and that's not a bad thing either, is it?

2   A. It doesn't seem like it.

3   Q. And Vivendi was going to reduce its debt, and that was not

4   a bad thing, was it?

5   A. No.

6   Q. And this follows a few weeks after S&P had said Vivendi

7   could be expected to reduce its debt.  So this was not

8   unanticipated, was it?

9   A. Vivendi was always going to reduce its debt, so no, there

10  shouldn't have been -- it shouldn't have been unanticipated.

11  They had been on a debt reduction program for a year now.

12  Q. Now, the news that Vivendi was going to -- withdrawn.

13      The press release we showed you and the news that

14  Vivendi was engaging in this transaction, that was released

15  before the opening of the securities exchanges in both Paris

16  and New York, right?

17  A. I believe it was.  Since Paris opens before New York, yes,

18  it's before Paris, it's before New York.

19  Q. Now, in your testimony on direct you testified that you

20  looked at prices from the close of the prior day to the close

21  of the day under examination, is that correct?

22  A. That's correct.

23  Q. But it is true, sir, that during a particular trading day

24  the price can move up and down, right?

25  A. It does all day.

3730

9BI8VIV5          Nye - cross

1   Q. Is that sometimes called intraday stock price movement?

2   A. If it's not, it should be.  That's what it is.

3   Q. It is true, sir, is it not, that in your analysis of stock

4   price movements, you looked at intraday stock price data?

5   A. We had intraday stock price data.

6       We didn't really have market or industry intraday

7   data, but we had Vivendi intraday data, and I believe might

8   have had some from the European market index.  But not full-day

9   intraday.  It's really not available at this point for all the

10  indices.

11  Q. Are you done with your answer?

12  A. I am, indeed.

13  Q. You know that, in fact, detailed intraday data was supplied

14  to you when you received the expert report from Dr. Silber who

15  is Vivendi's expert?

16  A. We received what we received.  I'm not sure that was

17  detailed and complete.  He doesn't even use intraday market and

18  industry in assessing his opinion.

19  Q. It is true, is it not, sir, that Dr. Silber's backup

20  includes intraday stock price data for Vivendi?  I am talking

21  about the market and the index just for Vivendi.

22  A. That's what I was talking about was the market and the

23  index.  And yes -- I don't know whether Dr. Silber gave it to

24  us or whether we got it ourselves or whether we had both had it,

25  but whatever, we do have intraday Vivendi price data.

THIS PAGE INTENTIONALLY LEFT BLANK

3843

9BJ8VIV2            Nye - cross

1  December 31, 2001?

2  A. I don't recall.

3  Q. Do you have any idea?

4  A. Not really. It varied. They reported different things,

5  net of things. Consolidated, media, Environment, they split

6  it. I remember one occasion, I believe it was in December,

7  when somebody postulated that it was some number, an analyst,

8  and a person from Vivendi responded, No, it's not that high,

9  but didn't give a number. So I think there was some confusion

10 on that.

11 Q. You understand that when you just gave that answer to the

12 jury in response to my question, that that is not what I asked

13 you? You understand that, right, Dr. Nye?

14 A. I was trying to respond. I will try it again.

15 Q. What was Vivendi's reported net financial debt as of

16 December 31, 2001? Would you tell the jury the answer to that

17 question?

18 A. I don't know any more than the analysts I related the story

19 to did, because Vivendi didn't provide a number.

20 Q. Vivendi did not provide a number for net financial debt at

21 the end of -- let me rephrase that.

22    Vivendi did not provide a number for net financial

23 debt as of December 31, 2001?

24 A. Are you talking about financial statements? They were

25 filed earlier in the year. They had to put net debt down there

3844

9BJ8VIV2            Nye - cross

1  somewhere.

2  Q. Did they?

3  A. I am sure they did. They filed accounting statements.

4  Q. Simple question. How much was reported?

5  A. I don't know.

6  Q. Is the company's debt related to its liquidity risk?

7  A. Liquidity risk is the ability to cover your fixed

8  obligations. So fixed obligations are debt. You have to pay

9  interest and repay them according to the terms.

10 Q. So the answer would be yes?

11 A. Yes.

12 Q. That would obviously also include what Vivendi called net

13 financial debt, right?

14 A. I would assume.

15 Q. To make the question clearer, that would also be related to

16 the nature of a company's liquidity risk, right?

17    MR. ABBEY: Objection.

18    THE COURT: Overruled.

19 A. What?

20 Q. Net financial debt.

21 A. Net financial debt is the debt less cash and equivalents

22 and treasury shares, right? It would be seem to be somewhat

23 the same animal.

24 Q. So your answer to my question is yes?

25 A. What was the question again?

3845

9BJ8VIV2            Nye - cross

1  Q. Have you forgotten the question?

2  A. I have. It slipped my mind.

3  Q. Is net financial debt as defined by Vivendi related to its

4  liquidity risk?

5  A. It's debt, and it's a French determination of it, but it is

6  debt. It is a fixed obligation and therefore related to the

7  liquidity risk, yes. You have fixed obligations and you need

8  to cover them. Net debt needs to be handled.

9  Q. Let's go back, if we can, to what the market knew before

10 January 7, 2002.

11    Did the market know before January 7, 2002 that there

12 was downward pressure on Vivendi's credit ratings?

13 A. Of course they did. It was downward pressure at the

14 beginning.

15 Q. Did the market know, prior to January 7, 2002, that it was

16 more likely that Vivendi's credit ratings would go down than it

17 was that they would go up?

18 A. The market had a credit rating, it was pressure on it,

19 that's about it. Whether they were a negative outlook, I guess

20 if they were under a negative outlook, that would be an

21 indication the market thought the outlook was negative. If

22 they were stable, it would mean it could go up or down.

23 Q. A negative outlook would mean a statement by the rating

24 agencies that it was more likely that the credit rating would

25 go down than up, am I right about that?

3846

9BJ8VIV2            Nye - cross

1  A. That's my interpretation of a negative outlook. It doesn't

2  look good. You're here, but the future looks negative. That's

3  my interpretation of it. I am pretty sure that would be the

4  definition of it.

5  Q. When you say you're pretty sure that would be the

6  definition of it, you're pretty sure that would be the

7  definition by the rating agencies?

8  A. That's what I am saying.

9  Q. Vivendi did have a negative outlook on its ratings prior to

10 January 7, 2002, am I right about that?

11 A. I'm not sure I recall. They had a negative outlook at a

12 time and stable other times. January 7, I am not sure I

13 recall.

14 Q. Was the question of whether Vivendi did or did not have a

15 negative outlook on its credit ratings prior to January 7, 2002

16 relevant to your opinion?

17 A. It was relative in that that was the rating.

18 Q. I didn't hear you.

19 A. It was relative that that was the rating.

20 Q. You said relative. My question is was it relevant?

21    Do you want me to repeat the question?

22 A. I tried to say relevant. I guess I just didn't spit it

23 out.

24 Q. Let's do it again.

25 A. Relative or relevant?

**THIS PAGE INTENTIONALLY LEFT BLANK**

4017

9BKSVIV2

1  raises issues that aren't relevant to this case and so I have
2  directed that large portions of these documents be redacted so
3  that the print is removed because, as I say, large portions of
4  that dispute aren't relevant to this dispute. I have found,
5  however, that there are some statements made in these Vivendi
6  filings which may be admitted into this case and so those
7  portions may be read to you by Mr. Abbey now.
8      Now, keep in mind that these statements that you are
9  going to hear are being admitted against Vivendi because they
10  come from Vivendi documents. They are not statements by Mr.
11  Hannezo or Mr. Messier and they can't be considered with
12  respect to Mr. Hannezo and Mr. Messier.
13      Mr. Hannezo wasn't a party to this other lawsuit and
14  Mr. Messier of course, as you will see, will naturally deny
15  some of the statements that are made in these documents. So
16  these documents are admitted only with respect to the claims
17  made about Vivendi, not Mr. Messier or not Mr. Hannezo, so you
18  have to, again, put the documents out of your mind with respect
19  to those two individuals but you are allowed to consider them
20  in connection with the trial here against Vivendi.
21      MR. ABBEY: Put up 1288 please, the first page.
22      This is the caption American Arbitration Association,
23  Commercial Arbitration Rules, and it's Jean-Marie Messier,
24  claimant, against Vivendi Universal, Vivendi Universal Canada,
25  successor in interest to the Seagram Company LTD, which is

4018

9BKSVIV2

1  limited, and Vivendi Universal Holding 1 Corp., as successor in
2  interest to Joseph E. Seagram & Sons, Inc., respondents. And
3  you see that it bears file number 50T11600585, and 02 would be
4  the year.
5      And this document is respondents Vivendi Universal,
6  Vivendi Universal Canada and Vivendi Universal Holding Corp.'s
7  answer and response to Jean-Marie Messier's statement of claim
8  and counterclaims. And it begins respondents Vivendi
9  Universal, Vivendi Universal or the company, Vivendi Universal
10  Canada, as successor in interest to the Seagram Company and
11  Vivendi Universal Holding 1 Corp., Vivendi holding, as
12  successor in interest to the Joseph E. Seagram & Sons
13  (collectively all called Vivendi) by and through their
14  undersigned attorneys, hereby set forth their answer and
15  response to claimant Jean-Marie Messier's statement of claim,
16  and that is called the statement, and assert counterclaims
17  against claimant as follows, and go on please to page 2. And
18  this is the statements by Vivendi in that proceeding.
19      As you can see just a small portion on this page is
20  being read to you by order of the court. So nature of the
21  proceeding, paragraph one, Messier in brackets. "Messier
22  pushed the company to the brink of financial ruin."
23      I am turning pages now. Page 3 is redacted
24  completely.
25      Page 4, paragraph 6, and again this is Vivendi's

4019

9BKSVIV2

1  answer to Mr. Messier's arbitration claim, paragraph 6,
2  "Indeed, Vivendi intends to prove that Mr. Messier Messier lost
3  the support of the board and had lost credibility with
4  investors, lenders and other important constituents."
5      That is on page 4, paragraph 6 of Vivendi's answer to
6  the claim.
7      Turning to the next page, page 5, "At the end of June
8  2002 Vivendi Universal was in the midst of an immediate and
9  critical financial crisis threatening its very existence."
10      This is on page 5 of Vivendi's answer to Mr. Messier.
11      Moving forward, page 6 has nothing, page 7 has
12  nothing.
13      Page 8 at the bottom, paragraph 18, it says, "Vivendi
14  avers" -- avers means states -- "Vivendi avers that at the end
15  of June 2002, immediately prior to Mr. Messier's resignation,
16  Vivendi's market capitalization" -- and that is the value of
17  its stock -- "was approximately 24 billion Euros (down from
18  approximately 67 billion Euros at December 31, 2001) and its
19  indebtedness was approximately 19 billion Euros (35 billion
20  Euros including the indebtedness of its then consolidated
21  subsidiary Vivendi Environment)."
22      That is paragraph 18, the bottom of page 8 of
23  Vivendi's answer to Mr. MessierMessier
24      Page 9, paragraph 19, "Vivendi avers" -- again, avers
25  means states -- "that during the spring of 2002, the

4020

9BKSVIV2

1  marketplace and investors started to question very seriously
2  Mr. Messier's credibility and his ability to run Vivendi as a
3  successful group. This culminated in Vivendi being downgraded
4  to junk status by Moody's on July 1, 2002 and Standard & Poor's
5  on July 2, 2002, and certain banks not renewing or canceling
6  credit facilities and other banks threatening to do the same."
7      That is paragraph 19 on page 9 of Vivendi's response.
8      Paragraph 20 has been deleted.
9      Paragraph 21 on page 9, "Vivendi avers" -- again,
10  states -- "that serious questions were raised by certain
11  Vivendi directors, investors and the media about Mr. Messier's
12  credibility and continued service." Paragraph 21 on page 9.
13      Page 10, paragraph 26, "Vivendi avers" -- again,
14  states -- "that the company was in the midst of a severe
15  liquidity crisis." Vivendi response from Mr. Messier,
16  paragraph 26.
17      Page 11 at the top, "The company was facing a severe
18  liquidity crisis threatening its very existence."
19      Again, turn to page 12, please, at the bottom,
20  "Vivendi was facing an immediate and critical financial crisis
21  threatening the company's very existence." This is on page 12
22  of Vivendi's response to Mr. Messier.
23      Moving on, page 13 there is nothing. 14 there is
24  nothing. 15 there is nothing.
25      Page 16, please, paragraph 38 in Vivendi's response,

THIS PAGE INTENTIONALLY LEFT BLANK

4929

9C2MVIV11

1    judgment stage and at the motion in limine stage when the
2    defendants strenuously tried to disqualify Dr. Nye and refute
3    plaintiffs' theory of loss causation in this case.  Suffice it
4    to say, that the Court rejected all of those arguments.  I
5    don't think that anything has happened since then that could or
6    would cause the Court to consider it.
7        And I think it also goes without saying that
8    Mr. Saunders is correct that Dr. Nye's testimony did hue to
9    what the Court decided were the appropriate standards for loss
10   causation and that's because, your Honor, you were announcing
11   law according to what the Supreme Court and the Second Circuit
12   has said in this area.  So none of that is remotely surprising
13   here.
14       I had thought, given a lot of the initial part of the
15   presentation by Vivendi, both in its brief and with
16   Mr. Saunders here, that I was going to have to remind everyone
17   that this is not a case of one and one, one to one
18   nondisclosure or misstatement during the class period and a
19   very direct disclosure of that very matter at the end of the
20   class period.  This is a materialization of concealed risk
21   theory that we are primarily proceeding under, and it is
22   primarily an omissions case, which necessarily makes all of
23   these issues somewhat less clean than the prototype one to one
24   disclosure.  Nevertheless, under Lentil and under Castellano,
25   as your Honor decided at the summary judgment stage, it is

4930

9C2MVIV11

1    proper for plaintiffs to proceed in the way that we have.
2        Let me address the three points that I think
3    Mr. Saunders made that we haven't exactly heard before.
4        One, which I think is very minor, is that he quoted
5    Dr. Nye as saying, the market always thinks that Vivendi needs
6    cash as somehow disqualifying the entire loss causation
7    analysis.  I think, your Honor, that the context in which Dr.
8    Nye said that is that, yes, it was generally known that Vivendi
9    needed cash.  We knew that from the rating agencies.  We knew
10   that from all of the events during the class period and, in
11   fact, pretty much every company needs cash.  So that statement
12   by Dr. Nye is a big yawn, as far as I can tell, in the loss
13   causation context.
14       Another point which, again, I think, is very small,
15   but received a fair amount of emphasis by Mr. Saunders, and
16   that is, that he charges that Dr. Nye selected the December 13,
17   2001 date of maximum inflation because he was unduly influenced
18   to do so by virtue of the fact that he is also an expert in the
19   Liberty Media case, and Mr. Saunders assumes that Liberty Media
20   also has been paying Dr. Nye's bills in this case.
21       There is an old canard, your Honor, about assuming,
22   it's well known to every lawyer.  And what I want to say here
23   is that Mr. Saunders should not make that assumption and I'm
24   sure he will not be arguing it to the jury because it's not in
25   evidence.  I hope I don't need to say more.

4931

9C2MVIV11

1        The third point that is somewhat new that Mr. Saunders
2    has made, although I think there were certainly echos of it in
3    the summary judgment and motion in limine papers and argument,
4    is that somehow the risk that materialized on the nine days
5    identified by Dr. Nye in 2002 as being his damage days somehow
6    is not connected or is a different risk or is separated somehow
7    from the liquidity risk that plaintiffs contend was concealed
8    throughout the class period, particularly leading up to the
9    December 13 date.  Mr. Saunders said that the liquidity risk in
10   2002 is not the same liquidity risk as was alleged by
11   plaintiffs to exist in 2001.
12       Then you have the chart up on the board of event A,
13   alleged failure to disclose liquidity risk, that's right, and
14   event B, which I think he intended to be the materialization of
15   the concealed risk.  And in the event B box was written,
16   Vivendi never failed to pay an obligation on time.  That is
17   obviously not the materialization of the concealed risk that
18   Dr. Nye was talking about, nor the materialization that the
19   plaintiffs have offered in their case.  The materialization are
20   the events that occurred on the nine days identified by Dr. Nye
21   that we had fairly extensive testimony about it, and we could
22   cram them all into that he event B box, I suppose, or you could
23   say, as we would, your Honor, that it was the same liquidity
24   risk that the defendants concealed in 2001.
25       So the defendants say, well, what evidence have

4932

9C2MVIV11

1    plaintiffs introduced to show that those risks were the same?
2    There hasn't been any.  And, your Honor, I have to confess, I
3    have no idea how the defendants could say that, because there
4    are two gross pieces of evidence in this case that, in my view,
5    do exactly that.  One of them is the book of warnings and the
6    other is Mr. Espinasse's description of the origins of the
7    liquidity crisis.
8        Now, Mr. Hannezo's book of warnings was prepared at
9    the time the liquidity crisis came to a head, and in the cover
10   page to that compendium of his earlier memos he stated that he
11   was putting it together to show that his department had warned
12   of the risks that were coming to fruition at that time.  And
13   when you look at those memos, your Honor, the substance of
14   those memos has everything to do with the risks that were
15   concealed by the company in 2001, and primarily that's because
16   they were written around that time.  So how the defendants have
17   the gall to say in this argument that there is no evidence
18   connecting the materialization of liquidity risks in 2002 with
19   what we say was concealed in 2001 really escapes me.
20       Similarly, Mr. Espinasse's presentations on the
21   origins of the liquidity crisis contain a list of a number of
22   items, many of which are precisely the things that we say were
23   not disclosed to the market and that form the basis of our
24   claim of liability in this case.  So without going further down
25   into the details of this case than that, your Honor, I think

THIS PAGE INTENTIONALLY LEFT BLANK

5184

```
1        THE COURT:  I am going to reserve decision on the Rule
2   50 motions.
3        As I mentioned yesterday, I want to determine whether
4   the parties want to make any further submissions on the jury
5   instructions.  I don't know whether, in light of the evidence
6   that's been admitted, anybody wants take a second bite at that
7   apple.
8        MR. ABBEY:  I think we probably are going to want to
9   consider it.  I don't think we had time to do that.  I
10  think the answer would be yes.  And do you have a date in mind
11  for that?
12       THE COURT:  Early, middle of next week, Tuesday,
13  Wednesday.
14       MR. ABBEY:  Okay.
15       MR. SAUNDERS:  We are going to do the same thing, your
16  Honor.  We are going to look at the proposed submissions on
17  both sides and see if we need to modify any of the submissions
18  that we made.
19       In that connection, your Honor, I'm recalling
20  something that your Honor said in the robing room yesterday,
21  that you have sort of a standard part one and a standard part
22  three.  It would be helpful for us if perhaps your clerk or
23  somebody could make those available to us or maybe we could get
24  them from one of the other cases --
25       THE COURT:  Sure.
```

5185

```
1        MR. SAUNDERS:  -- that you've had so we could look at
2   those and see if there are any suggestions that we might like
3   to make with respect to those.  Because I think on both sides
4   we both submitted what would fall into proposals with respect
5   to your parts one and parts three.  And if your Honor has
6   standard instructions that you give, that will facilitate our
7   work.
8        THE COURT:  I will make available from the last civil
9   trial I had the verdict form.
10       MR. SAUNDERS:  We will try to work with the plaintiffs
11  and see if we can reach agreement on a suggested verdict form.
12  And whether we can reach agreement or not, we would like to
13  propose a model verdict form for your Honor.  We will try to do
14  that as early as we can.
15       When would your Honor like us to try to give you
16  something to look at?
17       THE COURT:  Well, ideally, if I could have it at the
18  same time you give me any revised charges.
19       MR. SAUNDERS:  All right, your Honor.
20       THE COURT:  I am going to start thinking about it,
21  anyway.  The sooner the better.
22       Anything else we need to address?
23       MR. SAUNDERS:  No, your Honor.
24       THE COURT:  Monday at 9:30.
25       (Adjourned to Monday, December 7, 2009, at 9:30 a.m.)
```

THIS PAGE INTENTIONALLY LEFT BLANK

5424

1   the 8th of January 2001.
2       MR. QUINN:  We are going to offer it solely for the
3   purpose of showing what the rating agents were saying.
4       THE COURT:  Any objections?
5       MR. ABBEY:  No objection.
6       THE COURT:  Admitted.
7       (Defendants' Exhibit 119 received in evidence)
8       MR. QUINN:  Can we have up here --
9   Q.  I take it this is a research report from Standard & Poor's?
10  A.  Yes.  This is one of their periodical research reports,
11  yes.
12  Q.  Who does this go to?
13  A.  This would go to institutional investors, the marketplace.
14  This would go to the investment banks and the typical
15  participants in the capital markets.
16  Q.  Now, you mentioned earlier in your testimony that sometimes
17  a company will be willing to take a lower credit rating in
18  order to actually go into the market and increase its debt and
19  acquire companies?
20  A.  That's correct.
21      MR. QUINN:  Can we point to page 6 of this credit
22  report -- rather, research report.
23  Q.  Now, could you highlight for us -- this is a discussion by
24  Standard & Poor's about the financial profile of Vivendi right
25  at the beginning of the class period in January of 2001?

5425

1   A.  This is correct.  It's basically saying management has
2   shown its willingness to accept a substantial deterioration of
3   the group's credit indicators in order to pursue external
4   growth.
5   Q.  What did you conclude from that document that Standard &
6   Poor's was telling the marketplace?
7   A.  Well, I think what they are saying, and it's pretty clear,
8   that the company has been very willing to take on debt and
9   that's how they intend to take on this debt, and they intend to
10  change the company from a water company.  Doesn't say a water
11  company there, but they used to be a utility company and they
12  are moving into a media and telecom company in a very
13  competitive marketplace, and their plan is to do it by
14  substantially deteriorating their credit ratios.
15  Q.  That's what they were telling the world?
16  A.  That's what they told the worth repeatedly.
17      MR. QUINN:  Can we go back for a second to the first
18  page.  Could you highlight the author of this report.
19  A.  This is guy del loan.
20  Q.  Who is Mr. Deslondes?
21  A.  Mr. Deslondes is the lead analyst for Standard & Poor's
22  during this class period following Vivendi.
23  Q.  Was he deposed in this case?
24  A.  He was deposed, yes.
25  Q.  Is that one of the depositions that you read?

5426

1   A.  It is.
2   Q.  Now, are there other indicators -- you showed us the actual
3   ratings themselves, but do Standard & Poor's and Moody's have
4   other indicators that they are telling the marketplace as to
5   the status of a credit risk of a particular company at any
6   given time?
7   A.  Yes.  There are other indicators, and I have a slide on
8   this here.  You can see on the left, and this is what I
9   mentioned earlier about the summer or in July, I think it is,
10  of 2000, whenever both Standard & Poor's and Moody's put
11  Vivendi under review, active monitoring of event.  Vivendi has
12  taken on a very large transaction and the rating agencies are
13  not certain what the consequence of this transaction is.  And
14  so on the far left it's active monitoring, Moody's has under
15  review, and they have different categories.  One is for
16  possible upgrade, one is for direction uncertain, and one is
17  for possible downgrade.
18  Q.  And Standard & Poor's has similar categories?
19  A.  Standard & Poor's has something very similar.  It's under
20  credit watch or what they call credit watch; positive, if it's
21  a positive event; developing, if they are uncertain; and
22  negative, if they think it's more likely it's going to be
23  downgraded.
24      Just to be clear, even though it's under review for
25  downgrade, for example, it doesn't necessarily mean that it

5427

1   will be downgraded.  It just simply means that they are looking
2   at it and they are studying the situation.
3   Q.  Certainly, it's a warning to the marketplace that that's a
4   possibility?
5   A.  Absolutely.  That is their initial impression.  It is a
6   possibility.
7   Q.  That would be true if you were under review, possible
8   downgrade or credit watch negative?
9   A.  That is correct.
10  Q.  Is it true that during the vast majority of the time that
11  the class period was in effect, in fact, Vivendi was under
12  review, possible downgrade, or credit watch negative?
13  A.  For all -- from 2000, the summer of 2000 until December of
14  2001, Standard & Poor's had Vivendi under review or credit
15  watch negative.  That's about 18 months or so.  And then
16  starting in, I guess, it's July, July 2, put them under
17  review --
18  Q.  July 2?
19  A.  2002.  Put them under credit watch negative again until the
20  end of the class period.
21  Q.  Now, what's the difference between active monitoring of an
22  event and what you have on the other side of the slide, general
23  medium-term expectation or outlook?
24  A.  Well, active monitoring means that something has happened,
25  and they don't understand the implication of this thing

THIS PAGE INTENTIONALLY LEFT BLANK

5448

1  A. Yes, it does go on to talk about some of these

2  uncertainties.

3  Q. Here it says --

4     MR. QUINN:  Could you blow it up a little bit more.

5  A. I guess here it is pointing out, the rating review reflects

6  many uncertainties and on a pro forma basis the merged entity

7  would appear to exhibit reasonable financial flexibility, the

8  as-yet anticipated appetite for financial and business risk

9  that the enlarged management group will exhibit will likely be

10  a constraint on the enlarged Vivendi Universal.

11  Q. What did you understand Moody's in this case to mean when

12  they were talking about the untested appetite for financial and

13  business risk?

14  A. In the case of this particular situation, they are putting

15  together a North American-based operation in terms of the

16  Seagram's business with a European-based operation.  So you've

17  got lot of new managers and a lot of new people in the mix.

18  The board is changing for Vivendi.  So there is not clarity as

19  of yet in terms of the direction management is going to take

20  this company, and they are basically putting investors on

21  notice that it's untested.  It's not clear what the appetite

22  will be for taking on additional debt and that is something

23  they are going to study.

24  Q. Now, did Moody's shortly after this issue yet another

25  public press release with regard to their analysis of Vivendi?

5449

1  A. Yes, they did.

2  Q. Let me show you a document that is not yet in evidence,

3  which is Defendants' Exhibit 794, and ask you whether you can

4  tell us what this is.

5     First I will ask you again, is this one of the

6  documents --

7     MR. QUINN:  I stand corrected by about a thousand

8  people.  It is in evidence.

9     THE COURT:  Proceed.

10     MR. QUINN:  So I won't offer it again.

11  Q. This is one of the documents that you reviewed?

12  A. Yes, I did.

13  Q. Tell us, the headline is Moody's changes direction of

14  review of Vivendi SA from uncertain to possible downgrade.

15     What is the date of this?

16  A. This is the 4th of July 2000.

17  Q. Again, this is before the merger itself?

18  A. Correct.  There had been the announcement of the merger but

19  it had not officially taken place.

20  Q. What, based on your experience, is Moody's now telling the

21  market with regard to issues relating to this merger?

22  A. In the first paragraph here, I think it points it out

23  pretty clear.  They are no longer uncertain about going up or

24  down but, rather, now they think the likelihood, if anything,

25  is that the rating could possibly be going down.

5450

1  Q. That is the possible downgrade?

2  A. That is the possible downgrade they're referring to here.

3     They have clarified the debt structure following the

4  IPO.  They have some better understanding of it at this point.

5  It goes on.

6  Q. I'm sorry.  Go ahead.

7  A. They make it pretty clear about they have the debt rating

8  for Vivendi, the senior unsecured, senior unsecured, downgrade,

9  but they left the Seagram's unreviewed for possible -- it is

10  uncertain what is going on with Seagram's at this point.

11  Q. Did S&P also issue press releases in this same time period

12  regarding the merger?

13  A. Yes, they did.

14  Q. I am going to show you what is DX272, and I am informed

15  this is not in fact in evidence, and ask you if you can tell us

16  whether this is something they reviewed and what it is.

17  A. Yes, this is something I've seen.  The date is the 23rd of

18  June 2000.  This is from Standard & Poor's.  Vivendi stolen

19  credit watch negative and Seagram on credit watch developing

20  following the merger announcement, and basically they still

21  don't know which way it is going to go with Seagram at this

22  point.

23     MR. QUINN:  I would offer this for the same purpose of

24  what the credit rating agencies were saying at this period.

25     THE COURT:  Any objection?

5451

1     MR. ABBEY:  As long as it is not offered for the

2  truth, no objection, your Honor.

3     THE COURT:  Admitted on that basis.

4     (Defendant's Exhibit 272 received in evidence)

5  Q. This is a couple of days after the Moody's announcement,

6  first announcement?

7  A. Yes.  I think the Moody's was on the 20th, 20 June, and

8  this is June 23rd.

9  Q. Here it says that Vivendi is still on credit watch

10  negative.  What are they saying there?

11  A. Well, they believe that this merger has more negative

12  implications than it does have positive implications from a

13  credit standpoint.

14     You can just read through this.

15  Q. Can we go down to the bottom of the page and going over.

16  It talks about the enlarged entity's pro forma financial

17  measures, including profitability and debt-coverage measures,

18  remain largely uncertain given the complex business

19  restructuring to be implemented with the merger and the July

20  2000 IPO of Vivendi's environmental services subgroup.  In

21  particular, Vivendi's pro forma gross debt must be determined

22  and analyzed in light of the numerous transactions that have

23  been completed since January 2000.

24     What is the S&P in this case telling the market?

25  A. S&P is saying that it is unclear what the appetite is going

THIS PAGE INTENTIONALLY LEFT BLANK

6252

1 and what Dr. Nye was talking about, as far as you know?

2 A. Not that I'm aware of, no.

3 Q. Let's go back to slide 4.

4    Let me clarify one point. Did anything in the work

5 that you have done suggest to you that the conclusion that

6 there was a misrepresentation is any more or less likely?

7 A. No. I assumed that there is a misrepresentation and I

8 assumed that the misrepresentation took the form of some

9 undisclosed liquidity risk, but there is nothing that I do in

10 terms of evaluating the impact of the corrective disclosures

11 which say anything to me about whether that assumption is

12 correct or not.

13 Q. Now, in doing your analysis, did you study publicly

14 available information about Vivendi?

15 A. Yes.

16 Q. Did you go beyond that to look inside the company's

17 internal documents?

18 A. No, I did not.

19 Q. Can you explain why that was?

20 A. Well, just about all financial research shows that the only

21 thing that influences stock prices is publicly available

22 information, and we know that that occurs very quickly. So the

23 appropriate way to determine whether there are damages or not

24 is to look at publicly available information.

25 Q. OK. Perhaps we can turn to the next slide, which is a

6253

1 summary, I believe, of your opinions.

2    Just give us an overview, before we dive in, to

3 explain the basis for these opinions, please, sir.

4 A. OK. So this is an overview. My first, a summary of my

5 opinion is that Dr. Nye's measure of alleged inflation or -- I

6 am going to use the word inflation and damages interchangeably.

7 So his measure of alleged inflation or damage per share is

8 wrong, and there are two parts to that.

9    First, Dr. Nye's statistical analysis is wrong, and

10 I'm going to explain to you why that is the case. It will be

11 intuitive, even though it says statistics up there, it will be

12 intuitive why it is wrong.

13    The second problem with Dr. Nye's analysis that he

14 hasn't looked at what was actually going on each and every day,

15 and I really have to look inside every day in order to draw the

16 proper conclusion.

17    Finally, once we have an estimate of per share

18 damages, the question is how far back do you go, how far back

19 do those damages go, and Dr. Nye doesn't do that correctly

20 either.

21 Q. OK. So we are going to start now on the first opinion,

22 that Dr. Nye's measure of alleged inflation is wrong. We will

23 start with the statistical analysis and why that is wrong.

24    You use the word inflation. I know Dr. Nye spoke

25 about this a few weeks ago, I believe before Thanksgiving, but

6254

1 let's just all be on the same page. Can you describe to us

2 again what inflation is per share.

3    MR. SLIFKIN: Let's go to the next slide.

4 A. Yes. I prepared a slide for us to look at here. And,

5 damage/inflation is measured by stock prices, stock price

6 movements. In the picture here, I have stock prices up on the

7 side there and I have them in euros, 1 euro, 2 euro, 3 euro, up

8 on the side. That represents the euro price of the stock.

9 Down at the bottom are the days of the month. So this

10 represents, you start at day one, the first day, the tenth day,

11 the twentieth day and the thirtieth day.

12    As you see here, I have a little red dot on top of day

13 ten, and that is the day of an alleged misrepresentation. If

14 anyone bought before that date, there are no damages. If you

15 buy after that date, there may be damages, but that depends

16 upon what happens when the alleged misrepresentation is

17 revealed. So I have that occurring on day 20.

18    When the alleged misrepresentation is revealed, you

19 may have a damage if the stock price declines. So you have to,

20 in fact, you have to have bought after the alleged

21 misrepresentation occurred and you have to hold it through the

22 alleged, when the alleged misrepresentation is revealed, and

23 then you may have damages.

24 Q. Why do you say you may have damages if the stock price

25 falls? Why do you say the price may fall?

6255

1 A. I say the price may fall. It is not clear that if there is

2 a misrepresentation, which is then revealed to the marketplace

3 and corrected, that the stock price will in fact decline. That

4 information may not be material. It may not be important. It

5 may not be significant even if it was misrepresented or

6 concealed.

7 Q. OK. Now let's move to the next slide.

8    You spoke about revelation of the alleged

9 misrepresentation. Perhaps you could explain to us from an

10 economic perspective what you mean by that.

11 A. Well, the definition of a revelation of an alleged

12 misrepresentation is that it must be new information, it must

13 be something new. It also has to have been concealed. So a

14 revelation occurs when there is something new that was

15 previously concealed by Vivendi, and of course this has to

16 have, this revelation has to have some connection, there has to

17 be a connection with the alleged misrepresentations and then

18 there may be damages. There may be damages if there is a

19 significant stock price decline associated with that

20 revelation.

