UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/11/15
```

------------------------------------------------------X

IN RE VIVENDI UNIVERSAL, S.A.
SECURITIES LITIGATION

**OPINION AND ORDER**

**02-cv-5571 (SAS)**

------------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION[1]

The only core disputes remaining in this thirteen-year old class action

securities fraud lawsuit (the "Class Action") – decided in class plaintiffs' favor at

trial – address whether certain, sophisticated members of the class actually relied

on defendant Vivendi Universal, S.A.'s  ("Vivendi") misstatements in trading its

stock.[2]  Class plaintiffs have moved for summary judgment on behalf of one such

group of class members – Southeastern Asset Management ("SAM") and its clients

---

[1]    Familiarity with the extensive factual and legal background of this litigation is presumed. *See In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512 (S.D.N.Y. 2011).  Only facts pertinent to this motion will be recited.

[2]    In a July 5, 2012 Order, the Court established procedures for a post-trial claims administration whereby class members could submit claims against Vivendi, and Vivendi could interpose individualized challenges, including on the basis of a claimant's lack of reliance or damages. *See In re Vivendi Universal, S.A. Sec. Litig.*, 284 F.R.D. 144, 155 (S.D.N.Y. 2012).

-1-

and advisees – asking the Court to accept their claims for damages.[3]  Vivendi has

cross-moved for summary judgment on those same claims, arguing they should be

denied because SAM never relied on Vivendi's misstatements or sustained any

damages resulting from the fraud.[4]  For the following reasons, class plaintiffs'

motion is DENIED and Vivendi's motion is GRANTED.

## II.    BACKGROUND[5]

### A.    Procedural Overview

The Class Action concerns transactions in Vivendi's ordinary shares,

or American Depositary Receipts ("ADRs" or "ADSs") representing those shares,

which traded on the New York Stock Exchange during the period October 30, 2000

through August 14, 2002 (the "Class Period").  On January 29, 2010, the jury in

---

[3]    *See* Memorandum of Law in Support of Class Plaintiffs' Motion for Summary Judgment Admitting the Claims of Class Members Advised by Southeastern Asset Management, Inc. ("Pl. Mem.") at 1.

[4]    *See* Memorandum of Law in Support of Defendant Vivendi, S.A.'s Motion for Summary Judgment ("Def. Mem.") at 1.

[5]    The following facts are drawn from the parties' agreed Local Rule 56.1 Statements, as well as from their legal memoranda, declarations, and exhibits attached thereto.  For each motion, class plaintiffs and Vivendi met and conferred regarding their respective statements of material facts and agreed that none were in dispute.  *See* Class Plaintiffs' Agreed Statement Under Rule 56.1 in Support of Their Motion for Summary Judgment Admitting the Claims of Class Members Advised by Southeastern Asset Management, Inc. ("Pl. 56.1"); Defendant Vivendi, S.A.'s Agreed Local Civil Rule 56.1 Statement in Support of Its Motion for Summary Judgment ("Def. 56.1").

the class action returned its verdict, finding that Vivendi acted recklessly with respect to fifty-seven misstatements that misstated or omitted Vivendi's true liquidity risk.[6]  On February 17, 2011, the Court denied Vivendi's post-trial motion for judgment as a matter of law as well as class plaintiffs' motion for entry of final judgment.[7]

Relevant to the instant motions, the Court stated that "Vivendi is entitled to rebut the presumption of reliance on an individual basis[,]" and that "any attempt to rebut the presumption of reliance on such grounds would call for separate inquiries into the individual circumstances of the class members."[8] Vivendi has now conducted such an inquiry into the circumstances surrounding SAM, taking discovery from late 2014 to early 2015 on individual reliance issues. During discovery, Vivendi deposed James Thompson, the analyst at SAM primarily responsible for SAM's investments in Vivendi.[9]  After an April 27, 2015, status conference, the Court permitted the parties to cross-move for summary

---

[6]     *See In re Vivendi*, 765 F. Supp. 2d at 524.

[7]     *See id.* at 512.  However, the Court granted Vivendi's motion for judgment as a matter of law as to one of the fifty-seven statements, statement number fifty-five.  *See id*. at 544.

[8]     *Id*. at 584-85.

[9]     *See* Def. 56.1 ¶ 7.

judgment on individual reliance and damages issues related to SAM.[10]

**B.     Relevant Facts**

In support of their motions, the parties set forth the following relevant facts, which are undisputed.  The claimants are class member investors who made eighty claims in this case, collectively seeking alleged losses of approximately fifty-seven million dollars.[11]  SAM, an institutional asset manager, exercised full investment discretion on behalf of the claimants as fund manager and investment advisor during the Class Period.[12]  Thompson, the analyst responsible for SAM's investment in Vivendi, was (and remains) a Vice President and principal at SAM.[13]

**1.     SAM's Investment Approach**

SAM is a "value investor," which seeks to "achieve superior long-term performance" by buying stocks undervalued by the market.[14]  According to Thompson, "[s]lightly over half of . . . total assets under [SAM's] management are in separately managed accounts for institutional clients, while the remainder is

---

[10]     On July 27, 2015, the Court held a teleconference to hear additional argument on the issue of damages.  Subsequently, the Court granted the parties leave to submit supplemental briefs limited to the damages issue.

[11]     *See* Pl. 56.1 ¶ 1.

[12]     *See id.* ¶¶ 2-3.

[13]     *See id.* ¶ 11.

[14]     *Id.* ¶ 4.

invested in the Longleaf Partner Funds," which are mutual funds SAM created to "enable its employees to invest alongside [its] clients."[15]  While SAM and Longleaf are distinct entities, SAM still serves as the investment advisor to Longleaf Funds.[16]  On average, SAM holds its investments for a five-year period, and "it has never bought anything for an immediate flip."[17]

According to Thompson, SAM has "three components [it] look[s] for in an investment."[18]  *First*, SAM considers the target company's line of business.[19]  *Second*, it examines whether the company has "good management."[20]  *Third*, SAM determines whether the company's stock is undervalued.[21]  According to a 2002 SAM prospectus, SAM views stocks as "ownership units in a business enterprise[,] which has an unrecognized business or 'intrinsic' value subject to determination

---

[15]     SAM's "About Us" Web Page, Ex. N to the 5/15/15 Declaration of Miranda Schiller, Esq. ("Schiller Decl."), counsel for Vivendi.

[16]     *See* 2/25/15 Deposition of James E. Thompson ("Thompson Dep."), Exs. A-D to the Schiller Decl., at 10:16-20.

[17]     *Id.* at 68:23-24.

[18]     *Id.* at 37:4-5.

[19]     *See id.* at 37:11-13.

[20]     *Id.* at 37:14-16.

[21]     *See id.* at 37:17-19.

