UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

IN RE VIVENDI UNIVERSAL, S.A.
SECURITIES LITIGATION

------------------------------------------------------X

SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/25/16

**OPINION AND ORDER**

**02-cv-5571 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

The only core dispute remaining in this fourteen-year old securities fraud class action (the "Class Action") — decided in class plaintiffs' favor at trial — concerns whether certain, sophisticated members of the class actually relied on defendant Vivendi Universal, S.A.'s ("Vivendi" or the "Company") misstatements in trading its stock.[1] The Class Action concerns transactions in Vivendi's ordinary shares, or American Depositary Receipts ("ADRs" or "ADSs") representing those shares, which traded on the New York Stock Exchange from October 30, 2000 through August 14, 2002 (the "Class Period").

---

[1]    The Court established procedures for a post-trial claims administration process whereby class members could submit claims against Vivendi, and Vivendi could interpose individualized challenges, including on the basis of a claimant's lack of reliance or damages. *See In re Vivendi Universal, S.A. Secs. Litig.*, 284 F.R.D. 144, 155 (S.D.N.Y. 2012).

In April 2015, it was agreed that Vivendi was entitled to reliance discovery of the investment advisors of certain claimants.  Vivendi conducted discovery of only two such investment advisors:  Southeastern Asset Management ("SAM") and Capital Guardian Trust Company ("Capital Guardian").

In May 2015, class plaintiffs moved for summary judgment on behalf of SAM and its clients and advisees, asking the Court to accept their claims for damages.  Vivendi cross-moved for summary judgment on those same claims, arguing they should be denied because SAM neither relied on Vivendi's misstatements nor sustained any damages resulting from the fraud.  In August 2015, this Court denied class plaintiffs' motion and granted Vivendi's motion, ruling that Vivendi had rebutted *Basic*'s reliance presumption by showing that SAM was not misled about the Company's debt and believed that the Company's intrinsic value would be realized when it began liquidating its assets.[2]

Before the Court now is Vivendi's motion for summary judgment with respect to all claims for which Capital Guardian made the decision to invest in Vivendi common shares and ADRs.  For the following reasons, Vivendi's motion for summary judgment is GRANTED.

---

[2]     *See In re Vivendi Universal, S.A. Secs. Litig.*, 123 F. Supp. 3d 424 (S.D.N.Y. 2015).

## II.    BACKGROUND[3, 4]

### A.    Capital Guardian Discovery

At a March 30, 2016 conference, Vivendi reported that it had experienced difficulties in securing certain discovery materials from Capital Guardian.  Vivendi alleged that Capital Guardian had refused to produce relevant trading records and investor communications relating to its Vivendi investments, and had not allowed Vivendi to depose John Longhurst, the former Capital Guardian shareholder and analyst responsible for making the "investment recommendations that resulted in the [Capital Guardian] Transactions" at issue in this case.[5]  The Court then ordered that Capital Guardian produce relevant

---

[3]     Familiarity with the extensive factual and legal background of this litigation is presumed.  Accordingly, this Opinion recites only those facts pertinent to the instant motion.

[4]     The following undisputed facts are drawn from Vivendi's Local Rule 56.1 Statement ("Def. 56.1") and Plaintiff's Response to Vivendi's Local Rule 56.1 Statement ("Pl. Reply 56.1"), as well as from the parties' legal memoranda, declarations, and exhibits attached thereto.  I note that plaintiffs have indicated that they "lack any basis for confirming or denying" certain assertions, relating to non-party Capital Guardian or its affiliates, that are contained in Vivendi's Local Rule 56.1 Statement.  Pl. Reply 56.1 at 1.  However, many such assertions are confirmed by corroborating documentation and plaintiffs' objections to any assertions cited by this Opinion are overruled.

[5]     Def. 56.1 ¶ 10 (quoting 7/22/15 Capital Interrogatory Response, Ex. H to Declaration of Defense Counsel Miranda Schiller, Esq. in Support of Defendant Vivendi S.A.'s Motion for Summary Judgment ("Schiller Decl."), at 4).

documents to Vivendi and make Longhurst available to Vivendi for a three hour telephonic deposition.