21    MR. SLIFKIN: Let's pause there and put up a slide

22 that Dr. Nye showed to the jury, slide 15 from his

23 presentation.

24 Q. Dr. Nye spoke about, he used the phrase fraud is revealed,

25 too, and he spoke about materialization of a risk and he showed

6256

1  this slide.
2       Is there any difference between the kind of analysis
3  that you are doing and the kind of analysis that he's doing?
4  A. No. We both looked at the corrective disclosure, the
5  alleged corrective disclosure, to see what the impact was.
6  Q. So let's go back to your slide and I have a few follow-up
7  questions.
8       When you say the new information is revealed, does
9  that have to come from the company itself?
10 A. No. It can come from the company. It could also come from
11 a rating agency. It could come into the market in any number
12 of ways -- from the company, from a rating agency, and so on.
13 Q. For purposes of your analysis, does the revelation have to
14 be precisely the same as the misrepresentation?
15 A. No, it doesn't have to be precisely the same, but there has
16 to be a connection. There must be a connection.
17 Q. How do you tell as an economist that there is such a
18 connection?
19 A. I look for an economic connection to see whether the
20 correction is related in an economic way to the alleged
21 misrepresentation, and you have to do that on a case-by-case
22 basis. There is no single rule that you follow.
23 Q. Now, the last item on your slide talks about a significant
24 stock price decline, and I know Dr. Nye testified about what is
25 significant. Perhaps you could explain it to us also. I think

6257

1  the next slide will help.
2  A. So the picture that I put up before with the stock prices
3  on the side and the days on the bottom, that is a simplified
4  version of what happens in the real world. Stock prices don't
5  stay at $2 for 20 days. Hardly ever. What you have to do is
6  extract from the normal movement of stock prices that which
7  might be due to an alleged misrepresentation, and this is why
8  we use statistical analysis.
9       Statistical analysis helps us extract from the normal
10 up-and-down-movements of stock prices what might be due to an
11 alleged misrepresentation, and we know there are a number of
12 factors which are generally related to stock prices or cause
13 stock price movements. In particular, the stock market as a
14 whole. When the stock market as a whole goes up and goes down,
15 all stocks tend to move up and down together, and you don't
16 want that to be left in the stock price that you are looking at
17 for the impact of an alleged misrepresentation. So that is why
18 the first bullet point there says you remove the market. So
19 statistically we take out of the movement in the stock price,
20 the movement that is associated with the market as a whole.
21      Now, Vivendi's stock traded in Paris, on the Paris
22 Bourse, and that was the primary market, the main market, and I
23 used something called the CAC 40, which is like the Dow Jones
24 Industrial Average in the United States. The CAC 40 is the
25 movements in the stock market, in the French stock market. So

6258

1  I used that to remove statistically from the up-and-down
2  movements of stock prices the part that comes from the market
3  as a whole.
4       I also have industry effects. So, for example,
5  Vivendi belongs to the media index. What I do is remove the
6  effects of the industry, because, again, I'm looking for
7  allegation-related, potentially allegation-related movements
8  and in order to do that I want to take out the movement in the
9  stock price due to the industry. What I used in that context
10 was the Dow Jones -- same name as the Dow Jones of the United
11 States -- Dow Jones Euro Stocks Media Index, because Vivendi is
12 part of the media industry.
13      So the first step is to remove market and industry
14 effects and look at what is left, and sometimes we call that
15 the residual.
16 Q. Let me just pause you there for a moment, Professor.
17      Now, Dr. Nye created, spoke about how he created his
18 own index, the one with the Egyptian cement company in it and
19 so forth.
20      Do you remember that?
21 A. You're talking about his industry index?
22 Q. Yes.
23 A. Yes, I remember that.
24 Q. Now, did you create your own index or did you use one that
25 was generally available?

6259

1  A. No, I used one that was prepared by one of the professional
2  financial research firms, Dow Jones. I looked at a number of
3  different indices prepared by the people who are in the
4  business of creating these kind of indices, and I examined the
5  number of alternatives. I took the one that explained the
6  stock price movements the best. That turns out to be the Dow
7  Jones Euro Stocks Media Index.
8  Q. Why did you do it that way?
9  A. I think that is the right way to do it.
10 Q. Now, Dr. Nye also used different indexes for the United
11 States on one hand and France on the other hand.
12      How did you deal with the issue of there being two
13 markets, one in the U.S. and one in France?
14 A. Well, the U.S. market and the French market are what we
15 call perfectly integrated when both markets are open, and
16 Dr. Nye and I have no disagreement on that. There is one price
17 in New York and one price in Paris when both markets are open,
18 of course once you make the foreign currency adjustment. So
19 they are perfectly integrated. You could look at either one.
20 I used the Paris market because that is, in fact, the main
21 market.
22      When there is a misrepresentation, an alleged
23 misrepresentation, if it affects the market in Paris, it will
24 affect the market in New York. There are times when there is
25 an announcement and the French market is closed and the New

6260

1   York market is open.  When that occurs, I look specifically at
2   the New York market, see whether there is a response, and then
3   I do the translation, the foreign currency translation, if
4   there is a significant impact, a statistically significant
5   impact.
6   Q.  OK.  Now, you have spoken about the statistically
7   significant impact.  Your next bullet concerns a control period
8   to measure volatility.  Can you explain to us why that is
9   important.
10  A.  This is getting into a little statistics, but it really is
11  intuitive.  There is nothing complicated.  Because we just said
12  that we took out the market, we took out the industry.  So I
13  have stock price movements.  I extract what is due to the
14  market, I extract what is due to the industry.  What is left
15  over is what we call the residual; namely, the part of the
16  stock's movement, Vivendi's stock movement, not explained by
17  the market, not explained by the industry.  But even those
18  movements tend to be, bounce around.  Even when the market
19  doesn't change and even when the industry doesn't change, these
20  stock price movements move up and down for all sorts of
21  reasons, mostly associated with the normal buying and selling
22  of the stock.  Every single day people buy and sell stocks for
23  all sorts of reasons, for reasons that we don't necessarily
24  know.
25       What we then have to do is determine whether on a day

6261

1   when there is an alleged corrective disclosure, whether the
2   price movement was different from this normal movement.  So
3   what we need to do is get a period, a control period, that
4   tells us about normal variability against which we can measure
5   this residual stock price movement.
6        So choosing the appropriate control period is very
7   important, because the control period tells you what is the
8   normal variability, normal residual variability.  Residual is,
9   again, after we have removed the market as a whole and after we
10  have removed the industry.
11  Q.  I think you prepared an illustration of that volatility
12  concept for us on the next slide.
13  A.  Yes, I have.
14  Q.  Could you explain to us what these next couple of slides
15  show.
16  A.  OK.  So this is what stock prices look like more normally
17  as opposed to the example that I gave you before, which was
18  just to illustrate the potential impact of a corrective
19  disclosure.
20       So what I now have is, again, on the side, price
21  movements, although you see they are now in percentage terms.
22  The reason they are in percentage terms is because a dollar
23  stock price movement on $10 is much different than a dollar
24  stock price movement on $100.  One is 10 percent and one is 1
25  percent.

6262

1        So in order to put all the price movements on a
2   standard, we talk about percentages.  And then of course we
3   could translate that back into dollars if there is a damage.
4   But the normal procedure is to take it to look at stock price
5   movements percentage-wise so that they can all be put on the
6   same basis.
7        So we have percentage movements on the side and,
8   again, I have days of the month, 1 through 30.  Those blue
9   lines and the red line represent percentage price movements
10  every single day.
11       As you can see, if you look at the blue lines, you
12  could get a rough idea of what is normal.  Just look at it and
13  you will see some of them are up, some down.  Again, this is
14  associated with normal buying and selling for no particular
15  reason that we may know about.  On the other hand, you see just
16  by the fact that I drew them red, but more than that, they are
17  much bigger.  They are much bigger than every other day.  And
18  we can then measure whether the red lines are statistically
19  significant.  In other words, although when you look at it they
20  look different, what a statistician does, what a financial
21  economist does, is measure precisely whether that really is
22  different.  That's what we do.
23       Of course, whether that 4 percent up or down is really
24  different depends upon how big those blue lines are, how big
25  the normal variability is.  So if you look at this picture, the

6263

1   red lines surely look abnormal.  They surely look statistically
2   significant.
3        Can we do something to this chart to show them they
4   don't look that way?
5        Yes.  So now if the normal movement, daily movement,
6   is the way the blue lines look on this picture, what looked
7   abnormal before doesn't look abnormal.  They are normal.  It is
8   what you would normally expect from the buying and selling
9   every day, for no reason that we can discern, that we know,
10  they are just normal buying, people making decisions on their
11  own.
12       So the key, an important key, to understanding whether
13  a corrective disclosure has an impact is to determine whether
14  it is statistically significant.  In order to determine whether
15  it is statistically significant, you have got to get the right
16  blue lines, the right daily normal residual volatility.  You
17  have to pick the right control period.
18  Q.  So when you say volatility, and you have that in your chart
19  here, is that the same as the normal movement?
20  A.  Yes.  When I use the word volatility or variability or
21  daily variability, I mean the normal movement that you would
22  expect just on any normal day when nothing in particular is
23  driving stock prices.
24  Q.  Now can volatility change over time?
25  A.  Yes.  Absolutely.

6264

1    Q. Why?

2    A. For any number of reasons.  So, for example, the stock

3    market as a whole can become more volatile because the economy

4    becomes more uncertain as a whole.  When all stocks move, when

5    the stock market as a whole moves, when the stock market

6    becomes more volatile, all stocks together will become more

7    volatile.

8        When the industry itself becomes more risky, more

9    uncertain, every company in the industry becomes riskier, and

10   riskier companies become riskier.  So a company that starts out

11   risky will become riskier when stock prices tend to decline.

12       So depending on how uncertain the economy is, how

13   uncertain the industry is, and how risky the company is to

14   begin with will determine whether a company's normal daily

15   volatility is a lot or a little.

16   Q. Let's go to the next slide and talk about what Dr. Nye did.

17       Perhaps you could explain to us what he did and what

18   your view is.

19   A. Yes.  So again, this control period, the period that you

20   use to judge how big those blue lines are normally.  So

21   Dr. Nye -- again, it is volatility.  He means daily volatility.

22   He assumes that volatility, the normal daily volatility, during

23   2001, which is his control period.  He uses 2001 as the control

24   period.  He assumes that it was constant.  In point of fact, it

25   was not.  I tested it and found that during 2001 volatility was

6265

1    not constant.

2        Now, that doesn't mean every single day is the same.

3    It means when you look at it, it looks the same, and the answer

4    is it doesn't look the same.  That is not a surprise, by the

5    way.  2001 we had a major event in the world -- 9/11.  The

6    world became more uncertain after that.  When you do a test and

7    test for the question, was volatility constant throughout 2001,

8    the answer is no.

9        Not only that, 2001 is during the class period.  The

10   class period starts in October of 2000 and extends through

11   2002.  In general, we do not want to use the class period as a

12   control because there are alleged misrepresentations that, what

13   we call, can contaminate the estimates because there are these

14   alleged misrepresentations.  And Dr. Nye admits that.  He says

15   that, yes, and normally we won't want to do it.  Nevertheless,

16   he uses 2001.  I think that is a mistake.

17       So I looked for a different control period that

18   matches the volatility of Vivendi during the period of

19   corrective disclosures that Dr. Nye identifies.  Dr. Nye

20   identifies the period between January and August of 2002 as the

21   period of corrective disclosures.  That's the period that we

22   are trying to describe to see what is normal.

23   Q. When you say corrective disclosures, from an economic

24   perspective, is that the same or different as a revelation

25   of --

6266

1    A. I'm sorry if I keep on -- corrective disclosure and alleged

2    misrepresentations, they are the same thing from my perspective

3    and Dr. Nye's perspective.  We are looking at the exact same

4    set of revelations.

5    Q. Let's go to the next slide, because you said Dr. Nye's

6    measure was wrong.

7        Perhaps you can explain to us what you discerned from

8    your analysis.

9    A. Yes.  Dr. Nye, again, he focuses our attention from January

10   2002 until August 14th of 2002 when there were these alleged

11   corrective disclosures.  So I looked at the average daily

12   volatility of Vivendi's shares during that period, taking out

13   the allegation days because I want to take away the

14   allegations.  I don't want them to represent, to be included in

15   the measure of volatility.

16       As you see, the average daily volatility of Vivendi

17   shares is 4.1 percent.  On the other hand, in 2001 it's only

18   2.6 percent.  Those numbers are what we call -- I tested those

19   numbers -- they are statistically significantly different.

20   They are -- I know they look different.  One is 2.6 and one is

21   4.1.  But we go further.  We do a formal test.  They are

22   different numbers, even when you take out the allegation days.

23       So Dr. Nye's control period, the standard that he uses

24   to judge whether the blue lines are what size of the normal

25   daily variability you would expect, it's too small.

1

1    Q. I think you started going into this, but is there a reason

2    in your opinion as to why Vivendi's stock price is, if I can

3    put it this way, bouncing around more in 2002 than it was in

4    2001?

5    A. Bouncing around is fine.  In fact, it moves around much

6    more.

7        There are a number of major changes that occurred.

8    9/11 is one.  9/11 changed the world.  It changed the way we

9    look at the world.  In addition, in the financial world things

10   changed dramatically in December of 2001; namely, there was the

11   largest bankruptcy in U.S. history to that date.  Enron.  You

12   may have heard of the company.  Enron bankruptcy occurred in

13   December 2002 -- 2001.  This made all companies riskier.

14   People looked at companies differently.  Is there another

15   Enron.

16       In addition, in June of 2002 there was a huge scandal

17   called the WorldCom scandal.  WorldCom was a major company and

18   it was, in fact, it was the company that owned MCI.  MCI was

19   the telecom or telephone, mobile telephone company.  There was

20   a scandal.  Companies became riskier, especially risky

21   companies to begin with.  Vivendi was a risky company.  It had

22   lots of debt.

23       So all of these risky events were magnified for a

24   company that started out riskier.  Namely, Vivendi.  Vivendi

25   started out riskier and had a lot of debt.

6268

1    Q. And from your analysis, was the fact that Vivendi was risky
2    and had a lot of debt, was that publicly known?
3    A. Yeah, quite so.  Everyone -- every analyst said Vivendi has
4    to reduce its debt.  Standard & Poor's said Vivendi had to
5    reduce its debt.
6    Q. So now you've spoken about your disagreement with Dr. Nye.
7    Let's talk about what that means for purposes of alleged
8    damages.
9        Let's go to the next slide.  This is about control
10   period?
11   A. Yes.
12   Q. Tell us what you do different from Dr. Nye.
13   A. Again, Dr. Nye uses 2001 as his control period for judging
14   whether a daily stock price movement is normal or not.  His
15   volatility, his measure of daily variability is too small,
16   which means that there are going to be days when he says, oh,
17   this is an abnormal movement when, in fact, nothing happened
18   out of the norm.
19       So what I did was looked for a control period that
20   matched the period of the alleged corrective disclosures, the
21   period between January and August of 2002.  So I started after
22   the class period.  That's what you want to do.  You don't want
23   to include the class period to get a normal movement.
24       So I started a week after the class period, I think it
25   was August 22, 2002, and I took a year's period, August 2002 to

6269

1    August 2003, and I did the same exercise.  I did the market, I
2    did Vivendi stock price movement.  I removed the market.  I
3    removed the industry and was left with a residual.  And I then
4    did a test, a statistical test, a formal test to say, are the
5    residual movements in my control period the same.  And I found
6    they are the same.  In other words, August 2002 through August
7    2003 fits the facts better.  What are the facts?  What's the
8    normal daily movement in stock prices?  During the period that
9    we are concerned with?  What's the period that we are concerned
10   with?  January through August of 2002, which is Dr -- which Dr.
11   Nye identified for us as what we should be focused on.
12   Q. Now, when Dr. Nye testified he said -- I'll paraphrase --
13   that he didn't want to use August '02 to August '03 because
14   Vivendi was a different company.
15       Do you have an opinion on that?
16   A. Well, Vivendi is Vivendi, as far as I know.  And Vivendi,
17   in fact, has been buying and selling companies throughout the
18   class period.  There were more than 20 purchases and sales of
19   Vivendi during the class period.  And they continued to do the
20   same.  So was Vivendi the same company?  Yeah.  It was a
21   company that was always buying and selling other companies.
22   And as far as I'm concerned, the proof of the pudding is in the
23   eating.
24       What does that mean in this context?  In this context,
25   of course.  In this context it means that, is the stock price

6270

1    movement, the residual stock price movement between 2002 --
2    between August 2002 and August 2003, is it the same?  The
3    answer is, it's the same.  And, therefore, that's the
4    appropriate control period.
5    Q. You've explained now your differences with Dr. Nye on the
6    statistical point.
7        Let's go to the next slide just to kind of get to the
8    bottom line of what all that means.  Explain to us what the
9    effect is of the correcting for Dr. Nye's errors in your
10   opinion.
11   A. Well, once you use the correct control period, once you
12   take into account the correct measure of daily volatility,
13   daily stock price movements, then the abnormal movements that
14   Dr. Nye associates with the disclosures on the alleged
15   disclosures on January 7, July 10, and July 15 are no longer
16   abnormal.  You can't say that the price movements on those days
17   was anything more than what you would normally see on days when
18   there are no announcements, on days when there are no
19   corrective disclosures.  Therefore, using the correct measure
20   of daily variability, daily volatility, there are no damages on
21   January 7, July 10, and July 15 because the alleged corrective
22   disclosures on those days did not do anything out of the normal
23   to those stock prices.
24   Q. So we all remembering things correctly, these dates that
25   you list here, where do those come from?

6271

1    A. Those come from Dr. Nye's report.
2    Q. And when it says Dr. Nye's inflation per share, is that the
3    elements of his damages?
4    A. Those are the numbers that he comes out with as an estimate
5    of what the damage is associated with the alleged corrective
6    disclosures on those days.
7    Q. So the three of them you changed it to zero?
8    A. Yes.
9    Q. What is your opinion about those particular days?
10   A. On those particular days there are no damages from the
11   alleged corrective disclosures because the alleged corrective
12   disclosures didn't do anything.
13   Q. Now, I believe you analyzed January 7, 2002 in even more
14   detail.  Is that right?
15   A. Yes, I did.  And this is the beginning of an example of
16   where Dr. Nye fails to take a look at what's going on inside
17   each day.  You can't just take a look at the entire day if you
18   want to understand what are the impacts of the corrective
19   disclosures.  You want to look at when those corrective
20   disclosures occurred, and you might -- not always, but you
21   might be able to determine the impact with greater precision.
22   You could put a narrower band on the precision of the number.
23   That's what I did in January 7.
24       And the reason I was able to do that on January 7 is
25   because on January 7, the alleged corrective disclosure that

**THIS PAGE INTENTIONALLY LEFT BLANK**

6276

1 the bottom, I have hours of the day.  So before we had days of
2 the month, but now I'm looking inside each day, which is what
3 you have to do.  And I start at 9:00.  That's when the French
4 market opened and that's the market that we are looking at.
5 And it ends a little after 5 because the French market closes
6 at 5:30.  And you have that blue line there, that jagged line.
7 That represents the stock price movements during the day.  And
8 I've just assumed that that's what's happening.  And as you
9 see, the stock price starts at 9 a.m. at 10 euro.  And by the
10 end of the day it looks like it bottoms out sort of around 5.
11     But if you take a look, my red dot -- you know what
12 the red dot is.  That's the alleged disclosure.  That alleged
13 disclosure doesn't happen until -- I'm making an assumption
14 here -- 2:30 in the afternoon.  By 2:30 in the afternoon the
15 stock price has declined from 10 to 6.  It's inappropriate to
16 include the entire drop because of that announcement.  That
17 announcement doesn't occur until 2:30 in the afternoon.  You
18 can't, as Dr. Nye does, take the entire day's price movement
19 and consider it a measure of the damage associated with that
20 alleged corrective disclosure.  That's inappropriate.
21 Q.  So if this were a day, is it fair to say that Dr. Nye would
22 have a number of five euros?
23 A.  If this were a day that he found a statistically
24 significant price decline, he would say it's equal to five euro
25 as a result of that disclosure, which that just can't be.

6277

1 Q.  And your number would be what, one euro, or that would be
2 your starting point?
3 A.  I would have to examine the circumstances in every single
4 case to determine, in fact, whether that price movement had any
5 effect at all or whether that announcement had any effect at
6 all.
7 Q.  With that example in mind let's turn to May 3, 2002, which
8 is the second of Dr. Nye's days that he analyzes.  If we can go
9 to the next slide.  That's the day of a Moody's downgrade,
10 right?
11 A.  That's correct.
12 Q.  Why don't you describe for us how you understand Dr. Nye's
13 opinion first.
14 A.  Well, I understand Dr. Nye saying that the Moody's
15 downgrade on that day is a revelation of an alleged
16 misrepresentation associated with the hidden liquidity risk
17 that he assumes existed, and he then comes up with an estimate
18 of 1 euro 49 as his stock price decline associated with that
19 announcement as the damage estimate, and I think that's wrong.
20 Q.  Let's go to the next slide then.  You can tell us what your
21 analysis is.
22 A.  Well, as I said, you've got to look inside each day.  If
23 you don't look inside each day you miss important facts that
24 will allow you to make the correct conclusion, draw the same
25 conclusion.  So the previous day the French market closed at 33

6278

1 euro and 77 cents.  At 5:12 on May 3, almost at the end of the
2 trading day, the price of Vivendi had declined from 33.77 to
3 32.43, more than a euro, almost a euro 30, 35.  5:30, the close
4 on May 3, it's 31.52.  More than 60 percent of the price
5 decline on May 3 occurred prior to the Moody's downgrade.  You
6 cannot include that part as a measure of damages.  It occurred
7 before the announcement.
8 Q.  Now, Dr. Nye said, well, you showed the jury some e-mail or
9 referred to some e-mails and said he thought the news of the
10 downgrade had been leaked to the market before its actual
11 announcement.  Did you form a view on that?
12 A.  I didn't see any evidence of any leakage in the
13 marketplace.  I saw no evidence of any leakage.
14 Q.  Well, did you look at those -- I believe they were May 2
15 e-mails that Dr. Nye referenced?
16 A.  Yes.  I saw it on his -- on the e-mails that he showed the
17 jury.  I would point out first, that's May 2.  That's not May
18 3.  And Dr. Nye and I have no quarrel that an announcement on a
19 day has its effect within that day.  So even if those e-mails
20 accurately described knowledge of the Moody's downgrade, it
21 would have occurred on May 2, not on May 3.  That's number one.
22     Number two, these e-mails did not -- I looked at them.
23 I don't remember the exact wording, but none of them said that
24 Moody's will downgrade tomorrow and that we know that.  They
25 said, we heard, we think there may be a downgrade.  The market

6279

1 has been thinking about a downgrade for weeks before.  This is
2 not something that's new.  This is not a leak.  This is people
3 doing normal analysis two weeks before that, people were
4 talking about a downgrade.  So I saw no evidence of any
5 leakage.
6     Dr -- as I recall, Dr. Nye mentions a hedge fund
7 that -- I don't want to quote out of context, but something
8 about a hedge fund shorting the stock because they think there
9 is a downgrade.  I work for a hedge fund.  It's called Odyssey
10 Partners.  It's a private equity form.  The last thing we would
11 do is tell anyone while we are shorting stock.  You don't do
12 that.  You don't want to tell anybody, guess what, we have some
13 information and we are going to sell.  Nobody does that.  So
14 the assumption that these e-mails tell us anything about
15 leakage, I don't see it at all.
16 Q.  Dr. Nye also suggested that Mr. Altuzarra of Goldman Sachs,
17 Vivendi's advisor, was telling his traders to trade on some
18 potential information about Moody's.  You worked at Lehman
19 Brothers.  Do you find Dr. Nye's assertion plausible?
20 A.  Well, as I understand it, Mr. Altuzarra was an advisor to
21 Vivendi.  He worked for Goldman Sachs.  And I would be
22 extremely upset at Dr. Nye's assertions.  I worked for Lehman
23 Brothers.  You are not allowed -- if you are a banker advising
24 a company, you are not allowed to disclose that to anyone.
25 It's against the law.  Not only that, trust me, most of the

6280

1    bankers don't like the traders.  They are in different worlds.
2    They don't want to talk to each other aside from the fact that
3    they are not allowed to.  Dr. Nye never worked for an
4    investment bank.  I worked there and I know that that's not the
5    way they conduct business.
6    Q.  Now, it is fair to say you observed a price movement,
7    downward price movement, after the actual announcement of the
8    downgrade.  Is that fair?
9    A.  Yes, sure.  If you take a look at my chart or my table
10   there, it says that the previous close, May 2, 33.77, it
11   declined to 32.43 at 5:12, and it continued to decline to 31.52
12   afterwards, after the announcement.  My conclusion is that
13   whatever was causing the price to climb to occur before
14   continued.
15   Q.  Let's go to the next slide.  Perhaps you could explain to
16   us what your analysis of the downgrade was.
17   A.  So I, in fact, went ahead and looked at the downgrade in
18   more detail because I see that there was no effect.  I see that
19   there is no impact.  The question is, why was there no impact?
20   Well, there were at least two reasons why there was no impact.
21   One, all the reasons that Moody's gave for the downgrade were
22   known.  So if it were already known, it was already what we
23   say, as we say, in the market.  People knew about these
24   factors.  Moody's did not add any new information other than
25   the fact that they downgraded.  And that information that they

6281

1    downgraded had already been anticipated in the market on April
2    17.
3         There was an article in Bloomberg, which is a news
4    dissemination.  He is our mayor, but he also has a company
5    called Bloomberg.  That company released -- had a news article
6    which said, a downgrade was -- that Vivendi's debt was already
7    trading, as they say, one step below, one step lower than its
8    current downgrade.  This, by the way, is not unusual.  The
9    markets look very carefully.  It doesn't always happen.  In
10   this particular instance, the market already knew about the
11   downgrade.  The downgrade wasn't news.
12   Q.  I think you said it's one step below its current downgrade?
13   A.  One step below its current rating by Moody's.  Moody's had
14   a rating and it reduced the rating on May 3, but on April 17 it
15   had already been trading quite not a step below that level; in
16   other words, the same as what it downgraded it to.
17   Q.  Let's look first or let's look in more detail at this view
18   of yours that all the reasons for the downgrade were previously
19   known.  Let's go to the next slide.  Can you tell us what you
20   show on this slide, sir?
21   A.  Well, on the right-hand side here I'm giving the Moody's --
22   the reasons for Moody's downgrades.  If you read the Moody's
23   announcement, which I did, this is just a summary of those
24   reasons, and this summary is taken from Dr. Nye.  So this is a
25   summary of what the reasons for the downgrade that Moody's gave

6282

1    on May 3, at 5:12 in the afternoon on May 3.
2         The first thing they talk about is lack of economic
3    control of telecoms.  You know the telecoms, Maroc Telecom,
4    Cegetel.  And I'm giving you -- on the left-hand side I will
5    give you the references to when these discussions that Moody's
6    is referring to, in fact, were disclosed to the market; in
7    particular, lack of economic control of telecoms.  People have
8    been complaining, analysts have been complaining about that for
9    a long time.  And there was an article by Merrill Lynch on
10   November 5, 2001, worrying about lack of economic controls of
11   telecoms.
12        The next, doubts about Vivendi's ability to achieve
13   meaningful excess cash flow.  We have heard about cash flow.
14   Well, everybody has been worried about Vivendi's cash flow or
15   lack of cash flow.  Doubts about Vivendi's ability to achieve
16   meaningful excess cash flow, Credit Suisse First Boston,
17   another investment bank on February 22, 2002, discussing the
18   exact same thing.
19        Next one:  Payment obligations from put options.  I am
20   going to come back to this one because it's important for other
21   reasons.  But payment obligations from put options made on
22   March 5 was in a Vivendi's press release, the payment
23   obligations that had under their put options.
24        Concerns about Vivendi's ability to reduce debt at a
25   planned pace.  This has been going on since the beginning of

6283

1    the class period.  And on April 11, 2002, concerns about
2    Vivendi's ability to reduce planned debt in a Reuters news
3    article.
4         Uncertainty surrounding asset sales.  How much are
5    they going to get when they finally sell their assets?  The
6    value of their assets has been going down the whole time.  How
7    much time are they going to get?  Uncertainty surrounding asset
8    sales, Reuters article, April 11, 2002.
9         Strategic challenges in the cash consuming Canal Plus
10   operations.  Canal Plus has been a cash consumer and they have
11   been worried about it.  Again, Bank of America, April 12, 2002.
12        Finally, Vivendi was challenged to reach its ambitious
13   2002 EBITDA targets.  You've heard about EBITDA.  Everybody has
14   been worried about EBITDA.  The most recent one is April 18,
15   2002, Vivendi's challenges in Bear Stearns.  Every one of
16   Moody's reasons has been discussed in the market and these are
17   just some illustrations.
18   Q.  Based upon that analysis, what did you conclude?
19   A.  I conclude that none of the reasons that Moody's uses --
20   gives that could be connected to the alleged misrepresentations
21   were new.  If they were not new they wouldn't have an impact on
22   the stock price.
23   Q.  Why don't we move then to the next slide, slide 23.  You
24   also have an opinion about unrelated factors in the Moody's
25   downgrade.  Can you explain to us what you mean by this?

THIS PAGE INTENTIONALLY LEFT BLANK

6288

1 decline. What is that? I cannot give you the specific reason.
2 I've traded for 15 years. The markets teach you the number of
3 lessons.
4     The first lesson, markets are efficient. The second
5 lesson is, never say never. Anything can happen. And the
6 third lesson, the third lesson is, I don't know is often the
7 correct answer. The market teaches humility. We don't know
8 everything about stock prices other than they are volatile.
9     And just by way of example, in the 20th century there
10 were 25,000 days of trading in the stock market. The single
11 biggest stock price movement occurred on October 19, 1987.
12 1987, that's recent. The single largest price decline, more
13 than 22 percent without any reason. There is no reason for the
14 single largest stock price decline that we know of other than
15 the always correct reason, more sellers than buyers at
16 yesterday's price. That forces the price to go down.
17 Sometimes we know what happened, sometimes we don't. Sometimes
18 we know what couldn't have caused it. Sometimes we say, I
19 don't know. And I don't know is the correct answer in this
20 case.
21 Q. If we go to the next slide, what is your ultimate
22 conclusion then about May 3, 2002?
23 A. I conclude that the Moody's downgrade did not cause a price
24 decline on that day and, therefore, there are no damages from
25 the alleged corrective disclosure associated with the Moody's

2

1 downgrade.
2 Q. Now we are going to turn to the next day, June 21, to
3 analyze that.
4     MR. SLIFKIN: Your Honor, may I ask when you want to
5 take a morning break, 11:30?
6     THE COURT: You want to break now? We will take a
7 break now.
8     MR. SLIFKIN: Thank you very much, your Honor.
9     (Jury not present)
10     THE COURT: Fifteen minutes.
11     (Recess)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

6290

1     THE COURT: Jury entering.
2     (Jury present)
3     THE COURT: Mr. Slifkin.
4     MR. SLIFKIN: Thank you very much, your Honor.
5 Can we put up again Dr. Silber's slide 24.
6 BY MR. SLIFKIN:
7 Q. This is where we left off before our break, Professor.
8 You have told us your conclusion on May 3, 2002. The
9 next day is June 21, 2002.
10     MR. SLIFKIN: Perhaps we can go to the next slide, 25.
11 Q. Perhaps set the stage for us as to what you are responding
12 to here.
13 A. OK. So Dr. Nye concludes that the Vivendi sale of its
14 shares in Vivendi Environment through a repurchase agreement
15 was a revelation of the alleged fraud and he attributes the
16 entire 2 euro and 1 cent price decline on this day to that
17 alleged misrepresentation. I think those conclusions are
18 wrong.
19 Q. Let's go to the next slide and perhaps you can tell us what
20 your view is.
21 A. Once again, you have to look within the day to really
22 understand what is going on. So in point of fact, the news
23 about the repurchase agreement occurred not on the 21st, but on
24 the 20th, after the Paris Bourse was closed. It occurred at
25 around 6:08 or 6:07 the night of the 20th. Of course, that's

6291

1 after the Bourse closed, but it is 12:00 New York time. It is
2 in the middle of the day, while the New York Stock Exchange is
3 open. We know that Vivendi's ADR shares, these shares related
4 to the underlying stock of Vivendi, are traded on the New York
5 Stock Exchange.
6     I took a look at what happened on the New York Stock
7 Exchange from 12:00 until 4:00 that day. When the news came
8 out -- immediately before the news came out, the shares of
9 Vivendi's ADRs on the New York Stock Exchange were trading at
10 26.21. At the close of the New York Stock Exchange, they were
11 trading at 26.21.
12     If that information was material, if that information
13 mattered, if that information had disclosed anything about the
14 alleged misrepresentations, we should have seen it there. Four
15 hours is more than enough time for information to be impounded
16 in stock prices.
17 Q. Now let's explore that a little more extensively, whether
18 or not four hours is more than enough time.
19     MR. SLIFKIN: Let's go to the next slide.
20 Q. Now you may recall, Professor, that Dr. Nye and I spoke
21 about his opinion in a case in Florida, where he had said that
22 stock price movements are virtually instantaneous. Different
23 from what he said to this jury in this case.
24     Now, what is your view on that question?
25 A. Well, I think Dr. Nye's conclusion in the Florida case was

**THIS PAGE INTENTIONALLY LEFT BLANK**

6308

1    know.

2         In addition, and it is not on this chart -- I don't

3    know why it is not on here -- there were other things that

4    happened overnight.  In particular, there was uncertainty over

5    whether the banks would lend to Vivendi until Mr. Messier

6    resigns.  This is something that is the banks deciding about

7    whether it will extend loans.  This is bad news.  It doesn't

8    seem to me to be allegation related.  This is something that is

9    the decision of the banks until Mr. Messier resigns.