through [SAM's own] careful securities analysis."[22]  SAM's ultimate decision to invest in a stock depends heavily on its proprietary valuations: "[w]hen the common stock is available at 60% or less of our conservative appraisals, and when such an opportunity has been qualified, both quantitatively and qualitatively, we purchase a position."[23]  This investment formula is known as a price-value ratio ("PVR"), containing the stock's market price in the numerator, and the stock's intrinsic value as determined by SAM in the denominator.

To calculate a stock's intrinsic value, SAM relies on "two primary methods of appraisal."[24]  "The first assesses the company's liquidation value based on the current economic worth of corporate assets and liabilities.  The second method determines the company's ongoing value based on its ability to generate free cash flow after required capital expenditures and working capital needs."[25]

### 2.    SAM's Investment in Vivendi ADSs

Thompson began following Vivendi's stock some time in late 2000 or

---

[22]    Def. 56.1 ¶ 12.

[23]    Pl. 56.1 ¶ 5.

[24]    *Id.* ¶ 8.  SAM's "research team appraises businesses by studying financial statements, regulatory information, trade publications, and other industry and corporate data, and by talking with corporate management, competitors, and suppliers."  *Id.*

[25]    *Id.*

early 2001.[26]  Specifically, Thompson and SAM conducted an extensive evaluation

of Vivendi's debt and the values of its assets.[27]  He was particularly familiar with

the value of some of those assets – even before Vivendi acquired them – because

the assets had been stand-alone publicly-traded companies for which Thompson

could easily access financial information; in fact, SAM had even owned some of

them in the past.[28]  Further, other Vivendi business lines were part-owned by other

public companies with independent financial reporting obligations, so Thompson

could value them from sources other than Vivendi.[29]  Thompson also spoke with a

member of Vivendi's Investor Relations team.[30]

      In May 2002, Thompson started to pitch the idea of investing in

Vivendi to SAM's investment committee, holding weekly meetings "where he

talked about Vivendi and his appraisal of the business."[31]  Thompson claims that he

---

[26]    *See* Thompson Dep. at 18:6-17.

[27]    *See* Def. Mem. at 4.

[28]    *See* Thompson Dep. at 18:6-19:7.  At his deposition, Thompson noted that "we started getting very interested [in Vivendi] because we knew a lot of the components."  *Id.* at 17:18-19.  He also stated that SAM had "owned [some] of these assets in the past . . . [s]o we knew what they really were."  *Id.* at 187:20-22.

[29]    *See id.* at 62:16-67:2.

[30]    *See* Pl. Mem. at 8 n.9.

[31]    Pl. 56.1 ¶ 15.

persuaded the committee that Vivendi would be a good investment because the company met the three prongs of SAM's investment philosophy.[32]  Once Vivendi's PVR met SAM's threshold, SAM formally approved Thompson's recommendation to invest in Vivendi.[33]

SAM began purchasing Vivendi ADSs on June 25, 2002, after Vivendi had already disseminated to the market four of the nine corrective disclosures relating to Vivendi's liquidity position, as identified by class plaintiffs' expert.[34]  At the time of its investment, SAM anticipated holding Vivendi ADSs for a five-year period.[35]  During the Class Period, the majority of SAM's Vivendi purchases were made immediately following days on which Vivendi issued corrective disclosures, and SAM continued buying Vivendi up to the very end of – and after – the Class Period, becoming the single-largest outside institutional investor in Vivendi.[36]  Even after French regulators had stormed some of Vivendi's offices in early July 2002 – an incident that Thompson claimed caused him to

---

[32]     *See id.* ¶ 16.

[33]     *See id.* ¶¶ 16-18.

[34]     *See* Thompson Dep. 172:19-25.

[35]     *See* Def. 56.1 ¶ 14.  Indeed, SAM did not significantly reduce its position in Vivendi until roughly 2007.  *See id.*

[36]     *See* Def. Mem. at 6; Thompson Dep. at 45:6-17.

"question [his] investment" – SAM reported publicly that it "believe[d] that short

term liquidity concerns are overblown."[37]  Vivendi's declining stock price made

investing in the company "more attractive."[38]

Accordingly, SAM continued to purchase Vivendi ADSs in massive

quantities through the end of the Class Period and beyond, ultimately accumulating

over forty-five percent of Vivendi's total outstanding ADSs by the end of 2002.[39]

SAM was not aware that Vivendi securities were tainted by fraud at the time of

these purchases.[40]  However, Thompson admitted that in his view, *none* of the nine

corrective disclosures identified by class plaintiffs' expert "corrected" any

misunderstanding by Thompson concerning the value of Vivendi.[41]  Nor did

Thompson think that any of these disclosures conveyed new information bearing

on his earlier appraisal of Vivendi's debt and liquidity.

I never felt – I always felt like I had the debt in material

---

[37]     Pl. Mem. at 10.

[38]     Thompson Dep. at 182:6.  Thompson also stated that "[w]e believed
that [Vivendi] would quickly resolve short-term liquidity needs," but that "[t]he
market was less convinced and the price fell to dramatic lows."  *Id.* at 121:22-
122:19.

[39]     *See* Def. 56.1 ¶ 1.

[40]     *See* Pl. 56.1 ¶ 26.

[41]     *See* Thompson Dep. at 167:16-169:20, 169:21-171:13, 171:14-172:18,
180:9-181:14, 182:24-183:21, 191:5-14, 192:9-193:11, 193:12-197:13, 203:7-13.

> ways, the level of it right. Were there points in time where
> I had to move things . . . ? Sure. Little tweaks, but in
> material ways, I was – I had the debt from the very – the
> level of debt, the gross level of debt, *I had it right the whole
> time. . . . I was not misled on the level of debt.*[42]

Thompson explained that SAM continued to purchase Vivendi ADSs for several

consecutive days after the last day of the Class Period, on which ratings agencies

downgraded Vivendi, because the ratings agencies misinterpreted the impact of the

change in accounting standards on Vivendi's debt sheet: "I went back and did all

my numbers, and *I knew I was right on the debt.*"[43]

He was. Over the holding period (2002-2008), SAM achieved its

investment objectives with respect to its Vivendi investment, earning a very large

---

[42]    *Id.* at 197:2-17 (emphasis added). After the Class Period, as negative
reports swirled through the market about Vivendi's liquidity, Thompson met with
various Vivendi insiders, including then-Chief Executive Officer Jean-René
Fourtou and Chief Financial Officer Jacques Espinasse. These meetings revealed
Vivendi's liquidity to be "worse than anyone thought (including new management
and [Thompson])." Pl. 56.1 ¶ 23. However, the meetings ultimately reassured
Thompson that Vivendi was still a sound investment. *See, e.g.*, Thompson Dep. at
236:17-237:19 ("[A]fter we met Fourtou, we were convinced it was a good
management team."), 51-53 (describing how Thompson felt "better" about SAM's
investment in Vivendi after meeting with Fourtou and Espinasse).