Capital Guardian continued to refuse to produce its Vivendi trading records, informed Vivendi that there were no investor communications describing its Vivendi investments,[6] and explained that Longhurst was available for a one hour deposition only.[7]  On April 11, 2016, Vivendi conducted a one hour telephonic deposition of Longhurst.[8]

**B.     Capital Guardian's Vivendi Investments**

**1.     Investment Approach**

The Capital Group Companies, Inc. ("Capital") is the parent

---

[6]     Plaintiffs maintain that Vivendi had access to Capital Guardian's trading records as this information was provided to all counsel from Garden City Group, and attach a table summarizing the relevant Capital Guardian trades to their Opposition Brief.  *See* Plaintiffs' Memorandum in Opposition to Vivendi's Motion for Summary Judgment Rejecting Claims by Class Members Advised by Capital Guardian Trust Co. ("Pl. Mem.") at 3; List of Capital Guardian Advised Claims at Issue, Ex. A to Pl. Mem.

[7]     *See* Schiller Decl. ¶ 6.

[8]     *See id.*  Vivendi states that, due to technical difficulties in taking Longhurst's telephonic deposition, its counsel had less than one hour to actually question him.  *See* Memorandum of Law in Support of Defendant Vivendi, S.A.'s Motion for Summary Judgment (citing 4/11/16 Transcript of Deposition of John Q. Longhurst (Excerpted) ("4/11/16 Longhurst Dep."), Exs. F, G to Schiller Decl., at 4, 27, 33, 48-49, 51-52).

company for Capital Guardian and several other investment funds.[9]  The claims at issue were submitted by ten institutional clients of Capital Guardian, for whom Capital Guardian made investment decisions.[10]  These claimants seek damages in the amount of $1,859,406 plus interest.[11]  Neither Capital nor any of its investment funds submitted claims against Vivendi.[12]

> Capital described its investment approach as follows:

> Our investment professionals seek to identify securities that can do well over several years, by using fundamental analysis and paying close attention to valuations.  While this approach can often involve taking a stance that is odds with market consensus, the expectation is that new information will come to light that validates our opinions and steers the consensus view in our favour.[13]

> Likewise, Capital described its research approach as a "boots-on-the-ground, company-by-company approach to assess value. . . . As part of our research, we establish long term relationships with company management to better

---

[9]       *See* Def. 56.1 ¶ 1.

[10]      *See id.* ¶ 2.

[11]      *See id.*

[12]      *See id.*

[13]      *Id.* ¶ 12 (quoting Screenshot of Capital Group Website, Ex. K to Schiller Decl., at CAP071).

understand the Company and assess its quality."[14]  During his deposition,

Longhurst corroborated that this was, in fact, Capital's investment approach.[15]

### 2.    Vivendi Holdings

As of August 2002, near the end of the Class Period, Capital's

investment funds held approximately one billion dollars of Vivendi common

shares and ADRs.[16]  By that time, Capital Guardian was the single largest

institutional investor in Vivendi, holding 60,743,664 shares and ADRs —

equivalent to 5.58 percent of the Company's equity.[17]  Even after the Class Period,

the Capital funds continued acquiring Vivendi shares and ADRs:  in December

2003, Capital filed a Schedule 13G disclosing that it had increased its position to

eight percent of the Company's equity (beneficially owning over seventy-one

million Vivendi common shares and ADRs).[18]

### 3.    Longhurst

While making Vivendi investment recommendations at Capital

---

[14]    *Id.* ¶ 11 (quoting 7/22/15 Capital Interrogatory Response at 4).

[15]    *See id.  See also* 4/11/16 Longhurst Dep. at 11:3.

[16]    *See* Def. 56.1 ¶ 11.

[17]    *See id.* ¶ 4.

[18]    *See id.* ¶¶ 6-7.