10   Q.  I am going to come back to that range of zero to 1.35 in a

11   moment.

12        Let me ask you this.  Because you have a range there

13   zero to 1.35, does that suggest to you that in fact there was

14   some misrepresentation or hidden liquidity risk here at all?

15   A.  Well, again, there is an allegation that the Cegetel loan

16   was a misrepresentation.  I don't know whether that is true,

17   but you can't tell whether the damage is zero or 1.35 or

18   something in between.

19   Q.  OK.  I will come back to that in a moment because there is

20   also the S&P downgrade.

21        Let's go to the next slide and cover that briefly.

22        What did you conclude about the S&P downgrade?

23   A.  Again, the S&P downgrade occurred during the day and it

24   occurred -- we know exactly when it occurred.  It occurred at

25   2:37.  That is when it hit the news wires.  You know that

6309

1    you've got to see a response in 15 minutes.  People don't just

2    sit there and wait.  They respond.  Especially if they are

3    nervous.

4         Well, if you look immediately prior to that

5    announcement, Vivendi's stock price is 16 euro.  An hour later,

6    the stock price is 16.98.  It went up, not went down, as a

7    result of -- associated with the S&P downgrade.  How is it

8    possible that a downgrade can cause the stock price to go up.

9    The answer is no more uncertainty.  Uncertainty, you don't like

10   uncertainty when you are an investor.  When uncertainty gets

11   resolved, you feel better.  Stock price actually goes up in

12   this case.

13   Q.  So let's go to the next slide and look at your conclusion

14   for July 2, 2003.  Again, explain to us what you did with

15   respect to Dr. Nye's number.

16   A.  I can reject his number of 5.31 is a proper estimate

17   of damage.  I put my estimate of damage as somewhere between

18   zero and 1.35 euro.  I don't think you can tell which one or

19   whether it is zero, 1.35 or something in the middle.

20   Q.  Could it in fact be zero?

21   A.  It certainly could be.

22   Q.  Is it in your view at least more likely than not that it is

23   1.35?

24   A.  No.  You can't tell, I said.

25   Q.  Is there a way from using economic or statistical analysis

6310

1    that you can pick whether it is zero, 1.35, or somewhere in

2    between?

3    A.  No, you cannot disentangle that.

4    Q.  Let's turn, then, to August 14th, the very last day on your

5    analysis.

6         This slide is a little longer than most.

7         Explain to us what is it that Dr. Nye thinks is going

8    on that day.

9    A.  Well, there were, again, ratings downgrades on August 14th.

10   As he says, the ratings downgrades further reveal the alleged

11   misrepresentations.

12        The second bullet point he says that there were other

13   revelations that day, in part by the company, on debt levels,

14   proposed asset sales, EBITDA, and liquidity.  He says that

15   there are a whole bunch of alleged misrepresentations

16   concerning these points.  He then attributes the entire

17   residual stock price decline on this day to these alleged

18   misrepresentations.

19        The number that he comes up with is 3 euro and 52

20   cents.  That estimate is wrong.  I have a different

21   model.  I have a correct model.  I have a model that uses the

22   correct control period.  We haven't talked about control period

23   in a while.  I use the correct control period.  My calculation

24   of 3 euro and 33 is the correct estimate of the residual

25   decline on that day.  So if there are any -- if the

6311

1    misrepresentations cause any damage, and we look at the entire

2    day, then the maximum will turn out to be 3 euro 33, not 3 euro

3    52.

4    Q.  Let's go to the next slide.  Perhaps you can tell us

5    whether or not you think it is 3 euro 33.

6    A.  Well, once again, Dr. Nye does not look at what goes on

7    within the day.  In particular, if you look at the downgrades,

8    and I did, you look at after the Standard & Poor's downgrade

9    that occurred during the day, you look for an hour afterwards,

10   stock price once again does not go down.

11        If you look at the Moody's downgrade, and the Moody's

12   downgrade, by the way, occurred after the close on August 14th,

13   after the close in Paris but while New York is still open, you

14   see that the stock price does not go down after the Moody's

15   announcements.

16        So my conclusion is the downgrades did not cause any

17   of the price decline on that day.

18        Now, there were other announcements that Dr. Nye

19   points to, but there was other non-allegation-related news that

20   day that could have contributed it to the price decline.  In

21   particular, there was a conference call in which Mr. Fourtou,

22   the new CEO, discussed his plans.  He discussed liquidity.  But

23   he also discussed business strategy, not to the liking of

24   analysts.  The analysts did not find that his strategy was well

25   articulated.  That made them nervous.  And therefore, this is

3

1    something which could easily have caused, contributed to the
2    price decline but has nothing to do with alleged
3    misrepresentations.
4        (Continued on next page)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

6313

1        In addition, at the same time that there was this news
2    conference by Vivendi, News Corp., Rupert Murdoch's company,
3    which had been negotiating on and off with Vivendi about buying
4    its Telepiu subsidiary suddenly comes up with a new reason that
5    it doesn't want to buy Telepiu, that it's worried about
6    Telepiu, something very specific that it hadn't talked about
7    before, and that is its subscriber list.  A telecom company,
8    telephone company, is only as good as its subscribers, how many
9    people use it, and he was worried about its subscriber list.
10   That, too, could easily have contributed to the stock price
11   decline.  Therefore because it is almost impossible to
12   disentangle all these different effects, except, by the way,
13   for the downgrades, all the other announcements that were made
14   on this day, the damage must be between zero and 3 euro and 33
15   cents.
16   Q.  Can you be confident that the downgrades themselves did not
17   cause a stock price decline?
18   A.  I think I said that, yes.  Again, you look at the -- I
19   looked at the announcements of when the downgrades occurred, I
20   looked at the stock price before the announcement, and I looked
21   at the stock price within an hour.  We know that you must see
22   some response.  People don't sit and wait.  They react.  And if
23   you don't see a response, there is no impact.
24   Q.  Again, as I asked you before, could the correct number for
25   August 14, even if there was -- the jury determines there was

6314

1    some misrepresentation and there was some correction on that
2    day, could the correct number still be zero?
3    A.  Yes.  It could be zero because we have a number of things
4    occurring that day, and you can't disentangle their effects.
5    The News Corp. announcement and the conference call occurred at
6    the same time.  If you look within the day, the stock prices
7    declining during both of those news conference.
8    Q.  Can you as an economist say that it is more probably than
9    not that it is some number greater than zero?
10   A.  No.  It's zero, 3.33, or something in between.
11   Q.  Let's turn to the next slide.  This is a day-by-day slide.
12   Now we are back into totals at the bottom.  Perhaps you can
13   tell us what the net result of all the analysis and
14   calculations are.
15   A.  The only two days on which there are potential damages are
16   July 2 and August 14, and on each of those days I give you a
17   range.  I give you a range because to do otherwise would be
18   wrong.  I have to give you a range.  There is no way of
19   disentangling it.  And the range is on July 2, between zero and
20   1 euro 35.  On August 14, the range is between zero and 3.33
21   euro.  Therefore, total inflation, total damage from the
22   alleged curative disclosures, corrective disclosures, are
23   somewhere between zero and 4.68.
24   Q.  How did that compare to Dr. Nye's numbers, which is
25   somewhat obscured here?

6315

1    A.  He has one number.  It's 22.52.  One number is not better
2    than a range.  I could give you one number, but that would be
3    wrong.  I'm giving you a range because that's the right way to
4    think about it.  It's between two numbers.  So putting 4.68 up
5    there or zero up there would be incorrect.
6    Q.  Again, just so we are clear, from this analysis, are you
7    saying this shows there was, in fact, some misrepresentation or
8    hidden liquidity risk, or are you merely assuming that?
9    A.  As I said when I started, I made an assumption, I made an
10   assumption.  The assumption is there is some alleged hidden
11   liquidity risk.  And the question that I'm answering is, is
12   there any damage to shareholders from that alleged liquidity
13   risk.  In order to assess damage, you must determine a stock
14   price decline associated with the revelation of the truth.
15   That's what I've done here.
16   Q.  One last question to be addressed as part of this analysis,
17   which is, I think you had in your earlier slide how far back.
18   If there is any inflation, how far back does it go?
19       Let's go to the next slide.  There are three bullets.
20   I think we'll probably do them in turn.  Perhaps you could
21   explain to us first what you're saying in your first bullet.
22   A.  Let me just say, how far you go, we now have per share
23   damages between zero and 4 euro and whatever my number was
24   there.  I have forgotten it.
25   Q.  4 euros and 68?

6316

1   A. 4 euros and 68. We now have per share damages. The
2   question is, who is entitled to get the damage? How far back
3   do you go? And in order to know how far back do you go you
4   have to determine when the alleged liquidity risk first
5   occurred and was concealed. And what Dr. Nye claims is that he
6   did an economic analysis to determine when that maximum damage
7   occurred.
8      Do you have his slide here?
9   Q. We will put up Dr. Nye's slide 93.
10  A. This is his economic analysis.
11  Q. What is your opinion of this, sir?
12  A. This is not an economic analysis. This is a summary of
13  press releases, public statements, and it's a summary of trial
14  testimony by various people. That's not economics. Economics
15  is an examination of the books and records of the company to
16  determine sources and uses of funds. That's what you do.
17  That's what you call an economic analysis. This is not an
18  economic analysis. So whatever Dr. Nye is basing his
19  conclusion on, it's not economics.
20  Q. Let's go back to Professor Silber's slide 49. Now, I
21  think, again, you were here when Dr. Nye spoke about using
22  purchase accounting to construct an inflation band. Is that
23  correct? You were here for that?
24  A. Yes, I was.
25  Q. Perhaps we can show Dr. Nye's slide 98. You see that green

6317

1   line. That's his price inflation band. What is your view with
2   respect to his analysis in that green line?
3   A. Well --
4   Q. Go back to Professor Silber's slide.
5   A. His analysis of how far back you go based on purchase
6   accounting as a proxy, you don't need a proxy. Not only don't
7   you need it, you can't use a proxy. I mean, there is no reason
8   to go to a proxy. Purchase accounting has something to do with
9   how Vivendi treated its acquisitions. I understand that there
10  was uncertainty about how much benefit there was associated
11  with purchase accounting. That is not a proxy for how far back
12  you go. I've never seen something like that, nor would I do
13  something like that.
14  Q. When you use the word proxy, can you explain what you mean
15  by that in this context?
16  A. Well, I'm not sure, but what I think Dr. Nye is saying is
17  that the purchase accounting alleged misrepresentations that I
18  think it's Mr. Mintzer describes is a stand-in for the alleged
19  liquidity risk that Vivendi -- that Vivendi concealed. I don't
20  see any connection.
21  Q. When you say proxy, is that a kind of substitute? Is that
22  what he means in this context?
23  A. I should have used the word substitute.
24  Q. Now, just for illustration purposes, is it as a matter of
25  arithmetic possible to take Dr. Nye's line and instead of using

6318

1   his damages numbers to plug in your two days of damages
2   numbers, potential damages numbers?
3   A. I certainly can do that. I don't like doing it because I
4   think his line is wrong, but I certainly can do it in the
5   interests of putting correct numbers into his proxies.
6   Q. Let's look at slide 50. Perhaps you can tell us what this
7   represents first.
8   A. Well, as I recall, this is Dr. Nye's description -- he
9   calls it inflation. It's damage, nothing more, nothing less
10  than damage, and he has maximum damage. If you take a look
11  going straight up from December 13, 2001, that's when the
12  maximum inflation occurs, when the maximum concealed liquidity
13  risk, alleged concealed liquidity risk. And then, of course,
14  you see those steps coming down. Each of those steps is one of
15  his alleged corrective disclosures. And that's when the
16  inflation, when the damage gets reduced. And his purchase
17  accounting proxy starts from December 13 with that squiggly
18  line, and then going back based on Mr. Mintzer's calculation of
19  purchase accounting. So that's what that black line is.
20  Q. If one were to plug in your numbers to that line, is this
21  what it would look like?
22  A. Yes. The reason it looks like this is I have two dates
23  when there are corrective disclosures: August 14, 3 euro 33
24  and July 2, 1 euro 35, and this is maximum. I'm putting in the
25  maximum numbers, the biggest numbers possible, knowing that

6319

1   it's still a range. It could be zero. Putting in the maximum
2   numbers. If the jury were to conclude that the maximum numbers
3   were correct on these days, the damage would be 3 euro 33
4   as of August 14 for anyone holding it through August 14 from
5   the beginning of the class period, and it would be the sum of
6   1.35 -- again, 4 --
7   Q. 4.68?
8   A. 4.68 for anyone holding it from the beginning of the class
9   period through -- until July 2. And then it follows Dr. Nye's
10  line all the way back to December 13. There are no breaks
11  because there are no other corrective disclosures. And then it
12  sort of follows his line using purchase accounting, which I
13  think is incorrect. There is no reason to use a proxy for
14  these things and the proxy has, as far as I can tell, no
15  relationship. If you use his, you get the remainder going back
16  to the beginning of the class period.
17  Q. So the maximum starting on December 13, '01 would be 4.68?
18  A. 4.68.
19  Q. And less prior to that time?
20  A. Yes, less prior to that time because Dr. Nye says it's
21  going to be less.
22  Q. Again, do you think that's correct?
23  A. My numbers are more correct than his numbers, so my damage
24  band is more correct than his, but I don't think that this is
25  the right way to calculate how far back the damage goes.

6320

1  Q. Let's go to slide 49 again and the third bullet on it.
2  Describe to us your correct analysis.
3  A. There is a fairly straightforward way to think about
4  damages. The way you think about it is, you determine when the
5  new information that was ultimately revealed could have first
6  been disclosed, when could Vivendi have disclosed whatever it
7  is the corrective disclosures were correcting. That's when
8  damages begin. There is no shortcut.
9  Q. Let's go back to Professor Silber's illustration in slide
10  6. At the beginning, sir, you gave us this simple
11  illustration. If one were then to construct an inflation band
12  based on this, how would it work?
13  A. Anybody who bought stock in this company between day one
14  and day 10 has no damage. There is no misrepresentation.
15  Anybody who buys stock in this company from day 10 through day
16  20 -- 19 would have one euro -- and held it beyond day 20 and
17  held it beyond day 20 would, in fact, have one euro damage.
18  That's the inflation. That's the way you calculate properly
19  the damage that goes to stockholders.
20  Q. Now, let's turn to slide 51, the very last of Professor
21  Silber's slides. Perhaps you could explain to us what your
22  overall conclusion on this topic is, sir.
23  A. So I am going -- I'm summarizing. Assuming the jury finds
24  that there were misrepresentations that were revealed on July 2
25  and August 14, then the correct measure of damages cannot be

6321

1  more than 4 euro and 68 cents from someone who at the start of
2  the class period, October 30, who held the shares through July
3  1, 2002. And the damage cannot be greater than 3 euro and 33
4  cents for anyone who bought the shares on July 2 and held it
5  through August 13.
6  Q. Could the damages be zero on your analysis?
7  A. Yes. I said that before. The damage -- all of my numbers,
8  all of my calculations were assuming that the jury finds it's
9  the maximum. I gave you a range on both days that you
10  cannot -- that I can't as an economist disentangle which number
11  it is. It could be zero, it could be anything between zero and
12  35, anything between zero and 3.33.
13  Q. Now, on Defendants' Exhibit 1878 referred to there, does
14  that put those bands day by day to those date ranges?
15  A. Yes.
16  Q. And on that defendants' exhibit did you see the exchange
17  rate conversions that you previously testified about?
18  A. Yes, I did. In order to calculate damages in dollars, you
19  have to change the euros back into dollars, and I did it using
20  the exchange rate on each of those days.
21  Q. Now, you start October 30, 2000, the beginning of the class
22  period. Can you tell us what you're saying in the last bullet?
23  A. Well, I start October 30, 2000, but, again, the key that
24  the jury, I think, has to remember is that that's the beginning
25  of the class period, but the jury has to decide when the

6322

1  alleged misrepresentations could have been disclosed, and
2  damages go no further back than when that occurred. This is
3  the beginning of the class period. So it couldn't have been
4  before this, but it certainly could be later.
5  Q. Now, finally, sir, if the information disclosed to the
6  market on July 2 and August 14, 2002 was, in fact, already
7  known to the market, then because of prior disclosures, then
8  what are the damages numbers?
9  A. Well, if those were not corrective disclosures, then the
10  damage is zero.
11  Q. Zero?
12  A. Yes, zero.
13      MR. SLIFKIN: Thank you. I have no further questions
14  on direct examination, your Honor.
15      THE COURT: Mr. Spencer.
16      MR. SPENCER: Your Honor, I wonder if defendants are
17  seeking to admit DX1878, which was up there. So perhaps they
18  should do it with this witness.
19      MR. SLIFKIN: We can talk perhaps outside the presence
20  of the jury on this topic, your Honor, but our personal position
21  is it could be treated exactly the same way as the similar
22  exhibits with Dr. Nye.
23      MR. SPENCER: That's what I think, your Honor.
24  CROSS-EXAMINATION
25  BY MR. SPENCER:

6323

1  Q. Good morning, Professor Silber. You and I met this morning
2  on the line to get through the metal detector downstairs?
3  A. Yes. I thank you for helping me get in.
4  Q. We have, however, have been working on the same things in
5  this case, causation and damages issues that you've been
6  testifying about this morning, so I hope it's gratifying for
7  both of us to finally discuss this face to face and see where
8  we come out on this.
9  A. It's a pleasure.
10  Q. Professor, we only have about 20 minutes until the lunch
11  break, so I am going to start with a big-picture attempt to put
12  some things in perspective, and then after the lunch break we
13  will talk about some of the actual numbers that you have
14  discussed with Mr. Slifkin here this morning.
15      Dr. Silber, do you remember what the share price was
16  for Vivendi at the beginning of the class period?
17  A. No, I don't.
18  Q. If I suggested to you that it was around 82 euros, does
19  that sound about right?
20  A. It could be.
21  Q. And do you know what the share price of Vivendi's shares
22  were on the last day, closing of the last day of the class
23  period?
24  A. I don't remember the exact number.
25  Q. If I suggest that the charts show that that was 11

THIS PAGE INTENTIONALLY LEFT BLANK

6429

9CHMVIV1

1  claiming to have suffered as a result of the alleged fraud are
2  the share price declines that occurred on the nine days
3  identified by Dr. Nye in his event study.
4      To the extent that the defendants are taking the
5  position that Dr. Nye's testimony regarding these days pertains
6  solely to damages rather than to plaintiffs' alleged economic
7  loss or to loss causation, I do not accept that proposition.
8      Plaintiffs contend that the decline on the identified
9  days established loss causation, as they were caused by the
10  alleged fraud and not by other confounding factors, and Dr. Nye
11  has testified to that effect.  It is undisputed that various
12  market-wide, industry-wide, and company-specific factors caused
13  a general stock decline with respect to Vivendi shares on many
14  other days throughout the class period.  In fact, most of the
15  decline in Vivendi's stock price occurred on days other than
16  the days identified by Dr. Nye.  But plaintiffs are not
17  claiming to have suffered any fraud-related losses on those
18  other days.
19      What is in dispute with regard to loss causation,
20  therefore, is whether on the days identified by Dr. Nye
21  plaintiffs did, in fact, suffer some losses in the form of
22  stock price declines, and whether those losses were the result
23  of the alleged fraud and not a result of other factors.
24      As defendants' other expert, Dr. Silber, testified, a
25  proper analysis of stock price movement on any given day must

6430

9CHMVIV1

1  remove market and industry factors, as well as company-specific
2  information unrelated to the alleged fraud, in order to
3  determine if there are residual downward price movements
4  properly attributable to the fraud.
5      Professor Gilson's testimony does not help the jury
6  answer those questions, as he simply offers no opinion on those
7  subjects.  It was represented last night and it is clear from
8  his deposition testimony that Professor Gilson is not opining
9  that Vivendi's losses on the days identified by the plaintiffs
10  were caused by factors that Dr. Nye failed to account for.
11  Indeed, Professor Gilson offers no opinion as to what caused
12  the losses on those days.  And the subject in which Professor
13  Gilson does offer an opinion, that is, that Vivendi's stock
14  prices went down on other days, due to various market, industry
15  and company-specific factors is not disputed.  Allowing
16  Professor Gilson such testimony will not assist the jury and
17  may present a risk of undue confusion that outweighs any
18  probative value such testimony might have.  Those are my
19  general rulings.
20      I also have the letter of December 16 from Mr. Abbey
21  raising certain specific objections to slides 3, 4, 20, and 13.
22  I believe that plaintiffs' objections to some of the language
23  on those slides is appropriate.  Starting with slide 3, I
24  believe that plaintiffs' objection can't be addressed by simply
25  striking the first three words of the first bullet.  And so it

6431

9CHMVIV1

1  would simply say, if any risks were known to the market.  I
2  take plaintiffs' point that it's their theory that it is a
3  single liquidity risk.  So as not to have any question about
4  mischaracterizing plaintiffs' theory, I request the defendants
5  to make that change to slide 3 and slide 4 in the heading.
6  Slide 4 would simply say:  Vivendi disclosed liquidity risks.
7  And slide 20, I think.  Is that correct, Mr. Abbey, is it slide
8  20?
9      MR. ABBEY:  Yes.  It's one risk.
10      THE COURT:  Same three words.
11      With respect to slide 13, it's a close question, but I
12  think the caption is perhaps too argumentative and cueing
13  closely to the witness's testimony, I believe the heading should
14  simply say that Dr. Nye testified that the market is a rare
15  purchase accounting.
16      MR. QUINN:  Your Honor, we will make those changes.
17  That's not a problem.
18      I want to just mention, if I could, that it seems that
19  the theory is changing as we go along.  Because when Mr. Abbey
20  opened, he referred to -- I'm quoting from his opening -- these
21  were internal warnings, internal warnings about the real
22  liquidity risks that the company faced.  That was in his
23  opening.  Mr. Nye, when he was asked to assume with regard to
24  his testimony, he was asked to assume that the plaintiffs would
25  prove at trial that Vivendi Universal had aggressively

6432

9CHMVIV1

1  worsening and undisclosed liquidity risks.
2      And I know your Honor could have misspoken, but when
3  you instructed the jury -- this is a great thing about
4  computers now -- when you instructed the jury one day, which I
5  have here, your Honor also refers to the liquidity risks that
6  were, for the limited purpose of the witness' opinion, being
7  Nye, that this represents a materialization of the liquidity
8  risks of Vivendi.  So I do think that it is in the record that
9  at least they have talked about these multiple risks.  I have
10  no problem.  We will change the slides, but I thought it was
11  important to make sure the record is clear as to the kind of
12  shifting nature of plaintiffs' claims.
13      MR. ABBEY:  Liquidity risk, singular.  There is a
14  series of slides.  For instance, beginning on, let's say, slide
15  14.  I don't know if you have them here.
16      THE COURT:  I do.
17      MR. ABBEY:  But it talks about what was disclosed and
18  then in these slides there is about five or six of them that
19  follow, and the market understood this.  And I have an
20  objection to using the term, the market understood this.  I
21  don't think anyone could testify what the market understood.  I
22  think at most you could say, and the market was aware and
23  that's what he's using his slides for, to say that they were
24  aware of it.  But to say what somebody understood is beyond the
25  scope of his expertise or anyone's expertise.

THIS PAGE INTENTIONALLY LEFT BLANK

6489

1   A. Yes, sir.

2   Q. -- in the past?

3   A. Yes, I have.

4   Q. Give us some examples.

5   A. I worked with a group called Analysis Group. I've worked

6   with NERA, the National Economic Research Associates, Charles

7   River Associates, the Long Economics Consulting Group.

8   Different cases I have worked with I have used different firms

9   for support.

10  Q. About how many times have you been retained as an expert in

11  this area?

12  A. In this area over 25 years, probably two dozen.

13  Q. By the way, do you happen to know where -- you have been a

14  professor in a lot of different places -- do you happen to know

15  where the Fletcher School is located?

16  A. Yes, sir.

17  Q. Where is it?

18  A. It's part of Tufts University in Cambridge, Massachusetts,

19  just outside of Boston.

20  Q. It is not in Washington, D.C.?

21  A. I don't believe so.

22  Q. Now let's move on to your opinions, the opinions that you

23  have reached in connection with the work you have done in this

24  case.

25      Do you have a summary of those opinions?

6490

1   A. Yes. They are on the slide.

2      I understand that plaintiffs allege that there were a

3   variety of events or liquidity risks that had been concealed

4   from the market and when those risks were revealed in the

5   summer of 2002.

6      My conclusion, the opinions I reached after my

7   investigation, was that those risks were in fact known to the

8   market, had been disclosed, and since they were known to the

9   market, they weren't revealed in 2002, they were already public

10  information.

11      MR. ABBEY: Your Honor, could we have a side bar,

12  please.

13      THE COURT: Counsel approach.

14      (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

6491

1      (At the side bar)

2      MR. ABBEY: I thought what we agreed this morning was

3   that the plaintiffs' case involved a liquidity risk. I see the

4   word risks all over these charts.

5      You may have taken it out of the heading, but you have

6   it in the body. To me, that's ridiculous.

7      MR. QUINN: Your Honor, Mr. Spencer about five or six

8   times ten minutes ago referred to liquidity risks. This has

9   been what the case is about. This was in Nye's report,

10  Mr. Abbey refers to it --

11      THE COURT: All right.

12      MR. QUINN: It can't be changed.

13      THE COURT: Let's proceed.

14      (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

6492

1      (Jury present)

2   BY MR. QUINN:

3   Q. I'm sorry. I think you were in the middle of an answer

4   when Mr. Abbey asked for a side bar.

5   A. The conclusion I reached after my investigation were these

6   risks in fact had been disclosed to the market and that as a

7   result, once disclosed, there was nothing left to be revealed

8   in the summer of 2002.

9   Q. Now you also, I take it you prepared a series of slides to

10  help us through this last day.

11  A. Yes, I did.

12  Q. Have you prepared a slide that summarizes some of the

13  issues that the jury has heard about that the plaintiffs are

14  claiming were hidden in some way?

15  A. Yes, I did.

16      If you can put that up, please.

17  Q. Now, are these the different areas that you looked at in

18  connection with the study that you prepared?

19  A. I looked at these areas.

20      The 16 percent put with respect to Maroc Telecom

21  stock, issues relating to the Cegetel current account loan,

22  issues relating to the ownership of Telco, in effect, the

23  Polish telephone company, issues relating to the use of

24  purchase accounting by Vivendi, Vivendi's use of EBITDA, and,

25  finally, Vivendi's use of the operating free cash flow.

THIS PAGE INTENTIONALLY LEFT BLANK

6505

1   A. They were disclosed in filings that were required to be
2   filed by the Securities and Exchange Commission, that's
3   correct.
4        MR. QUINN:  Can we have up, I believe it's Plaintiffs'
5   Exhibit 1075.
6   Q. First of all, just remind the jury, they have seen this
7   several times, what this particular document is.
8   A. It's two things.  It's a form F-4, which is a registration
9   statement required by -- in the form required of foreign
10  issuers.  The word registration statement means that if someone
11  is going to issue securities to the public for the first time
12  they have to file a full disclosure of everything about the
13  company with the Securities and Exchange Commission who reviews
14  it and in turn that's information that's both available to the
15  public and given to the shareholders of the company.
16  Q. Now, this is dated, I believe, October 30, 2000?
17  A. That's correct.
18       MR. QUINN:  And could we have up, I believe it's page
19  34 of this document.  Highlight the top, I believe.
20  Q. Could you focus on, first, the highlighted title, which
21  says that the integration of Seagram and Canal Plus'
22  transferred businesses into Vivendi Universal may be difficult
23  and expensive to achieve and may not result in the benefit that
24  we currently anticipate.
25       What's Vivendi telling the investing public in that

6506

1   regard?
2        MR. ABBEY:  Objection.
3        THE COURT:  Sustained.
4   Q. What is your understanding of what Vivendi is telling the
5   investors in this document?
6   A. A short way of putting it is that it's easy to have a good
7   idea.  It's very hard to make it work.  Mergers and
8   acquisitions are extremely difficult transactions.  What this
9   transaction involved was taking three existing, very big
10  companies in very different businesses with thousands of
11  employees, and trying to put them together so that every
12  employee knew who was their boss, when it was over, who
13  understood what the business was actually about.  To have
14  managers who understood not just their own business but the
15  other two businesses that were in place, the potential for
16  mergers is easy to see.  The actual hard work of putting the
17  companies together and making a much larger institution run
18  efficiently is in fact quite difficult.
19       And what I understand Vivendi is disclosing in the
20  highlighted document -- in the highlighted passage is just
21  that, that it's difficult and expensive to make that
22  transaction work and that it's risky, and they may not get the
23  benefits that they had hoped, not because it wasn't possible,
24  but because it was just too hard to do.
25  Q. Now, below there is another statement that focuses on the

6507

1   prices of Vivendi's shares and exchangeable shares may be
2   adversely affected by factors different from the above,
3   affecting the prices of Vivendi, Seagram, and Canal Plus shares
4   separately.  What was your understanding of what they were
5   seeking to convey in that regard?
6   A. There were two things they were seeking to convey.  The
7   first is that the effect of putting these businesses together
8   was to expose each business to the risks of the others.  So
9   Canal Plus was a cable television company.  They weren't
10  exposed to the risks associated with Seagram's in part selling
11  alcoholic beverages before the merger.  After the merger, each
12  of the companies would be subject to the risks of each of the
13  other companies.
14       The second point in fact reiterates the first point;
15  that is, each of the businesses which operated independently
16  well would now be subjected to the risk of when you put
17  everything together it would work less well for all of the
18  reasons that were described in the first highlighted point.  So
19  you were now exposed to everybody else's problems, plus you
20  were also potentially exposed to the problem of putting them
21  all together.
22  Q. And when it says adversely affected, you understand that
23  the stock would go down?
24  A. Bad things would happen.
25  Q. Prior to the announcement or at the time of the

6508

1   announcement of the merger, was there discussion and concern
2   raised in the marketplace by market participants about the
3   merger?
4   A. That's correct.
5   Q. And why don't we have up DX794, which I believe is already
6   in evidence.  This is one of the documents that you reviewed in
7   connection with your analysis?
8   A. That's correct.
9   Q. Could you tell us briefly what this is?  I believe this is
10  dated July 4, 2000.
11  A. You recall that when I described the sources of
12  information -- of institutions that provided information about
13  public companies, one of them was credit rating agencies like
14  Moody's.  This is an example of what they did, what they do,
15  and this a report -- this is a report that explains Moody's
16  reaction to the merger, what Moody's assessment is of the
17  impact of the announced merger on what will be the combined --
18  what will be the credit of the combined company.
19  Q. And it says that Moody's is changing direction of review of
20  Vivendi SA from uncertain to possible downgrade.
21       What is your understanding of what Moody's is telling
22  the investing public in that regard?
23  A. Moody's is telling the public that the effect of the
24  transaction will be to reduce the credit worthiness of Vivendi
25  as a result of the transaction.

6509

1    Q. And this is something that was -- the actual downgrade that

2    I think you mentioned earlier occurred about two years later,

3    in May of 2002, correct?

4    A. That's correct.  What they are saying here is the direction

5    of review.  That's shorthand for which way does it look like

6    it's going.  Before this it was uncertain, neither up nor down.

7    This shifts downward to a possible downgrade.  Nothing has

8    happened yet, but that's not good news.  You'd rather -- if

9    it's your company, you'd rather it didn't happen.

10   Q. They were warning the investing public two years in advance

11   that there was a possible downgrade?

12   A. That's correct.

13   Q. Now, was the market also discussing in this time period --

14   again, before the merger -- concerns that they saw with regard

15   to the strategy relating to the merger?

16   A. Yes, sir.

17        MR. QUINN:  Can we have up, I believe -- or we may

18   need to put this one in evidence, DX1183.

19        MR. ABBEY:  Don't put it up until we see it.

20        MR. QUINN:  Absolutely right.

21        MR. ABBEY:  It's your rule.

22   Q. I am going to ask you whether this is one of the documents

23   that you reviewed in connection with your analysis?

24   A. The answer to that question is yes.

25        MR. QUINN:  Your Honor, I am going to offer it for the

6510

1    limited purpose of showing what the market was discussing with

2    regard to Vivendi at this time.

3        THE COURT:  Any objection?

4        MR. ABBEY:  No objection.

5        THE COURT:  Received.

6        (Defendants' Exhibit 1183 received in evidence)

7    Q. Could you tell us, just for the record, what this is?  I

8    believe it's dated December 4, 2000.  That would be about four

9    days before the merger was consummated?

10   A. Yes.  This is an article, another example of the kind of

11   information that institutions provide about a company.  This is

12   an article from Business Week, a national business news weekly,

13   concerning Vivendi.  The title of it is, Welcome to the Real

14   World, Vivendi's Grand Design Now Gets Put to the Test.

15   Q. Now, can we highlight I believe it is the third or fourth

16   paragraph down.  And here it says:  Impressive, but Vivendi's

17   stock has drifted steadily down since the merger was announced.

18        The merger was announced in June of 2000?

19   A. That's correct.

20   Q. And it says that Vivendi is presenting a strategy that does

21   not make sense to investors, says a French banking executive.

22   When he met recently with leaders of nearly 50 U.S. pension

23   funds, this source adds that not a single one wanted to invest

24   in Vivendi.

25        Now, what was your understanding of what Business Week

6511

1    was saying with regard to concerns being raised in the

2    marketplace as to the merger?