[43]    Thompson Dep. at 195:13-17. Thompson also stated that the
downgrade of Vivendi "wouldn't have changed my overall belief that they had
ample assets." *Id.* at 182:7-17. *See also id.* at 217:9-11 ("We just thought there
w[ere] ample assets to sell, that there's no cause for [a] liquidity squeeze.").

overall return on its investment.[44]

## III.   LEGAL STANDARD

Summary judgment is appropriate "only where, construing all the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in that party's favor, there is 'no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law.'"[45]  "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[46]

"[T]he moving party has the burden of showing that no genuine issue of material fact exists and that the undisputed facts entitle [it] to judgment as a matter of law[.]"[47]  To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to

---

[44]      *See id.* at 74:20-75:7; Def. 56.1 ¶ 3.

[45]      *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 19 (2d Cir. 2014) (quoting Fed. R. Civ. P. 56(c)) (some quotation marks omitted).

[46]      *Windsor v. United States*, 699 F.3d 169, 192 (2d Cir. 2012), *aff'd*, 133 S. Ct. 2675 (2013) (quotations and alterations omitted).

[47]      *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (citations omitted).

the material facts,"[48] and "may not rely on conclusory allegations or

unsubstantiated speculation."[49]

In deciding a motion for summary judgment, "[t]he role of the court is

not to resolve disputed issues of fact but to assess whether there are any factual

issues to be tried."[50]  "'Credibility determinations, the weighing of the evidence,

and the drawing of legitimate inferences from the facts are jury functions, not those

of a judge.'"[51]

## IV.  APPLICABLE LAW

### A.  Section 10(b) of the Securities and Exchange Act and Rule 10b-5

Section 10(b) of the Securities and Exchange Act makes it illegal to

"use or employ, in connection with the purchase or sale of any security . . . any

manipulative or deceptive device or contrivance in contravention of such rules and

regulations as the Commission may prescribe . . . ."[52]  Under Rule 10b-5,

promulgated under Section 10(b), one may not "make any untrue statement of a

---

[48]     *Brown v. Eli Lilly & Co.,* 654 F.3d 347, 358 (2d Cir. 2011) (quotation marks and citations omitted).

[49]     *Id.* (quotation marks and citations omitted).

[50]     *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 119 (2d Cir. 2012).

[51]     *Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012).

[52]     15 U.S.C. § 78j(b).

material fact or [] omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."[53]  "To sustain a private claim for securities fraud under Section 10(b), 'a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"[54]

## 1. Reliance

The reliance and loss causation elements of a securities fraud claim are analogous to but-for and proximate causation, respectively.[55]  To prove reliance, the plaintiff must show that but for the material misleading statement or omission, he would not have transacted in the security.  "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of

---

[53]     17 C.F.R. § 240.10b-5.

[54]     *Halliburton Co. v. Erica P. John Fund (Halliburton II)*, 134 S. Ct. 2398, 2406 (2014) (quoting *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S. Ct. 1184, 1192 (2013)).  *Accord Erica P. John Fund, Inc. v. Halliburton Co. ("Halliburton I")*, 131 S.Ct. 2179, 2184 (2011).

[55]     *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 106 (2d Cir. 2007).

a company's statement and engaged in a relevant transaction— *e.g.*, purchasing common stock—based on that specific misrepresentation."[56]

### a.     The *Basic* Presumption

In *Basic v. Levinson*, the Supreme Court held that, under certain circumstances, a class action plaintiff is entitled to a rebuttable presumption (the "*Basic* presumption") that she relied on the integrity of the market price of a security.[57]  Specifically, the Court held that an investor who bought stock at the market price may, at the class certification stage, avail herself of the presumption that she "relied on the integrity of the price set by the market" if the market is efficient.[58]  The Court reasoned that "[b]ecause most publicly available information is reflected in [the] market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action."[59]  As long as the "plaintiffs can show that the alleged misrepresentation was *material* and publicly transmitted into a well-developed market, then reliance

---

[56]     *Halliburton I*, 131 S.Ct. at 2185.

[57]     485 U.S. 224, 247 (1988).

[58]     *Id.* at 227.  Market efficiency is not in dispute in these motions.

[59]     *Id.* at 247.  *Accord Hevesi v. Citigroup Inc.*, 366 F.3d 70, 77 (2d Cir. 2004).

will be presumed . . . ."[60] *Basic*'s holding obviated the need for a securities fraud class action plaintiff to show that she personally was aware of, and relied on, the alleged material misrepresentation.[61]

Critically, *Basic* emphasized that the "presumption of reliance was rebuttable rather than conclusive."[62] Therefore, "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or [her] decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance."[63] One way to "sever the link" is to demonstrate that the alleged misrepresentation did not impact the market price. For example, a defendant could show that the misstatement was known to be false by market makers,[64] or that a statement correcting the misrepresentation was made to, and digested by, the market.[65] Another way to sever the link is to show that the

---

[60]    *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 483 (2d Cir. 2008) (emphasis added).

[61]    *See Halliburton I*, 131 S.Ct. at 2185 (noting that the holding of *Basic* was made in response to the evidentiary issues posed by modern impersonal markets, as well as the difficulty of class certification where direct proof of reliance was required).

[62]    *Halliburton II*, 134 S. Ct. at 2408.

[63]    *Basic*, 485 U.S. at 248-49.

[64]    *See id.* at 248.

[65]    *See id*.

investor did not "rely on the integrity of the market price in trading stock."[66]

It was for this second reason that the Court entered judgment for Vivendi in an individual, reliance-based action brought two years ago by GAMCO Investors following the class-wide jury verdict.[67]  In *GAMCO*, I found that Vivendi rebutted the fraud-on-the-market presumption because "Vivendi's liquidity crisis was irrelevant to [GAMCO's] decision to purchase Vivendi securities during the Relevant Period."[68]  There, as here, Vivendi offered evidence that GAMCO – a sophisticated value investor – did not rely on the integrity of the market price of Vivendi's shares in buying them during the Class Period.[69]  Specifically, I found that "the liquidity crisis at Vivendi was irrelevant to [GAMCO's] investment decisions, except to the extent that each corrective disclosure made Vivendi a more attractive investment."[70]  In so holding, I emphasized that *GAMCO* "is sharply

---

[66]    *Halliburton II*, 134 S. Ct. at 2412.

[67]    *See GAMCO Investors, Inc. v. Vivendi, S.A.*, 927 F. Supp. 2d 88, 100 (S.D.N.Y. 2013).  Owing to the rebuttable nature of the *Basic* presumption, the Court, in upholding the jury's verdict against Vivendi, expressly authorized Vivendi "to rebut the presumption of reliance on an individual basis," contemplating that "any attempt [to do so] would call for separate inquiries into the individual circumstances of particular class members."  *In re Vivendi*, 765 F. Supp. 2d at 584-85.