Guardian, Longhurst engaged in a "sum of the parts" valuation of the Company.[19]

In March 2001, Longhurst prepared a three-year projection that estimated that

Vivendi's debt would increase from approximately €23 billion to €29.8 billion by

2003-2004[20] and predicted that Vivendi would need to sell assets in order to

address its liquidity needs.[21]

  To acquire insight into the Company, Longhurst maintained a regular

dialogue with Vivendi's senior management.[22]  He spoke with the Company's

Investor Relations Director daily, and with its Chief Financial Officer and Chief

Executive Offer "very regularly . . . probably around once a week."[23]  Longhurst

also attended multiple one-on-one meetings with Vivendi management in Paris.[24]

## III. LEGAL STANDARD

  Summary judgment is appropriate where, "viewing the record in the

---

[19] *Id.* ¶ 19.  *Accord* 3/27/01 Longhurst Vivendi Valuation Summary (Filed Under Seal) "3/27/01 Vivendi Valuation"), Ex. J to Schiller Decl., at CAP012.

[20] *See* 3/27/01 Vivendi Valuation at CAP012.

[21] *See* Def. 56.1 ¶ 19.

[22] *See id.* ¶ 13 (citing, *inter alia*, 4/11/16 Longhurst Dep. at 11:21-13:22).

[23] *Id.* (quoting 4/11/16 Longhurst Dep. at 13:6-8).

[24] *See id.*

light most favorable to the non-moving party[,] . . . 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[25] "In making this determination . . . we resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."[26] "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[27]

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact."[28] To defeat a motion for summary judgment, the non-moving party must "'do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation.'"[29]

─────────────

[25]   *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting Fed. R. Civ. P. 56(a)) (quotation marks and citation omitted).

[26]   *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015) (quotation marks and citation omitted).

[27]   *Windsor v. United States*, 699 F.3d 169, 192 (2d Cir. 2012), *aff'd*, 133 S. Ct. 2675 (2013) (quotation marks, citation, and alterations omitted).

[28]   *Crawford v. Franklin Credit Mgmt. Corp*., 758 F.3d 473, 486 (2d Cir. 2014) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

[29]   *Robinson*, 781 F.3d at 44 (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).

"'The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists.'"[30] "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"[31]

## IV.   APPLICABLE LAW

### A.   Section 10(b) of the Securities and Exchange Act and Rule 10b-5

Section 10(b) of the Securities and Exchange Act makes it illegal to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ."[32] Under Rule 10b-5, promulgated under Section 10(b), one may not "make any untrue statement of a material fact or [] omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made,

---

[30]     *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (quoting *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)).

[31]     *Crawford*, 758 F.3d at 486 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

[32]     15 U.S.C. § 78j(b).

not misleading . . . in connection with the purchase or sale of any security."[33]  "To sustain a private claim for securities fraud under Section 10(b), 'a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"[34]

## B.   Reliance and the *Basic* Presumption

The reliance and loss causation elements of a securities fraud claim are analogous to but-for and proximate causation, respectively.[35]  To prove reliance, the plaintiff must show that but for the material misleading statement or omission, she would not have transacted in the security.  "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that [s]he was aware of a company's statement and engaged in a relevant transaction — *e.g.*, purchasing

---

[33]     17 C.F.R. § 240.10b-5.

[34]     *Halliburton Co. v. Erica P. John Fund* ("*Halliburton II*"), 134 S. Ct. 2398, 2406 (2014) (quoting *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S. Ct. 1184, 1192 (2013)).  *Accord Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"), 131 S. Ct. 2179, 2184 (2011).

[35]     *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 106 (2d Cir. 2007).

common stock — based on that specific misrepresentation."[36]

In *Basic v. Levinson*, the Supreme Court held that, under certain circumstances, a class action plaintiff is entitled to a rebuttable presumption (the "*Basic* presumption") that she relied on the integrity of the market price of a security.[37]  Specifically, the Court held that an investor who bought stock at the market price may, at the class certification stage, avail herself of the presumption that she "relied on the integrity of the price set by the market" if the market is efficient.[38]  The Court reasoned that "[b]ecause most publicly available information is reflected in [the] market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action."[39]  As long as the "plaintiffs can show that the alleged misrepresentation was *material* and publicly transmitted into a well-developed market, then reliance will be presumed . . . ."[40]  *Basic*'s holding obviated the need for a securities fraud class action plaintiff to show that she personally was aware of, and relied on, the

---

[36]     *Halliburton I*, 131 S. Ct. at 2185.

[37]     485 U.S. 224, 247 (1988).