3    A. They were raising questions about the wisdom of the

4    business strategy that the merger reflected.  You will recall a

5    moment ago I described that there was something really

6    difficult about mergers that you actually had to put them all

7    together.

8        There is a second thing that's difficult about mergers

9    and that is the business strategy that the merger is supposed

10   to achieve also has to make sense.

11       What this article is reporting is that the strategy of

12   putting Vivendi, Canal Plus, and Seagram's together from their

13   perspective, a media conglomerate, to these investors didn't

14   make any sense.  So it added a second level of risk associated

15   with the merger.  The first we have already talked about, that

16   they wouldn't be able to make their work.  And this one, which

17   suggests some observer's view that the strategy reflecting --

18   the strategy reflected in the merger was a bad one and couldn't

19   work.

20   Q. Let's focus on some of the risks that were disclosed

21   regarding Vivendi's financial condition during that period of

22   time.  Specifically, I take it you have reviewed the 20-Fs that

23   were filed by Vivendi during the course of the class period?

24   A. Yes, I have.

25       MR. QUINN:  Let me have up PX701.  The jury has seen

6512

1    it several times.

2    Q. For the record, tell us again what this is.

3    A. This is a form 20-F annual report.  As a matter of United

4    States securities regulation, this has to be filed every year

5    by a company like Vivendi.

6    Q. Now, did, in this document and others, Vivendi disclose

7    that the amount of its debt was rising during the class period?

8    A. Yes, it did.

9        MR. QUINN:  Can we have up page 2.  Can we highlight

10   the line particularly that talks about Mr. Perschetz's favorite

11   subject, net financial debt and take it all the way across to

12   1997.

13   Q. What is Vivendi telling the investing public about the size

14   of and growth in its net financial debt from the four-year

15   period -- five year period from 1997 to 2000?

16   A. In this case it's -- it's pretty observable.  What they

17   define as net financial debt -- and for present purposes, the

18   precise definition isn't important.  What's important is the

19   direction of the change, that is, it's going up substantially

20   each year from 1997 to 2000.

21   Q. Now, the disclosure in terms of debt, whether it's gross

22   debt or net debt, is that something that is relevant if you

23   were looking at the liquidity of a company?

24   A. Yes, it is.

25   Q. Approximately how -- am I right, just looking at my quick

THIS PAGE INTENTIONALLY LEFT BLANK

6

1   more days when it was finally revealed.  And you know what
2   happened in those days between January and August of 2002?
3   There was a dividend paid and there were downgrades and, lo and
4   behold, Mr. Messier got canned at the company and the banks
5   took over, and they insisted on the company selling a whole
6   bunch of assets and so on and so forth.  And all of that, all
7   of that stuff happens in 2002.  It's a little bit like the air
8   coming out of a balloon.  The balloon is fully inflated at the
9   end of 2001 and then little by little, as the news comes out,
10  the balloon deflates.  It deflates on January 7, it deflates on
11  May 3, and then it starts to really pick up steam as the
12  liquidity crisis becomes full blown, Mr. Messier gets kicked
13  out and all the rest.
14      (Continued on next page)
15
16
17
18
19
20
21
22
23
24
25

7200

1   catastrophic events at Vivendi produced no losses to my
2   clients.
3       I submit to you that there are two concepts that go
4   hand-in-hand.  They form for my client on liability --
5   that is, undisclosed liquidity risks -- and the other is when
6   they started to come out, the stock went down.
7       Believe me, the investing public worries when they
8   learn that a company may be having or developing a liquidity
9   problem.  You would worry to your own household if you knew
10  what the bills were coming in if you didn't have in your mind
11  at least the money to pay those bills.  Well, that is true at
12  Vivendi.  That is common sense.  You know that, we know that,
13  and the defendants know that.
14      The news about the liquidity problems at Vivendi
15  caused the stock price to go down because the investors became
16  concerned.  Why wouldn't they, just like you would be concerned
17  if you had money problems.  Yet the defense experts, they came
18  here and told you that the investing public did not care about
19  the news about Vivendi's liquidity problem and the stock did
20  not go down one penny because of it.  You saw all the Xs, no
21  liability, no damages.  What they want is a free pass.
22      How credible is it that Vivendi's stock went down on
23  the nine days when there was news related to liquidity
24  problems, yet on every one of those nine days what they would
25  have you believe is the stock went down for reasons having

7199

1       MR. ABBEY:  You know that story as well as I do.  So
2   just keep that in mind.  It is like going to a gas station and
3   filling your tire with air during 2001 and then you have a
4   slow leak in your tire that starts to come out.  That is what
5   happened at Vivendi.  And it came out, according to Dr. Nye, on
6   nine days in that period of time.  In those days there were
7   liquidity disclosures and the stock dropped significantly.
8   That is what we capture for our damages, the damages for those
9   nine days.
10      Now, Mr. Saunders spent a lot of time making fun of
11  Dr. Nye.  But think about what the defendants have told you.
12      Vivendi admitted in the arbitration documents in the
13  Supreme Court -- if you go out the main entrance to this
14  building and you walk toward the subway, you pass by the
15  Supreme Court.  It is a building with a lot of big columns in
16  front of it on the right side, after you pass the federal
17  court.  He spent a lot of time making fun of Dr. Nye.  But
18  think about what the defendants have told you.
19      Vivendi admitted -- no question about that -- in the
20  arbitration documents that the company was at the brink of
21  insolvency.  But Vivendi's experts claim -- this is
22  incredible -- that the stock market did not care at all when
23  Vivendi's liquidity problems started to come out.  How can that
24  be?  How can that make any sense?
25      I am certain that you will reject the idea that

7201

1   nothing to do with Vivendi's liquidity problems.  Does that
2   make any sense?
3       Defendants, believe me, are committing and using what
4   I would call smoke in mirrors.  I am going to show you more
5   about that too.
6       So here is the plan for my closing.  I am going to
7   show you some evidence that proves each of those three points.
8   That is our case.  We have got to prove it.  The judge will
9   tell you about that proof, but we are going to prove it and try
10  to show you the evidence that does that.
11      I am going to show you how the evidence fits in the
12  verdict form.  You will have to decide on a bunch of statements
13  that we claim are omissions, that when Vivendi made them it
14  omitted to tell you about its true liquidity risk.  I will also
15  try, in the amount of time that I have, and it is not endless,
16  thank God for that, I will address the defendants various
17  attacks on our claims about intentionally misleading the
18  investors that we represent.  I am also going to answer
19  Mr. Quinn's question, which he wrote on that chart.
20      Now, let's go to the first point.  Vivendi had growing
21  liquidity problems.  That is a threshold point.  You need to
22  decide that in this case.  Did Vivendi ever have a liquidity
23  problem?
24      Why do I say that?  It is a threshold issue.  You know
25  why, because the defendants are contesting that they ever had a

7202

1  liquidity problem. I thought when we got to this point that
2  Vivendi was going to change its story after three months of
3  trial when Mr. Quinn said in his closing that Vivendi had a
4  liquidity crisis. But then he said it wasn't a real one. And
5  then Mr. Saunders got up and told you once again in his closing
6  that there wasn't even a liquidity risk much less a crisis.
7       Can we put up -- this is what Mr. Saunders said in his
8  closing two days ago. No liquidity crisis, no risk. That's
9  what the actual facts are.
10      I suppose if you believe that, then maybe you have to
11  find for the defendants. But that is not what the evidence
12  nearly shows.
13      Mr. Saunders said no crisis, no risk. That is one of
14  the main pillars of their defense. So I think I need to
15  undertake and try to show you if Vivendi ever had liquidity
16  problems. Are the defendants telling the truth about there
17  being no serious liquidity problem at Vivendi or no real
18  problem, as Mr. Quinn said, no real problem ever? Well, the
19  evidence, I think, is pretty clear.
20      Vivendi did have a liquidity problem, and believe you
21  me, it was a very serious problem. All you have to do is ask
22  Mr. Messier, the chief cook and bottle washer at Vivendi. He
23  lost his job because of the liquidity problem.
24      Why do I say this? Every piece of evidence shows it.
25  Only, and I say only, Vivendi's lawyers, table two, and their

7203

1  hired expert, Mr. Fleming, say otherwise.
2       Now, Vivendi's own admissions down the street are
3  devastating on this point. Do you remember how Mr. Malone,
4  Mr. Messier's lawyer, said in his opening that Mr. Messier,
5  Mr. Hannezo and Vivendi are all standing shoulder to shoulder
6  at this trial. Well, a while ago when those admissions were
7  made, in 2002 and 2003, when the defendants weren't locked
8  together as they are in this trial standing shoulder to
9  shoulder and agreeing on the best story to try to tell you,
10  there was a different story in a different court. It could not
11  be any clearer.
12      Vivendi repeatedly said that it was faced with a
13  liquidity crisis -- and I am quoting their words -- a liquidity
14  crisis like none ever that you would expect to see at a
15  company. Why do I say that it was that big? Because they said
16  in that court a while back there was a liquidity crisis that
17  threatened its very existence. That is a pretty serious
18  liquidity crisis. Not that we were short for a week or that it
19  was financial flexibility, but a liquidity crisis that
20  threatened its very existence.
21      Those are mighty powerful words, and they are not just
22  made in the document at Vivendi. They are made in the court
23  here in New York, where people tell the truth. That's where it
24  was made.
25      That was Vivendi speaking then. What you hear now is

7204

1  Vivendi speaking now, six or seven years later, defending
2  itself in this case and trying to sell you all a bill of goods
3  that, it's a week, we always paid our bills, we had a few
4  bucks, things worked out, we're a good company, everything was
5  fine. But over there, in 2002 and 2003, when they were not
6  locked together before you, they told it as it was, and that is
7  very, very important.
8       That evidence from that court is as high and as good
9  as it ever gets for a lawyer trying a case. That is top-notch
10  stuff. You can take that to the bank, what they said in that
11  court in 2003.
12      Is there any explanation for it other than the truth?
13  Well, I will ask you this. We put it up. I stood there. I
14  read it slowly. I wanted you to get it. Some of you took
15  notes. Have you heard one word, one witness get up here and
16  tell you an explanation or try to contradict it? You think
17  about all that we have gone through. Has anybody ever got up
18  and said, you know, that is not what happened. The answer is
19  zippo, zero, nothing. No way to overcome it. You know why?
20  They can't overcome it because they would be saying,
21  hey, we committed perjury in that court, and that is not going
22  to happen.
23      Now, Mr. Saunders promised in his opening you would
24  hear from Mr. Fourtou live in this courtroom. I think when he
25  got up he pointed to that chair and he said you will hear

7205

1  Mr. Fourtou sitting in that chair. He is the new CEO. He is
2  going to tell you what the true story was at Vivendi.
3       Well, we talked about it as lawyers and we tried to
4  figure out whether he would come. What happened? I have not
5  seen Mr. Fourtou. You know, there are plenty of Frenchmen
6  here. They know how to get on a plane from Paris and get here
7  the next day when they want to.
8       Did Fourtou show up and tell you what the real story
9  was? Now, he was the CEO when those papers were filed. So he
10  could have got up if he was here and said, oh, that lawyer, he
11  was on cocaine or drugs that day. He didn't know what he was
12  doing when he said that. Or I don't know what he would say.
13      But the answer is, he really can't say anything
14  because when you have a lawyer and he goes into court and he
15  files papers with the judge, just like we would do with Judge
16  Holwell, you better stand behind him; otherwise, you know, you
17  can even lose your license as a lawyer if you do that. So I
18  think the answer is that stuff speaks and, boy, it couldn't
19  speak louder. It just resonates from that court down the block
20  into this court.
21      Vivendi has never given any explanation during this
22  entire trial for those very, very powerful legal admissions.
23  Not a one. I think you are entitled to conclude for sure that
24  there was a liquidity crisis that shook, and I say shook, this
25  billion dollar company to its foundation. It was a massive

7206

1    crisis.

2        Now, you recall on Tuesday when Mr. Saunders'

3    arguments were coming to a close, right before his impassioned

4    plea that you give Vivendi its good name back for the sake of

5    its secretaries, its security guards, he accused us of not

6    telling you the whole story.  I think Saunders' accusations

7    against me at that point, he ended by saying he knew I would

8    read to you again those statements, the statements that Vivendi

9    had made about Mr. Messier in litigation against him.

10       Mr. Saunders said we didn't tell you the whole story.

11   And then if you remember, and this was just two days ago, he

12   flashed up on the screen one page of the arbitration documents

13   and he pointed out that most of the pages I have read, that I

14   read from, when I read them to you during the course of the

15   trial, they were blank.  I guess the implication was, well, I

16   kept all that stuff out of those arbitration documents and

17   there were just those few words that were up there.  I kept the

18   whole story from you.

19       Let me tell you the whole story about the arbitration

20   documents, about those blank pages that Mr. Saunders implied I

21   kept from you.  It was Mr. Saunders, Mr. Quinn, and Vivendi who

22   fought mightily to keep you from hearing any of the information

23   in those arbitration documents, and, yes, some of that stuff

24   was even more powerful, and Judge Holwell agreed to not have it

25   come before you.  So the blank part of those pages had nothing

7207

1    to do with me not telling you something.

2        What Judge Holwell decided was that the parts of the

3    pages that I did read -- this was Judge Holwell deciding

4    this -- the pages that I did read to you are relevant to your

5    decision in this case.  Mr. Saunders somehow wants you to think

6    they aren't relevant or that something was withheld, but Judge

7    Holwell found exactly the opposite.

8        Those powerful, powerful statements that I read to you

9    from those documents are what is called admissions by Vivendi.

10   They are relevant, highly relevant to this case, as Judge

11   Holwell has found over defendants strong objections.

12       As Mr. Saunders knows full well, they are pretty,

13   pretty devastating to his defense.  And why is that?  Because

14   they show the very lie that Vivendi is attempting to perpetrate

15   in this courtroom under the guise of getting its good name

16   back, as though the investors took Vivendi's good name.  What

17   happened here was Vivendi took the investors.  But that is part

18   of this whole strategy.  Make things and stand them on their

19   head.

20       In 2003, when it served its self interest, Vivendi,

21   speaking through its lawyers, just as it now speaks to you

22   through Mr. Quinn and Mr. Saunders, it then said it suffered a

23   severe liquidity crisis threatening its very existence, and in

24   concluding his remarks about these very devastating admissions

25   by his client, Mr. Saunders said, you should ignore them

7208

1    because you know what the truth is.

2        I sat there and I heard that and I have to say, I

3    could barely contain myself when Saunders said that.  He was

4    saying to you that some other lawyers -- this is important --

5    representing this big company Vivendi in another case lied to

6    another judicial tribunal and, you know what, you can and

7    should ignore that in favor of what I, Mr. Saunders, are

8    telling you in this case.  Ignore that, make believe it didn't

9    happen, and listen to what I'm telling you about what happened

10   in 2002 and 2003.

11       Ladies and gentlemen, that is just how cynically, how

12   without regard to the truth Vivendi seems to approach getting

13   its good name back.  That is, whatever is needed at the moment

14   to win.

15       To me, that sounds like -- and you heard this a couple

16   of days ago -- heads I win, tails you lose.  Mr. Saunders said

17   that this was a trick he learned as a boy.  Remember that?

18   That had to do with washing and drying the dishes and his

19   younger brother.  And then he feigned confession about what he

20   had done as a youth to his own brother.

21       But Mr. Saunders now stands in front of you and says

22   you should ignore what his client said six or seven years ago

23   in order to win a case against Mr. Messier, but instead you

24   should believe him now -- he is a different Vivendi lawyer in a

25   different case of a different kind -- so that he can win a case

7209

1    against my client.

2        Mr. Saunders may have confessed years ago, as he

3    claimed, for his youthful trickery, but the lesson he had

4    learned as a youth remains.  He still plays the same game.

5    Heads I win and tails -- you know what, tails the people who

6    bought the shares of Vivendi, because of Vivendi's fraud, they

7    lose.  Heads Vivendi wins there with a liquidity crisis and

8    Vivendi wins here without a liquidity crisis.  Whatever is

9    convenient to win the case, that's what they do, and that,

10   ladies and gentlemen, I think is heads I win in the Supreme

11   Court, tails I win in the federal court, with the same story

12   just spinning it in a different way.  Think of that when they

13   get up here and they tell you there was no liquidity crisis

14   here in this court but there was one in that court that rocked

15   the company to its foundations.

16       Now, those things said in 2002 and 2003 are true.  No

17   amount of attempts to rewrite history can change that.  Now,

18   you would think that that is enough.

19       The main defendant, Vivendi -- and those are

20   admissions only against Vivendi.  Mr. Messier was on the other

21   side of that case so he didn't say it, and certainly

22   Mr. Hannezo was not involved, but it is against Vivendi.  You

23   would think the main defendants, who have admitted in

24   official court papers that there was a severe liquidity crisis,

25   you would think that that would be the end.  Those are the

**THIS PAGE INTENTIONALLY LEFT BLANK**

7283

1    You have got the full statement in the chart.

2    So you look at entry No. 1 and then you go back to the

3    corresponding questions, question 1A and 1B.  Question 1A asks

4    whether we have proven our 10(b) claim against any defendant

5    with regard to entry No. 1.  You have heard about the four

6    elements of proof for a 10(b) claim, and they will be described

7    to you in detail in the jury instructions that Judge Howell

8    will give you.

9    First, we have to prove that a defendant made a

10   material misstatement or omission.  I explained to you

11   misstatement or omission earlier.  Material just means that a

12   reasonable investor would have considered the fact important in

13   making investments regarding Vivendi's stock.  So if it is

14   about what color socks someone was wearing, obviously that

15   wouldn't be material.

16   Plaintiffs admit that the statements and omissions

17   related to Vivendi's earnings and major obligations, like Maroc

18   Telecom obligation, and the rest of the statements and

19   omissions you see in Table A, in other words, statements and

20   omissions that related to Vivendi's liquidity, we contend that

21   every one of these statements were material.  They all involve

22   lots of money.  So the first element, materiality, we say we

23   have proven that.

24   Now, for the first element we also have to show that

25   the defendants made the statement.  I believe you don't have to

7284

1    worry too much about that.  The questions in the verdict form

2    list the defendants that we contend made these statements or

3    omissions.  Some of the later questions involve, as I said,

4    statements only by Vivendi since the statements, for example,

5    in the press release might not have been identified with a

6    particular individual.  Some involve one or both of Mr. Messier

7    and Mr. Hannezo, but they all involve Vivendi since they are

8    all made by someone speaking for the company.

9    You will see that throughout Table A each entry lists

10   the particular defendants that we contend made the particular

11   statements.  Again, if any of the Vivendi agents, including

12   Messier and Hannezo, made the statement, then Vivendi also made

13   the statement.  It is not an either Vivendi or Messier or

14   Hannezo type of deal.  But Judge Howell will instruct you on

15   that, and you have those instructions to follow in the jury

16   room.

17   The defendants are not contesting that Messier and

18   Hannezo were agents of Vivendi.  So it is always a statement by

19   Vivendi and sometimes it is one or both of the individual

20   defendants as well.

21   Now, plaintiffs have to prove that defendants acted

22   knowingly or recklessly.  Again, Judge Howell will explain

23   this to you in more detail.  You will have his instructions in

24   the jury room.  But we believe it is pretty clear that the

25   defendants knew what they were doing when they failed to tell

7285

1    the truth about Vivendi's liquidity condition.  They knew that

2    the statements and omissions on the outside were misleading

3    because they knew the whole truth on the inside.  As

4    Mr. Perschetz said, eleven of the 57 statements relate to

5    Mr. Hannezo.  Even more relate to Mr. Messier.  But again, all,

6    all 57 relate to Vivendi.

7    You might ask yourself, well, how do we know?  We

8    can't crawl into their heads and know what they were thinking.

9    Well, just use your common sense.  Look at the evidence and

10   what was being said inside the company as compared to being

11   said on the outside.  That is why you are here.  Juries are

12   great in making judgments like that.

13   You can figure it out by comparing what the defendants

14   knew with what they said.  At the very least, it is clear the

15   defendants acted recklessly.  But we believe that it was more

16   than just reckless.  We say the defendants knew they were

17   making false and misleading statements and omissions.  After

18   all, Mr. Hannezo was writing the memos in the book of warnings.

19   Mr. Messier was reading those memos.  They certainly both knew

20   the truth and, as a result, so did Vivendi.

21   Judge Howell will explain to you that a company knows

22   as much as any of its employees or officers knows.  That any

23   one employee or officer, it is not what all or most or even a

24   few know, it is what any employee or officer knows.

25   Just to illustrate, if you found that for any given

7286

1    one of these statements that Mr. Messier knew was false or that

2    Mr. Hannezo did know, well, what about Vivendi.  Would it be

3    somewhere in between.  Maybe reckless.  No.  Vivendi knows

4    whatever any of its employees and officers knows.  Even if

5    Mr. Messier had made a false statement and you were to find

6    that he is the only person in the whole company to know it was

7    false, Vivendi, the company, would still also know that the

8    statement was false.  Vivendi also has knowingly made a false

9    statement.

10   Third, plaintiffs have to prove that plaintiffs

11   justifiably relied on the misstatements or omissions.  Judge

12   Howell will instruct you about the presumption in plaintiffs'

13   favor on this one.  It doesn't matter if a particular investor

14   even knew about the misstatement or omission.  It is presumed

15   that the class of investors that we represent justifiably

16   relied on it.  The only way defendants can challenge this, and

17   it is their, defendants, burden to prove it, is to show that

18   the truth was already known in the market.  But here we say

19   Vivendi's true liquidity risk was concealed throughout the

20   class period.

21   Fourth and finally, plaintiffs have to show that there

22   was an economic loss as a result of the misstatement or

23   omission.  In other words, the misstatement or omission

24   concealed something.  In this case, Vivendi's true liquidity

25   condition.  That when disclosed, the true liquidity condition,

**THIS PAGE INTENTIONALLY LEFT BLANK**

7295

1  is important, obviously that is something all of you should
2  discuss during your deliberations.
3      Let's move on now -- I have got to go through 57 -- to
4  Nos. 2 and 3.  They are going to go -- they will move along
5  here, which I am going to discuss together.  Statements No. 2
6  and 3.
7      During 2000 and early 2001, what was the reality?  In
8  connection with the three-way merger, the reality was that
9  Vivendi incurred billions of euros in short-term debt to
10  finance Seagram's repurchase of long-term bonds in late 2000
11  and 2001.
12      Now, if you will bring up page 1306 of the trial
13  transcript, lines 2 through 15.  You can see that Mr. Hannezo
14  testified during this trial that in restructuring the Seagram's
15  debt, Vivendi incurred more short-term debt and paid a premium
16  for that debt.
17      Show the quote.
18      Now, what was the outside message?
19      Show Table A.
20      On December 19, Vivendi issued a press release about
21  the sale of the liquor business.  The press release says:
22  Vivendi will be free of debt in its communications business on
23  January 1, 2001 and will have more than 2 billion euros of free
24  cash flow for the coming two years.  However, just a few weeks
25  later, inside the company, Mr. Hannezo was warning Mr. Messier

7296

1  that he shouldn't be talking up Vivendi's free cash flow
2  because there wasn't going to be any that year.
3      So the statement in Table A talks about cash flow.
4  Two weeks later Mr. Hannezo and Mr. Messier are talking about
5  there not being any free cash flow.
6      Can we bring up PX168.
7      You can see it right there for yourself in this
8  exhibit, Mr. Hannezo's own words.
9      "I believe that it is wrong to reason in terms of free
10  cash flow.  There won't be any this year."
11      The outside message, January 12, 2001, early in the
12  class period.
13      What does Vivendi say?  It tells the public:  Thanks
14  to our free net cash flow, we will have an additional war chest
15  of 10 billion euros in '01 and '02 before the first euro of
16  debt.
17      This is from Mr. Messier's speech in a shareholders
18  meeting filed with the SEC on January 12, 2001.  You can see
19  that Vivendi deliberately gave investors our true cash flow
20  impression of what its true cash flow situation was on January
21  of '01.
22      So as to these two statements, when you go to the
23  verdict form, you should check yes and knowingly for both
24  Vivendi and Mr. Messier.
25      Statement No. 4.  This is part of the same speech.

7297

1  This part is about Vivendi's 35 percent EBITDA growth target.
2  We just saw Vivendi was misleading investors because inside
3  Vivendi they knew that the 35 percent target would only be met
4  by using one-time purchase accounting benefits.  So on this
5  statement, the verdict form, we submit, should be checked yes
6  and knowingly.
7      Moving on, statement No. 5.  February 2001.  The
8  reality on the inside.  Let's look at PX159.
9      This is on the inside.  Hannezo was telling Messier
10  the following:  Our banks are at their limit.  They are
11  beginning to get worried.
12      Now, the outside message on Table A.  Around the same
13  time, February of '01, one week later.  In this press release,
14  Mr. Messier and Vivendi tell investors that the company is off
15  to a fast start with strong growth prospects and a very strong
16  balance sheet.
17      You can see that Vivendi's positive message to the
18  public concealed the fact that defendants knew on the inside
19  that Vivendi was already at its limit with its banks and that
20  they were worried.
21      Now, Mr. Quinn spent the first half hour of his
22  closing telling you about all the concerns the people had about
23  how the Seagram/Canal Plus merger would work out in early 2001.
24  Ladies and gentlemen, that is why the defendants here concluded
25  they had to lie.  People did have concerns, and did the

7298

1  defendants say these concerns were justified?  No.  They said
2  the opposite.  They said, while you may have concerns, we are
3  on target.  We can handle our debt.  Everything is working.
4      Mr. Quinn also said the banks were lining up to loan
5  Vivendi money.  They were begging to loan money to Vivendi.
6  Assume that Mr. Quinn said is right, even though it is not what
7  the internal documents say.  Why would banks be so willing to
8  lend Vivendi money?  Because the banks didn't know the truth
9  either.  The banks were loaning lots of money to Vivendi when
10  the liquidity situation was getting tense and getting
11  dangerous.  That is what Ms. Brassens told you bothered her so
12  much.  The banks weren't being told the truth.
13      This again means for this statement you check yes and
14  knowingly on the verdict form.
15      Statements Nos. 6 and 8, and we are moving
16  chronologically.  March 2001.  On the inside the reality was
17  this.  Vivendi was managing its numbers for the year ended
18  December 31, 2000.  You probably remember our accounting expert
19  from France, Xavier Oustalniol.  He explained to you why in his
20  opinion Vivendi had managed its earnings numbers for 2000.  He
21  explained to you that he saw a number of memos and e-mails from
22  inside Vivendi that he considered to be red flags of earnings
23  management.
24      For example, look at PX227.  This is a memo that Mr.
25  Oustalniol brought to your attention.  It is from Mr. Messier

2

1  and it is dated January 14, 2001, which is two weeks after
2  year-end 2000.
3          The second paragraph says:  I will not give my
4  agreement for any adjustments which may give comfort for 2001
5  as long as we are not at or in excess of the 2000 consolidated
6  EBITDA targets given to the market.  Nothing would be more
7  detrimental to Vivendi Universal than to miss that target.  The
8  market would immediately discount both the basis and the
9  growth.
10         Here, Mr. Messier is discussing the fact that he
11 doesn't want to give his agreement for any adjustments that
12 would give comfort for 2001.
13         Then Mr. Messier goes on to say:  "Sorry for 2001, but
14 you have to ask the BUs, the business units, not only not to
15 create further future reserves but to exit part of the existing
16 ones to reach that target."
17         It is break time.
18         THE COURT:  We will take our morning break.
19         (Jury excused)
20         THE COURT:  15 minutes.
21         (Recess)
22         (Continued on next page)
23
24
25

7300

1          MR. PERSCHETZ:  Your Honor, is there something we can
2  address briefly?
3          THE COURT:  Yes.  One more thing to clear up.
4          MR. PERSCHETZ:  Thank you.  I appreciate that.  The
5  reason I want to do it now is because I would like to see if we
6  can avoid having it happen again.
7          Here is a quote.  If you agree that it's false and
8  doesn't disclose the full liquidity risk, you will check yes as
9  to entry No. 1.  We know that's not so.  There are other
10 elements.  And we focused a lot on intent.  This is compounded
11 by the problem that we have been discussing with regard to the
12 part A and part B of each question.  Then Mr. Abbey, after
13 doing that, goes on to say, and now let me tell you why it's
14 made knowingly, why the statement was made knowingly.  This
15 compounds -- I acknowledge that it was a close call as to how
16 to deal with part A and part B.
17         I think one thing we are going to suggest and we can
18 give your Honor language is to actually include in your
19 instructions something as to how to tell them to do that.  What
20 I would appreciate is an instruction to Mr. Abbey that he
21 should avoid, especially in light of the way the jury form is
22 constructed, saying to the jury that it's enough that it's
23 false to check No. 1 and then move on to whether it's knowing.
24 That is only going to compound the confusion that your Honor
25 rightly identified for us or the possibility of confusion with

7301

1  regard to the separation of A and B.  It's a wrong statement of
2  the law.  We know it's a wrong statement of the law.
3  Obviously, there are other elements, the most important of
4  which is intent.  Thank you.
5          THE COURT:  Mr. Abbey, I think it is probably a fair
6  statement that before you check yes with respect -- plaintiffs
7  have to satisfy all elements?
8          MR. ABBEY:  Elements of 10(b).
9          MR. SAUNDERS:  All four elements.
10         (Jury present)
11         THE COURT:  Mr. Abbey.
12         MR. ABBEY:  Thank you.
13         We had PX227 up, I think, when we took a break.
14         So, as Mr. Oustalniol told you, this memo is a clear
15 red flag alerting us to the company is managing its earnings.
16 That's because there is no economic underlying economic
17 substance for what is being said other than the fact that there
18 are targets to be reached and reserves that should be released
19 for that purpose.
20         Can we pull up PX414.
21         Again, these exhibits relate to statements No. 6 and
22 8.
23         This is another memo from Mr. Messier that
24 Mr. Oustalniol found in his analysis of Vivendi's books and
25 records.  This one is dated February 11, 2001 and it says:  I

7302

1  understand one by one the different points.  But if we want to
2  depress our share price by 20 percent, we do that without
3  asking ourselves further questions.
4          What's important here?  As Mr. Oustalniol explained to
5  you what is a red flag indicating earnings value when an
6  accountant actually looks at material like this, is
7  Mr. Messier's emphasis on the share price under the impact that
8  certain accounting entries may have of the price of Vivendi
9  stock.
10         Mr. Messier goes on to say, update 3 was a total
11 floor.  We have to stay at it and cannot accept any negative
12 variance, that clear targets are, and then he goes on.
13         And Mr. Messier goes on to list various targets
14 relating to different measurements, including 2.5 billion euros
15 in operating income.
16         As Mr. Oustalniol explained to you, from his
17 perspective, as an accountant, what is important here is that
18 there are clear targets that are being set of numbers that
19 should be reached in connection with a closing of year 2000.
20 But this is written long after the end of the year.
21         And there is the sentence that is underlined which
22 says, cannot accept any negative variance.  That, I submit, is
23 a red flag of earnings management.  Mr. Oustalniol told you
24 that because Vivendi is not taking into consideration the
25 underlying economic substance of this transaction.

7303

1        Now, let's go to the outside message for statements 6
2    and 8.  You've seen inside.  The outside show table A.  The
3    statements are on March 9 from a Vivendi press release.  And
4    the positive message is very strong 2000 results with
5    outstanding growth, which is attributed to things like
6    operations and productivity improvements.  And it's clear when
7    you look at the press release, Mr. Messier's target was met.
8    However, defendants concealed the fact that in order to reach
9    those results Vivendi was managing its earnings for 2000.
10       What about the other part of the March 9 Vivendi press
11   release where it was saying to people on the outside, the
12   outlook for 2001 was excellent.
13       Again, show table A.
14       Well, the truth is, inside the company Vivendi was
15   saying that it was only meeting its EBITDA target through
16   undisclosed accounting adjustments, not through operations and
17   productivity improvements.
18       Let's look at PX191.  This is an e-mail from
19   Mr. Hannezo -- to Mr. Hannezo, and other people at Vivendi only
20   a few weeks before the March 9 press release.  It says:  I
21   believe that, more importantly, in terms of communication, we
22   should stress that the focus is on the bottom line.  We have
23   some room for improvement of the margin.  More importantly than
24   sales, we maintain EBITDA forecasts and, in parenthesis, thanks
25   to PA, purchase accounting, but that we obviously should not

7304

1    repeat.
2        You can see right in this e-mail that the defendants
3    know they are making their EBITDA forecast only thanks to
4    purchase accounting.  That, I submit, is entirely concealed.
5        Okay.  Bring up PX415.
6        You also see right here Hannezo reminded Messier in a
7    memo on February 28 in '01 that it was only because of
8    accounting magic that Vivendi was able to confidently state
9    that 2001 would be an excellent year for Vivendi.
10       And it says:  We apply accounting magic, and I submit
11   that's purchase accounting, below EBITDA adjustments,
12   capitalization of costs, et cetera, which lead to the fiscal
13   year 2001 EBITDA.
14       You may remember that Mr. Hannezo was asked about this
15   memo and his accounting magic during the trial.  Well, his
16   answer was that he was just trying to be funny in this memo.
17       Again, the accounting magic, we believe was purchase
18   accounting, and we believe it leads to the EBITDA budget.
19       Please bring up trial transcript page 1350, lines 21
20   and 22.  Here on October 29 Mr. Hannezo said in this trial:
21   This is what I call an attempt to be funny.  That's what he
22   said about accounting magic.  This is what I called an attempt
23   to be funny.  It doesn't look that funny in the middle of the
24   courtroom, which I call accounting magic.  Actually, it's not
25   magic.  It's accounting.  It should just be called accounting.