[68]    *GAMCO*, 927 F. Supp. at 97.

[69]    *See id.*

[70]    *Id.*

limited to its unusual facts, and should not be taken to suggest that sophisticated institutional investors or value-based investors are not entitled to the fraud on the market presumption in general."[71]

### b.   *Halliburton II*

One year after my *GAMCO* ruling, the Supreme Court revisited – and reaffirmed – the fraud-on-the-market presumption in *Halliburton II*, declining defendants' request to overturn *Basic*.[72]  Writing for the majority, Chief Justice John G. Roberts emphasized that "*Basic* itself 'made clear that the presumption was just that, and could be rebutted by appropriate evidence.'"[73]  Significantly, in explaining the need to retain the *Basic* presumption, the Court pointed to a fundamental tenet of *Basic*:  to permit plaintiffs to "'proceed[] [as a] class' in Rule 10b-5 suits."[74]  As the Chief Justice noted, "[i]f every plaintiff had to prove direct

---

[71]    *Id.* at 102.  As one commentator recently observed, "[c]ases [such as *GAMCO*] in which the presumption has been rebutted once it attaches are thus as rare as hen's teeth."  Joseph A. Grundfest, *Damages and Reliance Under Section 10(b) of the Exchange Act*, 69 Bus. Law. 307, 360 (2014).

[72]    In the main, Halliburton offered two core reasons for overturning *Basic*:  (1) evidence suggested that capital markets are no longer fundamentally efficient, and (2) that investors do not universally rely on the integrity of a stock's market price.  *See* 134 S. Ct. at 2409-10.  The Court rejected both of these arguments, the second of which is described in more detail below.

[73]    *Id.* at 2414 (quoting *Haliburton I*, 131 S. Ct. at 2185).

[74]    *Id.* at 2407-08 (quoting *Basic*, 485 U.S. at 242).

reliance on the defendant's misrepresentation, 'individual issues then would . . . overwhelm[] the common ones,' making certification under Rule 23(b)(3) inappropriate."[75]

   Accordingly, the Court clarified that defendants could defeat the *Basic* presumption by "introduc[ing] *price impact evidence at the class certification stage*," reasoning that "[p]rice impact is [] an essential precondition for any Rule 10b-5 class action."[76]   The Court also stressed that

> *Basic* does afford defendants an opportunity to rebut the presumption of reliance *with respect to an individual plaintiff* by showing that he *did not rely on the integrity of the market price in trading stock.*  While this has the effect of "leav[ing] individualized questions of reliance in this case," there is no reason to think that *these questions will overwhelm common ones and render class certification inappropriate* under Rule 23(b)(3).[77]

   In so holding, the Court rejected one of Halliburton's main arguments

---

  [75] *Id.* at 2408 (quoting *Basic*, 485 U.S. at 242).  In the very next sentence of *Halliburton II*, Chief Justice Roberts wrote that the Court established the *Basic* presumption "[t]o address these [class certification] concerns."  *Id.*

  [76] *Id.* at 2414-15, 2416 (emphasis added) ("While *Basic* allows plaintiffs to establish that precondition indirectly, it does not require courts to ignore a defendant's direct, more salient evidence showing that the alleged misrepresentation did not actually affect the stock's market price and, consequently, that the *Basic* presumption does not apply.").

  [77] *Id.* at 2412 (emphasis added) (quoting *id.* at 2424 (Scalia, J., dissenting)).

for abandoning the presumption: that value investors are universally "indifferent to the integrity of market prices."[78]  To the contrary, "*Basic* concluded only that it is reasonable to presume that *most* investors," including value investors, "will rely on the security's market price as an unbiased assessment of the security's value . . . ."[79]  Chief Justice Roberts explained that value investors

> implicitly rel[y] on the fact that a stock's market price will eventually reflect material information—how else could the market correction on which his profit depends occur?  To be sure, the value investor "does not believe that the market price accurately reflects public information *at the time he transacts*."  But to indirectly rely on a misstatement in the sense relevant for the *Basic* presumption, he need only trade stock based on the belief that the market price will incorporate public information within a reasonable period.  The value investor also presumably tries to estimate *how* undervalued or overvalued a particular stock is, and such estimates can be skewed by a market price tainted by fraud.[80]

## 2.    Damages

Section 28(a) of the Securities and Exchange Act provides that "no

---

[78]    *Id.* at 2411 ("*Basic* concluded only that it is reasonable to presume that *most* investors . . . will rely on the security's market price as an unbiased assessment of the security's value . . . .").

[79]    *Id.* (emphasis in original).

[80]    *Id.* (emphasis in original) (quoting *id.* at 2423 (Scalia, J., dissenting)). In reaching this conclusion, the Court considered an amicus curiae brief submitted by Vivendi advancing the value investor argument.  *See id.*

person permitted to maintain a suit for damages under the provisions of this chapter shall recover . . . a total amount in excess of his actual damages on account of the act complained of."[81]  In calculating damages in securities fraud cases, courts usually rely on the out-of-pocket measure of damages, which "consist[s] of the difference between the price paid and the 'value' of the stock when purchased."[82] These damages are capped by a provision in the Private Securities Litigation Reform Act ("PSLRA") known as the "bounce back" provision, which provides that

> the award of damages to the plaintiff shall not exceed the difference between the purchase or the sale price paid . . . by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market.[83]

In *Dura Pharmaceuticals Inc. v. Broudo*, the Supreme Court clarified that in pleading a 10b-5 action, "an inflated purchase price will not itself constitute

---

[81]    15 U.S.C. § 78bb.

[82]    *Acticon A.G. v. China Ne. Petroleum Holdings, Ltd*, 692 F.3d 34, 40 (2d Cir. 2012) (quotation marks and citation omitted).

[83]    15 U.S.C. § 78u-4(e)(1).

or proximately cause the relevant economic loss."[84]  The Court reasoned that "as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value."[85]  Even when a plaintiff sells a security after its price drops following a corrective disclosure of the lie or omission, "that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price."[86]

What *Dura* did not directly consider was "the case of the investor who still holds shares throughout the duration of the lawsuit, or that of the investor who sells at a profit following the corrective disclosure but claims he or she would have made a greater profit absent the misrepresentation or omission."[87]  On this issue, the law in this circuit is somewhat unclear.

---

[84]     544 U.S. 336, 342 (2005) ("[The] logical link between the inflated share purchase price and any later economic loss is not invariably strong.").

[85]     *Id.*

[86]     *Id.* at 343.

[87]     Warren R. Stern & Sarah E. McCallum, *Securities Fraud Damages After* Dura, 8 No. 12 Wallstreetlawyer.com: Sec. Elec. Age 1 (2005).