[38]     *Id.* at 227.  Market efficiency is not in dispute.

[39]     *Id.* at 247.  *Accord Hevesi v. Citigroup Inc.*, 366 F.3d 70, 77 (2d Cir. 2004).

[40]     *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 483 (2d Cir. 2008) (emphasis added).

alleged material misrepresentation.[41]

Critically, *Basic* emphasized that the "presumption of reliance was rebuttable rather than conclusive."[42]  Therefore, "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or [her] decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance."[43]  One way to "sever the link" is to demonstrate that the alleged misrepresentation did not impact the market price.  For example, a defendant could show that the misstatement was known to be false by market makers,[44] or that a statement correcting the misrepresentation was made to, and digested by, the market.[45]  Another way to sever the link is to show that the investor did not "rely on the integrity of the market price in trading stock."[46]

It was for this second reason that the Court entered judgment in

---

[41]    *See Halliburton I*, 131 S. Ct. at 2185 (noting that the holding of *Basic* was made in response to the evidentiary issues posed by modern impersonal markets, as well as the difficulty of class certification where direct proof of reliance was required).

[42]    *Halliburton II*, 134 S. Ct. at 2408.

[43]    *Basic*, 485 U.S. at 248-49.

[44]    *See id.* at 248.

[45]    *See id.*

[46]    *Halliburton II*, 134 S. Ct. at 2412.

February 2013 for Vivendi in an individual, reliance-based action brought by GAMCO investors following the class-wide jury verdict.[47]  In *GAMCO*, I found that Vivendi rebutted the fraud-on-the-market presumption because "Vivendi's liquidity crisis was irrelevant to [GAMCO's] decision to purchase Vivendi securities during the Relevant Period."[48]  There, Vivendi offered evidence that GAMCO — a sophisticated value investor — did not rely on the integrity of the market price of Vivendi's shares in buying them during the Class Period.[49]

Specifically, I found that "the liquidity crisis at Vivendi was irrelevant to [GAMCO's] investment decisions, except to the extent that each corrective disclosure made Vivendi a more attractive investment."[50]  In so holding, I emphasized that *GAMCO* "is sharply limited to its unusual facts, and should not be taken to suggest that sophisticated institutional investors or value-based investors are not entitled to the fraud on the market presumption in general."[51]

### 1.    *Halliburton II*

---

[47]    *See GAMCO Investors, Inc. v. Vivendi, S.A.*, 927 F. Supp. 2d 88, 100 (S.D.N.Y. 2013).  That decision is currently on appeal, and oral argument was held on March 3, 2016.

[48]    *Id.* at 97.

[49]    *See id.*

[50]    *Id.*

[51]    *Id.* at 102.

One year after my *GAMCO* ruling, the Supreme Court revisited —
and reaffirmed — the fraud-on-the-market presumption in *Halliburton II*, declining
defendants' request to overturn *Basic*.[52]  Writing for the majority, Chief Justice
John G. Roberts emphasized that "*Basic* itself 'made clear that the presumption
was just that, and could be rebutted by appropriate evidence.'"[53]  Significantly, in
explaining the need to retain the *Basic* presumption, the Court pointed to a
fundamental tenet of *Basic*:  to permit plaintiffs to "'proceed[] [as a] class' in Rule
10b-5 suits."[54]  As the Chief Justice noted, "[i]f every plaintiff had to prove direct
reliance on the defendant's misrepresentation, 'individual issues then would . . .
overwhelm[] the common ones,' making certification under Rule 23(b)(3)
inappropriate."[55]

Accordingly, the Court clarified that defendants could defeat the
*Basic* presumption by "introduc[ing] price impact evidence at the class certification

---

[52]    Halliburton offered two core reasons for overturning *Basic*:  (1) that
evidence suggested that capital markets are no longer fundamentally efficient, and
(2) that investors do not universally rely on the integrity of a stock's market price.
*See* 134 S. Ct. at 2409-10.  The Supreme Court rejected both of these arguments,
the second of which is described in more detail below.

[53]    *Id.* at 2414 (quoting *Haliburton I*, 131 S. Ct. at 2185).

[54]    *Id.* at 2407-08 (quoting *Basic*, 485 U.S. at 242).