7305

1    I'd like to think that we all have a good sense of humor, but,
2    frankly, I really don't get that one.  And concealing important
3    information from investors, I submit, is not funny,
4    particularly when the joke leads to very large financial
5    losses.
6        So those statements about the 2000 results and the
7    outlook for 2001, EBITDA growth, statements No. 6 and 8 on the
8    verdict form, those all violate Section 10(b) and you would
9    check yes and knowingly if you agree with those statements.
10       Next, statement No. 7.  This statement is also from
11   Vivendi's March 9, 2001 press release.  But this one is about
12   Vivendi's investment in Maroc Telecom.
13       Show table A, please.
14       You'll remember that this is the wireless company in
15   Maroc that Vivendi bought into.  Inside Vivendi the defendants
16   knew they had a secret agreement locked in a safe.  That
17   agreement said Vivendi was irrevocably committed to pay another
18   1.1 billion euros to the Kingdom of Morocco.
19       Please put up P661.
20       As you can see from this February 17, 2001 memo
21   written by Mr. Hannezo, Vivendi was already committed to buy an
22   additional 16 percent of Maroc for 1.1 billion euros.  Vivendi
23   never told anyone publicly about that obligation.  As you can
24   see in Mr. Hannezo's memo, Vivendi kept it hidden in a safe and
25   didn't tell anyone about it.

7306

1    While Vivendi said in his press release that it
2    acquired a stake in Maroc Telecom for 2.3 billion euros, it
3    didn't mention the 1.1 billion euro commitment at all, and that
4    is an omission.  Again, that statement, if it violates Section
5    10(b) you would check yes and knowingly on the verdict form.
6        Now, statements No. 9 and 10, moving forward and
7    moving forward in time, April 2001.
8        On the inside, the reality.
9        Vivendi knew that its EBITDA was significantly
10   benefited by purchase accounting adjustments, but it did not
11   tell investors how significant a difference it made.  And
12   instead of attributing EBITDA growth to purchase accounting,
13   Vivendi in its statements to investors on the outside of the
14   company said that it was enjoying positive operations and
15   business performance.  It's easy to see how that would mislead
16   someone about how well the company was really doing.
17       And Vivendi knew that it was deliberately hiding the
18   true reasons for its EBITDA growth from investors.
19       Take a look at PX110.
20       Some of these you've seen before.  I am taking you
21   through it to remind you before you go in for your jury
22   deliberations.
23       This is an e-mail from Vivendi's director of SEC
24   reporting where she said:  We will need to discuss results
25   before the impact of purchase accounting, but John Luczycki,

7307

1    Vivendi's chief accounting officer and controller, replied to
2    her and said, PA cannot be disclosed, no way.
3        Even though it seems pretty obvious to me, this is one
4    of the documents that Mr. Saunders was trying to convince you
5    the other day is not evidence of Vivendi hiding the truth, not
6    so, not so, he said.
7        As plaintiffs' accounting expert, U.S. accounting
8    expert, Andy Mintzer, explained to you, Vivendi's EBITDA was
9    significantly enhanced by undisclosed purchase accounting
10   benefits for the first quarter of 2001 and the rest of 2001 as
11   well.  You can see from slide No. 5 in Mr. Mintzer's
12   presentation, the purchase accounting benefit to EBITDA was
13   more than 70 million euros in the first quarter of 2001.  And
14   by the end of 2001, it added up to 831 million euros.
15       You heard Mr. Mintzer explain how Vivendi essentially
16   kept two sets of books, one with and one without the purchase
17   accounting memos.  The problem for investors is Vivendi never
18   let the public see the information in the set of books that did
19   not include the purchase accounting benefits.  This was despite
20   the fact that, as Mr. Mintzer explained, Vivendi was required
21   under the accounting rules to disclose that information to
22   investors.
23       And Mr. Morris, Universal Music Group's CEO, also
24   explained how knowing the results in the second set of books
25   without the purchase accounting benefits was important in

7308

1    understanding how Vivendi was really performing.
2        Let's play a short clip from his testimony.
3        (Video recording played)
4        MR. ABBEY:  Ladies and gentlemen, take a look at
5    statements 9 and 10.  These are both from a Vivendi press
6    release on April 23, 2001, when the company reported its first
7    quarter results for 2001.  And as you can see, the outside
8    message was always very positive, ahead of targets, EBITDA is
9    growing.  But you just saw the reality.  Only on the inside of
10   Vivendi could you learn the whole truth about how Vivendi was
11   really performing and how much EBITDA was a result of purchase
12   accounting benefits.
13       Please show PX277.
14       Behind closed doors the defendants called purchase
15   accounting their profit adder.  Mr. Hannezo called it
16   accounting magic, as we just saw in PX415.
17       Not disclosing that important information to investors
18   was misleading, it was fraudulent.  Not revealing the amount of
19   purchase accounting benefits reflected in EBITDA deprived
20   investors of the ability to truly understand Vivendi's business
21   performance and its liquidity condition.
22       If you believe that those statements violate 10(b),
23   you should check yes and knowingly on the verdict form for
24   statements 9 and 10.
25       Moving along, statements 11, 12, and 13.

7309

1        Please put up PX150, please.
2        Inside the company.  We are moving ahead in time, June
3    8, 2001, Dominique Gibert writes to Mr. Hannezo and Mr. Messier
4    about the rating agency.  Taking into account this restatement,
5    it estimates that the level of our debt at 12/31/01 would be 19
6    million euros after the disposal of beverages.  They are
7    warning us that any new acquisitions, without a prior disposal
8    of a significant asset, BSkyB, would lead them to immediately
9    place us under credit watch.
10       Mr. Hannezo agreed with this warning and he says that
11   Vivendi can no longer do any acquisitions at all without a real
12   sale of Sky and/or treasury stock prior to or at the same time.
13   This was not what Vivendi was saying to investors on the
14   outside.
15       Please show table A.
16       June 26, 2001.  Only a few weeks after these warnings
17   that I just read to you on the inside, Mr. Messier's letter to
18   Vivendi shareholders told him, Vivendi was healthy, it was
19   strong, it had a healthy balance sheet, a pro forma net debt
20   that is practically nonexistent, and record high net income
21   with cash available for investing.  The outside message is that
22   Vivendi and its liquidity condition was rock solid and stable.
23       And as you saw inside, the reality was very different.
24   This is, again, another example of Vivendi saying one thing to
25   the public on the outside and something else on the inside.

7310

1    That is why if you believe these statements that they violated
2    Section 10(b), you should check yes and knowingly in the
3    verdict form for statements 11, 12, and 13.
4        Now, statement No. 14.
5        By mid-2001, Vivendi's liquidity situation was tense,
6    and becoming dangerous.  Remember Ms. Brassens, who came here
7    from France to testify.  She worked at Vivendi's finance
8    department and she was fired after she went to a French
9    newspaper and blew the whistle because she was so bothered by
10   what Vivendi was saying to the public about its liquidity
11   condition, compared to the real story on the inside.
12       Here is what Ms. Brassens testified.
13       Please bring up trial transcript page 376, lines 12
14   through 14.
15       And she said:  We felt in the finance department is
16   that it was tense in the middle of 2001.  It was dangerous at
17   the end of the year, and throughout 2002, it was more than
18   dangerous.  That, I submit, is totally inconsistent with what
19   Vivendi was saying on the outside.
20       Now, go to item 14 in table A.
21       This is from July 2, 2001, from Vivendi's form 20-F,
22   annual report filed with the SEC for the year 2000.  It's
23   signed by Mr. Hannezo.  The outside message is that Vivendi can
24   meet its liquidity needs, no liquidity problems.  That is far
25   different from the reality described by Ms. Brassens.

7311

1    If you believe that statement 14 violates Section

2    10(b), you should check on the verdict form yes and knowingly

3    as to statement 14.

4        Statement No. 15, the form 20-F also talks about Maroc

5    Telecom.  It didn't tell the public about the Maroc agreement

6    that was locked in a safe.  So investors had no idea that

7    Vivendi owed an additional billion euros in connection with its

8    Maroc Telecom acquisition.  If you believe that statement No.

9    15 violates Section 10(b), on your verdict form you will check

10   yes and knowingly.

11       Statement No. 16 through 18.

12       You remember I told you about Mr. Oustalniol's opinion

13   about earnings management for the 2000 financial results?

14   Well, Mr. Mintzer and Mr. Oustalniol also explained to you they

15   also found evidence of earnings management for the second

16   quarter and first half of 2001.

17       Let's take a look at the inside documents showing how

18   Vivendi was meeting its targets in the second quarter and the

19   first half of '01.  Not meeting them because of successful

20   business operations, but because Vivendi was managing their

21   numbers.

22       Can I bring up PX345, please.  This is an e-mail from

23   John Luczycki, dated June 28, 2001, to Pierre Trotot with a

24   copy to Mr. Hannezo relating to the second quarter of '01.  It

25   says:  Pierre, your Q2 update was at a level of 648.6 for the

7312

1    total segment.  We would like you to stretch this an additional

2    15 to 664 for the quarter.

3        Focus on that word stretch.  Mr. Oustalniol explained

4    to you that the word stretch is not an accounting term under

5    the accounting rules.

6        Andrew, bring up the trial transcript at page 2817,

7    lines 18 through 20.

8        This is what Mr. Oustalniol said.  The word stretch

9    basically means the number is going to be enhanced or improved

10   or inflated or artificially wrong.

11       Then go to PX188.

12       This is a memo from Mr. Trotot.  If you highlight the

13   second paragraph, it says:  For Q2 and H1, Cegetel will be able

14   to stretch for an additional 15 million euros.  And there is a

15   reference to provisions for bad debts and inventories.  So here

16   Mr. Trotot says he is going to find the 15 million euros that

17   Vivendi asked for.  And he is going to find it in the

18   provisions for bad debts and inventories.

19       As Mr. Oustalniol explained to you, this memo is a red

20   flag, highly suggestive of earnings management.  This is so

21   because Vivendi first established the target.  And then there

22   is a, quote, stretched response that comes right after to an

23   exact amount.  The amount requested is being delivered by

24   Mr. Trotot, but there is no sufficient underlying economic

25   reason why this number is obtained other than it reached

7313

1    Vivendi's requested target.

2        Now, PX229.

3        This is a memo from John Luczycki to Mr. Hannezo,

4    dated July 4, 2001.  Mr. Oustalniol explained to you that this

5    memo was another red flag.  It is strong evidence that Vivendi

6    managed its earnings for the second quarter in the first half

7    of '01.  Look at page 1.  You can see where it says.

8        Both versions include 100 percent of JMM's, that's

9    Mr. Messier, stretch EBITDA targets.

10       Even though Cegetel and Mr. Trotot found the 15

11   million that Vivendi asked for at that point, it was not

12   enough.  So Mr. Messier, the CEO, asked for more.

13       Put up PX57.

14       Mr. Messier wrote:

15       Target EBITDA growth Q2 has to remain in the 30 to 35

16   percent range, 30 plus to 35 percent range.  Need of 20 to 70 M

17   euros more.

18       But Mr. Hannezo protested.  And let's show PX148.

19   This is the sequence and you're tam with this document.

20       Mr. Hannezo writes:  I beg for mercy.  We cannot,

21   after everyone has met his stretched targets for Q2 and 24

22   hours before we send the information to the audit committee,

23   restretch the targets and remake everyone's closing.

24       Mr. Hannezo begs for mercy because people at Vivendi

25   were being forced to further stretch their reports of operating

7314

1    results in order to meet Mr. Messier's targets.

2    Notwithstanding his request for mercy, Mr. Hannezo nevertheless

3    worked with Mr. Messier to get the requested results.  Hannezo

4    says, I suggest then to concentrate on Cegetel.  Big, big

5    surprise.  Mr. Messier got exactly what he wanted.

6        Now, I could show you page 1429, lines 7 to 9 of the

7    trial transcript.

8        You can see here that when Mr. Hannezo was on the

9    witness stand, he testified that he was certain there were

10   comfort provisions at Cegetel and that it was a legend in the

11   company.  But Mr. Trotot, the CFO of Cegetel, he denied it in

12   his testimony here in this courtroom.  He said never even one

13   single time use comfort reserves.  So I guess when Mr. Hannezo

14   said it was a legend in the company, ladies and gentlemen,

15   well, who do you believe, Mr. Hannezo or Mr. Trotot?

16       Actually, Mr. Trotot admitted he was inflating

17   numbers, anyway.  Let's look at PX926T, which is a memo from

18   Mr. Trotot the next year, 2002.

19       Mr. Trotot writes:  We had inflated 2001 Q2 by nearly

20   70 million euros out of the need to present 2001 half-year

21   earnings up from 2000 earnings.

22       He actually said it -- look at PX226.

23       Mr. Trotot again writes:  As a prefatory note, we

24   should comment and remind that, one, we had inflated Q2 EBITDA

25   by 70 million euros in order to show a growth in H1 '01 over H1

3

1   2000 and we shall have to renew it for H1 2002 results with a
2   20 percent gross-up.  But we have some room for maneuver to
3   address this issue.
4       Mr. Trotot wrote two memos, one in English and one in
5   French.  They both said Cegetel's results were inflated for the
6   second quarter of '01.  Now, years after the fact, Mr. Trotot
7   came here and tells you during this trial that he preferred to
8   use the word increased instead of inflated because the word
9   inflated is negative.  Well, he's right at least on that point,
10  inflated is negative.  It certainly is.  Comfort reserves are
11  improper and the use of them to meet targets amounts to fraud.
12  You know what it's called in some corners, it's called cooking
13  the books.
14      Can you go to statements 16, 17 and 18 in table A.
15  You see the underlying documents.  July 23, 2001.  This is the
16  public's document.
17      The outside message is that second quarter to first
18  half '01 results for Vivendi are very strong and that Vivendi
19  was confident that it would meet its EBITDA targets.  Of
20  course, there is no mention in here that EBITDA numbers were
21  inflated through the use of improper accounting entries that
22  lack any economic substance.
23      In addition as I mentioned to you before, you heard
24  Mr. Mintzer talk about how Vivendi's EBITDA was benefited by
25  purchase accounting.

7316

1       MR. ABBEY:  Well, as you can see from slide 5 from
2   Mr. Mintzer's presentation, Vivendi was able to boost its
3   EBITDA for the second quarter in '01 by 60 million euros,
4   thereby allowing it once again to meet the target numbers that
5   it set for investors.  In other words, Vivendi didn't tell
6   investors that the way it was able to meet its EBITDA targets
7   was purchase accounting adjustments -- one-time business
8   events -- rather than the robustness of its businesses, as it
9   said in the public press release.
10      While I am on that subject of earnings manipulation,
11  you will recall that each of the defendants' counsel have
12  argued that because Mr. Mintzer and Mr. Oustalniol testified
13  about the red flags evidencing manipulation, that they didn't
14  point to the specific underlying accounts that were
15  manipulated.  There can be no earnings manipulation.  However,
16  the evidence is that Mr. Messier demanded increased earning
17  results, and quarter after quarter various business units met
18  Mr. Messier's demands.
19      As defendants' expert, Mr. Milner, agreed, these
20  documents clearly were red flags of earnings management that he
21  said should have caused the auditors to investigate further.
22  But we now know that these red flag documents were withheld
23  from the auditors.  So that work couldn't be done and wasn't
24  done at the time.
25      Now let me describe what happened.  Remember the

7317

1   testimony of Mr. Trotot, who was asked what accounts he came up
2   with to get the additional earnings demanded by Mr. Messier.
3   He replied, Mr. Trotot, the CFO of Cegetel, he replied that he
4   did not know.
5       Now, if the man who came up with the extra earnings
6   didn't know from what accounts he got the earnings, there is no
7   way an outside expert can know what accounts were used to meet
8   Mr. Messier's demands.  But the judge will tell you that there
9   is something called circumstantial evidence, which is just as
10  valid as direct evidence.  So when you see direct evidence that
11  Mr. Messier demanded these additional earnings and quarter
12  after quarter these demands were met, you are entitled to use
13  your common sense and conclude that these accounts were the
14  subject of earnings manipulation.
15      So if you believe these statements violate 10(b), you
16  will check yes and knowingly.
17      Now, I can hear and feel the defense lawyers getting
18  all agitated.  Wait, they want to say.  The plaintiffs'
19  accounting experts can't testify there was earnings management
20  just because they found some red flags.  They didn't confirm
21  that there was no real basis for the adjustments that were
22  made.  They didn't look at the underlying accounting records.
23  They were either lazy or worse.
24      That has been the theme of every defense lawyer who
25  has addressed this topic.  They obviously didn't listen to the

7318

1   testimony.  Please look at me, at Mr. Mintzer's testimony at
2   trial, and I will read it to you.
3       "Q.  Mr. Mintzer, do you know what Magnitude is?
4       "A.  Yes, in general.
5       "Q.  And are you aware that Magnitude was Vivendi's accounting
6   software?  Correct?
7       "A.  At some point in time it was, that is correct.
8       "Q.  And are you aware that plaintiffs requested Vivendi to run
9   over 1,000 searches for Magnitude reports, are you not?
10      "A.  I don't remember the number.
11      "Q.  And are you aware that Vivendi produced thousands of pages
12  of documents from this accounting database?
13      "A.  Well, I sure do remember getting thousands of pages of
14  documents.  I don't remember the precise number, but I didn't
15  find them too particularly useful.
16      "Q.  And despite Vivendi producing these documents, thousands
17  of pages of these accounting records, you did not rely on one
18  single document from that accounting database to support your
19  opinion, did you?
20      "A.  I couldn't find any basis to rely on them.  They were not
21  useful to me."
22      So Mr. Mintzer testified he and his staff did review
23  thousands of pages of internal Vivendi accounting documents.
24  They looked at the internal accounting records and they
25  couldn't find anything that would justify the earnings

7319

1　management numbers covered by those red flags.  They argument
2　that defense counsel has used throughout to try to get rid of
3　those flags is just wrong.
4　　　　I say this to you.  You would know this.  If the
5　defendants were so sure that underlying accounting records
6　existed to justify the earnings management numbers, don't you
7　think their experts, their Cornerstone, their litigation
8　support person, even defense counsel themselves would have
9　found them if they were so important?  Of course.
10　　　　There is a simple explanation as to why you haven't
11　seen accounting documents.  The supporting accounting documents
12　are a myth.  They don't exist.  If they did exist, don't you
13　think the defendants would have brought them here to this trial
14　and shown them to you?  Did you see any?  No.  Did Mr. Mintzer
15　or Mr. Oustalniol see any?  No.  Did Mr. Milner, defendants'
16　expert, show you any?  Not a one.
17　　　　The red flags were right.  Earnings management was
18　going on at Vivendi.
19　　　　That takes us to entries 19, 20 and 22.
20　Table A, please.  We are moving forward in time.
21　September of '01.  These are a Vivendi press release and a
22　conference call for analysts and investors on September 25,
23　2001.  Defendants are reporting the same supposedly strong
24　operating results for the second quarter and first half of 2001
25　that we just saw were plagued with earnings management

7320

1　adjustments.  No mention, no mention at all, of any liquidity
2　problems or issues.
3　　　　So again, if you believe Section 10(b) was violated,
4　you should check yes on your verdict form for these statements
5　since Vivendi was improperly managing its reported numbers --
6　for example, as shown by Mr. Trotot's later memos admitting the
7　numbers were inflated.  And you should also check yes because,
8　as we saw previously, Vivendi would not have been able to meet
9　its EBITDA targets except for the fact that it was relying on
10　these one-time purchase accounting benefits for which the
11　amounts were concealed from the outside.
12　　　　So again, on statements 19, 20 and 22, if you believe
13　that we have satisfied our burden -- and, as I say, it is just
14　a hair more, that's what we need to establish under 10(b) --
15　then you should check yes for those statements.
16　　　　Statement 21.  Please show Table A.  This is another
17　public statement by Vivendi.  Again, what I am trying to do in
18　this exercise -- and I have got to get to 57; I am on 21 -- is
19　to try to show you what was said on the outside chronologically
20　and to match it with the evidence that we have in this case on
21　the inside for you to decide about those statements.
22　　　　Now, Table A.  This is another public statement,
23　September 25, '01.  This was an analyst and investor
24　conference.  One of their main outside messages at this
25　conference was about Cegetel.  But in Cegetel, they omitted to

7321

1　disclose the most important thing that was going on at that
2　time.  Let's put the evidence together on this issue.  What
3　does it show?
4　　　　Vivendi started using almost 1 billion euros of
5　Cegetel's money in August of '01, and this is right at the time
6　when there is a bunch of memos being written, like
7　Mr. Hannezo's book of warnings, saying that Vivendi needed
8　money.  When Pierre Trotot testified during this trial, he told
9　you that the Cegetel loan was his idea.  He said that the loan
10　had nothing to do with the fact that Vivendi needed money.  He
11　said, if you can believe it, that it was just a total
12　coincidence.  That is even though Mr. Trotot is a long-time
13　Vivendi employee, paid by Vivendi, and very close to Vivendi.
14　　　　Yet his sworn testimony is that he had no idea that
15　Vivendi needed the money.  Can you believe that?  Is that even
16　credible?
17　　　　Mr. Quinn showed you a clip of Mr. Trotot saying:  I
18　proposed the loan.  Trotot said it twice.  I proposed the loan.
19　I proposed.  Trotot knew it was important to say it was his
20　idea.  Why was it so important?  So Mr. Quinn could make the
21　argument he did in the closing.  If it was Trotot's idea, how
22　could that show a cash squeeze at Vivendi.
23　　　　Now, Trotot admits that for them to use Cegetel's
24　money like this they had to get Cegetel board approval.  This
25　is required under French law.  Yet Trotot causes Cegetel to

7322

1　loan almost a billion dollars to Vivendi, the company he works
2　for, without getting the Cegetel board approval that is
3　required under French law.
4　　　　This goes on for two months.  So for two months,
5　Trotot goes to work every day, his salary being paid by Vivendi
6　the whole time, not having the approval that is required under
7　French law.  He has loaned almost a billion dollars of
8　Cegetel's money to Vivendi, for the company he works for, and
9　again he tells you, I had no idea Vivendi needed the money.
10　Does that make any sense to you?
11　　　　Well, they do eventually end up getting Cegetel board
12　approval.  But when they got it, obviously the Cegetel board
13　had no better idea about Vivendi's liquidity than anyone
14　else on the outside.  There was no reason for them to think
15　that Vivendi wasn't completely good for the money, no reason to
16　think that because they had no better information about Vivendi
17　than anyone else in the outside.
18　　　　So those other shareholders signed the agreement.  The
19　Cegetel board members were representatives of other large
20　investors in Cegetel, like a representative from British
21　Telecom.  So they too were also fooled by Vivendi.
22　　　　Bring up PX504.
23　　　　You notice when you look at the agreement, it is dated
24　August 1, 2001.  That is when Vivendi started using the money.
25　But the record is clear, and this fact is undisputed, that they

7323

1   didn't get the required authorization required by French law
2   until September 28th, almost two months later.
3        What is the significance of that? Well, these
4   auditors that you hear so much about, the watchdogs, if the
5   auditors asked for the agreement that said what is the basis
6   for Vivendi using a billion dollars of Cegetel's money since
7   August of '01, if they were shown this agreement -- and there
8   is no evidence they were -- it would be dated August 1. That
9   means that the auditors, if they ever did see it -- and, again,
10  we have no evidence they did -- it would look like Vivendi
11  actually had the authorization required by French law during
12  August or September. We know that was not the case.
13       You think that is an accident? You think it is an
14  accident that the agreement is dated August 1 even though it
15  wasn't approved until September 28th.
16  So we go on.  November '01.
17       Andrew, please bring up PX88.
18       Do you remember when you saw this memo, PX88, from
19  Mr. Dupont L'Hotelain, Vivendi's treasurer. It says that
20  Vivendi had asked Cegetel to draw down its bank lines and put
21  the money in its bank account so Vivendi could use it to meet
22  other cash flow requirements.
23       Mr. Trotot, CFO, told you that never happened, that
24  Vivendi never asked Cegetel for the money. But think about
25  what that request really is. Vivendi is basically telling

7324

1   Cegetel, go to your banks, take out your credit lines, borrow
2   as much as you can, stick it in your bank account, and then we
3   are going to take all that money and use it at Vivendi. And
4   Pierre Trotot, the CFO of Cegetel, still comes to you and says,
5   gosh, I didn't know that Vivendi needed money.
6        Think about that. If your son or daughter came to you
7   and said, can you take out your credit lines or overdraft lines,
8   put it in your bank account so I can use it, would you think
9   that they probably needed the money?
10       What about the fact that, as in Vivendi's case, it was
11  over a billion dollars. A billion euros. Would you think they
12  probably needed money? Isn't it clear they needed money at
13  that point? But of course, Mr. Trotot on the stand wouldn't
14  admit it. So you remember on the last day of trial we had to
15  bring you the video testimony of Mr. L'Hotelain to show you
16  that is exactly what happened.
17       Let's play that short bit of testimony.
18       (Videotape played)
19       MR. ABBEY:  OK. So Cegetel borrowed money, put it in
20  their bank account so Vivendi could use it. And Vivendi wants
21  you to believe that they didn't have any liquidity issues in
22  2001, that they had no need for money. That position, I
23  submit, is ridiculous, ladies and gentlemen, and you shouldn't
24  be fooled by the idea that Vivendi didn't need the money and
25  was doing Cegetel a favor by borrowing.

7325

1   So after this, the loan was set to expire the end of
2   December '01, and under French law the Cegetel board had to
3   approve the renewal. But just like the original loan back in
4   August, it didn't get the required approval.
5        Mr. Trotot was asked why he didn't get the required
6   approval, and he said on the witness stand: We just all
7   forgot. You loaned out all of Cegetel's money, the agreement
8   expires, you are required under law to get approval for the
9   renewal, and you say we just forgot? Is that credible? One
10  billion euros and we just forgot? All of Cegetel's available
11  cash is loaned to Vivendi and we just forgot to document the
12  loan?
13       You are the CFO of a company, Mr. Trotot. You have
14  loaned out every penny it has. You have loaned it to another
15  company, which company you are paid by, and that is your
16  answer, we just forgot? That is the whole explanation? Does
17  that make any sense?
18       Hey, Mr. CFO, do you have approval required by law to
19  loan out all your company's money?
20       Oh, I forgot. We don't have the approval that is
21  required under the law.
22       So what happened? Well, Vivendi's liquidity problems
23  start to materialize in 2002, and those minority shareholders
24  of Cegetel find out that the loan has been extended and they
25  start to get very nervous. So they demand the money back from

7326

1   Vivendi, and Vivendi has to pay it back.
2        The defendants in this courtroom dance around and want
3   you to think that there was no formal demand by the other
4   Cegetel shareholders for repayment. So I guess they want you
5   to believe, you know, there is no problem, we got it, we got it
6   back. Well, we showed you the memo where Mr. Hannezo said it
7   was within those shareholders' rights to demand the money back
8   from Vivendi.
9        Let's bring up PX120.
10       Take a look right there on the screen. That is
11  exactly what Mr. Hannezo said.
12       What is the defendants' response to this? Mr. Hannezo
13  was just wrong. No formal demand, no problem. But Mr. Hannezo
14  didn't say that. He said: "Off the top of my head, I think
15  they may be within their rights, but I would need to check."
16  He said: "We verified that they were within their rights," and
17  Vivendi had to pay it back.
18       Even Mr. Trotot told you he was worried about Vivendi
19  not being able to pay it back.
20       Can you please bring up the trial transcript, 5725,
21  lines 6 to 14. Let me read what Mr. Kerr asked and what
22  Mr. Trotot said in response.
23       "Sir, the minority shareholders at Cegetel were
24  concerned at this time because they suddenly discovered that
25  the money that they had loaned to Vivendi was at risk, isn't

7327

1  that right?"
2  "A. They read the press and they read the downgrading.
3  "Q. And they were worried about whether or not they are going
4  to get their money back. Isn't that right?
5  "A. Yes.
6  "Q. And you were concerned too, right?"
7       This is Mr. Trotot:
8  "A. Yes."
9       Bring up PX756.
10      You can see that Mr. Trotot basically threatened to
11  put Vivendi into receivership if they didn't pay the money
12  back. But again the defendants say: No problem. We weren't
13  worried about that. No liquidity issues.
14      But eventually, as you know, Vivendi did pay the money
15  back.
16      Look at PX718.
17      Mr. Espinasse said this whole thing with Cegetel was
18  one of the causes of Vivendi's liquidity crisis. Now
19  defendants want to point to this disclosure of the current
20  account in the April '02 French regulatory filing.
21      Andrew, please put up PX75 and go to page 224.
22      It is all there. That is what they say. Is that
23  true, ladies and gentlemen? Let's look at a note from one of
24  the rating agencies. Do you think that the rating agencies
25  read the French filing? Of course they do. It makes sense

7328

1  that they do. That is their job.
2       Now, did the rating agencies say it is all there, it
3  is fully disclosed? No. Actually, the rating agencies were
4  mad because Vivendi had basically lied to them. For example,
5  look at PX103-6.
6       You can see that the Cegetel loan came as a big
7  surprise to Standard & Poor's, and Mr. Deslondes, who works for
8  S&P, said the same thing in his testimony that was shown during
9  the trial.
10      Let's play a clip of Mr. Deslondes' testimony right
11  now for the jury, please.
12      (Videotape played)
13      MR. ABBEY:  Now, Mr. Quinn asked where our rating
14  expert was to say, oh, no, Vivendi tricked all the rating
15  people. Well, we didn't need one. We had the facts. The
16  rating agency analysts themselves who explained how they didn't
17  know the whole story about Vivendi's liquidity and were lied
18  to.
19      So I ask you, did the defendants really reveal the
20  whole truth in the French filing, which doesn't say a word
21  about the minority shareholders' right to call this money on a
22  moment's notice, which of course is exactly what happened, or
23  are the defendants being as honest with you as they were with
24  the rating agencies back in '01 and '02?
25      You heard the defendants in closing say everyone knows

7329

1  current accounts are payable on demand, but then they told you
2  in those same closings that the defendants themselves were
3  surprised by the fact that the minority shareholders could
4  demand repayment of a loan. Which one is it, ladies and
5  gentlemen?
6       Also, if it is wildly known, as defendants argue, that
7  this loan could be recalled on demand, then defendants were
8  reckless at best for not knowing this.
9       So if you believe statement one violates Section
10  10(b), you should check yes and knowingly on your verdict form.
11      Going to statements 23 and 24, these are two
12  statements, both about Maroc. The first is from the September
13  25, '01 conference call and the second is the October 17,
14  '01 SEC filing, financial statements for the first half of '01.
15      While these outside messages are about Maroc Telecom,
16  the real story is nowhere to be found in these statements.
17  Nothing. Nothing in there tells investors about the 1.1
18  billion Maroc Telecom irrevocable commitment, stated in the
19  agreement that is hidden in a safe. Even Mr. Hannezo
20  acknowledged that Vivendi failed to disclose the obligation in
21  these half-year financial statements.
22      Again, Andrew, please bring up PX284.
23      You saw this when Mr. Perschetz anticipated that we
24  would use this document, and he was right. Mr. Hannezo wrote:
25  "It's time to sound the alarm." He goes on: This

7330

1  commitment -- meaning the Maroc Telecom commitment -- was not
2  disclosed in H1, which is first-half financial statements.
3  Mr. Hannezo also admitted during his trial testimony that the
4  Maroc debt obligation was not disclosed, and it is the first
5  half that this statement refers to. So Mr. Hannezo is saying
6  that it was not disclosed in that statement. That is one of
7  the statements that you have to render your verdict on.
8       Let's bring up the trial transcript again, page 1220,
9  lines 21 through 23. Let me read Mr. Gluck's questions to
10  Mr. Hannezo on cross-examination and his answers. Page 1207,
11  lines 7 through 10:
12  "Q. You had a binding agreement to pay the money, didn't you?
13  "A. Yes.
14  "Q. You did not disclose it, did you?
15  "A. No."
16      You also saw Alex Hebert's testimony on this. He was
17  the person at Vivendi who was in charge of dealing with the
18  rating agencies. He said that the rating agencies had no idea
19  about the 1.1 billion dollar Maroc obligation, even though he
20  knew or he would have wanted to know that kind of information.
21      Let's play the video clip of Mr. Hebert's deposition
22  on this point.
23      (Videotape played)
24      MR. ABBEY:  Now, Christian Rauch, who was a Moody's
25  analyst who followed Vivendi, also testified about Maroc. You

7331

1  may remember we read his transcript to you.  Now let me read
2  what he said:
3      "Q. At any point did Vivendi ever tell you about that the
4  agreement?
5      "A. I don't think -- as I say, I don't remember Vivendi
6  telling me about that agreement.
7      "Q. Did someone else tell you about that agreement?
8      "A. I don't remember anybody -- just to follow the line of
9  questioning, I don't remember anybody telling me about that
10  agreement."
11      So the fact is for almost a year Vivendi made no
12  disclosure, not the amount of the Maroc contractual commitment
13  or even that they had a commitment.  The excuse you have heard
14  is that they didn't know the final amount because they were
15  negotiating with the King of Morocco and the King had told them
16  that the put would not be enforced.  If you remember, they said
17  it's good to be King.
18      The only support defendants have for this happening is
19  Messier's saying so.  There is no memo showing this agreement,
20  no e-mail or letter stating that the agreement had been made.
21  Nothing.
22      Supposing something happened to Messier or the King,
23  what would Vivendi have done then?  As the judge will tell you,
24  you will be the judge of Mr. Messier's testimony about this.
25      But even if there were negotiations with the King,