Before the PSLRA, the Second Circuit followed the path of Judge

Henry Friendly, who held in *Levine v. Seilon, Inc.* that an investor that sustains no

pecuniary loss has suffered no "actual loss," and therefore, "no *compensable* loss"

under the Exchange Act.[88]   The court applied the same reasoning in *Commercial*

*Union Assurance Co. plc v. Milken*, affirming summary judgment for a defendant

in another 10b-5 action where several months after filing their complaint, plaintiffs

recouped "not only their initial investment, but also [] received a 10.2 per cent

return on their capital."[89]   In so holding, the court explained:  "[d]amage is an

essential element of a 10b-5 cause of action that seeks a monetary award.  As

appellants recognize, they have not suffered any direct pecuniary loss under 10b-5 .

. . ."[90]   And, in *Carlisle Ventures, Inc. v. Banco Espanol de Credito*, the Second

Circuit overturned the district court's damages award to an investor in a Spanish

bank that ultimately sold its securities due to the bank's misrepresentations "at a

modest profit."[91]   Applying an earlier 10b-5 case, *Barrows v. Forest Laboratories,*

*Inc.*,[92] the court held that "[b]ecause [plaintiff] recognized a profit from the sale of

---

[88]     439 F.2d 328, 335 (2d Cir. 1971) (emphasis added).

[89]     17 F.3d 608, 631 (2d Cir. 1994).

[90]     *Id.*

[91]     176 F.3d 601, 604 (2d Cir. 1999).

[92]     742 F.2d 54 (2d Cir. 1984).

[defendant's] stock, [plaintiff] did not suffer compensable damages entitling it to recover the difference between the purchase price and the 'true value' of the [defendant's] stock at the time of purchase."[93]

However, in *Acticon AG v. China North East Petroleum Holdings Ltd.*, a 2012 decision informed by *Dura*, the Second Circuit appeared to change course, holding that a stock price's recovery after the class period does not defeat an inference of economic loss at the pleading stage.[94]

> [A] share of stock that has regained its value after a period of decline is not functionally equivalent to an inflated share that has never lost value . . . [because] it is improper to offset gains that the plaintiff recovers after the fraud becomes known against losses caused by the revelation of the fraud if the stock recovers value for completely unrelated reasons. Such a holding would place the plaintiff in a worse position than he would have been absent the fraud. [95]

The court stated that it could not conclude whether it was proper to offset the stock

---

[93]     *Carlisle*, 175 F.3d at 606.  The court also noted that plaintiff could not cite any case "in which a court awarded a purchaser of shares the difference between the purchase price and the actual 'true value' of the shares at the time of purchase when the purchaser had already sold the shares at a profit."  *Id.* at 607.

[94]     *See* 692 F.3d at 36.

[95]     *Id.* at 41.  Significantly, the court also noted that  "[s]ubject to the bounce-back limitation imposed by the PSLRA, a securities fraud action attempts to make a plaintiff whole by allowing him to recover his out-of-pocket damages, that is, the difference between what he paid for a security and the uninflated price." *Id.*

price recovery against plaintiff's losses in determining economic loss because at "[the pleading] stage in the litigation, we do not know whether the price rebounds represent the market's reactions to the disclosure of the alleged fraud or whether they represent unrelated gains."[96]  Notably, the stock price rebounds at issue in *Acticon* occurred within ninety days after the final corrective disclosure was made, and on various days during that period, plaintiff had the opportunity to sell its shares for a net profit.[97]  However, the plaintiff decided to hold its shares, and throughout the bounce back period, the stock's mean trading price never exceeded the plaintiff's initial purchase price.[98]  Eventually, in the following months, the plaintiff sold its shares at a loss.[99]

　　　　Finally, three years ago this Court held that damages in the Class

---

[96]　　*Id.*

[97]　　*See id.* at 36-37.

[98]　　*See id; In re China North East Petroleum Holdings Ltd. Sec. Litig.*, No. 10 Civ. 4577, Dkt. 81.

[99]　　*See In re China North East Petroleum Holdings Ltd. Sec. Litig.*, 819 F. Supp. 2d 351, 353 (S.D.N.Y. 2011).  In this sense, *Acticon* is slightly different from the  *Levine* line of cases, in which plaintiffs *did not lose money* on their investments.  However, *Levine*, *Barrows*, *Milken,* and the precedents on which *Carlise* – itself not a 10b-5 case – relied all predated the enactment of the PSLRA and its bounce back provision.  Further, none of these cases confronted the issue of whether to offset profits from sales of shares occurring more than *five years after* the close of the class period and initiation of the litigation.

Action should be governed by a "partial netting" methodology, such that "only those gains resulting from transactions occurring between the first materialization date and the end of the Class Period will be used to offset losses incurred during that very same period."[100]  Subsequent to the Court's ruling, the parties worked with the Court-appointed claims administrator to implement a damage calculation methodology applicable to all class members, resulting in both class plaintiffs' and Vivendi's approval of claim forms implementing partial netting.  These claim forms did not solicit information about what the class members did with their Vivendi securities after the close of the PSLRA ninety-day bounce back period.[101]

## V.   DISCUSSION

### A.   Vivendi Has Rebutted the *Basic* Presumption Because SAM Was Indifferent to the Fraud

In *GAMCO*, I held that Vivendi rebutted the presumption of reliance "by showing that plaintiffs would have transacted in securities notwithstanding any inflation in their market price caused by fraud."[102]  For SAM, the record in this

---

[100]     *In re Vivendi*, 284 F.R.D. at 159.

[101]     *See* Memorandum of Law in Opposition to Defendant Vivendi, S.A.'s Motion for Summary Judgment ("Pl. Opp.") at 14-15.

[102]     *GAMCO*, 927 F. Supp. 2d at 104.

case is equally strong, if not stronger.[103]  But in light of the Supreme Court's recent holding in *Halliburton II*, which post-dates *GAMCO*, I must consider whether *GAMCO* remains good law and compels the same result in this case.  For the reasons that follow, I find that it does.

To begin, *Basic* and *Halliburton II* must be understood in their proper context.  As Chief Justice Roberts explained in *Halliburton II*, the *Basic* presumption responded to a fear that "'[r]equiring proof of individualized reliance' from every securities fraud plaintiff [at the class certification stage] 'effectively would . . . prevent [] [plaintiffs] from proceeding with a class action' in Rule 10b-5 suits."[104]  "To address th[is] concern" – that "'individual issues [] would . . . overwhelm[] the common ones,' making certification under Rule 23 (b)(3) inappropriate" – *Basic* "invok[ed] a *rebuttable* presumption of reliance."[105]

As a practical matter, the presumption of reliance – once it attaches –

---

[103]    *See, e.g.*, Thompson Dep. at 197:2-17 ("I had it right the whole time. . . . I was not misled on the level of debt."), 182:6 (noting that Vivendi's declining stock price made it a "more attractive" investment).  While the *GAMCO* decision followed a bench trial, the parties here, in cross-moving for summary judgment, have agreed that no facts are in dispute in either party's motion.