[55]    *Id.* at 2408 (quoting *Basic*, 485 U.S. at 242).

-14-

stage," reasoning that "[p]rice impact is [] an essential precondition for any Rule 10b-5 class action."[56]  The Court also stressed that

> *Basic* does afford defendants an opportunity to rebut the presumption of reliance *with respect to an individual plaintiff* by showing that he *did not rely on the integrity of the market price in trading stock*.  While this has the effect of "leav[ing] individualized questions of reliance in this case," there is no reason to think that these questions will overwhelm common ones and render class certification inappropriate under Rule 23(b)(3).[57]

In so holding, the Court rejected one of Halliburton's main arguments for abandoning the presumption:  that value investors are *universally* "indifferent to the integrity of market prices."[58]  To the contrary, "*Basic* concluded only that it is reasonable to presume that *most* investors," including value investors, "will rely on the security's market price as an unbiased assessment of the security's value . . . ."[59]  Chief Justice Roberts further explained that value investors

> implicitly rel[y] on the fact that a stock's market price will eventually reflect material information — how else could

---

[56]    *Id.* at 2414-15, 2416.

[57]    *Id.* at 2412 (emphasis added) (quoting *id.* at 2424 (Scalia, J., dissenting)).

[58]    *Id.* at 2411 ("*Basic* concluded only that it is reasonable to presume that *most* investors . . . will rely on the security's market price as an unbiased assessment of the security's value . . . .").

[59]    *Id.* (emphasis in original).

the market correction on which his profit depends occur? To be sure, the value investor "does not believe that the market price accurately reflects public information *at the time he transacts*." But to indirectly rely on a misstatement in the sense relevant for the *Basic* presumption, he need only trade stock based on the belief that the market price will incorporate public information within a reasonable period. The value investor also presumably tries to estimate *how* undervalued or overvalued a particular stock is, and such estimates can be skewed by a market price tainted by fraud.[60]

## 2.    SAM Decision

As explained, in *GAMCO* I held that Vivendi had rebutted the presumption of reliance "by showing that plaintiffs would have transacted in securities notwithstanding any inflation in their market price caused by fraud."[61] For SAM, another value investor, I observed that the record of its indifference to the fraud was "equally strong, if not stronger."[62] However, in light of the Supreme Court's intervening *Halliburton II* decision, evaluating SAM's reliance required consideration of whether *GAMCO* remained good law and compelled the same result with respect to SAM. I concluded that it did because, consistent with *Halliburton II*, SAM did not

---

[60]    *Id.* (emphasis in original) (quoting *id.* at 2423 (Scalia, J., dissenting)). In reaching this conclusion, the Court considered an amicus curiae brief submitted by Vivendi advancing the value investor argument. *See id.*

[61]    *GAMCO*, 927 F. Supp. 2d at 104.

[62]    *In re Vivendi*, 123 F. Supp. 3d at 435.

rely on the integrity of the market in trading Vivendi securities.[63]  Rather, SAM was one of those "occasional class members" that cannot survive an "individualized rebuttal" outside of the class certification context.[64]  In so finding, I observed that

> [t]he market price of Vivendi's ADSs was not important to [SAM's] calculation of their intrinsic value.  Instead, [SAM] relied on [its] own careful assessments of Vivendi's assets and liquidity position, drawing largely from [its] familiarity with the company's assets and tapping into resources unavailable to the average investor.  Even had [SAM] known about the fraud, it would not have mattered to [it]. . . . [SAM] thought Vivendi's supposed liquidity crisis — the very subject of the fraud — was overblown.  [SAM] did not view any of the nine corrective disclosures as correcting any misunderstanding [it] had about Vivendi's liquidity — SAM did not even start investing in Vivendi until after the fourth (of nine) corrective disclosure[s] was disseminated to the market. . . .
>
> *Halliburton II* confirms that a plaintiff who buys or sells stock with knowledge that the stock price was tainted by fraud is not entitled to the presumption. . . . The same treatment must apply to a sophisticated institutional investor whose own specialized knowledge and advanced research rendered it completely indifferent to the fraud.
>
> This holding does not give blanket protection to securities fraud defendants against sophisticated investors.  It is easy to imagine a situation in which an institutional investor is legitimately duped by a fraud and loses a substantial sum of money as a result.  These simply are not the facts here.  The fraud, and its disclosure, had only a positive impact on SAM.[65]

---

[63]    *See id.* at 436.