7332

1  surely Vivendi was going to pay something.  Do you think the
2  King of Morocco is a fool?  You can be sure he was not going to
3  give Mr. Messier the keys to the kingdom for nothing.
4      That is why Mr. Hannezo was sounding the alarm in
5  January of '02.  It was because he knew the King would expect
6  payment.
7      You know, of course, the King eventually got his 1.1
8  billion euros, a little bit later, but nevertheless Vivendi
9  paid the full amount.
10      So all this stuff from the defendants about maybe
11  getting the 16 percent for nothing and suing the King of
12  Morocco for fraud, come on.  In Morocco, the King owns the
13  court.
14      As Mr. Mintzer and Mr. Oustalniol explained to you,
15  both U.S. and French accounting rules required Vivendi to make
16  the disclosure.  But as of December 31, 2001, there was an
17  agreement requiring 1.1 billion.  So investors didn't know
18  anything about this commitment nor did the rating agency, and
19  it would have been particularly significant to them because we
20  know they were focused in December of 2001 on Vivendi's debt
21  level and on Vivendi's promises to reduce debt, that would have
22  been very negative on another billion-plus euro debt.  And if
23  they had known of the Maroc commitment, which they didn't,
24  maybe the cannonball would have found its mark.
25      If you believe that those statements, 23 and 24,

7333

1  violate Section 10(b), you should check yes and knowingly on
2  your verdict form.
3      Statements No. 25 through 28.  We are still in October
4  2001.
5      Behind closed doors the story for the third quarter of
6  '01 was that 134 billion euros of the EBITDA growth for media
7  and communications came from the undisclosed one-time purchase
8  accounting adjustments.  Remember, the profit adder, as they
9  called it inside Vivendi.  That is what Mr. Mintzer explained
10  to you when he put up slide No. 5.
11      Can we put that up, please.
12      Mr. Mintzer also explained to you that even though
13  Vivendi was required to do so under the accounting rules, it
14  was not telling investors about the effect of applying purchase
15  accounting benefits or the amounts involved.
16      Let's look at PX626.
17      You will see that Mr. Hannezo was told by the CFO, Mr.
18  Henny, of the Universal Music Group, the following:  "I'm sure
19  you knew this when you so confidently predicted EBITDA growth."
20  That is a prediction to the public, right?  "We have the
21  benefit of purchase accounting, some EU 81 million this quarter
22  and EU 133 million year to date.  On a year-to-date basis, we
23  would have shown an EBITDA decline of 13 percent but for the
24  purchase accounting benefit.
25      "You ask that I look at EBITDA again.  I mentioned it

7334

1  in an earlier note to you that we have examined our accounting
2  options and taken what we can.  Almost two-thirds of this
3  quarter's EBITDA comes from purchase accounting, one-time
4  transactions and accounting options.  I'm prepared to walk you
5  through these at any time, but would prefer not to do it in
6  e-mail."
7      Keeping that in mind, ladies and gentlemen, let's take
8  a look at the outside message.  This is what was being said at
9  the time to the outside.
10      October 30, 2001, just a few weeks after Mr. Henny's
11  e-mail, the outside message is again a positive one.  Vivendi
12  is announcing strong third quarter results for its media and
13  communication division.  Reported EBITDA growth is off the
14  charts, up 9 percent.  Vivendi even singled out the performance
15  of Mr. Henny's company, Universal Music Group, saying that UMG
16  reported a 6 percent increase in EBITDA to 250 million euros,
17  reflecting strong performances in North America, France, the
18  UK, Australia, and music publishing and a further improvement
19  in Japan.
20      I just want to take a moment and point this out to
21  you.  The press release is a very good example of how Vivendi
22  was telling the public that the reasons for EBITDA growth were
23  things like improved operations and strong business
24  performance.  When in reality, as you have seen from the
25  internal stuff, the growth came in large part from purchase

7335

1 accounting or one-time accounting options, and their huge, but
2 unannounced, effect on EBITDA inside.
3     The real story.  Without the purchase accounting,
4 EBITDA declines 13 percent, like Mr. Henny said.  Outside, the
5 public message, with a purchase accounting EBITDA, it increases
6 6 percent.  Two very, very different stories about Vivendi's
7 performance.  On the outside up; on the inside down.
8     Now you see Mr. Bronfman.  He also talked about this.
9     Bring up PX709, please.
10     You can see Mr. Bronfman wrote in this e-mail:  "The
11 EBITDA achievement occurred with huge purchase accounting
12 benefits.  Therefore, what really happened is that revenues
13 were down .8, but EBITDA was down approximately 15 percent."
14     We asked him about this e-mail during his video
15 deposition.  We played his testimony for you during the first
16 week of the trial.  This is what he said:
17     "I guess what I'm saying is that the difference
18 between the EBITDA that we reported with purchase accounting
19 and the EBITDA if there had been no purchase accounting would
20 have been the delta between -- let me find the numbers -- I
21 don't even know if the numbers were here.  But that the
22 purchase accounting accounted for -- allowed us to report
23 numbers that would have been worse had we not had purchase
24 accounting in the numbers.  And since I have now resigned from
25 the company and I'm just -- really what I'm saying to the guys

7336

1 is, 2002, you need to pay attention to costs and go and do what
2 you have to do."
3     You just heard it.  Mr. Bronfman admitted that the
4 purchase accounting adjustments allowed Vivendi to report
5 numbers far better than if they didn't have the purchase
6 accounting benefit.
7     Finally on these statements, these are 25 to 28 on
8 your verdict form.  You also heard plaintiffs' accounting
9 experts, Mr. Mintzer and Mr. Oustalniol, explain how there were
10 red flags of earnings management at Vivendi in the third
11 quarter of 2001.  The first one was a $7 million corporate
12 overhead adjustment relating to the Universal Music group.  You
13 can see that here in PX1393.
14     Mr. Henny, Universal Music group's CFO, referred to
15 this as a -- pardon my English -- as a BS entry.
16     There was also a 20 million euro adjustment at
17 Cegetel.  When Mr. Trotot testified about it during the trial,
18 he remembered that Mr. Messier had asked him for an additional
19 20 million euros.  He remembered that he got the extra 20
20 million euros.  But he didn't remember how he got the extra 20
21 million euros.  He didn't have any recollection about the
22 details other than to say he didn't do anything improper.  Does
23 that sound right to you?  Talk about a selective memory.  How
24 convenient.
25     Ladies and gentlemen, given all that, Vivendi's public

7337

1 announcement of third quarter '01 results was misleading to say
2 the least.  Defendants knew it.  They knew inside the company
3 all the things we have been taking you through.  But what you
4 have seen is from their own documents.  There absolutely are no
5 credible explanations to contradict the documents.
6     That is why if you believe we have satisfied the
7 elements of Section 10(b) for statements 23, 25 through 28, you
8 should check the verdict form yes and knowingly.
9     This is probably a good time just to say that
10 Mr. Quinn asked me some questions.  This is one of them.  Where
11 the fraud is, if the numbers were always right.  Well, they
12 weren't always right and we have seen a lot of examples of
13 that.  They were inflated, like Mr. Trotot said.  They were
14 really down when Vivendi told the public they were up, like
15 Mr. Bronfman said.
16     Statement No. 29.
17     Your Honor, can we take a break after this statement?
18 Would that be OK?
19     THE COURT:  That will be fine.
20     MR. ABBEY:  Thank you.
21     November 14, 2001.  The outside message is a letter to
22 Vivendi shareholders from Mr. Messier.  He is telling everyone
23 how pleased he is with Vivendi's strong financial results and
24 how confident Vivendi was about its businesses notwithstanding
25 the September 11 attacks.

7338

1     Well, as we have been talking about, Vivendi's results
2 were inflated by earnings management and purchase accounting
3 adjustments.  So once again, Vivendi just wasn't telling
4 investors the real story.
5     If you believe that statement No. 29 satisfies the
6 violation of Section 10(b), you should check yes and knowingly
7 on the verdict form for statement No. 29.
8     I have one more that I will go through and it will
9 only take a minute or two and then we can take a break.
10     No. 30.  This relates to Vivendi's Polish telecom
11 subsidiary called Elektrim or Telco.
12     I want to remind you of the series of memos from the
13 end of '01 where Vivendi was discussing internally its 51
14 percent interest in Telco.
15     Please put up PX526.
16     This is a memo from Dominique Gibert to Mr. Messier,
17 Mr. Hannezo and others.  The second paragraph says:  "Following
18 the closing, we" -- meaning Vivendi "will control 51 percent
19 of Telco."
20     Can we put up PX922, please.
21     This is an e-mail from Mr. Gibert to Mr. Hannezo,
22 dated October 12, '01.  Right there, in paragraph 4, Mr. Gibert
23 says:  "Our" -- meaning Vivendi -- "our 51 percent in Telco."
24     How about PX755, another e-mail from Gibert to
25 Hannezo.  You can see the bottom of the e-mail that Mr. Gibert

7339

1    is again talking about our 51 percent in Telco.

2         So inside the company they talk over and over and over

3    about how Vivendi owns 51 percent of Telco.

4         Let's go to the outside message.  Of course, it is

5    very different.

6         Table A.  December 12, 2001.  The outside message in

7    this press release is that Vivendi wants to make things clear

8    about its arrangement with Telco.  Vivendi says that it owns 49

9    percent in Telco.

10        I ask you, is that consistent with the internal memos

11   recognizing the 51 percent?  Of course not.

12        You have heard testimony that the rating agencies told

13   Vivendi -- and this is the motive -- it told Vivendi it would

14   have a ratings problem if it owned 51 percent in Telco.  As

15   plaintiffs' accounting expert explained, under the accounting

16   rules if Vivendi owned 51 percent of Telco it had to

17   consolidate Telco's financial results into Vivendi.  And since

18   the rating agencies were concerned that consolidation of Telco

19   would have increased Vivendi's debts, Vivendi wanted to avoid a

20   rating downgrade.

21        Bring up PX539.

22        You can see Mr. Hannezo say it very clearly right here

23   in this e-mail:  Consolidation, conso Elektrim, no, never.

24        But even people inside Vivendi understood that it

25   should have consolidated Telco.

7340

1         Andrew, can we put up PX634.

2         This is a September 4, 2001 e-mail to Mr. Gibert from

3    John Luczycki.  Mr. Luczycki says, now that Vivendi has a 51

4    percent interest in Telco, with control, it must be

5    consolidated in U.S. GAAP.

6         What did Vivendi do?  They bought and paid for 2

7    percent of Telco, but withheld the information from investors

8    and the rating agencies.  Instead, Vivendi secretly decided to

9    hold a 2 percent interest in the name of that investment fund

10   called Ymer, that was administered by Societe Generale and

11   located in Luxembourg.  Vivendi put their lawyer on one board

12   and paid for and indemnified the investment banker who was put

13   on another Telco board.

14        The most sophisticated person in Vivendi's finance

15   department, Dominique Gibert, called the arrangement a portage.

16   But after this lawsuit was started, Gibert changed his tune,

17   and society had used the phrase too loosely.

18        Plaintiffs' two accounting experts explained to you

19   the nature of the portage arrangement is that it not be

20   disclosed.  You should not be fooled by Vivendi's attempt to

21   elevate form over substance.  Ymer was nothing more than the

22   undisclosed agent of Vivendi, and Vivendi's statements about

23   Telco to the contrary are false.

24        You remember when Mr. Quinn was talking to you about

25   how we were just on the Telco rabbit trail.  He said, so the

7341

1    plaintiffs came up with this wacky idea, something called a

2    portage, which, believe me, I have no idea what they were

3    talking about.

4         Well, Mr. Quinn should have asked his own client

5    portage.  That is not my word.  I didn't even know what a

6    portage was until this case.  I saw it in Mr. Gibert's

7    documents.  You can see it right there in PX638.  He is the one

8    who said portage and he is the one who came up with the wacky

9    idea, as Mr. Quinn called it.

10        If you believe that statement 30 violates Section

11   10(b), you should check yes and knowingly, and I hope you enjoy

12   lunch.

13        THE COURT:  We will take a break and we will resume at

14   2:00.

15        (Jury excused)

16        THE COURT:  What is your estimate, Mr. Abbey?

17        MR. ABBEY:  Pardon me?

18        THE COURT:  Your estimate.

19        MR. ABBEY:  The rest of the day for sure.  I may

20   squeak by, but it may carry over until the morning on Monday.

21        THE COURT:  All right.

22        MR. ABBEY:  I'm getting there.  Thank you.

23        MR. GLUCK:  You are losing your voice in the process,

24   too.

25        THE COURT:  Mr. Saunders.

4

1         MR. SAUNDERS:  I was going to hand up a letter to your

2    Honor.

3         THE COURT:  Please do.

4         MR. GLUCK:  This is basically what is the form of the

5    list of the exhibits.  Do we have a dispute about one color two

6    columns?  Two.  Whether or not the exhibit should be described,

7    you know the ones would show what is in for all purposes, just

8    using exhibit number.  Date and description, whether or not

9    that should be in the chart that is given to the jury.

10        THE COURT:  All right.  I will review the

11   correspondence.

12        MR. ABBEY:  Thank you, your Honor.

13        (Recess)

14        (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

7343

1          AFTERNOON SESSION

2               2:03 p.m.

3     (Jury present)

4          THE COURT:  Mr. Abbey.

5          MR. ABBEY:  Good afternoon, everyone.

6          Moving along with our statements, remember there were

7     57 of them and I'm telling you what was said on the outside and

8     then trying to show you the exhibits that tell you what was

9     going on on the inside.  So now I am going to discuss

10    statements numbers 31 through 33.

11         It's now mid-December; chronologically, mid-December

12    2001.  Vivendi is holding a conference for analysts and

13    investors here in New York City.  They are talking about

14    Vivendi's latest acquisitions, USA Networks and Echostar, the

15    satellite TV company.  Vivendi is spending billions of dollars.

16         You have heard testimony about how the rating agencies

17    were worried that Vivendi would do more acquisitions and

18    increase its debt.  Vivendi's three-way merger with Seagram's

19    and Canal Plus in 2000 had itself been a very big and expensive

20    deal.  After that, Vivendi continued to take on more debt as it

21    bought more companies during 2001.

22         Vivendi could not afford a downgrade.  That would

23    trigger a treasury crisis, as Hannezo in Hannezo's December

24    death seat memo, which I will put up next.

25         So Vivendi met with rating agencies in 2001, in

7344

1     December.  It wanted assurances that the rating agencies would

2     not issue downgrades due to the USA Networks deal.  And in

3     order to get those assurances, Vivendi made extraordinary

4     commitments that it would deleverage.  That means, of course,

5     pay down debt.  Vivendi was very keen to convince everyone that

6     it could handle the additional debt that it was taking on from

7     USA Networks and Echostar, and it said as much.

8          Now, the reality, Vivendi just barely avoided down

9     grade by the credit rating agencies.  Let's look again at

10    Mr. Hannezo's death seat memo, which is Plaintiffs' Exhibit

11    136T.

12         Of course, you recall Mr. Hannezo telling about his

13    painful and humiliating meetings with the credit rating agency,

14    the danger of Vivendi having a treasury crisis.  This is

15    December of 2001.  The cannonball going by his head, being in

16    the death seat of a car that was accelerating in a sharp turn,

17    and Hannezo pleading that it not all end in shame.

18         With that memo on the inside, let's look at the public

19    message at the time.

20         December 17, 2001, as you can see right here,

21    statement 31, Vivendi told the public that it had a comfortable

22    triple B rating, that these acquisition transactions were not

23    putting any pressure on Vivendi, and that the balance sheet was

24    clean.

25         Well, that's just not the truth, ladies and gentlemen.

7345

1     You saw it right there in that important exhibit, the death

2     seat memo.  Vivendi was very far from comfortable that it would

3     be able to keep its rating.  The truth is, it had just barely

4     avoided a downgrade.  It was touch and go, even though Vivendi

5     did not disclose the secret 1.1 billion euro Maroc commitment

6     to the rating agencies.  It never disclosed to the rating

7     agencies the fact that Vivendi had been borrowing Cegetel's

8     money and could be forced to pay it back on a moment's notice.

9     They didn't disclose to the rating agencies the fact that

10    Vivendi's EBITDA had been enhanced and boosted for the last

11    year by purchase accounting.  It certainly kept behind closed

12    doors that it was managing its earnings.  You could imagine

13    what S&P's position would have been if these things had been

14    disclosed to the rating agency.

15         It's easy to see that the whole situation was pressure

16    filled.  Just look at Mr. Hannezo's description of being in

17    the death seat of the car.  That's pretty serious stuff.

18         Now, Mr. Gluck asked Mr. Hannezo about this document

19    during the trial.  Mr. Hannezo said that it was just a personal

20    note that he was sending best wishes to Mr. Messier and his

21    family for 2002.  Well, ladies and gentlemen, we are here in a

22    few weeks after New Years in 2010.  And I think it's fair to

23    say that none of us got any holiday cards like that.  So if you

24    believe that this statement violates Section 10(b), you would

25    check yes and knowingly on the verdict forms for statements 31

7346

1     through 33.

2          Next, statements 34 through 37.  Again,

3     chronologically, you've seen and heard about how in January '02

4     investors started to get the idea that things were not so great

5     at Vivendi.  And this was because, on January 7, 2002, Vivendi

6     announced that it sold a bunch of its shares to raise billions

7     of dollars.  This made people start to wonder whether, despite

8     what it was saying, Vivendi might be short of cash and needed

9     money, needed liquidity.

10         Now, let's look at PX86.  This is the inside story and

11    this is from Mr. Hannezo to Mr. Messier on February 8, 2001,

12         PX86.  Compared to its peers and particularly if the

13    market begins to disregard EBITDA, VU, that's Vivendi

14    Universal, has a big problem.  Number one, free cash flow;

15    number two, net result for the real thing, but no goodwill, but no

16    capital gains; number three, overleverage; and number four, an

17    excess of minority interests.

18         Can we please bring up PX15.

19         You can see that Mr. Hannezo told Mr. Messier that

20    although Vivendi's rival, AOL Time Warner, had impressive cash

21    flows, Vivendi's was around zero.

22         Now, having said that on the inside, let's see what

23    the public message was at that time.

24         Please show table A.

25         February 6, 2002.  This is a Reuter's article quoting

7347

1 Mr. Messier.  You can see here, at statement 37, it says that
2 Messier is slamming Vivendi's share price decline, calling it
3 unfair.  He is denying that there are any hidden surprises in
4 its financial results.  He says there is no major uncertainty
5 about debt, no hidden risks, no speculative instruments.  He
6 said that Vivendi was a victim of rumors and manipulation.  He
7 told investors that Vivendi was much healthier than its
8 competition.
9     Now, those statements, No. 34 through 37, they will be
10 on your verdict form, came only a few weeks after the January 7
11 treasury share sale, which was really the first time that
12 investors started to think that Vivendi may have some liquidity
13 issues.
14     So that's a good example of how the defendants, as the
15 bad news about Vivendi's liquidity situation started to come
16 out in 2002, how the defendants, to counter that, issued more
17 positive statements and to assure the public that everything
18 was fine.  In reality, however, they knew that at Vivendi
19 everything was not so fine.
20     If you believe that statements 34 through 37 on your
21 verdict form violate Section 10(b), you should check yes and
22 knowingly for those four statements.
23     Again, moving forward, statements number 38 through
24 42.
25     With these statements we are now in early March 2002.

7348

1 Vivendi is discussing internally whether it should pay a
2 dividend to investors.  There is a serious concern inside the
3 company that Vivendi really can't afford a dividend, and there
4 was also a lot of internal concern that if Vivendi doesn't pay
5 the dividend, its share price will go down because investors
6 will think something is wrong.
7     Please bring up, Andrew, PX127.
8     Now, at the same time internally Mr. Hannezo writes in
9 an e-mail to Mr. Messier, we cannot count on any free cash flow
10 from operations to pay for the dividend.
11     You even heard Mr. Hannezo tell you during the trial
12 that he was against paying the dividend and that he believed it
13 was a bad idea.  His internal warnings were ignored.
14     You also heard Ms. Brassens, as well as Mr. Hannezo,
15 explain that Vivendi really didn't have the cash to pay the
16 dividend.  It actually had to borrow the money to pay.
17     Now, with that in mind, let's look at what Vivendi was
18 saying on the outside.
19     March 5, 2002.  We have a Vivendi press release and a
20 conference call for analysts and investors on the same day.
21 The outside message, again, very positive.  Vivendi announced
22 that it was paying a one euro per share dividend based on the
23 company's excellent operating results.  Vivendi was doing,
24 quote, better than well.
25     Ladies and gentlemen, borrowing to pay the dividend is

7349

1 not what Vivendi told investors.  Vivendi said they were paying
2 it because of its positive operating results.  That's because
3 paying the dividend created the false impression that Vivendi
4 was flush, flush with cash, that it had ample liquidity.  Well,
5 the truth really lies inside the company.  Vivendi did not have
6 ample liquidity.  The defendants knew it and they hid it from
7 the public.
8     Ladies and gentlemen, you've seen the real story.
9 Only a few days before the dividend announcement Mr. Hannezo
10 told Mr. Messier that Vivendi could not afford to pay a
11 dividend, let alone one that was more than a billion euros.  I
12 believe in total with taxes it came to approximately 1.4
13 billion euros.  And certainly the dividend wasn't justified
14 because of excellent operating results.  On the inside,
15 defendants knew the results were anything but excellent.
16     Also in statement No. 38 Vivendi is saying that its
17 operating free cash flow was 2.026 billion euros, up 2 billion
18 euros from the year 2000.
19     You can see that figure in statement 40, which is one
20 of the statements in table A.
21     But you've heard Mr. Mintzer, plaintiffs' U.S.
22 accounting expert, explain to you how that number was wrong.
23 It was overstated by 740 million euros.
24     Please bring up PX1429.
25     As Mr. Mintzer explained, Vivendi violated the

7350

1 accounting rules by not reducing the 2.026 billion number by
2 740 million euros.  As Mr. Mintzer said, free cash flow was
3 supposed to be reduced by something called intangible capital
4 expenditures.  Vivendi failed to make the reduction and
5 overstated its free cash flow by 740 million euros.  That's
6 what Mr. Mintzer testified.
7     And there were also a bunch of internal e-mails from
8 around this time where Mr. Hannezo was warning people inside
9 Vivendi about the lack of free cash flow.
10     Let's put up PX303.
11     You can see here, Mr. Hannezo warned Vivendi's
12 investor relations department in an e-mail on March 1, 2002,
13 just a few days before the March 5 conference call, and this is
14 what the e-mail says.  Terrific.  Outstanding, amazing,
15 particularly inappropriate when you make bottom line 15 billion
16 losses and no cash flow.  Such statements -- that's my
17 language -- terrified, terrified at least three members of the
18 executive committee.  Inside, that's a statement and outside
19 they are getting ready to pay dividends.
20     Let's look now at PX128, another exhibit, March 1,
21 2002, an e-mail from Mr. Hannezo to Mr. Messier.  And that
22 e-mail reads:  What do we do when we generate negative cash
23 flows at the central level than are barely, barely offset by
24 inaccessible cash flows at the minority level?
25     So if you believe that statements 38 through 42

7351

1  violate Section 10(b) and omit to tell the true liquidity
2  condition at Vivendi for those statements, please check yes and
3  knowingly on your verdict form.
4      Statement No. 43, again, moving forward.  It's now
5  April 2003.
6      Could we put up PX737, please.
7      The real story, as you can see, in this e-mail is that
8  inside the company Vivendi was currently working with a free
9  cash flow figure of zero.  You can also see that the person who
10  was dealing with the rating agencies, Alex Hebert, admitted
11  that if that fact would get out it would be a serious issue for
12  Moody's.
13      However, the public message doesn't say anything at
14  all about that.
15      Please show table A.  This is a statement 43.
16      April 1, 2002.  Despite the date, Mr. Messier's
17  letter, printed in Business Week magazine was serious.  He said
18  Vivendi's hard numbers showed plus 2 billion euros of free cash
19  flow.  He said, there is no need for further comment on the
20  strength of Vivendi's operations because the numbers speak for
21  themselves.
22      That's so obviously different from Vivendi's internal
23  documents.  Mr. Messier did not mention the current free cash
24  flow at Vivendi was zero.
25      So if you believe that statement 43 omitted the true

7352

1  liquidity condition at Vivendi and satisfied Section 10(b), you
2  should check yes and knowingly for statement 43.
3      Statement 44, now, ladies and gentlemen, you've seen
4  over and over again that Vivendi's EBITDA was inflated during
5  the class period.  It was stretched, managed, boosted, pumped
6  up, call it what you want.
7      Now, let's see what Vivendi was saying publicly about
8  its EBITDA in April 2002.
9      Put up statement No. 44 from table A.
10      April 23, 2002.  This is Vivendi's annual report that
11  it files with the French securities regulator.  It was signed
12  by Messier and Hannezo.  It's called the document de reference,
13  or the DDR, as it's called by people who can't speak French
14  like me.
15      You can see here that Vivendi is telling the public to
16  look at the EBITDA figure because it's an important indicator
17  of the operational performance of its businesses.  Again, the
18  public would say, look at that EBITDA figure, it's an important
19  indicator because EBITDA has the ability to provide cash flows
20  to service debt.  In other words, Vivendi is saying in this
21  document that if you want to understand our liquidity
22  condition, one of the important things to look at is our
23  recorded EBITDA.  That would be fine except that people outside
24  the company could not get a fair understanding of Vivendi's
25  ability to service debt in its liquidity condition because the

7353

1  defendants were in fact playing with the EBITDA numbers.  Okay.
2      Go to statement No. 45 and show table A.
3      You can see that the DDR also includes reference to
4  the Cegetel current account and it says that the amount is 608
5  million euros, there, near the end of the paragraph.  Ladies
6  and gentlemen, we talked about earlier, the defendants didn't
7  say anything about this current account, this big Cegetel loan
8  being essentially callable on demand by the other Cegetel
9  shareholders.  It is a fact that as of April 23, 2002, Vivendi
10  was still hiding this key liquidity fact from the public,
11  including investors and the rating agency.
12      So, therefore, if you believe that statements 44 and
13  45 hit the true liquidity risk in Vivendi and satisfied Section
14  10(b), you should check your verdict form on statements 44 and
15  45 yes and knowingly.
16      Statements 46 through 49.
17      These statements are all from the same date.  Four of
18  them, April 24, 2002, they all come from a Vivendi press
19  release at a Vivendi shareholder meeting.  The defendants here
20  are basically telling the public the same positive thing.
21  Vivendi has strong cash flow, it is far above the targets,
22  Vivendi's winning strategy is working, and so on.  Okay, that's
23  the outside statement.
24      Well, the real story on the inside is that cash flow
25  isn't as strong.  It's nonexistent.  You just saw PX737, a

7354

1  Vivendi internal e-mail.
2      Please put up PX737.
3      Vivendi said that it was currently working with a free
4  cash flow figure of zero.
5      So you should check yes and knowingly if you believe
6  those statements in 46 through 49, those four statements purely
7  omitted the true liquidity risk at Vivendi, you satisfy Section
8  10(b).
9      Statements No. 50 and 51.
10      May 3, 2002.  Moody's just downgraded Vivendi's credit
11  rating because Moody's had become concerned about Vivendi's
12  liquidity condition.
13      Andrew, would you please put up PX122T.
14      Now, this certainly wasn't a surprise to Mr. Hannezo,
15  given the fact that he had been warning about liquidity issues
16  for over a year, and had just dodged a cannonball of a rating
17  downgrade in December.
18      Take a look at one of Mr. Hannezo's e-mails to
19  Mr. Messier.  You've seen this before.
20      I'm a little sick and tired of losing my professional
21  reputation working like a good little soldier to cover your
22  decisions, over which I have fought, warned, and pestered you
23  to the point that I have had to give my collaborators
24  instructions not to carry out your oral instructions.  I've had
25  it.

7355

1    Sure sounds to me like there is a problem.

2    Why don't we also look at PX711.

3    711, this is just after the Moody's downgrade.  You

4    can see here, Dominick Gibert is telling Mr. Hannezo:

5    It is difficult to deny that the drop in the Stock

6    Exchange price and Moody's and Standard & Poor's downgrading

7    will affect the group's liquidity.  There is that word again

8    internally.

9    Nonetheless, even though that is what was said

10   internally, Vivendi issued a press release denying that it had

11   any liquidity problems.

12   So even though in table A Vivendi's dangerous

13   liquidity risk was really beginning to materialize, the

14   defendants took steps to continue to keep the public in the

15   dark.  They assured everyone that the rating downgrade would

16   have no effect on the company.

17   You can see it right there in Vivendi's announcement

18   to the public in statement 51.  This decision, when you're

19   talking about the Moody's downgrade, has no impact on Vivendi

20   Universal's cash situation.

21   As you have seen, ladies and gentlemen, Vivendi's

22   denials were completely contrary to what was really going on at

23   the company.

24   As Mr. Gibert admitted in that 2002 e-mail, Vivendi

25   could not, in all honesty, deny that there were problems at

7356

1    Vivendi following the Moody's downgrade.

2    That means if you believe that statements 50 and 51

3    omitted information about the true liquidity risk at Vivendi

4    and violated Section 10(b), you should check on your verdict

5    form for statements 50 and 51 yes and knowingly.

6    No. 52, please show the statement in table A.

7    May 28, 2002.  Keep in mind this is 18 months into a

8    21 and a half month class period, so we are in the last 10

9    percent of our class period.  90 percent of it has already gone

10   by.  May 28, 2002 is just a tiny bit more than a month before

11   Mr. Messier is let go.  So he was let go June 30 or July 1.

12   This is May 28.  So it's maybe 32 days before they explode.

13   This is very late in the class period.

14   Now, this is Vivendi's U.S. annual report.  Keep in

15   mind that it's filed with the SEC on May 28, so whatever is in

16   there comes out on May 28, has nothing to do with people who

17   already bought the stock before.  We are 18 months into the

18   class period, one month before Mr. Messier is fired.  This is

19   individual's U.S. annual report that it filed with the SEC.

20   It's called a form 20-F.  There was a discussion about it in

21   this trial.  Of course, it's signed by the CFO, Mr. Hannezo.

22   This is the same point as with the French annual report that is

23   the subject of statement 44, and that's the DDR.  The DDR gets

24   filed in April of 2002 and the 20-F gets filed in the United

25   States in May, late May 28.  Even though defendants knew that

7357

1    they were enhancing and inflating EBITDA and that because of

2    the enhancement and inflation EBITDA was not a good indicator

3    of liquidity, Vivendi told investors in this document to look

4    at EBITDA to understand liquidity.

5    Let's look at the next statement for another positive

6    statement in the 20-F.  Here you go, statement No. 53 in table

7    A.

8    As we saw before, Mr. Hannezo had been told by

9    Dominique Gibert behind the doors of the company that the

10   negative effect of the downgrade was something that could not

11   legitimately be denied.  Defendants again told the public in

12   the form 20-F that the recent Moody's downgrade wasn't a big

13   deal.

14   If you believe that statements 52 and 53 violated

15   Section 10(b) and failed to disclose the true liquidity risk at

16   Vivendi, you should check the verdict form with a yes for both

17   52 and 53, and with a knowingly for both 52 and 53.

18   Moving along, statement No. 54, we are still in the

19   20-F, May 28, 2002.  The statement called out here is the

20   20-F's report of cash, cash equivalents, and marketable

21   securities.  Cash includes the proceeds of the current account

22   loans from Cegetel.  But the statement in the 20-F omits to

23   disclose that the minority shareholders call the loan at any

24   time.  That concealment of a serious restriction on cash means

25   that statement 54 violates 10(b), that it does not disclose the

7358

1    material liquidity risk of Vivendi.  And if you agree on your

2    verdict form with statement 54, check yes and knowingly.

3    Statement No. 55.

4    June of 2002.  After the word got out that the Vivendi

5    had done a complicated financing arrangement with Deutsche

6    Bank, called the Vivendi Environment Repo, the market got more

7    and more nervous about whether Vivendi was desperate for cash,

8    that is, whether its liquidity condition was okay.

9    Andrew, please put up PX543T.

10   The reality.  As Mr. Hannezo admitted in this e-mail,

11   Vivendi would have had a treasury rupture in July, a liquidity

12   rupture, if it hadn't done a Repo deal.

13   Once again, Vivendi issued on the outside a press

14   release to calm everyone down and denied that there were any

15   problems.

16   Show table A, statement 55.

17   June 20, 2002.  What did Vivendi say on the outside,

18   as opposed to the inside, about the treasury rupture?  On the

19   outside, defendants said that the VE Repo was just a classic

20   financing operation.  It was not.  It was an effort to obtain

21   cash and stave off the liquidity crisis.

22   This was misleading.  If you agree that statement 55

23   violates Section 10(b) and fails to disclose the true liquidity

24   condition of Vivendi, you should check yes and knowingly on the

25   verdict form for statement 55.