[104]    134 S. Ct. at 2407-08 (some alterations in original) (quoting *Basic*, 485 U.S. at 242).

[105]    *Id.* at 2408 (some alterations in original) (emphasis added) (quoting *Basic*, 485 U.S. at 242).

severely limits a securities fraud defendant's ability to defeat class certification on reliance grounds.  But successfully navigating the choppy waters of class certification on a sturdy ship named *Basic* does not guarantee safe passage for the rest of the journey.  Chief Justice Roberts stated:

> *Basic* does afford defendants an opportunity to rebut the presumption of reliance *with respect to an individual plaintiff* by showing that he *did not rely on the integrity of the market price in trading stock*.  While this has the effect of "leav[ing] individualized questions of reliance in this case," there is no reason to think that *these questions will overwhelm common ones and render class certification inappropriate* under Rule 23(b)(3).  That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate.[106]

This is entirely consistent with the posture of Vivendi's motion.  Here, as in *GAMCO*, the class certification determination was made long ago, and all that remains to decide – with the benefit of a full factual record – is whether SAM relied on the integrity of the market in trading Vivendi securities.  It did not.  To the contrary, SAM is one of those "occasional class members" that cannot survive an "individualized rebuttal."[107]  The market price of Vivendi's ADSs was not important to Thompson's calculation of their intrinsic value.  Instead, he relied on

---

[106]    *Id.* at 2412 (emphasis added) (quoting *id.* at 2424 (Scalia, J., dissenting)).

[107]    *Id.*

his own careful assessments of Vivendi's assets and liquidity position, drawing largely from his familiarity with the company's assets and tapping into resources unavailable to the average investor.[108]  Even had Thompson known about the fraud, it would not have mattered to him:  he said that he was "right the whole time" about his calculations and assessments and "was not misled" about Vivendi's debt.[109]  He thought Vivendi's supposed liquidity crisis – the very subject of the fraud – was "overblown."[110]  He did not view any of the nine corrective disclosures as "correcting" any misunderstanding he had about Vivendi's liquidity – SAM did not even start investing in Vivendi until after the fourth (of nine) corrective disclosure was disseminated to the market.[111]

Arguing that SAM relied on the integrity of the market, class plaintiffs advance a narrow reading of *dicta* in *Halliburton II* regarding value investors. Specifically, Chief Justice Roberts stated that for a "value investor . . . to indirectly rely on a misstatement in the sense relevant for the *Basic* presumption, he need

---

[108]	Nor did he necessarily expect the market price of Vivendi's ADSs to reflect his predictions within a short period of time after investing – SAM intended to hold the securities for five years, and ultimately did just that.

[109]	Thompson Dep. at 197:2-17.

[110]	Pl. Mem. at 10.

[111]	*See* Thompson Dep. at 172:19-25.

only trade stock based on the belief that the market price will incorporate public information within a reasonable period."[112]  Read in isolation, this lone statement supports SAM's position.  SAM is a value investor, and it unquestionably believed that the market price of Vivendi's stock would eventually reflect what SAM understood Vivendi's true liquidity position to be.  The very PVR formula SAM used to guide its investment decisions is derived from a company's actual market price, and those decisions are predicated on the hope that the actual market price will move in the direction of the intrinsic value as calculated by SAM.[113]

But here is where the context of *Basic* and *Halliburton II* matters.  If courts, in conducting individualized reliance inquiries *outside of the class certification context*, were bound by the above statement without exception, the *Basic* presumption would become irrebuttable.  *Halliburton II* did not go that far.[114] There is a key difference between relying on the market price of a stock – in the way SAM does in calculating PVR – and relying on the *integrity* of the market price in trading that stock.  All investors rely on the former, and most on the latter – at least indirectly – which is why value investors may invoke the *Basic*

---

[112]     *See Halliburton II*, 134 S. Ct. at 2411.

[113]     *See* Pl. 56.1 ¶ 5; Pl. Mem. at 15.

[114]     *Halliburton II*, 134 S. Ct. at 2408 (noting that the "presumption of reliance [is] rebuttable rather than conclusive").

presumption at the *class certification stage*:  sorting out individual reliance issues

in the context of class certification would spell the end of class action securities

fraud lawsuits.[115]  Yet the very premise of the *Basic presumption* is that not *all*

investors rely on the integrity of the market price.  Chief Justice Roberts even

frames his discussion about value investors by noting that "*most* investors . . . will

rely on the security's market price as an unbiased assessment of [its] value."[116]

*Most* does not mean all.  If it did, then *Halliburton II* would jettison a presumption

in favor of an iron-clad rule – every investor would by default rely on market price

integrity.  SAM, a highly-sophisticated asset manager, is different from *most* value

investors.[117]

Ultimately, *dicta* aside, *Halliburton II* did not disturb a central holding

of *Basic*:  that "[a]ny showing that severs the link between the alleged

---

[115]    *See Halliburton II*, 134 S. Ct. at 2412.

[116]    *Id.* at 2411 (emphasis in original).

[117]    *See id.* (stating that most value investors rely on the integrity of the
market price because they "know[] that they have little hope of outperforming the
market in the long run based solely on their analysis of publicly available
information").  By contrast, believing that it can outperform the market is SAM's
entire *raison d'être*, and in its efforts to do so, it relies on a wealth of information,
experience, and expertise that the average investor lacks.  For instance, Thompson
explained at his deposition that SAM "knew what [Vivendi's assets] really were"
because it "had owned these assets in the past."  Thompson Dep. at 187:20-22.
Thompson also "spoke to and met with Vivendi insiders, such as the CEO and
CFO."  Def. 56.1 ¶ 15.

misrepresentation and either the price received (or paid) by the plaintiff, or [her] decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance."[118]  As detailed above, that link is unquestionably severed here.[119]  And Chief Justice Roberts specifically contemplated the instant case, in which such a factual showing – as it relates to the reliance on the integrity of the market price – may ultimately enable defendants to "pick off the occasional class member," but need not disrupt a finding of predominance at the class certification stage.[120]

To hold otherwise would defy *Halliburton II* and defeat the purpose of the *Basic* presumption.  Taking class plaintiffs' argument to its logical limit, not even investors who trade on inside information, with actual knowledge of the fraud, could truly be said to be indifferent to the integrity of the market price – their end game is to make a profit after the truth is revealed, as reflected in the market price.  Yet *Halliburton II* confirms that a plaintiff who buys or sells a stock with knowledge that the stock price was tainted by fraud is not entitled to the

---

[118]     *Basic*, 485 U.S. at 248-49.