[64]    *Id.* (quoting *Halliburton II*, 134 S. Ct. at 2412).

[65]    *Id.* at 437-38 (quotation marks and record citations omitted).

## V.    DISCUSSION

Plaintiffs do not dispute that Vivendi's Capital Guardian motion raises substantially the same issues as its prior motion challenging SAM's individual reliance.[66]  Nor do plaintiffs dispute that most of their arguments have been previously considered and rejected by this Court.[67]  Accordingly, for similar reasons as I have already articulated with respect to SAM, I find that Vivendi has rebutted the *Basic* presumption because Capital Guardian was indifferent to the fraud.[68]

As was the case for SAM, the market price of Vivendi common shares and ADRs was not important to Capital Guardian's assessment of their value. Rather, Longhurst (acting for Capital Guardian) pursued an investment strategy that relied on his own, carefully researched evaluation of Vivendi's assets and liquidity[69] — which "dr[ew] largely from his familiarity with the [C]ompany's assets and tapp[ed] into resources unavailable to the average investor."[70]  In fact,

---

[66]    *See* Pl. Mem. at 2.

[67]    *See id.* at 2, 8, 11.

[68]    *See In re Vivendi*, 123 F. Supp. 3d at 436-38.

[69]    *See* Def. 56.1 ¶¶ 11-13.

[70]    *In re Vivendi*, 123 F. Supp. 3d at 436.  *Accord id.* at 437 ("[T]he very premise of the *Basic* presumption is that not all investors rely on the integrity of the market price." (emphasis omitted)).

Capital Guardian arguably presents an even stronger instance of an indifferent value investor (notwithstanding the limited discovery about Capital Guardian's Vivendi investments that has been provided to defendants):  Longhurst had regular meetings and telephone conversations with Vivendi's senior management throughout the Class Period — a level of access that SAM apparently did not have.[71]

Accordingly, like SAM's, Capital Guardian's "sum-of-the-parts" investment strategy was based on Longhurst's understanding and acceptance of Vivendi's liquidity risks.[72]  For example, as early as March 2001 — prior to any of the identified corrective disclosures — Longhurst projected that Vivendi's debt would increase from approximately 23 billion Euros to 29.8 billion Euros by 2003-2004.[73]  Likewise, Longhurst predicted that Vivendi would need to sell assets in order to address its liquidity needs.[74]  And relying on Longhurst's assessment, Capital chose to increase its already-substantial Vivendi position even beyond the end of the Class Period.[75]

---

[71]   *See* Def. 56.1 ¶¶ 13-14.

[72]   3/27/01 Vivendi Valuation at CAP012.

[73]   *See id.*

[74]   *See* Def. 56.1 ¶ 19.

[75]   *See id.* ¶¶ 4, 6-7.

-19-

*Basic* holds that "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or [her] decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance."[76] For Capital Guardian's Vivendi investments, this link is unquestionably severed. Because the undisputed facts demonstrate that Capital Guardian was indifferent to the fraud, I conclude that Vivendi has rebutted the *Basic* presumption of reliance with respect to the Capital Guardian claims.

## VI.   CONCLUSION

For the foregoing reasons, Vivendi's motion for summary judgment is GRANTED. The Clerk of Court is directed to close this motion (Dkt. No. 1279).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            April 25, 2016

---

[76]      *Basic*, 485 U.S. at 248-49.

**- Appearances -**

**Lead Counsel for Class Plaintiffs:**

Arthur N. Abbey, Esq.
Stephen T. Rodd, Esq.
Abbey Spanier LLP
212 East 39th Street
New York, NY 10016
(212) 889-3700

**Counsel For Class Plaintiffs:**

Matthew Gluck, Esq.
Michael C. Spencer, Esq.
Milberg LLP
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300

**For Defendant:**

James W. Quinn, Esq.
Miranda S. Schiller, Esq.
Gregory Silbert, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue, 25th Floor
New York, NY 10153
(212) 310-8000