7359

1   We come now to the last two statements, numbers 56 and
2   57.
3   Ladies and gentlemen, that brings me to the last two
4   statements, June 26, 2002.  I am going to take them on at the
5   same time.  Let me first pull the evidence together.
6   You heard at the end of May 2002 Vivendi's board had
7   asked Goldman Sachs to do an analysis of Vivendi's liquidity
8   condition.  The board was beginning to realize that Mr. Messier
9   had not been up front with them about what Vivendi's true
10   liquidity condition was.
11   Goldman Sachs completed its work a few weeks later.
12   And in June 2002, Goldman Sachs presented its findings to the
13   entire board of directors.  The presentation by Goldman Sachs
14   was quite grim.  One of the scenarios in the presentation that
15   Goldman had put together even had Vivendi running out of money
16   by September.  As you can see from the following e-mails, I
17   think it's fair to say that the board was shocked, shocked to
18   learn how bad Vivendi's liquidity situation really was.
19   Let's bring up PX549.
20   Mr. Messier received an e-mail from Edgar Bronfman,
21   Sr., not Edgar Bronfman, Jr., but Edgar Bronfman, Sr.  You
22   heard Mr. Messier describe Edgar Bronfman, Sr. as a grand
23   monsieur, grand monsieur, which means, as Mr. Messier said,
24   someone who is very respected.  A grand monsieur.
25   Mr. Bronfman, Sr. wrote, that's in PX549, wrote it to

7360

1   Mr. Messier.  One of the troubles with you is that the truth
2   and you have barely met.  The person who is destroying the
3   company by leaps and bounds is Jean-Marie Messier.  That is why
4   you have to resign.
5   Please put up PX201T, please.
6   This is another e-mail to Mr. Messier from Marie Josee
7   Kravis.  And she wrote to him:  This correspondence is becoming
8   absurd.  I told you that I would listen to your plan and the
9   proposals.  Do not respond to the urgent needs of the company.
10   Let's see now PX588T, another e-mail from Ms. Kravis
11   to Mr. Messier.
12   And it said:  Many of us are naive, but the numbers
13   lead us unfortunately back to reality.  All this is too bad.
14   That's PX588.
15   Now, can we go to PX759, another e-mail from
16   Ms. Kravis to Mr. Messier:
17   Quote, it's a shame that we have to come to this.  If
18   the problems had been recognized and explained more candidly
19   and sooner, another way could have perhaps been found.  I am
20   terribly disappointed, it's true, and my responsibilities as
21   director require me to react to this situation before it gets
22   worse.
23   Let's turn to PX202.
24   Now, Mr. Bronfman, Jr., the son of the grand monsieur,
25   Mr. Bronfman, Sr., he writes:  This move is far worse than a

7361

1   matter of the gravest concern.  We must install a new
2   management right away to take charge of convincing the banks to
3   extend some credit while we sell some of our assets to avoid
4   bankruptcy.  We have no time.  Our board must act tomorrow
5   without fail.  Our company may fail, and we have not one minute
6   more to waste.  And I think at the time that the Bronfman
7   family may have been the largest shareholders of Vivendi, plus
8   it was their company secrets that Vivendi purchased.
9   Now, PX758.
10   Marie Josee Kravis wrote, quote, let's get the facts
11   straight.  Moody's and S&P had been looking at our problems for
12   a week or two, but no one bothered to tell the board.  Thank
13   you.  As we told you on Monday at our committee meeting --
14   that's the Goldman Sachs meeting -- scenario A2 was the most
15   likely scenario and possibly even A3.  You remember Goldman
16   Sachs did some analysis where they had three or four scenarios
17   and they were A1 through A4.  And she writes, so just to avoid
18   any misperceptions, we had a better sense of the company's
19   problems than you cared to admit.  Thank you so much for
20   keeping the bad news from your directors.  You have left a
21   wonderful gachis.  If you recall, Ms. Kravis testified that
22   gachis is a French word that means mess.  You have left a
23   wonderful mess.
24   So it should come as no surprise that the board then
25   demanded Mr. Messier's resignation.

7362

1   The board was slowly waking up to the fact that things
2   were basically falling apart at Vivendi because of the
3   liquidity crisis.  And Mr. Messier was on his way out the door.
4   Nevertheless, even with that, Vivendi continued to deny that it
5   had any liquidity problems.
6   Table A.
7   Looking at statements 56 and 57, the last two on your
8   verdict form, we see that predictively, with Mr. Messier still
9   in charge, Vivendi went so far as to issue a press release and
10   hold a conference call on June 26, three or four days before
11   Mr. Messier left, held a conference call on June 26, 2002, to
12   assure investors that there were no liquidity problems, that
13   the company had strong free cash flow, and that there was no
14   hidden liabilities.
15   Please put up table A again.  Vivendi even told the
16   public that the news story trickling out about Vivendi's
17   serious liquidity issue were just rumors.  Well, take a look,
18   again, at those court papers that Vivendi filed in its
19   litigation with Mr. Messier over his severance package.  The
20   words on the screen are the words of Vivendi used to describe
21   what was going on in 2002.
22   Please put up PX1289, page 6.
23   Vivendi said, end of June 2002 -- and these are the
24   papers filed down the street.  This is what they said in those
25   papers.  You've seen this before.  Vivendi was actually facing

5

1  a severe liquidity crisis, of which they had never been
2  informed by Mr. Messier.
3      I am going to repeat that.  That the company stated
4  down the street that Vivendi was facing a severe liquidity
5  crisis, of which they had never been informed by Mr. Messier.
6      (Continued on next page)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

7364

1      MR. ABBEY:  Now, that's the truth.  It came from
2  Vivendi.  It cannot be denied.  The statement that was made
3  down the street is totally consistent with what you have seen
4  and heard about.  The board was not fully appreciating what was
5  going on until Goldman Sachs came in and told them.
6      Can there be any doubt in your mind from what you have
7  just seen that the truly liquidity condition of Vivendi had
8  been hidden?  It was even hidden from its own board of
9  directors.  If the board of directors didn't know about it, how
10  in any way could people on the street possibly know about it.
11      So with Mr. Messier pushed out of the company,
12  Mr. Fourtou came in to take his place.  You may remember
13  Mr. Fourtou explaining in his videotaped testimony that he was
14  encouraged to come out of retirement by Mr. Valerie Giscard
15  d'Estaing, who was a former president in France.  Vivendi
16  needed Mr. Fourtou, and he came with his reputation to take
17  over the company and help deal with its urgent liquidity
18  problem.
19      Mr. Fourtou testified that he was dealing with a
20  crisis situation at Vivendi as soon as he walked in the door
21  and that he was desperately working to find a billion dollar
22  credit line in order to prevent another rating downgrade by
23  Moody's.
24      So, ladies and gentlemen, what you have seen, these
25  aren't what ifs and rumors.  These are the facts, and Vivendi

7365

1  has admitted them.
2      If you believe that statements 56 and 57 violate
3  Section 10(b) and that they concealed the true liquidity risk
4  at Vivendi, then you should check yes and knowingly for these
5  two statements 56 and 57.
6      I have taken you now through those 57 statements.  I
7  have tried as best I can to match up what was being said on the
8  inside and what was being said on the outside.  When I am done
9  and after Judge Holwell has given you the instructions, I hope
10  that you will remember some of them, what was said on the
11  inside versus what was said on the outside.  But keep in mind
12  that the one common issue for all of these is that Vivendi
13  failed to disclose its true liquidity condition, and it went
14  from here to way down.
15      I would like to now turn to some other discrete topics
16  in terms of my closing.  I would like to deal with the question
17  of the auditors.  You have heard a lot during the course of
18  this trial about Vivendi's auditors and what they mean and so
19  on.
20      Now, let me talk, before we get to damages, a little
21  bit about one of defendants' favorite arguments in this case.
22  Let's discuss the role of Vivendi's auditors.
23      Defendants have tried very hard, in our opinion, to
24  hide behind their outside auditors.  They have tried to
25  convince you that its auditors have blessed and approved many

7366

1  things that we have complained about.  In fact, it is part of
2  the second pillar of their defense, that there is no fraud here
3  because Vivendi always followed the accounting rules.
4      Well, Vivendi wants you to believe that everything
5  that we complain about was approved by the auditors.  They want
6  you to believe that every e-mail was reviewed by the auditors
7  and every secret document came to the auditors' attention, that
8  the auditors gave Vivendi, Mr. Messier, and Mr. Hannezo their
9  seal of approval for all the things that are at issue in this
10  case.
11      The real answer here is that the auditors did not see
12  everything that was going on at Vivendi, even things right on
13  site at Vivendi's headquarters.  The reason is that auditors
14  aren't detectives.  In their routine work, they only review and
15  test the small portion of the accounts when they do an audit.
16  And if the auditors are not told things or if things are hidden
17  from them, then the chances are very high that they will not be
18  able to review the accounts and test them.  They will not see
19  things that are concealed from them.
20      Auditors may not discover serious problems with many
21  transactions.  Many bad things never come to light during an
22  audit, and auditors will tell you they are not guarantors of
23  their clients' financial statements.  The financial statements
24  are the clients.  They are Vivendi's financial statements.
25  They are not the financial statements of the auditors.

7367

1    Judge Holwell will give you instructions about the
2    auditors.  He has one instruction that is most important from
3    our point of view.  He will tell you in the instructions that
4    you take into the jury room that you should consider whether a
5    defendant made a complete disclosure of all relevant facts to
6    the auditors.  If defendant is saying that he is relying on the
7    auditors, and that is, if defendant is saying his reliance on
8    the auditors meant that he was acting in good faith, that is,
9    you have to consider whether a defendant made complete
10   disclosure in order to have a good faith reliance on an auditor
11   defense.
12         Now, to put it bluntly, we, on the plaintiffs' side,
13   suggest to you that the evidence does not support any
14   conclusion that defendants made a complete disclosure to the
15   auditors of all the documents pertaining to the issues in this
16   case.  We submit to you, in fact, despite defendants' lip
17   service, the auditors here were kept pretty much in the dark
18   about some of the disputed transactions in this case.
19         You know, many of the facts about many of the issues
20   in this case are found in Vivendi's e-mails and other Vivendi
21   documents.  You have seen lots of e-mails and other documents
22   during the course of this trial.  Some of those documents were
23   never seen by the auditors.  They were never shown to the
24   auditors.
25         How many of the important documents, say about

7368

1    earnings management, did the defendants persuasively say were
2    shown to the auditors?  And plaintiffs for sure, none of us at
3    this first table, were there when the 2000 and 2001 audits were
4    done.  So one would presumably look for evidence in this trial
5    from the defendants that complete disclosure of all relevant
6    facts was made to Vivendi's auditors.
7          Vivendi certainly should know what documents it gave
8    to the auditors to review for the 2000 and 2001 audits.
9    Auditors just don't roam the halls of Vivendi opening up file
10   drawers.  The way an audit is done is by the auditors asking to
11   see documents and Vivendi giving those documents to the
12   auditors.  Audits are done systematically and in an orderly
13   way, and records are kept regarding what the auditors have seen
14   or not seen.
15         So, for example, I ask you in this trial, did you see
16   any real hard proof of what the auditors received about
17   earnings management?  Well, I didn't, and I think you are
18   entitled to presume if Vivendi had such real hard proof, it
19   would have surfaced and been shown to you in this trial.
20         All I saw was the two or three paragraph auditors'
21   opinion at the end of the audit.  This was the same type of two
22   or three paragraph opinion given to most companies.  But the
23   real evidence of what went on is not the opinion.  The evidence
24   that you need to see is what the auditors did or did not review
25   during the course of their audit to get to that opinion.

7369

1    That's how you would be able to judge what the auditors
2    reviewed and what they did or they didn't.
3          What the defendants want you to believe is because
4    they received a clean two or three paragraph opinion that every
5    Vivendi transaction for the whole year was reviewed and
6    approved by the auditors.  They want you to believe that all
7    the stretching and inflating was passed on and approved by the
8    auditors.
9          Well, we believe that that is just not so.  The best
10   proof of that is the testimony dealing with that issue in this
11   case.  What I heard, and I hope what you heard, loud and clear
12   from the testimony of Mr. Hannezo, Mr. Trotot, and the auditor,
13   Mr. Cattenoz, from Salustro, is not what the auditors got, but,
14   rather, what the auditors didn't get.
15         Mr. Quinn asked a question of me, how come the
16   auditors always approved the financials clean opinion every
17   time.  Well, you heard Mr. Milner, defendants' accounting
18   expert, testify that when auditors see red flags, they are
19   supposed to investigate to find the truth.  You heard from
20   Mr. Mintzer and Mr. Oustalniol that e-mails about finding more
21   EBITDA to meet targets were red flags that indicate earnings
22   management was going on at Vivendi.  For sure, the red flags
23   were flying at Vivendi.
24         But as the testimony shows, the red flags were not
25   shown to the auditors.  For example, you remember the memo from

7370

1    Mr. Trotot, PX188, where Mr. Trotot said he could stretch and
2    meet Vivendi's target for the second quarter of 2001.
3          Please put up PX188.
4          Can we bring up page 5672, lines 19 through 24 of the
5    trial transcript.
6          Here you can see Mr. Kerr asked Mr. Trotot, the CFO at
7    Cegetel, whether the auditors were provided with a copy of that
8    memo, and Mr. Trotot testified:  "No.  The auditors are
9    provided with financial statements once they are finalized."
10         If we go on, line 25 of page 5672, through line 6 on
11   page 5673, Mr. Kerr asked Mr. Trotot again:
12   "Q.  So they don't see documents like this?
13   "A.  No, no.  It's no use for their work.  They work on
14   definite documents.  They don't work on the different
15   preliminary documents.  They are given the definite documents.
16   "Q.  They don't see the memos, the e-mails, the back and forth
17   leading up to the results, right?
18   "A.  No."
19         Only the definitive documents.
20         What that means is the horse has long since left the
21   barn when the auditors come in to look around at the barn.
22   They don't see the preliminary documents; they just get the
23   definite ones, when it is all over.
24         You remember Mr. Trotot's memos where he wrote that
25   Cegetel's earnings had been inflated.  That is his word,

7371

1    Mr. Trotot's word, inflated.  Let's bring that one up, PX926T.

2         This is the one where Mr. Trotot wrote:  "We had

3    inflated 2001 Q2 by nearly 70 million euros out of the need to

4    present 2001 half-year earnings up from 2000 earnings."

5         Now if we can show the trial transcript again.  This

6    time go to page 5690, lines 15 through 19.  Here you can see

7    that Mr. Trotot, who was doing lots of stretching at Cegetel,

8    was asked whether the auditors were provided with a copy, that

9    is, a copy of this memo, PX926.  He said no.

10        You can also see the next question and answer there on

11   the screen, where Mr. Trotot said that he knew for a fact that

12   the auditors never saw this memo.

13        Now if we can just go to page 5701 of the trial

14   transcript, lines 9 through 19.  When Mr. Trotot was asked

15   whether the auditors got any of the internal communication

16   between Vivendi and Cegetel showing how Cegetel met the targets

17   or how Cegetel actually got to its final numbers, Mr. Trotot

18   admitted the auditors never got them.

19        Now, Mr. Hannezo testified along the same lines when

20   Mr. Gluck asked him about the book of warnings.  If we can just

21   put another part of the trial transcript on the screen, please.

22   Page 1881, lines 4 through 13.  You can see right there where

23   Mr. Hannezo said that he never sent the memos in his book of

24   warnings to the auditors.

25        On the last day of the trial, very last day before we

7372

1    broke for the holiday, and after hearing -- you heard so many

2    times -- Vivendi witnesses repeatedly talk about the auditors'

3    approval of Vivendi's financial results, you finally heard on

4    the last day from one of Vivendi's auditors himself when we,

5    the plaintiffs, played for you his testimony.  Vivendi didn't

6    play any auditor testimony in their case.  We did it on our

7    case.  The supposed watchdog that Vivendi says approved all of

8    their transactions, we, plaintiffs, were the ones that had to

9    bring you their testimony.  Think about it.  We are bringing in

10   Vivendi's auditors to testify in our case.

11        Mr. Bernard Cattenoz works for the Salustro accounting

12   firm in Paris, and he was Vivendi's auditor during the relevant

13   time period.  We, the plaintiffs, went to Paris and we asked

14   Mr. Cattenoz during a deposition whether he had seen the kinds

15   of documents and material that are at issue in this case.  This

16   came on the last day of trial.  Let me bring your attention to

17   what the auditor here is saying in his testimony when you think

18   about whether or not defendants put up a good auditor defense

19   of good faith in this case.

20        (Videotape played)

21        MR. ABBEY:  Well, you have seen it.  Ladies and

22   gentlemen, that is the evidence on the auditors and the auditor

23   defense.  The only thing left for me to say on this is, don't

24   be confused, don't be misled by the defendants trying to hide

25   behind their auditors.  It is part of their defense to try, I

7373

1    think, to confuse you and to distract you.

2         But you know, they can't have it both ways.  If you

3    want to try to hide behind the auditors, at the very least, as

4    the court will instruct you, defendants have the burden to show

5    you that they made full disclosure to the auditors of all of

6    the relevant facts.  The evidence I think is clear that they

7    have not nearly met the burden that is required of them to try

8    to hide behind their auditors as a good faith defense in this

9    action.

10        So I submit to you that you should reject any defense

11   of good faith reliance on the auditors that would somehow serve

12   to excuse the defendants from full liability in this case.

13        Now I want to turn to yet another subject that you

14   will have to deal with in addition to good faith reliance on

15   auditors and whether that is present or not in this case.  You

16   have heard some references to a word called puffery.  Puffery

17   is another defense that the defendants want you to consider,

18   and the judge will give you instruction on how to consider

19   puffery in this case.

20        Now, defendants dismiss as puffery some of the

21   statements that plaintiffs claim are materially misleading.

22   That is -- and this is my term, I am using it here -- puffery

23   is just some generalizations everybody makes.  How is the

24   weather?  The weather is good.  Something like that.

25   Therefore, if it turns out when you go outside and it's

7374

1    raining, well, that is just how it is.

2         They are saying that there are statements in here that

3    are just puffery, that they are not really misstatements and

4    omissions that are actionable under Section 10(b).  They are

5    just sort of puffery-type statements.

6         As I say, you will look to the judge's instructions on

7    what puffery is and how you have to deal with them.

8         Now, for example, statement No. 42 -- you have seen

9    this statement as we went through the statements -- we contend

10   it is false and misleading.

11        Could you put up, please, statement 42.

12        That includes the statement by Mr. Messier, statement

13   42 -- you may recall we talked about this -- that Vivendi was

14   doing "better than well."  The better-than-well phrase sums up

15   statements made by the defendants at the March 5, 2002 analyst

16   and investor conference call.

17        Defendants announce what then appear, and that is on

18   this call, strong Vivendi 2001 annual financial results.

19   Defendants say this phrase, those three words, "better than

20   well," was just an expression of Mr. Messier's sincere optimism

21   and even if it turned out to be wrong, it is not false or

22   misleading.  It's puffery.  Better than well, they say, is

23   puffery.

24        Now, as I said, Judge Holwell will instruct you that a

25   vague statement -- like the company is generally optimistic or

7375

1   has a positive outlook -- is too general to be a violation of
2   Section 10(b). But the statements that we have asked you to
3   consider, those 50 statements, we believe that they are not
4   puffery and we are not complaining about statements that are
5   puffery.
6      You will also be instructed by Judge Holwell that
7   statements of optimistic opinion may well be misleading if the
8   speaker had no reasonable or genuine belief that the opinion
9   was true.  And we believe that is exactly what these statements
10   are.  These are statements of false optimism -- better than
11   well -- that violate Section 10(b).  So try not to let the
12   defendants convince you otherwise.
13      These statements, we contend, are false because when
14   defendants said them, they knew they were untrue.  Better than
15   well, in our contention, is just not a vague statement of
16   optimism.  We believe the evidence will show that it was a
17   deliberately false statement.  Defendants knew that Vivendi was
18   not doing well and were desperately trying to convince the
19   market that Vivendi was not running out of money.  That is,
20   that Vivendi was not having liquidity issues.
21      The evidence in this case, we believe, is very, very
22   strong on this point.  For one thing, on the same day that
23   investors were told that Vivendi was "better than well,"
24   Vivendi also announced that it would pay its shareholders a one
25   euro per share cash dividend.  As I told you today, in our

7376

1   opinion, Vivendi -- as the evidence shows -- Vivendi could
2   not afford this dividend, and, unknown to investors, that
3   dividend seriously added to the liquidity risk that was rapidly
4   materializing into a liquidity crisis.
5      You have seen evidence like PX127.  Mr. Hannezo had
6   warned just four days earlier that Vivendi cannot count on any
7   free cash flow from operations to pay for the dividend.
8      If you could also please put up PX128.  Hannezo also
9   warned Mr. Messier, just four days earlier, in the
10   better-than-well statement, how dangerous the liquidity risk
11   had become when he wrote: "What do we do when we generate
12   negative cash flows at the central level that are barely offset
13   by inaccessible cash flows at the minority level, yet we
14   continue to make acquisitions because, like a collector, we
15   don't know how not to look, and selling is torture."
16      "I am showing up with figures that I only just started
17   to manipulate at the last minute with all these different
18   people involved so that they no longer reconcile in the various
19   media."
20      That is what was on the inside when the statements
21   better than well were being made on the outside, and it is
22   defendants' position that the better than well is just puffery.
23      Now, again, it comes with these other things that are
24   going on at the same time, and you will see from Judge
25   Holwell's instruction, a combination of things can change how

7377

1   you view puffery.  You have also heard persuasive evidence of
2   this from Anne Brassens.
3      Your Honor, maybe this would be a good place to take a
4   break.  It is 3:15.
5      THE COURT:  We will take our afternoon break now and
6   resume in 15 minutes.
7      (Jury excused)
8      THE COURT:  3:30, counsel.
9      MR. PERSCHETZ:  Your Honor, I am sure we have lot of
10   objections, but there is one specific one that we are all
11   agreed absolutely needs correction.  This is the exact quote:
12   As the court will instruct you, defendants have the burden to
13   show you that they made full disclosures to the auditors of all
14   the relevant facts.  The evidence I think is clear that they
15   have not nearly met the burden that is required of them to try
16   to hide behind their auditors as a good faith defense in this
17   action.
18      In essence, we litigated this issue.  We submitted a
19   letter brief to your Honor on this issue.  They asked for an
20   instruction that we have the burden.  Your Honor did not
21   include that instruction.  It is clearly an erroneous statement
22   by Mr. Abbey.
23      I would appreciate it if we instructed the jury before
24   Mr. Abbey begins again that that is wrong, that we do not have
25   the burden with respect to that.

7378

1      THE COURT:  I am certainly going to make the
2   instructions on that point that are in the court's proposed
3   instructions which will address that point.  I don't think --
4      MR. PERSCHETZ:  Except your Honor's instruction does
5   not specifically say that it is not our burden.
6      THE COURT:  If you want to propose a modification to
7   our instructions that I will give at the close of arguments, I
8   will be happy to consider it.
9      MR. PERSCHETZ:  Thank you.
10      MR. MALONE:  Your Honor, not only do I join in that,
11   but the point is that we can't allow Mr. Abbey to continue to
12   misrepresent what the law is going to be time after time and
13   then simply rely on the jury being able to sort out your
14   instructions.  He should be directed not to misrepresent what
15   your instruction on the law is going to be.
16      THE COURT:  All right.  Any other comments?
17      MR. SAUNDERS:  Your Honor, we are going to submit to
18   your Honor a letter probably over the weekend listing all of
19   the objections that we have to Mr. Abbey's misstatements, and
20   included in that is going to be a series of instances in which
21   Mr. Abbey has misstated what your Honor's instructions actually
22   are, which he has done on numerous occasions.
23      THE COURT:  I welcome your submission.
24      (Recess)
25      (Jury present)

THIS PAGE INTENTIONALLY LEFT BLANK

7387

1   with Vivendi's primary violations of Section B.  In other
2   words, Mr. Messier was right in the middle of everything that
3   was going on at Vivendi.
4        If Messier controlled Vivendi and we, the plaintiffs,
5   believe he clearly did, then he is liable for Vivendi's
6   violations, if he acted either with knowledge or if he should
7   have known that Vivendi was engaging in fraudulent or deceptive
8   conduct.  And if you believe that Mr. Messier was the control
9   person at Vivendi, as we do, if you believe the other
10  requirements of Section 20(a) were met, then you should check
11  yes on question 42 of the verdict form.  Question 42 asks the
12  question of whether or not Mr -- there it is, it's up on the
13  board.  Have we proven that defendant Mr. Messier is
14  secondarily liable as a controlling person of Vivendi?  You
15  have to find that Vivendi did something wrong.  And then the
16  idea is you control someone who violates the law, you're also
17  liable, and that's the controlling person requirement of
18  Section 20(a).
19       Now, Mr. Hannezo.  We contend he, too, is a
20  controlling person and should be liable under Section 20(a).
21  He was the number two guy at Vivendi.  The only executive more
22  senior at Vivendi than Mr. Hannezo was Mr. Messier.
23  Mr. Hannezo, we submit, participated in most board meetings,
24  and was the management member of the board's audit committee.
25  He was also a member of the executive committee.  As the chief

7388

1   financial officer, head of the finance department, he worked
2   actively day to day on the financial affairs and the financial
3   report, financial affairs or financial reporting that
4   Mr. Hannezo worked on is at the heart of the alleged fraudulent
5   and deceptive conduct at Vivendi.  So, you will be asked the
6   same question on your verdict form, question 43, as it
7   relates -- I have the wrong numbers.  Excuse me.  It's question
8   60 for Mr. Messier and 61 for Mr. Hannezo.  That's 61, same
9   issues that relate to Mr. Messier relate to Mr. Hannezo in
10  terms of Section 20(a).  And the judge, Judge Holwell, will
11  instruct you about the requirements of Section 20(a) to find
12  liability, and you will follow those instructions and you will
13  determine whether or not Mr. Hannezo and/or Mr. Messier were
14  controlling people at Vivendi and, thus, whether they are
15  secondarily liable under Section 20(a).
16       Now, before we get to damages, which I think will be
17  the last item that I cover today, I want to talk to you a
18  little bit about something that you may have thought about.
19  When you watch lawyer programs on television, you always hear
20  about motive.  What's the motive.  Why were things happening?
21  What was the motive to cause them to happen?  Let's just talk a
22  little bit about motive.
23       Judge Holwell will instruct you that all we have to
24  show is that defendants acted with actual knowledge or
25  recklessness.  He will instruct you about other things as well.

7389

1   But that's one of the questions on the verdict form, actual
2   knowledge of recklessness.  You have heard throughout this
3   trial about, I think, the clear motive defendants had to
4   conceal the truth about Vivendi's liquidity condition.  So even
5   though it doesn't matter whatsoever, not at all really, why the
6   defendants were motivated to commit the fraud, we are going to
7   give you the motive nonetheless.
8        You have seen how Mr. Messier almost obsessively
9   insists that each business unit of Vivendi achieve EBITDA
10  targets that he himself imposed.  Messier also sought to
11  acquire companies like Maroc Telecom during 2001 and he did
12  that in order to pump up Vivendi's EBITDA numbers by
13  consolidating the EBITDA of the acquired company into Vivendi's
14  results.  For Mr. Messier and for Mr. Hannezo, these actions
15  and, therefore, the motive allowed them to maintain their
16  position as CEO and CFO of a large international company, and
17  all the perks and salaries and so on that goes along with that.
18       But Messier and Hannezo and other top management at
19  Vivendi, we submit, had another motive to mislead the public,
20  huge bonuses tied directly to a reported EBITDA results.
21  Remember how Vivendi, at the time of the three-way merger,
22  announced a target of 35 percent EBITDA growth?  You'll
23  remember even from today that is statement number one in the
24  tables.  You may also recall Mr. Kaslow.  He was the head of
25  human resources at Vivendi.  And he testified, you'll remember

7390

1   this, that Mr. Messier's bonus for 2001, which was largely
2   based on EBITDA, provided that he would receive a bonus of 300
3   percent of his base salary if Vivendi exceeded the 35 percent
4   EBITDA total.  This is 300 percent of the 1.3 million euro base
5   salary, or 3.9 million euros for meeting the EBITDA target.
6   Because Vivendi's reported EBITDA had met the targets,
7   Mr. Messier received that 3.9 million euro EBITDA-based bonus,
8   making his total bonus for 2001 4.8 million euros.
9        Under Vivendi's bonus plan, Hannezo and the other top
10  management also received substantial bonuses in 2002, largely
11  because of Vivendi's EBITDA results for '01.  Mr. Hannezo
12  received almost a million euros, or twice his base pay, because
13  of Vivendi's reported EBITDA during the relevant time period.
14  In short, the higher the EBITDA Vivendi reported, the higher
15  the compensation for Mr. Messier and Mr. Hannezo.  This, we
16  submit, gave defendants the clear motive to make the
17  misstatements and omissions about Vivendi's EBITDA that you
18  have seen evidence about in this trial.
19       Now, you have heard Mr. Messier's lawyer, Mr. Malone,
20  talk to you at great length about Mr. Messier's purchase of
21  stock as if that should excuse everything.  Of course, it
22  doesn't.
23       A quick look at the facts.  Mr. Messier exercised
24  options, that is, he bought with options that he had from the
25  company and he sold stock, we are told, for tax reasons.  He

**THIS PAGE INTENTIONALLY LEFT BLANK**

7440

1    Continuing into October, now you remember Dr. Nye's
2    testimony was that the liquidity risks were greater and greater
3    and greater.  We are now in November of '01.  And you can see
4    how it changes going up, up, and finally it maximizes on
5    December 13, where the inflation is 22.52 euros and $20.09 in
6    terms of dollars.
7        And now it continues at that rate, I think we said,
8    for about three weeks.  And now you can see January 7, there is
9    the information coming out about the 55 million share sale
10   and the market goes down.  And this is the first of Dr. Nye's
11   disclosure dates where there is a drop in the price, and this
12   is one of the days that he uses to measure the amount of the
13   inflation.
14       Continuing forward, again, you will have this exhibit
15   to use, if you wish to fill in the numbers.  It keeps -- it
16   stays at that level until -- I believe until we get to May 3.
17   And on May 3 you remember there was a downgrade and the stock
18   went down further.  And that's one of the nine days, I think
19   that's the second of Dr. Nye's nine days to show that the
20   inflation is going down.  And we are now in May.  You will
21   recall that the class period ends in August.  And so things are
22   really starting to unravel.  Goldman Sachs is on the scene.
23   Not quite at that point.  I think that's a little early.  Here
24   you have the downgrade going forward.  And you can see we are
25   now into June and now there is the repo.  That comes.  There is

7441

1    more drop in the stock.  You can see the inflation going down
2    because the truth little by little is starting to come out in
3    June of '02.
4        Now, in July of '02, you've got Mr. Messier being
5    fired.  You've got Mr. Fourtou and Mr. Espinasse coming on the
6    scene.  News is coming out.  It's all bad news about Vivendi's
7    liquidity.  And the stock is getting hammered.  But of course
8    at the same time the inflation is coming out of it.  And that
9    carries us down through all of July and into August of 2002.
10   And you can see how it's coming down.
11       And, finally, according to Dr. Nye, on August 14 of
12   2002, all the bad news is out, there is no more inflation in
13   the stock, and the inflation is zero.  So, again, you will have
14   a form that matches to Dr. Nye's form.  It has all the blanks
15   in it.  And as you deliberate on what the appropriate measure
16   of damages is, you have to fill out that amount.  You can use
17   Dr. Nye or, as the jury, you can decide for yourself what you
18   think the amount of inflation is.
19       Now, Mr. Quinn and Mr. Saunders and Mr. Perschetz all
20   made a big deal about the fact that on some days during the
21   class period we say Vivendi made positive statements about the
22   company, even though Vivendi's stock went down or stayed flat.
23   They say, how does that make any sense?  How can the stock be
24   inflated, yet, be going down or staying the same?  They have
25   got these charts showing all these statements that appear when

7442

1    Dr. Nye's inflation line is flat.
2        So I say to you, don't be taken in by that argument.
3    It's not right and it's not the law.
4        In fact, even Dr. Silber testified for the defense,
5    didn't agree with this.  Remember, Dr. Silber gave us his chart
6    of inflation values and it, too, has long flat periods in it.
7    And Silber didn't say that as a result the plaintiffs couldn't
8    pursue any of the 57 statements.  You can bet that Dr. Silber
9    would have taken advantage of that argument if it was remotely
10   possible.
11       The stock doesn't have to go up on a particular day
12   when a statement is made in order for the stock to be
13   considered inflated.  Judge Holwell will instruct you that the
14   law works that way.  He will not tell you that on the day each
15   statement is made the price needs to go up for plaintiffs to
16   prevail.
17       And why is that?  Why is the defendants' theory
18   completely wrong, no matter how many of them stand shoulder to
19   shoulder and tell you it's right?  They are completely wrong
20   because it's enough that the defendants continued and repeated
21   misstatements that maintained the stock price and kept it from
22   going down.
23       Now, please use your common sense on why this is the
24   case.  These are obviously periods when the market is going
25   down as a whole.  And does that mean that because of that that

7443

1    Vivendi couldn't be misleading people?  If that was the case, a
2    company -- think about this -- could just lie every day.  And
3    if the market -- as the market was going down and not be held
4    accountable.  Then they would stand in front of a jury and try
5    to tell you there is no fraud.
6        Ladies and gentlemen, that won't fly.  The idea that,
7    sorry, the stock price didn't go up on that day, so I didn't
8    commit fraud, that's not how it works and that's not what this
9    case is about.
10       This is how it works.  Every time the defendants make
11   a statement in table A.  And you can see those 57 statements,
12   there was an opportunity, an obligation for Vivendi to come
13   clean.  Since it did not take the opportunity to come clean,
14   the markets didn't know the truth.  And since the market didn't
15   know the truth, it didn't react every day and bounce around
16   because of Vivendi omissions.  It just kept rolling along, kept
17   being inflated, without the market knowing the full truth about
18   Vivendi's liquidity.
19       Then, and you saw it as we went through the numbers,
20   on those nine separate days in 2002, the market finally
21   realized that Vivendi's liquidity condition was not as it had
22   been led to believe.  It took separate disclosures on nine
23   separate days for the market to finally learn the truth about
24   Vivendi's liquidity risk, and it learned about the risk on
25   those nine days and the stock went down on each of those days.