[119]     *See, e.g.*, Thompson Dep. at 197:2-17 (stating that Thompson was "right the whole time" and "not misled" by Vivendi's statements concerning its level of debt).

[120]     *See Halliburton II*, 134 S. Ct. at 2412.

presumption.[121]  The same treatment must apply to a sophisticated institutional

investor whose own specialized knowledge and advanced research rendered it

completely indifferent to the fraud.[122]

This holding does not give blanket protection to securities fraud

defendants against sophisticated investors.  It is easy to imagine a situation in

which an institutional investor is legitimately duped by a fraud and loses a

substantial sum of money as a result.  These simply are not the facts here.  The

fraud, and its disclosure, had only a positive impact on SAM.

No matter how a class member investor is categorized, the

*Basic* presumption subjects that investor to the risk of an "individualized rebuttal"

outside of the class certification context.[123]  SAM cannot survive Vivendi's

individualized rebuttal as a matter of law because the undisputed facts demonstrate

---

[121]    *See id.* at 2408.

[122]    Class plaintiffs' argument that Thompson's concern about Vivendi's
liquidity being worse than he had thought, based on a post-Class Period meeting
with Vivendi's CEO and CFO, cannot possibly support their claims.  Class
plaintiffs' theory at trial was that the concealed liquidity risk was fully revealed by
August 14, 2002, the last day of the Class Period.  Whatever liquidity issue that
gave Thompson pause at a meeting over a month later could not be the same
liquidity issue at the heart of the Class Action.  In any case, SAM continued to
invest in Vivendi well after the Class Period ended, holding over forty-five percent
of Vivendi's total outstanding ADSs by the end of 2002.

[123]    *Halliburton II*, 134 S. Ct. at 2412.

that SAM was indifferent to the fraud.  Accordingly, the Court grants summary judgment to Vivendi on the claims submitted by SAM and its clients.

### B.   But for Its Lack of Reliance, SAM Would Be Entitled to Damages

The separate ground on which Vivendi moves for summary judgment – that SAM has not suffered compensable damages – is mooted by SAM's failure to prove reliance, a required element of its claims for relief.  Therefore, I make no finding regarding the claim administrator's calculation of damages, a figure Vivendi may wish to challenge if my reliance ruling is reversed.  But if the case is remanded for that reason, I now conclude that SAM and its clients and advisees have sustained damages under Rule 10b-5.

In light of the PSLRA and *Dura*, it is inappropriate to take notice of gains resulting from sales of Vivendi shares occurring more than *five years after the close of the class period*, as Vivendi urges.  The bounce back provision of the PSLRA caps damages by factoring in gains that occur within *ninety days* after a corrective disclosure.  It is hard to imagine that stock price movements occurring well after the bounce back period are still attributable to the disclosure of the fraud.[124]  Indeed, *Acticon* confirms the general out-of-pocket damages rule in 10b-5 cases:  that "[s]ubject to the [bounce back provision], a securities fraud action

---

[124]   *See Acticon*, 692 F.3d at 41.

attempts to make a plaintiff whole by allowing him to recover his out-of-pocket damages, that is, the difference between what he paid for a security and the uninflated price."[125]

Acticon expressly states that limiting damages by offsetting losses with gains that occur "*at some point* after the final corrective disclosure" is "inconsistent with both the traditional out-of-pocket measure for damages and the 'bounce back' cap imposed in the PSLRA."[126]  To be sure, "if the mean trading price of a security during the [bounce back period] is greater than the price at which the plaintiff purchased his stock[,] then that plaintiff would recover nothing."[127]  But that is only true under that specific condition – *i.e.* where the mean trading price during the bounce back period is greater than the plaintiff's purchase price.[128]  Here, the mean trading price of the Vivendi ADSs during the bounce back period following the final corrective disclosure has been used to

---

[125]     *Id.*

[126]     *Id.* at 39 (emphasis added).

[127]     *Id.* (citation and quotation marks omitted).

[128]     *See id.* at 39-41.  And, plaintiffs are not required to sell their shares during that period, even on the isolated days when they could make a profit from doing so.  *See id.*

calculate damages as required by the governing statute, 15 U.S.C. § 78u-4(e)(1).[129]

But the important point is that the mean trading price during the bounce back

period never exceeded the inflated prices at which SAM purchased the stock

during the Class Period.[130]  *Acticon* states, unequivocally, that when "the mean

trading price during the [bounce back] period is less than the plaintiff's purchase

price, then the plaintiff may recover out-of-pocket damages up to the difference

between her purchase price and the mean trading price."[131]  Over the Class Period,

the claims administrator determined that total amount to be fifty-seven million

dollars.

> Nor did *Acticon* alter "'decades of precedent both before and after the

enactment of the PSLRA' that plaintiffs holding shares at the time of suit 'have not

been precluded from maintaining securities fraud actions.'"[132]  SAM did not sell its

---

[129]    *See* 5/12/10 Declaration of Dr. William L. Silber on the Method of
Calculating Class Member Damages, Ex. A to Class Plaintiffs' Supplemental
Memorandum Concerning Damages in Further Opposition to Defendant's Motion
for Summary Judgment Rejecting the Claims of Class Members Advised by
Southeastern Asset Management ¶ 18.

[130]    SAM did not suffer losses stemming from its purchase of Vivendi
ADSs on the *final day* of the Class Period, by which point the fraud was fully
disclosed, thereby eliminating any inflation in the stock price.

[131]    *Acticon*, 692 F.3d at 39.

[132]    *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d
596, 611 (S.D.N.Y. 2009) (quoting *In re Royal Dutch/Shell Transp. Sec. Litig.*, 404

shares until at least five years after the commencement of the Class Action and the

final corrective disclosure, and the eventual profit it made on its initial investment

did not include extra compensation for the out-of-pocket loss it sustained by

purchasing Vivendi ADSs at inflated prices during the Class Period.

Vivendi's approach to defining 10b-5 damages – which relies

exclusively on pre-PSLRA case law – defies the statutory scheme and would create

a dangerous precedent.  There must be some time limit when considering post-

class period stock price movements for the purpose of calculating damages.

Otherwise, general market forces could effectively provide shelter for all 10b-5

defendants, provided that the plaintiffs they defraud hold their investments well

past the close of the class period.  Conceivably, a stock could fully regain value

within ninety days after a final corrective disclosure, eliminating compensable

damages under the PSLRA.  But a full recovery might also take one year, five

years, ten years, or more:  Imagine if a plaintiff's entitlement to damages varied

---

F.Supp. 2d 605, 611 (D.N.J. 2005)).  "While the Second Circuit has not decided
the issue specifically," courts have long adhered to the position that "plaintiff need
not allege subsequent sales of the securities purchased at inflated prices in order
adequately to allege an economic loss for purposes of loss causation." *Prime
Mover Capital Partners, L.P. v. Elixir Gaming Techs., Inc.*, 793 F. Supp. 2d 651,
664 n.66 (S.D.N.Y. 2011).  *Cf. Merrill Lynch, Pierce, Fenner & Smith Inc. v.