**THIS PAGE INTENTIONALLY LEFT BLANK**

7448

1 seriously mislead under Section (b) and would suffer huge
2 damages; probably, in our view, all the damages that Dr. Nye's
3 analysis showed.  So even if you find that some of the
4 statements are not actionable, that doesn't mean that you can't
5 follow Dr. Nye's chart.  So you don't have to find necessarily
6 that every single statement is actionable, violates Section
7 10(b) in order to follow Dr. Nye.  You can find less than all
8 and still follow Dr. Nye.  And, of course, you don't have to
9 follow Dr. Nye.  You can decide for yourself.  But we think
10 that Dr. Nye really has it right.
11     Now, defendants made a vigorous attack of Dr. Nye on
12 this issue.  And Dr. Silber didn't think it was a problem to
13 give his estimates of inflation.  And you see that in his
14 Exhibit 1878.  He gave us as well, that is, Dr. Silber gave us
15 his estimate without differentiating, whether he was talking
16 about inflation based on one or two or ten or even 57
17 misstatements or omissions that violate Section 10(b).
18     The reality is that plaintiffs have given you a case
19 based on an overriding omission.  And, that is, that defendants
20 concealed Vivendi's true liquidity risk in each and every one
21 of the statements and thus violated Section 10(b).  The
22 defendants concealed liquidity risks through many filings and
23 press releases that were publicly issued over 21 months of the
24 class period.  But it was all merely a major big deception that
25 concealed Vivendi's true liquidity risk.  That's why neither

7449

1 Dr. Nye nor Dr. Silber found it necessary or appropriate to
2 parse out their inflation figures on a statement-by-statement
3 basis.
4     It's a little bit complicated, but I hope that you
5 understand it, and I'm sure that you will, and I'm sure that
6 when you go in the jury room that you will understand what I'm
7 talking about.
8     You'll hear from the judge in the instructions on this
9 point that plaintiffs must prove by a preponderance of the
10 evidence that the alleged material misstatements or omissions
11 concealed something from the market that when disclosed caused
12 the price of Vivendi's shares to drop and that the loss
13 suffered by the plaintiff was a foreseeable consequence of the
14 alleged misstatements or omissions.
15     Now, part of the next instruction, giving details
16 about this, will say something like this.  Any damages you
17 award must have a reasonable basis in the evidence.  But
18 damages need not be proven with mathematical certainty, but
19 there must be enough evidence for you to make a reasonable
20 estimate of damages.
21     What you should do, ladies and gentlemen, you've heard
22 this before, is to use your common sense and collective wisdom
23 to connect the fraud that you believe was committed by the
24 defendants and the damages that they should be responsible for
25 and enter those amounts in the verdict form.  Again, we

7450

1 suggest, strongly suggest, that we have proven by an
2 overwhelming preponderance of the evidence that all the
3 statements in the table are misleading concerning Vivendi's
4 true liquidity risk and all violate Section 10(b).  If you
5 agree, and I hope that you do, we respectfully submit that Dr.
6 Nye's damage numbers are fair and conservative in providing
7 reasonable damages to the class.
8     Moving forward, let's talk a little bit about one of
9 defendants' main defenses to our claim for damages.  Defendants
10 say that Vivendi's stock could not have gone down due to hidden
11 liquidity risk, and they say it because everything about such
12 risk had always been disclosed.
13     But I submit to you defendants are trying to simply
14 move the ball.  The things that they are saying were disclosed
15 aren't the things that we are suing about.  They keep saying,
16 you've heard this over and over again, investors knew about the
17 risk at Vivendi.
18     Now, I remember Mr. Quinn saying to you in his closing
19 that Wall Street was like being the Las Vegas of the east and
20 that Vivendi disclosed that it was a risky company.  Well,
21 that's a little bit like a casino.  Everyone knows it's risky
22 to gamble here.  At the same time they don't tell you that the
23 game is rigged and that the dice are loaded.  And then you
24 complain later that you've been cheated at the casino.  And
25 then the big boss says to you, well, you knew it was risky,

7451

1 gambling.
2     First of all, we are representing everybody who bought
3 the stock.  I mean, the lead plaintiff, Rick Rivera, who was
4 here, he's from a pension fund.  And individuals who bought the
5 stock, like Mr. Morel, who came here from France to testify.
6     I sat here while Mr. Quinn basically was demeaning two
7 of our plaintiffs in his closing.  He said Mr. Rivera really
8 didn't know anything about the case.  He didn't really read
9 anything about it.  Then Mr. Quinn showed some document to you
10 saying, maybe you remember this, that 50 pension funds didn't
11 want to invest in Vivendi.
12     What's the message here?  Mr. Quinn is saying that
13 Mr. Rivera is a fool for investing in Vivendi.  Is that what
14 Vivendi was saying when Mr. Rivera invested the pension fund's
15 money in the company, that he was investing the money for the
16 people who worked for the City of Miami Beach.  And what
17 Mr. Quinn was, in effect, saying to Mr. Rivera, you must be an
18 idiot to invest in Vivendi.  Isn't that ridiculous?
19     The truth is is that Miami Beach was not the only
20 pension fund to invest in Vivendi.  There are thousands of
21 pension funds, big and small, that invested in Vivendi and got
22 paid in a part of this lawsuit.  Retirement funds, teachers and
23 city workers all around the United States invested in Vivendi.
24 They shouldn't be demeaned and they are not stupid.  They
25 bought into the same story.

THIS PAGE INTENTIONALLY LEFT BLANK

7480

1    verdict based on the evidence.  You have a big and important
2    job to do.  You saw that when we went through all 57 statements
3    the other day, you saw it took us some time, but it's not an
4    insurmountable hurdle like in that cartoon.  We went through
5    all 57 statements with you in about two hours to give you a
6    start.
7         We have all been especially lucky to have Judge
8    Holwell preside over this trial.  To say that he has dedicated
9    himself to this case is an understatement.  And I am the only
10   lawyer actively involved in this case that has been practicing
11   law for more than 50 years, and I speak with some experience.
12   We are also fortunate that Judge Holwell's law clerk, Andrea
13   Glen and courtroom deputy Bill Donald have worked so hard and
14   been so patient during this whole trial.  They have been
15   efficient and very helpful and they deserve everyone's
16   gratitude.
17        On behalf of all the lawyers and paralegals,
18   secretaries, and everyone else on the plaintiffs' trial team,
19   both here in the courtroom and back in our offices and the cast
20   of many in the courtroom and everyone else who has been
21   following this case very, very closely I want to thank you
22   again most sincerely for your attention.  It's been a long,
23   long case.  The lawyers watched the jurors and the jurors
24   watched the lawyers.  We have noticed that you've been
25   enormously attentive.  You have taken notes.  You followed the

7481

1    evidence very closely.  We greatly appreciate all of that and
2    you should follow the law as Judge Holwell gives it to you when
3    I'm finished.  I know you will do that and whatever the final
4    outcome is, we are enormously grateful to each and every one of
5    you for your time and attention for the past three weeks.
6         I want to leave you with this.  You know, we talked
7    about the scales of justice, but there is also a statue of
8    justice and it's in almost every courthouse in America.  And if
9    you look at the statue it has the scales in one hand, those
10   scales of justice, those same scales that I have to tip ever so
11   slightly for me to win this case.  Those scales were in one
12   hand and they certainly tipped in our direction.  I don't think
13   by a featherweight, which is all that is required, but I think
14   by so much more.  And I hope you will agree, agree that we have
15   not only met our burden, just as Judge Holwell will instruct
16   you.
17        There is one thing that many people don't really
18   notice about that statue of justice that sits in many
19   courthouses, and that is, that the statue of justice has a
20   blindfold.  You can look when you go down at the big statue in
21   the lobby of this courthouse the next time you're walking by it
22   in the main entrance on the first floor, and you will see that
23   that big statue has a blindfold and there is a reason for that,
24   because justice is blind.  Justice is blind because in this
25   country everybody is deemed equal before the law.  It shouldn't

7482

1    matter who you are or where you're from.  If justice is done
2    right, it should be blind.
3         So whether you're Vivendi, one of France's biggest
4    companies with major business operations in the United States,
5    or Mr. Messier or Mr. Hannezo, making their millions of dollars
6    a year, or somebody else, like a retired Vivendi investor,
7    you're all equal before the law and you know what that
8    equalizer is when there is a legal dispute.  It's you, the
9    jury, you, the jury that will have the last word in this
10   dispute.
11        The jury system in this country is the great
12   equalizer, because no matter how high and how mighty you are,
13   you've got to come to court and convince the nine of you to
14   have the last word that you're right.  That is the great
15   equalizer.  You, the jury, decide this dispute.  It's pretty
16   remarkable.
17        You should all have faith in our system.  We have
18   faith that you will do the right thing in this case, and the
19   right thing in this case is clearly a verdict for plaintiffs on
20   both liability and the damages that flow from that liability.
21        Thank you, all for your time and your dedication and
22   thank you, your Honor.  That concludes my closing.
23        THE COURT:  Thank you, Mr. Abbey.  That completes
24   plaintiffs' closing argument.
25        There are a couple of legal matters I am going to

7483

01BMVIV4

1    resolve with counsel.  We are going to take a break for about
2    five minutes, and then I am going to read to you the
3    instructions of law, which will take about an hour.  And then
4    you'll take a break and have lunch, which will be provided to
5    you in the jury room, and begin your deliberations.
6         (Jury not present)
7         THE COURT:  Mr. Saunders.
8         MR. SAUNDERS:  Thank you, your Honor.  Your Honor, I
9    have 16 specific objections to Mr. Arthur Abbey's continuation
10   of his closing argument this morning.  These are not in the
11   order of significance, but they are in the order in which the
12   statements were made by Mr. Abbey.  And our contention is that
13   these statements are erroneous, they should be corrected by
14   your Honor, and they are additional support for a motion for
15   mistrial that we made over the weekend, if your Honor is so
16   inclined.
17        First, Mr. Abbey said that the jury would be required
18   to fill in the numbers on the day-by-day chart in the jury
19   verdict form.  That is obviously not correct.  The jury is not
20   required to do that if the jury finds for us on liability.
21        Second, Mr. Abbey said that Dr. Nye's testimony was
22   that the liquidity risk was becoming greater and greater.  That
23   is not correct.  Dr. Nye was asked to assume that there was an
24   increasing liquidity risk.  He made it clear that he was
25   testifying only because that's what he was asked to assume.

7484

01BMVIV4

1          Third, Mr. Abbey said that Mr. Messier was fired.
2     That's not correct. The evidence is that he resigned.
3          Fourth, Mr. Abbey said, once again, quote, you have to
4     fill in that amount in the chart in the jury verdict form, and
5     that's obviously not correct. They don't have to do that.
6          Fifth, Mr. Abbey confused inflation with price when he
7     said that "a company could lie each day and get away with it if
8     the stock price is going down." He was simply confusing, and I
9     think he was improperly confusing, for the jury the distinction
10    between inflation and price.
11         Sixth, Mr. Abbey said that Dr. Nye's numbers were
12    lower than Dr. Silber's for the earlier period and that even
13    Dr. Silber conceded that his numbers were higher than Dr.
14    Nye's. That is not correct. Dr. Silber conceded no such
15    thing. Dr. Silber simply gave your Honor and the jury a range
16    that went from zero to the top of his range. He never conceded
17    that his damage numbers were higher than Dr. Nye's.
18         Seventh, Mr. Abbey said that Dr. Silber did not parse
19    out his damage number on a statement-by-statement basis because
20    there was a single deception. That's not correct. That's not
21    what Dr. Silber said. And, in fact, we didn't even have the
22    plaintiffs' list of 57 statements until after we rested in this
23    case. We certainly didn't have it at the time Dr. Silber
24    testified.
25         Eighth, Mr. Abbey said that thousands of pension funds

7485

01BMVIV4

1     invested in Vivendi all around the United States and that they
2     got taken. There is no evidentiary support for that statement.
3     Mr. Abbey just made it up.
4          Ninth, Mr. Abbey said, referring to Plaintiffs'
5     Exhibit 856, 2001 20-F, that the words purchase accounting do
6     not appear anywhere in the paragraph that he put up on the
7     screen, one sentence of which was called out and highlighted.
8     In fact, that sentence and that paragraph both appear under the
9     heading, quote, allocation of purchase price which appears on
10    page F14 of Plaintiffs' Exhibit 856. Mr. Abbey's statement was
11    simply wrong.
12         Tenth, Mr. Abbey said that we said that Mr. Rivera was
13    a fool to invest in Vivendi. We never said any such thing. In
14    fact, the record is clear that Mr. Rivera was not in charge of
15    making investments for the Miami Beach pension fund.
16         Eleventh, Mr. Abbey said, quote -- he was referring to
17    Defendants' Exhibit 646, which was an analyst report that
18    talked about purchase accounting and sports rights and Canal
19    Plus. I am going to quote what Mr. Abbey said to the jury.
20    "Now I submit to you everyone who has been at this trial, and
21    you have been here longer than anyone, knows that the evidence,
22    the plaintiffs' evidence, never once mentioned sports rights,
23    not once. There is nothing in this case about sports rights.
24    So defendants' claim somehow that Merrill Lynch disclosed lots
25    of information about purchase accounting benefits at Vivendi to

7486

01BMVIV4

1     boost EBITDA is way, way off the mark." That statement is
2     false.
3          First, Plaintiffs' Exhibit 952, which is in evidence,
4     dated January 15, 2001, from Mr. Nabet to Mr. Messier and
5     others talks specifically about sports rights, contract rights,
6     Football Club Europe contract rights with respect to Canal Plus
7     and purchase accounting.
8          Second, Mr. Nabet's testimony about this very document
9     was played to the jury as a part of his videotaped deposition
10    on November the 19th, 2009.
11         Third, at transcript page 1377 and 1378 of the
12    transcript on October 29, 2009, Mr. Gluck asked the following
13    question of Mr. Hannezo:
14    "Q. The phrase I want to ask you about is, quote, make the
15    reconciled EBITDA thanks to purchase accounting. Now, that is
16    your word, quote, thanks to purchase accounting.
17    "A. Thanks to PA, yes, because here it's about Canal Plus, and
18    what is it. It's a good example of PA. It's about football
19    rights. Canal Plus forgot to tell us about the merger that
20    they were committed to expense 400 million euros over the next
21    five years to secure the exclusivity of some football rights
22    beyond their accounts. So it was bad news and it's bad news,
23    and there was also Formula 1 and other sports of that sort
24    which were not disclosed to the board, and we came to realize
25    that they have these commitments, so we provisioned these

7487

01BMVIV4

1     commitments here, and here is what I say that my team has been
2     working on during all Christmas period because we had just come
3     to realize that this commitment existed. They had not been
4     published before. They had not been told to the board. So I
5     sent a team which did analyze the contract between Christmas
6     and New Year's, and this alerted us to make the necessary
7     provision we were required under GAAP and which protected the
8     EBITDA in the year to follow. And then it goes on. I won't
9     bother to read the rest of it. That's part of the record.
10         Also, Dr. Mintzer's expert report specifically refers
11    to the document that is now in evidence as Plaintiffs' 952 and
12    talks about football rights at Canal Plus and purchase
13    accounting.
14         So the record is absolutely clear that there is a lot
15    of evidence about football rights, sports rights, Canal Plus,
16    and purchase accounting. In fact, those concepts are discussed
17    throughout Plaintiffs' Exhibit 856, the one that Mr. Abbey put
18    up on the board.
19         No. 12, Mr. Abbey said that the banks demanded that
20    Vivendi sell Houghton Mifflin and Echostar. There is no such
21    evidence in the record.
22         13, Mr. Abbey said that liquidity risk means "the
23    ability to handle your debt." There is no such definition or
24    evidence in the record. The evidence in the record from Dr.
25    Nye is that liquidity risk means the ability to pay your fixed

7488

01BMVIV4

1  obligations.

2       No. 14, Mr. Abbey said that statement No. 27 that

3  would be given to the jury says: "We have reached or exceeded

4  all our operational objectives."  That is not what statement 27

5  says.  Statement 27 says: "For the third quarter UMG reported a

6  6 percent increase in EBITDA to 250 million euros, reflecting

7  strong performance in North America, France, the UK, Australia,

8  and Music Publishing, and a further improvement in Japan.  And

9  we tried to follow Mr. Abbey's references to the other

10  statements.  We couldn't find his references to the statements

11  made in the other statements either.

12       No. 15, Mr. Abbey said, referring to purchase

13  accounting, "that is because you saw in every quarter of '01

14  the business units had the precise impact of purchase

15  accounting in front of them."  That is not true.  The only

16  evidence in the record is that one and possibly two of the many

17  Vivendi business units had information about the precise impact

18  of purchase accounting, and that would be UMG and possibly

19  Canal Plus.  The statement applied to all the business units.

20  It's simply not true.  And there is no evidence in the record

21  to support it.

22       Finally, Mr. Abbey said that the defendants claimed

23  that the phrase "accounting magic" means plain old accounting,

24  close quote.  Nobody said that.  We didn't say that.  Mr. Abbey

25  just made that up.  In fact, the document, the only document in

7489

01BMVIV4

1  the record that refers to the phrase accounting magic is a

2  budget for Vivendi's headquarters operation.  That's it.

3       Thank you, your Honor.  That completes my objections.

4  I stand on our earlier motion and the request that we made over

5  the weekend with respect to misstatements of this kind.

6       MR. MALONE:  Your Honor, I join in those objections.

7  I have one additional one.

8       At the end of his closing Mr. Abbey said, so whether

9  you're Vivendi, one of France's biggest companies with major

10  business operations in the United States, or Mr. Messier or

11  Mr. Hannezo, making their millions of dollars a year, or

12  somebody else, like a retired VU investor, you're all equal

13  before the law.  In context, this statement by Mr. Abbey --

14  which was not a slip.  It was made quite deliberately -- is a

15  blatant appeal to the prejudice of the jury.  It's an attempt

16  to inflame them based on purported wealth of Mr. Messier and

17  Mr. Hannezo.  It is clearly improper.

18       MR. PERSCHETZ:  Your Honor, if I may, I join in

19  Mr. Saunders' application and his objections.

20       Just a couple of additional ones.  At the very end Mr.

21  Abbey said that under our system it is the responsibility of

22  our clients to convince the jury.  That, again, misstates the

23  burden.

24       The next one takes a little bit of explanation, but I

25  think it's very important, especially for Mr. Hannezo,

7490

01BMVIV4

1  exclusively for Mr. Hannezo, but I guess I'll do it by

2  extension the company.

3       Mr. Abbey made a very big point when he said -- and

4  this a quote -- when Mr. Fourtou asked Mr. Hannezo, Fourtou

5  comes on the scene, how do we get into this crisis?  This goes

6  to the question of everybody knew what was going on.  So

7  Fourtou asked Mr. Hannezo, how did we get into all this mess?

8  Mr. Hannezo, if you recall, didn't tell Mr. Fourtou, well,

9  Mr. Fourtou, why are you asking me that?  Just go read our

10  public filings.  We have already told everyone everything you

11  need to know.  That's not what Mr. Hannezo told Mr. Fourtou.

12  And that's the end of the quote.  There is more.  I don't want

13  to read the whole thing.

14       The point is, the rest of it is, he didn't do that.

15  All he did was give him the book of warnings.

16       Your Honor, at page 908 of the transcript, line 3,

17  Mr. Hannezo is asked the following by Mr. Gluck:  And what did

18  Fourtou ask you to do?

19  "A.  What he asked me to do was do two things.  First, to

20  explain the reason why this crisis happened and what were the

21  origins.  So I wrote a memo in that respect.  And, second, he

22  wanted me to put in the book to unite, to assemble in one

23  single document the different warnings, which the finance

24  department did send to Mr. Messier as to the origins of this

25  crisis.

7491

01BMVIV4

1       And so what we have is Mr. Abbey saying, the only

2  thing that Mr. Hannezo did in response to the question of how

3  did we get here is give him the book of warnings.  And

4  specifically that he didn't say anything to him about how our

5  disclosures were fine or our accounting was fine, et cetera.

6       The reason that the jury doesn't know about the

7  origins of the crisis, the document called the origins of the

8  crisis, except to have heard about it, is because the plaintiffs

9  notwithstanding the fact that Mr. Hannezo testified that was

10  the document that he gave to Mr. Fourtou in response to the

11  question about what happened, is because the plaintiffs

12  objected to it on hearsay grounds.  I offered it on

13  Mr. Hannezo's cross-examination.  And it was objected to.  The

14  objection was sustained.

15       That document had lots of explanations, including a

16  statement at page --

17       THE COURT:  I don't think we need to go into a line by

18  line --

19       MR. PERSCHETZ:  It's not a line by line, your Honor.

20  The point I wanted to make is he specifically says to

21  Mr. Fourtou that there was no accounting fraud, that we were

22  audited, that the disclosures were fine, et cetera.

23       Now, had Mr. Abbey said in his opening statement what

24  he said on his closing statement, it seems to me there is no

25  question that that would have opened the door to this document

7492

01BMVIV4

1  in which in response to the question this is exactly what
2  Mr. Hannezo said.  And then to have excluded the document or to
3  have kept it out on grounds of hearsay and then in closing to
4  say, well, well, Mr. Hannezo didn't say anything else isn't
5  fair and I object to it.
6      The last point that I want to make, your Honor, is,
7  there were some additional references today that he lied to
8  various elements, that we have satisfied our obligations --
9  I'll paraphrase -- we have satisfied our obligation under
10 Section 10(b) because we have proven to you the statement is
11 false and misleading.
12     The only point with regard to that is, while I
13 appreciate, I'm grateful for the fact that your Honor is
14 changing part A of the verdict form, I, again, recommend that
15 we make it even more explicit by including in the Court's
16 charge the language that was on page 7 of my letter of
17 yesterday.
18     Thank you.
19     MR. SPENCER:  Your Honor, without going through each
20 of the 20, I think, objections, frankly, I listened very
21 carefully to Mr. Abbey during the argument today with ears very
22 attuned to whether the defendants had any correct and
23 convincing objection to any word that he said.  I know my
24 opinion doesn't control here at all, your Honor, but I think in
25 fairness, listening to each and everything that Mr. Abbey said,

7493

01BMVIV4

1  both individually and in the context of his whole argument,
2  there was nothing that was materially misleading to the jury or
3  that materially misstated any of the evidence here, and that it
4  certainly conforms to the standards for closing arguments
5  identified in the court precedence.
6      Your Honor, if you'd like a discussion of each of
7  those 20 items, I can probably stand here and do it, but I
8  doubt that that's --
9      THE COURT:  I don't think it's necessary at this
10 point.
11     Having listened to Mr. Abbey's remarks this morning I
12 think taken as a whole they do not exceed bounds of argument.
13 I deny the defendants' motions with respect to the objections
14 voiced this morning.
15     Why don't we bring the jury in and we will do the
16 instructions and send them off to work.
17     (Jury present)
18     THE COURT:  Ladies and gentlemen, you have now heard
19 all the evidence in the case as well as the final arguments
20 from the lawyers for the parties.
21     My duty at this point is to instruct you as to the
22 law.  It's your duty to accept these instructions of law and
23 apply them to the facts as you determine them, just as it has
24 been my duty to preside over the trial and decide what
25 testimony and evidence is relevant under the law for your

7494

01BMVIV4          Charge

1  consideration.
2      On legal matters, you should take the law as I give it
3  to you.  If any attorney or witness has stated a legal
4  principle different from any that I state to you in these
5  instructions, it's my instructions that you must follow.  You
6  should not single out any instruction alone as stating the law,
7  but you should consider my instructions as a whole when you
8  retire to deliberate in the jury room.  You'll receive a copy
9  of these instructions in the jury room and you'll be able to
10 refer to them.
11     You shouldn't be concerned about the wisdom of any
12 legal rule that I state.  Regardless of any opinion that you
13 may have as to what the law is or ought to be, it would violate
14 your sworn duty to base a verdict upon any view of the law
15 other than the one that I give you this afternoon.
16     Your role, as I have said earlier, is to consider and
17 to decide the fact issues in this case.  You, the members of
18 the jury, are the sole and exclusive judges of those facts.
19 You pass upon the evidence, you determine the credibility or
20 believability of the witnesses.  You resolve whatever conflicts
21 may exist in the testimony.  You draw whatever reasonable
22 inferences and conclusions you seek to draw from the facts as
23 you've determined them, and you determine the weight of the
24 evidence that's been introduced.
25     In determining the facts, you should rely upon your

7495

01BMVIV4          Charge

1  own recollection of the evidence.  What the lawyers have said
2  in their opening statements, in their closing arguments, in
3  their objections or in their questions is not evidence, nor is
4  anything I may have said during the trial or may say during
5  these instructions to be considered by you as evidence.  Rely
6  on your own independent recollection.  It is your independent
7  recollection of the evidence that controls.  In this connection
8  remember that a question put to a witness is not evidence.
9  It's only the answer that is evidence.  But you may not
10 consider any answer that I directed you to disregard or that I
11 directed to be struck from the record.
12     If there is any difference or contradiction between
13 what any lawyer has said and what you decide the evidence
14 showed or between anything I may have said and what you believe
15 the evidence has showed, it's your view of the evidence, not
16 the lawyers', not mine, that counts.
17     Since you're the sole and exclusive judges of the
18 facts, I don't mean to indicate any opinion as to the facts or
19 what your verdict should be.  The rulings I have made during
20 the trial are not any indication of my views as to what your
21 decision should be as to whether plaintiffs or defendants have
22 presented the more convincing evidence on any issue.  It is
23 critically important that you understand that I wish to convey
24 absolutely no opinion as to what your verdict should be in this
25 case.  And that even if I did convey such an opinion, it would

7496

01BMVIV4          Charge

1    be your duty to ignore it.
2         In determining the facts, you must weigh and consider
3    the evidence without regard to sympathy, prejudice or passion
4    for or against any party, or without regard to what the
5    reaction of the parties or the public to your verdict may be.
6    I'll later discuss with you how to pass upon the credibility of
7    the witnesses that you've heard.
8         It is the duty of the counsel on each side of the case
9    to object when the other side offers testimony or other
10   evidence that the attorney believes is not properly admissible.
11   Counsel also have the right and the duty to ask the Court to
12   make rulings of law and to request conferences at side bar out
13   of the hearing of the jury.  All of those questions of law have
14   to be decided by me, the Court, and you shouldn't show any
15   prejudice against any attorney or his or her client because the
16   attorney objected to the admissibility of evidence, or asked
17   for a conference at side bar, or asked the Court to make a
18   ruling on the law.
19        Furthermore, my rulings on the admissibility of
20   evidence do not indicate any opinion as to the weight or effect
21   of such evidence.  You are the sole judges of the credibility
22   of all the witnesses and the weight and effect of the evidence.
23        During the trial and in closing arguments there have
24   been many references to the statements made on behalf of
25   Vivendi in a separate arbitration litigation between

7497

01BMVIV4          Charge

1    Mr. Messier and Vivendi over his termination agreement.  I
2    ruled that certain of his statements were relevant to this case
3    and those statements were admitted into evidence and read to
4    you.  You may consider these statements.  I also excluded or
5    redacted other portions of documents that were not relevant to
6    this case, and you should not speculate as to what was or was
7    not in those redacted portions or speculate as to what the
8    outcome of that separate dispute was.  Nor should you hold
9    against any party the Court's decision on an evidentiary
10   matter, either on this or any other issue.
11        As this is a civil case, plaintiffs have the burden of
12   proving each element of their claim -- here, for securities
13   fraud -- by a preponderance of the evidence.  This means that
14   plaintiffs have the burden of proving by a preponderance of the
15   evidence each and every disputed element of their claims and
16   damages.  If you find that plaintiffs have failed to establish
17   any claim by a preponderance of the evidence, you must decide
18   against them on that claim.
19        To establish a fact by a preponderance of the evidence
20   means to prove that the fact is more likely true than not true.
21   A preponderance of the evidence means the greater weight of the
22   evidence.  It does not mean the greater number of witnesses or
23   the greater length of time taken by either side.  This phrase
24   refers to the quality of the evidence, that is, its
25   persuasiveness, the weight, and the effect that it has on your

7498

01BMVIV4          Charge

1    minds.  In determining whether a claim has been proven by a
2    preponderance of the evidence, you may consider the relevant
3    testimony of all witnesses, regardless of who may have called
4    them, and all the relevant exhibits received in evidence,
5    regardless of who may have produced them.
6         This concept of preponderance of the evidence is often
7    illustrated with the idea of scales.  In considering whether
8    the plaintiffs have met their burden of proof on a claim, you
9    put on one side all the credible evidence favoring the
10   plaintiffs and on the other side all the favorable evidence
11   favoring the defendants.  If the scales tip towards the
12   plaintiffs because plaintiffs' evidence is weightier, you must
13   find in the plaintiffs' favor.  But if the scales are evenly
14   balanced, maybe yes or maybe no, or if they tip in the
15   defendants' favor, then you must find for the defendants.
16        Some of you no doubt have heard about proof beyond a
17   reasonable doubt.  That is the standard of proof in a criminal
18   case.  A plaintiff in a civil case does not have to satisfy
19   that requirement, and you should just put it out of your mind.
20        The evidence from which you are to decide what the
21   facts are consists of the sworn testimony of the witnesses, the
22   documents and exhibits which have been received into evidence,
23   and any stipulation agreed to by the parties.  Nothing else is
24   evidence, not what the lawyers say, not what I say, and not
25   anything you may have heard outside of the courtroom.

7499

01BMVIV4          Charge

1         You will recall that during the course of the trial I
2    instructed you that I had admitted a certain evidence only for
3    a limited purpose.  You must consider this evidence only for
4    the limited purpose for which it was admitted.  Similarly, you
5    will recall that during the course of trial I instructed you
6    that I had admitted certain evidence against some defendants,
7    but not all the defendants.  Again, you must consider that
8    evidence only against the defendant against whom it was
9    admitted.
10        You will receive a list identifying all the exhibits
11   that have been admitted into evidence throughout the course of
12   the trial.  That list will indicate which exhibits you may
13   consider as to which defendants, as well as any other
14   limitations on the purpose for which you may consider a
15   particular exhibit.  The tags identifying the exhibits will
16   also be color coded to help you identify the documents that are
17   not to be considered for any purpose against, for example,
18   Mr. Messier or Mr. Hannezo but may be considered against
19   Vivendi.
20        French and other foreign languages have been used
21   during this trial.  When an interpreter or translator has been
22   used, you are to consider only that evidence that was provided
23   by the official court interpreter or translator.  Similarly,
24   many documents in this case have been translated from French or
25   another foreign language into English, and you are to consider

**THIS PAGE INTENTIONALLY LEFT BLANK**

7632

1    Question No. 59:  Asking the jury to apportion any
2    liability.  The answer is:  Vivendi, 100 percent; Messier, 0
3    percent; and Hannezo, 0 percent.
4    Question No. 60:  With respect to the Section 20(a)
5    claim, have plaintiffs proven that defendant, Mr. Messier, is
6    secondarily liable as a controlling person of Vivendi?  The
7    jury's response was no.
8    Question No. 61:  With respect to the Section 20(a)
9    claim, have plaintiffs proven that defendant, Mr. Hannezo, is
10   secondarily liable as controlling person for Vivendi?  And the
11   jury has answered no.  The jury form is then signed by each of
12   the jurors.
13   Madam Foreperson, is this the verdict of the jury?
14   THE FOREPERSON:  Yes, your Honor.
15   THE COURT:  Any counsel like me to poll the jury?
16   MR. SAUNDERS:  Yes, your Honor.  Pursuant to Rule
17   48(c), we request that the jury be polled.
18   (Jury polled; verdict unanimous)
19   THE COURT:  Thank you.  Ladies and gentlemen, I don't
20   know how we would begin to thank you for the service that you
21   have put in over the past four months.  I always tell jurors
22   how much we appreciate and understand the inconvenience serving
23   on a jury means.  In a trial like this, inconvenience isn't
24   even the right word.  It's total disruption of your lives.  We
25   understand that very much and we appreciate it, and appreciate

7633

1    the honesty and integrity and the obvious care that you have
2    taken in your long deliberations.
3    There probably is no individual service more important
4    to ensuring that we live in a free society than to have people
5    such as yourselves sit on a jury.  If you think about all of
6    the responsibilities you have as a citizen, this is perhaps the
7    largest contribution you'll ever be asked to make other than,
8    of course, serving in a war, but as a civilian you are ensuring
9    that all of us in America enjoy the freedoms that we have all
10   enjoyed for 200 years, and I can't tell you how proud I am of
11   the fact that you have sat here, listened to very, very
12   difficult and complicated evidence and applied that judgment to
13   these facts.
14   I want to thank each of you and I'm sure I speak on
15   behalf of all the lawyers in the courtroom and their clients
16   and on behalf of society in general for your service.  Thank
17   you very much.  The jury is released.
18   (Jury discharged)
19   THE COURT:  Would counsel like some time to consider
20   motions?
21   MR. SAUNDERS:  Yes, your Honor.
22   THE COURT:  Thirty days?
23   MR. SAUNDERS:  Well, I think what we would like to do,
24   just to make sure that we have done everything that we are
25   required to do under the rules, is to renew our Rule 50(a)

7634

1    motion to make a Rule 50(b) motion; and in the alternative, to
2    make a Rule 59 motion.  And we would like 30 days within which
3    to brief those motions, if that's acceptable to your Honor.
4    THE COURT:  Yes.  If you need more time indeed, given
5    the length of the trial and the complexity of the issues --
6    MR. QUINN:  It's possible we may need more time.
7    THE COURT:  I thought perhaps.
8    MR. SAUNDERS:  Thank you.
9    THE COURT:  Anything else?
10   I can only say that this is by far the best tried case
11   that I have had in my time on the bench.  I don't think either
12   side could have tried the case better than these counsel have.
13   The jury has spoken and that's the end of the trial.  It was a
14   pleasure having you in the courtroom.
15   MR. ABBEY:  Thank you, your Honor.
16   MR. SAUNDERS:  Thank you, your Honor.
17   (Trial concluded)
18
19
20
21
22
23
24
25