Dabit*, 547 U.S. 71, 88-89 (2006) (holding that state law class action securities
fraud claims brought by "holders" of securities are, just like those of "purchasers"
and "sellers," preempted by the Securities Litigation Uniform Standards Act).

throughout the pendency of a suit.  A district court awards damages to a plaintiff that held its shares through trial, and as of the verdict, the price of the shares is still below plaintiff's purchase price.  Later, during the pendency of an appeal, plaintiff finally sells its shares at a net profit, capitalizing on an increase in the stock price.  Would the date of the ultimately profitable sale become the appropriate date to assess damages?  How long must a plaintiff wait before its damages can be assessed?[133]  Vivendi's answer to that question is contrary to both common sense and the law.  It would be absurd to hold that a defrauded plaintiff cannot recover any damages from a defendant because ten years after the close of the class period the stock price finally eclipsed the plaintiff's initial purchase price, prompting him to liquidate his holdings and achieve a net positive return on his investment.  Yet this hypothetical fits within Vivendi's theory of damages, under which a court would be required to ignore a verdict in plaintiff's favor because the plaintiff refused to dump his shares at a loss in the immediate aftermath of the fraud.[134]

---

[133]    Surely, if the facts in this case were reversed, and Vivendi's stock spiraled downward five years after the fraud – costing SAM much more money than its initial fifty-seven million dollar loss – Vivendi would not accept responsibility for a loss occurring years after the close of the class period and the last corrective disclosure.

[134]    To be fair, Vivendi's position is not completely without merit.  Awarding damages to a plaintiff that has made a substantial profit from an investment tainted by fraud is troubling.  But in cases where this problem seems particularly salient, it may in fact be moot, as evidenced by this Order.  When a

SAM was under no such obligation.[135]

Finally, that the plaintiff in *Acticon*, unlike SAM, eventually sold its shares for a loss, is irrelevant.  In both cases, plaintiffs sustained out-of-pocket damages by purchasing shares at inflated prices and holding them beyond ninety days after the final corrective disclosures were issued, without being made whole during that period through a profitable sale or a mean trading price during that period that exceeded their purchase price.[136]

It must be noted that there is room for the Second Circuit to clarify the law.  The concluding sentences of *Acticon* are problematic inasmuch as they can be interpreted to permit a court to look beyond the ninety-day bounce back period to

---

plaintiff is indifferent to misstatements and hatches a long-term investment plan at the end of the class period, tangentially benefitting from the fraud, the extent of his damages – if any – will not matter due to his lack of reliance.

[135]   *See Acticon*, 692 F.3d at 39-41; *Varghese*, 672 F. Supp. 2d at 611.

[136]   In fact, the Second Circuit's *Acticon* ruling does not even mention that the plaintiff ultimately sold shares at a loss.  That information was contained only as background *in the district court decision* that the Second Circuit overturned.  Instead, the Second Circuit inferred economic loss strictly on the basis that when "the mean trading price during the [bounce back] period is less than the plaintiff's purchase price, then the plaintiff may recover out-of-pocket damages up to the difference between her purchase price and the mean trading price."  *Acticon*, 692 F.3d at 39.

determine the significance of a stock price recovery.[137]  Indeed, defendants urge

that interpretation here!  Further, as Vivendi stresses, the Second Circuit has never

overturned a line of precedent stating that a plaintiff does "not suffer compensable

damages [when] it recoup[s] its entire investment as well as a small profit."[138]  This

follows from the words of the statute, which provides that no 10b-5 plaintiff may

recover "a total amount in excess of his *actual damages* on account of the act

complained of."[139]

       But ultimately, class plaintiffs have not identified any case, since the

passage of the PSLRA, that would allow damages to be offset by gains realized

*years* after the close of the bounce back period.  That is so for two good reasons.

*First*, it would be contrary to the unambiguous language of the PSLRA, which

does not permit a court to look beyond the ninety day post-disclosure period when

---

[137]    *See id.* at 41 ("At this stage in the litigation, we do not know whether the price rebounds represent the market's reactions to the disclosure of the alleged fraud or whether they represent unrelated gains.  We thus do not know whether it is proper to offset the price recovery against Acticon's losses in determining Acticon's economic loss.").

[138]    *Carlisle*, 176 F.3d at 607.  This approach conflicts with that of the Seventh Circuit, which has held that a plaintiff who purchased shares at an inflated purchase price but sold them at a higher price is not "disqualif[ied] from recovering any loss" because his profit could have been higher.  *Rand v. Monsanto Co.*, 926 F.2d 596, 597 (7th Cir. 1991).  The Supreme Court has yet to resolve the disagreement.

[139]    15 U.S.C. § 78bb (emphasis added).

calculating damages. *Second*, 10b-5 cases are usually either dismissed on a dispositive motion or settled. Since the enactment of the PSLRA, only fifteen cases have been tried to verdict – only three of which were within the Second Circuit (including this one).[140] Thus, courts have had little or no opportunity to discuss individual damages awards following a class-wide verdict in a 10b-5 case.

## VI.   CONCLUSION

For the foregoing reasons, Vivendi's motion for summary judgment is GRANTED, and the class plaintiffs' motion for summary judgment is DENIED. The Clerk of Court is directed to close these motions (Docket Nos. 1241 and 1243).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           August 11, 2015

---

[140]     *See* Dr. Renzo Comoli & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2014 Full-Year Review*, NERA Economic Consulting (Jan. 20, 2015), *available at* http://www.nera.com/content/dam/nera/publications/2015/Full_Year_Trends_2014 _0115.pdf. The latest such case was *In re Longtop Fin. Techs. Sec. Litig.*, No. 11 Civ. 3658 (S.D.N.Y. 2014) (Scheindlin, J.).

**- Appearances -**

**Lead Counsel for Class Plaintiffs:**

Arthur N. Abbey, Esq.
Stephen T. Rodd, Esq.
Jeremy Nash, Esq.
Abbey Spanier LLP
212 East 39th Street
New York, NY 10016
(212) 889-3700

**For Class Plaintiffs:**

Matthew Gluck, Esq.
Michael C. Spencer, Esq.
Milberg LLP
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300

Brian C. Kerr, Esq.
Brower Piven, P.C.
488 Madison Avenue, 8th Floor
New York, NY 10022
(212) 501-9000

**For Defendant:**

James W. Quinn, Esq.
Miranda S. Schiller, Esq.
Gregory Silbert, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue, 25th Fl.
New York, NY 10153
(212) 310-8000